JAN

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT

OF CALIFORNIA

| | |
|---|---|
| SIEU PHONG NGO, | Case No. |
| Petitioner-Appellant, | (Cal. Supreme Ct. No. S148684) |
| v. | Super Ct. No. M10984 |
| BEN CURRY, Warden, CTF, and DENNIS KENNEALLY, Executive Director of the Board of Parole Hearings (BPH), | |
| Respondent-Appellee. | |

CV 08    0620

FROM THE JUDGMENT OF THE SUPERIOR COURT OF ORANGE COUNTY, THE
HONORABLE KAZUHARU MAKINO, JUDGE PRESIDING

## EXHIBITS IN SUPPORT OF
## PETITION FOR WRIT OF HABEAS CORPUS

Sieu P. Ngo
Correctional Training Facility
Central-Facility
J-07024
P.O. Box 689, B-319U
Soledad, CA 93960-0689

## TABLE OF EXHIBITS

Exhibit A   Transcript of Parole Hearing 2/8/2006 ......... 1

Exhibit B   Transcript of Parole Hearing 5/13/2002 ........71

Exhibit C   Transcript of Parole Hearing 8/3/2004 ....... 139

Exhibit D   Support letter from Donald G. Rubright ...... 206

Exhibit E   Psychological Evaluation 1/23/2002 .......... 210

Exhibit F   Life Prisoner Evaluation 8/2005 ............. 218

Exhibit G   Life Prisoner Evaluation 5/2004 ............. 224

Exhibit H   Life Prisoner Evaluation 5/2002 ............. 232

Exhibit I   Psychological Evaluation 12/27/1996 ......... 238

Exhibit J   Superior Court Minute Order ................. 242

Exhibit K   Court of Appeal Minute Order ................ 244

Exhibit L   California Supreme Court Minute Order ....... 246

# EXHIBIT A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )               CDC Number J-07024
                           )
SIEU NGO                   )      **INMATE**
                           )
_____)        **COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

FEBRUARY 8, 2006

9:58 A.M.

PANEL PRESENT:

Ms. Sandra Bryson, Presiding Commissioner
Mr. Doug Filangeri, Deputy Commissioner

OTHERS PRESENT:

Mr. Sieu Ngo, Inmate
Ms. Tara Rutledge, Attorney for Inmate
Mr. Tom Crofoot, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No      See Review of Hearing
_____  Yes     Transcript Memorandum

**Sue Gerdes, Peters Shorthand Reporting**

2

ii

## INDEX

PAGE

Proceedings......................................... 1

Case Factors........................................ 5

Pre-Commitment Factors.............................. 6

Post-Commitment Factors............................. 12

Parole Plans........................................ 24

Closing Statements.................................. 47

Recess.............................................. 59

Decision............................................ 60

Adjournment......................................... 66

Transcriber Certification........................... 67

--oOo--

3

1

1        **P R O C E E D I N G S**

2        **DEPUTY COMMISSIONER FILANGERI:**  We're on

3    record.

4        **PRESIDING COMMISSIONER BRYSON:**  This is a

5    Subsequent Parole Consideration Hearing for Sieu

6    Ngo CDC number J-07024.  Today's date is

7    February 8th, 2006 and the time is 9:58 A.M.  We

8    are located at Correction Training Facility in

9    Soledad.  The inmate was received on February

10   1st, 1994 committed from Orange County.  The

11   life term began February 1st, 1994.  The

12   inmate's minimum eligible parole date is May

13   24th, 2003.  The controlling offense for which

14   the inmate is committed is set forth in case

15   number C199109 charging in count one a violation

16   of Penal Code 187 murder second enhanced with a

17   weapon Penal Code 1222A sub one, armed with a

18   firearm to wit a 22 caliber pistol for which the

19   inmate received a term of 15 years to life plus

20   one year.  This hearing is being recorded.  For

21   the purpose of voice identification each of us

22   will state our first and last name, spelling the

23   last name.  When it is your turn Sir, after you

24   spell your last name please state your CDC

25   number.  I will start and then go to my left,

26   Sandra Bryson B-R-Y-S-O-N Commissioner Board of

27   Parole Hearings.

4

2

1        **DEPUTY COMMISSIONER FILANGERI:**  Deputy

2    Commissioner Doug Filangeri F-I-L-A-N-G-E-R-I.

3        **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Tom

4    Crofoot C-R-O-F-O-O-T Orange County District

5    Attorney's Office.

6        **ATTORNEY RUTLEDGE:**  Tara E. Rutledge R-U-

7    T-L-E-D-G-E Attorney for Mr. Ngo.

8        **INMATE NGO:**  Inmate Ngo N-G-O first name

9    Sieu S-I-E-U middle name Phong P-H-O-N-G CDC

10   number J-07024.

11       **PRESIDING COMMISSIONER BRYSON:**  I note

12   for the record that we have two correctional

13   peace officers in the room who are here for

14   security purposes.  Commissioner Filangeri is

15   there any confidential material in the file and

16   if so will it be used today?

17       **DEPUTY COMMISSIONER FILANGERI:**  There is

18   none we will be using today.

19       **PRESIDING COMMISSIONER BRYSON:**  All right

20   I passed the hearing checklist marked exhibit

21   one to your counsel and I believe, do you have

22   that District Attorney?

23       **DEPUTY DISTRICT ATTORNEY CROFOOT:**  I have

24   it as well.

25       **PRESIDING COMMISSIONER BRYSON:**  All right

26   and confirming that the District Attorney has

27   the documentation.

5

3

1       **DEPUTY DISTRICT ATTORNEY CROFOOT:**  I have

2    thank you.

3       **PRESIDING COMMISSIONER BRYSON:**  And

4    counsel you have the documentation.

5       **ATTORNEY RUTLEDGE:**  Yes.

6       **PRESIDING COMMISSIONER BRYSON:**  Thank

7    you.  Are there any additional documents to be

8    submitted counsel?

9       **ATTORNEY RUTLEDGE:**  No, just that the

10   packet that we provided dated February the 8th I

11   believe --

12      **PRESIDING COMMISSIONER BRYSON:**  We do

13   have this.

14      **ATTORNEY RUTLEDGE:**  Okay other than that

15   we have nothing to submit.

16      **DEPUTY DISTRICT ATTORNEY CROFOOT:**  I have

17   not seen that, can you just describe it for me?

18      **ATTORNEY RUTLEDGE:**  Sure, it's Mr. Ngo

19   has prepared sort of a, it's entitled Memorandum

20   of Evidence in Law and Support of Parole

21   Suitability where he tells the board, well, it

22   includes parole plans, what his place of

23   residence and employment, psych evaluation

24   reports, life prisoner evaluation reports,

25   includes his chronos and certificates which are

26   all in the C File, and support letters.  Last I

27   checked everything in here is in the C File

*6*

4

1   except the first two sections.  Is that correct
2   or not?

3          **INMATE NGO:**  I don't know.

4          **ATTORNEY RUTLEDGE:**  Everything else
5   beginning with the psych eval should –

6          **INMATE NGO:**  Should be all in there.

7          **ATTORNEY RUTLEDGE:**  Is all in the C File.
8   So if you want to review this I'll let you.

9          **DEPUTY DISTRICT ATTORNEY CROFOOT:**  That's
10  fine thank you.

11         **PRESIDING COMMISSIONER BRYSON:**  And we
12  will be going over those first two sections
13  basically here in the hearing.  All right Sir,
14  today you and your attorney signed a document
15  marked exhibit two regarding ADA Accommodation
16  Hearing Procedures and Inmate's Rights.  Counsel
17  do you have any comments or concerns regarding
18  the ADA Rights or the inmate's ability to
19  participate in the hearing?

20         **ATTORNEY RUTLEDGE:**  No.

21         **PRESIDING COMMISSIONER BRYSON:**  Are there
22  any preliminary objections?

23         **ATTORNEY RUTLEDGE:**  No, not at this time.

24         **PRESIDING COMMISSIONER BRYSON:**  All
25  right, will the inmate be speaking with the
26  panel?

27         **ATTORNEY RUTLEDGE:**  According to what he

7

5

1  wrote there he will be speaking to the panel in
2  all issues other than the commitment offense
3  which he spoke to the board I believe at his
4  first hearing and he notes in his Memorandum,
5  let me just quote from there, "further more I
6  have fully and freely, I confess and accept the
7  facts of my personal culpability and
8  responsibility for the life term offense." So
9  that would conclude his comments on the offense.
10 Other than that though he will discuss other
11 issues with the board.

12         **PRESIDING COMMISSIONER BRYSON:** All right
13 then Sir if you are going to address the panel
14 we will swear you in. So would you raise your
15 right hand please, do you solemnly swear or
16 affirm that the testimony you give at this
17 hearing will be the truth, the whole truth and
18 nothing but the truth?

19         **INMATE NGO:** Yes I swear.

20         **PRESIDING COMMISSIONER BRYSON:** All right
21 I will read the facts of the crime into the
22 record, information obtained from the probation
23 officer's report pages three and four. On
24 September 18th, 1992 Angel Gonzales was beaten
25 and shot to death near Fullerton High School as
26 he was walking home after school. An
27 investigation revealed that earlier in the day

*8*

6

1    the victim, a member of the "Fullerton's Toker's

2    Town" a Latin gang and member of "Fullerton's

3    Boyz" B-O-Y-Z an Asian gang were at a McDonald's

4    restaurant near the high school.  The victim and

5    No, that's N-O Muhamed M-U-H-A-M-E-D, had a

6    confrontation with each claiming there each

7    respective gang affiliations.  After this non

8    physical altercation the group of Asians which

9    at the time included Sieu Phong Ngo obtained a

10   firearm.  Ngo, N-G-O, and the Asian gang members

11   returned to the school where they waited for

12   Gonzales.  As he walked home he was attacked and

13   beaten.  During the physical altercation the

14   victim was shot one time in the back by Usumang

15   U-S-U-M-A-N-G last M-U-H-A-M-E-D, the group of

16   five Asian gang members including Ngo N-G-O fled

17   the area after the shooting.  Angel Gonzales

18   died at the scene as a result of the gun shot

19   wound.  Ngo N-G-O, Jimmy Dao D-A-O and Asat Cham

20   A-S-A-T-C-H-A-M fled to the state of Washington.

21   They were subsequently apprehended there and the

22   murder weapon, a stolen 22 caliber hand gun was

23   recovered in the vehicle.  All right Sir, as to

24   your pre-conviction record you have none as a

25   juvenile.  We have as to your adult arrest

26   history and conviction's, we have that on March

27   30th, 1992 you were arrested by the San Gabriel

9

7

1   Police Department for possession of a controlled

2   substance, three pieces of rock cocaine.  On May

3   7th, 1992 that was diverted pursuant to Section

4   1000 of the Penal Code.  And then on September

5   22nd, 1992 you were arrested by the Olympia

6   Sherriff's Office for possession of stolen

7   property.  This case was subsequently dismissed

8   and that of course ensued with the instant

9   crime.  And that comports with your record here

10  so they are the same.  Okay, all right, as to

11  your personal history, it's cleared also by the

12  way that you do have a strong stable family and

13  good social support.  Just reviewing it and then

14  your welcome to add to it if you would like.

15  You were born in Vietnam on May 18th 1973.

16       **INMATE NGO:**  Correct.

17       **PRESIDING COMMISSIONER BRYSON:**  And you

18  resided in the United States since 1979 so that

19  means that you basically came here when you were

20  six years old.  Is that right?

21       **INMATE NGO:**  Correct.

22       **PRESIDING COMMISSIONER BRYSON:**  In 1991

23  you graduated from Fullerton High School and

24  subsequently attended Fullerton Community

25  College and Pasadena City College.  As to your

26  high school courses and then your subsequent

27  college courses, where were you headed

*10*

8

1  professionally in both high school and college
2  as you went through?

3      **INMATE NGO:**  Well I was trying major in
4  small business and you know hopefully start my
5  own business one day.

6      **PRESIDING COMMISSIONER BRYSON:**  Okay, we
7  have here that you completed ten units and your
8  major was business.  Were those semester units,
9  is that what that's referencing?

10      **INMATE NGO:**  Yeah, semester.

11      **PRESIDING COMMISSIONER BRYSON:**  All
12  right, you were employed as a telemarketer and
13  worked odd jobs.  So you were working while you
14  were in college?

15      **INMATE NGO:**  Right.

16      **PRESIDING COMMISSIONER BRYSON:**  You were
17  employed at your family's liquor store and
18  resided with your parents.  We note that you had
19  problems with substance abuse including, it says
20  controlled substances or alcohol.  Would you
21  explain that a little more.  First of all your
22  record is very A characteristic of your getting
23  involved in this in the first place so that's
24  where I'm trying to gain some understanding.
25  You were in a gang, or a want to be gang at the
26  time?

27      **INMATE NGO:**  Correct.

//

9

1      **PRESIDING COMMISSIONER BRYSON:**  And what
2  go you motivated into the gang, I can't imagine
3  actually from your record?

4      **INMATE NGO:**  Well you know as kids you
5  always you know feel like you want to belong to
6  somebody or be a part of something you know.

7      **PRESIDING COMMISSIONER BRYSON:**  Right.

8      **INMATE NGO:**  I mean at that time you
9  know, that's how I felt when I was a kid you
10  know, wanted to belong to something you know.
11  Never thinking something like this leads to you
12  know what happened in this instant case but you
13  know that's my mistake you know choosing the
14  wrong friends you know, not knowing any better
15  but now your know I realize what I did was you
16  know by choosing wrong friends you know can cost
17  you your life you know, ruin your life.

18      **PRESIDING COMMISSIONER BRYSON:**  Were your
19  parents aware of your involvement with gangs and
20  or drugs?

21      **INMATE NGO:**  At that time I don't know,
22  no they weren't aware of it you know because you
23  know I guess you know you can say I hide from
24  them or what not because like was said earlier
25  we just more like want to be gang member.  We
26  just like, there was five of us we like friends
27  you know we just hang around you know do what

*12*

10

1  kids do, you know, play arcade and what not you
2  know, that's about it.

3     **PRESIDING COMMISSIONER BRYSON:** Were your
4  parents both employed?

5     **INMATE NGO:** Yes they were, we own -- at
6  that time we had a family business, a liquor
7  store.

8     **PRESIDING COMMISSIONER BRYSON:** Right.
9     **INMATE NGO:** Before that my dad you know
10  he was into making signs and stuff before we
11  purchased a liquor store. From that point on we
12  just run a liquor store, a family liquor store
13  in Anaheim.

14     **PRESIDING COMMISSIONER BRYSON:** You have
15  brothers and sisters?

16     **INMATE NGO:** I have one older brother,
17  two older sisters and one younger brother, and
18  one younger sister. There are all doing well, I
19  mean, my brothers getting married soon and they
20  all graduate, most of them graduated from
21  college and my little sister, I don't know,
22  right now I really don't know where she is
23  because of what happened to me and stuff like
24  that you know, my dad and he was passing away.
25  I don't know what happened, she came visit me
26  one time and she just moved out and I have never
27  heard from her again.

/3

11

1          **PRESIDING COMMISSIONER BRYSON:** I see.
2          **INMATE NGO:** That's the only person,
3     thing I know about what -- I don't even know
4     where she is right now at this point, my little
5     sister so I would like to look for her when I
6     get out though if I'm given a second chance.
7          **PRESIDING COMMISSIONER BRYSON:** Okay, now
8     is your mom still living?
9          **INMATE NGO:** Yes my mom is still living.
10         **PRESIDING COMMISSIONER BRYSON:** And how
11    is she doing?
12         **INMATE NGO:** She's doing well.
13         **PRESIDING COMMISSIONER BRYSON:** Is she
14    working or is she retired?
15         **INMATE NGO:** Right now she's going to
16    school right now.  She's trying to learn English
17    she said you know so it's a good thing to keep
18    her occupied you know because since my dad
19    passed away and she really you know had no one
20    to you know talk to so you know friends wise and
21    what not so beside family members so she's going
22    to school from what I understand.
23         **PRESIDING COMMISSIONER BRYSON:** All
24    right, let's go to post-conviction factors and
25    Commissioner -- do you have any questions first
26    of all relevant to the personal history?
27         **DEPUTY COMMISSIONER FILANGERI:** Yeah

*14*

12

1  thanks I do.  Are you suggesting that your

2  sister's disappearance has something to do with

3  your imprisonment?

4      **INMATE NGO:**  I think she was maybe

5  traumatized and I know she feel you know she's,

6  I don't know I can't personally say how she

7  feels but I think it might have a little affect

8  on her because you know she just moved away you

9  know so.  My family is still looking for her so.

10     **PRESIDING COMMISSIONER BRYSON:**  How old

11  is she now?

12     **INMATE NGO:**  She should be about 28 right

13  now, 28, 29.

14     **DEPUTY COMMISSIONER FILANGERI:**  So what

15  makes you think she might become traumatized?

16     **INMATE NGO:**  At the time my dad was sick

17  and he was dying of cancer and me being in

18  prison I guess it just, she didn't want to be

19  around at that time I guess.  I don't know what

20  the reason, I would like to know but I can't

21  answer that at this point right now.

22     **DEPUTY COMMISSIONER FILANGERI:**  Well what

23  would stop me from thinking that you're just

24  trying to exploit the situation to garner some

25  sympathy from the panel members?

26     **INMATE NGO:**  I'm not, not at all.

27     **DEPUTY COMMISSIONER FILANGERI:**  That's

/5

13

1    all the questions I have.

2        **PRESIDING COMMISSIONER BRYSON:** All

3    right, we'll go to post conviction factors with

4    Commissioner Filangeri.

5        **DEPUTY COMMISSIONER FILANGERI:** Okay

6    thanks.  The purpose of this part of the hearing

7    is to detail your prison behavior since you last

8    appeared before the board.  I think that was

9    August 5th, 2004 where you were denied for one.

10   That was your first Subsequent Parole

11   Consideration Hearing.

12       **INMATE NGO:** I was denied two years for

13   my first one and my Subsequent was one year.

14       **DEPUTY COMMISSIONER FILANGERI:** Right,

15   that was 2004 your first Subsequent Parole

16   Consideration Hearing resulted in a one year

17   denial.

18       **INMATE NGO:** Right, correct Sir.

19       **DEPUTY COMMISSIONER FILANGERI:** The first

20   document that I want to refer to is the

21   Correctional Counselor's Report provided by F.I.

22   DeGuzman D-E-G-U-Z-M-A-N its dated 6/16/05.

23   Under post-conviction factors the counselor

24   writes that you've remained at CTF in the

25   general population, medium A with a mandatory

26   minimum placement score of 19 although your

27   actual classification score, but for your being

*16*

14

1  a lifer without a date would have been zero.
2  The writer refers us to the post conviction
3  progress report which says that you're doing
4  independent studies through Coast Line Community
5  College.  I saw six items in the C File from
6  Coast Line College about training material,
7  tests, CDs and stuff like that.  Each one of
8  those items correspond to a particular course?
9      **INMATE NGO:**  Yes, like some course
10  require you know, it's enclosed with the books
11  along which explained the program itself but
12  since we can't, we don't allow the use of
13  computers so it's pretty much pointless so I had
14  to return it you know.
15      **DEPUTY COMMISSIONER FILANGERI:**  So if
16  they come on CD's you can't do the class?
17      **INMATE NGO:**  No, the CD just part of the
18  curriculum but it's just basically what there
19  teachers like explaining what's in the class
20  itself.
21      **DEPUTY COMMISSIONER FILANGERI:**  So you
22  can still do the class with the books and still
23  pass the tests?
24      **INMATE NGO:**  Yes.
25      **DEPUTY COMMISSIONER FILANGERI:**  You have
26  enough to do to pass the tests?
27      **INMATE NGO:**  Yes, you have a syllabus, it

*17*

15

1  has all the curriculum in there.

2      **DEPUTY COMMISSIONER FILANGERI:**  Okay, I

3  saw that first item was I think dated around

4  2005, have you actually completed any of the

5  course work yet?

6      **INMATE NGO:**  For the Coast Line, yes.

7      **DEPUTY COMMISSIONER FILANGERI:**  Do you

8  have certificates?

9      **INMATE NGO:**  There's no certificate but I

10  have grades which unfortunately I don't have it

11  hear but I have listed all the courses I've

12  completed.  If you look -

13      **DEPUTY COMMISSIONER FILANGERI:**  What

14  section of that is that in the packet?

15      **INMATE NGO:**  Page seven of my Memorandum.

16      **DEPUTY COMMISSIONER FILANGERI:**  Okay

17  current academic and self help programs and down

18  here, here it is Coast Line College.

19      **INMATE NGO:**  Right.

20      **DEPUTY COMMISSIONER FILANGERI:**  So you

21  have completed biology 100.

22      **INMATE NGO:**  Correct.

23      **DEPUTY COMMISSIONER FILANGERI:**  Business

24  110.

25      **INMATE NGO:**  120.

26      **DEPUTY COMMISSIONER FILANGERI:**  I see,

27  this one says 110.

*18*

16

1          **INMATE NGO:**  Oh typo.

2          **DEPUTY COMMISSIONER FILANGERI:**  Okay,

3  counseling 105.

4          **INMATE NGO:**  Correct.

5          **DEPUTY COMMISSIONER FILANGERI:**

6  Psychology 100.

7          **INMATE NGO:**  Correct.

8          **DEPUTY COMMISSIONER FILANGERI:**  Sociology

9  100.

10          **INMATE NGO:**  Correct.

11          **DEPUTY COMMISSIONER FILANGERI:**  Spanish

12  180.

13          **INMATE NGO:**  Correct.

14          **DEPUTY COMMISSIONER FILANGERI:**  And your

15  currently enrolled in Health 100?

16          **INMATE NGO:**  No that's the old from a

17  previous board.

18          **ATTORNEY RUTLEDGE:**  Here maybe this one

19  will I think, in fact this does not have the

20  typo.  I didn't realize they weren't the same so

21  go right ahead.

22          **DEPUTY COMMISSIONER FILANGERI:**  I see

23  okay.  Okay this one says Business 120.  Spanish

24  180, Health 100 you've completed that?

25          **INMATE NGO:**  Yes.

26          **DEPUTY COMMISSIONER FILANGERI:**

27  Philosophy.

*19*

17

1        **INMATE NGO:**  Yes.

2        **DEPUTY COMMISSIONER FILANGERI:**

3    Communications 100.

4        **INMATE NGO:**  Yes.

5        **DEPUTY COMMISSIONER FILANGERI:**  Geology

6    100.

7        **INMATE NGO:**  Yes.

8        **DEPUTY COMMISSIONER FILANGERI:**  History

9    175.

10        **INMATE NGO:**  Yes.

11        **DEPUTY COMMISSIONER FILANGERI:**  Astronomy

12    100.

13        **INMATE NGO:**  Yes.

14        **DEPUTY COMMISSIONER FILANGERI:**  Marine

15    Science 100.

16        **INMATE NGO:**  Correct.

17        **DEPUTY COMMISSIONER FILANGERI:**  And your

18    currently enrolled in Humanities and Political

19    Science.

20        **INMATE NGO:**  Correct.

21        **DEPUTY COMMISSIONER FILANGERI:**  Okay,

22    let's see, 13 classes figuring there what, about

23    worth three units a piece?

24        **INMATE NGO:**  Three units except for

25    Spanish its five units.

26        **DEPUTY COMMISSIONER FILANGERI:**  So you

27    are more than halfway towards your AA degree?

20

18

1          **INMATE NGO:**  I have 41 unit.

2          **DEPUTY COMMISSIONER FILANGERI:**  How many?

3          **INMATE NGO:**  41 units currently.

4          **DEPUTY COMMISSIONER FILANGERI:**  And you

5    need 60?

6          **INMATE NGO:**  Sixty.

7          **DEPUTY COMMISSIONER FILANGERI:**  Great,

8    are you taking all the necessary core classes

9    that I'm assuming there are some classes that

10   have to be taken?

11         **INMATE NGO:**  Yes, I still have to take

12   English which is required and math so Political

13   Science is required so I'm taking it right now.

14   After I take those two classes I will be taking

15   Small Business and Business Management.

16         **DEPUTY COMMISSIONER FILANGERI:**  Great.

17         **INMATE NGO:**  To upgrade.

18         **DEPUTY COMMISSIONER FILANGERI:**  Great, it

19   seems to me I noticed that a test of Adult Basic

20   Education, it was 12.9.

21         **INMATE NGO:**  Correct.

22         **DEPUTY COMMISSIONER FILANGERI:**  All right

23   and I also saw a certificate of High School

24   Graduation from Fullerton in 1992.

25         **INMATE NGO:**  Correct.

26         **DEPUTY COMMISSIONER FILANGERI:**  Okay, all

27   right.  Let's go back to the Counselor's post-

*21*

19

1  conviction progress report.  It says that you

2  are assigned as the culinary store keeper office

3  aid with satisfactory grades.  You've got

4  certificates of completion in automotive

5  refinishing in 1997 and upholstery in 1997.  Now

6  that was when you were at LA County.

7      **INMATE NGO:**  Lancaster.

8      **DEPUTY COMMISSIONER FILANGERI:**  Lancaster

9  that's it, Lancaster.  You haven't had any

10  vocational upgrading since you've been at CTF?

11      **INMATE NGO:**  Well the only one that they

12  have right now it was drafting and at that time

13  was computer data.

14      **DEPUTY COMMISSIONER FILANGERI:**  It says

15  that your on the computer processing or the data

16  processing waiting list but I heard that people

17  been on that list forever.

18      **INMATE NGO:**  Forever, it's so I have a

19  upgrade on forklift things which is trade in

20  itself, a forklift operator.

21      **DEPUTY COMMISSIONER FILANGERI:**  That's

22  right, you didn't mention it.  I did see that.

23      **PRESIDING COMMISSIONER BRYSON:**  It's in

24  here.

25      **DEPUTY COMMISSIONER FILANGERI:**  2002, I

26  saw that.

27      **INMATE NGO:**  I am certified and I have a

22

20

1   new updated license I just been renewed.

2       **DEPUTY COMMISSIONER FILANGERI:**  Do you

3   use that forklift operator's license in this --

4       **INMATE NGO:**  Facility yes to move.

5       **DEPUTY COMMISSIONER FILANGERI:**  Culinary

6   store keeper office aid?

7       **INMATE NGO:**  Right.

8       **DEPUTY COMMISSIONER FILANGERI:**  Good.

9   Are there any more upgrades you can do on that?

10      **INMATE NGO:**  Besides fork lifting?

11      **DEPUTY COMMISSIONER FILANGERI:**  Something

12  about jacks you had some sort of certification.

13      **INMATE NGO:**  Those are hand jacks, it's

14  just like manual by my self.  It's pretty easy

15  to operate, they electric ones to though.

16      **DEPUTY COMMISSIONER FILANGERI:**  Okay in

17  terms of your education I also saw some peer

18  education back in 1999 for sexual transmitted

19  disease, HIV, AIDS, TB and hepatitis.

20      **INMATE NGO:**  Correct.

21      **DEPUTY COMMISSIONER FILANGERI:**  I saw a

22  document for anger management in 2005 and some

23  2000 documents for Salesmanship and Key to

24  Fatherhood, something through the Muslim Chapel

25  was it?

26      **INMATE NGO:**  Correct.

27      **DEPUTY COMMISSIONER FILANGERI:**  Okay

23

21

1   let's go to the psychological evaluation.  My
2   file indicates that there was a new
3   psychological evaluation ordered 1/20/06 which I
4   would guess is the reason why I'm having to use
5   the last one from 2002.  I realize it's old but
6   it's not particularly negative so I wouldn't be
7   surprised if we did have a new one it wouldn't
8   be similar.  And you should also know that the
9   board has a new directive that if your not
10  involved in the -- if your not Triple CMS or EOP
11  then we are not going to be asking for updated
12  psych reports.

13        **INMATE NGO:**  No I'm not.

14        **DEPUTY COMMISSIONER FILANGERI:**  So this
15  one is dated 1/31/02 and it's signed by, no it's
16  not signed by C. Saindon S-A-I-N-D-O-N PHD,
17  staff psychologist although he appears to be the
18  writer.  It is signed by Bill Zika Z-I-K-A PHD
19  Senior Supervising Staff Psychologist.  Under
20  clinical assessment on page four, current
21  diagnostic impressions on axis I no contributory
22  clinical disorder, axis II deferred, global
23  assessment of functioning score is 90.  The
24  examiner writes that there's no evidence that
25  inmate Ngo currently suffers from any
26  psychiatric illness.  Under review of the life
27  crime the inmate stated that he agreed with the

24

22

1   version of the crime given in the Central File

2   and the verdict from sentencing, however he

3   stated that no one intended to kill the victim.

4   Under assessment of dangerousness item 14 the

5   examiner writes that cocaine use and gang

6   affiliation resulted in the current offense.

7   Under item C, the most significant risk factors

8   of this inmate as a precursor to violence or

9   return to criminal behavior would be his re-

10  involvement with others having a criminal

11  history and or gang members.  If use of alcohol

12  and or drugs in isolation from his family

13  members.  Clinical observations, the inmate is

14  competent and responsible for his behavior.

15  Inmate does not have a mental disorder which

16  would resuscitate treatment either during his

17  incarceration period or following parole.  In

18  back of the short file there is several items

19  I'd like to make note of.  Oh yeah, here's the

20  tape test score, that was back in 1997 for 12.9

21  and there's a list of disciplinaries, there are

22  no 115's, two 128's minor in 1997 and 2000 for

23  failure to respond to a medical duckett, and a

24  covered window respectively.  Here is the

25  certificate to anger management that I already

26  said, talked about.  And there's a series of

27  chronos, one 11/06 for NA attendance, 12/8/05

25

23

1    completion of the Phobic Anger Management Class,

2    10/28/05 a laudatory chrono signed by

3    Correctional Supervising Cook W. Rogers R-O-G-E-

4    R-S, says he finds you to be a reliable worker

5    who needs little or no supervision working in

6    the culinary warehouse store keeper. Says that

7    you are responsible for many tasks that require

8    attention to detail and accuracy and the writer

9    believes you would be an asset to any employer

10   upon release given your range of skills

11   including certification for the operation of

12   forklifts and power jacks. 6/13/05 is a chrono

13   for NA, 3/12/05 Narcotics Anonymous, 1/5/05

14   Correctional Supervising Cook W. Rogers writes

15   again that your , commending your outstanding

16   performance of your assignment, your still in

17   the culinary warehouse store keeper and Rogers

18   believes you can be relied upon to take the

19   initiative to ensure the varies duties your

20   responsible for are completed and you would be

21   an asset to any employer upon release given your

22   range of skills. 10/22/04 Narcotics Anonymous,

23   9/27/04 NA. Is there anything else that you

24   want to call the panel's attention to regarding

25   behavior during the last, since August of 2004?

26        **INMATE NGO:** That should be it for my

27   incarceration for what I been doing but as you

26

24

1   can I see I have a lot of support letter's here.

2         **DEPUTY COMMISSIONER FILANGERI:**  That's in

3   another segment of the hearing.

4         **INMATE NGO:**  All right.

5         **DEPUTY COMMISSIONER FILANGERI:**  Right now

6   I am just focusing on your behavior in the

7   institution and I don't mean to cut you off.

8         **INMATE NGO:**  Oh no problem.

9         **DEPUTY COMMISSIONER FILANGERI:**  If there

10  is something else that you have done that you

11  want to call our attention to now would be the

12  time.

13        **INMATE NGO:**  No that would be all.

14        **DEPUTY COMMISSIONER FILANGERI:**  Okay.

15        **INMATE NGO:**  Thank you.

16        **DEPUTY COMMISSIONER FILANGERI:**  Thank

17  you.

18        **PRESIDING COMMISSIONER BRYSON:**  All

19  right, we'll talk about your parole plans and

20  support which I have to say is extensive and  --

21        **DEPUTY COMMISSIONER FILANGERI:**  I'm

22  sorry, I forgot to mention the certificate that

23  Mr. Ngo handed us that 2005 certificate of

24  appreciation for your generous donation to the

25  5th Annual Correctional Training Facilities

26  Teddy Bear Drive.  I'm sorry.

27        **PRESIDING COMMISSIONER BRYSON:**  Thank

27

25

1   you.   It's very well thought out and well

2   organized, that's very helpful to the board.

3         **INMATE NGO:**   Thank you.

4         **PRESIDING COMMISSIONER BRYSON:**   Let's go

5   to your parole plans and I'd like to read these,

6   these seem very current, I assume they are.

7         **INMATE NGO:**   Yes they are.

8         **PRESIDING COMMISSIONER BRYSON:**   We will

9   go with this first.   You've organized it in a

10   liable way.   First you have articulated what you

11   plan to do in the first year of adjustment and

12   then for the next two to five years.   So for the

13   first one to twelve months you have written that

14   you will first report to work at "First China

15   Kitchen" or "Hot Wok" which will meet your

16   immediate needs.   So you would be working as a

17   cook there?

18         **INMATE NGO:**   Waiter, cashier, it don't

19   matter.

20         **PRESIDING COMMISSIONER BRYSON:**   Okay

21   second you would continue working toward

22   completing your Associates Arts Degree in

23   Liberal Arts at Coast Line Community College.

24         **INMATE NGO:**   Correct.

25         **PRESIDING COMMISSIONER BRYSON:**   Third you

26   would reinforce your relationship with your

27   family members, academically and technically.

*28*

26

1    Fifth or fourth you would continue to attend and
2    participate in the local Narcotics Anonymous
3    Meetings and then you would also purchase an
4    automobile for transportation.  All right now,
5    this stuff tails into where you would plan to
6    reside during this time which would be with your
7    mother, Phuong Hung Ngo at Monterey Park.  Is
8    there anyone else living at home right now with
9    her?

10          **INMATE NGO:**  My little brother, he's
11   taking care of her.

12          **PRESIDING COMMISSIONER BRYSON:**  And how
13   is he doing, what's he do?

14          **INMATE NGO:**  He works at Kaiser
15   Permanente.

16          **PRESIDING COMMISSIONER BRYSON:**  Oh he
17   does.

18          **INMATE NGO:**  So, he's taking care of her.
19          **PRESIDING COMMISSIONER BRYSON:**  And does
20   he have a record of any sort?

21          **INMATE NGO:**  No, I am the only one.

22          **PRESIDING COMMISSIONER BRYSON:**  Okay well
23   that's good actually.  All right and then -- let
24   me go ahead now at this point and divert again
25   to this place of residence, places of residence
26   that you allude to.  You have an alternative
27   residency that you've planned in the event

*29*

27

1   something unforeseen occurs.  I've made

2   arrangements to obtain housing, transportation,

3   food, clothing at the following addresses.  Now

4   are these all relatives?

5          **INMATE NGO:**  Yes.

6          **PRESIDING COMMISSIONER BRYSON:**  All

7   right, and he lists Lisa and Raymond Lau L-A-U

8   in Alhambra, is that Chi Fong Ngo?

9          **INMATE NGO:**  Chi Fong Ngo.

10          **PRESIDING COMMISSIONER BRYSON:**  Chi Fong

11   Ngo thank you, that's in Monterey.  And Julie

12   and Raymond Seeto S-E-E-T-O in Placentia

13   California.

14          **INMATE NGO:**  Right.

15          **PRESIDING COMMISSIONER BRYSON:**  That's

16   good so you'll have alternatives and I believe

17   I've seen support letters in here that we will

18   be going over from these people.  Okay, so that

19   would be -- upon my release I will be working at

20   the following places of business, so here you

21   are giving options?

22          **INMATE NGO:**  Correct.

23          **PRESIDING COMMISSIONER BRYSON:**  All

24   right, now you're listing these, you realize

25   does not constitute verification in our minds

26   because this is your out reach.  Have you, how

27   have you contacted these establishments, have

*30*

28

1   you had personal contact with them or --

2        **INMATE NGO:**  Yes I have personal contact

3   with them because my uncle owns these, the First

4   China Kitchen and Hot Wok.

5        **PRESIDING COMMISSIONER BRYSON:**  I see.

6        **INMATE NGO:**  And he just started a new

7   business called Empire Lighting, one in New

8   Orleans Heights and one in Riverside.

9        **PRESIDING COMMISSIONER BRYSON:**  And what

10  is Empire Lighting, what is it like?

11       **INMATE NGO:**  From my understanding it's

12  just selling lamps and stuff.

13       **PRESIDING COMMISSIONER BRYSON:**  Lamps and

14  things?

15       **INMATE NGO:**  Kitchen furniture and what

16  not, accessories.

17       **ATTORNEY RUTLEDGE:**  He has a letter in

18  there to.

19       **INMATE NGO:**  Yeah.

20       **PRESIDING COMMISSIONER BRYSON:**  All

21  right, okay good.

22       **INMATE NGO:**  Updated business card along

23  with it.

24       **PRESIDING COMMISSIONER BRYSON:**  Okay.

25       **INMATE NGO:**  So and AC Financial which is

26  my brother in law where my sister Julie, Raymond

27  Seeto they own that company.

31

29

1          **PRESIDING COMMISSIONER BRYSON:**  I see,
2     and what would you do for them do you think?
3          **INMATE NGO:**  Well probably clerical
4     duties to begin.
5          **PRESIDING COMMISSIONER BRYSON:**
6     Initially.
7          **INMATE NGO:**  To start out.
8          **PRESIDING COMMISSIONER BRYSON:**  Okay, all
9     right.  Then you have a projected plan for the
10    next two to five years.  First you would
11    continue to establish yourself as a law bidding
12    citizen with respect and integrity.  Two become
13    a concerned community member about negative
14    influences that our youth face today.  Three
15    help to change my community into a safe and
16    wholesome environment.  How would you do that?
17         **INMATE NGO:**  Well just by teaching kids
18    just you know, talking to kids and cause I'm
19    trying to organize, not try but like organize
20    station called I-Inga right which is based on
21    community for the kids.  It's supported by NFL,
22    stores like that and it's well known so I would
23    like to keep in contact with them out there so
24    you know I can educate the kids about what
25    violence gang can impact on family and anyone in
26    the community that sorts.
27         **PRESIDING COMMISSIONER BRYSON:**

30

.1   Outstanding, okay.  Continue working and open a

2   savings account and finally use money saved to

3   start my own business.  You also have made,

4   presented a statement here as to your overall

5   plan.  Either I can read that now or you're

6   welcome to read this as part of your closing

7   statement.  Would you like to read it then?

8        **INMATE NGO:**  Oh no, I have a closing

9   statement.

10        **PRESIDING COMMISSIONER BRYSON:**  All

11   right, would you like to read this here?

12        **INMATE NGO:**  What?

13        **PRESIDING COMMISSIONER BRYSON:**  This is

14   your overall plan, this is immediately following

15   the place of residences.

16        **INMATE NGO:**  My overall plan is to spend

17   my time working to earn a living wage, assist my

18   mom with maintaining the household in a loving

19   good atmosphere and to work closely with my

20   assigned parole officer to ensure that my

21   understanding of all conditions of parole is

22   complete and in compliance.  The evidence that I

23   asked to present above strongly show great

24   institutional program efforts.  More over I have

25   made every attempt to comply with BPT to demand

26   more therapy as shown in psychological

27   consideration portion of this Memorandum.  The

*33*

31

1   California Department of Corrections have made

2   final determination that I do not qualify for

3   nor do I require continued therapy where public

4   safety issue are concerned. I've made every

5   effort to change from the immature 19 year old I

6   was at the time of the commitment offense into

7   the mature, responsible and well reasoned 32

8   year old adult I am today. I submit to this

9   panel that my institutional programming is

10  sufficient to warrant a finding of suitability

11  at this time. In addition, I am willing to

12  volunteer submit to a continuous electronic

13  monitoring in accordance with Penal Code 9000

14  and I am willing to have my wages garnished for

15  the purpose of paying for the cost of my parole

16  during the parole period. For the all the

17  reasons stated above I urge this panel of the

18  Board of Prison Terms to make a unanimous

19  finding that I am no longer would pose an

20  unreasonable risk of danger to the public if

21  paroled at this time. Find me suitable for

22  parole and set a release date in accordance with

23  applicable regulation regarding the length of

24  time I may have yet to serve.

25          **PRESIDING COMMISSIONER BRYSON:** Thank

26  you.

27          **INMATE NGO:** Thank you for your time and                 *24*

32

1   consideration.

2       **PRESIDING COMMISSIONER BRYSON:**   All

3   right, let's go to your support letters.

4       **INMATE NGO:**   Okay.

5       **PRESIDING COMMISSIONER BRYSON:**   And I

6   believe this even more updated than our board

7   packet so I'll just operate off of this

8   document.   Counsel do you concur?

9       **ATTORNEY RUTLEDGE:**   Yes.

10      **PRESIDING COMMISSIONER BRYSON:**   All right

11  and I'm just going to elude to them, frankly

12  there's quite a few as you know and so we

13  actually, I have read most all of them.   I

14  believe the other Commissioner has also and we

15  will be going through them in our deliberations

16  extensively but you have a letter of support

17  from Empire Lighting from Calvin Ung U-N-G Ung

18  and is this your uncle?

19      **INMATE NGO:**   My uncle.

20      **PRESIDING COMMISSIONER BRYSON:**   Okay, and

21  this is dated June 21st, 2005.

22      **INMATE NGO:**   Correct.

23      **PRESIDING COMMISSIONER BRYSON:**   And he is

24  totally supportive of your release.   He says

25  that I am the Chinese Restaurant and lighting

26  retail business, he mentions both of those.

27  Between these two businesses I have about 25

*25*

33

1 employees. At any time I am always will to

2 offer a job position that is suitable for Sieu.

3 All right, he also references other, your

4 siblings, you mom, your other uncles, aunts and

5 cousins who in aggregate provide support and

6 care for you. Then we have a letter, one

7 moment, from Donald G. Rubright R-U-B-R-I-G-H-T

8 the Senior Deputy Public Defender of Orange

9 County, this letter is dated June 23rd, 2005. I

10 represented Mr. Ngo in the case that sent him to

11 prison. I've been a criminal defense lawyer for

12 almost 30 years and I represented over 40

13 persons accused of homicide. I do not see my

14 clients through rose colored glasses however the

15 circumstances of Sieu's case are unusual enough

16 that I feel compelled to make a statement on his

17 behalf. I am going to read this in it's

18 entirety because I think it's worth reading. At

19 the time I represented him, Sieu was a very

20 likeable young man with a minor criminal record.

21 To my recollection he had no convictions for any

22 crimes of violence. The incident in question

23 was very different from the typical "gangs case"

24 and the facts are worth sketching for your

25 review. Sieu and his friends were a want to be

26 type gang who really did not have a significant

27 history or established turf in Orange County.

36

34

1   On the day of the incident, some of Sieu's
2   friends by chance went to the McDonalds which
3   was near Fullerton High School in Northern
4   Orange County. Sieu was not present at the
5   time. One of Sieu's friends got in a staring
6   match with the decedent and some of his friends
7   who were members of "Toker Town" T-O-K-E-R a
8   long established Hispanic gang in Fullerton.
9   Essentially the Toker Town group told Sieu's
10  friends that they were not welcome in Fullerton
11  where some of them already lived and they should
12  get out of town. Angered by this Sieu's friends
13  decided to confront the decedents group after
14  school got out that day. Sieu was called to
15  help out in case they should be out numbered.
16  There group waited after school and confronted
17  the decedent and one of his friends about two
18  blocks south of Fullerton High School, not on
19  school grounds. From all appearances this was
20  intended to be a fist fight. Sieu and the
21  friends that had been in the stare down
22  approached the decedent and another young who
23  were walking on the sidewalk. A fist fight is
24  how it started, however the decedent's friend
25  fled just after the punching began and that left
26  Sieu and his friend fighting the decedent who
27  was significantly larger than either of them.

37

35

1   Of course this wasn't fair but nothing at this
2   point suggested that this was intended to be a
3   homicide.   While the fist fight was ongoing a
4   third member of the group Sieu was part of ran
5   forward to the scene.   While the fight was still
6   in progress he reached around Sieu and shot the
7   decedent killing him and narrowly missing Sieu.
8   Sieu and his group then fled ultimately being
9   arrested out of state.   Evidence was received to
10  show that Sieu and his friends knew that a gun
11  was in the car.   However there was no evidence
12  to show that there was a plan to use it.   Based
13  upon the theory of foreseeable consequences,
14  Sieu and several co-defendants were convicted or
15  plead guilty to the murder.   The following is
16  underlined, Sieu was not the shooter and no
17  evidence suggested to show that he suggested,
18  encouraged or aided or abetted the shooting in
19  any way.   After the shooting Sieu angrily
20  confronted the shooter demanding to know why he
21  brought out the gun and asserting that he, Sieu,
22  didn't know the gun was going to be used.   In
23  summary this was not a drive by or similar gang
24  crime where everyone knew that legitimately
25  should have know that death or serious bodily
26  injury was intended.   On the contrary this
27  appeared to be an impulsive act by one member of

38

36

1  the group which due to the rest of the
2  circumstances swept all of them away by
3  derivative liability.  I'm not suggesting that
4  Sieu and the other non shooters bear no
5  responsibility for the tragic outcome but for
6  the fight of course no shooting would have taken
7  place.  However I would submit that the
8  circumstances here are significantly mitigated
9  when considered against other convictions of
10 this type.  Assuming that Sieu's performance
11 within the Department of Corrections has been
12 positive I would urge his parole at the earliest
13 possible time.  Then we have a letter from Chi
14 Phong Ngo of June 30th, 2005, that's C-H-I P-H-
15 O-N-G N-G-O and from your brother.  According to
16 the productive things you've done in prison and
17 there willing to help by providing housing,
18 financial aid, job hunt and any other assistance
19 he may need to promote a better life.  Now we
20 have next a letter of July 14th, 2005 from okay,
21 Thanh?
22         **INMATE NGO:**  Thanh.
23         **PRESIDING COMMISSIONER BRYSON:**  Thanh.
24         **INMATE NGO:**  My sister.
25         **PRESIDING COMMISSIONER BRYSON:**  That's T-
26 H-A-N-H T N-G-O yes she's your older sister,
27 Sieu was the most down to earth, caring and kind

*39*

37

1    person.  And then she also is offering support,

2    our families have arranged for his support once

3    released.  My husband's store number, she gives

4    that number, in Anaheim, her husband is Raymond.

5         **INMATE NGO:**  Right.

6         **PRESIDING COMMISSIONER BRYSON:**  Raymond's

7    mom and dad have offered him work if he wishes

8    to work there.  Housing would not be a problem.

9    The housing indicated would be located in

10   Placentia and you also had indicated that.  Then

11   we have a letter dated June 30th, 2005 from is

12   that Duck Phan Ngo?

13        **INMATE NGO:**  Duck Phan Ngo.

14        **PRESIDING COMMISSIONER BRYSON:**  Duck Phan

15   Ngo, a brother who gives you general support.

16   Says I work for Kaiser Permanente as a help desk

17   technician.  I am willing to provide Sieu with

18   any support, financial or emotional in his

19   transition into society as an obedient citizen.

20   Then July 19th, 2005 from Connie Hua.

21        **INMATE NGO:**  Hua.

22        **PRESIDING COMMISSIONER BRYSON:**  All

23   right, H-U-A and she's your cousin and has known

24   you since childhood.  She reviews your

25   accomplishments, doing all that he can to

26   improve his life, full support, I can offer

27   financial help, advice and encouragement and she

40

38

1  offers her family as well.  My father can offer
2  him a job at his restaurant.  Is that one of the
3  restaurants that you referenced?
4        **INMATE NGO:**  Yes, a few of my uncles own
5  restaurants so I can work at any one of them.
6        **PRESIDING COMMISSIONER BRYSON:**  I see,
7  all right.  Then we have a letter of March 22nd,
8  2004 from Calvin Ung?
9        **INMATE NGO:**  Correct, my uncle again.
10       **PRESIDING COMMISSIONER BRYSON:**  Okay and
11  then we have a letter of May 22nd, 2004 from
12  Phang Hung Ngo?
13       **INMATE NGO:**  My mom.
14       **PRESIDING COMMISSIONER BRYSON:**  Okay.
15       **ATTORNEY RUTLEDGE:**  These are the letters
16  you brought for your last hearing?
17       **PRESIDING COMMISSIONER BRYSON:**  These go
18  back to the last letters.
19       **INMATE NGO:**  These were my last letters.
20       **PRESIDING COMMISSIONER BRYSON:**  We will
21  take note of that, there are quite a few of
22  them, probably a dozen of them I would say
23  attached.  Okay and then earlier letters beyond
24  that.  All right this is a very extensive
25  comprehensive support file.  All right do you
26  have anything further then because I think this
27  is quite comprehensive at this point.

41

39

1        **INMATE NGO:**  No, that should cover it.
2        **PRESIDING COMMISSIONER BRYSON:**  We will
3   be reviewing this even further.  We have sent
4   out 3042 notices, those notices go to agencies
5   having a direct interest in your case.  We have
6   a representative from the Orange County District
7   Attorney's Office present who will have the
8   opportunity to make a statement regarding parole
9   suitability prior to the conclusion of this
10  hearing.  First Commissioner do you have any
11  questions for the inmate at this time?
12       **DEPUTY COMMISSIONER FILANGERI:**  No thank
13  you.
14       **PRESIDING COMMISSIONER BRYSON:**  All
15  right, Mr. Crofoot do you have any questions of
16  the inmate?
17       **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Thank
18  you, I have -- the reports indicate that the
19  inmate has multiple tattoos, I see specifically
20  referenced a tiger on the chest.  Is that tiger,
21  does that have significance with the membership
22  into the Tiger Mafia?
23       **INMATE NGO:**  No Sir.
24       **DEPUTY DISTRICT ATTORNEY CROFOOT:**  What
25  is the significance of the tiger.
26        **INMATE NGO:**  The tiger was just for, it
27  was for Fullerton Boyz you know we all had the

42

40

1   same tiger but all different, all five of us.

2   It's not for Tiger Mafia or nothing.

3          **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Okay

4   and the Fullerton Boyz is a gang as well is that

5   correct?

6          **INMATE NGO:**  It's more like a want to be,

7   there are only five of us, we just friends.

8   Nothing more can say to change it.

9          **DEPUTY DISTRICT ATTORNEY CROFOOT:**  The

10  probation report indicates a tattoo Wong Lee

11  under the left arm, what is the significance of

12  that tattoo?

13         **INMATE NGO:**  That is my ex-girlfriend's

14  name that's all.

15         **DEPUTY DISTRICT ATTORNEY CROFOOT:**  And

16  does the inmate have any other tattoos other

17  than those two?

18         **INMATE NGO:**  That one no.

19         **DEPUTY DISTRICT ATTORNEY CROFOOT:**  No.

20         **INMATE NGO:**  That's all I have.

21         **PRESIDING COMMISSIONER BRYSON:**  You don't

22  have any other tattoos is that correct?

23         **INMATE NGO:**  Correct.

24         **PRESIDING COMMISSIONER BRYSON:**  All

25  right.

26         **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Was

27  the inmate attending college at the time of this

43

41

1   crime?

2        **INMATE NGO:**  Yes I was, I was attending
3   at Pasadena City College.

4        **DEPUTY DISTRICT ATTORNEY CROFOOT:**  And
5   was this --

6        **DEPUTY COMMISSIONER FILANGERI:**  This is
7   side two of the tape recording of the hearing
8   transcript for Mr. Sieu Ngo, last name spelled
9   N-G-O J-07024.  Sorry for the interruption.

10       **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Thank
11  you.  The car that was used on the day of the
12  crime, was that the inmate's car?

13       **INMATE NGO:**  No it wasn't.

14       **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Whose
15  car was that?

16       **INMATE NGO:**  I think it belonged to Jimmy
17  Dao.

18       **DEPUTY DISTRICT ATTORNEY CROFOOT:**  And
19  that car was later burned is that correct?

20       **INMATE NGO:**  Correct Sir.

21       **DEPUTY DISTRICT ATTORNEY CROFOOT:**  All
22  right and what were the circumstances of burning
23  that car?

24       **INMATE NGO:**  My friend wanted to get rid
25  of it so when we were leaving the state of
26  California we didn't want to be followed so they
27  decided to burn it.

44

42

1      **PRESIDING COMMISSIONER BRYSON:**  Where did

2  you do that?

3      **INMATE NGO:**  At that point I wasn't even

4  there but I knew what they did when they told me

5  but it was in somewhere, I think it was, I'm not

6  sure but I think it was near some beach or

7  something.  I don't know exactly where though

8  because I wasn't there.

9      **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Where

10  did the murder weapon come from?

11      **INMATE NGO:**  Now I know that Asat Chan

12  who live in Washington I think he stole a gun

13  and brought it to California.  That's the only

14  thing I know.

15      **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Was

16  that person involved in this crime?

17      **INMATE NGO:**  Yes he was.

18      **DEPUTY DISTRICT ATTORNEY CROFOOT:**  And

19  did he return to Washington with you?

20      **INMATE NGO:**  Yes he was -- when we were

21  arrested he was arrested with me and Jimmy Dao

22  at that time.

23      **DEPUTY DISTRICT ATTORNEY CROFOOT:**  And

24  when you were arrested you still had the murder

25  weapon is that correct?

26      **INMATE NGO:**  Correct.

27      **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Thank

*45*

43

1  you I have no further questions.

2      **PRESIDING COMMISSIONER BRYSON:**  All

3  right, Counselor do you have questions for the

4  inmate?

5      **ATTORNEY RUTLEDGE:**  Yeah I do.  Clearly

6  you've been busy since you've been here.

7      **INMATE NGO:**  Yes I have.

8      **ATTORNEY RUTLEDGE:**  And when you were

9  going to college, you were going to college when

10  this happened and you were?

11      **INMATE NGO:**  Just visiting them.

12      **ATTORNEY RUTLEDGE:**  Okay that's what I

13  was getting at.  So what was your social life

14  after -- did you move to Pasadena at that time

15  or were you just going to college there?

16      **INMATE NGO:**  I moved down there you know

17  back to LA because I want to straighten out my

18  life you know, get away from so called gang but

19  I was trying to straighten out, I had a steady

20  girlfriend, I was going back to college trying

21  to straighten out my life.  I hadn't seen my co-

22  defendant in a little over a year when, before

23  this happened you know so that -- they called me

24  up one day you know to come visit them and one

25  thing led to another, this is what happened.

26      **ATTORNEY RUTLEDGE:**  And what do you think

27  -- were you able to ever apologize to the

*46*

44

1   victim's mother or family?

2       **INMATE NGO:** At the time I tried to

3   during court but I guess she didn't want to hear

4   it so she walked out on me. I made an attempt

5   but I wasn't successful at that though because

6   she left the court.

7       **ATTORNEY RUTLEDGE:** All right, and how do

8   you think the loss of this young man affected

9   his mother and he had other siblings, how did

10  that affect them?

11      **INMATE NGO:** There is really no word can

12  express how truly and deeply sorry I am for the

13  victim's family because the pain and suffering a

14  mother goes through is incomprehensible because

15  it just affect the family and it just everyone

16  that's involved in this crime. I know this

17  because you know I lost loved one myself so I

18  know, I can emphasize what the family is going

19  through, friends, I mean just everyone, the

20  community that knows Angel Gonzales you know but

21  at this time I can't change what happened you

22  know. I wish I could make the pain go away but

23  I can't, I'm only human. But I am truly, truly

24  sorry for what happened to Angel. It was never

25  my intention to take his life. It thought it

26  was going to be a fist fight and at a young age

27  I never in my wildest dream think something like

47

45

1   this was going to happen.  So I take full
2   responsibility for my action, there's no doubt.
3   I deserve to be punished you know, I'm willing
4   to do my time for this so all I can say at this
5   time is I am truly, truly sorry for what I have
6   done to the Gonzales family.  I know what each
7   and every day it's like for them without there
8   son so that's all I have to say.
9          **ATTORNEY RUTLEDGE:**  Have you been in any
10  fights since you've been in the institution?
11         **INMATE NGO:**  No I haven't.  I been
12  disciplinary free.
13         **ATTORNEY RUTLEDGE:**  All right, how do you
14  stay -- have you managed to stay away and I
15  wanted to ask you to have you been involved with
16  any gangs in the prison?
17         **INMATE NGO:**  No I haven't.
18         **ATTORNEY RUTLEDGE:**  How have you managed
19  to keep yourself from the gangs and not involve
20  yourself in any violence?
21         **INMATE NGO:**  Knowing what I know today
22  about what impact a gang can have on people.  I
23  have grown so I know to change my behavior for
24  the better.
25         **ATTORNEY RUTLEDGE:**  You mentioned, did
26  you recently loose a co-worker here at the
27  prison?

*48*

46

1        **INMATE NGO:**  Yes I have.

2        **ATTORNEY RUTLEDGE:**  And how did that

3    impact your life?

4        **INMATE NGO:**  Realize life is short you

5    know and anything can happen.  I mean he was a

6    good man, older individual.  His name was

7    Nicholas you know.  The last thing I said to him

8    when you know I see you out in the yard.  I gave

9    him a hug but when I came back from visit that's

10    the first thing I heard was that he passed away

11    and I just couldn't believe it you know like

12    something like this happens so short you know.

13    Life is so unpredictable.

14        **ATTORNEY RUTLEDGE:**  No further questions

15    for Mr. Ngo.

16        **PRESIDING COMMISSIONER BRYSON:**  I have a

17    couple of questions.  We didn't really discuss

18    and I would like to know what your history has

19    been -- have you trafficked drugs?

20        **INMATE NGO:**  No I haven't Ma'am.

21        **PRESIDING COMMISSIONER BRYSON:**  And how

22    was it that you were associated with cocaine at

23    one point in your life?

24        **INMATE NGO:**  Well at that point you know

25    I tried it, a friend introduced me to it so I

26    tried it and I bought three piece of rock

27    cocaine as I was going home I was pulled over by

*49*

47

1  the police, got arrested.

2       **PRESIDING COMMISSIONER BRYSON:**  And

3  that's your whole history with cocaine?

4       **INMATE NGO:**  Yeah, pretty much.

5       **PRESIDING COMMISSIONER BRYSON:**  Okay, how

6  about alcohol?

7       **INMATE NGO:**  I don't drink alcohol, I'm

8  allergic to alcohol.

9       **PRESIDING COMMISSIONER BRYSON:**  Okay.

10      **INMATE NGO:**  I break out in hives.  Tried

11  it though but that's how I knew I was allergic

12  to it.

13      **PRESIDING COMMISSIONER BRYSON:**  Okay well

14  that answers those questions.   Thank you.  All

15  right, I'd like to invite the District Attorney

16  Mr. Crofoot to make a closing statement at this

17  time.

18      **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Thank

19  you.  At the time of this offense he was on

20  diversion for possession for that rock cocaine.

21  He was a gang member, Don Rubright stated in his

22  letter that this gang had not established a

23  territory.  The fact is Asian gangs generally

24  are not territorial as opposed to Spanish gangs

25  which are.  So that is meaningless, there in a

26  gang he was in the Tiger Mafia previously to

27  Fullerton Boyz.  Apparently in the gang

48

1   significantly in that he chose to have his chest
2   tattooed with a tiger relating to that gang
3   affiliation.  One of the correctional counselors
4   indicated that he was immature at the time of
5   the crime and easily influenced by peers.
6   Actually he was 19 years old at that time, he
7   was out of high school, he was in his first year
8   of college and in his story had moved away from
9   the gang influence.  However at the request of
10  the other gang members he did return to
11  Fullerton, he entered into a, there was an
12  argument at McDonalds between the Asian gang
13  members and the Fullerton Toker's Gang, a
14  Mexican gang.  That was a verbal confrontation.
15  They left, they the defendant, the inmate and
16  his cohorts left and went to another location
17  where they obtained a gun, returned to the
18  location where the 15 year old victim was
19  attending school and there they waited for the
20  victim, lay and wait for him and when the victim
21  came out the three of them attacked that victim
22  and ultimately the victim was shot in the back.
23  They fled to Washington, saw fit to destroy the
24  vehicle, burn the vehicle which might have
25  identified them.  However they also chose to
26  hang onto that 22 handgun which was the murder
27  weapon and they possessed that at the time they

51

49

1  were arrested.  This inmate denied knowledge of
2  the gun until it was in the vehicle, until it
3  was in the vehicle is the key because this is
4  pre-shooting.  He knew of the gun prior to going
5  to lay and wait for the 15 year old victim.  He
6  indicates that they didn't intend to kill the
7  victim, they only intended to beat him up.  So
8  they chose to bring a handgun to a fist fight.
9  The inmate indicates that they had the gun for
10 protection if someone else had a gun.  If
11 someone else chose, if they thought that someone
12 else had a gun and they bring a gun, it's
13 inevitable that there is going to be a shooting.
14 If he wanted to stay out of this he had plenty
15 of opportunity to walk away when all they had
16 previous to that was a verbal altercation.  The
17 reason for the shooting was inexplicable, it was
18 a minor affront during this argument, I'm sorry,
19 the victim said get out of town and that's the
20 basis for this killing.  In 1990, two years
21 prior to this, there was a similar cowardly
22 attack by this inmate and others.  There were --
23      **ATTORNEY RUTLEDGE:**  I would object to
24 that, do we have a police report for that?
25      **DEPUTY DISTRICT ATTORNEY CROFOOT:**  It's
26 in the probation report.
27      **ATTORNEY RUTLEDGE:**  But they couldn't --

52

50

1  my understanding is that they couldn't confirm
2  it, they couldn't reach the victim.

3      **DEPUTY DISTRICT ATTORNEY CROFOOT:**  The
4  police report is right there, it's on page ten
5  of the probation report.

6      **ATTORNEY RUTLEDGE:**  I would object to it
7  unless they can produce, it's like triple hear
8  say of actual police report.

9      **PRESIDING COMMISSIONER BRYSON:**  Okay,
10  that's over ruled, I won't be looking at all
11  that information.

12      **DEPUTY DISTRICT ATTORNEY CROFOOT:**  It was
13  a similar attack, the victim was confronted by
14  three, this inmate and two others.  He was
15  struck and this inmate was the second person to
16  strike that victim when the victim went down he
17  was kicked and punched by the three of them.  So
18  this is not, this one shooting is a culmination
19  of what was going to happen and what was going
20  to happen eventually and it did and it happened
21  in 1992.  The inmate is programming but he was
22  programming at the time that he got involved in
23  this gang activity.  He was attending college at
24  that time, he had moved from the area at that
25  time, it appeared that he was moving ahead as it
26  appears here that he's moving ahead.  But he
27  chose to go back and get involved in this gang

53

51

1   activity again and that's why he's here.  And I
2   think that he has served his MAPD was less than
3   two years ago, one and a half years ago.  I
4   think that he is - I'm sorry two and a half
5   years ago.  And I don't think that he has served
6   enough time and I would ask that the board not
7   grant him a date at this time.  Thank you.

8          **PRESIDING COMMISSIONER BRYSON:**  Thank
9   you.  All right counsel I would like to invite
10  you to make a closing statement.

11         **ATTORNEY RUTLEDGE:**  Thank you.  Well I
12  think that the most important thing that I would
13  comment that the people shared with us was that
14  this happened in 1992.  I wouldn't consider Mr.
15  Ngo programming when he was on, he had a
16  diversion charge at that time.  I think again
17  that he had just been an adult for about one
18  year.  I think he's discussed openly with the
19  panel his -- and if you have any other questions
20  about what his motivation was to be involved
21  with these people or what they were involved in
22  feel free to ask him again but I think he has
23  pretty much answered that.  I commented to him
24  you know, it's a miracle that most teenagers
25  survive the teen years because there is such a
26  high possibility of them to get involved in
27  stupid things like this.  This was a very

54

52

1   unfortunate situation and you know a clear
2   picture of an ignorant teenager thinking let's
3   just go get in a fight not appreciating at the
4   time that any type of violence has a potential
5   for something serious.  I think he clearly sees
6   that now, in fact he noted to the board that he
7   would like to share that with other people at
8   risk and I think that is, we still have young
9   people that are out there at risk for thinking
10  that they are just going to be beating up people
11  and not truly appreciating and I think there's
12  evidence that at that age your -- everything is
13  not together that's why teenagers act like there
14  from another planet.  But I think there is a
15  truly different person here today at 32.  He's
16  been down for this time.  There hasn't been any
17  evidence of any drug use or gang affiliation.  I
18  believe that some of these co-defendants are
19  housed here at CTF.  Is that correct?

20          **INMATE NGO:**  Correct.

21          **ATTORNEY RUTLEDGE:**  And there has been no
22  further action.  I think this did -- which I
23  would say I would speculate that this was an
24  isolated incident for these boys.  I think, I
25  don't think that that behavior marked Mr. Ngo's
26  life long traits as a person.  I think it was
27  sort of an immature wrong.  I mean I am not

55

53

1    going to disagree with the people, it was
2    clearly wrong, clearly had the potential for
3    what happened.  And I think we have all been
4    teenagers, we know how these kids don't think
5    these things through and it's very serious and
6    it had a tremendous impact on the community and
7    on this family and I believe that Mr. Ngo also
8    is in touch with that.  That said the amount of
9    time that he's served, he has served 13 years.
10   Is it 13 or 14?
11        **INMATE NGO:**  About 13, almost 13.
12        **ATTORNEY RUTLEDGE:**  Almost 13 years and
13   he came into the system when he was quite a
14   young man so in his twenties.  We all can
15   remember the twenties.  That's a significant
16   time of your life.  It's almost like if you
17   loose your twenties you've lost half your
18   thirties and your forties because that is such a
19   prime time.  So I would like the panel to when
20   you think about the amount of time he's served
21   think about the time of his life when everyone's
22   going to college or discovering life.  He lost
23   that whole decade, I mean he gave it up, I
24   shouldn't say it was taken away from him, he
25   made that decision to get involved in that
26   behavior and gave it up but I do believe that's
27   stronger punishment had he been older it would

54

1   have been a little bit different.  He's lost, he
2   gave up the prime years of his life in exchange
3   for this act.  He had no juvenile record, his
4   stable social history is all there.  All the
5   letters written by his family and also all the
6   reports in the file indicate that he had good
7   family ties, his family had there own business,
8   they were highly productive members of society.
9   And as far as remorse goes I think his comments
10  speak for themselves and also what he has
11  included in his Memorandum, I would incorporate
12  that into the remorse.  And his psychological
13  reports also underlie his true feelings of
14  remorse for what he's done.  And the motivation
15  for the crime, I mean what can you say about
16  that.  I'm not sure -- there are rare
17  circumstances when there is any way that you can
18  explain away this type of situation.  Other than
19  the fact again that you've got a bunch of
20  immature teenagers and I would note that when we
21  talk about gangs its one thing if one of us says
22  get out of town but when a gang member says
23  that, its almost like a threat you know.   If
24  there affiliated with dangerous people and they
25  tell other people to get out of town that should
26  put them on notice that something could happen
27  if they don't get out of town.  Mr. Ngo had one

57

55

1   prior incident with his diversion which he up
2   until the commitment offense he was completing
3   that. His maturity level I think is quite
4   significant. I think its obvious he has spent
5   this time in prison because he's a little bit
6   more mature than we would expect at that age but
7   that's probably what prison does to people. And
8   his understanding and plans for the future, that
9   goes without saying, he's submitted a Memorandum
10  that's covered every applicable suitability
11  factor as far as skills, he's got three vocs,
12  he's got -- he had been in college, he had
13  completed high school so he does have an
14  aptitude for academics. He's got the highest
15  TAB score and he has jobs lined up, family
16  support and interesting in his file to is he has
17  been giving money to organizations that are
18  feeding children. I don't know if you noted,
19  there was a letter thanking him for that so he
20  seems to have a community, a sense of community.
21  His institutional behavior is exceptional.
22  Nothing violent, no substance abuse, nothing
23  again to show that he has any motivation to
24  continue that, the path that he was on when he
25  entered the CDC. There is no documentation that
26  he's ever disrespected inmates or staff, he has
27  marketable skills, he has many years of self

58

56

1    help, he's fully prepared really for life among
2    free society as a productive citizen.  I think
3    he has covered every possible basis that is
4    necessary for his integration and his behavior
5    here indicates an enhanced ability to actually
6    function within the law.  I mean he knows he is
7    the know what can happen when you aren't
8    following the norms of society.  And while he
9    has been here he has lost his father and been
10   able to get more of an idea of the impact that
11   the death of Mr. Gonzales had on his family
12   which he expressed here today.  All those things
13   considered I would ask the board to please give
14   him a parole date today.  Thank you.
15          **PRESIDING COMMISSIONER BRYSON:**  Thank
16   you.  Sir I would like to give you an
17   opportunity to make a final statement to this
18   panel regarding your suitability for parole.
19          **INMATE NGO:**  All right.  I would like to
20   read, I wrote this.  First and for most there is
21   no adequate amount of words in the universe
22   which can express the truly deeply sorry I am to
23   Gonzales family for all the pain and suffering I
24   caused them and everyone else who was affected
25   by Angels death.  In hindsight I wish I could
26   have changed what happened on that tragic day
27   but the truth is I really did not know what was

59

57

1   about to happen that very instant that took
2   Angel's life.  At the time I honestly believe I
3   was getting into a fist fight and nothing more.
4   I did not take Angel's life, it was never my
5   intention that is such a tragic incident would
6   occur.  Again I was there for a fist fight,
7   nothing I say or do at this point will ever
8   change what happened on that tragic day.  All I
9   can do on my part is to accept full
10  responsibility for my action alone.  I hope and
11  pray that someday the Gonzales family will find
12  it in there hearts to forgive me for my actions.
13  We all have made mistakes at some point in our
14  lives, some more than others but as individual
15  how we choose to learn, grow and change our
16  behavior does set us apart from the one who
17  don't.  Today as I sit in front of you I am no
18  longer the young stupid naive 19 year old back
19  then but as a good decent 32 year old mature
20  adult who is intelligent enough to know the
21  difference between right and wrong.  Who is able
22  to think things through before reacting to any
23  situation and responsible for any actions that I
24  may take here on out.  I know in my heart and
25  soul that I am a good decent person who as a
26  young man made some very poor choices which  I
27  am truly sorry for.  There is not a single day

60

58

1    that goes by that I don't think about what
2    happened to Angel and what his family is going
3    through.  Everyday I wake up in here, it's a
4    constant reminder of that tragic day.  I deserve
5    to be punished for my actions but I believe I
6    have served more than enough time for my
7    actions.  In closing I understand the difficulty
8    of you task as Commissioner in determining ones
9    suitability with regard to public safety.  All
10   that I ask of you is please don't judge me for
11   one of my unchanging aspect of my past conduct
12   to find who I am today.  But look at all that I
13   have accomplished during my incarceration.  With
14   absolute certainty I know I am a better person
15   today than I was when I committed this
16   unfortunate offense.  I know I will never come
17   back in prison and I know I can be a law,
18   productive law bidding citizen if you would only
19   give me a second chance.  Should you find me
20   suitable here today the rules that govern this
21   panel in setting my term of confinement are set
22   forth in California Code of Regulation title 15
23   division two section 2403, the conduct most
24   closely related to the crime I've committed is
25   category A section three.  Which has a minimum
26   term of 17 years medium term of 18 years and a
27   maximum term of 19 years.  I respectfully

61

59

1   request that this panel set my appropriate term

2   of 17, 18 or 19 years.  And please, please give

3   me a second chance.  I know I will be a law

4   bidding citizen.  I know I can make it out

5   there.  I won't be a statistic that comes back

6   in here.  I will never, never come back in to

7   prison.  I have a family that's waiting for me

8   out there.  So please grant me a date today.

9   Thank you for your time today.

10          **PRESIDING COMMISSIONER BRYSON:**  Thank you

11   for your remarks.  We will now recess for

12   deliberations the time is 11:11 A.M.

13                    **R E C E S S**

14                      --oOo--

15

16

17

18

19

20

21

22

23

24

25

26

27

62

60

1        **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3        **DEPUTY COMMISSIONER FILANGERI:**  Okay

4    we're back on record.

5        **PRESIDING COMMISSIONER BRYSON:**  All

6    right, the time is 11:58 A.M. in the matter of

7    Sieu Phong Ngo.

8        **DEPUTY COMMISSIONER FILANGERI:**  Did

9    somebody tell the DA?

10       **PRESIDING COMMISSIONER BRYSON:**  Oh my

11   apologies.  We'll start is all again.  Why don't

12   you please find the DA.

13       **ATTORNEY RUTLEDGE:**  He went home.

14       **DEPUTY COMMISSIONER FILANGERI:**  We're on

15   record.

16       **PRESIDING COMMISSIONER BRYSON:**  The time

17   is 11:59 in the matter of Sieu Phong Ngo.  Sir

18   the panel reviewed all information received from

19   the public and you and relied on the following

20   circumstances in concluding that you are not

21   suitable for and would pose an unreasonable risk

22   of danger to society or a threat to public

23   safety if released from prison.  The offense was

24   carried out in an especially cruel and callous

25   manner in that you attacked and beat a 15 year

26   old male, Angel Gonzales who was ultimately shot

27   **SIEU NGO   J-07024   DECISION PAGE 1   2/8/06**       b3

61

1    in the back and died at the scene.  The offense
2    was carried out in a dispassionate and
3    calculated manner in that it was a confrontation
4    between gang members preplanned by lying in wait
5    for the victim as he walked home.  The offense
6    was carried out in a manner demonstrating
7    exceptionally callous disregard for human
8    suffering, disregard for public safety in that
9    it occurred near a school and there was a clear
10   opportunity for you to cease but you continued.
11   Despite some prior record of involvement with
12   cocaine this panel recognizes and submits that
13   you have a relatively criminal free background
14   and you are to be commended for that.  And you
15   have a history of stable relationships including
16   your family support.  We do not have evidence
17   that you have a long history with established
18   gangs and so we do not point to that in terms or
19   your history of relationships.  And it will be
20   further discussed you have presented to us a
21   history of strong stable social support.  As to
22   your institutional behavior you have programmed
23   commendably, your education includes 41 units
24   towards you AA Degree and continuing involvement
25   with college enrollment including your current
26   independent study through Coast Line Community
27   **SIEU NGO   J-07024   DECISION PAGE 2   2/8/06**

64

1   College.  We also have read into the record a
2   very reputable list of vocational achievements
3   including automotive refinishing and upholstery,
4   forklift operator, salesmanship and other
5   vocational work.  You have participated in self
6   help and therapy, well self help consistently
7   ranging from Anger Management, the Teddy Bear
8   Drive, Feed the Children, Buddhist ordination
9   into Buddhist Studies, the Impact Program, Key
10  to Fatherhood, The Muslim Chapel, and you have
11  assisted in inmate education.  As to misconduct
12  you have zero 115's, you have two minor 128A's,
13  the last in 2000 for window covering.  As to
14  your psychological report, the report that is
15  dated January 23rd, 2002, the last we have by
16  Doctor Saindon S-A-I-N-D-O-N does in general
17  support release.  And I quote, this man has
18  spent ten years in prison and that is at the
19  time of this psychological report, I would
20  recommend should he be paroled abstinence from
21  all alcohol or use of any controlled substance,
22  frequent monitoring for substance abuse, he
23  should be relocated so that he is near his
24  family, he should make frequent reports to his
25  parole officer concerning his vocational
26  progress and goals.  And due to his families
27  **SIEU NGO  J-07024  DECISION PAGE 3  2/8/06**

65

1   commitment to supporting him upon his release,
2   his projected level of success in the community
3   if granted a date for parole is seen at this
4   time to be better than average.  You also have
5   made outstanding parole plans.  You have viable
6   residential plans in the last county of legal
7   residence and I refer to the record for the
8   documentation that we have received.  You also
9   have acceptable employment plans with
10  established businesses owned by your relatives
11  who are assuring you of jobs.  As to Penal Code
12  3042 responses, the responses indicate
13  opposition to a finding of parole suitability,
14  specifically by the District Attorney of Orange
15  County.  In a separate decision the hearing
16  panel finds it's not reasonable to expect that
17  parole would be granted at a hearing during the
18  following two years.  Specific reasons for this
19  finding are as follows.  The panel reviewed all
20  information received from the public and relied
21  on the following circumstances.  The offense was
22  carried out in a specially cruel and callous
23  manner in that you attacked and beat a 15 year
24  old Angel Gonzales who was ultimately shot in
25  the back and died at the scene.  The offense was
26  carried out in a dispassionate and calculated
27  **SIEU NGO   J-07024   DECISION PAGE 4   2/8/06**

64

1    manner, it was a confrontation between gang
2    members preplanned by lying in wait for the
3    victim as he walked home.  The offense was
4    carried out in a manner demonstrating
5    exceptionally callous disregard for human
6    suffering.  The offense risked public safety in
7    that it was conducted near a school and you had
8    a clear opportunity to cease but continued.
9    Moreover, the motive for this crime was very
10   trivial in relation to the offense.  It was gang
11   activity and you told this panel "I thought I
12   was going to a fist fight", that minimizes the
13   gravity of the crime, your involvement in it and
14   there fore your insight into the gravity of this
15   crime.  In denying you parole for two years this
16   panel will place the prisoner on the 2008
17   calendar for the next Subsequent Hearing.  If
18   this decision is final you will not get parole,
19   the board will send you a copy of the decision.
20   It will indicate the reasons you did not get
21   paroled.  If this decision is not final the
22   board will set up another hearing.  You can find
23   the laws of California Code of Regulations title
24   15 section 2041.  The board recommends get self
25   help, stay discipline free, get therapy, and
26   continue your educational and vocational
27   **SIEU NGO   J-07024   DECISION PAGE 5  2/8/06**

67

65

1    development plus your outreach to help others.

2    Commissioner do you have anything further?

3        **DEPUTY COMMISSIONER FILANGERI:**  Yeah, the

4    thing that bother's me the most is you know our

5    job is to determine whether your  release would

6    pose an unreasonable risk to public safety and

7    one of the tools that we look at, one of the

8    tools that I like to try to use in that is your

9    insight into the crime.  I think your contention

10    that you were going to a fist fight when you

11    somebody else was armed is hard to believe and

12    as Commissioner said it tends to minimize your

13    role.  I can see where you might be motivated to

14    minimize your role.  What it means to me is that

15    you haven't come to grips, you haven't developed

16    the insight that you need into the causative

17    factors of this crime and I think you should

18    look at that.  Moreover you told the

19    psychiatrist that no one intended to kill the

20    victim, well even if you weren't holding the gun

21    somebody came to a fist fight with a gun and

22    what was that person's intentions.  So it's hard

23    for me to get a gauge on what risk you would

24    pose to public safety when I can't feel

25    comfortable about the level of insight that

26    you've displayed.  And that's what prevents me

27    **SIEU NGO  J-07024  DECISION PAGE 6  2/8/06**

68

66

1  from granting you a date.  I wish you the best

2  of luck, you've been doing good work in the

3  institution, I hope you keep it up.  Thank you.

4         **PRESIDING COMMISSIONER BRYSON:**  Please

5  don't get discouraged, I hope you will take this

6  as a challenge and an opportunity.  And that

7  concludes this hearing and the time is 12:08

8  P.M.

9                    --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23  **PAROLE DENIED TWO YEARS**

24  **THIS DECISION WILL BE FINAL ON:**___JUN **8** 2006___

25  **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **SIEU NGO  J-07024  DECISION PAGE 7  2/8/06**

67

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, SUE GERDES, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 66, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF SIEU NGO

CDC NO. J-07024, ON FEBRUARY 8, 2006, and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated February 27, 2006 at Sacramento,

California.


SUE GERDES
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

70

# EXHIBIT B

71

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

| | |
|---|---|
| In the matter of the Life )<br>Term Parole Consideration )<br>Hearing of: )<br> )<br>SIEU PHONG NGO )<br>_____ ) | CDC Number J-07024 |

**COPY**

**INMATE**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 13, 2002

2:20 P.M.

PANEL PRESENT:

AL ANGELE, Presiding Commissioner
ROBERT RODRIGUEZ, Deputy Commissioner

OTHERS PRESENT:

SIEU PHONG NGO, Inmate
PAT FOX, Attorney for Inmate
JAMES LAIRD, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No
  ✓   Yes          See Errata Sheet

**Valerie Lord, Transcriber    Capitol Electronic Reporting**

72

ii

INDEX

                                                                Page

Proceedings ......................................  1

Case Factors .....................................  9

Pre-Commitment Factors ........................... 15

Parole Plans ..................................... 23

Post-Commitment Factors .......................... 29

Closing Statements ............................... 50

Recess ........................................... 56

Decision ......................................... 57

Adjournment ...................................... 64

Transcriber Certification ........................ 65

--oOo--

73

1

1        **P R O C E E D I N G S**

2        **PRESIDING COMMISSIONER ANGELE:** --- hearing,

3   pronounce your last name.

4        **INMATE NGO:** Ngo.

5        **PRESIDING COMMISSIONER ANGELE:** Ngo?

6        **INMATE NGO:** Yes.

7        **PRESIDING COMMISSIONER ANGELE:** First name?

8        **INMATE NGO:** Sieu.

9        **PRESIDING COMMISSIONER ANGELE:** Sieu, okay.

10   Initial parole consideration hearing for Sieu Ngo,

11   that's N-G-O, CDC number J-John-07024. Today's

12   date Monday, May 13, 2002. The time approximately

13   2:20 p.m. We're located at CTF Soledad. Inmate

14   received February the 1st, 1994, Orange County,

15   murder second degree. Case number C-Charles

16   99109, count number one, 187 of the Penal Code.

17   Received a term of 16 years to life, with a

18   minimum eligible parole date of May the 24th,

19   2003. Mr. Ngo, this hearing's going to be

20   tape-recorded. For the purpose of voice

21   identification, each of us will state our first

22   name, last name, spelling our last name. When it

23   comes to your turn, after you spell your last

24   name, give us your CDC number. I'm going to go to

25   my left. My name is Al Angele, A-N-G-E-L-E,

26   Commissioner, Board of Prison Terms.

27        **DEPUTY COMMISSIONER RODRIGUEZ:** Deputy

74

1   Commissioner Rodriguez, R-O-D-R-I-G-U-E-Z, Board

2   of Prison Terms.

3         **DEPUTY DISTRICT ATTORNEY LAIRD:** James

4   Laird, Orange County District Attorney's office,

5   L-A-I-R-D.

6         **ATTORNEY FOX:** Pat Fox, F-O-X, attorney for

7   Mr. Ngo.

8         **INMATE NGO:** Ngo, N-G-O. First name,

9   S-I-E-U. Middle name Phong, P-H-O-N-G.

10        **DEPUTY COMMISSIONER RODRIGUEZ:** Prison

11   number?

12        **INMATE NGO:** J-07024.

13        **DEPUTY COMMISSIONER RODRIGUEZ:** You can

14   bring that closer to you.

15        **PRESIDING COMMISSIONER ANGELE:** Let the

16   record reflect that there are also two

17   correctional officers in the room for security

18   purposes and will not be participating in today's

19   hearing. The hearing is being conducted pursuant

20   to Penal Code Sections 3041 and 3042 and the rules

21   and regulations of the Board of Prison Terms

22   governing parole consideration hearings for life

23   prisoners. The purpose of today's hearing is to

24   consider your suitability for parole. We'll

25   consider the crimes you were committed for, your

26   prior criminal and social history and your

27   behavior and programming since your commitment.

75

3

1    We'll reach a decision today and inform you
2    whether or not we find you suitable for parole and
3    the reasons for our decision.  If we find you
4    suitable for parole, the length of your
5    confinement will be explained to you.  Before we
6    go any further, I want to instruct you, Mr. Ngo,
7    that if you do not get a date today, this is your
8    initial hearing and this will form the foundation
9    of all future hearings, okay.  In saying that, we
10   ask that you be totally truthful with us.  Nothing
11   you say today is going to change the outcome of
12   your court case, okay.  If you tell us things
13   today that are not true, I'm sure somewhere down
14   the line it's going to catch up to you and you're
15   going to wind up finding yourself with a situation
16   where nobody knows what the story is, the right
17   story.  So, we need to have the total truth today,
18   okay.  I'm going to explain to you the way the
19   system is going to work.  We're going to have two
20   different segments.  I'm going to discuss with you
21   the crime, your prior criminal and social history.
22   I'm going to discuss with you your parole plans,
23   any letters of support or opposition that are in
24   the record.  And Commissioner Rodriguez will then
25   discuss with you your programming since your
26   commitment, your psychological evaluation, your
27   counselor's report and he'll also discuss with you

76

4

1   any sort of discipline that you may have had.
2   Once that is conducted, we will then have the
3   ability to ask you questions, as will the District
4   Attorney and your attorney.  After that, the
5   District Attorney, your attorney and yourself,
6   will have the opportunity to make a closing
7   statement.  Once the closing statements are done,
8   we'll recess, clear the room and deliberate.  When
9   we have completed our deliberations, we'll resume
10  the hearing and announce our decision.  The Board
11  of Prison Terms' rules and the law state a parole
12  date shall be denied if your release would pose an
13  unreasonable risk of danger to others.  Do you
14  understand that?

15          **INMATE NGO:**  The last part, I ---

16          **PRESIDING COMMISSIONER ANGELE:**  The law
17  requires that parole would be denied if your
18  release would pose an unreasonable risk of danger
19  to others.  Now you have certain rights.  Those
20  rights include a timely notice of this hearing, a
21  right to review your Central file, have an Olson
22  Review, and a right to present relevant documents.
23  Have those rights been so far, Ms. Fox?

24          **ATTORNEY FOX:**  Yes, they have.

25          **PRESIDING COMMISSIONER ANGELE:**  You have an
26  additional right and that's to be heard by an
27  impartial Panel.  Any objections to either member

77

5

1    of this Panel?

2         **ATTORNEY FOX:** At this time on behalf of

3    Mr. Ngo, I'd pose an objection. It's not possible

4    for Mr. Ngo to receive a fair hearing before any

5    Panel comprised of members of the Board of Prison

6    Terms as it's currently constituted. That's based

7    on their policies, practices, and procedures, as

8    well as on the practices, policies, and public

9    statements of the governor.

10        **PRESIDING COMMISSIONER ANGELE:** Can you

11   enumerate the policies and practices of this

12   particular Panel?

13        **ATTORNEY FOX:** My understanding is that when

14   a date, for instance, when a date is granted the

15   Board of Prison Terms submits to the governor a

16   list of reasons why the date should not be granted

17   after the Panel has already found the person

18   suitable. So I think there's a conflict there.

19   And just the inherent conflict of interest having

20   been appointed by the governor and answering back

21   to the governor.

22        **PRESIDING COMMISSIONER ANGELE:** First of all

23   the statement with regards to the Board of Prison

24   Terms providing the governor with a list of

25   reasons not to find the inmate suitable for parole

26   is not true. The governor has staff that reviews

27   these cases that have nothing to do with Board of

78

6

1   Prison Terms and it is they who present the

2   governor with reasons (inaudible) to.  As far as

3   this particular Panel goes, I am an appointee of

4   the governor.  I've never discussed with him my

5   appointment, nor have I discussed with him his

6   philosophy on parole dates.  I have given a number

7   of parole dates in the past and will continue

8   doing that as long as I'm on this Board.  And

9   there's no reason at all that I feel that I am not

10  able to give or to be fair and impartial.

11  Commissioner Rodriguez.

12      **DEPUTY COMMISSIONER RODRIGUEZ:**  I'm a civil

13  servant and I've always been known to be fair and

14  impartial as well as I've been on panels with

15  Commissioner Angele where we have given a number

16  of dates at various prisons throughout California.

17      **PRESIDING COMMISSIONER ANGELE:**  I'll

18  overrule your objection, anything else?

19      **ATTORNEY FOX:**  No, that's all.  Thank you.

20      **PRESIDING COMMISSIONER ANGELE:**  Okay,

21  Mr. Ngo, do you have any problems at all

22  understanding or speaking the English language?

23      **INMATE NGO:**  No, I don't, Sir.

24      **PRESIDING COMMISSIONER ANGELE:**  Not even

25  technical words?

26      **INMATE NGO:**  Maybe if you use court lingo,

27  you know, then I might have a problem.

79

1        **PRESIDING COMMISSIONER ANGELE:**  Your

2   attorney can probably help you with that.  So you

3   have no problem at all ---

4        **INMATE NGO:**  No problem.

5        **PRESIDING COMMISSIONER ANGELE:**  All right.

6   I noticed that you signed BPT form 1073 on January

7   the 18th, of this year indicating that you do not

8   have a disability as defined under the Americans

9   with Disabilities Act, is that true?

10       **INMATE NGO:**  Yes, it is.

11       **PRESIDING COMMISSIONER ANGELE:**  And you need

12  no accommodation, correct?

13       **INMATE NGO:**  Pardon?

14       **PRESIDING COMMISSIONER ANGELE:**  You need no

15  accommodation?

16       **INMATE NGO:**  No.

17       **PRESIDING COMMISSIONER ANGELE:**  You will

18  receive a copy of our written tentative decision

19  today.  That decision becomes final within 120

20  days.  You'll then receive a copy of the decision

21  and a copy of the transcript and you'll have 90

22  days from the effective date to appeal if you so

23  desire.  You are not required to discuss your

24  offense with us.  You are not required to admit

25  your offense.  However, this Panel does accept as

26  true the findings of the court.  Do you understand

27  what that means?

8

1          **INMATE NGO:**  The findings of the court?

2          **PRESIDING COMMISSIONER ANGELE:**  We accept as

3     true the findings of the court.  Do you understand

4     what that means?

5          **INMATE NGO:**  What the court found?

6          **PRESIDING COMMISSIONER ANGELE:**  Yes.

7          **INMATE NGO:**  Yes.

8          **PRESIDING COMMISSIONER ANGELE:**  In other

9     words, we accept that as being true.

10          **INMATE NGO:**  Yes, it is.

11          **PRESIDING COMMISSIONER ANGELE:**  Okay.  Any

12     confidential material to be used today,

13     Commissioner Rodriguez?

14          **DEPUTY COMMISSIONER RODRIGUEZ:**  There will

15     be none used today, Sir.

16          **PRESIDING COMMISSIONER ANGELE:**  I have

17     passed the hearing checklist marked exhibit one

18     both to your attorney and the District Attorney to

19     ensure that we're all operating off the same set

20     of documents.  Mr. Laird, do you have those

21     documents?

22          **DEPUTY DISTRICT ATTORNEY LAIRD:**  Yes, Sir.

23          **PRESIDING COMMISSIONER ANGELE:**  Okay, do you

24     have those documents, Ms. Fox?

25          **ATTORNEY FOX:**  Yes, I do.

26          **PRESIDING COMMISSIONER ANGELE:**  Thank you.

27          **ATTORNEY FOX:**  You're welcome.

9

 1          **PRESIDING COMMISSIONER ANGELE:**  Any

 2     additional documents to submit?

 3          **ATTORNEY FOX:**  I don't believe so.  However,

 4     if we can't find certain things in the Central

 5     file then I would like to present what we do have.

 6     But I'm assuming that we're going to find them

 7     all.  I do have two photographs, however, of

 8     Mr. Ngo's family.

 9          **PRESIDING COMMISSIONER ANGELE:**  Will the

10     inmate be speaking with us today?

11          **ATTORNEY FOX:**  Yes, he will.

12          **PRESIDING COMMISSIONER ANGELE:**  Mr. Ngo, if

13     you'd please raise your right hand to be sworn.

14     Do you solemnly swear or affirm that the testimony

15     you give at today's hearing will be the truth, the

16     whole truth, and nothing but the truth?

17          **INMATE NGO:**  Yes, I do.

18          **PRESIDING COMMISSIONER ANGELE:**  If there is

19     no objection, Ms. Fox, I'm going to read into the

20     record the Statement of Facts taking it from the

21     probation officer's report, page three, line 15 to

22     page four, line six.

23          **ATTORNEY FOX:**  I usually object to the use

24     of the probation officer's report because it is

25     based on hearsay to the extent that there are

26     statements attributed to my client in that, I

27     think they could be admitted for prior

82

10

1  inconsistent or consistent statements.

2       **PRESIDING COMMISSIONER ANGELE:**  You said you

3  usually do or you are?

4       **ATTORNEY FOX:**  No, I will.

5       **PRESIDING COMMISSIONER ANGELE:**  And what

6  would you like us to use?

7       **ATTORNEY FOX:**  Either the trial transcript

8  or the findings of any court of appeals that would

9  be based on the sworn testimony presented in

10  trial.

11       **PRESIDING COMMISSIONER ANGELE:**  Okay, well I

12  have neither.

13       **ATTORNEY FOX:**  Well, that's not our fault.

14       **PRESIDING COMMISSIONER ANGELE:**  Not our

15  fault neither, so I'll overrule that objection

16  also.

17       **ATTORNEY FOX:**  Then the risk we run is that

18  we're going to have a Statement of Facts that's

19  based on uncorroborated hearsay, which in many

20  cases is just based on the police report, which is

21  not from testimony of percipient witnesses.  And

22  also from the District Attorney's office many

23  times the probation office uses their file to come

24  to their statements.  Perhaps you can read the

25  Statement of Facts and then ask Mr. Ngo if he has

26  any comments, but I do have a standing hearsay

27  objection for non-corroborated statements.

83

11

1      **DEPUTY DISTRICT ATTORNEY LAIRD:**  Mr. Angele,
2   if I may ---

3      **PRESIDING COMMISSIONER ANGELE:**  Yes.
4      **DEPUTY DISTRICT ATTORNEY LAIRD:**  Is it
5   possible, I do note that this went to trial, the
6   jury had found the defendant guilty of murder in
7   the first degree.  However, in exchange for a plea
8   agreement whereby the defendant would admit second
9   degree murder, he got that deal in exchange for
10   getting a 15 to life sentence with a one-year
11   vicarious arm enhancement for a total of 16 years
12   to life.  And he agreed to suspend any, or not to
13   seek any appeal of the matter and that's why there
14   would be no court of appeal record on this case in
15   that he agreed to extinguish all appellate rights
16   (inaudible).

17      **PRESIDING COMMISSIONER ANGELE:**  Well, once
18   again, I'm going to overrule your objection and
19   we'll go ahead and incorporate by reference, or
20   excuse me incorporate by reading into the record
21   the probation officer's report, page three, line
22   15, page four, line six.  September 18th, 1992, 15
23   year old Angel Gonzales was beaten and stabbed to
24   death at a Fullerton High School as she was
25   walking home after school.  As a result of a
26   police investigation, it was learned that earlier
27   in the day the victim, a member of the Fullerton

*84*

12

1    Tokerstown, that's T-O-K-E-R-S-town, a Latin gang,

2    and members of the Asian gang, Fullerton Boyz,

3    B-O-Y-Z, were at a McDonald's restaurant near the

4    high school.  The victim and the name of No

5    Muhamed, that's N-O, first name, Muhamed,

6    M-U-H-A-M-E-D, had a confrontation with each

7    claiming their respective gang affiliations.

8    After this non-physical altercation, the group of

9    Asians, which at the time included the defendant,

10   and for the sake of the interpreter, defendant is

11   synonymous with Mr. Ngo, obtained a firearm.  And

12   defendant and his co-defendants then returned to

13   the school where they waited for Angel Gonzales.

14   As he was walking home he was attacked and beaten.

15   During the physical altercation, the victim was

16   shot one time in the middle of the back by one of

17   the defendants who was later identified as Usumang

18   Muhamed, first name U-S-U-M-A-N-G, last name,

19   M-U-H-A-M-E-D.  The group of five defendants fled

20   the area after the shooting.  Angel Gonzales died

21   at the scene as a result of a gunshot wound.  The

22   defendant, along with Jimmy Dao, D-A-O, and Asat

23   Cham, first name A-S-A-T, last name C-H-A-M, fled

24   to the state of Washington.  They were

25   subsequently arrested there and the murder weapon,

26   a stolen 22-caliber handgun was recovered in the

27   vehicle.  Another statement that I want to add to

85

13

1   this was that the vehicle used the day of the

2   shooting apparently was burned prior to them

3   leaving the state.  Is that what happened,

4   Mr. Ngo?

5       **INMATE NGO:** Yes, it was.

6       **PRESIDING COMMISSIONER ANGELE:**  Are there

7   any changes in this story that I just read that

8   you want to bring up?

9       **INMATE NGO:**  No, Sir.

10       **PRESIDING COMMISSIONER ANGELE:**  So this is

11   exactly what happened?

12       **INMATE NGO:**  Basically, yes.

13       **PRESIDING COMMISSIONER ANGELE:**  Basically.

14       **INMATE NGO:**  Yes.

15       **PRESIDING COMMISSIONER ANGELE:**  Okay.  You

16   were involved in beating this individual, correct?

17       **INMATE NGO:**  Yes, we got in a fight,

18   fistfight.

19       **PRESIDING COMMISSIONER ANGELE:**  Well, it was

20   more than a fistfight, he was jumped by a gang of

21   people, right?

22       **INMATE NGO:**  Yes, he was.

23       **PRESIDING COMMISSIONER ANGELE:**  Okay.  Now

24   if I'm not mistaken you were the one that handed

25   this gentleman the gun?

26       **INMATE NGO:**  No, that's ---

27       **PRESIDING COMMISSIONER ANGELE:**  Is that

86

14

1   true?

2          **INMATE NGO:**  No, that's not true.

3          **PRESIDING COMMISSIONER ANGELE:**  You didn't

4   find it on the floor under the seat of the

5   vehicle?

6          **INMATE NGO:**  In my statement in court was I

7   saw under the car seat.

8          **PRESIDING COMMISSIONER ANGELE:**  Okay.

9          **INMATE NGO:**  And after that it was, my crime

10  partner had it on him without my knowledge.

11         **PRESIDING COMMISSIONER ANGELE:**  So you

12  didn't touch the gun at all?

13         **INMATE NGO:**  No, I didn't, Sir.

14         **PRESIDING COMMISSIONER ANGELE:**  Okay.  How

15  many of them, were there four of you or five?

16         **INMATE NGO:**  Five.

17         **PRESIDING COMMISSIONER ANGELE:**  And did you

18  know Mr. Gonzales at all?

19         **INMATE NGO:**  No, Sir.

20         **PRESIDING COMMISSIONER ANGELE:**  But you had

21  left and were living in Los Angeles County at the

22  time?

23         **INMATE NGO:**  Yes, I was, Sir.

24         **PRESIDING COMMISSIONER ANGELE:**  And had

25  become a part of a different gang.

26         **INMATE NGO:**  It wasn't --- I just known

27  them, associated with them.

87

15

1     **PRESIDING COMMISSIONER ANGELE:** The Tiger

2 Mafia?

3     **INMATE NGO:** Yes.

4     **PRESIDING COMMISSIONER ANGELE:** Did you

5 belong to them or did you just associate?

6     **INMATE NGO:** Associate.

7     **PRESIDING COMMISSIONER ANGELE:** Okay, but

8 you were a member of the Fullerton Boyz, right?

9     **INMATE NGO:** Yes, I was.

10     **PRESIDING COMMISSIONER ANGELE:** Did these

11 gangs know each other?

12     **INMATE NGO:** No.

13     **PRESIDING COMMISSIONER ANGELE:** You were 19

14 years old at the time?

15     **INMATE NGO:** Yes, Sir.

16     **PRESIDING COMMISSIONER ANGELE:** How do you

17 feel about what happened?

18     **INMATE NGO:** I'm sorry.

19     **PRESIDING COMMISSIONER ANGELE:** All right,

20 as far as I can see you had no criminal record

21 prior to this. You had some arrests as an adult,

22 but nothing as a juvenile. You had an intact

23 family?

24     **INMATE NGO:** Pardon me?

25     **PRESIDING COMMISSIONER ANGELE:** You had an

26 intact family.

27     **INMATE NGO:** Yes, I did, Sir.

16

1 **PRESIDING COMMISSIONER ANGELE:** You just got

2 --- I mean after you had left there, I guess they

3 called you up and said we got something we got to

4 take care of.

5 **INMATE NGO:** No. Actually what happened

6 that day was, you know, we came there, they called

7 me up, you know, I came down to visit them. I

8 said I'm just glad that you called me, you know,

9 it wasn't nothing planned or nothing. It just

10 happened.

11 **PRESIDING COMMISSIONER ANGELE:** Any reason

12 why you guys kept the gun?

13 **INMATE NGO:** The gun wasn't even in the car

14 when I first was there when they picked me up; it

15 was never there. The first time I saw it was

16 after I got back into the car.

17 **PRESIDING COMMISSIONER ANGELE:** I

18 understand. I'm talking about in Washington. The

19 murder gun was found in the car?

20 **INMATE NGO:** Yes, we kept it. We never

21 disposed of it.

22 **PRESIDING COMMISSIONER ANGELE:** I'll go over

23 your criminal activity. You had nothing as a

24 juvenile. As an adult you were arrested in 1992,

25 March, San Gabriel Police Department, possession

26 of rock cocaine. What was that about?

27 **INMATE NGO:** I experimented with cocaine,

89

17

1    rock cocaine.

2        **PRESIDING COMMISSIONER ANGELE:**  You were

3    experimenting with it?

4        **INMATE NGO:**  Yes.

5        **PRESIDING COMMISSIONER ANGELE:**  Were you

6    dealing it at all?

7        **INMATE NGO:**  No.

8        **PRESIDING COMMISSIONER ANGELE:**  Did you

9    experiment with it?

10       **INMATE NGO:**  Yes.

11       **PRESIDING COMMISSIONER ANGELE:**  And?

12       **INMATE NGO:**  I got busted the first time I

13   bought it.  I was just driving home at that point

14   and police pulled me over and he searched the

15   vehicle and found --- I gave him permission to

16   search the vehicle, he found the rock cocaine.

17   They gave me diversion for it.

18       **PRESIDING COMMISSIONER ANGELE:**  How long

19   after you bought it did they stop you?

20       **INMATE NGO:**  About what, 15 minutes.  I was

21   just going home by then.

22       **PRESIDING COMMISSIONER ANGELE:**  Was it a

23   sting do you know?

24       **INMATE NGO:**  I don't know.

25       **PRESIDING COMMISSIONER ANGELE:**  Do you know

26   what that means?

27       **INMATE NGO:**  Yeah, yes I do.  It was not a

90

18

1   sting.  The cop just saw me and he pulled me over.

2       **PRESIDING COMMISSIONER ANGELE:**  Pulled you

3   over for what?

4       **INMATE NGO:**  I don't know.

5       **PRESIDING COMMISSIONER ANGELE:**  Okay, he

6   never indicated to you that he saw you make the

7   purchase?

8       **INMATE NGO:**  No.

9       **PRESIDING COMMISSIONER ANGELE:**  Had you

10  tried it before?

11      **INMATE NGO:**  Yes.

12      **PRESIDING COMMISSIONER ANGELE:**  It does

13  indicate that you were diverted, but you were also

14  arrested apparently in Olympia, Washington,

15  possession of stolen property.  But apparently

16  they dismissed it and I think they probably

17  dismissed it because of the arrest and the murder,

18  correct?

19      **INMATE NGO:**  I think so.

20      **PRESIDING COMMISSIONER ANGELE:**  Okay.  What

21  was the stolen property?

22      **INMATE NGO:**  From what my understanding is

23  the gun that the murder weapon came from was

24  (inaudible) Washington.

25      **PRESIDING COMMISSIONER ANGELE:**  Okay.

26      **INMATE NGO:**  So I was never even in

27  Washington until after the fact.

*91*

19

1    **PRESIDING COMMISSIONER ANGELE:**  Which one of

2    your crime partners was from Washington?

3        **INMATE NGO:**  Asat Cham.

4        **ATTORNEY FOX:**  Do you want to spell that?  I

5    think for the ---

6        **INMATE NGO:**  A-S-A-T, C-H-A-M.

7        **PRESIDING COMMISSIONER ANGELE:**  I think we

8    already went through that one time.  Now, okay, it

9    would indicate --- I want to make sure I have the

10   record straight on the names also.  Were there two

11   Muhameds there?

12       **INMATE NGO:**  Yes.

13       **PRESIDING COMMISSIONER ANGELE:**  Okay,

14   because I had two spellings of each name.  It

15   would probably be pretty reasonable to assume that

16   Cham, Mr. Cham ---

17       **INMATE NGO:**  Yes.

18       **PRESIDING COMMISSIONER ANGELE:**  Probably

19   brought the gun from Washington when he came down

20   here.  Just assuming since it was taken from

21   Washington State.

22       **INMATE NGO:**  Yes, Sir.

23       **PRESIDING COMMISSIONER ANGELE:**  And that's

24   where you wound up going back.  You were born in

25   Vietnam on May the 18th, 1973.  You (inaudible)

26   the United States since 1979, graduated Fullerton

27   High School.  And it says here you attended

92

20

1    Fullerton Community College and Pasadena City

2    College.  You completed 10 units and your major

3    was Business.  You worked as a telemarketer.

4    Who'd you work for as a telemarketer?

5         **INMATE NGO:**  It's for like a real estate

6    place, (inaudible) insurance, telemarketing.  Try

7    to get them to go to seminar.

8         **PRESIDING COMMISSIONER ANGELE:**  You worked

9    at your family liquor store and was living with

10   your parents when this occurred?

11        **INMATE NGO:**  Yes, Sir.

12        **PRESIDING COMMISSIONER ANGELE:**  I want to

13   make sure I get honest answers from you because

14   I've seen two places now that indicates that you

15   were a member of the Tiger Mafia.

16        **INMATE NGO:**  Tiger Mafia is who I associated

17   with.  That's when they asked me (inaudible) my

18   tattoo was on there, TM.  I was on bulletin

19   boards.

20        **PRESIDING COMMISSIONER ANGELE:**  I

21   understand.

22        **INMATE NGO:**  They ask me TM, that's why I

23   say Tiger Mafia, because you know, I was

24   associated with them.

25        **PRESIDING COMMISSIONER ANGELE:**  But you left

26   Fullerton.

27        **INMATE NGO:**  Yes.

*93*

21

1    **PRESIDING COMMISSIONER ANGELE:**  And you

2    moved to Los Angeles area.

3    **INMATE NGO:**  Yes.

4    **PRESIDING COMMISSIONER ANGELE:**  And became

5    affiliated one way or the other with the Tiger

6    Mafia.

7    **INMATE NGO:**  When I moved to Orange County,

8    that's when ---

9    **PRESIDING COMMISSIONER ANGELE:**  Orange

10   County, I'm sorry.

11   **INMATE NGO:**  Associated with Fullerton Boyz.

12   In LA I was with the Tiger Mafia.

13   **PRESIDING COMMISSIONER ANGELE:**  Were you in

14   LA before you went to Orange County?

15   **INMATE NGO:**  Yes, Sir.

16   **PRESIDING COMMISSIONER ANGELE:**  Okay.  Now

17   you said you were associated with them.  You were

18   associated with them enough to have a tattoo on

19   your arm.

20   **INMATE NGO:**  It's not --- I can have ---

21   it's taken off already.

22   **PRESIDING COMMISSIONER ANGELE:**  Well, it was

23   taken off, it was on at the time.  It still said

24   TM.

25   **INMATE NGO:**  Yes.

26   **PRESIDING COMMISSIONER ANGELE:**  Which would

27   indicate to me that you were a member.  I mean,

94

22

1    let's be honest, were you or weren't you?

2        **INMATE NGO:**  To tell you the truth, Sir ---

3        **PRESIDING COMMISSIONER ANGELE:**  Yeah, that's

4    what I want to hear, the truth.

5        **INMATE NGO:**  It's just a made up name,

6    bottom line.  I was Fullerton Boyz, I didn't want

7    to admit that I was in a gang when I was arrested

8    and they just saw the TM, it's my ex-girlfriend's

9    name, Teresa May, so --- it was just a made up

10   name so, I just tried to throw them off.

11       **PRESIDING COMMISSIONER ANGELE:**  Well, we're

12   looking for honesty and the reason I kept on

13   pushing you is I never heard of Tiger Mafia.

14   Truthfulness is important to us, understand that.

15       **INMATE NGO:**  Yes, Sir.

16       **PRESIDING COMMISSIONER ANGELE:**  But you took

17   her initials off your arm?

18       **INMATE NGO:**  No, I mean --- I tried to put

19   it on myself as (inaudible), it never came out

20   anyway, it faded.

21       **PRESIDING COMMISSIONER ANGELE:**  You've never

22   been married.

23       **INMATE NGO:**  No.

24       **PRESIDING COMMISSIONER ANGELE:**  And you've

25   got no children, correct?  Never been in the

26   military.  You indicate you only tried cocaine

27   once.

96

23

1       **INMATE NGO:** Yes.

2       **PRESIDING COMMISSIONER ANGELE:** Okay. Have

3    you experimented with any other drugs?

4       **INMATE NGO:** No.

5       **PRESIDING COMMISSIONER ANGELE:** Alcohol?

6       **INMATE NGO:** I'm allergic to alcohol.

7       **PRESIDING COMMISSIONER ANGELE:** That's

8    probably good. Tried nothing else, marijuana,

9    nothing?

10       **INMATE NGO:** I don't like drugs, not no

11    more. (Inaudible) --- never mind.

12       **PRESIDING COMMISSIONER ANGELE:** No, tell me.

13       **INMATE NGO:** I mean you can test me everyday

14    and I'll be clean.

15       **PRESIDING COMMISSIONER ANGELE:** I believe

16    you. You haven't given me a reason not to. Okay,

17    we do have some letters that we received on your

18    behalf. I'd like to try to go over some of these.

19    We received these at a late hour, but I think

20    (inaudible) because I think it's very important.

21    One letter is from, you've got to help me with the

22    names again, okay.

23       **INMATE NGO:** Yes, Sir.

24       **PRESIDING COMMISSIONER ANGELE:** This is from

25    your sister, Tran?

26       **INMATE NGO:** Which one?

27       **PRESIDING COMMISSIONER ANGELE:** Tran Ngo.

96

24

1        **INMATE NGO:**  Tan.

2        **PRESIDING COMMISSIONER ANGELE:**  Tan Ngo.

3    She indicated that the family will support you any

4    way they can, that her husband has a job for you

5    in his store.

6        **INMATE NGO:**  Yeah.

7        **PRESIDING COMMISSIONER ANGELE:**  And that

8    your mother has a job for you in her store.  Then

9    we have one from a Donald Rubridc, R-U-B-R-I-D-C,

10   Orange County Public Defender, explains the case

11   where you were tried and is in support of your

12   release also.  Fong Ngo is your mother?

13       **INMATE NGO:**  Fong (inaudible).

14       **PRESIDING COMMISSIONER ANGELE:**  Okay.  She

15   offers support in any way possible.  And then we

16   have Calvin Ung, U-N-G, your uncle.

17       **INMATE NGO:**  Yes.

18       **PRESIDING COMMISSIONER ANGELE:**  Who has a

19   job for you in his restaurant.

20       **INMATE NGO:**  Yes.

21       **ATTORNEY FOX:**  Have you gone over the letter

22   from his mother, I'm sorry.

23       **PRESIDING COMMISSIONER ANGELE:**  Uh-hmm,

24   yeah.

25       **ATTORNEY FOX:**  Okay.

26       **PRESIDING COMMISSIONER ANGELE:**  Yeah.

27       **INMATE NGO:**  I have one from my brother,

*97*

25

1   too.

2        **PRESIDING COMMISSIONER ANGELE:**   That's

3   Calvin?

4        **INMATE NGO:**   That's my uncle.

5        **PRESIDING COMMISSIONER ANGELE:**   Your uncle,

6   okay.   I'm sorry Calvin is the one who has a

7   restaurant job for you.

8        **INMATE NGO:**   Yes, Sir.

9        **PRESIDING COMMISSIONER ANGELE:**   I don't have

10   --- I've got your mother.

11        **ATTORNEY FOX:**   We may have a copy.

12        **PRESIDING COMMISSIONER ANGELE:**   Your sister.

13   I'm sorry, is it Raymond?   Raymond?

14        **INMATE NGO:**   Raymond Seto's my new

15   brother-in-law.

16        **PRESIDING COMMISSIONER ANGELE:**   Is that the

17   one you're talking about?

18        **INMATE NGO:**   No, my older brother.

19        **PRESIDING COMMISSIONER ANGELE:**   Okay, I do

20   have one here from Raymond Seto, S-E-T-O, he's

21   your brother-in-law.   He's known you since 1992.

22        **ATTORNEY FOX:**   There are two separate

23   letters from Calvin Ung.   One bears the date of

24   January 30th, 2001.   A more recent one is dated

25   April 6th of 2002.   I believe that's the one that

26   was referred to, the later of the two.

27        **PRESIDING COMMISSIONER ANGELE:**   I have the

98

26

 1   2002 letter here.  I don't have it here.  Who is

 2   Chi Phong Ngo, your older brother?

 3          **INMATE NGO:**  Chi Phong Ngo.

 4          **PRESIDING COMMISSIONER ANGELE:**  Chi?

 5          **INMATE NGO:**  C-H-I, Phong Ngo.

 6          **PRESIDING COMMISSIONER ANGELE:**  This says

 7   Sieu.

 8          **INMATE NGO:**  That's me.

 9          **PRESIDING COMMISSIONER ANGELE:**  Okay, I'm

10   sorry.  He's your older brother.  I've got it.

11   Okay.  First name is Chi, C-H-I.  Middle name

12   Phong, P-H-O-N-G.  Last name, N-G-O.  Writing in

13   support of my brother.  He's offering a job at a

14   convenience store which is in Anaheim.

15          **INMATE NGO:**  Yes, Sir.

16          **PRESIDING COMMISSIONER ANGELE:**  They all

17   believe in you and are willing to support you.

18   There's another letter from Duc Phong Ngo.  D-U-C

19   is the first name.  Middle, P-H-O-N-G.  Last name

20   N-G-O.  Younger brother, writing a letter of

21   support.  I'll help my brother financially and in

22   any way that he needs.  Like to see you get a

23   second chance, make a difference in society with

24   all the training you've had while in prison.  I'll

25   go back to the letter from Raymond Seto.  It's a

26   letter of support asking that you be given a

27   second chance.  Talks about your mother and her

*99*

27

1    work at the liquor store.  How he believes you

2    have the ability to become a law-abiding citizen.

3    And this is a letter in support of release.  Have

4    we covered them all now?  There's another one?

5        **INMATE NGO:**  No, just one from my older

6    sister?

7        **ATTORNEY FOX:**  Which I'm passing over.

8        **PRESIDING COMMISSIONER ANGELE:**  This is from

9    Lan Lau.

10       **INMATE NGO:**  Lan.

11       **PRESIDING COMMISSIONER ANGELE:**  First name

12    is Lan, L-A-N.  Last name is Lau, L-A-U, who is

13    inmate's sister.  She believes that the inmate

14    deserves a second chance to prove himself in the

15    community.  They offer you housing, financial

16    support.  These include a place to stay, food,

17    clothing, and education.  They reside in Alhambra

18    in Los Angeles County, okay.  Anything else?

19       **INMATE NGO:**  That should be it.

20       **ATTORNEY FOX:**  Thank you.

21       **PRESIDING COMMISSIONER ANGELE:**  All right,

22    we sent out what we call 3042 notices.  Those are

23    notices that go to agencies that have a direct

24    interest in your case.  I have received a reply

25    from the District Attorney's office, from the

26    County of Orange.  However, there's a

27    representative here today from that office so

*100*

28

 1    we'll have him make a statement when that time

 2    comes.  And we'll go to post-conviction factors

 3    please, Commissioner Rodriguez.

 4         **DEPUTY COMMISSIONER RODRIGUEZ:**  How do you

 5    pronounce your name again?

 6         **INMATE NGO:**  Just say "no."

 7         **DEPUTY COMMISSIONER RODRIGUEZ:**  No?

 8         **INMATE NGO:**  Yeah, it's easiest.

 9         **DEPUTY COMMISSIONER RODRIGUEZ:**  All right,

10    inmate Ngo, the purpose of, during the first

11    portion of this reading I'll be addressing what

12    you've done since you've been received in the

13    Department of Corrections, which will then bring

14    us to the present.  This will establish a base for

15    future Board appearances should you not receive a

16    date today.  If there's anything that I leave out

17    during the portion of this reading, either you or

18    your attorney can address it when I'm done, all

19    right?

20         **INMATE NGO:**  Yes, Sir.

21         **DEPUTY COMMISSIONER RODRIGUEZ:**  All right.

22    You were received in the Department of Corrections

23    on February 1st, 1994, at RJ Donovan Reception

24    Center.  From there you transferred on March 17th,

25    1994, to Centinella State Prison.  From there you

26    transferred on May 16th, 1995, to Calipatria State

27    Prison, excuse me, California State Prison,

*101*

1    Lancaster, and that was a non-adverse transfer.

2    And then you subsequently transferred here to

3    California (sic) Training Facility in Soledad,

4    also a non-adverse transfer on December 16th,

5    1998.  Your current classification score is zero.

6    You're currently housed as a Level II inmate on a

7    life override.  Your custody is Medium A.  You're

8    still in culinary warehouse?

9        **INMATE NGO:**  Yes, Sir.

10       **DEPUTY COMMISSIONER RODRIGUEZ:**  And I note

11   that you have exceptional to excellent work

12   reports.  You did complete your high school.  You

13   have completed vocation auto upholstery and that

14   was on April 3rd, 1997.  What is, is vocation

15   automotive refinishing a separate course?

16       **INMATE NGO:**  Yes, that's a separate course.

17   That's auto paint.

18       **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay, and

19   you did complete that one and that was in

20   September 1997.  So you've completed two

21   vocations.

22       **INMATE NGO:**  Yes, Sir.

23       **DEPUTY COMMISSIONER RODRIGUEZ:**  You've been

24   an active participant in the NA program as

25   evidenced by your most recent chronos.  You've

26   also completed the Key to Fatherhood, December of

27   2000.  You completed a course in the Cause,

102

30

1    Prevention, and Treatment of both Tuberculosis and

2    Hepatitis and that was December 1999. And also

3    you've participated in a Muslim group course,

4    Salesmanship II. And what do you do in that?

5        **INMATE NGO:** On the Muslim fatherhood and

6    salesmanship, you learn how to be a parent if

7    someday by circumstance to have my kids and stuff.

8    You learn to take care of your own kids and I'll

9    be a good, how a father should be.

10       **DEPUTY COMMISSIONER RODRIGUEZ:** Have you

11   gone to any anger management courses?

12       **INMATE NGO:** I try. The only one try to

13   enroll right now, try to get into is Impact.

14       **DEPUTY COMMISSIONER RODRIGUEZ:** Yeah, the

15   impact program, which is an excellent program

16   here. Captain Gara runs that program.

17       **INMATE NGO:** Captain Gara's running it.

18       **DEPUTY COMMISSIONER RODRIGUEZ:** Exactly.

19       **INMATE NGO:** And it's been very difficult to

20   get in.

21       **DEPUTY COMMISSIONER RODRIGUEZ:** But you've

22   been here for a long, going on ---

23       **INMATE NGO:** I have tried since last year,

24   sir.

25       **DEPUTY COMMISSIONER RODRIGUEZ:** Almost five

26   years, four years actually.

27       **INMATE NGO:** Yeah.

31

1    **DEPUTY COMMISSIONER RODRIGUEZ:**  Yeah.

2    **INMATE NGO:**  They just start this program

3    recently.

4    **DEPUTY COMMISSIONER RODRIGUEZ:**  It's a very

5    good program.  I strongly urge you to try to get

6    in and at least keep your name active on that.

7    **INMATE NGO:**  I will.

8    **DEPUTY COMMISSIONER RODRIGUEZ:**  Do you study

9    your 12-steps?

10   **INMATE NGO:**  Not all of them because I have

11   to say I'm a Buddhist and some steps I can't

12   really apply to it.  There's only four step, maybe

13   step four, step eight.

14   **DEPUTY COMMISSIONER RODRIGUEZ:**  What is step

15   number eight to you?

16   **INMATE NGO:**  Making a list of all persons

17   harmed.

18   **DEPUTY COMMISSIONER RODRIGUEZ:**  Who would be

19   at the top of that list?

20   **INMATE NGO:**  All of the families, victim

21   family and my family.

22   **DEPUTY COMMISSIONER RODRIGUEZ:**  Now you

23   stated, I believe somewhere we read in the reports

24   that you furnished the gun.  You say you didn't?

25   **INMATE NGO:**  No (inaudible).

26   **ATTORNEY FOX:**  Could you tell us where you

27   saw that because I'd like to correct it as well.

*104*

1    **DEPUTY COMMISSIONER RODRIGUEZ:**  I believe

2    that's in the probation officer's report.  Did you

3    quote that, Commissioner Angele?

4    **PRESIDING COMMISSIONER ANGELE:**  No.

5    **ATTORNEY FOX:**  I don't believe it's stated

6    there.

7    **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay, I was

8    looking at the prisoner's version.  And what I'm

9    looking at is the current Board report, April

10   2002, and that's on the first page, (inaudible)

11   addressing that --- You explained that they had

12   the gun for protection in case someone else had to

13   have a weapon, correct?

14   **ATTORNEY FOX:**  Once again ---

15   **DEPUTY COMMISSIONER RODRIGUEZ:**  Excuse me,

16   counsel, I'll let you address that.  Ngo stated

17   that he did not see the gun until he was in the

18   vehicle, it was located under the passenger seat,

19   correct?

20   **INMATE NGO:**  (Inaudible.)

21   **DEPUTY COMMISSIONER RODRIGUEZ:**  And that's

22   the story you're staying ---

23   **INMATE NGO:**  It's a true story.

24   **DEPUTY COMMISSIONER RODRIGUEZ:**  And he's

25   corrected and we're satisfied ---

26   **ATTORNEY FOX:**  And I believe it's

27   consistently stated that way throughout the

1    probation report as well, and the defendant's

2    statement and also a statement that was given by

3    one of the detectives involved in the

4    investigation.

5         **DEPUTY COMMISSIONER RODRIGUEZ:**  All right.

6    Do you agree with everything I've read up to this

7    point, as far as your program?

8         **INMATE NGO:**  I still have a, I have a

9    certificate in STD and AIDS too.

10        **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay, I

11   don't think I have copies of those.  Do you have

12   copies of them?

13        **INMATE NGO:**  Yes, Sir.

14        **DEPUTY COMMISSIONER RODRIGUEZ:**  I went

15   through all the certificates you have here that

16   they provided us, which I confirmed, which are in

17   the ---

18        **INMATE NGO:**  Hepatitis and tuberculosis.

19        **DEPUTY COMMISSIONER RODRIGUEZ:**  Well I

20   addressed those already.

21        **INMATE NGO:**  Sexually transmitted disease---

22        **DEPUTY COMMISSIONER RODRIGUEZ:**  I addressed

23   that too.  That was in 1999, correct, right there

24   at the bottom?

25        **ATTORNEY FOX:**  Well, one is in 2000, the

26   STD's.

27        **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay.  That

34

1    was the sexually transmitted disease, right.

2        **ATTORNEY FOX:** And on the back there's

3    another one in 2000.

4        **DEPUTY COMMISSIONER RODRIGUEZ:** Right, and

5    then HIV. I may have said the wrong date, but I

6    did address both these certificates.

7        **ATTORNEY FOX:** The other two, tuberculosis

8    and hepatitis were (inaudible).

9        **DEPUTY COMMISSIONER RODRIGUEZ:** Correct,

10   okay. So do you agree with everything else?

11       **INMATE NGO:** Yes, Sir.

12       **DEPUTY COMMISSIONER RODRIGUEZ:** Okay. As

13   far as disciplinary history, you have received no

14   CDC 115's, either administrative or serious since

15   reception. And you've only received a total of

16   two 128(a) counseling chronos. The first one was

17   April 1st, 1997, for failure to respond to medical

18   ducat. And then the last one was on February

19   11th, 2000, for covering your windows with a

20   towel. Trying to keep the light out, huh?

21       **INMATE NGO:** Actually, cold Sir.

22       **DEPUTY COMMISSIONER RODRIGUEZ:** Cold. In

23   going through your counselor's recommendation,

24   that's from the current Board report dated April

25   2002. The author of this report is the initial M.

26   Rubio, R-U-B-I-O, Correctional Counselor I here at

27   Soledad state prison. Going to page three under

107

35

1   the heading of Summary, it says considering the
2   commitment offense, minimal prior arrest record
3   and prison adjustment, the writer believes Ngo
4   would probably pose a moderate to low degree of
5   threat to the public at this time if released from
6   prison.  Going to the psych report, there's two
7   reports I'll be addressing.  The first one is
8   dated December 27th, 1996.  It's a three page,
9   three.  It's completed at California State Prison,
10  Lancaster.  The author of that report is the
11  initial C. Schroeder, S-C-H-R-O-E-D-E-R, Staff
12  Psychologist.  I'm not going to read that report
13  in it's entirety, but I will address areas of that
14  report.  Going to page two, under Present
15  Condition, it says the remorse he expresses is
16  sincere.  He is synonymous with inmate Ngo.  He
17  shows much (inaudible) and self-incrimination for
18  the crime.  In hindsight he sees that he perhaps
19  could have stopped the incident and now has great
20  empathy and remorse for the family of the victim.
21  Under Mental Status and Diagnosis, Axis I:  no
22  diagnosis or condition.  Axis II:  no diagnosis.
23  Axis III:  none.  Going to page three, Axis IV:
24  psychosocial stressors, incarceration.  Axis V:
25  Global Assessment of Functioning score, that's
26  your GAF score is 75.  Under Conclusions and
27  Recommendations, Mr. Ngo's history of depression

108

1    and suicide attempts may have contributed to his

2    state of mind and poor judgment during the time of

3    the crime.   There are no records of any mental

4    health treatment during incarceration and Mr. Ngo

5    is no longer depressed.   Going to the last psych

6    report, and that is a seven-page report completed

7    here at Soledad state prison.   The date of that

8    report is April, excuse me, January 23rd, 2002.

9    The author of that report is the initial C.

10   Saindon, capital-S-A-I-N-D-O-N, Staff

11   Psychologist.   Under, let's see, going to page

12   four, under heading Current Diagnostic

13   Impressions, Axis I:  no contributory clinical

14   disorder.   Axis II:  deferred.   Axis III:  no

15   contributory physical disorder.   Axis IV:

16   long-term incarceration.  Axis V:  Global

17   Assessment of Functioning score, your GAF score is

18   90, noting that it had gone up considerably from

19   75 from the first report that I addressed in 1996.

20   Ninety is a very good score.  Going to page five

21   under Assessment of Dangerousness, based upon his

22   complete lack of disciplinary actions while

23   incarcerated, his insight into the negative

24   aspects of gang involvement and his remorse for

25   his actions, his violence potential within a

26   controlled setting is estimated to be below

27   average relative to this Level II inmate

1  population.  If released to the community, his

2  violence potential is estimated to be less than

3  the average citizen in the community given his

4  insight, his demonstrated ability to stay out of

5  trouble, his successful development of plans upon

6  release, and the support of his family.  At this

7  time, I'll return to the Chair.

8       **PRESIDING COMMISSIONER ANGELE:**  Thank you.

9  Do you know what the term mad dogging means?

10      **INMATE NGO:**  Yes, Sir.

11      **PRESIDING COMMISSIONER ANGELE:**  What does

12  that mean to you?

13      **INMATE NGO:**  Back then it was dirty looks.

14      **PRESIDING COMMISSIONER ANGELE:**  You

15  indicated that you first saw the gun in the car.

16      **INMATE NGO:**  Yes, Sir.

17      **PRESIDING COMMISSIONER ANGELE:**  And then you

18  were driving around and just happeneded come upon

19  Mr. Gonzales.

20      **INMATE NGO:**  No, Sir.  We met Mr. Gonzales

21  at McDonald's first.

22      **PRESIDING COMMISSIONER ANGELE:**  I understand

23  that.  I'm talking about the second time.

24      **INMATE NGO:**  The second time, what happened

25  was, when we came back me and (inaudible) went to

26  confront Mr. Gonzales and his friend.  We were

27  going to get into a fistfight.  When the fistfight

38

1 started, we were fighting one another, we knocked

2 Mr. Gonzales down. And after that, my crime

3 partner came and while we was beating him up

4 (inaudible) Muhamed was hitting him with a gun.

5 Somehow it shot, it went off, the gun went off and

6 shot him. The first round probably missed him,

7 but the second round hit him.

8 **PRESIDING COMMISSIONER ANGELE:** So you were

9 actually looking for him?

10 **INMATE NGO:** Looking for ---

11 **PRESIDING COMMISSIONER ANGELE:**

12 Mr. Gonzales.

13 **INMATE NGO:** Yes, we were looking for him to

14 fight.

15 **PRESIDING COMMISSIONER ANGELE:** Weren't you

16 waiting there for him to get out of school?

17 **INMATE NGO:** We were waiting for him after

18 school.

19 **PRESIDING COMMISSIONER ANGELE:** Okay. Also,

20 you know, a little trouble by some (inaudible)

21 problems. Back in December '90, you had a problem

22 in school where you jumped somebody else. Do you

23 recall that?

24 **INMATE NGO:** It was not a jump. I got in a

25 fight with another individual.

26 **PRESIDING COMMISSIONER ANGELE:** Yeah, but

27 you had three guys with you and they all jumped in

///

1    on it.

2         **INMATE NGO:**  Yes, Sir, they were my friends,
3    they back me up.

4         **PRESIDING COMMISSIONER ANGELE:**  They backed
5    you up.  You against one guy.  You knocked him
6    down.

7         **INMATE NGO:**  I beat him up, yes, Sir.

8         **PRESIDING COMMISSIONER ANGELE:**  And then
9    three guys backed you up and you all jumped him.
10   How do you figure that backing you up, you didn't
11   sound like you needed a back up at all?

12        **INMATE NGO:**  I have no control over their
13   actions, Sir.

14        **PRESIDING COMMISSIONER ANGELE:**  How about
15   the time you were in a vehicle and found three
16   purses, do you remember that?

17        **INMATE NGO:**  No, Sir.

18        **PRESIDING COMMISSIONER ANGELE:**  You don't
19   remember that?  This is in the POR, page 11, line
20   seven, (inaudible) automobile during a traffic
21   stop three women's purses were found in the
22   vehicle in which (inaudible) Ngo was the sole
23   occupant.  Indicated you did not know who they
24   belonged to, that's when they found the rock
25   cocaine.

26        **INMATE NGO:**  Oh, that's my mom's car ---
27        **DEPUTY COMMISSIONER RODRIGUEZ:**  I'd like to

112

40

1    turn the tape over, one moment.

2         [Thereupon, the tape was turned over.]

3         **DEPUTY COMMISSIONER RODRIGUEZ:** Side two,

4    back on record.

5         **PRESIDING COMMISSIONER ANGELE:** So that was

6    your mother's car?

7         **INMATE NGO:** Uh-hmm.  It was my mother's car

8    when I was arrested, Sir.  If there was a purse,

9    it must belong to my mom.

10        **PRESIDING COMMISSIONER ANGELE:** Okay.  Then

11   you indicated the car was searched for no reason.

12        **INMATE NGO:** At first, yes.  But when they

13   asked me for consent, I gave it to them.

14        **PRESIDING COMMISSIONER ANGELE:** All right.

15   But you do understand a male driving in a vehicle

16   with three purses in the car would be pretty

17   suspicious to me.  I'd think maybe it was a purse-

18   snatcher.  (Inaudible) plenty of probable cause.

19   But they asked you ---

20        **INMATE NGO:** Yeah.

21        **PRESIDING COMMISSIONER ANGELE:** And you gave

22   consent and inside one of the purses they found

23   the rock cocaine.  I found in a couple of spots

24   the gun was given to one of your crime partners by

25   somebody at an arcade.  Do you recall that

26   statement at all?

27        **INMATE NGO:** It was brought up in trial,

113

41

1    Sir, but like I said before, the first time I ever

2    seen the gun was when I got back into the car.

3        **PRESIDING COMMISSIONER ANGELE:** Okay, let me

4    ask you this, did you happen to go to the arcade

5    prior to you first seeing the gun?

6        **INMATE NGO:** Yeah, I was playing arcade, but

7    I went to the restaurant. I told them in court

8    that I was at a restaurant, a Hispanic restaurant

9    eating when this ---

10       **PRESIDING COMMISSIONER ANGELE:** Okay. So

11   can we assume without taking anything out of it

12   that isn't, it's a possibility that somebody did

13   get the gun at the arcade and put it in the car

14   and you just didn't see it.

15       **INMATE NGO:** Very.

16       **PRESIDING COMMISSIONER ANGELE:** What I'm

17   trying to establish is that you were at the arcade

18   before you got in the car and saw the gun?

19       **INMATE NGO:** Yes.

20       **PRESIDING COMMISSIONER ANGELE:** And the

21   first place you saw it was in the car.

22       **INMATE NGO:** Exactly.

23       **PRESIDING COMMISSIONER ANGELE:** All right,

24   any questions, Commissioner Rodriguez?

25       **DEPUTY COMMISSIONER RODRIGUEZ:** None at this

26   time.

27       **PRESIDING COMMISSIONER ANGELE:** Any

114

42

1    questions from the District Attorney?

2        **DEPUTY DISTRICT ATTORNEY LAIRD:** Yes, just a

3    few. And I'm referring to the P and S, the

4    Probation and Sentencing report.

5        **PRESIDING COMMISSIONER ANGELE:** One second,

6    (inaudible) you answer the questions. The

7    questions will be asked by the District Attorney

8    through the Panel and your statements are to be

9    directed to this side of the table.

10       **INMATE NGO:** Yes.

11       **DEPUTY DISTRICT ATTORNEY LAIRD:** Would you

12   like me to read what's in the probation report?

13   It's just, it's regarding the trial deputy's

14   statement in the report.

15       **PRESIDING COMMISSIONER ANGELE:** Is it a

16   question or what do you intend to do with it?

17       **DEPUTY DISTRICT ATTORNEY LAIRD:** The

18   question is I want to know if the inmate believes

19   that is an accurate statement, sentence by

20   sentence. And I'm talking about page nine of the

21   Probation and Sentencing report, starting with

22   line 14, that entire paragraph, 14 to 21, which

23   begins with in a telephone conversation with the

24   prosecuting attorney Robin Park. She's the Deputy

25   District Attorney that took the case to trial and

26   tried (inaudible) case. And those are her

27   comments. And I was wondering if they, Mr. Ngo,

*115*

43

1   felt that those were accurate comments, and if

2   they are not accurate, how so.

3        **ATTORNEY FOX:**  I think we need to go through

4   each one point by point, otherwise it's ---

5        **DEPUTY DISTRICT ATTORNEY LAIRD:**  Right.

6        **PRESIDING COMMISSIONER ANGELE:**  Well, let me

7   go through it.  There's a statement that the

8   prosecuting attorney made regarding the offenses

9   being a very vicious attack.  After the

10  confrontation at the fast food restaurant, the

11  inmate, along with No Muhamed, drove by the school

12  and planned the revenge.  They subsequently

13  obtained the weapon, loaded it, and drove back to

14  the area of Fullerton High School.  They were

15  lying in wait for the victim to get out of school.

16  This occurred at 3:02 p.m., the victim was killed

17  at 3:07 p.m.  Is that what happened?

18       **INMATE NGO:**  Yes, Sir.

19       **PRESIDING COMMISSIONER ANGELE:**  Now did you

20  understand everything I just said?

21       **INMATE NGO:**  When you say lying in wait, do

22  you mean I was waiting for him (inaudible).

23       **PRESIDING COMMISSIONER ANGELE:**  Uh-hmm.

24  Well no there's a portion that I think is

25  extremely important in today's hearing.  It says

26  after the confrontation at the fast food

27  restaurant, the defendant, which is you, and No

116

44

1    Muhamed, drove by the school and planned the

2    revenge.  They, which would be you and Muhamed,

3    subsequently obtained a weapon, loaded it, and

4    then drove back to the area of Fullerton High

5    School.

6        **INMATE NGO:**  That's wrong.  It wasn't just

7    me and No Muhamed.  There was five of us.

8        **PRESIDING COMMISSIONER ANGELE:**  Okay.

9        **INMATE NGO:**  So, and we didn't load the

10   weapon.  I know I didn't (inaudible).  I didn't

11   see the weapon until I was in the car.  So that

12   statement has to be wrong.

13       **PRESIDING COMMISSIONER ANGELE:**  All right.

14   But you are aware of the term lying in wait.  Do

15   you know what that means?

16       **INMATE NGO:**  That we were waiting.

17       **PRESIDING COMMISSIONER ANGELE:**  Yeah, you

18   were parked by the school waiting for him to get

19   out of school.

20       **INMATE NGO:**  Yeah.

21       **PRESIDING COMMISSIONER ANGELE:**  Is that

22   basically what happened?

23       **INMATE NGO:**  That's true.

24       **PRESIDING COMMISSIONER ANGELE:**  Did that

25   answer your question?

26       **DEPUTY DISTRICT ATTORNEY LAIRD:**  Yes.  Just

27   a follow up question.  Did Mr. Ngo realize that

117

· 45

1    the gun in the car was loaded when they were going
2    back to the school to find victim Gonzales?

3        **PRESIDING COMMISSIONER ANGELE:**  When you saw
4    the gun or was there any conversation to lead you
5    to believe the gun was loaded?

6        **INMATE NGO:**  They led me to believe, I think
7    it was loaded because, they say that I told the
8    police that they say, you know, use it for
9    protection.  So I figured it probably is loaded.
10   But my lack of judgment that day ---

11       **DEPUTY DISTRICT ATTORNEY LAIRD:**  And then
12   was, at the time that they were waiting for the
13   victim, this is addressed to the parole board, at
14   the time the suspects were waiting for the victim,
15   was victim Alex Gonzales by himself?

16       **INMATE NGO:**  No, he wasn't.  There was two
17   of them, Angel Gonzales and his friend.  That's
18   when No Muhamed confronted Mr. Gonzales and I
19   confronted his other friend.  I followed the other
20   guy, I don't know his name, and No Muhamed was
21   fighting with Mr. Gonzales.  And after that, his
22   friend ran away and I helped No out.

23       **PRESIDING COMMISSIONER ANGELE:**  And how
24   about the rest of your crime partners?

25       **INMATE NGO:**  They didn't come until later,
26   until --- it happened so fast.  Me and No was
27   fighting we didn't know until the first time the

*118*

46

1   gun went off and that's when everybody just

2   stopped and we started running away.  After that,

3   you know, when I heard the first shot, I ran.

4       **PRESIDING COMMISSIONER ANGELE:**  Okay.

5       **DEPUTY DISTRICT ATTORNEY LAIRD:**  And, again,

6   this is directed to the parole board.  Did Mr. Ngo

7   realize that one of his group would get out of the

8   car to confront Alex Gonzales, the victim who

9   died, with that firearm that was in the car?

10      **PRESIDING COMMISSIONER ANGELE:**  Let's see if

11  I understand that clearly.  Did you have knowledge

12  that somebody in the car was going to confront

13  Mr. Gonzales with that firearm?

14      **INMATE NGO:**  No, Sir.  Not at all.

15      **DEPUTY DISTRICT ATTORNEY LAIRD:**  Did Mr. Ngo

16  nevertheless realize that somebody was going to be

17  taking that gun out of the car into the

18  confrontation?

19      **PRESIDING COMMISSIONER ANGELE:**  Do you

20  understand that question?

21      **INMATE NGO:**  Yes.  My understanding is,

22  that's the argument between No, Mr. Muhamed, I

23  asked why did you guys bring a gun, you know,

24  without telling me, you know, when I first saw it

25  under the seat.  That's when they tell me it's

26  only for protection.  My understanding was it was

27  only going to be used if the other group have

47

1   weapon on them; otherwise, it was supposed to be

2   in the car.  Because when I agreed to go into

3   fistfight, that's all I agreed upon, was to have a

4   fistfight.  I never knew that someone was going to

5   take it out and shoot him; otherwise, I probably

6   wouldn't be there.  But back then I was trying to

7   get my life back straight, you know.  I'm sorry,

8   but ---

9   **PRESIDING COMMISSIONER ANGELE:**  Take your

10  time.

11  **INMATE NGO:**  I'm sorry that Mr. Gonzales,

12  you know, died, but I never wanted that to happen.

13  It was not my intention.  I thought it was just

14  for fight.  (Inaudible.)

15  **PRESIDING COMMISSIONER ANGELE:**  Let's take a

16  break (inaudible).

17              [Off the record.]

18  **INMATE NGO:**  Thank you.  I know there's

19  nothing I can say or do at this point to bring

20  back Mr. Gonzales.  I know his family is probably

21  going through a lot of pain, but I was young and I

22  was ignorant, naïve.  I made bad judgment.

23  There's nothing I can say to bring him back, Sir.

24  If sorry would help, but hopefully one day they'll

25  find it in their heart to forgive me.

26  **PRESIDING COMMISSIONER ANGELE:**  Any

27  questions?

48

 1          **DEPUTY DISTRICT ATTORNEY LAIRD:**  Yes.  I

 2     appreciate that answer from Mr. Ngo.  I have just

 3     a couple of follow up questions to the Board

 4     regarding the Tiger Mafia.  Because it is printed

 5     in several pieces of documentation including the

 6     probation report as well as elsewhere that at

 7     about the time of the murder he was affiliated

 8     with a group called the Tiger Mafia.  And I'm

 9     aware and I can point to a picture here on the

10     table that dealt with search warrants and items

11     that were obtained and seized during the time of

12     this crime.  And I've seen and become aware of

13     several drawings, that are drawings, handwritten

14     drawings of a tiger, which I'm making the

15     assumption refers to the Tiger Mafia.  And I'm

16     just trying to get a clarification of what that

17     group was and why the inmate put the tattoo on his

18     arm for TM or Tiger Mafia.

19          **ATTORNEY FOX:**  I'd like to pose an

20     objection to the extent that the District

21     Attorney was testifying.  If there is a

22     question regarding the Tiger Mafia, I think it

23     might be asked as a direct question rather

24     than a litany of what the District Attorney

25     has seen.

26          **PRESIDING COMMISSIONER ANGELE:**  I'll

27     overrule your objection.  I don't believe he was

/2/

49

1    testifying.  I believe the question has already

2    been asked and answered.  The Tiger Mafia,

3    according to the inmate, was made up and the

4    initials on his arm stood for the initials of an

5    ex-girlfriend.  Do you still state that?

6        **INMATE NGO:**  Yes, Sir.

7        **PRESIDING COMMISSIONER ANGELE:**  So there

8    never was a group called the Tiger Mafia?

9        **INMATE NGO:**  No.  It's just a made-up name.

10       **DEPUTY COMMISSIONER RODRIGUEZ:**  Are those

11   drawings from ---

12       **DEPUTY DISTRICT ATTORNEY LAIRD:**  I do not

13   know.  I do not know.  I just used it as a purpose

14   of illustration just because I've, in reviewing

15   the file I've seen some pictures of tigers.  I see

16   a tattoo.  So I'm just asking by illustrating what

17   I've seen if there was any connection to the Tiger

18   Mafia.

19       **INMATE NGO:**  If you want clarification what

20   the tattoo of the tiger is, all the Fullerton Boyz

21   has a tiger on his chest.  It's not because of the

22   Tiger Mafia.  It's Fullerton Boyz has a tiger on

23   his chest, all of us.

24       **DEPUTY DISTRICT ATTORNEY LAIRD:**  Thank you.

25       **PRESIDING COMMISSIONER ANGELE:**  Anything

26   further?

27       **DEPUTY DISTRICT ATTORNEY LAIRD:**  Nothing

122

50

1   further.

2       **PRESIDING COMMISSIONER ANGELE:**  Ms. Fox,

3   questions of your client.

4       **ATTORNEY FOX:**  Just briefly.  When you were

5   found in possession of cocaine, when the police

6   officer stopped you.

7       **INMATE NGO:**  Yes.

8       **ATTORNEY FOX:**  They found the cocaine in a

9   purse, right?

10      **INMATE NGO:**  I'm not sure where they found

11  it.  I think it was underneath the seat,

12  underneath the seat when they found it.  It wasn't

13  in no purse at all.

14      **ATTORNEY FOX:**  Okay, that was my question.

15  If it was in the purse how did it get there.  But

16  it's your testimony you didn't put it there?

17      **INMATE NGO:**  No, if anything, if I remember

18  correctly I put it under the seat.  If it also

19  found it'd be under the seat.

20      **ATTORNEY FOX:**  So it wasn't your mother's

21  cocaine?

22      **INMATE NGO:**  No.  It was mine.  I bought it.

23      **ATTORNEY FOX:**  Okay, I have no further

24  questions.

25      **PRESIDING COMMISSIONER ANGELE:**  Okay, can we

26  go into closing please, from the District

27  Attorney, Mr. Laird?

123

51

1    **DEPUTY DISTRICT ATTORNEY LAIRD:**  Yes, I

2   have, I've been prosecuting gang cases in my

3   office for approximately five years.  I know Robin

4   Parks, she's a colleague of mine.  I have tried a

5   case just like a case like this in terms that the

6   type of theory that is presented in terms of a

7   gang, group attack that results in a death.  I

8   would indicate that Mr. (inaudible) who I also

9   know is, or who was the Public Defender at the

10   time, and is still a public defender representing

11   his client, basically is not talking about any

12   sort of novel or unique theory that is applied in

13   Orange County in terms of finding the defendant

14   guilty of murder by virtue of being involved in

15   gang related activity and aiding and abetting in a

16   fight on a victim that results in a murder.  I

17   would note that the seriousness of the crime,

18   basically is well spoken for in the probation

19   report by Robin Park.  It's also well spoken for

20   by the fact that a jury did return a first degree

21   murder verdict on this case and that there was a

22   subsequent plea apparently between the District

23   Attorney in exchange for not raising any appellate

24   rights on the case.  It is my opinion that based

25   on, well I'll just withdraw, I won't make any

26   comments regarding the nature of why that plea

27   took place because I personally have not been able

124

```
 1   to find the precise material that refers to that.
 2   However, I would just point to the gravity of the
 3   offense in urging what we have urged in our
 4   May 3rd, 2002, letter in that we believe that at
 5   this point Mr. Ngo is not suitable for parole.
 6   And it's largely based on the heinousness of the
 7   crime in that it involved an extremely vulnerable
 8   victim at the time of the group attack.  It
 9   involved a picture, an accurate picture of gang
10   subculture with respect to the roles of guns and
11   how guns are brought to a conflict for backup.
12   And that in the gang subculture any type of
13   escalation by rival gangs is basically a form of
14   disrespect which must be answered to.  And that by
15   virtue of the victim answering with blows to
16   Mr. Ngo at the time, back in 1990, literally
17   1990's, it was just a right condition for an
18   escalation of a conflict wherein the gun would be
19   used.   The People have a concern also regarding
20   the modus operandi of Asian gangs in this state in
21   that their activity is not as overt in the
22   community.  They appear to be less overt regarding
23   their gang affiliation and it's hard to look at
24   the inmate essentially with a crystal ball at this
25   time.  We're forced to look back at past conduct
26   that has happened which I've described above.
27   It's my belief that the inmate's account about the
```

1    gun and the use of the gun at the crime is
2    somewhat unreasonable in that he indicates that
3    the reason they had a gun was for protection and
4    they were laying in wait or lying in wait for the
5    victim to come out of school.  At that time, they
6    knew they had had a conflict earlier at the
7    McDonald's.  They didn't know whether the victim
8    was armed or not or whether the victim's cohort
9    was armed or not.  And it seems unreasonable that
10   this defendant would not know that the gun was
11   taken out of the car in concert with the rest of
12   the suspects who ended up attacking victim
13   Gonzales.  And we just believe based on all the
14   psychiatric reports and based on the limited
15   contact that the experts have had with the inmate
16   that there needs to be a longer test of time
17   before this inmate is found suitable for a parole
18   date and I thank you very much for your time.
19        **PRESIDING COMMISSIONER ANGELE:**  Thank you.
20   Ms. Fox.
21        **ATTORNEY FOX:**  Thank you.  I respectfully
22   disagree with my colleague from Orange County.  I
23   think it would be appropriate to set a date for
24   Mr. Ngo today.  Before the Panel is a man who has
25   matured in the prison system.  Today he displayed
26   genuine remorse, which has been a hallmark of his
27   existence in the Department of Corrections.  Going

126

1    back to the probation report, which was used for
2    the Statement of Facts over my objection.
3    Consistently throughout there, that report Mr. Ngo
4    is cited for having stated that he did not know
5    that the weapon is in the car for any long period
6    of time before it was used and today he spoke what
7    he thought the use to which that weapon would be
8    put.   It would be used in self-defense.   Hindsight
9    is 20/20.   He can't go back and change what
10   happened.   Facts is facts.   And I think the fact
11   that he stands convicted of a murder two, not
12   murder one, is a significant finding.   Turning to
13   his institutional adjustment, he has minimal
14   disciplinary history, and that's consistent with
15   his personality prior to the time he came into the
16   Department of Corrections with this one very
17   tragic situation.   He has improved himself to the
18   extent that he's able to within the Department of
19   Corrections having achieved two completed
20   vocations, sustained attendance at AA, good work
21   reports, and he continues to enjoy a sustained
22   excellent family support system out there.   In the
23   psych report it's important to note that he does
24   have a Global Assessment score of 90, which would
25   let us know that he is able to cope with life on
26   the streets in a non-destructive manner.   And he's
27   done that and it's demonstrable or has been

127

55

1    demonstrable since he's been incarcerated.  I
2    believe both psych reports accurately describe
3    Mr. Ngo, and he is ready for parole.  The plans
4    are excellent.  And if the Board is disinclined to
5    find him suitable for parole today, I'd suggest a
6    one or two year denial to allow him time to get
7    into the Impact program and pursue any other
8    self-help and anger management programs that the
9    Board would find useful.  So we'll submit based on
10   that unless Mr. Ngo has something he'd like to
11   say.

12   **PRESIDING COMMISSIONER ANGELE:**  Thank you.
13   Mr. Ngo, now it's your turn to make a statement to
14   the Panel regarding your parole suitability.
15   Before we do that, I just want to add one thing.
16   When I read the Statement of Facts from the
17   probationary report when we first started the
18   hearing, you indicated to me that that was the way
19   it happened?

20   **INMATE NGO:**  Yes.

21   **PRESIDING COMMISSIONER ANGELE:**  Thank you.
22   All right, do you need to make a statement or we
23   can end this hearing on what your attorney has
24   said on your behalf.

25   **INMATE NGO:**  I just say, honestly I'm sorry
26   for what I've done.  I accept the fact that, you
27   know, because of my ignorance that a human life

128

56

1    was lost.  And, you know, I made a mistake.

2    There's nothing I want more than to change what

3    happened.  I'm sorry, but I just don't know what I

4    can say anymore.  That's all I guess.

5        **PRESIDING COMMISSIONER ANGELE:**  Okay.  Thank

6    you for your comments.  We'll recess for

7    deliberations.

8                    **R E C E S S**

9                      --o0o—

10
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

*129*

1    **CALIFORNIA BOARD OF PRISON TERMS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER RODRIGUEZ:**  We're back

4    on record, all parties are present.

5    **PRESIDING COMMISSIONER ANGELE:**  In the

6    matter of Sieu Ngo, that's N-G-O.  Mr. Ngo, the

7    Panel has reviewed all information received from

8    the public and relied on the following

9    circumstances in concluding that you are not

10   suitable for parole and would pose an unreasonable

11   risk of danger to society or a threat to public

12   safety if released from prison.  The offense was

13   carried out in an exceptionally cruel, callous,

14   violent and brutal manner.  The offense was

15   carried out in a manner which demonstrates an

16   exceptionally callous disregard for human

17   suffering and life.  And the motive for the crime

18   was inexplicable or very trivial in relation to

19   the offense.  These conclusions were drawn from

20   the Statement of Facts wherein the inmate and his

21   crime partners, after altercation with the victim,

22   armed themselves with a weapon, went to the high

23   school where the victim, one 15 year old Angel

24   Gonzales went to school, and waited for him to get

25   out of school.  The inmate and one of his crime

26   partners then approached Mr. Gonzales and a friend

27   **SIEU PHONG NGO   J-07024   DECISION PAGE 1   05/13/02**

130

58

1   of his, each getting in a fight with one of them.
2   At which time both the inmate and his other crime
3   partner, both got into a fight with Mr. Gonzales.
4   At the same time three other crime partners
5   jumping in and attacking Mr. Gonzales who was shot
6   and killed after he was on the ground, by one of
7   the other crime partners. The prisoner has on a
8   previous occasion has attempted to inflict injury
9   upon a victim. This has to do with another fight
10  in which he was involved in a one-on-one, which he
11  got the better of the fight and knocked the victim
12  down and then his crime partners jumped in and all
13  started beating the victim. The inmate does have
14  an escalating pattern of criminal conduct, albeit
15  minor. However, it does include the possession of
16  rock cocaine. The inmate has received during his
17  incarceration no 115 disciplinary reports, which
18  is a very positive step. He's received two 128(a)
19  counseling chronos. 4/1/97, failure to respond to
20  a medical ducat and 2/11/00, for window coverings.
21  Psychological evaluation dated 1/23/02, by initial
22  C. Saindon, S-A-I-N-D-O-N, would indicate that the
23  inmate, or would be favorable to the inmate. The
24  inmate does have parole plans. He does have
25  residential plans in the last county of legal
26  residence, also in Los Angeles County. And does
27  **SIEU PHONG NGO   J-07024   DECISION PAGE 2   05/13/02**

/3/

59

 1    have acceptable job offers.  The hearing Panel
 2    notes that responses to 3042 notices indicate
 3    opposition to a finding of parole suitability,
 4    specifically the District Attorney of Orange
 5    County.  The Panel makes the following findings:
 6    that the inmate needs additional time in order to
 7    fully understand and deal with the causation
 8    factors that led to the commitment of the life
 9    crime.  Until progress is made, the prisoner
10    continues to be unpredictable and a threat to
11    others.  Nevertheless, he should be commended for
12    his participation in NA, for his participation in
13    the 12-steps, for his completing vocational auto
14    upholstery and auto refinishing.  In addition, to
15    his being 115-free during his incarceration and
16    for completing the Keys to Fatherhood a
17    salesmanship course, and the tuberculosis and
18    hepatitis courses.  However, these positive
19    aspects of his behavior do not outweigh the
20    factors of unsuitability.  In a separate decision,
21    the hearing Panel finds that it is not reasonable
22    to expect that parole would be granted at a
23    hearing during the following two years.  The
24    specific reasons for the findings are as follows:
25    the prisoner committed the offense in an
26    exceptionally cruel, callous, violent, brutal
27    **SIEU PHONG NGO  J-07024  DECISION PAGE 3  05/13/02**

*132*

1    manner.  Specifically, he and his crime partners,
2    after one of his crime partners was involved in a
3    fight with the victim, left, armed themselves with
4    a weapon, and then went back to the school area
5    where the victim had gone to school, waited for
6    the victim to get out of school.  The inmate and
7    one of his crime partners then got involved in a
8    one-on-one fight with the victim and one of his
9    friends.  After which, the inmate and his crime
10   partner both began fighting with the victim.  They
11   were then joined in by two other individuals who
12   were beating the victim, knocked to the ground.
13   One of the crime partners shot and killed the
14   victim, one Angel Gonzales, age 15.  The offense
15   was carried out in an exceptionally cruel and
16   callous manner.  The motive for the crime was
17   inexplicable or very trivial in relation to the
18   offense.  The prisoner had been involved in
19   previous violent behaviors, which included once
20   again, a fistfight with an individual who he got
21   the better of and knocked down and after which
22   time three of his crime partners and him all began
23   continuing to strike the victim.  The correctional
24   counselor's report dated (inaudible) 2002, by
25   initial M. Rubio, R-U-B-I-O, indicates a degree of
26   threat as moderate if released to the public.
27   **SIEU PHONG NGO  J-07024  DECISION PAGE 4  05/13/02**

133

1    Therefore, a longer period of observation and

2    evaluation of the prisoner is required before the

3    Board should find the prisoner is suitable for

4    parole.  The Panel recommends that inmate remain

5    disciplinary-free.  If available, upgrade any way

6    you can, vocation, education.  If available,

7    participate in self-help and therapy programming.

8    That does conclude the reading of the decision.

9    Any comments, Commissioner Rodriguez?

10    **DEPUTY COMMISSIONER RODRIGUEZ:**  Yeah,

11    Mr. Ngo, one thing I think you took more of a

12    leadership role in this incident and I think

13    you've been a little bit less than truthful today.

14    If I'm wrong and what you stated today is the

15    truth, I don't expect you to change your story

16    just for the Board's panel.  But I truly would

17    like you to take this next two years, as far as

18    I'm certain you're programming well, don't

19    misunderstand me.  But I think there's more to the

20    incident than you're actually telling us today.

21    Whether you just don't want to say it or you

22    choose not to say it or throughout the years

23    you've made yourself believe what you've said in

24    the past is correct.  But I think if you look deep

25    down, I truly believe that you took more of a

26    leadership role and that possibly you did have,

27    **SIEU PHONG NGO  J-07024  DECISION PAGE 5  05/13/02**

134

62

1   know more about that weapon.  So I want you to
2   think about that.  But, again, like I said, if I
3   am incorrect, I don't expect you to come to the
4   Board next time and say you did do it if you
5   didn't.  But I will ask you one more time, did you
6   know more about that gun?

7        **INMATE NGO:**  (Inaudible) not until I looked
8   under the car.  When I got into the car, that's
9   the first time I seen the gun, Sir.

10       **DEPUTY COMMISSIONER RODRIGUEZ:**  Did you plan
11  the assault or the incident?

12       **INMATE NGO:**  No, Sir.

13       **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay.  Thank
14  you.

15       **ATTORNEY FOX:**  I'm sorry.  That's vague,
16  because he did earlier say he planned to fight
17  him, but not shoot him.

18       **INMATE NGO:**  Thank you.

19       **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay, no, no
20  that's all right counselor.  Thank you.  And I
21  just want to wish you the best of luck.

22       **PRESIDING COMMISSIONER ANGELE:**  Mr. Ngo, let
23  me tell you, you know, what disturbs me is the
24  other fight you had and we're very familiar with
25  the gang mentality.  Regardless of whether or not
26  you beat somebody, going to beat somebody, the end ·
27  **SIEU PHONG NGO   J-07024   DECISION PAGE 6   05/13/02**

*135*

1    result is everybody jumps on a guy when he's down.
2    It happened in another fight you had.  I think
3    your statement was, you couldn't be responsible
4    for what they do, but I'll tell you very frankly
5    if it was one of your crime partners involved in
6    that, you'd of jumped in just like everybody else
7    did.  That's the way things are.  We both know
8    that.

9         **INMATE NGO:**  Yes, it is.

10        **PRESIDING COMMISSIONER ANGELE:**  It disturbs
11   me that the killing of Mr. Gonzales was the same
12   type of situation.  The only difference is
13   somebody had a gun there.  So the history that you
14   started to accumulate would indicate to me that
15   the gang mentality that has no respect at all for
16   humanity, you know what happens next?

17        **INMATE NGO:**  That's when I was young, Sir.
18        **PRESIDING COMMISSIONER ANGELE:**  I realize
19   that.  I realize that.  And the reason why I
20   brought that up is I'd really like to see you get
21   into that anger management program here.
22   Hopefully, they'll get it out for you or you'll
23   get into it soon and maybe the next time you'll
24   have it under your belt.  I figure it will help.
25   And I don't want this to discourage you.  You're
26   doing a good job.  And for an initial hearing,
27   **SIEU PHONG NGO  J-07024  DECISION PAGE 7  05/13/02**

64

1    your counsel knows, that two years is not a bad

2    thing.  So I do wish you good luck.

3           **INMATE NGO:**  Thank you, Sir.

4           **PRESIDING COMMISSIONER ANGELE:**  That does

5    conclude the hearing.  Time is approximately 3:52

6    p.m.

7                              --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    **PAROLE DENIED TWO YEARS**

                                      **JUN 1 0 2002**

26    **EFFECTIVE DATE OF THIS DECISION_____**

27    **SIEU PHONG NGO   J-07024   DECISION PAGE 8   05/13/02**

*137*

65

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, VALERIE C. LORD, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 64, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, AT SOLEDAD, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING of SIEU PHONG NGO, CDC No. J-07024, on MAY 13, 2002, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 23, 2002, at Auburn, California.

Valerie C. Lord
Transcriber
**CAPITOL ELECTRONIC REPORTING**

138

# EXHIBIT C

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )     CDC Number J-07024
Hearing of: )
 )
SIEU NGO )
_____)

# COPY
# INMATE

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 3, 2004

1:15 P.M.

PANEL PRESENT:

BOOKER WELCH, Presiding Commissioner
ROLANDO MEJIA, Deputy Commissioner

OTHERS PRESENT:

SIEU NGO, Inmate
DAVID SPOWART, Attorney for Inmate
JENNIFER CONTINI, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum

**Wendy Thomas, Capitol Electronic Reporting**

140

ii

## INDEX

                                                          Page

Proceedings ....................................... 1

Case Factors ...................................... 12

Pre-Commitment Factors ........................... 15

Post-Commitment Factors .......................... 20

Parole Plans ..................................... 29

Closing Statements ............................... 49

Recess ........................................... 57

Decision ......................................... 58

Adjournment ...................................... 63

Transcriber Certification ........................ 64

--oOo--

141

1

1  **P R O C E E D I N G S**

2     **DEPUTY COMMISSIONER MEJIA:** We are now on

3  the record.

4     **PRESIDING COMMISSIONER WELCH:** Okay, good

5  afternoon, Mr. Ngo.

6     **INMATE NGO:** Good afternoon.

7     **PRESIDING COMMISSIONER WELCH:** Sir, this is

8  a Subsequent Parole Consideration Hearing. I'll

9  read your case factors into the record. The

10  prisoner's name is Ngo, N-G-O. How do you

11  pronounce your first name?

12     **INMATE NGO:** Sieu.

13     **PRESIDING COMMISSIONER WELCH:** Sieu,

14  S-I-E-U, CDC number J-07024. The date of the

15  hearing is Tuesday, August 3rd, 2004, the time is

16  approximately 1:15. The location is Correctional

17  Training Facility, Soledad. The prisoner was

18  received CDC on 2-1, 1994 from Orange County for

19  the offense of murder second, case number C99109,

20  count one, Penal Code violated 187, total term 16

21  years to life, minimum eligible parole date was

22  5-24-03. Sir, this hearing will be tape-recorded

23  so for the purpose of voice identification, we'll

24  need to go around the room and identify ourselves

25  stating our full name, spelling our last name. In

26  your case, you need to add your CDC number. I'll

27  start with myself, go to my left. My name is

*142*

2

1    Booker Welch, W-E-L-C-H.  Mr. Mejia.

2         **DEPUTY COMMISSIONER MEJIA**:  Rolando Mejia,

3    M-E-J-I-A, Deputy Commissioner.

4         **DEPUTY DISTRICT ATTORNEY CONTINI**:  Jennifer

5    Contini, C-O-N-T-I-N-I, Deputy District Attorney,

6    Orange County.

7         **ATTORNEY SPOWART**:  David Spowart,

8    S-P-O-W-A-R-T, attorney for Mr. Ngo.

9         **INMATE NGO**:  Sieu Ngo, S-I-E-U N-G-O, CDC

10   number J-07024.

11        **PRESIDING COMMISSIONER WELCH**:  Okay, sir,

12   that identifies everyone in the room with the

13   exception of the correctional peace officer who is

14   seated directly behind you, two of them, and

15   they're here for security purposes only and will

16   not be taking part in today's proceedings.  Mr.

17   Ngo, are you familiar with the American with

18   Disabilities law?

19        **INMATE NGO**:  No, I'm not, Sir.

20        **PRESIDING COMMISSIONER WELCH**:  Well, that

21   form in front of you, it will give you a good

22   overview.  Do you mind reading that into the

23   record.

24        **INMATE NGO**:  "ADA American with

25        Disability Act.  Americans with

26        Disability Act (ADA) is a law to help

27        people with disabilities.

3

```
 1          Disabilities are problems that make
 2          it harder for some people to see,
 3          hear, breathe, talk, walk, learn,
 4          think, work, or take care of
 5          themselves than it is for others.
 6          Nobody can be kept of public places
 7          or activities because of a
 8          disability.  If you have a
 9          disability, you have the right to ask
10          for help to get ready for your BPT
11          hearing to get to the hearing, talk,
12          read forms and papers, and understand
13          the hearing process.  BPT will look
14          at what you ask for to make sure that
15          you have a disability that is covered
16          by the ADA and that you have asked
17          for the right kind of help.  If you
18          do not get help or if you don't think
19          you've got the kind of help you need,
20          ask for a BPT 1074 Grievance Form.
21          You can also get help to fill it
22          out."
23      PRESIDING COMMISSIONER WELCH:  Very good.
24  Mr. Ngo, does that give you a little bit better
25  overview of what the American with Disabilities
26  law is all about?
27          INMATE NGO:  Yes.  Yes, Sir.
```

*144*

4

1      **PRESIDING COMMISSIONER WELCH:**  Now after
2   being armed with that knowledge, let me ask you,
3   do you have a disability as defined under the
4   American Disabilities Act?
5      **INMATE NGO:**  No, Sir.
6      **PRESIDING COMMISSIONER WELCH:**  I see you
7   have glasses, do you need those to read?
8      **INMATE NGO:**  I'm nearsighted.
9      **PRESIDING COMMISSIONER WELCH:**  Nearsighted,
10  okay.  You have no problems talking, reading here,
11  or walking, is that correct?  You were able to
12  walk over under your own power today?
13     **INMATE NGO:**  Yes, Sir.
14     **PRESIDING COMMISSIONER WELCH:**  You have a
15  12.3 overall TABE grade point level which would
16  indicate to the Board that you're totally capable
17  of reading and understanding the documents
18  necessary to prepare for this hearing, is that
19  correct?
20     **INMATE NGO:**  Correct, Sir.
21     **PRESIDING COMMISSIONER WELCH:**  Have you
22  received any mental health treatment within the
23  last 12 months?
24     **INMATE NGO:**  No, Sir.
25     **PRESIDING COMMISSIONER WELCH:**  Counselor, do
26  you have any concerns about your client's rights
27  as it relates to the American with Disabilities

*145*

5

1    law?

2         **ATTORNEY SPOWART:** I have none.

3         **PRESIDING COMMISSIONER WELCH:** Okay, then

4    we'll proceed with this hearing. The purpose of

5    today's hearing is to once again to consider your

6    suitability for parole. We will consider the

7    nature and the number of the crimes you were

8    committed for, your prior criminality, your social

9    history, and your behavior and programming since

10   your commitment. We've had an opportunity to

11   review your C-File and your prior transcripts and

12   you'll have an opportunity to make corrections or

13   clarifications to the record. We will consider

14   your progress since your last hearing, any new

15   psychiatric reports, and any other information

16   that may have a bearing on your suitability for

17   parole. Any change in parole plans should be

18   brought to our attention. Before we recess for

19   deliberations, the District Attorney, your

20   attorney, and yourself will be given the

21   opportunity to make a final statement regarding

22   your suitability for parole and the length of

23   confinement. After that's done, we will recess,

24   clear the room, and deliberate. Once we reached a

25   decision, we will reconvene and at that time we'll

26   let you know what our decision is. Do you

27   understand all that so far?

6

1       **INMATE NGO:**  Yes, Sir.

2       **PRESIDING COMMISSIONER WELCH:**  Now the Board

3   of Prison Terms rules and the law basically state

4   that a parole date shall be denied you if in the

5   opinion of the Commissioners your parole would

6   pose an unreasonable risk of danger to others.

7   However, prisoners do have certain rights.

8   Counsel, have your client's rights been met?

9       **ATTORNEY SPOWART:**  Yes, they have.

10      **PRESIDING COMMISSIONER WELCH:**  Mr. Ngo, you

11  have an additional right, you have the right to a

12  fair and impartial panel.  Do you have any reason

13  to believe the Panel Members will not be fair and

14  impartial to you?

15      **INMATE NGO:**  I would like to reserve that

16  right towards the end of this hearing.

17      **PRESIDING COMMISSIONER WELCH:**  Okay.  Mr.

18  Ngo, that's fine, I don't have a problem with

19  that, but I do need to tell you that I have no

20  reason not to give you a fair hearing.  I have

21  every intention to make sure that your due process

22  rights are adhered to.  I've already covered your

23  ADA issues and made sure you didn't have any

24  issues with that.  I'll be going over your due

25  process right issues to insure that you don't have

26  a problem with your rights.  And during the

27  hearing, it is -- I have every intention to insure

*147*

1   that you receive a fair and impartial hearing.

2   Commissioner, do you have any reasons why you

3   can't give the prisoner a fair hearing?

4        **DEPUTY COMMISSIONER MEJIA:**  No, I'm

5   objective and I take the case on a case by case

6   basis, no predetermined opinion or belief for

7   suitability or unsuitability.  I'll base all my

8   decision based on what I hear here and also what's

9   reflected in his file.

10        **PRESIDING COMMISSIONER WELCH:**  Okay, very

11   good.  Sir, you will receive a copy of our written

12   tentative decision today.  The decision becomes

13   effective in 120 days.  Mr. Ngo, you no longer

14   have a right to administrative appeals process, do

15   you understand that?

16        **INMATE NGO:**  Yes, I do.

17        **PRESIDING COMMISSIONER WELCH:**  Okay.

18        **INMATE NGO:**  The 1040 you mean?

19        **PRESIDING COMMISSIONER WELCH:**  Yes.  You're

20   not required to discuss the offense today, you're

21   not required to admit to guilt.  However, the

22   Panel Members accept as true the findings of the

23   court.  Do you understand that concept?

24        **INMATE NGO:**  Yes, I do.

25        **PRESIDING COMMISSIONER WELCH:**  Counselor,

26   pardon me?

27        **INMATE NGO:**  I would like to say that I will

*148*

8

1    not be talking about -- discussing my case, my

2    case today under Penal Code section 5011.  And

3    before we go any further, I would like to submit

4    this memorandum as evidence in support of my

5    parole suitability to you.

6         **PRESIDING COMMISSIONER WELCH:**  Okay, I'll

7    take it at this time, but you're getting a little

8    ahead of the game, we were going to give you an

9    opportunity.  That's fine we'll accept it now,

10   how's that?

11        **INMATE NGO:**  Thank you.

12        **PRESIDING COMMISSIONER WELCH:**  Okay, very

13   good.  And certainly you do not have to talk or

14   admit to the crime.  Very good.  Commissioner, is

15   there any confidential information to be used

16   today?

17        **DEPUTY COMMISSIONER MEJIA:**  None.

18        **PRESIDING COMMISSIONER WELCH:**  Good.

19   Counselor, I passed you a list of the documents we

20   will be working from.  Do you have those

21   documents?

22        **ATTORNEY SPOWART:**  Yes, I have these.

23        **PRESIDING COMMISSIONER WELCH:**  District

24   Attorney, do you have those documents?

25        **DEPUTY DISTRICT ATTORNEY CONTINI:**  Yes, I

26   do.

27        **PRESIDING COMMISSIONER WELCH:**  Counselor, do

*149*

9

1    you have any additional documents to submit?  Your

2    counsel have already -- I mean, your client have

3    already submitted a brief.

4        **ATTORNEY SPOWART:**  He's already given me

5    that brief, he says the first 10 pages are an

6    overview of why he should be considered.

7        **PRESIDING COMMISSIONER WELCH:**  Why he should

8    be considered for parole.

9        **INMATE NGO:**  Because it would clarify my

10   position at this hearing today, Sir.

11       **PRESIDING COMMISSIONER WELCH:**  Okay, then we

12   will review that during deliberations, we'll go

13   through and review that.

14       **INMATE NGO:**  All right, Sir.

15       **PRESIDING COMMISSIONER WELCH:**  Very good,

16   very good.  Any other documents to submit?

17       **ATTORNEY SPOWART:**  No, I haven't.

18       **PRESIDING COMMISSIONER WELCH:**  Any

19   preliminary objections?

20       **ATTORNEY SPOWART:**  Yeah, I have an

21   objection.  This was a plea agreement and I have

22   an objection to the District Attorney being here

23   today on a recent Supreme Court ruling that

24   classifies a plea agreement as a contract.  I know

25   that my client was not the shooter, he had no

26   criminal prior record, and has had an excellent

27   performance since he's been in here, so.

*150*

10

1        **PRESIDING COMMISSIONER WELCH:**   What does

2   that have to do with the District Attorney being

3   here?

4        **ATTORNEY SPOWART:**   That the District

5   Attorney is breaking the contract (inaudible).

6   When he pled, he gave up certain rights.   The

7   People got certain benefits from that.

8        **PRESIDING COMMISSIONER WELCH:**   Okay.

9        **ATTORNEY SPOWART:**   They got their benefits.

10   Now they're just trying to deny him of his

11   benefits.

12        **PRESIDING COMMISSIONER WELCH:**   Okay, all

13   right, I think I understand.

14        **ATTORNEY SPOWART:**   (Inaudible).

15        **PRESIDING COMMISSIONER WELCH:**   Okay.

16        **ATTORNEY SPOWART:**   I just want it on the

17   record, Commissioner.

18        **PRESIDING COMMISSIONER WELCH:**   Okay,

19   absolutely, absolutely.   I'm going to overrule

20   that objection because according to Penal Code

21   3042, section 3042 that is, the District Attorney

22   or his representative have a right to appear and

23   represent The People's interest at these hearings.

24   If not the District Attorney, certainly the

25   Attorney General, he can appear depending on who

26   prosecuted the case or has a major interest in the

27   case, not one or both, but only one can appear.

151

11

1    In this case, The People -- the District Attorney

2    of Orange County have opted to send his

3    representative, i.e., the Deputy District Attorney

4    from Orange County here to represent the District

5    Attorney.  Therefore, per statute, per Penal Code,

6    I'll have to overrule that objection, okay.  All

7    righty, thank you very much.  Any other

8    objections?

9         **ATTORNEY SPOWART:**  I have none.

10        **PRESIDING COMMISSIONER WELCH:**  All right,

11   thank you, Mr. Spowart.  Okay, and your client

12   will not be speaking to us today?

13        **ATTORNEY SPOWART:**  Not on the life crime, he

14   pled on the crime.

15        **PRESIDING COMMISSIONER WELCH:**  Will he be

16   speaking -- will he be giving any testimony today?

17        **ATTORNEY SPOWART:**  Yes, he'll talk about

18   everything else.

19        **PRESIDING COMMISSIONER WELCH:**  Okay, Mr.

20   Ngo, would you raise your right hand.

21        **INMATE NGO:**  Yes, Sir.

22        **PRESIDING COMMISSIONER WELCH:**  Do you

23   solemnly swear or affirm that the testimony you

24   give today will be the whole truth and nothing but

25   the truth?

26        **INMATE NGO:**  Yes, I do, Sir.

27        **PRESIDING COMMISSIONER WELCH:**  Okay.  In

152

12

1    that case what I'm going to do, Mr. Ngo, is just

2    go to -- let me give this to my colleague, he can

3    take a look at it and then I'll take a look at it

4    later.  Are your parole plans in that brief you

5    submitted?

6          **INMATE NGO:** Yes, Sir.

7          **PRESIDING COMMISSIONER WELCH:** You've got

8    everything in it, okay.

9          **INMATE NGO:** Parole plan, place for

10   residence, employment, support letters.

11         **PRESIDING COMMISSIONER WELCH:** Okay, very

12   good.  Let's go to the summary of the crime, it

13   say,

14         "On 9-18, 1992 Angel Gonzalez,

15         G-O-N-Z-A-L-E-Z, was beaten and shot

16         to death near Fullerton,

17         F-U-L-L-E-R-T-O-N, High School as he

18         walked home after school.  An

19         investigation revealed that earlier

20         in the day the victim, a member of

21         the Fullerton Tokers, T-O-K-E-R-S,

22         Town, a Latin gang, and  members of

23         the Fullerton Boys, an Asian gang,

24         were at a McDonald's Restaurant near

25         the high school.  The victim and

26         Usumang Muhamed had a confrontation

27         with each claiming their respective

153

13

1          gang affiliations.  After a
2          nonphysical altercation, a group of
3          Asians, which at the time included
4          Sieu Phong Ngo obtained -- and middle
5          name is spelled P-H-O-N-G, referring
6          to the prisoner, obtained a firearm.
7          Ngo and the Asian gang members
8          returned to the school where they
9          waited for Gonzalez.  As he walked
10         home, he was attacked and beaten.
11         During the physical altercation, the
12         victim was shot one time in the back
13         by Usumang, that's U-S-U-M-A-N-G,
14         Muhamed, M-U-H-A-M-E-D.  The group of
15         five Asian gang members including Ngo
16         fled the area after shooting Angel
17         Gonzalez who died at the scene as a
18         result of the gunshot wound.  Ngo,
19         Jimmy Bao, B-A-O, and Asat, A-S-A-T,
20         Cham, C-H-A-M, --"
21    or is that Ham?  C-H-A?
22         **INMATE NGO:**  Cham.
23         **PRESIDING COMMISSIONER WELCH:**  "-- Cham,
24    C-H-A-M, fled to the State of Washington.  They
25    were subsequently apprehended there and the murder
26    weapon, a stolen .22 caliber handgun, was
27    recovered in the vehicle."  Now we'll go to the

154

14

1   prisoner's version,

2           "Ngo explained that earlier in the

3           day his group had a confrontation

4           with the victim.  Subsequently he and

5           his group went to an arcade to play

6           games.  At that time his companion

7           took possession of a weapon.  Ngo

8           stated that he did not see the gun

9           until he was in the vehicle.  It was

10          located under the passenger's seat

11          and he and his companion returned to

12          Fullerton High School where they

13          parked and went to look for Gonzalez,

14          the victim.  Ngo explained that they

15          had a gun for protection in case

16          someone else happened to have a

17          weapon.  They found Gonzalez and his

18          group and started fighting with the

19          victim.  During the fighting Ngo

20          heard two shots.  Ngo explained that

21          no one intended to kill the victim,

22          they just planned to beat him up

23          because the victim had told them to

24          get out of town and that made Muhamed

25          angry.  Ngo realized that his

26          behavior was a mistake.  Ngo drove

27          his two companions to Washington

155

15

1       because Muhamed told him that he knew

2       someone who would give them shelter.

3       Ngo feels sorry for the victim's

4       family."

5  Juvenile record, there's no juvenile arrest.  Will

6  you be talking about your juvenile record, I mean,

7  your criminal history?

8       **INMATE NGO:**  I have no juvenile record.  I

9  have one drug diversion with a controlled

10  substance.  I was given a diversion but I was

11  never able to complete it --

12      **PRESIDING COMMISSIONER WELCH:**  Okay.

13      **INMATE NGO:**  -- because I got this case,

14  that's about it.

15      **PRESIDING COMMISSIONER WELCH:**  It says, no

16  juvenile record as previously noted.  On 3-30,

17  1992 Ngo was arrested by the San Gabriel Police

18  Department for possession of controlled substance,

19  three pieces of rock cocaine.  On 5-7-92 he was

20  diverted pursuant to Penal Code section --

21  pursuant to section 1000 of the Penal Code.  On

22  9-22, 1992, Ngo was arrested by the Olympic

23  Sheriff for possession of stolen property.  This

24  case was subsequently dismissed.  So you had two

25  arrests?

26      **INMATE NGO:**  Yes, because we were arrested

27  in Washington.

156

16

1    **PRESIDING COMMISSIONER WELCH:** Okay.

2        **INMATE NGO:** I guess you can consider it as
3    two, for the same crime.

4        **PRESIDING COMMISSIONER WELCH:** Well, it says
5    you was arrested for stolen property and that was
6    dismissed.

7        **INMATE NGO:** They say the gun -- I sold the
8    gun but I never lived in Washington so they note
9    there was a (indiscernible) chance I stole the gun
10   when he brought it to California, so. I didn't
11   know nothing about the gun. I just drove there
12   for shelter like I said. I didn't know nothing
13   about the stolen property.

14       **PRESIDING COMMISSIONER WELCH:** All right,
15   now we have the explanation on the record.
16   Personal factors, Ngo was born in Vietnam on 5-18,
17   1973. He resided in the United States until 1979.
18   In 19 -- He resided in the United States since
19   1979. In 1991 he graduated from Fullerton High
20   School and subsequently attended Fullerton
21   Community College and Pasadena City College. He
22   completed 10 units and his major was business.
23   Ngo was employed as a telemarketing and worked odd
24   jobs. He was employed at his family's liquor
25   store and resided with his parents. Ngo had
26   problems with -- Ngo had problems with controlled
27   substance or alcohol. Is that true?

157

17

1        **INMATE NGO:** I don't have no problem with

2    drugs at this point. I never drank alcohol

3    because I'm allergic to alcohol. I tried cocaine

4    and I got busted.

5        **PRESIDING COMMISSIONER WELCH:** Okay.

6        **INMATE NGO:** I have never used since, since

7    that day.

8        **PRESIDING COMMISSIONER WELCH:** Have you used

9    any -- used any other illegal substances?

10       **INMATE NGO:** No, I don't, Sir.

11       **PRESIDING COMMISSIONER WELCH:** Okay. It

12   says you were a member of the Fullerton Boys, is

13   that correct, gang?

14       **INMATE NGO:** Used to be.

15       **PRESIDING COMMISSIONER WELCH:** Okay. And

16   after you moved to Los Angeles you became

17   affiliated with the Tiger Mafia.

18       **INMATE NGO:** Yeah, that was just a made up

19   name (inaudible) at that point.

20       **PRESIDING COMMISSIONER WELCH:** What?

21       **INMATE NGO:** It was a made up name, like I

22   told my last hearing that it was just to throw the

23   detective off my trail.

24       **PRESIDING COMMISSIONER WELCH:** To throw the

25   detective off your trail, okay, all right. Your

26   family, do you have any brothers and sisters?

27       **INMATE NGO:** Yes, I do, Sir.

158

18

1        **PRESIDING COMMISSIONER WELCH:**  How many?

2        **INMATE NGO:**  I've got one older brother, two

3    older sisters, one younger brother, and one

4    younger sister.

5        **PRESIDING COMMISSIONER WELCH:**  Okay, any of

6    your brothers have problems with law enforcement

7    agents?

8        **INMATE NGO:**  No.

9        **PRESIDING COMMISSIONER WELCH:**  Any of your

10   brothers been members of gangs?

11       **INMATE NGO:**  No.

12       **PRESIDING COMMISSIONER WELCH:**  Did you grow

13   up in an intact home with both parents?

14       **INMATE NGO:**  Yes, I did, Sir.

15       **PRESIDING COMMISSIONER WELCH:**  Would you say

16   you had a stable home environment?

17       **INMATE NGO:**  Yes, I have.

18       **PRESIDING COMMISSIONER WELCH:**  Were you

19   married before you came to prison?

20       **INMATE NGO:**  No, Sir.

21       **PRESIDING COMMISSIONER WELCH:**  Any childrens

22   before you came to prison?

23       **INMATE NGO:**  No, Sir.

24       **PRESIDING COMMISSIONER WELCH:**  Did you ever

25   serve in any branch of the military?

26       **INMATE NGO:**  No.  I tried it but they didn't

27   want me because I was a smoker back then.

19

1        **PRESIDING COMMISSIONER WELCH:**  Because you

2    were smoker of what?

3        **INMATE NGO:**  Cigarettes, tobacco.

4        **PRESIDING COMMISSIONER WELCH:**  And the

5    military turned you down because you smoked

6    tobacco?

7        **INMATE NGO:**  Yes.

8        **PRESIDING COMMISSIONER WELCH:**  What year was

9    that?

10       **INMATE NGO:**  I think I tried it during --

11   after my graduation in South Pasadena and before

12   my graduation it was '89 or '90 I tried, I wanted

13   to go to the Marines because I heard they can

14   travel around the world.

15       **PRESIDING COMMISSIONER WELCH:**  And they

16   turned you down because you smoke?

17       **INMATE NGO:**  Yes.

18       **PRESIDING COMMISSIONER WELCH:**  That's a new

19   one on me.

20       **INMATE NGO:**  That's what they said.

21       **PRESIDING COMMISSIONER WELCH:**  Okay, depends

22   on what you smoke.  What did you smoke?  What did

23   you tell them you smoked?

24       **INMATE NGO:**  Tobacco.

25       **PRESIDING COMMISSIONER WELCH:**  Okay, just

26   tobacco, huh?

27       **INMATE NGO:**  Just tobacco.

160

1      **PRESIDING COMMISSIONER WELCH:** All right.

2      It says you had -- and we already talked about you

3      said you had odd jobs, fast-food and you worked in

4      your family's liquor store, is that correct?

5      **INMATE NGO:** Yes, Sir.

6      **PRESIDING COMMISSIONER WELCH:** Is that

7      pretty much your employment history?

8      **INMATE NGO:** Yes.

9      **PRESIDING COMMISSIONER WELCH:** Okay, what

10     I'd like for you to do now is give your attention

11     to my colleague, he's going to talk to you about

12     post-conviction. I'll come back and talk to you

13     about your parole plans.

14     **INMATE NGO:** All right, Sir.

15     **DEPUTY COMMISSIONER MEJIA:** All right, Mr.

16     Ngo, I'll be covering your institutional

17     adjustment in this portion of this hearing since

18     your last Board appearance. I have reviewed your

19     Central File, Board reports and psychiatric

20     reports. If I miss anything, I'll be giving you

21     and your attorney an opportunity to make comments

22     at the end of my presentation. Your last Board

23     appearance was on May 13th, 2002 where you received

24     a two-year denial. Your recommendation was for

25     you to remain disciplinary free, upgrade

26     educationally, participate in self-help and

27     therapy. Classification score is 19, custody

21

1    level is medium A, you're assigned to the culinary

2    warehouse, correct?

3           **INMATE NGO:**  Correct, Sir.

4           **DEPUTY COMMISSIONER MEJIA:**  And I see some

5    laudatory chronos here about your performance.

6    Vocational history, you have an auto upholstery

7    completion, an auto finishing completion.  You

8    also have a forklift certification.

9           **INMATE NGO:**  Correct, Sir.

10          **DEPUTY COMMISSIONER MEJIA:**  And I see that

11   you're taking classes (inaudible) with the

12   Coastline Community College.

13          **INMATE NGO:**  Correct, Sir.

14          **DEPUTY COMMISSIONER MEJIA:**  When did you

15   start this?

16          **INMATE NGO:**  A little over -- about two

17   years now.

18          **DEPUTY COMMISSIONER MEJIA:**  Two years.  How

19   many years have you completed so far?

20          **INMATE NGO:**  So far completed -- at this --

21   this class I'm taking health right now.  Currently

22   I have 23.

23          **DEPUTY COMMISSIONER MEJIA:**  Twenty-three

24   units.

25          **INMATE NGO:**  I will have 23 units.

26          **DEPUTY COMMISSIONER MEJIA:**  Forklift.  Do

27   you have a high school?

*102*

22

1          **INMATE NGO:**  Yes, I do.

2          **DEPUTY COMMISSIONER MEJIA:**  Where did you

3    complete your high school at?

4          **INMATE NGO:**  Fullerton Union High.

5          **DEPUTY COMMISSIONER MEJIA:**  Fullerton Union

6    High.  Do you have a copy of the diploma?

7          **INMATE NGO:**  I should, yes.

8          **DEPUTY COMMISSIONER MEJIA:**  Can I see it,

9    please?  I couldn't find it in here.

10         **INMATE NGO:**  It should be in my file.

11         **DEPUTY COMMISSIONER MEJIA:**  If I thought --

12   If it was here I wouldn't ask for it.  Maybe I'm

13   just missing it but I don't want to spend time

14   looking for it.

15         **INMATE NGO:**  Unless I didn't put it in

16   there.

17         **DEPUTY COMMISSIONER MEJIA:**  It's not in your

18   --

19         **INMATE NGO:**  It's not in my C-File either?

20         **DEPUTY COMMISSIONER MEJIA:**  It's not in your

21   --

22         **INMATE NGO:**  I guess I didn't put it in

23   there.  I figured the C-File had it, but I can

24   always get you a copy if you need one.

25         **DEPUTY COMMISSIONER MEJIA:**  Okay.  What year

26   did you graduate there?

27         **INMATE NGO:**  '91.

163

23

1      **DEPUTY COMMISSIONER MEJIA:** 1991?

2      **INMATE NGO:** It was '91, yes.

3      **DEPUTY COMMISSIONER MEJIA:** Okay, and since

4   your last Board appearance in 2002 you were -- I

5   see that you have started in AA since 1997 and

6   then you switched to NA 2001 (inaudible)?

7      **INMATE NGO:** I've been going, yes.

8      **DEPUTY COMMISSIONER MEJIA:** The last chrono

9   was on --

10      **INMATE NGO:** It should be -- my last chrono

11   was 7-8-04 date of it.

12      **DEPUTY COMMISSIONER MEJIA:** Okay, 7-8-04 is

13   your NA participation.

14      **INMATE NGO:** My most recent one.

15      **DEPUTY COMMISSIONER MEJIA:** Yes, and the one

16   I have here on file is 2003 of March. Okay, you

17   also completed the IMPACT program in 2002

18   workshop?

19      **INMATE NGO:** Right.

20      **DEPUTY COMMISSIONER MEJIA:** 3-16, 2002.

21   There's a chrono from Mr. Vazquez, warehouse

22   supervisor, as a culinary storekeeper. You have

23   performed your assignment with excellence. You

24   have a good, helpful, mature attitude and has

25   worked even on holidays. On disciplinaries, you

26   have zero 115s and two 128(a)'s from -- one on

27   April '97 and one on 2000 -- in 2000. (Inaudible)

164

24

1   gang affiliation noted (inaudible) Tiger Mafia

2   member.  And when was the last time you were

3   hanging out with the Tiger Mafia as a member?

4       **INMATE NGO:**  Well, there is no Tiger Mafia,

5   as I was saying earlier, it's just a made up name,

6   so I don't have -- you know, there's no more gang

7   for me.  I've grown out of it.  Back then it was

8   just a --

9       **DEPUTY COMMISSIONER MEJIA:**  So was that the

10  Fullerton?

11      **INMATE NGO:**  Fullerton, yes.

12      **DEPUTY COMMISSIONER MEJIA:**  What was that,

13  Fullerton --

14      **INMATE NGO:**  Fullerton Boys, they call it

15  Fullerton Boys.

16      **DEPUTY COMMISSIONER MEJIA:**  Fullerton Boys

17  named as the Tiger Mafia?  Are you talking about

18  the same place?

19      **INMATE NGO:**  No, it's two different places,

20  LA right, I was living at LA at that time so, you

21  know, when they asked me where I was from, I told

22  them Tiger Mafia because they saw two initials on

23  my arm with TM so I just told them Tiger Mafia

24  just to make it up.

25      **DEPUTY COMMISSIONER MEJIA:**  So was there

26  really a Tiger Mafia gang?

27      **INMATE NGO:**  No, there's not.  You can check

105

25

1    into LA Police Department, you will not find no

2    Tiger Mafia at all.

3        **DEPUTY COMMISSIONER MEJIA:**  Well, I'm going

4    to your psych report.  Your psych report is dated

5    January 21, 2002 by Dr. Saindon, spelling

6    S-A-I-N-D-O-N.  We're going to look at your

7    substance abuse history, we have heard that you

8    said that you tried cocaine.  "Previous mental

9    health evaluation for the Board of Prison Terms

10   has recommended that he be involved in AA and NA.

11   However, inmate feels that he never really had a

12   drug or alcohol problem although he does currently

13   attend AA."  And you are attending NA right now,

14   right?

15       **INMATE NGO:**  Right.

16       **DEPUTY COMMISSIONER MEJIA:**  Okay.  And his

17   mental health status at this time of the

18   evaluation 2002 indicates that,

19            "There's no evidence of mood or

20            thought disorder, his judgment

21            appeared to be sound, showed

22            significant insight into his

23            commitment offense as far as some

24            recognition.  There's no guarantee

25            that he will be paroled at this time

26            by the Board of Prison Terms."

27   Diagnostic impressions, No Contributory Clinical

166

26

1    Disorder, Axis I. Axis II Deferred, Axis III No

2    Contributory Physical Disorder, Axis IV Long-Term

3    Incarceration, Axis V Global Assessment of

4    Functioning of 90. There's no evidence that he

5    suffers from any psychiatric illness. Assessment

6    of dangerousness, "Although --" he says,

7              "There's no evidence the inmate

8              currently suffers from any

9              psychiatric illness although he does

10             recognize that (inaudible) he was

11             vulnerable to depression and was

12             tempted by conscious altering

13             substances. In consideration of the

14             fact that he has received no 115s

15             through his entire incarceration, it

16             would appear that he has at least in

17             this controlled setting been able to

18             manage his behavior and remain

19             incident free."

20   Assessment of dangerousness,

21             "Mr. Ngo (inaudible) with the

22             information given in the Central File

23             and medical record with respect to

24             his prior history of (inaudible) or

25             attempt to use cocaine and was

26             affiliated with gangs, this resulted

27             in his current offense. Based upon

167

27

1      his complete lack of disciplinary

2      action while incarcerated, his

3      insight into negative aspects of gang

4      involvement, his remorse for his

5      actions, his violence potential

6      within a controlled is to be below

7      average relative to the level II

8      inmate population.  If released to

9      the community, his violence potential

10     is estimated to be less than the

11     average citizen in the community

12     given his insight, his demonstrated

13     ability to stay out of trouble, his

14     successful development of plans upon

15     release, and the support of his

16     family.  (Inaudible) the most

17     significant risk factor for this

18     inmate as a precursor to violence or

19     a return to criminal behavior would

20     be his being involved with others

21     having a criminal history and/or gang

22     members, the use of alcohol and

23     drugs, and isolation from his family

24     members.  As this man has spent 10

25     years in prison, I would recommend,

26     should he be paroled, abstinence from

27     all alcohol and use of uncontrolled

108

28

1          substance, frequent monitoring of

2          substance abuse, if at all possible

3          should be a relative so he's near to

4          his family, and should make frequent

5          reports to his parole officer. Given

6          his family's commitment in supporting

7          him upon his release, his projected

8          level of success in the community if

9          granted a date for parole is seen at

10         this time to be better than average."

11    His counselor based him as posing a low degree of

12    threat to the community if released. Have you got

13    any comments or any additions to my presentation,

14    Counsel?

15         **INMATE NGO:** Do you have any of my support

16    letters from my family because --

17         **DEPUTY COMMISSIONER MEJIA:** That will be

18    done by --

19         **INMATE NGO:** Okay.

20         **DEPUTY COMMISSIONER MEJIA:** Any additional

21    comments?

22         **PRESIDING COMMISSIONER WELCH:** Are you done?

23         **DEPUTY COMMISSIONER MEJIA:** Yeah.

24         **PRESIDING COMMISSIONER WELCH:** Okay.

25         **DEPUTY COMMISSIONER MEJIA:** I'll go back to

26    the Chair and we'll take a recess.

27         **PRESIDING COMMISSIONER WELCH:** Okay, we'll

169

29

1    take a recess for a minute.

2               [Off the record.]

3         **PRESIDING COMMISSIONER WELCH:**  Mr. Ngo, in

4    case --

5         **DEPUTY COMMISSIONER MEJIA:**  We're back on

6    record.

7         **PRESIDING COMMISSIONER WELCH:**  Mr. Ngo, in

8    case you receive a parole date, tell the Panel

9    where you plan to live.

10        **INMATE NGO:**  I'll be living with my mom to

11   start off.

12        **PRESIDING COMMISSIONER WELCH:**  Where does

13   your mom live?

14        **INMATE NGO:**  In Monterey Park.

15        **PRESIDING COMMISSIONER WELCH:**  Do you have

16   an INS hold?

17        **INMATE NGO:**  No, Sir.

18        **PRESIDING COMMISSIONER WELCH:**  Are you a US

19   citizen?

20        **INMATE NGO:**  Yes, Sir.

21        **PRESIDING COMMISSIONER WELCH:**  Okay, and how

22   do you plan to support yourself?

23        **INMATE NGO:**  I'll be working at my uncle's

24   restaurant for now, (inaudible) chef.

25        **PRESIDING COMMISSIONER WELCH:**  Okay, and you

26   have lots of support letters in the file and your

27   affidavit that you submitted.  And it appears that

*170*

30

1    you do have employment and you have a place to

2    live.  I'll start off by going over some of your

3    letters.  Your mom wrote you a letter, her name is

4    Ngo Phuong?  Phuong Huynh?

5         **INMATE NGO:**  Phuong Huynh.

6         **PRESIDING COMMISSIONER WELCH:**  Phuong Huynh,

7    okay, let me just spell the first name, the first

8    name is spelled P-H-U-O-N-G, and the middle name

9    is H-Y -- H-U-Y-N-H, and the last name is the same

10   as the prisoner's, N-G-O.  Anyway, she writes you

11   a very supportive letter.  She says,

12            "As the birth mother of Sieu Ngo, I

13            am writing to request for your

14            leniency and kind review of the

15            parole of Sieu Ngo.  Years ago our

16            family immigrated into the United

17            States from Vietnam.  With the kind

18            support from the US Government and

19            local communities, we settled down in

20            California and became US citizens in

21            1979.  All of our family members are

22            deeply indebted to our government and

23            community and we are determined to

24            serve our country when called for.

25            In fact, my children volunteer at

26            school and communities and help out

27            kids.  I have six children, some are

171

31

 1          college graduates and are doing very

 2          well in their careers, such as Chi

 3          Phong Ngo, middle name is -- I mean,

 4          first name is C-H-I, middle name is

 5          P-H-O-N-G.  My son is a quality

 6          assurance software engineer.  Judy

 7    .     Seeto --" Seeto?

 8          **INMATE NGO:**  Correct.

 9          **PRESIDING COMMISSIONER WELCH:**

10          "--S-E-E-T-O, my daughter, is

11          pursuing a college degree while

12          working full-time at Pacific Care.

13          And Lan Lau, L-A-N, last name is

14          L-A-U, another daughter, is an

15          assistant technician working at DG --

16          DCG Group Pacific Bell, SPG

17          (inaudible) Solutions Incorporated.

18          My husband was running a paint

19          business.  Unfortunately he passed

20          away in 1995 at the age of 47.  Some

21          of my uncles and aunts are business

22          owners of restaurants and stores.  I

23          used to run a family business too, a

24          convenience store."

25    And she says,

26          "Sieu Ngo have been working and

27          studying hard in prison and doing

172

```
 1          well in his college studies.  Please
 2          be assured that Sieu Ngo, if paroled,
 3          will be well taken care of and
 4          supervised by his family, relatives,
 5          and friends.  We, his immediate
 6          family members, will support him in
 7          every aspect of life.  We plan to let
 8          him complete his college studies
 9          before entering the workforce.  We
10          are financially capable and
11          emotionally prepared and spiritually
12          determined to help Sieu Ngo and his
13          endeavors to create his reborn life
14          and become a contributing member to
15          our society.  Thank you in
16          anticipation of your kind review in
17          granting Sieu Ngo parole."
18     And your mother signed that.  Very supportive.
19     And another one from Gavin Ung.  Is that U-N-G?
20          INMATE NGO:  Yes, my uncle.
21          PRESIDING COMMISSIONER WELCH:  He says,
22          "I am in the Chinese restaurant
23          business and currently employ about
24          20 workers.  Sieu, if released from
25          prison, he will also be welcomed to
26          work for me if he so chooses.
27          Besides me willing to provide him
```

173

33

 1          with accommodation, transportation,

 2          and job, I believe there are a lot of

 3          other relatives such as his mom,

 4          siblings, uncles, and aunts who are

 5          willing -- who will always be more

 6          than willing to help with all his

 7          essential daily needs."

 8   Okay, and I have another one from Chi Ngo/Judy Ngo

 9   -- slash Judy Ngo, and she writes -- she's writing

10   on behalf of her brother. She feels that you're a

11   good man and, "Tom is a good man and will remain

12   so.  He's a caring person who wants to take care

13   of his mother if he gets a second chance.  My wife

14   and I can fully support him financially and care

15   for all his personal needs including housing. I

16   believe Tom --" Do you also go by the name of Tom?

17           **INMATE NGO:**  Yes, that's my middle name.

18           **PRESIDING COMMISSIONER WELCH:**  Okay.  "I

19   believe Tom -- I believe in Tom and only good will

20   shine from him as each day passes."  Another

21   letter here from --

22           **INMATE NGO:**  Thanah.

23           **PRESIDING COMMISSIONER WELCH:**  T-H-A-N-A-H,

24   he writes you a very supportive letter.

25           **INMATE NGO:**  She.

26           **PRESIDING COMMISSIONER WELCH:**  She, okay,

27   your older sister I'm trying to say.

174

34

 1        **INMATE NGO:**  Second oldest.

 2        **PRESIDING COMMISSIONER WELCH:**  Second oldest

 3    sister.  And she says,

 4            "As you can see he's just the kind of

 5            person and always there for anyone

 6            who needs help.  Because of his

 7            caring and kind personality, he has

 8            done some harm to himself, this is

 9            how he got himself into this mess.

10            I'm sure that the whole mess has

11            taught my brother to beware of his

12            friends.  Sieu's decision to hang out

13            with his friends was a costly one.

14            My brother was a young naïve.  Now

15            he's a grownup person and realizes

16            his actions and takes responsibility

17            to make changes to become a better

18            person."

19    And she goes on to say, "Our family have already

20    arranged for his support once he's released, my

21    husband's store," and she writes the telephone

22    number, "and is located on (indiscernible) Avenue

23    and Alhambra.  And a matter of fact his uncle --

24    his aunts and uncle also offered him work in their

25    restaurant.  The store name is Hot Wok --"

26        **INMATE NGO:**  Hot Wok.

27        **PRESIDING COMMISSIONER WELCH:**  That's H-O-T

175

35

1    W-O-K, "-- and that's in Fullerton.  And there's a

2    First (inaudible) Kitchen that's in Anaheim.

3    Housing would not be a problem.  And we all make

4    arrangements for him."  So Duc Ngo?

5         **INMATE NGO:**  Duc Ngo.

6         **PRESIDING COMMISSIONER WELCH:**  D-U-C Ngo.

7    Anyway, that's your brother, says, "I'm writing a

8    letter in support of my brother."  He writes you a

9    very supportive letter and he pretty much voices

10   the same thing that the other ones wrote.  I have

11   another letter here from your defense attorney at

12   the time and I'll read his letter.  He says, "I

13   represented --" her letter I should say,

14        "I represented Mr. Ngo in the case

15        which sent him to prison.  I have

16        been a criminal defense attorney for

17        over 26 years and have represented

18        over 40 persons accused of homicides.

19        I do not see my clients through rose

20        colored glasses and have never

21        written a letter like this on behalf

22        of an inmate for a parole hearing.

23        The circumstances of Mr. Sieu's case

24        compel me to make a statement in this

25        instant.  At the time of the incident

26        he was a very likable young man and

27        with no significant criminal history.

176

36

1       My recollection, he had no conviction

2       of any crime or violence. The

3       incident in question was very

4       different from the typical gang case

5       and in fact a work sketching for your

6       review, Sieu and his friends was a

7       wannabe type group who did not really

8       have a significant history of tough

9       turf in Orange County as a gang. On

10      the day of the incident, some of

11      Sieu's friends by chance went to

12      McDonald's which was near Fullerton

13      High School in North Orange County.

14      Sieu was not present at the time.

15      One of Sieu's ultimate codefendants

16      got in a staring match with the

17      decedent and some of his friends who

18      were members of the Toker Gang --

19      Toker Town, a long established

20      Hispanic group in Fullerton.

21      Essentially the Toker, that's spelled

22      T-O-K-E-R T-O-W-N -- Essentially the

23      Toker Town Group told Sieu's friends

24      that they, Cooks, that's C-O-O-K-S,

25      were not welcome in Fullerton where

26      some of them already live and they

27      should get out of town. (Inaudible)

177

37

1    Sieu's friends decided to confront

2    the decedent's group after school got

3    out that day. Sieu was called to

4    help out in case they were

5    outnumbered. Their group waited at

6    the school and confronted the

7    decedent and one of his friends about

8    two blocks out of Fullerton High

9    School, not on school grounds. From

10   all appearances, this was intended to

11   be a fistfight. Sieu and his friends

12   who had been in the stare-down

13   approached the decedent and a friend

14   who was walking on the sidewalk and a

15   fistfight is how it started.

16   However, the decedent's friend fled

17   just after the punching began and

18   left Sieu and his friend fighting the

19   decedent who was much larger than

20   either of them. Of course this was

21   unfair but nothing at this point

22   suggested that this was intended to

23   be a homicide. A third member of

24   Sieu's -- A third member of the group

25   who was part of -- A third member of

26   the group who was part of (inaudible)

27   from where their car was parked to

178.

38

1    the scene of the site, he reached up

2    while the fight was in progress, shot

3    the decedent, killed him, and

4    narrowly missed Sieu.  Sieu and all

5    of his friends then fled, ultimately

6    being arrested out of state.

7    Evidence was received to show that

8    Sieu and his friends knew that a gun

9    was in a car.  Based largely upon

10   that and the theory of foreseeable

11   consequences, he and all of his

12   codefendants were convicted.  Sieu

13   was not the shooter and no evidence

14   to show that he suggested,

15   encouraged, abated -- or abetted the

16   shooting in any way.  After the

17   shooting, Sieu angrily confronted the

18   shooter, demanded to know why he

19   brought out the gun and asserted that

20   he, Sieu, didn't know the gun was

21   going to be used.  In summary, this

22   was not a drive-by or a similar gang

23   crime where everyone knew (inaudible)

24   should have known that death or

25   serious injury was intended.  On the

26   contrary, this appears to be an

27   impulsive act by one member of the

179

39

1           group which due to the rest of the
2           circumstances swept them all up by
3           way of the derivative liability --
4           derivative liability,
5           D-E-R-I-V-A-T-I-V-E.  I am not
6           suggesting that Sieu and the other
7           non-shooters bear no responsibility
8           for the tragic outcome, but for the
9           fight of course, no shooting would
10          have taken place.  However, I would
11          submit that the circumstances here
12          are significantly mitigated where --
13          when considered against other
14          convictions of this type.  Assuming
15          that Sieu's performance within the
16          Department of Corrections has been
17          positive, I would urge you to parole
18          at the earliest possible time."
19     Donald J. Rubright -- Donald G. Rubright, that's
20     R-U-B-R-I-G-H-T, Senior Deputy Public Defender,
21     Orange County.  Okay, and you have other letters
22     and some are duplicates and you have other family
23     members providing support.  And Raymond Seeto, the
24     brother-in-law, also writes you a supportive
25     letter and he notes that,
26          "Putting a roof over his head won't
27          be a problem.  He can stay with his

180

40

| | |
|---|---|
| 1 | mother, brother, or sisters. Tom has |
| 2 | a large extended family. This is his |
| 3 | base of support. Lastly, I beg the |
| 4 | Board to look at the facts |
| 5 | surrounding his conviction. He was a |
| 6 | young -- He was young and naïve." |
| 7 | So you have lots of family support and you have |
| 8 | lots of job offers and you have people offering |
| 9 | you a place to live. And most importantly you |
| 10 | have a letter from the Public Defender's Office |
| 11 | outlining the case and there's no reason to |
| 12 | dispute what he's saying is true and he wrote you |
| 13 | a very supportive letter. And I have to say I |
| 14 | haven't seen too many letters from the Public |
| 15 | Defender's Office in support of parole. And with |
| 16 | that we'll go to 3042 Notices. We sent out |
| 17 | notices pursuant to Penal Code 3042. We sent |
| 18 | those out to different agencies that would have an |
| 19 | interest in your case. I do see a letter here |
| 20 | from the Orange County Deputy District Attorney's |
| 21 | Office and basically what it's saying is that the |
| 22 | District Attorney's Office will be attending the |
| 23 | life parole consideration hearing, and they have |
| 24 | their representative here and at the appropriate |
| 25 | time she'll have something to say about your |
| 26 | parole suitability. Okay, with that we'll go to |
| 27 | questions. Commissioner, do you have any |

181

41

1   questions?

2       **DEPUTY COMMISSIONER MEJIA:**  Yes.  It looks
3   like you've been attending NA, AA, or self-help
4   since '97?

5       **INMATE NGO:**  I was attending mostly -- I was
6   attending both at the time but I dropped out of AA
7   because I feel that I don't need it because I
8   don't drink, I'm allergic to alcohol.  I never
9   drank.  And I think that I might -- you know,
10  because of my drug offense, I decided to go to NA
11  to better myself, to learn, so that's why I've
12  been attending NA.

13      **DEPUTY COMMISSIONER MEJIA:**  What have you
14  learned so far?

15      **INMATE NGO:**  To stay sober, to be a better
16  person.  Drugs can really harm a person, I mean,
17  change a person, even though you are guilty or
18  not, drugs can just alter your state of mind, you
19  can't function properly using drugs.

20      **DEPUTY COMMISSIONER MEJIA:**  Did they teach
21  the 12-Steps as well?

22      **INMATE NGO:**  Yes.

23      **DEPUTY COMMISSIONER MEJIA:**  Do you remember
24  what -- any of the 12-Steps?

25      **INMATE NGO:**  Yes, I remember all those.

26      **DEPUTY COMMISSIONER MEJIA:**  You remember all
27  of them.  Can you give me one?

182

42

1        **INMATE NGO:**  Which one?

2        **DEPUTY COMMISSIONER MEJIA:**  Whichever you

3    recall.

4        **INMATE NGO:**  Number one that I admitted to

5    God, to myself that (inaudible) drugs or alcohol,

6    that our lives will become unmanageable.  Two,

7    make a decision to turn our will and our lives

8    over to the care of God (inaudible) carry that

9    out.  Three, make decisions, turn our will and our

10   lives over to the care of God and (inaudible).

11   Four, made a searching fearless moral inventory

12   about ourselves.

13       **DEPUTY COMMISSIONER MEJIA:**  How old were you

14   when you were involved in this crime?

15       **INMATE NGO:**  I was 19.

16       **DEPUTY COMMISSIONER MEJIA:**  You were 19.

17   You are how old now?

18       **INMATE NGO:**  I'm 31.

19       **DEPUTY COMMISSIONER MEJIA:**  Let me just --

20       [Thereupon, the tape was turned over.]

21       **DEPUTY COMMISSIONER MEJIA:**  When did you get

22   involved with the gangs, you were 18 then, how old

23   were you when you started with the gang?

24       **INMATE NGO:**  Believe it or not -- gang is a

25   harsh word because like there was only like five

26   or six of us, you know, during that time.  We were

27   more friends because I (inaudible) know these

183

43

1    guys, I've been moved there for about a year, and

2    I hang around with them, you know.  So to me it's

3    more like a friend more than a gang but because we

4    live at Fullerton they call themselves Fullerton

5    Boys.

6        **DEPUTY COMMISSIONER MEJIA:**  How old were you

7    when you started hanging out with them?

8        **INMATE NGO:**  I think I was 16 or 17, Sir.

9        **DEPUTY COMMISSIONER MEJIA:**  So about two

10   years.

11       **INMATE NGO:**  Yeah, about two years.

12       **DEPUTY COMMISSIONER MEJIA:**  If you get

13   released to the streets, how are you going to get

14   away from the elements of the gang lifestyle?

15       **INMATE NGO:**  Knowing what a gang can do to a

16   person, I have confidence that I can stay away

17   from them, you know, because I learned from my

18   mistakes, that's how I've grown.  I know I can

19   deal with problems differently, you know, just

20   staying away, choose better friends, think before

21   I act, everything, what I've learned in here to be

22   a better person.

23       **DEPUTY COMMISSIONER MEJIA:**  No other

24   questions.

25       **PRESIDING COMMISSIONER WELCH:**  Okay, there's

26   one thing in your brief that a lot of it's clothed

27   in legal terminology, but there is one thing that

44

1   I think I will put on the record in your defense,

2   it's, "Considering the facts of my personal

3   culpability as established, it is clear that the

4   category --" well, that's not what I'm trying to

5   read.  Here it is, the next paragraph says,

6           "Since there are no words adequate

7           enough to express the sincerity of my

8           remorse of the acceptance of

9           responsibility for my past conduct

10          and behavior, I offer the following

11          actions, that I stipulate to the

12          aggravated term of 19 years in

13          accordance with 15CCR243 that I

14          stipulate to whatever other parole

15          conditions that the Board deems

16          necessary upon me."

17  Okay.  I was looking for something for your

18  remorse and I guess that's the closest thing I've

19  found there.  And under the facts of the crime,

20  starting off where you said, "The facts of the

21  crime shall be discussed with the prisoner to

22  assess determination, the extent of culpability,

23  the Board shall not require the admission --" we

24  already know that.  "Furthermore, I fully and

25  truly confess and accept the facts of my personal

26  culpability and responsibility for the life

27  crime."  Okay, anyway.  Commissioner, District

185

45

1   Attorney, do you have any questions?

2       **DEPUTY DISTRICT ATTORNEY CONTINI:**   Just very
3   briefly.  Could the Board ask the inmate, he
4   testified or stated that he made up the name Tiger
5   Mafia because he had TM tattooed on his shoulder.
6   What does TM stand for then?

7       **INMATE NGO:**  My ex-girlfriend's name,
8   Theresa May.

9       **DEPUTY DISTRICT ATTORNEY CONTINI:**  Could the
10  Board inquire of the inmate why he would make up
11  another gang affiliation and tell a police officer
12  that?

13      **INMATE NGO:**  Because at the time I just
14  wanted to throw off the investigator because when
15  I was arrested they knew I was from Fullerton so
16  just (inaudible) I didn't want to be associated
17  with them so I threw them off by making up a name.

18      **DEPUTY DISTRICT ATTORNEY CONTINI:**  Could the
19  Board inquire of the inmate when he and his crime
20  partners were arrested in the State of Washington,
21  he was arrested for possession of stolen property,
22  could the Board inquire of him whether or not he
23  was aware that was not only the murder weapon in
24  his life case but also a nine-millimeter
25  (inaudible) assault pistol that was in the car?

26      **INMATE NGO:**  Both of the weapons don't
27  belong to me, they belonged to my crime partner.

180

46

1    I'd never been to the State of Washington until I

2    drove there myself.  I'd never been out of the

3    State of California, period, so --

4         **PRESIDING COMMISSIONER WELCH:**  Did you

5    understand the question?

6         **INMATE NGO:**  She had stated why the weapon

7    was in the car.

8         **PRESIDING COMMISSIONER WELCH:**  She said were

9    you aware.

10        **INMATE NGO:**  Of the gun, yes, I was, Sir.

11        **PRESIDING COMMISSIONER WELCH:**  The other

12   weapon?

13        **INMATE NGO:**  Yes.

14        **PRESIDING COMMISSIONER WELCH:**  Okay.

15   District Attorney.

16        **DEPUTY DISTRICT ATTORNEY CONTINI:**  Could the

17   Board inquire of the inmate, he drove his crime

18   partner and fellow gang members to the State of

19   Washington, correct?

20        **INMATE NGO:**  Yes, that's correct.

21        **DEPUTY DISTRICT ATTORNEY CONTINI:**  And could

22   the Board just finally inquire of the inmate, he

23   indicated he had the 11350 arrest for the drug, in

24   the probation report for this case, indicated that

25   he and some other individual had previously beaten

26   up Hispanic men at a school, is he familiar with

27   that case?

187

47

1          **INMATE NGO:**  I'm wondering (inaudible) that

2     was never brought up, I don't see what it has to

3     do with my case right now.  (Inaudible) a fight,

4     everybody was getting in a fight.  We were young

5     then.

6          **PRESIDING COMMISSIONER WELCH:**  Okay.

7          **INMATE NGO:**  That was, you know --

8          **PRESIDING COMMISSIONER WELCH:**  Let's backup.

9     District Attorney, would you re-ask the question.

10         **DEPUTY DISTRICT ATTORNEY CONTINI:**  Sure.

11    Would the Board inquire of the inmate, in his

12    probation report for this case, the victim by the

13    last name of Perez was interviewed regarding a

14    physical altercation at a school in which the

15    inmate began the physical altercation and then

16    three of the inmate's companions joined in kicking

17    and punching the victim Perez, alleged to have

18    happened December 14th, 1990.  Is he familiar with

19    that assault?

20         **INMATE NGO:**  Yes, I am familiar with it.  I

21    was never convicted on anything.  I was released.

22    What can I say?

23         **PRESIDING COMMISSIONER WELCH:**  Well, you can

24    tell her the circumstances.  I don't think any --

25         **INMATE NGO:**  Well,

26         **PRESIDING COMMISSIONER WELCH:**  --

27    (inaudible) what happened.

48

1    **INMATE NGO:** For that fight I was going to

2    pick up my girlfriend at the school at that time.

3    She was in the agricultural or floral rearranging

4    class. I went over there to pick her up and Mr.

5    Perez, I guess, at that -- you know, tell me, who

6    the hell are you, and then he started cussing me.

7    He don't even know who I am. (Inaudible) what is

8    he doing, you know, what is his business. So I

9    just left it at that and I left, and I was waiting

10   for my girlfriend at the parking lot and he came

11   out and started mad-dogging me.

12   **PRESIDING COMMISSIONER WELCH:** What does

13   mad-dogging mean?

14   **INMATE NGO:** It means staring me down and

15   then he asked me who the hell -- you know, F, what

16   are you looking at. I said, what's your problem?

17   So he came over (inaudible) confronted so I just

18   socked him, you know.

19   **PRESIDING COMMISSIONER WELCH:** You socked

20   him?

21   **INMATE NGO:** Yes, because he wanted to fight

22   me for some reason so I just was trying to defend

23   myself so I socked him first and that's it.

24   **PRESIDING COMMISSIONER WELCH:** Okay, all

25   right. District Attorney.

26   **DEPUTY DISTRICT ATTORNEY CONTINI:** Could the

27   Board just inquire of the inmate whether or not

*189*

49

1   his three companions that assaulted Mr. Perez on

2   that day were also Fullerton Boys gang members?

3          **INMATE NGO:**  No.

4          **PRESIDING COMMISSIONER WELCH:**  No?

5          **INMATE NGO:**  No, they weren't.

6          **DEPUTY DISTRICT ATTORNEY CONTINI:**  I don't

7   have anything further.

8          **PRESIDING COMMISSIONER WELCH:**  Okay.

9   Counselor, do you have any questions for your

10   client?

11          **ATTORNEY SPOWART:**  I have nothing.

12          **PRESIDING COMMISSIONER WELCH:**  Okay, Mr.

13   Ngo, at this time we go -- at this portion of the

14   hearing we go to closing.  We start off with the

15   District Attorney.  District Attorney, closing.

16          **DEPUTY DISTRICT ATTORNEY CONTINI:**  The

17   People of the State of California strongly oppose

18   any parole of Mr. Ngo at this time.  This case was

19   a cold-blooded murderer of a 15-year-old.  Yes,

20   rival gang member, but a 15-year-old when this

21   inmate was 19 years, two years out of high school.

22   He and his friends, after a mad-dogging incident,

23   lie in wait essentially waiting for this young man

24   to walk home from school.  In the inmate's version

25   of events to the Board previously, he indicated

26   that he didn't know that a gun was in the car and

27   that at the same breath he indicates that they had

*190*

50

1   the gun for protection. Neither of those things
2   make any sense in the gang world, and when you are
3   waiting for an individual to assault them, it
4   seems ridiculous to say that you have the gun for
5   protection. Moreover, Mr. -- the victim, the 15-
6   year-old, in the case was walking with another
7   friend when he was first engaged by this inmate
8   and one other person which shows that this inmate
9   was a leader in this attack. There's five
10  individuals involved, he's one of the first ones
11  to go up and start beating the 15-year-old. I
12  just want to touch briefly on Mr. Rubright's
13  letter, the public defender, because he indicates
14  in that letter that -- just give me one moment, he
15  indicates in that letter that this was a wannabe
16  gang and I just have a strong -- strongly disagree
17  with that. This is a gang that had a loaded gun
18  that they used on this 15-year-old. It's also a
19  gang that when they're arrested after fleeing to
20  the State of Washington, has the nine-millimeter
21  stolen gun, both of the guns stolen, both the .22
22  and the nine-millimeter. In addition to that,
23  there's a level of sophistication involved in this
24  crime in that the suspects fled and they burn the
25  car that they were driving, and that's contained
26  in the record. They burn the car that they were
27  driving before taking off to Washington and this

/91/

51

1    inmate is the one who drove them to Washington.

2    Finally, I would note that although this inmate's

3    criminal history, it was not extensive, he does

4    have the drug offense, and then two years before

5    the killing he has this incident where he and some

6    other fellows are beating up an individual, so

7    there is an escalation of violence in his

8    background there.  When he first was housed at the

9    Orange County Jail, he had three incidents in the

10   Orange County Jail which were noted in his

11   probation report, the last was the mutual combat.

12   He's obviously done well in the last few years

13   here, but he does have a couple of -- I believe I

14   saw a couple of 128s in his record, so we're

15   talking 12 years since this incident occurred.

16   Based on the gang nature of it, basically a cold- ⚡

17   blooded execution of a 15-year-old boy, we would

18   strongly oppose a parole at this point.

19        **PRESIDING COMMISSIONER WELCH:**  Counselor,

20   closing.

21        **ATTORNEY SPOWART:**  If we look at Mr. Ngo's

22   entire history, he had no juvenile record.  He

23   came from a very good family, an excellent letter

24   from his mother, talking about her other children,

25   their accomplishments.  My client graduated from

26   high school.  He was attending Fullerton Community

27   College and then Pasadena City College.  He

192

52

```
1   completed 10 units.  In other words, he had a
2   stable social history.  He was in high school at
3   that time, various ethnic groups, Latinos, Asians,
4   and they would fight, and this happens.  He did
5   get in a fight once when he tried to pick up his
6   girl.  Now the DA says this shows an escalating
7   pattern.  Motivation for the crime was basically a
8   gang fight.  He was 19 then and he's 31 now.
9   Excellent parole plans which we've gone over, a
10  place to live, a place to work, good letters of
11  support.  Now, this is exactly what I was talking
12  about when I objected.  This is a murder second-
13  degree plea.  The DA comes up here today says
14  cold-blooded lying in wait.  If that was true then
15  the District Attorney's Office was grossly
16  inadequate in the prosecution of my client.  Why
17  wasn't he up for life without parole or the death
18  penalty?  Come on, give me a break, that is not
19  what happened.  He went with his friends, this big
20  gang, five guys, that he went over with and they
21  went over because one of them had gotten in
22  (inaudible) and they went over to have a fight, it
23  was clear.  As his trial attorney says, the fight
24  started and later on a guy comes up with a gun and
25  shoots the victim.  It wasn't my client.  He did
26  not have a gun.  He's never been violent.  If you
27  look at the Board report and he gives -- he says
```

193

53

1    he would pose a low degree of threat to the public

2    at this time.  This opinion is based on Ngo being

3    immature at the time of the crime and easily

4    influenced by his peers.  The crime was episodic

5    in nature.  It wasn't planned, it wasn't cold-

6    blooded, it wasn't lying in wait, it was none of

7    those.  It was a pure simple these five guys got

8    in a fight.  My client was there, he didn't even

9    know they had the gun.  He wasn't living in

10   Fullerton at the time, he was living in Pasadena,

11   going to college.  His institutional adjustment

12   has been outstanding, two 128(a)'s in the entire

13   time he's been down.  No 115s.  Where is the

14   violence?  Where's the violence?  Where's the

15   escalating pattern?  There isn't any.  He

16   completed IMPACT Workshop program, and if you

17   notice they talk about the IMPACT program it

18   includes anger management, domestic violence, gang

19   violence, murder and sexual assault, it includes

20   all these things.  So he's had good therapy there.

21   He's been AA or NA the entire time he's been down.

22   He completed the course of Sexual Transmitted

23   Disease, has excellent work reports, completed the

24   Salesmanship and the Key to Fatherhood, completed

25   the forklift certification.  The Board report is

26   low.  Now let's look at the psych report, and

27   let's remember, the psych report is the expert

194

54

1   here, and this is low too.  The Commissioner read
2   it, based on his complete lack of disciplinary
3   actions while incarcerated, his insight into the
4   negative aspects of gang involvement, and his
5   remorse for his actions, he has expressed remorse,
6   and the psych takes that into consideration, his
7   violence potential within a controlled setting is
8   estimated to be below average relative to this
9   level inmate II population, which is low.  If
10  released to the community, his violence potential
11  is estimated to be less than, not average, but
12  less than the average citizen in the community.
13  And he talks about, given his insight, his
14  demonstrated ability to stay out of trouble, his
15  successful development of plans upon release and
16  the support of his family -- and I know -- look
17  again at his plans, he's very detailed.  This is a
18  serious young man.  He's very serious about
19  wanting to get out.  He has clearly worked to get
20  out.  He admits what he did.  You can't get away
21  from it, he was there, he participated.  It was a
22  fight and then there was a gun there.  He did not
23  do the shooting.  He had no reason to believe that
24  this other guy would shoot anybody, it happened.
25  The point is, we're here now when he's 31 years
26  old not 19.  He's been in Coastline Community
27  College, he's preparing himself to get out.  He's

195

55

1    paid for his crime.  For his part in that crime,
2    he has paid for it.  And he's stated, if you find
3    me suitable, give me the highest because I know I
4    shouldn't have been there and I shouldn't have
5    participated in this.  Board report low, psych
6    report below average here, less than average.  Do
7    you know what that means?  Look at anybody walking
8    downtown Fullerton or Pasadena, they're the
9    average Joes.  And he, the psych, the
10   professional, is saying my client is no more -- is
11   less dangerous than they are, less dangerous.  So
12   how now does he become an unreasonable risk of
13   danger to society.  I think not.  You know, I'm
14   surprised really, I know it's difficult to get a
15   date on your first initial hearing, but I'm
16   surprised that this man didn't get a date on his
17   initial hearing.  I think he should be found
18   suitable today and I'll submit it.

19       **PRESIDING COMMISSIONER WELCH:**  Okay, Mr.
20   Ngo, you can make a closing statement or you can
21   let your attorney's statement be  your closing
22   statement.

23       **INMATE NGO:**  I'd like to make a statement.
24   During my last initial hearing, previous hearing,
25   one of the Commissioners told me that I needed
26   time to understand the nature and circumstances of
27   my crime and my disregard for human life.  In my

196

56

1    defense, I would say that it's part of telling the
2    truth because for the last 12 years I've had
3    nothing but time to think about my crime.  It's
4    with me every day, it's a reminder every day.   I
5    know nothing I can say or do can bring back Mr.
6    Angel Gonzalez.  I know I caused a lot of harm to
7    his family, anyone involved, but there's nothing I
8    can say or do at this point to ever change the
9    fact.  You know, I know what I did, or lack of on
10   my part is, I could have maybe have stopped this
11   from happening if I was smart enough to act upon
12   it because I was young and naïve.  I know that's
13   not an excuse, but looking back now I see what I
14   could have done if I'd have known better.  I took
15   full complete responsibility for my action.  I
16   can't take responsibility for others, only for
17   myself.  I know I'm partly responsible that's why
18   I know I deserve to do some time, but I have done
19   my time. I have done everything you have asked me
20   to do, I've gone beyond my scope of
21   (indiscernible) to better myself.  All I ask is
22   that you give me a fair chance, a second chance.
23   I know I have to prove to you that I can be a law-
24   abiding citizen, but if you should not find me
25   suitable at this time, I'd ask you, urge you, to
26   please specify what exactly I need to do in order
27   to be found suitable at my future hearings.

197

57

1    That's all I ask of you.   Thank you.

2         **PRESIDING COMMISSIONER WELCH:**   Okay, thank

3    you very much for our comments.   We'll take a

4    recess.

5                    **R E C E S S**

6                    --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

198

58

1     **CALIFORNIA BOARD OF PRISON TERMS**

2              **D E C I S I O N**

3        **DEPUTY COMMISSIONER MEJIA:**  Okay, we're back

4     on record for our decision.

5        **PRESIDING COMMISSIONER WELCH:**  Okay, Mr.

6     Ngo, we have a decision.  The Panel reviewed all

7     the information received from the public and

8     relied on the following circumstances in

9     concluding -- could you close the door, please, --

10    in concluding that the prisoner is not suitable

11    for parole and would pose an unreasonable risk of

12    danger to society or a threat to public safety.

13    One, this crime was carried out in an especially

14    cruel and callous manner.  Gang related violence

15    in a community is always cruel and callous

16    violence.  Actually there was multiple victims

17    attacked, one was killed, one ran away and was

18    able to escape.  The offense was carried out in a

19    dispassionate, it was a calculated manner.  The

20    victim was abused, he was beaten and then he was

21    shot.  The offense was carried out in a manner

22    that demonstrates an exceptionally callous

23    disregard for another human being.  The motive for

24    the crime was inexplicable or very trivial in

25    relationship to the offense.  Any gang-related

26    activity in our community is (inaudible) and

27    **SIEU NGO   J-07024   DECISION PAGE 1   8/3/04**

199

1    inexplicable type of behavior, it's the type of

2    behavior that certainly cannot be condoned in any

3    well-ordered society. The conclusion was drawn

4    from the Statement of Facts wherein on 9-18-92

5    Angel Gonzalez who was beaten and shot to death

6    near Fullerton High School as he was walking away

7    -- as he was walking home. The circumstances

8    surround this crime, apparently the prisoner and

9    some of his gang members had been at a McDonald's.

10   There was a stare down contest and apparently some

11   words was exchanged. The prisoner and his crime

12   partners waited for the victim as he was walking

13   home and a fight ensued and he was shot and killed

14   with a .22 caliber handgun. Mr. Angel Gonzalez,

15   aged 15, lost his life over a very, very trivial

16   matter, over a matter that really cheapens human

17   life, the gang related -- the gang mentality that

18   occurs in our cities. The prisoner really did not

19   have an escalating pattern of criminal conduct.

20   He did have one contact with law enforcement

21   agency. He has -- well, two contacts with law

22   enforcement agencies, one was for a controlled

23   substance and one was for stolen property

24   including the instant offense, so he did not have

25   a major record of criminal history or an

26   escalating pattern of violent type of behavior.

27   **SIEU NGO   J-07024   DECISION PAGE 2   8/3/04**

200

Case 3:08-cv-00620-JSW   Document 2-2   Filed 01/25/2008   Page 42 of 93

1   Under unstable social history, other than the

2   prisoner's gang activity or involvement in gang

3   activity to whatever extent it was.  The Board

4   have no reason to disbelieve the public defender

5   who detailed from his perspective what had

6   occurred, so it does not appear that the prisoner

7   was heavily into gang activity, criminal type of

8   behavior.  Also under unstable -- it appears that

9   the prisoner did have a stable home environment,

10  the letters from the family are very impressive in

11  terms of the type of support he have in the

12  community.  The prisoner has programmed in an

13  acceptable manner.  Recent psychological report

14  shows that the prisoner is making progress, shows

15  that his level of dangerousness both in a

16  structured environment and non-structured

17  environment is reduced.  He's on the right track

18  and he is making progress.  Certainly from a

19  psychological perspective we feel that the

20  prisoner is making progress.  Dr. Zika is the one

21  that prepared this report.  However, we are going

22  to request a new psychological evaluation for the

23  prisoner's next hearing.  Under parole plans,

24  certainly the prisoner have parole plans, lots of

25  support in the community, job offers, residential

26  plan.  The Hearing Panel notes that in response to

27  **SIEU NGO   J-07024   DECISION PAGE 3   8/3/04**

201

61

1   Penal Code 3042 Notices, the Deputy District
2   Attorney from Orange County spoke in opposition.
3   The Panel makes the following findings:  The Panel
4   finds that the prisoner needs to continue to
5   participate in the kinds of programs that he's
6   participating in, to continue to make progress,
7   continue to participate to the extent that he will
8   be able to face, understand, and cope with
9   stressful situations in a nondestructive manner.
10  Until the Board feels that enough progress is
11  made, the prisoner continues to be unpredictable
12  thereby presents some amount of threat.  However,
13  there are some things that we certainly want to
14  commend him for.  The prisoner's disciplinary
15  behavior certainly is not -- is something that we
16  certainly want to give him some accolades for and
17  encourage him to continue in his self-help
18  programs that he's involved in, his educational
19  programs that he's involved in, all of those kinds
20  of things we think is very significant and we want
21  to continue to -- him to continue in that way.
22  However, those positive aspects at this time does
23  not outweigh the factors of unsuitability.  Now
24  your parole is going to be denied for one-year
25  this time and we encourage you to continue to
26  remain disciplinary free, continue to explore your
27  **SIEU NGO   J-07024   DECISION PAGE 4   8/3/04**

202

62

1    culpability in the crime, continue to participate

2    in self-help programs and other type of positive

3    kinds of programs, educational programs, as they

4    maybe available to you. There again we want the

5    clinicians to look at your violence potential in

6    the free community when they complete the

7    psychological evaluation, whether there's a

8    significant problem with alcohol and drugs as it

9    relates to the commitment offense into which you

10   have -- and I think this is one area that we

11   certainly want them to take a look at, the extent

12   to which you have explored your commitment offense

13   and come to terms with the underlying causative

14   factors. That concludes the reading of the

15   decision. And personally I think you're making

16   progress, and you asked specifically what it is

17   that you need to do. You need to continue to do

18   the things that you're doing, you need to continue

19   to participate in self-help programs, continue to

20   participate in educational programs, continue to

21   explore the crime that you were committed for and

22   develop greater insight into it. And I think

23   you're on the right track. I think you'll get a

24   parole date in the not too distant future.

25   Commissioner, comments?

26        **DEPUTY COMMISSIONER MEJIA:** Good luck to

27   **SIEU NGO J-07024 DECISION PAGE 5 8/3/04**

203

63

1    you.

2              **INMATE NGO:**  Thank you.

3              **DEPUTY COMMISSIONER MEJIA:**  Keep up the good

4    work.

5              **PRESIDING COMMISSIONER WELCH:**  Good luck to

6    you, Mr. Ngo.  That concludes the hearing at

7    approximately 1500 hours.

8                        --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED ONE YEAR**

24    **THIS DECISION WILL BE FINAL ON:_____** DEC -1 2004 **_____.**

25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **SIEU NGO   J-07024   DECISION PAGE 6   8/3/04**

204

64

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, WENDY THOMAS, a duly designated
transcriber, CAPITOL ELECTRONIC REPORTING, do
hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total one in number and cover a total of pages
numbered 1 through 63, and which recording was
duly recorded at CORRECTIONAL TRAINING FACILITY at
SOLEDAD, CALIFORNIA in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING of SIEU
NGO, CDC No. J-07024, on AUGUST 3, 2004 and that
the foregoing pages constitute a true, complete,
and accurate transcription of the aforementioned
tape(s) to the best of my ability.

I hereby certify that I am a disinterested
party in the above-captioned matter and have no
interest in the outcome of the hearing.

Dated August 19, 2004 at Sacramento County,
California.

Wendy Thomas
Wendy Thomas
Transcriber
**CAPITOL ELECTRONIC REPORTING**

205

# EXHIBIT D

June 23, 2005

Board of Prison Terms
CTF Soledad
P.O. Box 686
Soledad, CA 93960

Re: Sieu Phong Ngo, CDC # J07024
     Parole Hearing

Dear Sirs:

I represented Mr. Ngo in the case which sent him to prison. I
have been a criminal defense attorney for almost thirty years
and have represented over 40 persons accused of homicide. I
do not see my clients through rose colored glasses.
However, the circumstances of Sieu's case are unusual
enough that I feel compelled to make a statement on his
behalf.

At the time I represented him, Sieu was a very likeable young
man with a minor criminal record. To my recollection he had
no convictions for any crimes of violence. The incident in
question was very different from the typical "gang case" and
the facts are worth sketching for your review.

Sieu and his friends were a "wanna be" type gang who did not
really have a significant history or established turf in Orange
County. On the day of the incident some of Sieu's friends, by
chance, went to the McDonald's which was near Fullerton
High School in northern Orange County. Sieu was not present
at the time.
One of Sieu's friends got in a staring match with the decedent
and some of his friends, who were members of "Tokertown," a
long established Hispanic gang in Fullerton.

207

Essentially, the "Tokertown" group told Sieu's friends that they were not welcome in Fullerton (where some of them already lived) and they should get out of town.

Angered by this, Sieu's friends decided to confront the decedent's group after school got out that day. Sieu was called to help out in case they should be outnumbered. Their group waited after school and confronted the decedent and one of his friends about two blocks south of Fullerton High School (**not on school grounds**).

From all appearances this was intended to be a fist fight. Sieu, and the friend who'd been in the stare-down, approached the decedent and another young man who were walking on a sidewalk. A fist fight is how it started. However, the decedent's friend fled just after the punching began and that left Sieu and his friend fighting the decedent who was significantly larger than either of them. Of course, this was unfair, but nothing at this point suggested that this was intended to be a homicide.

While the fist fight was ongoing a third member of the group Sieu was part of ran forward to the scene While the fight was in still in progress he reached around Sieu and shot the decedent, killing him and narrowly missing Sieu. Sieu and his group then fled, ultimately being arrested out of state.

Evidence was received to show that Sieu and his friends knew that a gun was in the car. However there was no evidence to show that there was a plan to use it. Based upon the theory of foreseeable consequences, Sieu and several co-defendant's were convicted or pled guilty to murder. **Sieu was not the shooter and no evidence existed to show that he suggested, encouraged or aided or abetted the shooting in any way.**

After the shooting Sieu angrily confronted the shooter, demanding to know "why" he brought out the gun and asserting that he (Sieu) didn't know the gun was going to be used.

208

In summary, this was not a "drive by" or similar gang crime where everyone knew or legitimately should have known that death or serious bodily injury was intended.

On the contrary, this appeared to be an impulsive act by one member of the group which, due to the rest of the circumstances, swept them all up by way of derivative liability.

I am not suggesting that Sieu and the other non-shooters bear no responsibility for the tragic outcome. But for the fight, of course, no shooting would have taken place. However, I would submit that the circumstances here are significantly mitigated when considered against other convictions of this type.

Assuming that Sieu's performance within the department of corrections has been positive, I would urge his parole at the earliest possible time.

Sincerely,

Donald G. Rubright
Senior Deputy Public Defender
Orange County, Ca
(949) 249-5060

209

# EXHIBIT E

(            (

MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
APRIL 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JANUARY 23, 2002

This is the second mental health evaluation for the Board of
Prison Terms on inmate Sieu Phong Ngo, CDC# J-07024.  This
report is the product of a personal clinical interview of
the inmate, conducted on 01/23/02, as well as a review of
his Central file and medical record.  This clinical
interview and a review of all pertinent documents were for
the express purpose of preparing this report.  Prior to
today's interview, I had no previous contact with this
inmate.

## PSYCHOSOCIAL ASSESSMENT

### I.   IDENTIFYING INFORMATION:

Inmate Ngo is a 28-year-old, single, Vietnamese male
who was born on 05/18/73.  He was born in Vietnam and
moved to the United States in 1979 with his family,
where they settled in Los Angeles.  He has multiple
tattoos on his arms, as well as scars from a suicide
attempt when he was 16.  He denies the use of any
nicknames or aliases.

### II.  DEVELOPMENTAL HISTORY:

Inmate Ngo was born in Vietnam.  His family moved to
the United States in 1979.  They settled in Los
Angeles, where they remain to this day.  The inmate has
one older brother, two older sisters, one younger
brother, and one younger sister.  They were raised by
both parents.

His father died in 1996 while the inmate was
incarcerated, but the inmate reports that he is still
in contact with his siblings and his mother.

He denies any history of birth defects or abnormalities
of developmental milestones, a history of cruelty to

211

NGO, SIEU PHONG
CDC NUMBER:   J-07024
BPT MENTAL HEALTH EVALUATION
PAGE TWO

animals, a history of arson, any significant childhood medical history, or a childhood history of physical or sexual abuse as either a perpetrator or a victim.

## III. EDUCATIONAL HISTORY:

Inmate Ngo graduated from high school and attended one year of college, studying general education, prior to his incarceration.   In high school, he relates that he was in English as a Second Language classes for some time.   Chinese is his primary language, although he speaks very fluent English at this time.   He reported that he had some reading problems, probably related to English being his second language at the time.

Since his incarceration, he has been studying vocational, self-paced, business courses.   He intends to finish college.

## IV. FAMILY HISTORY:

Inmate Ngo speaks of his family in largely positive terms.   He states that he is the only one in his family who has a criminal record.   There is no family history of mental illness or criminality, other than his.   He also denies a family history of alcohol or drug abuse.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Ngo states that he is a heterosexual male.   He denies any history of high-risk sexual behavior or sexual aggression.

## VI. MARITAL HISTORY:

Inmate Ngo has never been married and has no children. He does have a female friend whom he corresponds with, but who does not visit.   He did have a girlfriend prior to his incarceration.   He reports normal sexual relations.

## VII. MILITARY HISTORY:

The inmate denies any history of military service.

2/2

NGO        J-07024        CTF-CENTRAL        01/31/02        gmj

NGO, SIEU PHONG
CDC NUMBER:   J-07024
BPT MENTAL HEALTH EVALUATION
PAGE THREE

VIII. **EMPLOYMENT/INCOME HISTORY**:

Inmate Ngo was quite young at the time of his
commitment offense.  However, he had worked at odd jobs
in the fast food industry.

Since his incarceration, he has been a clerk.  The
works chronos in his Central file show that he has been
a satisfactory worker in job attendance, quality and
quantity.  He has learned a couple of job skills, both
in cooking and in upholstery, which he intends to
continue if granted parole.

IX. **SUBSTANCE ABUSE HISTORY**:

Inmate Ngo readily acknowledges having tried cocaine
once.  He reports that the first time he tried it, he
was caught and ordered to attend a diversion class for
drug addiction.  Previous mental health evaluations for
the Board of Prison Terms have recommended that he be
involved in Alcoholics Anonymous and Narcotics
Anonymous.  However, the inmate feels that he never
really had a drug or alcohol problem, although he does
currently attend Alcoholics Anonymous.

X. **PSYCHIATRIC AND MEDICAL HISTORY**:

Inmate Ngo reports one incident of psychiatric
illness, in which he states that when he was 16 years
old, he tried to kill himself by cutting his arms.  He
reports that his family life and personal problems felt
overwhelming at the time.  He states that he has not
suffered from depression or had any suicidal thoughts
since that time.  He has had no contact with the mental
health system since that time, either outside or inside
of prison.

He denies any significant medical history, other than
mentioned above.  He denies a history of serious
accidents or head injuries, a history of suicidal
behavior, or a history of seizures or other
neurological conditions.  He is taking no medications.

NGO, SIEU PHONG
CDC NUMBER:   J-07024
BPT MENTAL HEALTH EVALUATION
PAGE FOUR

## XI.   PLANS IF GRANTED RELEASE:

Inmate Ngo states that if he is paroled, he would be
fully supported by his family, and would use the money
he has earned as a clerk to start his own business,
either in the upholstery or restaurant business.  He
does acknowledge that he is determined not to have any
gang affiliation.  He shows a good deal of insight into
the negative aspects of gang involvement, which he
regrets to this day.

## CLINICAL ASSESSMENT

## XII. CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Ngo appears to be his stated age of 28.  He
was appropriately dressed and groomed.  He was calm,
cooperative, coherent and alert during the entire
interview.  He was open in his conversation and
emphasized throughout the interview his recognition
that gang affiliation had only resulted in injury to
himself and to those around him.  His mood was sober,
but his range of affect was good.  His speech, flow of
thought and affect all appeared to be within the normal
range.  His intellectual functioning was estimated to
be within the average range.  There was no evidence of
a mood or thought disorder.  His judgment appeared to
be sound.  He showed significant insight into his
commitment offense, as well as some recognition that
there is no guarantee he will be paroled at this time
by the Board of Prison Terms.

### CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):

**AXIS I:**    No Contributory Clinical Disorder.
**AXIS II:**   Deferred.
**AXIS III:**  No Contributory Physical Disorder.
**AXIS IV:**   Long-term incarceration.
**AXIS V:**    Global Assessment of Functioning (GAF) = 90.

There is no evidence that inmate Ngo currently suffers
from any psychiatric illness, although he does
recognize that in his early youth he was vulnerable to

214

NGO        J-07024        CTF-CENTRAL        01/31/02        gmj

NGO, SIEU PHONG
CDC NUMBER:   J-07024
BPT MENTAL HEALTH EVALUATION
PAGE FIVE


depression and was tempted by consciousness-altering substances.  In consideration of the fact that he has received no CDC-115 violations during his entire incarceration, it would appear that he has, at least in this controlled setting, been able to manage his behavior and remain incident-free.

## XIII. REVIEW OF LIFE CRIME:

According to inmate Ngo, his offense for which he was convicted and sentenced to 16 years to life was P.C. 187-A, Second Degree Murder, with enhancement P.C. 12022, vicariously armed with a gun.

The inmate stated that he agreed with the version of the crime given in his Central file, the verdict and the sentencing.  However, he did state that no one intended to kill the victim, and that their intent was only to beat him up.  He had past prior offenses, which included a two-year drug diversion, as referred to earlier in this report.  He has had one previous BPT evaluation.

## XIV. ASSESSMENT OF DANGEROUSNESS:

A.   Inmate Ngo's report agrees in all details with the information given in the Central file and medical record with respect to his prior history as a person who attempted to use cocaine and was affiliated with gangs, which resulted in his current offense.  Based upon his complete lack of disciplinary actions while incarcerated, his insight into the negative aspects of gang involvement, and his remorse for his actions, his violence potential within a controlled setting is estimated to be below average relative to this Level II inmate population.

B.   If released to the community, his violence potential is estimated to be less than the average citizen in the community, given his insight, his demonstrated ability to stay out of trouble, his successful development of plans upon release, and the support of his family.

*215*

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE SIX

C.   Clearly, the most significant risk factor for this
     inmate as a precursor to violence or a return to
     criminal behavior would be his reinvolvement with
     others having a criminal history and/or gang
     members, the abuse of alcohol and/or drugs, and
     isolation from his family members.

## XV.   CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.   This inmate is competent and responsible for his
     behavior.  He has the capacity to abide by
     institutional standards and has done so during his
     entire incarceration period.

B.   This inmate does not have a mental health disorder
     which would necessitate treatment either during
     his incarceration period or following parole.

C.   As this man has spent ten years in prison, I would
     recommend, should he be paroled:

     1)   Abstinence from all alcohol and/or use of any
          controlled substance.

     2)   Frequent monitoring for substance abuse.

     3)   If at all possible, he should be relocated so
          he is near his family.

     4)   He should make frequent reports to his parole
          officer concerning his vocational progress and
          goals.  The structure of the institution has,
          inevitably, to some extent, served to diminish
          his own self-reliance, and the process of
          reporting in and setting validating goals might
          be helpful in assisting him in establishing,
          perhaps for the first time in his life, a real
          sense of self-reliance and a positive prosocial
          sentence.

     5)   Due to his family's commitment to supporting
          him upon his release, his projected level of

216

NGO, SIEU PHONG
CDC NUMBER:   J-07024
BPT MENTAL HEALTH EVALUATION
PAGE SEVEN

success in the community, if granted a date for
parole, is seen at this time to be better than
average.

C. SAINDON, Ph.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

BILL ZIKA, Ph.D.
Senior Supervising Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

CS/gmj

D:   01/23/02
T:   01/31/02

217

# EXHIBIT F

DeQuzn ian

CFBW 31au

## LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
## AUGUST 2005 CALENDAR

NGO, SIEU                                                    J-07024

**INMATE COPY**

I.    **COMMITMENT FACTORS:**

A.    **Life Crime:** PC 187, Murder 2nd with PC 12022(A)(1), Use of Weapon in commission of a felony. Orange County Superior Court Case #C99109. Term: 15 years to Life plus 1 year enhancement. MEPD: 5/24/03. Victim: Angel Ganzales, 15 years old. Inmate Ngo was received in the California Department of Corrections on 2/1/94.

      1.    **Summary of Crime:** All relevant documents from the previous hearing including the transcripts have been considered and that information appears valid. The writer has no further information to add.

      2.    **Prisoner's Version:** Remains the same as stated in the previous hearing.

      3.    **Aggravating/Mitigating Circumstances:**

          a.    **Aggravating Factors:** Remains the same as stated in the previous hearing.

          b.    **Mitigating Factors:** Remains the same as stated in the previous hearing.

B.    **Multiple Crime(s):** N/A.

      1.    **Summary of Crime:** N/A.

      2.    **Prisoner's Version:** N/A.

II.    **PRECONVICTION FACTORS:**

A.    **Juvenile Record:** Documents from the previous hearing have been considered and that information remains valid.

B.    **Adult Convictions and Arrests:** Documents from the previous hearing have been considered and that information remains valid.

219

COPY TO INMATE ON: June 22 2005

    **C.**   <u>Personal Factors</u>: Documents from the previous hearing have been considered and that information remains valid.

## III.   <u>POSTCONVICTION FACTORS</u>:

    **A.**   <u>Special Programming/Accommodations</u>: None.

    **B.**   <u>Custody History</u>: Documents from the previous hearing(s) have been considered and that information remains valid. Since his last Board of Prison Terms (BPT) hearing on 8/5/04, in which his parole was denied for one (1), inmate Ngo has remained at the Correctional Training Facility (CTF), in the General Population (GP). He has retained his custody at Medium A with a Preliminary/behavior classification score of 0 and a Mandatory Minimum Placement score of 19 (the change is due to the revised classification scoring system effective 10/15/02).

    **C.**   <u>Therapy and Self-Help Activities</u>: Refer to the Postconviction Progress Report for details.

    **D.**   <u>Disciplinary History</u>: Refer to the Disciplinary Sheet for details.

    **E.**   <u>Other:</u>

## IV.   <u>FUTURE PLANS</u>:

    **A.**   <u>Residence</u>: Inmate Ngo plans to live with his mother, Huynh Phong Ngo at 709 Triana Street, Monterey Park, California, 91754 with telephone number 626-282-3156. In addition, most, if not all of his relatives has offered housing, employment, financial, moral and social assistance to inmate Ngo, if and when he is released to parole.

    **B.**   <u>Employment</u>: Inmate Ngo is in receipt of two (2) Certificates of Completion, Vocational Automotive Refinishing (9/12/97) and Upholstery (2/27/97), both employable trades. Inmate Ngo has been a Culinary Storekeeper Office Aide over two (2) years, another employable trade. His relatives are offering immediate employment opportunities in their liquor and restaurant business, if and when he is released to parole.

    **C.**   <u>Assessment</u>: Inmate Ngo does not have any prior record of criminal conduct (considering the recency and frequency of prior crimes) and the circumstances of the instant offense, he does not appear to be criminally minded and has a good insight into himself. He has been able to maintain himself relatively disciplinary free (of serious rules violation report) since 2/12/00. In 9/12/97 and 2/27/97, he

LIFE PRISONER EVALUAT  I REPORT                                        3
PAROLE CONSIDERATION . .EARING
AUGUST 2005 CALENDAR

acquired two (2) Certificates of Completion, Vocational Automotive Refinishing
and Upholstery, respectively. In addition, he is in the process of acquiring college
credits via correspondence from Coastline Community College with the hope that
said credits will be transferable to a university and eventually obtain a degree in
Biology. Finally, he has achievable and realistic parole plans.

V.      **USINS STATUS:** Inmate Ngo was born on 5/18/73 in Vietnam, immigrated to the
United States of America (USA) and later became a naturalized citizen of the USA.

VI.     **SUMMARY:**

A.      Prior to release the prisoner could benefit from:

(1) Participate in self-help programs;
(2) Remain disciplinary free;
(3) Earn positive chronos;

B.      This report is based upon 3 hours of Central File research, an interview with
inmate Ngo and incidental contact with the prisoner during this period of review.

C.      Inmate Ngo reviewed his Central File pursuant to in re: Olson on 5/31/05.

D.      No accommodation was required per the Armstrong vs. Davis BPT Parole
Proceedings Remedial Plan (ARP) for effective communication.

221

BOARD OF PRISON TERMS

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

STATE OF CALIFORNIA

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 4/24/04 to 6/8/05 (Present) | | | **PLACEMENT**: Remains housed at CTF, in the GP. **CUSTODY**: Remains at Medium A. **ACADEMIC**: Graduated from Fullerton High School, Orange County in 1992. Additionally, inmate Ngo has been and is currently enrolled in an Independent Study Program through Coastline Community College (semester ending May, 2005). **WORK**: Remains assigned as a Culinary Storekeeper Office Aide receiving satisfactory grades per the Work Supervisor's Report (CDC101). **VOCATION**: Inmate Ngo is in receipt of two (2) Certificates of Completion, Vocational Automotive Refinishing (9/12/97) and Upholstery (2/27/97). Additionally, he is in the Vocational Data Processing waiting list. **GROUP ACTIVITIES**: None noted this period. **PSYCH TREATMENT**: None noted this period. **PRISON BEHAVIOR**: Disciplinary free of serious rules violation reports since 2/12/00. **OTHER**: Inmate Ngo continues to better himself year after year. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | DATE |
|---|---|---|
| M. DeGUZMAN | | 6/8/05 |
| NGO, SIEU PHONG | J07024 | CTF | AUG/2005 |

222

# DISCIPLINARY SHEET

## CDC 128A'S:

| | | |
|---|---|---|
| **02/11/00** | **CTF** | **Window covering** |
| **04/01/97** | **LAC** | **Failed to respond to ducat** |

## CDC 115's:

None

# EXHIBIT G

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
MAY 2004 CALENDAR

NGO, SIEU PHONG                                                           J-07024

I.      COMMITMENT FACTORS:

        A.      Life Crime:  Murder second, PC 187, with use of a firearm PC 12022(A) (1). San
                Francisco County case #c99109, sentence: 15 years to life plus one year
                enhancement.MEPD: 5-24-03. Victim: Angel Gonzalez, age 15 years old.
                Received by CDC on 2-1-94.

                1.      Summary of Crime: All relevant documents from the previous hearings
                        including the transcripts have been considered and that information
                        appears valid and the writer has no further information to add.

                2.      Prisoner's Version: Remains the same as stated in the previous hearing.

                3.      Aggravating/Mitigating Circumstances:

                        a.      Aggravating Factors:  Remains the same as stated in the previous
                                hearing.

                        b.      Mitigating Factors: Remains the same as stated in the previous
                                hearing.

        B.      Multiple Crime(s): None.

                1.      Summary of Crime:  None.

                2.      Prisoner's Version:  None.

II.     PRECONVICTION FACTORS:

        A.      Juvenile Record:  Remains the same.

        B.      Adult Convictions and Arrests: Remains the same.

        C.      Personal Factors: Remains the same.

LIFE PRISONER EVALUATI  REPORT                                          2
SUBSEQUENT PAROLE CONSIDERATION HEARING
MAY 2004 CALENDAR

## III.    POSTCONVICTION FACTORS:

**A.    Special Programming /Accommodations:** None.

**B.    Custody History:** Documents from the previous hearing have been considered and that information remains valid. During the period of time since the last hearing (5-13-02), Ngo's behavior has been positive, in that he has remained disciplinary free and maintained a stable work program in his assignment as a culinary warehouse worker.

**C.    Therapy and Self-Help Activities:** Ngo is involved in an Independent Study Program through Coastline Community College. He participates in the Narcotics Anonymous Program. He completed the 13 week IMPACT workshop.

**D.    Disciplinary History:** Ngo received only two CDC 128A's. See Disciplinary Sheet for details.

**E.    Other:** An Initial Parole Consideration Hearing was held on 5-13-02. The BPT recommended:
1. Remain disciplinary free.
2. Upgrade education.
3. Continue to participate in self-help and therapy.
The BPT denied parole for an additional two years.

## IV.    FUTURE PLANS:

**A.    Residence:** Ngo plans to reside with his mother, Phuong Hungk Ngo, at 709 Triana Street, Monterey Park, California, (714)827-7832.

**B.    Employment:** Ngo plans to work at the family liquor store which is owned by his sister, Julie Seeto, in Anaheim. His uncle, Calvin Ung owns a restaurant in Anaheim and has offered Ngo a job as a cook.

**C.    Assessment:** Ngo's chances of a successful parole are very good. He has concrete parole plans and letters of support from his family.

## V.    USINS STATUS: No holds.

## VI.    SUMMARY:

LIFE PRISONER EVALUAT( ' REPORT                                    3
SUBSEQUENT PAROLE CU...SIDERATION HEARING
MAY 2004 CALENDAR

A.  Considering the commitment offense, minimal prior arrest record and good prison
    adjustment, the writer believes Ngo would probably pose a low degree of threat to
    the public at this time, if release from prison. This opinion is based on Ngo being
    immature at the time of the crime and easily influenced by his peers. The crime
    was episodic in nature. Ngo has a limited criminal history and has not shown a
    pattern of violence in custody.

B.  Prior to release, Ngo could benefit from remaining disciplinary free and upgrading
    his education.

C.  This board report is based upon a one hour interview, incidental contact in the
    housing unit and a through review of the Central File lasting on hour.

D.  Ngo declined the opportunity to review the Central File on 1-20-04 (see CDC
    128B Chrono).

E.  No accommodation was required per the Armstrong vs. Davis BPT Parole
    Proceeding Remedial Plan for effective communication.

227

# DISCIPLINARY SHEET

## CDC 128A's:

| 2-11-00 | CTF | Window covering. |
| 4-1-97 | LAC | Failed to respond to medical ducat. |

## CDC 115's:

None.

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
MAY 2004 CALENDAR

4

*M. Rubio*    4-23-04

M. Rubio
Correctional Counselor I                Date


*L.R. Baker, CCII (A)*    4-23-04

L.R Baker
Correctional Counselor II               Date


*J.L Clancy*    4·27·04

J.L Clancy
Facility Captain                        Date


*D.S. Levorse*    4-28-04

D. S. Levorse                           Date
Classification and Parole Representative


NGO, SIEU, PHONG        J-07024    CTF-SOLEDAD        MAY/2004        229

'RD OF PRISON TERMS                                            STATE OF CALIFORNIA

**FE PRISONER: POSTCONVICTION PROGRESS REPORT**

☐   DOCUMENTATION HEARING

☒   PAROLE CONSIDERATION HEARING

☐   PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 5/02 TO 4/2003 | | | **PLACEMENT**: CTF.<br>**CUSTODY**: MED A.<br>**VOC. TRAINING**: None.<br>**ACADEMICS**: Enrolled in an Independent Study Program.<br>**WORK RECORD**: Assigned to the culinary warehouse.<br>**GROUP ACTIVITIES**: Completed the IMPACT workshop attended Narcotics Anonymous meetings.<br>**PSYCH. TREATMENT**: None.<br>**PRISON BEHAVIOR**: No disciplinaries.<br>**OTHER**: None. |

CORRECTIONAL COUNSELOR'S SIGNATURE                                     DATE

*M. Rulio* ccI                                        4-23-04

Ngo, Sieu              J-07024                 CTF-SOLEDAD            May/2004

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 5/2003 To Present | | | **PLACEMENT**: CTF.<br>**CUSTODY**: MED A.<br>**VOC. TRAINING**: None.<br>**ACADEMICS**: Enrolled in an Independent Study Program.<br>**WORK RECORD**: Assigned to the culinary warehouse.<br>**GROUP ACTIVITIES**: Participated in Narcotics Anonymous meetings.<br>**PSYCH. TREATMENT**: None.<br>**PRISON BEHAVIOR**: No disciplinaries.<br>**OTHER**: None. |

ORDER:

☐ BPT date advanced by _____ months.  
☐ PBR date advanced by _____ months.

☐ BPT date affirmed without change.  
☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.  
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

| go, Sieu | J-07024 | CTF-SOLEDAD | May/2004 |

231

# EXHIBIT H

232

( ΓE PRISONER EVALUATION RE ORT
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2002 CALENDAR

NGO, SIEU PHONG                                                        J07024

I.      **COMMITMENT FACTORS:**

A.      **Life Crime:** Murder Second, PC 187, with Use of a Firearm, PC 12022(A)(1).
San Francisco County Case #C99109. Sentence: 15 years to Life plus one year
enhancement. MEPD: 5/24/03. Victim: Angel Gonzalez, age 15 years old.
Received by CDC on 2/1/94.

1.      **Summary of Crime:** On 9/18/92, Angel Gonzalez was beaten and shot to
death near Fullerton High School as he was walking home after school. An
investigation revealed that earlier in the day the victim, a member of the
"Fullerton Tokers Town" a Latin gang and member of "Fullerton Boyz"
an Asian gang, were at a McDonald's restaurant, near the high school. The
victim and No Muhamed had a confrontation with each claiming their
respective gang affiliations. After this non-physical altercation, the group
of Asians which at the time included Sieu Phong Ngo, obtained a firearm.
Ngo and the Asian gang members returned to the school where they
waited for Gonzalez. As he walked home he was attacked and beaten.
During the physical altercation the victim was shot one time in the back by
Usumang Muhamed. The group of five Asian gang members including
Ngo fled the area after the shooting. Angel Gonzalez died at the scene as a
result of the gunshot wound. Ngo, Jimmy Dao and Asat Cham fled to the
state of Washington. They were subsequently apprehended there, and the
murder weapon, a stolen .22 caliber handgun was recovered in the vehicle.
Information obtained from POR pages 3 & 4.

2.      **Prisoner's Version:** Ngo explained that earlier in the day his group had a
confrontation with the victim. Subsequently, he and his group went to an
arcade to play games. At that time his companions took possession of a
weapon. Ngo stated that he did not see the gun until he was in the vehicle,
it was located under the passenger's seat. He and his companions returned
to Fullerton High School where they parked and went to look for
Gonzalez. Ngo explained that they had gun for protection in case someone
else happened to have a weapon. They found Gonzalez, and he and his
group started fighting with the victim. During the fight Ngo heard two
shots. Ngo explained that no one intended to kill the victim. They just
planned to beat him up because Gonzalez had told them to "get out of
town," and this made Muhamed angry. Ngo realizes that his behavior was
a mistake. Ngo drove his two companions to Washington because

233

Muhamed told him that he knew someone who would give them shelter. Ngo feels sorry for the victim's family.

**B.** **Aggravating/Mitigating Circumstances:**

    **1.** **Aggravating Factors:**

        **a.** The victim was particularly vulnerable in that he was outnumbered.

        **b.** The crime was racially motivated.

        **c.** The inmate had an opportunity to cease but continued with the crime.

        **d.** The crime involved use of a firearm.

    **2.** **Mitigating Factors:** The inmate has a minimal history of criminal behavior.

## II. PRECONVICTION FACTORS:

**A.** **Juvenile Record:** None.

**B.** **Adult Convictions:** On 3/30/92, Ngo was arrested by the San Gabriel Police Department for Possession of a Controlled Substance (three pieces of rock cocaine). On 5/7/92 he was diverted pursuant to Section 1000 of the Penal Code. On 9/22/92, Ngo was arrested by the Olympia Sheriff's Office for Possession of Stolen Property. This case was Subsequently dismissed. Information obtained from CI&I.

**C.** **Personal Factors:** Ngo was born in Vietnam on 5/18/73. He has resided in the United States since 1979. In 1991 he graduated from Fullerton High School and subsequently attended Fullerton Community College and Pasadena City College. He completed ten units and his major was business. Ngo was employed as a telemarketer and worked odd jobs. He was employed at his family's liquor store and resided with his parents. Ngo had problems with controlled substances or alcohol. He was a member of the "Fullerton Boyz," and after his move to Los Angels he became affiliated with the "Tiger Mafia."

## III. POSTCONVICTION FACTORS:

234

LIFE PRISONER EVALUAT⌐⌐N REPORT                                    3
INITIAL PAROLE CONSIDL ⌐TION HEARING
APRIL 2002 CALENDAR

A.    **Special Accommodations/Disability:** None.

B.    **Custody History:** Ngo was received by R.J. Donovan Correctional Facility for Initial Processing on 2/1/84. He was transferred to Centinela State Prison on 3/17/94 and placed on Close A Custody. On 5/16/95 he was transferred to California State Prison at Lancaster and placed on Medium A Custody. On 12/16/98 he was transferred to the Correctional Training Facility and continued Medium A Custody. Ngo has been assigned to the Yard Crew and various positions as a clerk. He has completed courses in Tuberculosis, AIDS and Hepatitis. Ngo successfully completed Vocational Auto Upholstery, Automotive Refinishing and Vocational Auto Paint.

C.    **Work, Education, Vocation, Therapy & Self-Help Activities:** Ngo has completed self-help courses in Salesmanship and Parenting and has been a participating member of Alcoholics Anonymous and Narcotics Anonymous.

D.    **Disciplinary History:** Ngo has received only two CDC 128A's during his incarceration. See Disciplinary Sheet for details.

## IV.    FUTURE PLANS:

A.    **Residence:** Ngo plans to reside with his mother, Phuong Hungk Ngo, at 709 Triana Street, Monterey Park, California, (714) 827-7832.

B.    **Employment:** Ngo plans to work at the family liquor store which is owned by his sister, Julie Seeto, in Anaheim. His uncle, Calvin Ung, owns a restaurant in Anaheim and has offered Ngo a job as a cook.

## V.    USINS STATUS: Ngo is a United States Citizen.

## VI.    SUMMARY:

A.    Considering the commitment offense, minimal prior arrest record and prison adjustment, the writer believes Ngo would probably pose a moderate to low degree of threat to the public at this time, if released from prison. This opinion is based on Ngo being immature at the time of the crime and easily influenced by his peers. The crime was episodic in nature. Ngo has a limited criminal history and has not shown a pattern of violence in custody.

B.    Prior to release Ngo could benefit from remaining disciplinary free and completing an additional vocational program.

*225*

LIFE PRISONER EVALUAT͞ ͞N REPORT                                    4
INITIAL PAROLE CONSIDL. ATION HEARING
APRIL 2002 CALENDAR

     **C.**     This report is based upon a one hour interview, incidental contact in the housing
             unit and a thorough review of the Central File.

     **D.**     Ngo reviewed his Central File on 1/18/02.

*236*

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2002 CALENDAR

5

M. Rubio
Correctional Counselor I

C. Plymesser
Correctional Counselor II

J.L. Clancy
Facility Captain

D.S. Levorse
Classification and Parole Representative

237

# EXHIBIT I

COPY TO I/M
VIA
CC-1 OW   *1-8-97*

(date)

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS
MARCH 1997 CALENDAR
CALIFORNIA STATE PRISON-LOS ANGELES COUNTY

NAME:   NGO, SIEU
CDC#:   J-07024
DATE OF EVALUATION:   December 27, 1996

## IDENTIFICATION/FORENSIC DATA:

This is the psychological report for the "Documentation #1
Hearing" scheduled for March of 1997 for Sieu Ngo; CDC#
J-07024.  On October 21, 1993; Mr. Ngo was convicted by jury
trial of P.C. 187A murder in the second degree, reduced from
first degree in exchange for agreeing to a 15-to-life
sentence and no appeal, with enhancement P.C.  12022
vicariously armed with a gun.  He was sentenced to 16-years-
to-life.  The crime occurred September 18, 1992. Mr. Ngo
and four co-defendants beat and shot in the back a fifteen
year old member of an enemy gang.  Mr. Ngo stated that he
agreed with the records of the crime, the verdict, and the
sentencing.  However, he did state at the time of the trial
that no one intended to kill the victim only to beat him up.

Past prior offenses include a two year drug diversion, for
possession of Cocaine and several other arrests which did
not result in convictions.   There have been no prior
psychological Board of Prison Terms reports.

## BACKGROUND INFORMATION:

The evaluation consisted of a single 45-minute interview,
for the purposes of this report.  This was after review of
the Central File and medical records on 12/27/96.  There are
no records of past psychological/psychiatric treatment.

Mr. Ngo has received no disciplinary actions.  Not a single
115 or 128A.  Mr. Ngo completed two years of college prior
to coming to prison.  During incarceration, his vocational
training in auto upholstery earned him good comments from
his instructors such as, "doing well - shows enthusiasm".
He received several certificates of completion.   The last
one in October of 1996.  Mr. Ngo has attended Narcotic's

239

(                                          (

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS
MARCH 1997 CALENDAR
DATE OF EVALUATION:   December 27, 1996
PAGE 2

Anonymous and received a one year perfect attendance
certificate in November of 1996.  He has not been employed
in prison. Prior to incarceration, he was employed in sells,
telemarketing, and as a cook while a student in junior
college.

The historical information supplied by the inmate agreed
with the records and there were no distortions.

### PRESENT CONDITION:

His Central File contains no records of past mental illness;
however, the inmate reported a history of depression, with
three suicide attempts during his adolescence.  He has
records of hospitalization for the suicide attempts and his
family will be obtaining these records for entry in his
Central File.  He has numerous cuts and slices on his arm
from suicide attempts.   Mr. Ngo describes his level of
insight at the time of the crime as very limited, naive,
showing poor judgment in his friends and activities.  He had
decided to disengage from these friends and moved away one
year prior to the crime, which occurred while he was
visiting.   Now, he reports he is able to think before
acting; he has changed his attitude to one of valuing
service to his fellow man such as mentoring and tutoring.
The remorse he expresses is sincere.  He shows much shame
and self-incrimination for the crime.  In hindsight, he sees
that he perhaps could have stopped the incident and now has
great empathy and remorse for the family of the victim.

### MENTAL STATUS AND DIAGNOSIS:

Mental status indicators are clear in all areas: mood and
affect, behavior, speech, thought content and processes, and
cognition.

AXIS I:    V71.09     NO DIAGNOSIS OR CONDITION.

AXIS II:   V71.09     NO DIAGNOSIS.

AXIS III:             NONE.

240

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS
MARCH 1997 CALENDAR
DATE OF EVALUATION:  December 27, 1996
PAGE 3

AXIS IV:  PSYCHOSOCIAL STRESSORS:  INCARCERATION.

AXIS V:  GLOBAL ASSESSMENT OF FUNCTIONING = 75.

<u>CONCLUSIONS AND RECOMMENDATIONS:</u>

Mr. Ngo's history of depression and suicide attempts may
have contributed to his state of mind and poor judgment
during the time of the crime. There are no records of any
mental health treatment during incarceration and Mr. Ngo is
no longer depressed. He has increased his chances for
successful re-entry into society by setting educational
goals in academic subjects and a good start in attendance in
Narcotic's Anonymous.  He plans to start Alcoholic's
Anonymous in 1997.  He also has excellent family support who
can provide him a place to live, employment, and are willing
to   pay   for   correspondence   courses   for   him   during
incarceration. This inmate is of above average intelligence
and has excellent potential in intellectual endeavors.  He
is no longer depressed and is now able to recognize the
symptoms of depression and would seek help as needed.  Also
in his favor is the absence of any indications of violence
other than the crime.

To continue positive programming, Mr. Ngo needs to regularly
attend  Narcotic's  Anonymous  and  Alcoholic's  Anonymous,
remain  disciplinary-free,  and  pursue  higher  education
through correspondence courses. By reducing his points, he
can possibly transfer to other institutions that facilitate
correspondence studies and provide other self-help group
opportunities. Psychotherapy is not part of his program
unless he has a recurrence of his depression.

C. SCHROEDER, Ph.D.                    Date  1/6/97
Staff Psychologist

Orig:    C-File
  cc:    Medical Records    Psych.    Inmate

241

# EXHIBIT J

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE

# MINUTE ORDER

**Case Number  M-10984 X A**

─────── Report Request Criteria ───────
1. Docket Date Range      : Date filter
2. Sequnce Number Range : Sequence filter
3. Docket Category        : Category filter

**People Vs Ngo, Sieu**

| **Docket Dt** | **Seq** | **Text** |
|---|---|---|
| 8/31/2006 | 1 | **Hearing held on 08/31/2006 at 09:00 AM in Department C5 for Chambers Work.** |
|  | 2 | Officiating Judge: Kazuharu Makino, Judge |
|  | 3 | Clerk: L. Torres |
|  | 4 | No Court Reporter present at proceedings. |
|  | 5 | No appearances. |
|  | 6 | Order denying Writ of Habeas Corpus filed. |
|  | 7 | Petition for Writ of Habeas Corpus is denied for the reasons stated in the order denying writ filed 08/18/2006. |
|  | 8 | As ordered, the clerk this date has mailed a copy of this minute order to the Petitioner at MARILEE MARSHALL & ASSOCIATES 523 WEST SIXTH STREET SUITE 1109 LOS ANGELES, CA. 90014 |
|  | 9 | The clerk this date has forwarded a copy of this minute order to Orange County District Attorney's Office. |

*243*

**FILED**

SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

AUG 1 2006

ALAN SLATER, Clerk of the Court

BY _____ , DEPUTY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF ORANGE

In re

**SIEU NGO,**

　　　　Petitioner,

ON HABEAS CORPUS.

CASE NO. **M-10984**

**ORDER**

TO THE PETITIONER AND THE OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, HAVING RECEIVED THE PETITION FOR WRIT OF HABEAS CORPUS, THE COURT FINDS AND ORDERS AS FOLLOWS:

I

In 1993, Petitioner was a gang member who, along with four other members of his gang, attacked a 15-year-old rival gang member. The victim was beaten, kicked and finally shot and killed. Petitioner was not the shooter. In 1994, Petitioner entered a plea to second degree murder and was sentenced to 16 years to life. He became eligible for parole in 2003. He had a subsequent parole hearing in February 2006.

At the February 2006 hearing, the Board of Parole Hearings (hereafter individually and collectively referred to as "the BPH") found Petitioner would pose an unreasonable risk of danger to society or a threat to public safety at this time if he were released. In announcing its decision, the BPH stated the crime was carried out in an especially cruel and callous manner in that the 15-year-old victim was attacked and beaten and ultimately shot in the back and died at the scene. The offense displayed a disregard for public safety in that it occurred near a school. During the hearing, Petitioner stated that he thought he was going to a fist fight; he saw the gun under a car seat, but he did not intend that the victim would be killed and did not realize anyone else had that intent. The BPH concluded that Petitioner's statement minimized the gravity of the

1

244

crime as well as his involvement, and demonstrated a lack of insight based on that, the BPH stated it was "hard . . . to get a gauge on what risk [Petitioner] would pose to public safety when [it cannot] feel comfortable about the level of insight [Petitioner] displayed."

The BPH acknowledged that Petitioner was a model prisoner. He had no record of misconduct in prison and only two minor rule violations, one being for window coverings. Petitioner had participated in multiple self-help programs, had made substantial progress toward a college degree, had outstanding parole plans, and a psychological report supported his release. The psychologist had concluded Petitioner's violence potential was less than the average citizen in the community. Nevertheless, the BPH determined it would not grant parole. Based on Petitioner's statement that he thought he was going to a fist fight, the BPH believed Petitioner was minimizing the gravity of the crime as well as his involvement, and demonstrating a lack of insight. Based on Petitioner's lack of insight, the BPH concluded it was "hard . . . to get a gauge on what risk" Petitioner would pose to public safety. Parole was denied for two years.

II

Petitioner argues there was no evidence to support the BPH decision that he posed an unreasonable risk of danger to society if released from prison. Petitioner acknowledges that the requirements of due process are satisfied if "some evidence" supports the decision. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 626.) He contends, however, that the factors set forth in California Code of Regulations, title 15, section 2402 all indicate his suitability for parole. He points out that the psychological evaluation was extremely supportive of release and the evaluator concluded Petitioner's violence potential was less than the average citizen in the community. Further, the crime occurred when he was 19. He is now 33. He has a flawless prison record, has participated in numerous self-help programs and has upgraded educationally. He also argues, citing Penal Code section 3041, subdivision (b), that a life prisoner must be paroled when his release would not pose a danger to the public.

Petitioner further contends that denial of parole based solely on the unchanging facts of his commitment offense violated the constitutional prohibition against cruel and unusual punishment. Even assuming the BPH characterization of the offense was accurate, he argues, the crime alone cannot support a finding he currently poses a risk to society.

III

The petition is denied on the following grounds:

2

245

The California Supreme Court in *In re Dannenberg* (2005) Cal.4th 1061 held that the BPH "may protect public safety" by "considering the dangerous implications" of the commitment offense. (*Id.* at p. 1071.) This applies to crimes such as Petitioner's. (Pen. Code, § 3041; *In re Dannenberg, supra,* at pp. 1082-1084.) Thus, while the BPH must point to factors "beyond the minimum elements of the crime . . . it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." (*In re Dannenberg, supra,* at p. 1071.) Here, the BPH pointed over and over to the gang-related nature of the offense. Petitioner was not the shooter; nevertheless the death of the young victim resulted from gang rivalry, a factor beyond the minimum elements of second degree murder. (Compare *In re Shaputis* (2005) 135 Cal.App.4th 217 [no evidence of conduct beyond the minimum required for conviction of second degree murder where wife-victim died from a single gunshot wound fired at close range after marital argument and the petitioner immediately called police and turned himself in].) The BPH was therefore not required to consider the factors set forth in California Code of Regulations, title 15, section 2402. (*In re Dannenberg, supra,* at p. 1071.)

Moreover, the BPH "shall set a release date *unless* it determines that the gravity of the current convicted offense . . . is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen. Code, § 3041, subd. (b), emphasis added.) The BPH focused on Petitioner's statement he thought he was going to a fist fight and concluded he was minimizing the gravity of the crime and his involvement and demonstrating a lack of insight. It determined public safety considerations required more incarceration and denied parole on that basis. The denial was therefore authorized by Penal Code section 3041, subdivision (b).) (*In re Dannenberg, supra,* at p. 1071.) The petition is denied on that basis. (*Ibid.*)

IV

The petition for a writ of habeas corpus is DENIED.

DATED: 0-31-06

_____
JUDGE OF THE SUPERIOR COURT

3

240

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

I am over eighteen (18) years of age, and not a party to the within cause; my

business address is 523 West Sixth Street, Suite 1109, Los Angeles, CA. 90014. That on

October 17, 2006, I served a copy of the within:

## EXHIBITS IN SUPPORT OF
## PETITION FOR WRIT OF HABEAS CORPUS

On the interested parties by placing them in an envelope (or envelopes) addressed
respectively as follows:

Office of the Attorney General
P.O. Box 85266
San Diego, CA 92186-5266

Office of the District Attorney
700 Civic Center Drive West
Santa Ana, CA 92701

Clerk of the Superior Court
700 Civic Center Drive West
Santa Ana, CA 92702-1944
For delivery to the Honorbable Kazuharu
Makino

Mr. Sieu Phong Ngo
J-07024/ B-wing 319-up
CTF- Soledad
P.O. Box 689
Soledad, CA 93960-0689

Each said envelope was then, on October 17, 2006, sealed and deposited in the
United States mail at Los Angeles, California, the county in which I maintain my office,
with postage fully prepaid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 17, 2006, at Los Angeles, California.

SHANNON CALLAHAN

# EXHIBIT K

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

COURT OF APPEAL-4TH DIST DIV 3
**F I L E D**

NOV **0 9** 2006

G037732           Deputy Clerk

In re SIEU NGO

on Habeas Corpus.

(Super. Ct. No. M10984)

O R D E R

THE COURT:*

The petition for a writ of habeas corpus is DENIED.

O'LEARY, J.

O'LEARY, ACTING P. J.

* Before O'Leary, Acting P. J., Aronson, J., and Ikola, J.



# EXHIBIT L

S148684

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re SIEU NGO on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

SUPREME COURT
**FILED**

MAY 2 3 2007

Frederick K. Ohlrich Clerk

DEPUTY

Chief Justice