# EXHIBIT 1
# PART 1 OF 2

ORIGINAL

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

AUG 18 2006

ALAN SLATER, Clerk of the Court

BY: _C. MASON_, DEPUTY

MARILEE MARSHALL
State Bar No. 101046
JENNIFER PEABODY
State Bar No. 198746
MARILEE MARSHALL & ASSOCIATES, INC.
Attorneys at Law
523 W. Sixth Street
Suite 1109
Los Angeles, CA 90014

(213) 489-7715

Attorneys for Petitioner

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

Case No. _M-10984_

IN RE SIEU NGO

On Habeas Corpus.

Related Case No. C199109

PETITION FOR WRIT OF HABEAS CORPUS

PETITION FOR WRIT OF HABEAS
CORPUS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PETITION FOR WRIT OF HABEAS CORPUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM OF POINTS & AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . 12

I      STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II     THE PAROLE BOARD'S DECISION WAS NOT SUPPORTED BY
ANY EVIDENCE AND RESULTED IN A DEPRIVATION OF PETITIONER'S
FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     A.    The Applicable Law
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     B.    There is No Evidence to Support the Board's Decision that Petitioner Posed
an Unreasonable Risk of Danger to Society if Released From Prison
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     C.    Reliance Solely on the Facts and Characterization of Petitioner's
Commitment Offense and Petitioner's Prior Record to Deny Parole
Resulted in a Violation of the Eighth and Fourteenth Amendment
Prohibition Against Cruel and Unusual Punishment.
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910 .................................................. 15

*Board of Pardons v. Allen* (1987) 482 U.S. 369
    [107 S.Ct. 2415, 96 L.Ed.2d 303] ........................................................ 14

*Board of Regents of State Colleges v. Roth* (1972) 408 U.S. 564
    [92 S.Ct.2701, 33 L.Ed.2d 548] ...................................................... 14

*Greenholtz v. Inmates of Nebraska Penal* (1979) 442 U.S. 1
    [99 S.Ct.2100, 60 L.Ed.2d 668] ............................................. 14, 15

*Jancsek v. Oregon Board of Parole* (9th Cir. 1987) 833 F.2d 1389 .................. 16

*McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895 ......................................... 15

### STATE CASES

*In re Dannenberg* (2005) 34 Cal.4th 1061 ............................................. 12, 22, 23

*In re Capistran* (2003) 107 Cal.App.4th 1299 ................................................... 14

*In re DeLuna* (2005) 126 Cal.App.4th 585 ........................................................ 12

*In re Rosenkrantz* (2002) 29 Cal.4th 616 ................................................... passim

*In re Scott* (2004) 119 Cal.App.4th 871 ...................................................... 12, 13

*People v. Croy* (1985) 41 Cal.3d 1 ..................................................................... 19

*People v. Durham* (1969) 70 Cal.2d 171 ............................................................ 19

*People v. Kaufman* (1907) 152 Cal. 331 ............................................................ 19

*People v Mendoza* (1998) 18 Cal.4th 1114 ........................................................ 20

*People v. Nguyen* (1993) 21 Cal.App.4th 518 ............................................... 19, 20

*People v. Prettyman* (1996) 14 Cal.4th 248 ................................................. 19, 20

*People v. Price* (1991) 1 Cal.4th 324 ................................................................. 20

*People v. Woods* (1992) 8 Cal.App.4th 1570 ..................................................... 20

### FEDERAL STATUTES

U.S. Const., Amend. XIV, § 1 ........................................................................... 14

## STATE STATUTES

Cal. Const., Art. V, § 8. ................................................................................... 14

Penal Code section 187 ................................................................................... 1

Penal Code section 1000 ........................................................................... 6, 21

Penal Code section 3041 ................................................................... 13, 14, 15

Penal Code section 12022 ............................................................................ 1, 2

## UNITED STATES CONSTITUTION

Fifth Amendment ................................................................................. passim

Eighth Amendment .............................................................................. passim

Fourteenth Amendment ...................................................................... passim

1   **MARILEE MARSHALL**
  State Bar No. 101046
2   **JENNIFER PEABODY**
  State Bar No. 198746
3   **MARILEE MARSHALL & ASSOCIATES, INC.**
  Attorneys at Law
4   523 W. Sixth Street
  Suite 1109
5   Los Angeles, CA 90014

6   (213) 489-7715

7   Attorneys for Petitioner

8

9       **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10         **FOR THE COUNTY OF ORANGE**

11

| | |
|---|---|
| IN RE SIEU NGO, | Case No. _____ |
| On Habeas Corpus. | Related Case No. C199109 |
| | PETITION FOR WRIT OF HABEAS CORPUS |

16       <u>**PETITION FOR WRIT OF HABEAS CORPUS**</u>

17     TO THE PRESIDING JUDGE OF ORANGE COUNTY SUPERIOR COURT:

18     Petitioner, SIEU NGO, by and through his attorneys, MARILEE MARSHALL and

19 JENNIFER PEABODY, petitions for a writ of habeas corpus and by this verified petition

20 alleges as follows:

21                    I

22     Petitioner is in the custody of the California Department of Corrections at the

23 Correctional Training Facility in Soledad, California serving a term of 16 years to life

24 following his conviction in 1994 in Orange County Superior Court Case No. C199109

25 wherein petitioner was convicted of second degree murder in violation of Penal Code

26 section 187 and it was found that petitioner was vicariously armed with a firearm within

27 the meaning of Penal Code section 12022. Petitioner was received by the Department of

28 Corrections on February 1, 1994, when his life term commenced. Petitioner's minimum

1  Corrections on February 1, 1994, when his life term commenced. Petitioner's minimum
2  parole eligibility date was May 24, 2003. On February 3, 2006, petitioner appeared
3  before the Board for his second subsequent parole consideration hearing (third actual
4  hearing). Petitioner was denied parole for a period of two years. (Exhibit A: Parole
5  Consideration Hearing.) At this point, petitioner has served a total of twelve actual years
6  in state prison. If given post conviction credit as afforded in Title 15, section 2410,
7  subdivision (b) of the California Code of Regulations, petitioner's term to date is more
8  than 16 years. (CCR, Tit. 15, § 2403, subd. (c).) Petitioner alleges that the continued
9  denial of parole violates his Fifth and Fourteenth Amendment right to due process of law.
10  There is no evidence to support a finding that petitioner currently poses an unreasonable
11  risk to society if released from prison. Accordingly, his continued confinement violates
12  the due process clauses of the Fifth and Fourteenth Amendments and constitutes cruel
13  and unusual punishment in violation of the Eighth and Fourteenth Amendments.

14                                          II

15       Anthony Kane is the acting warden of the Correctional Training Facility in
16  Soledad, California and thus, is the legal custodian of petitioner.

17                                         III

18       Dennis Kenneally is the Executive Director of the Board of Parole Hearings
19  (formerly the Board of Prison Terms), the agency which determines whether prisoners
20  serving life sentences are suitable for release on parole.

21                                         IV

22       Petitioner was charged with the murder of Angel Gonzales. It was further alleged
23  that petitioner was vicariously armed with a firearm within the meaning of Penal Code
24  section 12022. On October 21, 1993, petitioner was convicted of second degree murder
25  and it was found that petitioner was vicariously armed with a firearm. Petitioner was
26  sentenced to 15 years to life plus one year for the armed allegation. Petitioner's life term
27  commenced on February 1, 1994. Petitioner's minimum parole eligibility date was May
28  24, 2003.

PETITION FOR WRIT OF HABEAS
CORPUS
2

V

The facts of the underlying offense are set forth in the trial court file (Case No. C199109) and were summarized by the Parole Board as follows:

> On September 18, 1992, Angel Gonzales was beaten and shot to death near Fullerton High School as he was walking home after school. An investigation revealed that earlier in the day, the victim, a member of the "Fullerton's Toker's Town," a Latin gang and member of "Fullerton's Boyz" B-O-Y-Z, an Asian gang were at McDonald's restaurant near the high school. The victim and No, that's N-O Muhamed M-U-H-A-M-E-D, had a confrontation with each claiming their respective gang affiliations. After this non physical altercation, the group of Asians which at the time included Sieu Phong Ngo obtained a firearm. Ngo, N-G-O, and the Asian gang members returned to the school where they waited for Gonzales. As he walked home, he was attacked and beaten. During the physical altercation the victim was shot one time in the back by Usumang U-S-U-M-A-N-G last M-U-H-A-M-E-D, the group of five Asian gang members including Ngo left the area after the shooting. Angel Gonzales died at the scene as a result of the gun shot wound. Ngo, Jimmy Dao, D-A-O and Asat Cham, A-S-A-T-C-H-A-M fled to the state of Washington. They were subsequently apprehended there and the murder weapon, a stolen 22 caliber handgun was recovered in the vehicle. (Exhibit A, pgs. 5-6 of the Hearing.)

VI

On May 13, 2002, the Board of Prison Terms (which is now referred to as the Board of Parole Hearings) conducted petitioner's Initial Parole Consideration Hearing. The Board found petitioner unsuitable and denied parole for a period of two years. (Exhibit B: Initial Parole Consideration Hearing 5/13/2002.) In support of its finding that petitioner currently posed an unreasonable risk to society, the Board found that the "offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering and life" and the "motive for the crime was inexplicable or very trivial in relation to the offense." (Exhibit B, p. 57.) The Board further found that petitioner had an escalating pattern of criminal conduct. (Exhibit B, p. 58.) Petitioner was, however, commended for remaining disciplinary free, obtaining a positive psychological evaluation, participating in NA, completing two vocations and securing positive parole plans. (Exhibit B, pgs. 58-59.) The Board recommended that petitioner remain disciplinary free, upgrade educationally and vocationally, and participate in self-help and therapy. (Exhibit B, p. 61.)

PETITION FOR WRIT OF HABEAS CORPUS

3

1    On August 3, 2004, the Board conducted petitioner's initial subsequent parole

2    consideration hearing (second actual hearing). The Board found petitioner unsuitable for

3    parole and denied parole for a period of one year. In finding petitioner unsuitable for

4    parole, the Board found that the offense was "carried out in an especially cruel and

5    callous manner." (Exhibit C: Parole Consideration Hearing 8/3/04, p. 58.) Specifically,

6    the Board concluded that the "offense was carried out in a dispassionate" and "calculated

7    manner." (Exhibit C.) The Board further found that the offense was "carried out in a

8    manner that demonstrates an exceptionally callous disregard for another human being,"

9    and the motive for the crime was "trivial." (Exhibit C, p. 58.) The Board commended

10    petitioner for his parole plans, lack of disciplinary problems, participation in self-help and

11    educational activities and noted that petitioner was making progress from a

12    "psychological perspective." (Exhibit C, p. 60-61.) The Board recommended that

13    petitioner continue self-help and therapy "to continue to make progress" "to the extent

14    that he will be able to face, understand, and cope with stressful situations in a

15    nondestructive manner." (Exhibit C, p. 61.) The Board further recommended that

16    petitioner: (1) remain disciplinary free, (2) continue to explore his culpability in the

17    crime, (3) participate in self-help and therapy, and (4) participate in other positive types

18    of programs. (Exhibit C, p. 62.)

19                                         VII

20    On February 8, 2006, petitioner, after successfully completing the

21    recommendations of the prior Boards, appeared for his second subsequent parole

22    consideration hearing (third actual hearing). (Exhibit A.) Despite petitioner's complete

23    compliance with the requests and suggestions of the Board, the Board again found

24    petitioner unsuitable for parole. The Board also found that it would not be "reasonable to

25    expect that parole would be granted at a hearing during the following two years."

26    (Exhibit A, p. 63.) The Board found that petitioner would pose an unreasonable risk of

27    danger to society or a threat to public safety if released from prison. (Exhibit A.) In

28    support of its finding, the Board concluded that "the offense was carried out in a

                                    PETITION FOR WRIT OF HABEAS
                                                            CORPUS
                                                                4

1   dispassionate and calculated manner in that it was a confrontation between gang members

2   preplanned by lying in wait for the victim as he walked home." The Board continued,

3   "The offense was carried out in a manner demonstrating exceptionally callous disregard

4   for human suffering, disregard for public safety in that it occurred near a school and there

5   was a clear opportunity for you to cease but you continued." (Exhibit A, p. 61.) The

6   Board commended petitioner for having "a relatively criminal free background" and "a

7   history of stable relationships, including your family support." The Board added:

> As to your institutional behavior you have programmed commendably, your
> education includes 41 units towards you [sic] AA Degree and continuing
> involvement with college enrollment including your current independent
> study through Coast Line Community College. We also have read into the
> record a very reputable list of vocational achievements including
> automotive refinishing and upholstery, forklift operator, salesmanship and
> other vocational work. You have participated in self-help and therapy, well
> self-help consistently ranging from Anger Management, the Teddy Bear
> Drive, Feed the Children, Buddhist ordination into Buddhist studies, the
> Impact Program, Key to Fatherhood, The Muslim Chapel, and you have
> assisted in inmate education. As to misconduct, you have zero 115's, you
> have two minor 128A's, the last in 2000 for window covering. As to your
> psychological report, the report that is dated January 23, 2002, the last we
> have by Doctor Saindon does in general support release. And I quote, this
> man has spent ten years in prison and that is at the time of this
> psychological report, I would recommend should he be paroled abstinence
> from all alcohol or use of any controlled substance, he should be relocated
> so that he is near his family, she should make frequent reports to his parole
> officer concerning his vocational progress and goals. And due to his
> family's commitment to supporting him upon his release, his projected level
> of success in the community if granted a date for parole is seen at this time
> to be better than average. You also have made outstanding parole plans.
> You have viable residential plans in the last county of legal residence and I
> refer to the record for the documentation we have received. You also have
> acceptable employment plans with established businesses owned by your
> relatives who are assuring you of jobs. (Exhibit A, pgs. 62-63.)

Despite all of the evidence supporting a granting of parole, the Board found petitioner

unsuitable for a grant of parole based solely on the commitment offense, including the

nature of the offense and the trivial motive for the offense. (Exhibit A, pgs. 60-65.) The

Board expressed some concern about petitioner's rendition of the claim and his denial

that he knew anyone was armed with a firearm and found that petitioner's version

"minimized" his role and showed "lack of insight" into the "causative factors" of the

crime. (Exhibit A, p. 65.) The Board again recommended that petitioner: (1) "get self-

PETITION FOR WRIT OF HABEAS
CORPUS
5

1    help," (2) stay disciplinary free, (3) get therapy and (4) continue his educational and

2    vocational development. (Exhibit A, pgs. 64-65.)

3                                          VIII

4         Petitioner alleges that there was no evidence to support the Board's finding that he

5    poses a *current unreasonable* risk if released. In fact, all current, reliable evidence

6    presented to the Board shows that petitioner poses no risk if released. Petitioner further

7    alleges that the Parole Board violated petitioner's statutory rights and his Fifth and

8    Fourteenth Amendment due process rights when it refused to grant petitioner a parole

9    date despite any evidence supporting a finding that petitioner posed an unreasonable risk

10   of harm. Furthermore, his continued confinement constitutes cruel and unusual

11   punishment in violation of the Eighth and Fourteenth Amendments of the United States

12   Constitution. Petitioner was only 19 years old at the time of the commitment offense and

13   had only one prior contact with law enforcement wherein he was found in possession of

14   rock cocaine and was diverted pursuant to Penal Code section 1000. Petitioner has spent

15   more than twelve years in state prison and is currently 33 years old. While incarcerated,

16   he has suffered no 115's, has engaged in no acts of violence and has shown no propensity

17   toward future criminality. Petitioner's offense was the direct result of immaturity and his

18   involvement with a group of wanna-be gangsters. As the psychologist who evaluated

19   petitioner noted, petitioner has gained insight into "the negative aspects of gang

20   involvement" and has remorse for this actions. Petitioner's role in the offense was

21   minimal and he was not the direct perpetrator of the murder, although culpable as an

22   aider and abettor under the natural and probable consequences theory. Petitioner had no

23   prior history of violence. Contrary to the Board's finding, nothing about petitioner or his

24   offense supports a finding that he poses *a current unreasonable risk* to society if released

25   from prison.

26

27

28

                                        PETITION FOR WRIT OF HABEAS
                                                        CORPUS
                                                              6

IX

Petitioner further alleges that the Board's finding that the offense was cruel, callous and carried out in a dispassionate manner, ignores the fact that all second degree murders are, by definition, cruel, callous and dispassionate. Since a second degree murder conviction by definition is the unlawful killing of a human being with malice aforethought, it is necessarily cruel and dispassionate. Taking the life of another for an insignificant reason is by definition cruel, callous and dispassionate. Because every second degree murder is cruel, callous and dispassionate, such a finding by the Board is insufficient to overcome the statutory command that parole must normally be given.

Petitioner submits that, contrary to the Board's finding, nothing about his commitment offense is more than minimally necessary to convict him of the life offense for which he is confined, namely, second degree murder. Petitioner was tried and convicted as an aider and abettor. (Exhibit D: Letter from Counsel Donald C. Rubright.) Although there was evidence that petitioner knew one of his friends had a gun in the vehicle, there was no evidence that there was a plan for the accomplice to use the gun. In fact, there was no evidence that petitioner aided and abetted the shooter in any manner. (Exhibit D.) Rather, the record demonstrates that petitioner was convicted under the natural and probable consequences doctrine in that he aided and abetted the fight which led to one member of his group impulsively deciding to retrieve the gun and shoot the victim. (Exhibit D.) There was nothing about petitioner's offense to indicate that it was particularly cruel or egregious. Rather, it was a typical second degree murder. Furthermore, petitioner's involvement was minimal in nature. Although still liable for the murder under an aiding and abetting and derivative liability theory, petitioner was not the direct perpetrator of the shooting. Even if petitioner's conduct is greater than that minimally required for a second degree murder, it is insufficient to support a finding that petitioner *currently poses* an unreasonable risk to society if released from prison. The Board erred in finding that the circumstances of the offense were sufficient to support a finding that petitioner poses an "unreasonable risk to society" if released from prison.

1    There is nothing about petitioner's commitment offense which supports an inference that

2    as a result of his offense, he *currently poses* an *unreasonable risk to society* if released.

3                                          X

4           Petitioner further alleges that the Board's finding that petitioner "hasn't developed

5    the insight that he needs into the causative factors of this crime," is without support.  All

6    of the current evidence before the Board affirmatively demonstrates that petitioner

7    accepts full responsibility for his actions and understands the causative factors which led

8    to his participation in the life offense.  Petitioner understands how his participation in the

9    underlying felony facilitated his co-defendant's commission of the murder and how his

10   life choices led to his involvement in the offense.  The Board's decision to the contrary is

11   without merit.

12          None of the psychological staff indicated or recommended that petitioner needed

13   or required additional self-help or therapy *prior* to being released from prison in order to

14   gain insight into the causative factors which led to his involvement in the life offense.

15   Rather, the available evidence shows that petitioner has "insight into the negative aspects

16   of gang involvement" and has "remorse for his actions." (Exhibit E: BPT Mental Health

17   Evaluation, p. 5.)  Dr. C. Saindon, Ph.D., who drafted the mental health evaluation

18   opined that petitioner "is competent and responsible for his behavior" and "does not have

19   a mental health disorder which would necessitate treatment either during his incarceration

20   period or following parole." (Exhibit E.)  Saindon found that petitioner "was open in his

21   conversation and emphasized throughout the interview his recognition that gang

22   affiliation had only resulted in injury to himself and to those around him." (Exhibit E, p.

23   4.)  Saindon further found that petitioner "showed significant insight into his commitment

24   offense . . ." (Exhibit E, p. 4.)  There was no evidence to support the Board's finding that

25   petitioner lacks insight into the commitment offense or requires additional self-help or

26   therapy to understand the causative factors which led to the commitment offense.

27   Petitioner's version of the offense is consistent with the evidence before the Board.

28   Petitioner was convicted of second degree murder under an aider and abettor theory and

                                    PETITION FOR WRIT OF HABEAS
                                                     CORPUS
                                                        8

1   the natural and probable consequences doctrine. Petitioner has always accepted

2   responsibility for his role in the offense and appreciates how his involvement in the

3   underlying offense facilitated his co-defendant's actions wherein he retrieved a gun and

4   shot the victim who was engaged in a fight with petitioner and others. The Board's

5   conclusion that petitioner requires additional therapy to understand the causative factors

6   of his life offense is with wholly without support.

7                                    XI

8        Petitioner did not file an administrative appeal because on April 15, 2004, Title 15

9   of the California Code of Regulations sections 2050 and 2051 were repealed and the

10   administrative appeals process was abolished.

11                                   XII

12       Petitioner has no other plain or speedy remedy to address the issues set forth in the

13   instant petition.

14                                   XIII

15       No other applications or motions have been filed in regard to the matters

16   complained of herein. This petition is addressed to this Court's original habeas corpus

17   jurisdiction.

18                                   XV

19       WHEREFORE, petitioner prays that this Court:

20   A.   Issue its writ of habeas corpus or Order To Show Cause;

21   B.   Conduct an evidentiary hearing wherein petitioner can obtain additional

22        evidence in support of his petition for writ of habeas;

23   C.   After a full hearing on the matter, grant petitioner's petition for writ of

24        habeas corpus and issue an order directing the Board of Parole Hearings to

25        hold a new parole suitability hearing consistent with the standards set forth

26        in *In re Rosenkrantz* (2002) 29 Cal.4th 616, 625-626, 656-657 and *In re*

27        *Dannenberg* (2005) 34 Cal.4th 1061; and

28

                                    PETITION FOR WRIT OF HABEAS
                                    CORPUS
                                    9

1        D.    Grant such other relief as this Court deems necessary and proper.

2    Dated: August 15, 2006      Respectfully submitted,

3        MARILEE MARSHALL & ASSOCIATES, INC.

4

5    MARILEE MARSHALL

6

7    JENNIFER PEABODY

8    Attorneys for Petitioner Sieu Ngo

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I the undersigned say:

I am the attorney for petitioner in this action; petitioner is in custody and restrained of his liberty at this time in a county other than that in which I maintain my office. For these reasons, I am making this verification on petitioner's behalf. I have read the foregoing petition and know the contents thereof, which are based upon the records of the Superior Court of Orange County, the records of the Department of Corrections, and the exhibits attached hereto.

The above document is true of my own knowledge, except as to matters that are stated on my information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing facts and allegations in the petition are true and correct.

Executed at Los Angeles, California, this 15th day of August, 2006.

MARILEE MARSHALL

PETITION FOR WRIT OF HABEAS
CORPUS
11

1

## MEMORANDUM OF POINTS & AUTHORITIES

2

I

3

## STANDARD OF REVIEW

4     Courts review the parole decisions of the Board of Prison Terms for an abuse of

5   discretion. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 625-626, 656-657.) The Board

6   abuses its discretion if it makes factual findings that are not supported by the record. (*Id.*

7   at 658; *In re Dannenberg, supra*, 34 Cal.4th at 1084.) If one or more of the factors lacks

8   evidentiary support, the next questions are whether the Board would have denied parole

9   based upon the supported factors and whether this result "satisfies the requirements of

10   due process of law" because the factors for which there is some evidence "constitutes a

11   sufficient basis supporting the ... discretionary decision to deny parole." (*In re DeLuna*

12   (2005) 126 Cal.App.4th 585, 598, citing, *In re Rosenkrantz, supra*, 29 Cal.4th at 677.)

13   Courts uphold the denial of parole when it appears that the Board would have reached the

14   same conclusion based on the supported factors and those factors individually or

15   collectively justify that conclusion. (*Id.* at 682-683; *In re Dannenberg, supra*, 34 Cal.4th

16   at 1071.) On the other hand, the "'decision cannot stand' when findings on important

17   factors lack evidentiary support and it is not clear that the Board would have reached the

18   same conclusion based on the supported factors." (*In re DeLuna, supra*, 126 Cal.App.4th

19   at 598.) In other words, "If the board's consideration of the specified factors is not

20   supported by some evidence in the record and thus is devoid of a factual basis, the court

21   should grant the prisoner's petition for writ of habeas corpus and should order the Board

22   to vacate its decision denying parole and thereafter to proceed in accordance with due

23   process of law." (*In re Scott* (2004) 119 Cal.App.4th 871.) "When the supported factors

24   could justify denying parole, but it is not clear that the Board would have reached this

25   conclusion," "the appropriate remedy is to direct the Board to reconsider the prisoner's

26   parole suitability in accordance with the discretion allowed by law." (*Id.*)

27

28

PETITION FOR WRIT OF HABEAS
CORPUS
12

II

**THE PAROLE BOARD'S DECISION WAS NOT SUPPORTED BY
ANY EVIDENCE AND RESULTED IN A DEPRIVATION OF PETITIONER'S
FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS**

A.    The Applicable Law

Under California law, a life prisoner *must be* paroled when his or her release

would not pose a danger to the public. (Pen. Code § 3041, subd. (b).) Penal Code

section 3041 confers upon the Board of Prison Terms its authority and its duty to

determine eligibility for parole. That section provides that "[o]ne year prior to the

inmates minimum eligible parole release date a panel consisting of at least two

commissioners of the Board of Prison Terms . . . shall normally set a parole release date. .

." (Pen. Code § 3041, subd. (a).) This requirement that normally a parole release date

shall be set is made subject to explicit statutory criteria in subdivision (b) of section 3041.

Subdivision (b) provides,

> The panel or board *shall* set a release date unless it determines that the
> gravity of the current convicted offense or offenses, or the timing and
> gravity of current or past convicted offense or offenses, is such that
> consideration of the public safety requires a more lengthy period of
> incarceration for this individual, and that a parole date, therefore, cannot be
> fixed at this meeting.

Matters to be considered by the Board of Prison Terms in making a parole suitability

include: The circumstances of the prisoner's social history; past and present mental state;

past criminal history, including involvement in other criminal misconduct which is

reliably documented; the base and other commitment offenses, including behavior before,

during and after the crime; past and present attitude toward the crime; any conditions of

treatment or control, including the use of special circumstances under which the prisoner

may safely be released to the community, and any other information which bears on the

prisoner's suitability for release. (Cal. Code Regs., tit. 15, §2402, subd. (b).)

Subdivision (c) of Title 15 section 2402 sets forth six nonexclusive circumstances tending

to show unsuitability, "the relevant importance of which is left to the judgment of the

Board." (*In re Scott, supra*, 119 Cal.App.4th 871.) The factors showing unsuitability

1   include (1) the commitment offense, (2) a previous record of violence, (3) unstable social

2   history, (4) sadistic sexual offenses, (5) psychological factors, and (6) institutional

3   behavior. (Cal. Code Regs. tit. 15 § 2402, subd. (c).)  Subdivision (d), on the other hand,

4   identifies nine circumstances tending to show suitability for release.  The circumstances

5   showing suitability include: (1) no juvenile record, (2) stable social history, (3) signs of

6   remorse, (4) motivation for the crime, (5) battered woman's syndrome, (6) lack of

7   criminal history, (7) age, (8) understanding and plans for the future, and (9) institutional

8   behavior. (Cal. Code Regs. tit. 15 § 2402, subd. (d).)  Neither the Board nor the

9   Governor may deny parole to petitioner unless he currently poses "an unreasonable risk

10  of danger to society if released from prison." (Cal. Code Regs. (hereinafter "CCR"), tit.

11  15, § 2402, subd. (a); See also, Cal. Const., Art. V, § 8, subd. (b).)  Due process requires

12  the Board's decision "reflect an individualized consideration of the specialized criteria."

13  (*In re Rosenkrantz, supra,* 29 Cal.4th at 677.)  The Parole Board's decision to deny

14  parole will not be disturbed if supported by "some evidence" and based upon the factors

15  set forth in Penal Code section 3041, subdivision (b).  (*In re Rosenkrantz, supra,* 29

16  Cal.4th at 676-677; *In re Capistran* (2003) 107 Cal.App.4th 1299.)  In the instant case,

17  there was no evidence to support the Board's decision.

18       The Fourteenth Amendment provides that no state shall deprive any person of life,

19  liberty or property without due process of law.  (U.S. Const., Amend. XIV, § 1.)  Federal

20  courts examine questions of procedural due process in two steps.  First, the court

21  ascertains whether there is a liberty or property interest that was interfered with by the

22  state.  Second, if there is such an interest, the courts must determine if the procedures

23  attendant upon a depravation of that interest were constitutionally sufficient.  (*Board of*

24  *Regents of State Colleges v. Roth* (1972) 408 U.S. 564, 571 [92 S.Ct. 2701, 33 L.Ed.2d

25  548].)

26       The Supreme Court in *Greenholtz v. Inmates of Nebraska Penal* (1979) 442 U.S.

27  1, 7, 11-12 [99 S.Ct. 2100, 60 L.Ed.2d 668] and *Board of Pardons v. Allen* (1987) 482

28  U.S. 369, 373 [107 S.Ct. 2415, 96 L.Ed.2d 303] established that:

PETITION FOR WRIT OF HABEAS
CORPUS
14

1  while there is no constitutional or inherent right of a convicted person to be
   conditionally released before the expiration of a valid sentence, a state's
2  statutory scheme, if it uses mandatory language, creates a presumption that
   parole release will be granted when or unless certain designated findings
3  are made, and thereby give rise to a constitutional liberty interest.

4  The Ninth Circuit Court of Appeals in *McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895

5  and *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910 examined the parole scheme in

6  California, namely, Penal Code section 3041, and concluded that language is mandatory

7  and thus, "creates a presumption that parole release will be granted" unless the

8  statutorially defined determinations are made. These courts found that the California

9  parole scheme uses mandatory language and is largely parallel to the schemes found in

10 *Greenholtz* and *Allen*. (*McQuillion v. Duncan, supra*, 306 F.3d at 901, *Biggs v. Terhune*,

11 *supra*, 334 F.3d at 914.) Accordingly, the Courts found that "it is clear that 'California's

12 parole scheme gives rise to a cognizable liberty interest in release on parole.'"

13 (*McQuillion v. Duncan, supra*, 306 F.3d at 902, *Biggs v. Terhune, supra*, 334 F.3d at

14 914.) "The liberty interest is created, not upon the grant of a parole date, but upon the

15 incarceration of the inmate." (*Id.* at 915.)

16     Because the California parole scheme vests in every inmate, a constitutionally

17 protected liberty interest, the court must look to the second step in the procedural due

18 process analysis to see of adequate procedural protections were afforded. (See, *Biggs v.*

19 *Terhune, supra*, 334 F.3d at 915.) "In the parole context, the requirements of due process

20 are satisfied if "some evidence" supports the decision." (*McQuillion v. Duncan, supra*,

21 306 F.3d at 304.) "Additionally, the evidence underlying the board's decision must have

22 some *indicia of reliability*." (*Biggs v. Terhune, supra*, 334 F.3d at 915 [emphasis

23 added].) "To ensure that a state-created parole scheme serves the public interest purposes

24 of rehabilitation and deterrence, the Parole Board must be cognizant not only of the

25 factors required by state statute to be considered, but also the concepts embodied in the

26 Constitution requiring due process of law." (*Id.* citing *Greenholtz v. Inmates, supra*, 442

27 U.S. at 7-8.) In California, in order to comply with the due process requirements of the

28 state and federal constitution, the decision to deny parole must be based on (1) some

PETITION FOR WRIT OF HABEAS
CORPUS
15

1    evidence; (2) of the existence of the factors specified by the statutory framework; (3) that

2    is relevant and reliable and (4) that suggests an inmate poses a *current unreasonable*

3    threat to public safety.  (Title 15 CCR § 2402, subds. (a)(b); See, *Jancsek v. Oregon Bd.*

4    *of Parole* (9th Cir. 1987) 833 F.2d 1389, 1390.)  In the instant case, there was no reliable

5    evidence before the Parole Board indicating that petitioner poses a *current unreasonable*

6    *risk* to society if released from custody.  Accordingly, the Board's failure to grant

7    petitioner a parole release date violated petitioner's Fifth and Fourteenth Amendment due

8    process rights.

9          B.      There is No Evidence to Support the Board's Decision that Petitioner Posed

10                 an Unreasonable Risk of Danger to Society if Released From Prison

11          At petitioner's second subsequent hearing, the Board again determined that

12    petitioner would pose a current unreasonable risk to society if released from prison.

13    (Exhibit A.)  In making this determination, the Board found that (1) the offense was

14    carried out in a manner demonstrating a callous disregard for human suffering and a

15    disregard for public safety, (2) the motive for the offense was "very trivial" and (3)

16    petitioner's statement, "I thought I was going to a fist fight," "minimizes the gravity of the

17    crime" and minimizes petitioner's involvement in the offense.  (Exhibit A, pgs. 61-64.)

18    The Board however, commended petitioner for having "a relatively criminal free

19    background," "a history of stable relationships, including your family support,"

20    programming "commendably," upgrading educationally, "a very reputable list of

21    vocational achievements," consistent "participation in self-help," total lack of disciplinary

22    violations and "outstanding parole plans."  (Exhibit A, pgs. 62-63.)  Despite all of

23    petitioner's accomplishments and achievements, the Board inexplicably found that the

24    positive factors showing suitability do not outweigh the factors showing unsuitability.

25    The Board then recommended that petitioner: (1) "get self-help," (2) "stay disciplinary

26    free," (3) "get therapy," and (4) continue his educational and vocational development."

27    (Exhibit A, pgs. 64-65.)  The Board's decision was unsupported by any evidence in the

28    record.  Rather, all competent evidence, including petitioner's Board Reports and

PETITION FOR WRIT OF HABEAS
CORPUS
16

1    Psychological Reports, overwhelmingly established that petitioner does not pose an

2    unreasonable risk to society if released from prison. According, habeas relief is

3    warranted.

4         The current evidence presented to the Board shows that petitioner does not pose an

5    unreasonable risk of danger to the public or a threat to the public safety. Petitioner's

6    Mental Health Evaluation report authored by C. Saindon, Ph.D. on January 23, 2002, was

7    supportive of release. Dr. Saindon concluded, "if released to the community,

8    [petitioner's] violence potential is estimated to be less than the average citizen in the

9    community, given his insight, his demonstrated ability to stay out of trouble, his

10   successful development of plans upon release, and the support of his family." (Exhibit E,

11   p. 5.)

12        Saindon's opinion is consistent with the findings of petitioner's correctional

13   counselors. All of petitioner's correctional counselors have been supportive of release on

14   parole. While his current Life Prisoner Evaluation Report does not contain a risk

15   assessment due to new rules by the Board, the report is nonetheless supportive of release.

16   In the section titled "Assessment," petitioner's counselor opined,

17        Inmate Ngo does not have any prior record of criminal conduct (considering
          the recency and frequency of prior crimes) and the circumstances of the
18        instant offense, he does not appear to be criminally minded and has a good
          insight into himself. He has been able to maintain himself relatively
19        disciplinary free (of serious rules violations) since 2/12/00 [sic]. In 9/12/97
          and 2/27/97, he acquired two (2) Certificates of Completion, Vocational
20        Automotive Refinishing and Upholstery, respectively. In addition, he is in
          the process of acquiring college credits via correspondence from Coastline
21        Community College with the hope that said credits will be transferable to a
          university and eventually obtain a degree in Biology. Finally, he has
22        achieved realistic parole plans. (Exhibit F: Life Prisoner Evaluation August
          2005, pgs. 2-3.)
23

24   In the Life Prisoner Evaluation Report prepared for the May 2004 hearing, petitioner's

25   correctional counselor concluded, "Considering the commitment offense, minimal prior

26   arrest record and good prison adjustment, the writer believes that Ngo would probably

27   pose a low degree of threat to the public at this time, if release[d] from prison." (Exhibit

28   G: Life Prisoner Evaluation May, 2004.) In reaching this decision, CCI Rubio relied on

PETITION FOR WRIT OF HABEAS
CORPUS
17

1  petitioner's immaturity at the time of the offense, being easily influenced by his peers and

2  his limited criminal history and lack of violence in custody. (Exhibit G, p. 3.) Rubio

3  further found the crime to be "episodic in nature." (Exhibit G, p. 3.) In April 2002,

4  petitioner's counselor was also supportive of parole. CCI Rubio found that petitioner

5  would probably pose a "moderate to low degree of threat to the public at this time, if

6  released from prison." (Exhibit H: Life Prisoner Evaluation April, 2002.)

7         The information before the Board overwhelmingly established that petitioner does

8  not pose an unreasonable risk to society if released from prison. The mental health

9  professional who has evaluated petitioner and make a risk assessment has concluded that

10 petitioner posed a low risk to society if released from prison. Furthermore, the

11 correctional counselors have determined that petitioner poses a low risk if released.

12 These experienced individuals have unanimously concluded that petitioner does not pose

13 an "unreasonable risk" to society if released from prison. These conclusions are

14 supported by petitioner's age, his new-found maturity, the "episodic" nature of his

15 offense, his institutional adjustment and his involvement in NA and other self-help and

16 therapy programs. Petitioner is currently 33 years old and has gained the maturity he was

17 lacking at the time of his commitment offense when he was only 19 years old. He has

18 gained insight into the negative impact his involvement with wanna-be gangsters had on

19 his life, the victim's life and society in general. He has been incarcerated since 1993.

20 While incarcerated, he has suffered no 115's, has engaged in no acts of violence and has

21 shown no propensity toward future criminality. Petitioner's offense, as recognized by the

22 experts evaluating petitioner, was episodic in nature, and the result of immaturity and

23 negative peer influences. (Exhibits E, F, G, H.) Nothing about petitioner or his offense

24 supports a finding that he poses *a current unreasonable risk* to society if released from

25 prison.

26        Furthermore, there is no current evidence to support a finding that petitioner

27 requires additional self-help or therapy to gain further insight into his offense in order to

28 be able to ensure that he no longer poses a danger to society. Rather, all the evidence

PETITION FOR WRIT OF HABEAS
CORPUS
18

1   before the Board shows that petitioner has participated in all of the available self-help

2   programs and no longer requires self-help or therapy in order to ensure that he does not

3   pose an unreasonable risk to society if released. As Dr. Saindon found, petitioner has

4   "insight into the negative aspects of gang involvement." (Exhibit E, p. 5.) In concluding

5   that petitioner poses less potential for violence than the average citizen, Saindon relied, in

6   part, on petitioner's "insight." (Exhibit E, p. 5.) Similarly, when petitioner was

7   evaluated by Dr. C. Schroeder, Ph.D. in December, 1996, Dr. Schroeder noted that at the

8   time of the offense, petitioner had very limited insight into the causative factors which led

9   to the offense. However, Schroeder noted that now, "In hindsight, he sees that he perhaps

10  could have stopped the incident and now has great empathy and remorse for the family of

11  the victim." (Exhibit I, p. 2.) Schroeder further noted that petitioner is now "able to

12  think before acting." (Exhibit I, p. 2.) Petitioner has always accepted responsibility for

13  his role in the commitment offense and his version of the offense is consistent with the

14  prosecution's theory and the evidence presented against petitioner. Petitioner has always

15  stated that he did not intend to kill the victim. This lack of intent is consistent with the

16  prosecution's theory of the case. Petitioner was tried as an aider and abettor. The jury

17  was instructed with the natural and probable consequences doctrine which permitted the

18  jury to find that petitioner was guilty of second degree murder if he aided and abetted the

19  fist fight and that the shooting was a natural and probable consequence of aiding and

20  abetting the fight. (Exhibit D.) Thus, there was no requirement that petitioner form the

21  specific intent to kill or be aware that anyone else formed the specific intent to kill. [1]

---

[1] Under the natural and probable consequences doctrine, " ... the aider and abettor in a proper case is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable consequences of any act that he knowingly aided or encouraged." (*People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5; *People v. Prettyman* (1996) 14 Cal.4th 248.) Thus, the pivotal question is, "whether the collateral criminal act was the ordinary and probable effect of the common design or was a fresh and independent product of the mind of one of the participants, outside of, or foreign to, the common design." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531 citing *People v. Kaufman* (1907) 152 Cal. 331, 337; See also, *People v. Durham* (1969) 70 Cal.2d 171, 182-183.) Each

PETITION FOR WRIT OF HABEAS
CORPUS
19

(Exhibit D.)  The Board's finding that petitioner lacks insight into the commission of his life offense is without any support and is based solely on ignorance of applicable California law governing aiding and abetting and the natural and probable consequences theory of second degree murder.  There is no evidence to support a finding that petitioner lacks insight into the life offense and requires additional self-help to gain such insight.

In the instant case, the record is devoid of any evidence that of aggravated conduct reflecting an exceptionally callous disregard for human suffering.  Rather, the offense was a routine second degree gang murder premised on an aiding and abetting theory and the natural and probable consequences doctrine.  Petitioner was not the shooter and there was no evidence that he intended for the victim to be shot or had knowledge that the shooter had armed himself with a firearm during the fight.  Rather, the testimony was that petitioner aided and abetted a fight which led to the commission of murder.  As petitioner's counselor noted, the crime was "episodic" in nature and was not indicative of petitioner's character.  (Exhibits G and H.)  Furthermore, whether a particular second degree murder is exceptionally callous or especially heinous, atrocious or cruel is relevant only to inform a judgment that the inmate poses a current unreasonable threat to public safety.  The "commitment offense" subfactors set forth in section 2402, subdivision (c), subsection (1) speak to this question- they focus on past acts as predictors of an inmate's future dangerousness, and are not meant to simply prolong punishment.  Nothing about petitioner's commitment offense supports an inference that petitioner *currently* poses an unreasonable risk to society if released.

---

juror must be convinced, beyond a reasonable doubt, that the defendant aided and abetted the commission of a criminal act, and that the offense actually committed was a natural and probable consequence of that act.  (*People v. Prettyman, supra,* 14 Cal.4th at 268.)  In order to determine whether a particular criminal act was a natural and probable consequence of another criminal act aided and abetted, a jury must determine whether, "under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant."  (*People v. Nguyen, supra,* 21 Cal.App.4th at 531 citing, *People v. Woods* (1992) 8 Cal.App.4th 1570, 1587; See, *People v Mendoza* (1998) 18 Cal.4th 1114, 1133; *People v. Price* (1991) 1 Cal.4th 324, 443.)

1    Contrary to the finding of the Board, there is no evidence to support a finding that

2    petitioner's commitment offense supports an inference that he currently poses an

3    unreasonable risk to society if released.  The Board's conclusion that petitioner remains a

4    danger to society, is so lacking in any medical, psychological or behavioral evidentiary

5    support that it is arbitrary and capricious.  Petitioner's continued confinement absent

6    some evidence showing that he currently poses an unreasonable risk to society violates

7    the Fifth and Fourteenth Amendments of the United State Constitution.  Petitioner should

8    be given a parole release date.

9    C.    Reliance Solely on the Facts and Characterization of Petitioner's

10          Commitment Offense and Petitioner's Prior Record to Deny Parole

11          Resulted in a Violation of the Eighth and Fourteenth Amendment

12          Prohibition Against Cruel and Unusual Punishment.

13    Even assuming that petitioner's offense is "cruel, callous or dispassionate," over

14    and above that necessarily implied in second degree murder, the crime fails to support a

15    finding that petitioner currently poses an unreasonable risk to society if released.

16    Petitioner was only 19 years old at the time he committed the life offense and, as

17    discussed thoroughly above, petitioner was convicted as an aider and abettor.  He has

18    been in state prison for 13 years.  While in custody, he has stayed away from trouble

19    and/or violence and has been without any 115's during his entire term.  The crime, as

20    discussed above, was episodic in nature and was not indicative of his character.

21    Petitioner was young and susceptible to negative peer influences.  Other than the life

22    offense, petitioner had no prior violent criminal history.  His only other contact with law

23    enforcement was when he was arrested for possessing cocaine.  As a result of his arrest,

24    petitioner was diverted pursuant to Penal Code section 1000.  Petitioner has obtained

25    treatment in prison for his drug use and has remained clean throughout his incarceration.

26    Nothing about petitioner's commitment offense supports an inference that he currently

27    poses an unreasonable risk to society.  As discussed above, all of the available evidence,

28    including the professional opinions of the mental health professionals who evaluated

PETITION FOR WRIT OF HABEAS
CORPUS
21

1    petitioner and petitioner's correctional counselors, indicates that despite the facts of

2    petitioner's commitment offense, petitioner does not pose an unreasonable risk to society

3    if released from custody.

4         Petitioner recognizes that in *In re Danneberg, supra,* 34 Cal.4th at 1071, the

5    California Supreme Court concluded that "the Board in exercising its traditional broad

6    discretion, may protect public safety *in each discrete case* by considering the dangerous

7    implications of a life-maximum prisoner's crime individually." [emphasis in original.]

8    The court, however, added, "Of course, no inmate may be imprisoned beyond a period

9    that is constitutionally proportionate to the commitment offense or offenses." (*Id.*) In the

10   instant case, continual reliance by the Board on the facts and characterization of

11   petitioner's commitment offense to support a current finding of dangerousness violates

12   the state and federal prohibition against sentences which are cruel and unusual. When the

13   facts of petitioner's offense are considered in relation to the time served and performance

14   in prison, continual confinement based solely on the nature of petitioner's offense and

15   prior criminal history is constitutionally excessive.

16        The facts of petitioner's commitment offense will never change. However, it does

17   not necessarily follow that petitioner will always remain a danger to society, especially in

18   light of the overwhelming evidence that petitioner no longer poses a danger to society. In

19   the instant case, there is no evidence to support the Board's finding that the facts of

20   petitioner's commitment offense render him a danger to society if released from custody.

21   Petitioner has served more than 13 years in custody. Petitioner's rehabilitation, as

22   documented in the psychological evaluations and counselor's report, clearly establishes

23   that petitioner poses no danger to society if released. In the instant case, reliance on the

24   facts of petitioner's commitment offense and his prior record are insufficient to justify the

25   denial of parole. Petitioner's continued confinement based solely such immutable factors

26   violates the state and federal prohibition against sentences which are cruel and unusual.

27

28

                                        PETITION FOR WRIT OF HABEAS
                                        CORPUS
                                        22

1

## III

## CONCLUSION

For all of the foregoing reasons, this Court should grant writ relief and direct the Board of Prison Terms to conduct a parole eligibility hearing that complies with the requirements in *In re Rosenkrantz, supra,* 29 Cal.4th at 625-626, 656-657 and *In re Dannenberg, supra,* 34 Cal.4th 1061.

Dated: August 15, 2006            Respectfully submitted,

MARILEE MARSHALL & ASSOCIATES, INC.

MARILEE MARSHALL

JENNIFER PEABODY

Attorneys for Petitioner

PETITION FOR WRIT OF HABEAS
CORPUS
23

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

I am over eighteen (18) years of age, and not a party to the within cause; my business address is 523 West Sixth Street, Suite 1109, Los Angeles, CA. 90014. That on August 15, 2006, I served a copy of the within:

### PETITION FOR WRIT OF HABEAS CORPUS

On the interested parties by placing them in an envelope (or envelopes) addressed respectively as follows:

Office of the Attorney General
P.O. Box 85266
San Diego, CA 92186-5266

Mr. Sieu Phong Ngo
J-07024/ B-wing 319-up
CTF- Soledad
P.O. Box 689
Soledad, CA 93960-0689

Office of the District Attorney
700 Civic Center Drive West
Santa Ana, CA 92701

Each said envelope was then, on August 15, 2006, sealed and deposited in the United States mail at Los Angeles, California, the county in which I maintain my office, with postage fully prepaid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2006, at Los Angeles, California.

SHANNON CALLAHAN

1
MARILEE MARSHALL
State Bar No. 101046
2
JENNIFER PEABODY
State Bar No. 198746
3
MARILEE MARSHALL & ASSOCIATES, INC.
Attorneys at Law
4
523 W. Sixth Street
Suite 1109
5
Los Angeles, CA 90014
6
(213) 489-7715
7
Attorneys for Petitioner
8
**IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9
**FOR THE COUNTY OF ORANGE**
10
11
IN RE SIEU NGO

Case No. _____
12
    On Habeas Corpus.

Related Case No.  C199109
13

EXHIBITS IN SUPPORT OF
PETITION FOR WRIT OF HABEAS
14

CORPUS
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PETITION FOR WRIT OF HABEAS
CORPUS

# **TABLE OF EXHIBITS**

Exhibit A    Transcript of Parole Hearing 2/8/2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Exhibit B    Transcript of Parole Hearing 5/13/2002 . . . . . . . . . . . . . . . . . . . . . . . . 71

Exhibit C    Transcript of Parole Hearing 8/3/2004 . . . . . . . . . . . . . . . . . . . . . . . . 139

Exhibit D    Support letter from Donald G. Rubright . . . . . . . . . . . . . . . . . . . . . . . . 206

Exhibit E    Psychological Evaluation 1/23/2002 . . . . . . . . . . . . . . . . . . . . . . . . 210

Exhibit F    Life prisoner Evaluation 8/2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

Exhibit G    Life Prisoner Evaluation 5/2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Exhibit H    Life Prisoner Evaluation 5/2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232

Exhibit I    Psychological Evaluation 12/27/1996 . . . . . . . . . . . . . . . . . . . . . . . . 238

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:              )        CDC Number J-07024
                         )
SIEU NGO ·               )        **INMATE**
                         )        **COPY**
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

FEBRUARY 8, 2006

9:58 A.M.

PANEL PRESENT:

Ms. Sandra Bryson, Presiding Commissioner
Mr. Doug Filangeri, Deputy Commissioner

OTHERS PRESENT:

Mr. Sieu Ngo, Inmate
Ms. Tara Rutledge, Attorney for Inmate
Mr. Tom Crofoot, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum

**Sue Gerdes, Peters Shorthand Reporting**                    2

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 5 |
| Pre-Commitment Factors | 6 |
| Post-Commitment Factors | 12 |
| Parole Plans | 24 |
| Closing Statements | 47 |
| Recess | 59 |
| Decision | 60 |
| Adjournment | 66 |
| Transcriber Certification | 67 |

--oOo--

3

1

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **DEPUTY COMMISSIONER FILANGERI:** We're on |
| 3 | record. |
| 4 | **PRESIDING COMMISSIONER BRYSON:** This is a |
| 5 | Subsequent Parole Consideration Hearing for Sieu |
| 6 | Ngo CDC number J-07024. Today's date is |
| 7 | February 8th, 2006 and the time is 9:58 A.M. We |
| 8 | are located at Correction Training Facility in |
| 9 | Soledad. The inmate was received on February |
| 10 | 1st, 1994 committed from Orange County. The |
| 11 | life term began February 1st, 1994. The |
| 12 | inmate's minimum eligible parole date is May |
| 13 | 24th, 2003. The controlling offense for which |
| 14 | the inmate is committed is set forth in case |
| 15 | number C199109 charging in count one a violation |
| 16 | of Penal Code 187 murder second enhanced with a |
| 17 | weapon Penal Code 1222A sub one, armed with a |
| 18 | firearm to wit a 22 caliber pistol for which the |
| 19 | inmate received a term of 15 years to life plus |
| 20 | one year. This hearing is being recorded. For |
| 21 | the purpose of voice identification each of us |
| 22 | will state our first and last name, spelling the |
| 23 | last name. When it is your turn Sir, after you |
| 24 | spell your last name please state your CDC |
| 25 | number. I will start and then go to my left, |
| 26 | Sandra Bryson B-R-Y-S-O-N Commissioner Board of |
| 27 | Parole Hearings. |

4

2

1          **DEPUTY COMMISSIONER FILANGERI:**  Deputy

2   Commissioner Doug Filangeri F-I-L-A-N-G-E-R-I.

3          **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Tom

4   Crofoot C-R-O-F-O-O-T Orange County District

5   Attorney's Office.

6          **ATTORNEY RUTLEDGE:**  Tara E. Rutledge R-U-

7   T-L-E-D-G-E Attorney for Mr. Ngo.

8          **INMATE NGO:**  Inmate Ngo N-G-O first name

9   Sieu S-I-E-U middle name Phong P-H-O-N-G CDC

10   number J-07024.

11          **PRESIDING COMMISSIONER BRYSON:**  I note

12   for the record that we have two correctional

13   peace officers in the room who are here for

14   security purposes.  Commissioner Filangeri is

15   there any confidential material in the file and

16   if so will it be used today?

17          **DEPUTY COMMISSIONER FILANGERI:**  There is

18   none we will be using today.

19          **PRESIDING COMMISSIONER BRYSON:**  All right

20   I passed the hearing checklist marked exhibit

21   one to your counsel and I believe, do you have

22   that District Attorney?

23          **DEPUTY DISTRICT ATTORNEY CROFOOT:**  I have

24   it as well.

25          **PRESIDING COMMISSIONER BRYSON:**  All right

26   and confirming that the District Attorney has

27   the documentation.

5

3

1        **DEPUTY DISTRICT ATTORNEY CROFOOT:**  I have

2   thank you.

3        **PRESIDING COMMISSIONER BRYSON:**  And

4   counsel you have the documentation.

5        **ATTORNEY RUTLEDGE:**  Yes.

6        **PRESIDING COMMISSIONER BRYSON:**  Thank

7   you.  Are there any additional documents to be

8   submitted counsel?

9        **ATTORNEY RUTLEDGE:**  No, just that the

10  packet that we provided dated February the 8th I

11  believe --

12        **PRESIDING COMMISSIONER BRYSON:**  We do

13  have this.

14        **ATTORNEY RUTLEDGE:**  Okay other than that

15  we have nothing to submit.

16        **DEPUTY DISTRICT ATTORNEY CROFOOT:**  I have

17  not seen that, can you just describe it for me?

18        **ATTORNEY RUTLEDGE:**  Sure, it's Mr. Ngo

19  has prepared sort of a, it's entitled Memorandum

20  of Evidence in Law and Support of Parole

21  Suitability where he tells the board, well, it

22  includes parole plans, what his place of

23  residence and employment, psych evaluation

24  reports, life prisoner evaluation reports,

25  includes his chronos and certificates which are

26  all in the C File, and support letters.  Last I

27  checked everything in here is in the C File

4

1  except the first two sections.  Is that correct

2  or not?

3        INMATE NGO:  I don't know.

4        ATTORNEY RUTLEDGE:  Everything else

5  beginning with the psych eval should –

6        INMATE NGO:  Should be all in there.

7        ATTORNEY RUTLEDGE:  Is all in the C File.

8  So if you want to review this I'll let you.

9        DEPUTY DISTRICT ATTORNEY CROFOOT:  That's

10  fine thank you.

11        PRESIDING COMMISSIONER BRYSON:  And we

12  will be going over those first two sections

13  basically here in the hearing.  All right Sir,

14  today you and your attorney signed a document

15  marked exhibit two regarding ADA Accommodation

16  Hearing Procedures and Inmate's Rights.  Counsel

17  do you have any comments or concerns regarding

18  the ADA Rights or the inmate's ability to

19  participate in the hearing?

20        ATTORNEY RUTLEDGE:  No.

21        PRESIDING COMMISSIONER BRYSON:  Are there

22  any preliminary objections?.

23        ATTORNEY RUTLEDGE:  No, not at this time.

24        PRESIDING COMMISSIONER BRYSON:  All

25  right, will the inmate be speaking with the

26  panel?

27        ATTORNEY RUTLEDGE:  According to what he

7

5

1    wrote there he will be speaking to the panel in

2    all issues other than the commitment offense

3    which he spoke to the board I believe at his

4    first hearing and he notes in his Memorandum,

5    let me just quote from there, "further more I

6    have fully and freely, I confess and accept the

7    facts of my personal culpability and

8    responsibility for the life term offense."  So

9    that would conclude his comments on the offense.

10   Other than that though he will discuss other

11   issues with the board.

12       **PRESIDING COMMISSIONER BRYSON:**  All right

13   then Sir if you are going to address the panel

14   we will swear you in.  So would you raise your

15   right hand please, do you solemnly swear or

16   affirm that the testimony you give at this

17   hearing will be the truth, the whole truth and

18   nothing but the truth?

19       **INMATE NGO:**  Yes I swear.

20       **PRESIDING COMMISSIONER BRYSON:**  All right

21   I will read the facts of the crime into the

22   record, information obtained from the probation

23   officer's report pages three and four.  On

24   September 18th, 1992 Angel Gonzales was beaten

25   and shot to death near Fullerton High School as

26   he was walking home after school.  An

27   investigation revealed that earlier in the day

6

1  the victim, a member of the "Fullerton's Toker's
2  Town" a Latin gang and member of "Fullerton's
3  Boyz" B-O-Y-Z an Asian gang were at a McDonald's
4  restaurant near the high school.  The victim and
5  No, that's N-O Muhamed M-U-H-A-M-E-D, had a
6  confrontation with each claiming there each
7  respective gang affiliations.  After this non
8  physical altercation the group of Asians which
9  at the time included Sieu Phong Ngo obtained a
10  firearm.  Ngo, N-G-O, and the Asian gang members
11  returned to the school where they waited for
12  Gonzales.  As he walked home he was attacked and
13  beaten.  During the physical altercation the
14  victim was shot one time in the back by Usumang
15  U-S-U-M-A-N-G last M-U-H-A-M-E-D, the group of
16  five Asian gang members including Ngo N-G-O fled
17  the area after the shooting.  Angel Gonzales
18  died at the scene as a result of the gun shot
19  wound.  Ngo N-G-O, Jimmy Dao D-A-O and Asat Cham
20  A-S-A-T-C-H-A-M fled to the state of Washington.
21  They were subsequently apprehended there and the
22  murder weapon, a stolen 22 caliber hand gun was
23  recovered in the vehicle.  All right Sir, as to
24  your pre-conviction record you have none as a
25  juvenile.  We have as to your adult arrest
26  history and conviction's, we have that on March
27  30th, 1992 you were arrested by the San Gabriel

9

7

1    Police Department for possession of a controlled

2    substance, three pieces of rock cocaine.  On May

3    7th, 1992 that was diverted pursuant to Section

4    1000 of the Penal Code.  And then on September

5    22nd, 1992 you were arrested by the Olympia

6    Sheriff's Office for possession of stolen

7    property.  This case was subsequently dismissed

8    and that of course ensued with the instant

9    crime.  And that comports with your record here

10   so they are the same.  Okay, all right, as to

11   your personal history, it's cleared also by the

12   way that you do have a strong stable family and

13   good social support.  Just reviewing it and then

14   your welcome to add to it if you would like.

15   You were born in Vietnam on May 18th 1973.

16          **INMATE NGO:**  Correct.

17          **PRESIDING COMMISSIONER BRYSON:**  And you

18   resided in the United States since 1979 so that

19   means that you basically came here when you were

20   six years old.  Is that right?

21          **INMATE NGO:**  Correct.

22          **PRESIDING COMMISSIONER BRYSON:**  In 1991

23   you graduated from Fullerton High School and

24   subsequently attended Fullerton Community

25   College and Pasadena City College.  As to your

26   high school courses and then your subsequent

27   college courses, where were you headed

10

8

1  professionally in both high school and college

2  as you went through?

3      INMATE NGO:  Well I was trying major in

4  small business and you know hopefully start my

5  own business one day.

6      PRESIDING COMMISSIONER BRYSON:  Okay, we

7  have here that you completed ten units and your

8  major was business.  Were those semester units,

9  is that what that's referencing?

10     INMATE NGO:  Yeah, semester.

11     PRESIDING COMMISSIONER BRYSON:  All

12 right, you were employed as a telemarketer and

13 worked odd jobs.  So you were working while you

14 were in college?

15     INMATE NGO:  Right.

16     PRESIDING COMMISSIONER BRYSON:  You were

17 employed at your family's liquor store and

18 resided with your parents.  We note that you had

19 problems with substance abuse including, it says

20 controlled substances or alcohol.  Would you

21 explain that a little more.  First of all your

22 record is very  A characteristic of your getting

23 involved in this in the first place so that's

24 where I'm trying to gain some understanding.

25 You were in a gang, or a want to be gang at the

26 time?

27     INMATE NGO:  Correct.

9

1          PRESIDING COMMISSIONER BRYSON:  And what

2    go you motivated into the gang, I can't imagine

3    actually from your record?

4          INMATE NGO:  Well you know as kids you

5    always you know feel like you want to belong to

6    somebody or be a part of something you know.

7          PRESIDING COMMISSIONER BRYSON:  Right.

8          INMATE NGO:  I mean at that time you

9    know, that's how I felt when I was a kid you

10   know, wanted to belong to something you know.

11   Never thinking something like this leads to you

12   know what happened in this instant case but you

13   know that's my mistake you know choosing the

14   wrong friends you know, not knowing any better

15   but now your know I realize what I did was you

16   know by choosing wrong friends you know can cost

17   you your life you know, ruin your life.

18         PRESIDING COMMISSIONER BRYSON:  Were your

19   parents aware of your involvement with gangs and

20   or drugs?

21         INMATE NGO:  At that time I don't know,

22   no they weren't aware of it you know because you

23   know I guess you know you can say I hide from

24   them or what not because like was said earlier

25   we just more like want to be gang member.  We

26   just like, there was five of us we like friends

27   you know we just hang around you know do what

12

10

1    kids do, you know, play arcade and what not you

2    know, that's about it.

3         PRESIDING COMMISSIONER BRYSON:  Were your

4    parents both employed?

5         INMATE NGO:  Yes they were, we own -- at

6    that time we had a family business, a liquor

7    store.

8         PRESIDING COMMISSIONER BRYSON:  Right.

9         INMATE NGO:  Before that my dad you know

10   he was into making signs and stuff before we

11   purchased a liquor store.  From that point on we

12   just run a liquor store, a family liquor store

13   in Anaheim.

14        PRESIDING COMMISSIONER BRYSON:  You have

15   brothers and sisters?

16        INMATE NGO:  I have one older brother,

17   two older sisters and one younger brother, and

18   one younger sister.  There are all doing well, I

19   mean, my brothers getting married soon and they

20   all graduate, most of them graduated from

21   college and my little sister, I don't know,

22   right now I really don't know where she is

23   because of what happened to me and stuff like

24   that you know, my dad and he was passing away.

25   I don't know what happened, she came visit me

26   one time and she just moved out and I have never

27   heard from her again.

13

11

1        PRESIDING COMMISSIONER BRYSON:  I see.

2        INMATE NGO:  That's the only person,

3   thing I know about what -- I don't even know

4   where she is right now at this point, my little

5   sister so I would like to look for her when I

6   get out though if I'm given a second chance.

7        PRESIDING COMMISSIONER BRYSON:  Okay, now

8   is your mom still living?

9        INMATE NGO:  Yes my mom is still living.

10       PRESIDING COMMISSIONER BRYSON:  And how

11  is she doing?

12       INMATE NGO:  She's doing well.

13       PRESIDING COMMISSIONER BRYSON:  Is she

14  working or is she retired?

15       INMATE NGO:  Right now she's going to

16  school right now.  She's trying to learn English

17  she said you know so it's a good thing to keep

18  her occupied you know because since my dad

19  passed away and she really you know had no one

20  to you know talk to so you know friends wise and

21  what not so beside family members so she's going

22  to school from what I understand.

23       PRESIDING COMMISSIONER BRYSON:  All

24  right, let's go to post-conviction factors and

25  Commissioner -- do you have any questions first

26  of all relevant to the personal history?

27       DEPUTY COMMISSIONER FILANGERI:  Yeah

14

12

1   thanks I do.  Are you suggesting that your

2   sister's disappearance has something to do with

3   your imprisonment?

4        INMATE NGO:  I think she was maybe

5   traumatized and I know she feel you know she's,

6   I don't know I can't personally say how she

7   feels but I think it might have a little affect

8   on her because you know she just moved away you

9   know so.  My family is still looking for her so.

10       PRESIDING COMMISSIONER BRYSON:  How old

11  is she now?

12       INMATE NGO:  She should be about 28 right

13  now, 28, 29.

14       DEPUTY COMMISSIONER FILANGERI:  So what

15  makes you think she might become traumatized?

16       INMATE NGO:  At the time my dad was sick

17  and he was dying of cancer and me being in

18  prison I guess it just, she didn't want to be

19  around at that time I guess.  I don't know what

20  the reason, I would like to know but I can't

21  answer that at this point right now.

22       DEPUTY COMMISSIONER FILANGERI:  Well what

23  would stop me from thinking that you're just

24  trying to exploit the situation to garner some

25  sympathy from the panel members?

26       INMATE NGO:  I'm not, not at all.

27       DEPUTY COMMISSIONER FILANGERI:  That's

15

13

1  all the questions I have.

2      **PRESIDING COMMISSIONER BRYSON:**  All

3  right, we'll go to post conviction factors with

4  Commissioner Filangeri.

5      **DEPUTY COMMISSIONER FILANGERI:**  Okay

6  thanks.  The purpose of this part of the hearing

7  is to detail your prison behavior since you last

8  appeared before the board.  I think that was

9  August 5th, 2004 where you were denied for one.

10  That was your first Subsequent Parole

11  Consideration Hearing.

12      **INMATE NGO:**  I was denied two years for

13  my first one and my Subsequent was one year.

14      **DEPUTY COMMISSIONER FILANGERI:**  Right,

15  that was 2004 your first Subsequent Parole

16  Consideration Hearing resulted in a one year

17  denial.

18      **INMATE NGO:**  Right, correct Sir.

19      **DEPUTY COMMISSIONER FILANGERI:**  The first

20  document that I want to refer to is the

21  Correctional Counselor's Report provided by F.I.

22  DeGuzman D-E-G-U-Z-M-A-N its dated 6/16/05.

23  Under post-conviction factors the counselor

24  writes that you've remained at CTF in the

25  general population, medium A with a mandatory

26  minimum placement score of 19 although your

27  actual classification score, but for your being

16

14

1   a lifer without a date would have been zero.

2   The writer refers us to the post conviction

3   progress report which says that you're doing

4   independent studies through Coast Line Community

5   College.  I saw six items in the C File from

6   Coast Line College about training material,

7   tests, CDs and stuff like that.  Each one of

8   those items correspond to a particular course?

9        INMATE NGO:  Yes, like some course

10   require you know, it's enclosed with the books

11   along which explained the program itself but

12   since we can't, we don't allow the use of

13   computers so it's pretty much pointless so I had

14   to return it you know.

15        DEPUTY COMMISSIONER FILANGERI:  So if

16   they come on CD's you can't do the class?

17        INMATE NGO:  No, the CD just part of the

18   curriculum but it's just basically what there

19   teachers like explaining what's in the class

20   itself.

21        DEPUTY COMMISSIONER FILANGERI:  So you

22   can still do the class with the books and still

23   pass the tests?

24        INMATE NGO:  Yes.

25        DEPUTY COMMISSIONER FILANGERI:  You have

26   enough to do to pass the tests?

27        INMATE NGO:  Yes, you have a syllabus, it

17

15

1   has all the curriculum in there.

2       **DEPUTY COMMISSIONER FILANGERI:**  Okay, I

3   saw that first item was I think dated around

4   2005, have you actually completed any of the

5   course work yet?

6       **INMATE NGO:**  For the Coast Line, yes.

7       **DEPUTY COMMISSIONER FILANGERI:**  Do you

8   have certificates?

9       **INMATE NGO:**  There's no certificate but I

10  have grades which unfortunately I don't have it

11  hear but I have listed all the courses I've

12  completed.  If you look –

13      **DEPUTY COMMISSIONER FILANGERI:**  What

14  section of that is that in the packet?

15      **INMATE NGO:**  Page seven of my Memorandum.

16      **DEPUTY COMMISSIONER FILANGERI:**  Okay

17  current academic and self help programs and down

18  here, here it is Coast Line College.

19      **INMATE NGO:**  Right.

20      **DEPUTY COMMISSIONER FILANGERI:**  So you

21  have completed biology 100.

22      **INMATE NGO:**  Correct.

23      **DEPUTY COMMISSIONER FILANGERI:**  Business

24  110.

25      **INMATE NGO:**  120.

26      **DEPUTY COMMISSIONER FILANGERI:**  I see,

27  this one says 110.

16

1       INMATE NGO:  Oh typo.

2       DEPUTY COMMISSIONER FILANGERI:  Okay,

3  counseling 105.

4       INMATE NGO:  Correct.

5       DEPUTY COMMISSIONER FILANGERI:

6  Psychology 100.

7       INMATE NGO:  Correct.

8       DEPUTY COMMISSIONER FILANGERI:  Sociology

9  100.

10       INMATE NGO:  Correct.

11       DEPUTY COMMISSIONER FILANGERI:  Spanish

12  180.

13       INMATE NGO:  Correct.

14       DEPUTY COMMISSIONER FILANGERI:  And your

15  currently enrolled in Health 100?

16       INMATE NGO:  No that's the old from a

17  previous board.

18       ATTORNEY RUTLEDGE:  Here maybe this one

19  will I think, in fact this does not have the

20  typo.  I didn't realize they weren't the same so

21  go right ahead.

22       DEPUTY COMMISSIONER FILANGERI:  I see

23  okay.  Okay this one says Business 120.  Spanish

24  180, Health 100 you've completed that?

25       INMATE NGO:  Yes.

26       DEPUTY COMMISSIONER FILANGERI:

27  Philosophy.

19

17

1          INMATE NGO:  Yes.

2          DEPUTY COMMISSIONER FILANGERI:

3   Communications 100.

4          INMATE NGO:  Yes.

5          DEPUTY COMMISSIONER FILANGERI:  Geology

6   100.

7          INMATE NGO:  Yes.

8          DEPUTY COMMISSIONER FILANGERI:  History

9   175.

10          INMATE NGO:  Yes.

11          DEPUTY COMMISSIONER FILANGERI:  Astronomy

12   100.

13          INMATE NGO:  Yes.

14          DEPUTY COMMISSIONER FILANGERI:  Marine

15   Science 100.

16          INMATE NGO:  Correct.

17          DEPUTY COMMISSIONER FILANGERI:  And your

18   currently enrolled in Humanities and Political

19   Science.

20          INMATE NGO:  Correct.

21          DEPUTY COMMISSIONER FILANGERI:  Okay,

22   let's see, 13 classes figuring there what, about

23   worth three units a piece?

24          INMATE NGO:  Three units except for

25   Spanish its five units.

26          DEPUTY COMMISSIONER FILANGERI:  So you

27   are more than halfway towards your AA degree?

20

18

1          INMATE NGO:  I have 41 unit.

2          DEPUTY COMMISSIONER FILANGERI:  How many?

3          INMATE NGO:  41 units currently.

4          DEPUTY COMMISSIONER FILANGERI:  And you

5    need 60?

6          INMATE NGO:  Sixty.

7          DEPUTY COMMISSIONER FILANGERI:  Great,

8    are you taking all the necessary core classes

9    that I'm assuming there are some classes that

10   have to be taken?

11         INMATE NGO:  Yes, I still have to take

12   English which is required and math so Political

13   Science is required so I'm taking it right now.

14   After I take those two classes I will be taking

15   Small Business and Business Management.

16         DEPUTY COMMISSIONER FILANGERI:  Great.

17         INMATE NGO:  To upgrade.

18         DEPUTY COMMISSIONER FILANGERI:  Great, it

19   seems to me I noticed that a test of Adult Basic

20   Education, it was 12.9.

21         INMATE NGO:  Correct.

22         DEPUTY COMMISSIONER FILANGERI:  All right

23   and I also saw a certificate of High School

24   Graduation from Fullerton in 1992.

25         INMATE NGO:  Correct.

26         DEPUTY COMMISSIONER FILANGERI:  Okay, all

27   right.  Let's go back to the Counselor's post-

21

19

1    conviction progress report.  It says that you

2    are assigned as the culinary store keeper office

3    aid with satisfactory grades.  You've got

4    certificates of completion in automotive

5    refinishing in 1997 and upholstery in 1997.  Now

6    that was when you were at LA County.

7          INMATE NGO:  Lancaster.

8          DEPUTY COMMISSIONER FILANGERI:  Lancaster

9    that's it, Lancaster.  You haven't had any

10   vocational upgrading since you've been at CTF?

11         INMATE NGO:  Well the only one that they

12   have right now it was drafting and at that time

13   was computer data.

14         DEPUTY COMMISSIONER FILANGERI:  It says

15   that your on the computer processing or the data

16   processing waiting list but I heard that people

17   been on that list forever.

18         INMATE NGO:  Forever, it's so I have a

19   upgrade on forklift things which is trade in

20   itself, a forklift operator.

21         DEPUTY COMMISSIONER FILANGERI:  That's

22   right, you didn't mention it.  I did see that.

23         PRESIDING COMMISSIONER BRYSON:  It's in

24   here.

25         DEPUTY COMMISSIONER FILANGERI:  2002, I

26   saw that.

27         INMATE NGO:  I am certified and I have a

22

20

1   new updated license I just been renewed.

2       DEPUTY COMMISSIONER FILANGERI:  Do you

3   use that forklift operator's license in this --

4       INMATE NGO:  Facility yes to move.

5       DEPUTY COMMISSIONER FILANGERI:  Culinary

6   store keeper office aid?

7       INMATE NGO:  Right.

8       DEPUTY COMMISSIONER FILANGERI:  Good.

9   Are there any more upgrades you can do on that?

10      INMATE NGO:  Besides fork lifting?

11      DEPUTY COMMISSIONER FILANGERI:  Something

12  about jacks you had some sort of certification.

13      INMATE NGO:  Those are hand jacks, it's

14  just like manual by my self.  It's pretty easy

15  to operate, they electric ones to though.

16      DEPUTY COMMISSIONER FILANGERI:  Okay in

17  terms of your education I also saw some peer

18  education back in 1999 for sexual transmitted

19  disease, HIV, AIDS, TB and hepatitis.

20      INMATE NGO:  Correct.

21      DEPUTY COMMISSIONER FILANGERI:  I saw a

22  document for anger management in 2005 and some

23  2000 documents for Salesmanship and Key to

24  Fatherhood, something through the Muslim Chapel

25  was it?

26      INMATE NGO:  Correct.

27      DEPUTY COMMISSIONER FILANGERI:  Okay

23

21

1  let's go to the psychological evaluation.  My

2  file indicates that there was a new

3  psychological evaluation ordered 1/20/06 which I

4  would guess is the reason why I'm having to use

5  the last one from 2002.  I realize it's old but

6  it's not particularly negative so I wouldn't be

7  surprised if we did have a new one it wouldn't

8  be similar.  And you should also know that the

9  board has a new directive that if your not

10 involved in the -- if your not Triple CMS or EOP

11 then we are not going to be asking for updated

12 psych reports.

13         **INMATE NGO:**  No I'm not.

14         **DEPUTY COMMISSIONER FILANGERI:**  So this

15 one is dated 1/31/02 and it's signed by, no it's

16 not signed by C. Saindon S-A-I-N-D-O-N PHD,

17 staff psychologist although he appears to be the

18 writer.  It is signed by Bill Zika Z-I-K-A PHD

19 Senior Supervising Staff Psychologist.  Under

20 clinical assessment on page four, current

21 diagnostic impressions on axis I no contributory

22 clinical disorder, axis II deferred, global

23 assessment of functioning score is 90.  The

24 examiner writes that there's no evidence that

25 inmate Ngo currently suffers from any

26 psychiatric illness.  Under review of the life

27 crime the inmate stated that he agreed with the

24

22

1  version of the crime given in the Central File

2  and the verdict from sentencing, however he

3  stated that no one intended to kill the victim.

4  Under assessment of dangerousness item 14 the

5  examiner writes that cocaine use and gang

6  affiliation resulted in the current offense.

7  Under item C, the most significant risk factors

8  of this inmate as a precursor to violence or

9  return to criminal behavior would be his re-

10 involvement with others having a criminal

11 history and or gang members.  If use of alcohol

12 and or drugs in isolation from his family

13 members.  Clinical observations, the inmate is

14 competent and responsible for his behavior.

15 Inmate does not have a mental disorder which

16 would resuscitate treatment either during his

17 incarceration period or following parole.  In

18 back of the short file there is several items

19 I'd like to make note of.  Oh yeah, here's the

20 tape test score, that was back in 1997 for 12.9

21 and there's a list of disciplinaries, there are

22 no 115's, two 128's minor in 1997 and 2000 for

23 failure to respond to a medical duckett, and a

24 covered window respectively.  Here is the

25 certificate to anger management that I already

26 said, talked about.  And there's a series of

27 chronos, one 11/06 for NA attendance, 12/8/05

25

23

1   completion of the Phobic Anger Management Class,

2   10/28/05 a laudatory chrono signed by

3   Correctional Supervising Cook W. Rogers R-O-G-E-

4   R-S, says he finds you to be a reliable worker

5   who needs little or no supervision working in

6   the culinary warehouse store keeper.  Says that

7   you are responsible for many tasks that require

8   attention to detail and accuracy and the writer

9   believes you would be an asset to any employer

10  upon release given your range of skills

11  including certification for the operation of

12  forklifts and power jacks.  6/13/05 is a chrono

13  for NA, 3/12/05 Narcotics Anonymous, 1/5/05

14  Correctional Supervising Cook W. Rogers writes

15  again that your , commending your outstanding

16  performance of your assignment, your still in

17  the culinary warehouse store keeper and Rogers

18  believes you can be relied upon to take the

19  initiative to ensure the varies duties your

20  responsible for are completed and you would be

21  an asset to any employer upon release given your

22  range of skills.  10/22/04 Narcotics Anonymous,

23  9/27/04 NA.  Is there anything else that you

24  want to call the panel's attention to regarding

25  behavior during the last, since August of 2004?

26          **INMATE NGO:**  That should be it for my

27  incarceration for what I been doing but as you

26

24

1  can I see I have a lot of support letter's here.

2      DEPUTY COMMISSIONER FILANGERI:  That's in

3  another segment of the hearing.

4      INMATE NGO:  All right.

5      DEPUTY COMMISSIONER FILANGERI:  Right now

6  I am just focusing on your behavior in the

7  institution and I don't mean to cut you off.

8      INMATE NGO:  Oh no problem.

9      DEPUTY COMMISSIONER FILANGERI:  If there

10  is something else that you have done that you

11  want to call our attention to now would be the

12  time.

13      INMATE NGO:  No that would be all.

14      DEPUTY COMMISSIONER FILANGERI:  Okay.

15      INMATE NGO:  Thank you.

16      DEPUTY COMMISSIONER FILANGERI:  Thank

17  you.

18      PRESIDING COMMISSIONER BRYSON:  All

19  right, we'll talk about your parole plans and

20  support which I have to say is extensive and  --

21      DEPUTY COMMISSIONER FILANGERI:  I'm

22  sorry, I forgot to mention the certificate that

23  Mr. Ngo handed us that 2005 certificate of

24  appreciation for your generous donation to the

25  5th Annual Correctional Training Facilities

26  Teddy Bear Drive.  I'm sorry.

27      PRESIDING COMMISSIONER BRYSON:  Thank

27

25

1  you.  It's very well thought out and well
2  organized, that's very helpful to the board.
3          INMATE NGO:  Thank you.
4          PRESIDING COMMISSIONER BRYSON:  Let's go
5  to your parole plans and I'd like to read these,
6  these seem very current, I assume they are.
7          INMATE NGO:  Yes they are.
8          PRESIDING COMMISSIONER BRYSON:  We will
9  go with this first.  You've organized it in a
10 liable way.  First you have articulated what you
11 plan to do in the first year of adjustment and
12 then for the next two to five years.  So for the
13 first one to twelve months you have written that
14 you will first report to work at "First China
15 Kitchen" or "Hot Wok" which will meet your
16 immediate needs.  So you would be working as a
17 cook there?
18         INMATE NGO:  Waiter, cashier, it don't
19 matter.
20         PRESIDING COMMISSIONER BRYSON:  Okay
21 second you would continue working toward
22 completing your Associates Arts Degree in
23 Liberal Arts at Coast Line Community College.
24         INMATE NGO:  Correct.
25         PRESIDING COMMISSIONER BRYSON:  Third you
26 would reinforce your relationship with your
27 family members, academically and technically.

25

26

1   Fifth or fourth you would continue to attend and

2   participate in the local Narcotics Anonymous

3   Meetings and then you would also purchase an

4   automobile for transportation.  All right now,

5   this stuff tails into where you would plan to

6   reside during this time which would be with your

7   mother, Phuong Hung Ngo at Monterey Park.  Is

8   there anyone else living at home right now with

9   her?

10          INMATE NGO:  My little brother, he's

11  taking care of her.

12          PRESIDING COMMISSIONER BRYSON:  And how

13  is he doing, what's he do?

14          INMATE NGO:  He works at Kaiser

15  Permanente.

16          PRESIDING COMMISSIONER BRYSON:  Oh he

17  does.

18          INMATE NGO:  So, he's taking care of her.

19          PRESIDING COMMISSIONER BRYSON:  And does

20  he have a record of any sort?

21          INMATE NGO:  No, I am the only one.

22          PRESIDING COMMISSIONER BRYSON:  Okay well

23  that's good actually.  All right and then -- let

24  me go ahead now at this point and divert again

25  to this place of residence, places of residence

26  that you allude to.  You have an alternative

27  residency that you've planned in the event

27

1  something unforeseen occurs.  I've made

2  arrangements to obtain housing, transportation,

3  food, clothing at the following addresses.  Now

4  are these all relatives?

5          INMATE NGO:  Yes.

6          PRESIDING COMMISSIONER BRYSON:  All

7  right, and he lists Lisa and Raymond Lau L-A-U

8  in Alhambra, is that Chi Fong Ngo?

9          INMATE NGO:  Chi Fong Ngo.

10          PRESIDING COMMISSIONER BRYSON:  Chi Fong

11  Ngo thank you, that's in Monterey.  And Julie

12  and Raymond Seeto S-E-E-T-O in Placentia

13  California.

14          INMATE NGO:  Right.

15          PRESIDING COMMISSIONER BRYSON:  That's

16  good so you'll have alternatives and I believe

17  I've seen support letters in here that we will

18  be going over from these people.  Okay, so that

19  would be -- upon my release I will be working at

20  the following places of business, so here you

21  are giving options?

22          INMATE NGO:  Correct.

23          PRESIDING COMMISSIONER BRYSON:  All

24  right, now you're listing these, you realize

25  does not constitute verification in our minds

26  because this is your out reach.  Have you, how

27  have you contacted these establishments, have

20

28

1   you had personal contact with them or --

2          INMATE NGO:  Yes I have personal contact

3   with them because my uncle owns these, the First

4   China Kitchen and Hot Wok.

5          PRESIDING COMMISSIONER BRYSON:  I see.

6          INMATE NGO:  And he just started a new

7   business called Empire Lighting, one in New

8   Orleans Heights and one in Riverside.

9          PRESIDING COMMISSIONER BRYSON:  And what

10  is Empire Lighting, what is it like?

11         INMATE NGO:  From my understanding it's

12  just selling lamps and stuff.

13         PRESIDING COMMISSIONER BRYSON:  Lamps and

14  things?

15         INMATE NGO:  Kitchen furniture and what

16  not, accessories.

17         ATTORNEY RUTLEDGE:  He has a letter in

18  there to.

19         INMATE NGO:  Yeah.

20         PRESIDING COMMISSIONER BRYSON:  All

21  right, okay good.

22         INMATE NGO:  Updated business card along

23  with it.

24         PRESIDING COMMISSIONER BRYSON:  Okay.

25         INMATE NGO:  So and AC Financial which is

26  my brother in law where my sister Julie, Raymond

27  Seeto they own that company.

29

1           PRESIDING COMMISSIONER BRYSON:  I see,

2    and what would you do for them do you think?

3           INMATE NGO:  Well probably clerical

4    duties to begin.

5           PRESIDING COMMISSIONER BRYSON:

6    Initially.

7           INMATE NGO:  To start out.

8           PRESIDING COMMISSIONER BRYSON:  Okay, all

9    right.  Then you have a projected plan for the

10   next two to five years.  First you would

11   continue to establish yourself as a law bidding

12   citizen with respect and integrity.  Two become

13   a concerned community member about negative

14   influences that our youth face today.  Three

15   help to change my community into a safe and

16   wholesome environment.  How would you do that?

17          INMATE NGO:  Well just by teaching kids

18   just you know, talking to kids and cause I'm

19   trying to organize, not try but like organize

20   station called I-Inga right which is based on

21   community for the kids.  It's supported by NFL,

22   stores like that and it's well known so I would

23   like to keep in contact with them out there so

24   you know I can educate the kids about what

25   violence gang can impact on family and anyone in

26   the community that sorts.

27          PRESIDING COMMISSIONER BRYSON:

32

30

.1  Outstanding, okay.  Continue working and open a

2  savings account and finally use money saved to

3  start my own business.  You also have made,

4  presented a statement here as to your overall

5  plan.  Either I can read that now or you're

6  welcome to read this as part of your closing

7  statement.  Would you like to read it then?

8        INMATE NGO:  Oh no, I have a closing

9  statement.

10       PRESIDING COMMISSIONER BRYSON:  All

11  right, would you like to read this here?

12       INMATE NGO:  What?

13       PRESIDING COMMISSIONER BRYSON:  This is

14  your overall plan, this is immediately following

15  the place of residences.

16       INMATE NGO:  My overall plan is to spend

17  my time working to earn a living wage, assist my

18  mom with maintaining the household in a loving

19  good atmosphere and to work closely with my

20  assigned parole officer to ensure that my

21  understanding of all conditions of parole is

22  complete and in compliance.  The evidence that I

23  asked to present above strongly show great

24  institutional program efforts.  More over I have

25  made every attempt to comply with BPT to demand

26  more therapy as shown in psychological

27  consideration portion of this Memorandum.  The

33

31

1    California Department of Corrections have made

2    final determination that I do not qualify for

3    nor do I require continued therapy where public

4    safety issue are concerned.  I've made every

5    effort to change from the immature 19 year old I

6    was at the time of the commitment offense into

7    the mature, responsible and well reasoned 32

8    year old adult I am today.  I submit to this

9    panel that my institutional programming is

10   sufficient to warrant a finding of suitability

11   at this time.  In addition, I am willing to

12   volunteer submit to a continuous electronic

13   monitoring in accordance with Penal Code 9000

14   and I am willing to have my wages garnished for

15   the purpose of paying for the cost of my parole

16   during the parole period.  For the all the

17   reasons stated above I urge this panel of the

18   Board of Prison Terms to make a unanimous

19   finding that I am no longer would pose an

20   unreasonable risk of danger to the public if

21   paroled at this time.  Find me suitable for

22   parole and set a release date in accordance with

23   applicable regulation regarding the length of

24   time I may have yet to serve.

25        **PRESIDING COMMISSIONER BRYSON:**  Thank

26   you.

27        **INMATE NGO:**  Thank you for your time and

34

32

1  consideration.

2      PRESIDING COMMISSIONER BRYSON:  All

3  right, let's go to your support letters.

4      INMATE NGO:  Okay.

5      PRESIDING COMMISSIONER BRYSON:  And I

6  believe this even more updated than our board

7  packet so I'll just operate off of this

8  document.  Counsel do you concur?

9      ATTORNEY RUTLEDGE:  Yes.

10     PRESIDING COMMISSIONER BRYSON:  All right

11 and I'm just going to elude to them, frankly

12 there's quite a few as you know and so we

13 actually, I have read most all of them.  I

14 believe the other Commissioner has also and we

15 will be going through them in our deliberations

16 extensively but you have a letter of support

17 from Empire Lighting from Calvin Ung U-N-G Ung

18 and is this your uncle?

19     INMATE NGO:  My uncle.

20     PRESIDING COMMISSIONER BRYSON:  Okay, and

21 this is dated June 21st, 2005.

22     INMATE NGO:  Correct.

23     PRESIDING COMMISSIONER BRYSON:  And he is

24 totally supportive of your release.  He says

25 that I am the Chinese Restaurant and lighting

26 retail business, he mentions both of those.

27 Between these two businesses I have about 25

*25*

33

1  employees.  At any time I am always will to

2  offer a job position that is suitable for Sieu.

3  All right, he also references other, your

4  siblings, you mom, your other uncles, aunts and

5  cousins who in aggregate provide support and

6  care for you.  Then we have a letter, one

7  moment, from Donald G. Rubright R-U-B-R-I-G-H-T

8  the Senior Deputy Public Defender of Orange

9  County, this letter is dated June 23rd, 2005.  I

10 represented Mr. Ngo in the case that sent him to

11 prison.  I've been a criminal defense lawyer for

12 almost 30 years and I represented over 40

13 persons accused of homicide.  I do not see my

14 clients through rose colored glasses however the

15 circumstances of Sieu's case are unusual enough

16 that I feel compelled to make a statement on his

17 behalf.  I am going to read this in it's

18 entirety because I think it's worth reading.  At

19 the time I represented him, Sieu was a very

20 likeable young man with a minor criminal record.

21 To my recollection he had no convictions for any

22 crimes of violence.  The incident in question

23 was very different from the typical "gangs case"

24 and the facts are worth sketching for your

25 review.  Sieu and his friends were a want to be

26 type gang who really did not have a significant

27 history or established turf in Orange County.

36

34

1  On the day of the incident, some of Sieu's

2  friends by chance went to the McDonalds which

3  was near Fullerton High School in Northern

4  Orange County.  Sieu was not present at the

5  time.  One of Sieu's friends got in a staring

6  match with the decedent and some of his friends

7  who were members of "Toker Town" T-O-K-E-R a

8  long established Hispanic gang in Fullerton.

9  Essentially the Toker Town group told Sieu's

10  friends that they were not welcome in Fullerton

11  where some of them already lived and they should

12  get out of town.  Angered by this Sieu's friends

13  decided to confront the decedents group after

14  school got out that day.  Sieu was called to

15  help out in case they should be out numbered.

16  There group waited after school and confronted

17  the decedent and one of his friends about two

18  blocks south of Fullerton High School, not on

19  school grounds.  From all appearances this was

20  intended to be a fist fight.  Sieu and the

21  friends that had been in the stare down

22  approached the decedent and another young who

23  were walking on the sidewalk.  A fist fight is

24  how it started, however the decedent's friend

25  fled just after the punching began and that left

26  Sieu and his friend fighting the decedent who

27  was significantly larger than either of them.

37

35

1  Of course this wasn't fair but nothing at this

2  point suggested that this was intended to be a

3  homicide.  While the fist fight was ongoing a

4  third member of the group Sieu was part of ran

5  forward to the scene.  While the fight was still

6  in progress he reached around Sieu and shot the

7  decedent killing him and narrowly missing Sieu.

8  Sieu and his group then fled ultimately being

9  arrested out of state.  Evidence was received to

10  show that Sieu and his friends knew that a gun

11  was in the car.  However there was no evidence

12  to show that there was a plan to use it.  Based

13  upon the theory of foreseeable consequences,

14  Sieu and several co-defendants were convicted or

15  plead guilty to the murder.  The following is

16  underlined, Sieu was not the shooter and no

17  evidence suggested to show that he suggested,

18  encouraged or aided or abetted the shooting in

19  any way.  After the shooting Sieu angrily

20  confronted the shooter demanding to know why he

21  brought out the gun and asserting that he, Sieu,

22  didn't know the gun was going to be used.  In

23  summary this was not a drive by or similar gang

24  crime where everyone knew that legitimately

25  should have know that death or serious bodily

26  injury was intended.  On the contrary this

27  appeared to be an impulsive act by one member of

36

1   the group which due to the rest of the

2   circumstances swept all of them away by

3   derivative liability.  I'm not suggesting that

4   Sieu and the other non shooters bear no

5   responsibility for the tragic outcome but for

6   the fight of course no shooting would have taken

7   place.  However I would submit that the

8   circumstances here are significantly mitigated

9   when considered against other convictions of

10  this type.  Assuming that Sieu's performance

11  within the Department of Corrections has been

12  positive I would urge his parole at the earliest

13  possible time.  Then we have a letter from Chi

14  Phong Ngo of June 30th, 2005, that's C-H-I P-H-

15  O-N-G N-G-O and from your brother.  According to

16  the productive things you've done in prison and

17  there willing to help by providing housing,

18  financial aid, job hunt and any other assistance

19  he may need to promote a better life.  Now we

20  have next a letter of July 14th, 2005 from okay,

21  Thanh?

22          **INMATE NGO:**  Thanh.

23          **PRESIDING COMMISSIONER BRYSON:**  Thanh.

24          **INMATE NGO:**  My sister.

25          **PRESIDING COMMISSIONER BRYSON:**  That's T-

26  H-A-N-H T N-G-O yes she's your older sister,

27  Sieu was the most down to earth, caring and kind

39

37

1  person.  And then she also is offering support,

2  our families have arranged for his support once

3  released.  My husband's store number, she gives

4  that number, in Anaheim, her husband is Raymond.

5        INMATE NGO:  Right.

6        PRESIDING COMMISSIONER BRYSON:  Raymond's

7  mom and dad have offered him work if he wishes

8  to work there.  Housing would not be a problem.

9  The housing indicated would be located in

10  Placentia and you also had indicated that.  Then

11  we have a letter dated June 30th, 2005 from is

12  that Duck Phan Ngo?

13        INMATE NGO:  Duck Phan Ngo.

14        PRESIDING COMMISSIONER BRYSON:  Duck Phan

15  Ngo, a brother who gives you general support.

16  Says I work for Kaiser Permanente as a help desk

17  technician.  I am willing to provide Sieu with

18  any support, financial or emotional in his

19  transition into society as an obedient citizen.

20  Then July 19th, 2005 from Connie Hua.

21        INMATE NGO:  Hua.

22        PRESIDING COMMISSIONER BRYSON:  All

23  right, H-U-A and she's your cousin and has known

24  you since childhood.  She reviews your

25  accomplishments, doing all that he can to

26  improve his life, full support, I can offer

27  financial help, advice and encouragement and she

40

38

1    offers her family as well.  My father can offer

2    him a job at his restaurant.  Is that one of the

3    restaurants that you referenced?

4           INMATE NGO:  Yes, a few of my uncles own

5    restaurants so I can work at any one of them.

6           PRESIDING COMMISSIONER BRYSON:  I see,

7    all right.  Then we have a letter of March 22nd,

8    2004 from Calvin Ung?

9           INMATE NGO:  Correct, my uncle again.

10          PRESIDING COMMISSIONER BRYSON:  Okay and

11   then we have a letter of May 22nd, 2004 from

12   Phang Hung Ngo?

13          INMATE NGO:  My mom.

14          PRESIDING COMMISSIONER BRYSON:  Okay.

15          ATTORNEY RUTLEDGE:  These are the letters

16   you brought for your last hearing?

17          PRESIDING COMMISSIONER BRYSON:  These go

18   back to the last letters.

19          INMATE NGO:  These were my last letters.

20          PRESIDING COMMISSIONER BRYSON:  We will

21   take note of that, there are quite a few of

22   them, probably a dozen of them I would say

23   attached.  Okay and then earlier letters beyond

24   that.  All right this is a very extensive

25   comprehensive support file.  All right do you

26   have anything further then because I think this

27   is quite comprehensive at this point.

A1

39

1          INMATE NGO:  No, that should cover it.

2          PRESIDING COMMISSIONER BRYSON:  We will

3   be reviewing this even further.  We have sent

4   out 3042 notices, those notices go to agencies

5   having a direct interest in your case.  We have

6   a representative from the Orange County District

7   Attorney's Office present who will have the

8   opportunity to make a statement regarding parole

9   suitability prior to the conclusion of this

10  hearing.  First Commissioner do you have any

11  questions for the inmate at this time?

12         DEPUTY COMMISSIONER FILANGERI:  No thank

13  you.

14         PRESIDING COMMISSIONER BRYSON:  All

15  right, Mr. Crofoot do you have any questions of

16  the inmate?

17         DEPUTY DISTRICT ATTORNEY CROFOOT:  Thank

18  you, I have -- the reports indicate that the

19  inmate has multiple tattoos, I see specifically

20  referenced a tiger on the chest.  Is that tiger,

21  does that have significance with the membership

22  into the Tiger Mafia?

23         INMATE NGO:  No Sir.

24         DEPUTY DISTRICT ATTORNEY CROFOOT:  What

25  is the significance of the tiger.

26         INMATE NGO:  The tiger was just for, it

27  was for Fullerton Boyz you know we all had the

40

1   same tiger but all different, all five of us.

2   It's not for Tiger Mafia or nothing.

3       **DEPUTY DISTRICT ATTORNEY CROFOOT:** Okay

4   and the Fullerton Boyz is a gang as well is that

5   correct?

6       **INMATE NGO:** It's more like a want to be,

7   there are only five of us, we just friends.

8   Nothing more can say to change it.

9       **DEPUTY DISTRICT ATTORNEY CROFOOT:** The

10  probation report indicates a tattoo Wong Lee

11  under the left arm, what is the significance of

12  that tattoo?

13      **INMATE NGO:** That is my ex-girlfriend's

14  name that's all.

15      **DEPUTY DISTRICT ATTORNEY CROFOOT:** And

16  does the inmate have any other tattoos other

17  than those two?

18      **INMATE NGO:** That one no.

19      **DEPUTY DISTRICT ATTORNEY CROFOOT:** No.

20      **INMATE NGO:** That's all I have.

21      **PRESIDING COMMISSIONER BRYSON:** You don't

22  have any other tattoos is that correct?

23      **INMATE NGO:** Correct.

24      **PRESIDING COMMISSIONER BRYSON:** All

25  right.

26      **DEPUTY DISTRICT ATTORNEY CROFOOT:** Was

27  the inmate attending college at the time of this

43

41

1   crime?

2       **INMATE NGO:**  Yes I was, I was attending

3   at Pasadena City College.

4       **DEPUTY DISTRICT ATTORNEY CROFOOT:**  And

5   was this --

6       **DEPUTY COMMISSIONER FILANGERI:**  This is

7   side two of the tape recording of the hearing

8   transcript for Mr. Sieu Ngo, last name spelled

9   N-G-O J-07024.  Sorry for the interruption.

10      **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Thank

11  you.  The car that was used on the day of the

12  crime, was that the inmate's car?

13      **INMATE NGO:**  No it wasn't.

14      **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Whose

15  car was that?

16      **INMATE NGO:**  I think it belonged to Jimmy

17  Dao.

18      **DEPUTY DISTRICT ATTORNEY CROFOOT:**  And

19  that car was later burned is that correct?

20      **INMATE NGO:**  Correct Sir.

21      **DEPUTY DISTRICT ATTORNEY CROFOOT:**  All

22  right and what were the circumstances of burning

23  that car?

24      **INMATE NGO:**  My friend wanted to get rid

25  of it so when we were leaving the state of

26  California we didn't want to be followed so they

27  decided to burn it.

44

42

1        **PRESIDING COMMISSIONER BRYSON:**  Where did

2   you do that?

3        **INMATE NGO:**  At that point I wasn't even

4   there but I knew what they did when they told me

5   but it was in somewhere, I think it was, I'm not

6   sure but I think it was near some beach or

7   something.  I don't know exactly where though

8   because I wasn't there.

9        **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Where

10  did the murder weapon come from?

11       **INMATE NGO:**  Now I know that Asat Chan

12  who live in Washington I think he stole a gun

13  and brought it to California.  That's the only

14  thing I know.

15       **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Was

16  that person involved in this crime?

17       **INMATE NGO:**  Yes he was.

18       **DEPUTY DISTRICT ATTORNEY CROFOOT:**  And

19  did he return to Washington with you?

20       **INMATE NGO:**  Yes he was -- when we were

21  arrested he was arrested with me and Jimmy Dao

22  at that time.

23       **DEPUTY DISTRICT ATTORNEY CROFOOT:**  And

24  when you were arrested you still had the murder

25  weapon is that correct?

26       **INMATE NGO:**  Correct.

27       **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Thank

45

43

1   you I have no further questions.

2           **PRESIDING COMMISSIONER BRYSON:**  All

3   right, Counselor do you have questions for the

4   inmate?

5           **ATTORNEY RUTLEDGE:**  Yeah I do.  Clearly

6   you've been busy since you've been here.

7           **INMATE NGO:**  Yes I have.

8           **ATTORNEY RUTLEDGE:**  And when you were

9   going to college, you were going to college when

10  this happened and you were?

11          **INMATE NGO:**  Just visiting them.

12          **ATTORNEY RUTLEDGE:**  Okay that's what I

13  was getting at.  So what was your social life

14  after -- did you move to Pasadena at that time

15  or were you just going to college there?

16          **INMATE NGO:**  I moved down there you know

17  back to LA because I want to straighten out my

18  life you know, get away from so called gang but

19  I was trying to straighten out, I had a steady

20  girlfriend, I was going back to college trying

21  to straighten out my life.  I hadn't seen my co-

22  defendant in a little over a year when, before

23  this happened you know so that -- they called me

24  up one day you know to come visit them and one

25  thing led to another, this is what happened.

26          **ATTORNEY RUTLEDGE:**  And what do you think

27  -- were you able to ever apologize to the

*40*

44

1  victim's mother or family?

2        INMATE NGO:  At the time I tried to

3  during court but I guess she didn't want to hear

4  it so she walked out on me.  I made an attempt

5  but I wasn't successful at that though because

6  she left the court.

7        ATTORNEY RUTLEDGE:  All right, and how do

8  you think the loss of this young man affected

9  his mother and he had other siblings, how did

10  that affect them?

11        INMATE NGO:  There is really no word can

12  express how truly and deeply sorry I am for the

13  victim's family because the pain and suffering a

14  mother goes through is incomprehensible because

15  it just affect the family and it just everyone

16  that's involved in this crime.  I know this

17  because you know I lost loved one myself so I

18  know, I can emphasize what the family is going

19  through, friends, I mean just everyone, the

20  community that knows Angel Gonzales you know but

21  at this time I can't change what happened you

22  know.  I wish I could make the pain go away but

23  I can't, I'm only human.  But I am truly, truly

24  sorry for what happened to Angel.  It was never

25  my intention to take his life.  It thought it

26  was going to be a fist fight and at a young age

27  I never in my wildest dream think something like

47

45

1    this was going to happen.  So I take full

2    responsibility for my action, there's no doubt.

3    I deserve to be punished you know, I'm willing

4    to do my time for this so all I can say at this

5    time is I am truly, truly sorry for what I have

6    done to the Gonzales family.  I know what each

7    and every day it's like for them without there

8    son so that's all I have to say.

9         ATTORNEY RUTLEDGE:  Have you been in any

10   fights since you've been in the institution?

11        INMATE NGO:  No I haven't.  I been

12   disciplinary free.

13        ATTORNEY RUTLEDGE:  All right, how do you

14   stay -- have you managed to stay away and I

15   wanted to ask you to have you been involved with

16   any gangs in the prison?

17        INMATE NGO:  No I haven't.

18        ATTORNEY RUTLEDGE:  How have you managed

19   to keep yourself from the gangs and not involve

20   yourself in any violence?

21        INMATE NGO:  Knowing what I know today

22   about what impact a gang can have on people.  I

23   have grown so I know to change my behavior for

24   the better.

25        ATTORNEY RUTLEDGE:  You mentioned, did

26   you recently loose a co-worker here at the

27   prison?

*48*

46

1       INMATE NGO:  Yes I have.

2       ATTORNEY RUTLEDGE:  And how did that

3    impact your life?

4       INMATE NGO:  Realize life is short you

5    know and anything can happen.  I mean he was a

6    good man, older individual.  His name was

7    Nicholas you know.  The last thing I said to him

8    when you know I see you out in the yard.  I gave

9    him a hug but when I came back from visit that's

10   the first thing I heard was that he passed away

11   and I just couldn't believe it you know like

12   something like this happens so short you know.

13   Life is so unpredictable.

14       ATTORNEY RUTLEDGE:  No further questions

15   for Mr. Ngo.

16       PRESIDING COMMISSIONER BRYSON:  I have a

17   couple of questions.  We didn't really discuss

18   and I would like to know what your history has

19   been -- have you trafficked drugs?

20       INMATE NGO:  No I haven't Ma'am.

21       PRESIDING COMMISSIONER BRYSON:  And how

22   was it that you were associated with cocaine at

23   one point in your life?

24       INMATE NGO:  Well at that point you know

25   I tried it, a friend introduced me to it so I

26   tried it and I bought three piece of rock

27   cocaine as I was going home I was pulled over by

49

47

1    the police, got arrested.

2          **PRESIDING COMMISSIONER BRYSON:**  And

3    that's your whole history with cocaine?

4          **INMATE NGO:**  Yeah, pretty much.

5          **PRESIDING COMMISSIONER BRYSON:**  Okay, how

6    about alcohol?

7          **INMATE NGO:**  I don't drink alcohol, I'm

8    allergic to alcohol.

9          **PRESIDING COMMISSIONER BRYSON:**  Okay.

10         **INMATE NGO:**  I break out in hives.  Tried

11   it though but that's how I knew I was allergic

12   to it.

13         **PRESIDING COMMISSIONER BRYSON:**  Okay well

14   that answers those questions.  Thank you.  All

15   right, I'd like to invite the District Attorney

16   Mr. Crofoot to make a closing statement at this

17   time.

18         **DEPUTY DISTRICT ATTORNEY CROFOOT:**  Thank

19   you.  At the time of this offense he was on

20   diversion for possession for that rock cocaine.

21   He was a gang member, Don Rubright stated in his

22   letter that this gang had not established a

23   territory.  The fact is Asian gangs generally

24   are not territorial as opposed to Spanish gangs

25   which are.  So that is meaningless, there in a

26   gang he was in the Tiger Mafia previously to

27   Fullerton Boyz.  Apparently in the gang

50

48

1  significantly in that he chose to have his chest

2  tattooed with a tiger relating to that gang

3  affiliation.  One of the correctional counselors

4  indicated that he was immature at the time of

5  the crime and easily influenced by peers.

6  Actually he was 19 years old at that time, he

7  was out of high school, he was in his first year

8  of college and in his story had moved away from

9  the gang influence.  However at the request of

10  the other gang members he did return to

11  Fullerton, he entered into a, there was an

12  argument at McDonalds between the Asian gang

13  members and the Fullerton Toker's Gang, a

14  Mexican gang.  That was a verbal confrontation.

15  They left, they the defendant, the inmate and

16  his cohorts left and went to another location

17  where they obtained a gun, returned to the

18  location where the 15 year old victim was

19  attending school and there they waited for the

20  victim, lay and wait for him and when the victim

21  came out the three of them attacked that victim

22  and ultimately the victim was shot in the back.

23  They fled to Washington, saw fit to destroy the

24  vehicle, burn the vehicle which might have

25  identified them.  However they also chose to

26  hang onto that 22 handgun which was the murder

27  weapon and they possessed that at the time they

49

1   were arrested.  This inmate denied knowledge of
2   the gun until it was in the vehicle, until it
3   was in the vehicle is the key because this is
4   pre-shooting.  He knew of the gun prior to going
5   to lay and wait for the 15 year old victim.  He
6   indicates that they didn't intend to kill the
7   victim, they only intended to beat him up.  So
8   they chose to bring a handgun to a fist fight.
9   The inmate indicates that they had the gun for
10  protection if someone else had a gun.  If
11  someone else chose, if they thought that someone
12  else had a gun and they bring a gun, it's
13  inevitable that there is going to be a shooting.
14  If he wanted to stay out of this he had plenty
15  of opportunity to walk away when all they had
16  previous to that was a verbal altercation.  The
17  reason for the shooting was inexplicable, it was
18  a minor affront during this argument, I'm sorry,
19  the victim said get out of town and that's the
20  basis for this killing.  In 1990, two years
21  prior to this, there was a similar cowardly
22  attack by this inmate and others.  There were --
23        ATTORNEY RUTLEDGE:  I would object to
24  that, do we have a police report for that?
25        DEPUTY DISTRICT ATTORNEY CROFOOT:  It's
26  in the probation report.
27        ATTORNEY RUTLEDGE:  But they couldn't --

52

50

1   my understanding is that they couldn't confirm

2   it, they couldn't reach the victim.

3       **DEPUTY DISTRICT ATTORNEY CROFOOT:**  The

4   police report is right there, it's on page ten

5   of the probation report.

6       **ATTORNEY RUTLEDGE:**  I would object to it

7   unless they can produce, it's like triple hear

8   say of actual police report.

9       **PRESIDING COMMISSIONER BRYSON:**  Okay,

10  that's over ruled, I won't be looking at all

11  that information.

12      **DEPUTY DISTRICT ATTORNEY CROFOOT:**  It was

13  a similar attack, the victim was confronted by

14  three, this inmate and two others.  He was

15  struck and this inmate was the second person to

16  strike that victim when the victim went down he

17  was kicked and punched by the three of them.  So

18  this is not, this one shooting is a culmination

19  of what was going to happen and what was going

20  to happen eventually and it did and it happened

21  in 1992.  The inmate is programming but he was

22  programming at the time that he got involved in

23  this gang activity.  He was attending college at

24  that time, he had moved from the area at that

25  time, it appeared that he was moving ahead as it

26  appears here that he's moving ahead.  But he

27  chose to go back and get involved in this gang



51

1   activity again and that's why he's here.  And I

2   think that he has served his MAPD was less than

3   two years ago, one and a half years ago.  I

4   think that he is – I'm sorry two and a half

5   years ago.  And I don't think that he has served

6   enough time and I would ask that the board not

7   grant him a date at this time.  Thank you.

8        **PRESIDING COMMISSIONER BRYSON:**  Thank

9   you.  All right counsel I would like to invite

10  you to make a closing statement.

11       **ATTORNEY RUTLEDGE:**  Thank you.  Well I

12  think that the most important thing that I would

13  comment that the people shared with us was that

14  this happened in 1992.  I wouldn't consider Mr.

15  Ngo programming when he was on, he had a

16  diversion charge at that time.  I think again

17  that he had just been an adult for about one

18  year.  I think he's discussed openly with the

19  panel his -- and if you have any other questions

20  about what his motivation was to be involved

21  with these people or what they were involved in

22  feel free to ask him again but I think he has

23  pretty much answered that.  I commented to him

24  you know, it's a miracle that most teenagers

25  survive the teen years because there is such a

26  high possibility of them to get involved in

27  stupid things like this.  This was a very

54

52

1   unfortunate situation and you know a clear

2   picture of an ignorant teenager thinking let's

3   just go get in a fight not appreciating at the

4   time that any type of violence has a potential

5   for something serious.  I think he clearly sees

6   that now, in fact he noted to the board that he

7   would like to share that with other people at

8   risk and I think that is, we still have young

9   people that are out there at risk for thinking

10  that they are just going to be beating up people

11  and not truly appreciating and I think there's

12  evidence that at that age your -- everything is

13  not together that's why teenagers act like there

14  from another planet.  But I think there is a

15  truly different person here today at 32.  He's

16  been down for this time.  There hasn't been any

17  evidence of any drug use or gang affiliation.  I

18  believe that some of these co-defendants are

19  housed here at CTF.  Is that correct?

20          **INMATE NGO:**  Correct.

21          **ATTORNEY RUTLEDGE:**  And there has been no

22  further action.  I think this did -- which I

23  would say I would speculate that this was an

24  isolated incident for these boys.  I think, I

25  don't think that that behavior marked Mr. Ngo's

26  life long traits as a person.  I think it was

27  sort of an immature wrong.  I mean I am not

55

53

1  going to disagree with the people, it was

2  clearly wrong, clearly had the potential for

3  what happened.  And I think we have all been

4  teenagers, we know how these kids don't think

5  these things through and it's very serious and

6  it had a tremendous impact on the community and

7  on this family and I believe that Mr. Ngo also

8  is in touch with that.  That said the amount of

9  time that he's served, he has served 13 years.

10  Is it 13 or 14?

11        INMATE NGO:  About 13, almost 13.

12        ATTORNEY RUTLEDGE:  Almost 13 years and

13  he came into the system when he was quite a

14  young man so in his twenties.  We all can

15  remember the twenties.  That's a significant

16  time of your life.  It's almost like if you

17  loose your twenties you've lost half your

18  thirties and your forties because that is such a

19  prime time.  So I would like the panel to when

20  you think about the amount of time he's served

21  think about the time of his life when everyone's

22  going to college or discovering life.  He lost

23  that whole decade, I mean he gave it up, I

24  shouldn't say it was taken away from him, he

25  made that decision to get involved in that

26  behavior and gave it up but I do believe that's

27  stronger punishment had he been older it would

50

54

1  have been a little bit different.  He's lost, he

2  gave up the prime years of his life in exchange

3  for this act.  He had no juvenile record, his

4  stable social history is all there.  All the

5  letters written by his family and also all the

6  reports in the file indicate that he had good

7  family ties, his family had there own business,

8  they were highly productive members of society.

9  And as far as remorse goes I think his comments

10  speak for themselves and also what he has

11  included in his Memorandum, I would incorporate

12  that into the remorse.  And his psychological

13  reports also underlie his true feelings of

14  remorse for what he's done.  And the motivation

15  for the crime, I mean what can you say about

16  that.  I'm not sure -- there are rare

17  circumstances when there is any way that you can

18  explain away this type of situation.  Other than

19  the fact again that you've got a bunch of

20  immature teenagers and I would note that when we

21  talk about gangs its one thing if one of us says

22  get out of town but when a gang member says

23  that, its almost like a threat you know.  If

24  there affiliated with dangerous people and they

25  tell other people to get out of town that should

26  put them on notice that something could happen

27  if they don't get out of town.  Mr. Ngo had one

57

55

1   prior incident with his diversion which he up
2   until the commitment offense he was completing
3   that.  His maturity level I think is quite
4   significant.  I think its obvious he has spent
5   this time in prison because he's a little bit
6   more mature than we would expect at that age but
7   that's probably what prison does to people.  And
8   his understanding and plans for the future, that
9   goes without saying, he's submitted a Memorandum
10  that's covered every applicable suitability
11  factor as far as skills, he's got three vocs,
12  he's got -- he had been in college, he had
13  completed high school so he does have an
14  aptitude for academics.  He's got the highest
15  TAB score and he has jobs lined up, family
16  support and interesting in his file to is he has
17  been giving money to organizations that are
18  feeding children.  I don't know if you noted,
19  there was a letter thanking him for that so he
20  seems to have a community, a sense of community.
21  His institutional behavior is exceptional.
22  Nothing violent, no substance abuse, nothing
23  again to show that he has any motivation to
24  continue that, the path that he was on when he
25  entered the CDC.  There is no documentation that
26  he's ever disrespected inmates or staff, he has
27  marketable skills, he has many years of self

56

1    help, he's fully prepared really for life among

2    free society as a productive citizen. I think

3    he has covered every possible basis that is

4    necessary for his integration and his behavior

5    here indicates an enhanced ability to actually

6    function within the law. I mean he knows he is

7    the know what can happen when you aren't

8    following the norms of society. And while he

9    has been here he has lost his father and been

10   able to get more of an idea of the impact that

11   the death of Mr. Gonzales had on his family

12   which he expressed here today. All those things

13   considered I would ask the board to please give

14   him a parole date today. Thank you.

15            **PRESIDING COMMISSIONER BRYSON:** Thank

16   you. Sir I would like to give you an

17   opportunity to make a final statement to this

18   panel regarding your suitability for parole.

19            **INMATE NGO:** All right. I would like to

20   read, I wrote this. First and for most there is

21   no adequate amount of words in the universe

22   which can express the truly deeply sorry I am to

23   Gonzales family for all the pain and suffering I

24   caused them and everyone else who was affected

25   by Angels death. In hindsight I wish I could

26   have changed what happened on that tragic day

27   but the truth is I really did not know what was

59

57

1   about to happen that very instant that took
2   Angel's life.  At the time I honestly believe I
3   was getting into a fist fight and nothing more.
4   I did not take Angel's life, it was never my
5   intention that is such a tragic incident would
6   occur.  Again I was there for a fist fight,
7   nothing I say or do at this point will ever
8   change what happened on that tragic day.  All I
9   can do on my part is to accept full
10  responsibility for my action alone.  I hope and
11  pray that someday the Gonzales family will find
12  it in there hearts to forgive me for my actions.
13  We all have made mistakes at some point in our
14  lives, some more than others but as individual
15  how we choose to learn, grow and change our
16  behavior does set us apart from the one who
17  don't.  Today as I sit in front of you I am no
18  longer the young stupid naive 19 year old back
19  then but as a good decent 32 year old mature
20  adult who is intelligent enough to know the
21  difference between right and wrong.  Who is able
22  to think things through before reacting to any
23  situation and responsible for any actions that I
24  may take here on out.  I know in my heart and
25  soul that I am a good decent person who as a
26  young man made some very poor choices which I
27  am truly sorry for.  There is not a single day

58

1    that goes by that I don't think about what

2    happened to Angel and what his family is going

3    through.  Everyday I wake up in here, it's a

4    constant reminder of that tragic day.  I deserve

5    to be punished for my actions but I believe I

6    have served more than enough time for my

7    actions.  In closing I understand the difficulty

8    of you task as Commissioner in determining ones

9    suitability with regard to public safety.  All

10   that I ask of you is please don't judge me for

11   one of my unchanging aspect of my past conduct

12   to find who I am today.  But look at all that I

13   have accomplished during my incarceration.  With

14   absolute certainty I know I am a better person

15   today than I was when I committed this

16   unfortunate offense.  I know I will never come

17   back in prison and I know I can be a law,

18   productive law bidding citizen if you would only

19   give me a second chance.  Should you find me

20   suitable here today the rules that govern this

21   panel in setting my term of confinement are set

22   forth in California Code of Regulation title 15

23   division two section 2403, the conduct most

24   closely related to the crime I've committed is

25   category A section three.  Which has a minimum

26   term of 17 years medium term of 18 years and a

27   maximum term of 19 years.  I respectfully

59

1    request that this panel set my appropriate term
2    of 17, 18 or 19 years.  And please, please give
3    me a second chance.  I know I will be a law
4    bidding citizen.  I know I can make it out
5    there.  I won't be a statistic that comes back
6    in here.  I will never, never come back in to
7    prison.  I have a family that's waiting for me
8    out there.  So please grant me a date today.
9    Thank you for your time today.
10          **PRESIDING COMMISSIONER BRYSON:**  Thank you
11   for your remarks.  We will now recess for
12   deliberations the time is 11:11 A.M.
13                      **R E C E S S**
14                      --oOo--
15
16
17
18
19
20
21
22
23
24
25
26
27

60

```
1            CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3        DEPUTY COMMISSIONER FILANGERI:  Okay

4  we're back on record.

5        PRESIDING COMMISSIONER BRYSON:  All

6  right, the time is 11:58 A.M. in the matter of

7  Sieu Phong Ngo.

8        DEPUTY COMMISSIONER FILANGERI:  Did

9  somebody tell the DA?

10       PRESIDING COMMISSIONER BRYSON:  Oh my

11  apologies.  We'll start is all again.  Why don't

12  you please find the DA.

13       ATTORNEY RUTLEDGE:  He went home.

14       DEPUTY COMMISSIONER FILANGERI:  We're on

15  record.

16       PRESIDING COMMISSIONER BRYSON:  The time

17  is 11:59 in the matter of Sieu Phong Ngo.  Sir

18  the panel reviewed all information received from

19  the public and you and relied on the following

20  circumstances in concluding that you are not

21  suitable for and would pose an unreasonable risk

22  of danger to society or a threat to public

23  safety if released from prison.  The offense was

24  carried out in an especially cruel and callous

25  manner in that you attacked and beat a 15 year

26  old male, Angel Gonzales who was ultimately shot

27  SIEU NGO  J-07024  DECISION PAGE 1  2/8/06
```

V3

61

1   in the back and died at the scene.  The offense

2   was carried out in a dispassionate and

3   calculated manner in that it was a confrontation

4   between gang members preplanned by lying in wait

5   for the victim as he walked home.  The offense

6   was carried out in a manner demonstrating

7   exceptionally callous disregard for human

8   suffering, disregard for public safety in that

9   it occurred near a school and there was a clear

10  opportunity for you to cease but you continued.

11  Despite some prior record of involvement with

12  cocaine this panel recognizes and submits that

13  you have a relatively criminal free background

14  and you are to be commended for that.  And you

15  have a history of stable relationships including

16  your family support.  We do not have evidence

17  that you have a long history with established

18  gangs and so we do not point to that in terms or

19  your history of relationships.  And it will be

20  further discussed you have presented to us a

21  history of strong stable social support.  As to

22  your institutional behavior you have programmed

23  commendably, your education includes 41 units

24  towards you AA Degree and continuing involvement

25  with college enrollment including your current

26  independent study through Coast Line Community

27  **SIEU NGO  J-07024  DECISION PAGE 2  2/8/06**

62

1  College.  We also have read into the record a

2  very reputable list of vocational achievements

3  including automotive refinishing and upholstery,

4  forklift operator, salesmanship and other

5  vocational work.  You have participated in self

6  help and therapy, well self help consistently

7  ranging from Anger Management, the Teddy Bear

8  Drive, Feed the Children, Buddhist ordination

9  into Buddhist Studies, the Impact Program, Key

10  to Fatherhood, The Muslim Chapel, and you have

11  assisted in inmate education.  As to misconduct

12  you have zero 115's, you have two minor 128A's,

13  the last in 2000 for window covering.  As to

14  your psychological report, the report that is

15  dated January 23rd, 2002, the last we have by

16  Doctor Saindon S-A-I-N-D-O-N does in general

17  support release.  And I quote, this man has

18  spent ten years in prison and that is at the

19  time of this psychological report, I would

20  recommend should he be paroled abstinence from

21  all alcohol or use of any controlled substance,

22  frequent monitoring for substance abuse, he

23  should be relocated so that he is near his

24  family, he should make frequent reports to his

25  parole officer concerning his vocational

26  progress and goals.  And due to his families

27  **SIEU NGO   J-07024   DECISION PAGE 3   2/8/06**

63

1   commitment to supporting him upon his release,

2   his projected level of success in the community

3   if granted a date for parole is seen at this

4   time to be better than average.  You also have

5   made outstanding parole plans.  You have viable

6   residential plans in the last county of legal

7   residence and I refer to the record for the

8   documentation that we have received.  You also

9   have acceptable employment plans with

10  established businesses owned by your relatives

11  who are assuring you of jobs.  As to Penal Code

12  3042 responses, the responses indicate

13  opposition to a finding of parole suitability,

14  specifically by the District Attorney of Orange

15  County.  In a separate decision the hearing

16  panel finds it's not reasonable to expect that

17  parole would be granted at a hearing during the

18  following two years.  Specific reasons for this

19  finding are as follows.  The panel reviewed all

20  information received from the public and relied

21  on the following circumstances.  The offense was

22  carried out in a specially cruel and callous

23  manner in that you attacked and beat a 15 year

24  old Angel Gonzales who was ultimately shot in

25  the back and died at the scene.  The offense was

26  carried out in a dispassionate and calculated

27  **SIEU NGO   J-07024   DECISION PAGE 4   2/8/06**

64

1   manner, it was a confrontation between gang

2   members preplanned by lying in wait for the

3   victim as he walked home.  The offense was

4   carried out in a manner demonstrating

5   exceptionally callous disregard for human

6   suffering.  The offense risked public safety in

7   that it was conducted near a school and you had

8   a clear opportunity to cease but continued.

9   Moreover, the motive for this crime was very

10  trivial in relation to the offense.  It was gang

11  activity and you told this panel "I thought I

12  was going to a fist fight", that minimizes the

13  gravity of the crime, your involvement in it and

14  there fore your insight into the gravity of this

15  crime.  In denying you parole for two years this

16  panel will place the prisoner on the 2008

17  calendar for the next Subsequent Hearing.  If

18  this decision is final you will not get parole,

19  the board will send you a copy of the decision.

20  It will indicate the reasons you did not get

21  paroled.  If this decision is not final the

22  board will set up another hearing.  You can find

23  the laws of California Code of Regulations title

24  15 section 2041.  The board recommends get self

25  help, stay discipline free, get therapy, and

26  continue your educational and vocational

27  **SIEU NGO   J-07024   DECISION PAGE 5   2/8/06**

65

1    development plus your outreach to help others.

2    Commissioner do you have anything further?

3          **DEPUTY COMMISSIONER FILANGERI:**  Yeah, the

4    thing that bother's me the most is you know our

5    job is to determine whether your  release would

6    pose an unreasonable risk to public safety and

7    one of the tools that we look at, one of the

8    tools that I like to try to use in that is your

9    insight into the crime.  I think your contention

10   that you were going to a fist fight when you

11   somebody else was armed is hard to believe and

12   as Commissioner said it tends to minimize your

13   role.  I can see where you might be motivated to

14   minimize your role.  What it means to me is that

15   you haven't come to grips, you haven't developed

16   the insight that you need into the causative

17   factors of this crime and I think you should

18   look at that.  Moreover you told the

19   psychiatrist that no one intended to kill the

20   victim, well even if you weren't holding the gun

21   somebody came to a fist fight with a gun and

22   what was that person's intentions.  So it's hard

23   for me to get a gauge on what risk you would

24   pose to public safety when I can't feel

25   comfortable about the level of insight that

26   you've displayed.  And that's what prevents me

27   **SIEU NGO   J-07024   DECISION PAGE 6   2/8/06**

66

1  from granting you a date.  I wish you the best

2  of luck, you've been doing good work in the

3  institution, I hope you keep it up.  Thank you.

4          **PRESIDING COMMISSIONER BRYSON:**  Please

5  don't get discouraged, I hope you will take this

6  as a challenge and an opportunity.  And that

7  concludes this hearing and the time is 12:08

8  P.M.

9                  --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23  **PAROLE DENIED TWO YEARS**

24  **THIS DECISION WILL BE FINAL ON:** ___JUN  8 2006___

25  **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **SIEU NGO   J-07024   DECISION PAGE 7   2/8/06**

67

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, SUE GERDES, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 66, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF SIEU NGO

CDC NO. J-07024, ON FEBRUARY 8, 2006, and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated February 27, 2006 at Sacramento,

California.


SUE GERDES
TRANSCRIBER
PETERS SHORTHAND REPORTING

70

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

71

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )   CDC Number J-07024
Hearing of: )
 )
SIEU PHONG NGO        · )
_____)

COPY

INMATE

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 13, 2002

2:20 P.M.

PANEL PRESENT:

AL ANGELE, Presiding Commissioner
ROBERT RODRIGUEZ, Deputy Commissioner

OTHERS PRESENT:

SIEU PHONG NGO, Inmate
PAT FOX, Attorney for Inmate
JAMES LAIRD, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

√     No
_____  Yes          See Errata Sheet

Valerie Lord, Transcriber    Capitol Electronic Reporting

72

ii

## INDEX

|                                  | Page |
|----------------------------------|------|
| Proceedings ...................... | 1    |
| Case Factors ..................... | 9    |
| Pre-Commitment Factors ........... | 15   |
| Parole Plans ..................... | 23   |
| Post-Commitment Factors .......... | 29   |
| Closing Statements ............... | 50   |
| Recess ........................... | 56   |
| Decision ......................... | 57   |
| Adjournment ...................... | 64   |
| Transcriber Certification ........ | 65   |

--oOo--

73

1

1                    P R O C E E D I N G S

2          **PRESIDING COMMISSIONER ANGELE:**   --- hearing,

3    pronounce your last name.

4          **INMATE NGO:**   Ngo.

5          **PRESIDING COMMISSIONER ANGELE:**   Ngo?

6          **INMATE NGO:**   Yes.

7          **PRESIDING COMMISSIONER ANGELE:**   First name?

8          **INMATE NGO:**   Sieu.

9          **PRESIDING COMMISSIONER ANGELE:**   Sieu, okay.

10   Initial parole consideration hearing for Sieu Ngo,

11   that's N-G-O, CDC number J-John-07024.   Today's

12   date Monday, May 13, 2002.   The time approximately

13   2:20 p.m.   We're located at CTF Soledad.   Inmate

14   received February the 1st, 1994, Orange County,

15   murder second degree.   Case number C-Charles

16   99109, count number one, 187 of the Penal Code.

17   Received a term of 16 years to life, with a

18   minimum eligible parole date of May the 24th,

19   2003.   Mr. Ngo, this hearing's going to be

20   tape-recorded.   For the purpose of voice

21   identification, each of us will state our first

22   name, last name, spelling our last name.   When it

23   comes to your turn, after you spell your last

24   name, give us your CDC number.   I'm going to go to

25   my left.   My name is Al Angele, A-N-G-E-L-E,

26   Commissioner, Board of Prison Terms.

27         **DEPUTY COMMISSIONER RODRIGUEZ:**   Deputy

74

2

 1   Commissioner Rodriguez, R-O-D-R-I-G-U-E-Z, Board

 2   of Prison Terms.

 3        **DEPUTY DISTRICT ATTORNEY LAIRD:**   James

 4   Laird, Orange County District Attorney's office,

 5   L-A-I-R-D.

 6        **ATTORNEY FOX:**   Pat Fox, F-O-X, attorney for

 7   Mr. Ngo.

 8        **INMATE NGO:**   Ngo, N-G-O.   First name,

 9   S-I-E-U.   Middle name Phong, P-H-O-N-G.

10        **DEPUTY COMMISSIONER RODRIGUEZ:**   Prison

11   number?

12        **INMATE NGO:**   J-07024.

13        **DEPUTY COMMISSIONER RODRIGUEZ:**   You can

14   bring that closer to you.

15        **PRESIDING COMMISSIONER ANGELE:**   Let the

16   record reflect that there are also two

17   correctional officers in the room for security

18   purposes and will not be participating in today's

19   hearing.   The hearing is being conducted pursuant

20   to Penal Code Sections 3041 and 3042 and the rules

21   and regulations of the Board of Prison Terms

22   governing parole consideration hearings for life

23   prisoners.   The purpose of today's hearing is to

24   consider your suitability for parole.   We'll

25   consider the crimes you were committed for, your

26   prior criminal and social history and your

27   behavior and programming since your commitment.

75

3

1    We'll reach a decision today and inform you

2    whether or not we find you suitable for parole and

3    the reasons for our decision.  If we find you

4    suitable for parole, the length of your

5    confinement will be explained to you.  Before we

6    go any further, I want to instruct you, Mr. Ngo,

7    that if you do not get a date today, this is your

8    initial hearing and this will form the foundation

9    of all future hearings, okay.  In saying that, we

10   ask that you be totally truthful with us.  Nothing

11   you say today is going to change the outcome of

12   your court case, okay.  If you tell us things

13   today that are not true, I'm sure somewhere down

14   the line it's going to catch up to you and you're

15   going to wind up finding yourself with a situation

16   where nobody knows what the story is, the right

17   story.  So, we need to have the total truth today,

18   okay.  I'm going to explain to you the way the

19   system is going to work.  We're going to have two

20   different segments.  I'm going to discuss with you

21   the crime, your prior criminal and social history.

22   I'm going to discuss with you your parole plans,

23   any letters of support or opposition that are in

24   the record.  And Commissioner Rodriguez will then

25   discuss with you your programming since your

26   commitment, your psychological evaluation, your

27   counselor's report and he'll also discuss with you

76

4

1    any sort of discipline that you may have had.

2    Once that is conducted, we will then have the

3    ability to ask you questions, as will the District

4    Attorney and your attorney.  After that, the

5    District Attorney, your attorney and yourself,

6    will have the opportunity to make a closing

7    statement.  Once the closing statements are done,

8    we'll recess, clear the room and deliberate.  When

9    we have completed our deliberations, we'll resume

10   the hearing and announce our decision.  The Board

11   of Prison Terms' rules and the law state a parole

12   date shall be denied if your release would pose an

13   unreasonable risk of danger to others.  Do you

14   understand that?

15        **INMATE NGO:**  The last part, I ---

16        **PRESIDING COMMISSIONER ANGELE:**  The law

17   requires that parole would be denied if your

18   release would pose an unreasonable risk of danger

19   to others.  Now you have certain rights.  Those

20   rights include a timely notice of this hearing, a

21   right to review your Central file, have an Olson

22   Review, and a right to present relevant documents.

23   Have those rights been so far, Ms. Fox?

24        **ATTORNEY FOX:**  Yes, they have.

25        **PRESIDING COMMISSIONER ANGELE:**  You have an

26   additional right and that's to be heard by an

27   impartial Panel.  Any objections to either member

77

5

1    of this Panel?

2        **ATTORNEY FOX:**  At this time on behalf of

3    Mr. Ngo, I'd pose an objection.  It's not possible

4    for Mr. Ngo to receive a fair hearing before any

5    Panel comprised of members of the Board of Prison

6    Terms as it's currently constituted.  That's based

7    on their policies, practices, and procedures, as

8    well as on the practices, policies, and public

9    statements of the governor.

10        **PRESIDING COMMISSIONER ANGELE:**  Can you

11    enumerate the policies and practices of this

12    particular Panel?

13        **ATTORNEY FOX:**  My understanding is that when

14    a date, for instance, when a date is granted the

15    Board of Prison Terms submits to the governor a

16    list of reasons why the date should not be granted

17    after the Panel has already found the person

18    suitable.  So I think there's a conflict there.

19    And just the inherent conflict of interest having

20    been appointed by the governor and answering back

21    to the governor.

22        **PRESIDING COMMISSIONER ANGELE:**  First of all

23    the statement with regards to the Board of Prison

24    Terms providing the governor with a list of

25    reasons not to find the inmate suitable for parole

26    is not true.  The governor has staff that reviews

27    these cases that have nothing to do with Board of

78

6

1   Prison Terms and it is they who present the

2   governor with reasons (inaudible) to.  As far as

3   this particular Panel goes, I am an appointee of

4   the governor.  I've never discussed with him my

5   appointment, nor have I discussed with him his

6   philosophy on parole dates.  I have given a number

7   of parole dates in the past and will continue

8   doing that as long as I'm on this Board.  And

9   there's no reason at all that I feel that I am not

10  able to give or to be fair and impartial.

11  Commissioner Rodriguez.

12      **DEPUTY COMMISSIONER RODRIGUEZ:**  I'm a civil

13  servant and I've always been known to be fair and

14  impartial as well as I've been on panels with

15  Commissioner Angele where we have given a number

16  of dates at various prisons throughout California.

17      **PRESIDING COMMISSIONER ANGELE:**  I'll

18  overrule your objection, anything else?

19      **ATTORNEY FOX:**  No, that's all.  Thank you.

20      **PRESIDING COMMISSIONER ANGELE:**  Okay,

21  Mr. Ngo, do you have any problems at all

22  understanding or speaking the English language?

23      **INMATE NGO:**  No, I don't, Sir.

24      **PRESIDING COMMISSIONER ANGELE:**  Not even

25  technical words?

26      **INMATE NGO:**  Maybe if you use court lingo,

27  you know, then I might have a problem.

79

1      **PRESIDING COMMISSIONER ANGELE:**  Your

2      attorney can probably help you with that.  So you

3      have no problem at all ---

4          **INMATE NGO:**  No problem.

5      **PRESIDING COMMISSIONER ANGELE:**  All right.

6      I noticed that you signed BPT form 1073 on January

7      the 18th, of this year indicating that you do not

8      have a disability as defined under the Americans

9      with Disabilities Act, is that true?

10         **INMATE NGO:**  Yes, it is.

11     **PRESIDING COMMISSIONER ANGELE:**  And you need

12     no accommodation, correct?

13         **INMATE NGO:**  Pardon?

14     **PRESIDING COMMISSIONER ANGELE:**  You need no

15     accommodation?

16         **INMATE NGO:**  No.

17     **PRESIDING COMMISSIONER ANGELE:**  You will

18     receive a copy of our written tentative decision

19     today.  That decision becomes final within 120

20     days.  You'll then receive a copy of the decision

21     and a copy of the transcript and you'll have 90

22     days from the effective date to appeal if you so

23     desire.  You are not required to discuss your

24     offense with us.  You are not required to admit

25     your offense.  However, this Panel does accept as

26     true the findings of the court.  Do you understand

27     what that means?

80

8

1        INMATE NGO:  The findings of the court?

2        PRESIDING COMMISSIONER ANGELE:  We accept as

3   true the findings of the court.  Do you understand

4   what that means?

5        INMATE NGO:  What the court found?

6        PRESIDING COMMISSIONER ANGELE:  Yes.

7        INMATE NGO:  Yes.

8        PRESIDING COMMISSIONER ANGELE:  In other

9   words, we accept that as being true.

10        INMATE NGO:  Yes, it is.

11        PRESIDING COMMISSIONER ANGELE:  Okay.  Any

12   confidential material to be used today,

13   Commissioner Rodriguez?

14        DEPUTY COMMISSIONER RODRIGUEZ:  There will

15   be none used today, Sir.

16        PRESIDING COMMISSIONER ANGELE:  I have

17   passed the hearing checklist marked exhibit one

18   both to your attorney and the District Attorney to

19   ensure that we're all operating off the same set

20   of documents.  Mr. Laird, do you have those

21   documents?

22        DEPUTY DISTRICT ATTORNEY LAIRD:  Yes, Sir.

23        PRESIDING COMMISSIONER ANGELE:  Okay, do you

24   have those documents, Ms. Fox?

25        ATTORNEY FOX:  Yes, I do.

26        PRESIDING COMMISSIONER ANGELE:  Thank you.

27        ATTORNEY FOX:  You're welcome.

81

9

1          **PRESIDING COMMISSIONER ANGELE:**  Any

2    additional documents to submit?

3          **ATTORNEY FOX:**  I don't believe so.  However,

4    if we can't find certain things in the Central

5    file then I would like to present what we do have.

6    But I'm assuming that we're going to find them

7    all.  I do have two photographs, however, of

8    Mr. Ngo's family.

9          **PRESIDING COMMISSIONER ANGELE:**  Will the

10   inmate be speaking with us today?

11         **ATTORNEY FOX:**  Yes, he will.

12         **PRESIDING COMMISSIONER ANGELE:**  Mr. Ngo, if

13   you'd please raise your right hand to be sworn.

14   Do you solemnly swear or affirm that the testimony

15   you give at today's hearing will be the truth, the

16   whole truth, and nothing but the truth?

17         **INMATE NGO:**  Yes, I do.

18         **PRESIDING COMMISSIONER ANGELE:**  If there is

19   no objection, Ms. Fox, I'm going to read into the

20   record the Statement of Facts taking it from the

21   probation officer's report, page three, line 15 to

22   page four, line six.

23         **ATTORNEY FOX:**  I usually object to the use

24   of the probation officer's report because it is

25   based on hearsay to the extent that there are

26   statements attributed to my client in that, I

27   think they could be admitted for prior

82

10

1  inconsistent or consistent statements.

2         PRESIDING COMMISSIONER ANGELE:  You said you

3  usually do or you are?

4         ATTORNEY FOX:  No, I will.

5         PRESIDING COMMISSIONER ANGELE:  And what

6  would you like us to use?

7         ATTORNEY FOX:  Either the trial transcript

8  or the findings of any court of appeals that would

9  be based on the sworn testimony presented in

10 trial.

11        PRESIDING COMMISSIONER ANGELE:  Okay, well I

12 have neither.

13        ATTORNEY FOX:  Well, that's not our fault.

14        PRESIDING COMMISSIONER ANGELE:  Not our

15 fault neither, so I'll overrule that objection

16 also.

17        ATTORNEY FOX:  Then the risk we run is that

18 we're going to have a Statement of Facts that's

19 based on uncorroborated hearsay, which in many

20 cases is just based on the police report, which is

21 not from testimony of percipient witnesses.  And

22 also from the District Attorney's office many

23 times the probation office uses their file to come

24 to their statements.  Perhaps you can read the

25 Statement of Facts and then ask Mr. Ngo if he has

26 any comments, but I do have a standing hearsay

27 objection for non-corroborated statements.

83

11

1       **DEPUTY DISTRICT ATTORNEY LAIRD:**  Mr. Angele,

2   if I may ---

3       **PRESIDING COMMISSIONER ANGELE:**  Yes.

4       **DEPUTY DISTRICT ATTORNEY LAIRD:**  Is it

5   possible, I do note that this went to trial, the

6   jury had found the defendant guilty of murder in

7   the first degree.  However, in exchange for a plea

8   agreement whereby the defendant would admit second

9   degree murder, he got that deal in exchange for

10  getting a 15 to life sentence with a one-year

11  vicarious arm enhancement for a total of 16 years

12  to life.  And he agreed to suspend any, or not to

13  seek any appeal of the matter and that's why there

14  would be no court of appeal record on this case in

15  that he agreed to extinguish all appellate rights

16  (inaudible).

17      **PRESIDING COMMISSIONER ANGELE:**  Well, once

18  again, I'm going to overrule your objection and

19  we'll go ahead and incorporate by reference, or

20  excuse me incorporate by reading into the record

21  the probation officer's report, page three, line

22  15, page four, line six.  September 18th, 1992, 15

23  year old Angel Gonzales was beaten and stabbed to

24  death at a Fullerton High School as she was

25  walking home after school.  As a result of a

26  police investigation, it was learned that earlier

27  in the day the victim, a member of the Fullerton

84

12

1   Tokerstown, that's T-O-K-E-R-S-town, a Latin gang,

2   and members of the Asian gang, Fullerton Boyz,

3   B-O-Y-Z, were at a McDonald's restaurant near the

4   high school.  The victim and the name of No

5   Muhamed, that's N-O, first name, Muhamed,

6   M-U-H-A-M-E-D, had a confrontation with each

7   claiming their respective gang affiliations.

8   After this non-physical altercation, the group of

9   Asians, which at the time included the defendant,

10  and for the sake of the interpreter, defendant is

11  synonymous with Mr. Ngo, obtained a firearm.  And

12  defendant and his co-defendants then returned to

13  the school where they waited for Angel Gonzales.

14  As he was walking home he was attacked and beaten.

15  During the physical altercation, the victim was

16  shot one time in the middle of the back by one of

17  the defendants who was later identified as Usumang

18  Muhamed, first name U-S-U-M-A-N-G, last name,

19  M-U-H-A-M-E-D.  The group of five defendants fled

20  the area after the shooting.  Angel Gonzales died

21  at the scene as a result of a gunshot wound.  The

22  defendant, along with Jimmy Dao, D-A-O, and Asat

23  Cham, first name A-S-A-T, last name C-H-A-M, fled

24  to the state of Washington.  They were

25  subsequently arrested there and the murder weapon,

26  a stolen 22-caliber handgun was recovered in the

27  vehicle.  Another statement that I want to add to

13

1    this was that the vehicle used the day of the

2    shooting apparently was burned prior to them

3    leaving the state.  Is that what happened,

4    Mr. Ngo?

5           INMATE NGO:  Yes, it was.

6           PRESIDING COMMISSIONER ANGELE:  Are there

7    any changes in this story that I just read that

8    you want to bring up?

9           INMATE NGO:  No, Sir.

10          PRESIDING COMMISSIONER ANGELE:  So this is

11   exactly what happened?

12          INMATE NGO:  Basically, yes.

13          PRESIDING COMMISSIONER ANGELE:  Basically.

14          INMATE NGO:  Yes.

15          PRESIDING COMMISSIONER ANGELE:  Okay.  You

16   were involved in beating this individual, correct?

17          INMATE NGO:  Yes, we got in a fight,

18   fistfight.

19          PRESIDING COMMISSIONER ANGELE:  Well, it was

20   more than a fistfight, he was jumped by a gang of

21   people, right?

22          INMATE NGO:  Yes, he was.

23          PRESIDING COMMISSIONER ANGELE:  Okay.  Now

24   if I'm not mistaken you were the one that handed

25   this gentleman the gun?

26          INMATE NGO:  No, that's ---

27          PRESIDING COMMISSIONER ANGELE:  Is that

86

14

1    true?

2         INMATE NGO:  No, that's not true.

3         PRESIDING COMMISSIONER ANGELE:  You didn't

4    find it on the floor under the seat of the

5    vehicle?

6         INMATE NGO:  In my statement in court was I

7    saw under the car seat.

8         PRESIDING COMMISSIONER ANGELE:  Okay.

9         INMATE NGO:  And after that it was, my crime

10   partner had it on him without my knowledge.

11        PRESIDING COMMISSIONER ANGELE:  So you

12   didn't touch the gun at all?

13        INMATE NGO:  No, I didn't, Sir.

14        PRESIDING COMMISSIONER ANGELE:  Okay.  How

15   many of them, were there four of you or five?

16        INMATE NGO:  Five.

17        PRESIDING COMMISSIONER ANGELE:  And did you

18   know Mr. Gonzales at all?

19        INMATE NGO:  No, Sir.

20        PRESIDING COMMISSIONER ANGELE:  But you had

21   left and were living in Los Angeles County at the

22   time?

23        INMATE NGO:  Yes, I was, Sir.

24        PRESIDING COMMISSIONER ANGELE:  And had

25   become a part of a different gang.

26        INMATE NGO:  It wasn't --- I just known

27   them, associated with them.

87

15

1        **PRESIDING COMMISSIONER ANGELE:**  The Tiger

2  Mafia?

3        **INMATE NGO:**  Yes.

4        **PRESIDING COMMISSIONER ANGELE:**  Did you

5  belong to them or did you just associate?

6        **INMATE NGO:**  Associate.

7        **PRESIDING COMMISSIONER ANGELE:**  Okay, but

8  you were a member of the Fullerton Boyz, right?

9        **INMATE NGO:**  Yes, I was.

10        **PRESIDING COMMISSIONER ANGELE:**  Did these

11  gangs know each other?

12        **INMATE NGO:**  No.

13        **PRESIDING COMMISSIONER ANGELE:**  You were 19

14  years old at the time?

15        **INMATE NGO:**  Yes, Sir.

16        **PRESIDING COMMISSIONER ANGELE:**  How do you

17  feel about what happened?

18        **INMATE NGO:**  I'm sorry.

19        **PRESIDING COMMISSIONER ANGELE:**  All right,

20  as far as I can see you had no criminal record

21  prior to this.  You had some arrests as an adult,

22  but nothing as a juvenile.  You had an intact

23  family?

24        **INMATE NGO:**  Pardon me?

25        **PRESIDING COMMISSIONER ANGELE:**  You had an

26  intact family.

27        **INMATE NGO:**  Yes, I did, Sir.

16

1      **PRESIDING COMMISSIONER ANGELE:**  You just got

2  --- I mean after you had left there, I guess they

3  called you up and said we got something we got to

4  take care of.

5      **INMATE NGO:**  No.  Actually what happened

6  that day was, you know, we came there, they called

7  me up, you know, I came down to visit them.  I

8  said I'm just glad that you called me, you know,

9  it wasn't nothing planned or nothing.  It just

10 happened.

11     **PRESIDING COMMISSIONER ANGELE:**  Any reason

12 why you guys kept the gun?

13     **INMATE NGO:**  The gun wasn't even in the car

14 when I first was there when they picked me up; it

15 was never there.  The first time I saw it was

16 after I got back into the car.

17     **PRESIDING COMMISSIONER ANGELE:**  I

18 understand.  I'm talking about in Washington.  The

19 murder gun was found in the car?

20     **INMATE NGO:**  Yes, we kept it.  We never

21 disposed of it.

22     **PRESIDING COMMISSIONER ANGELE:**  I'll go over

23 your criminal activity.  You had nothing as a

24 juvenile.  As an adult you were arrested in 1992,

25 March, San Gabriel Police Department, possession

26 of rock cocaine.  What was that about?

27     **INMATE NGO:**  I experimented with cocaine,

89

17

1    rock cocaine.

2         PRESIDING COMMISSIONER ANGELE:   You were

3    experimenting with it?

4         INMATE NGO:   Yes.

5         PRESIDING COMMISSIONER ANGELE:   Were you

6    dealing it at all?

7         INMATE NGO:   No.

8         PRESIDING COMMISSIONER ANGELE:   Did you

9    experiment with it?

10        INMATE NGO:   Yes.

11        PRESIDING COMMISSIONER ANGELE:   And?

12        INMATE NGO:   I got busted the first time I

13   bought it.  I was just driving home at that point

14   and police pulled me over and he searched the

15   vehicle and found --- I gave him permission to

16   search the vehicle, he found the rock cocaine.

17   They gave me diversion for it.

18        PRESIDING COMMISSIONER ANGELE:   How long

19   after you bought it did they stop you?

20        INMATE NGO:   About what, 15 minutes.  I was

21   just going home by then.

22        PRESIDING COMMISSIONER ANGELE:   Was it a

23   sting do you know?

24        INMATE NGO:   I don't know.

25        PRESIDING COMMISSIONER ANGELE:   Do you know

26   what that means?

27        INMATE NGO:   Yeah, yes I do.  It was not a

90

18

1    sting.  The cop just saw me and he pulled me over.

2         PRESIDING COMMISSIONER ANGELE:  Pulled you

3    over for what?

4         INMATE NGO:  I don't know.

5         PRESIDING COMMISSIONER ANGELE:  Okay, he

6    never indicated to you that he saw you make the

7    purchase?

8         INMATE NGO:  No.

9         PRESIDING COMMISSIONER ANGELE:  Had you

10   tried it before?

11        INMATE NGO:  Yes.

12        PRESIDING COMMISSIONER ANGELE:  It does

13   indicate that you were diverted, but you were also

14   arrested apparently in Olympia, Washington,

15   possession of stolen property.  But apparently

16   they dismissed it and I think they probably

17   dismissed it because of the arrest and the murder,

18   correct?

19        INMATE NGO:  I think so.

20        PRESIDING COMMISSIONER ANGELE:  Okay.  What

21   was the stolen property?

22        INMATE NGO:  From what my understanding is

23   the gun that the murder weapon came from was

24   (inaudible) Washington.

25        PRESIDING COMMISSIONER ANGELE:  Okay.

26        INMATE NGO:  So I was never even in

27   Washington until after the fact.

91

19

1　　　　PRESIDING COMMISSIONER ANGELE:  Which one of

2　　your crime partners was from Washington?

3　　　　INMATE NGO:  Asat Cham.

4　　　　ATTORNEY FOX:  Do you want to spell that?  I

5　　think for the ---

6　　　　INMATE NGO:  A-S-A-T, C-H-A-M.

7　　　　PRESIDING COMMISSIONER ANGELE:  I think we

8　　already went through that one time.  Now, okay, it

9　　would indicate --- I want to make sure I have the

10　　record straight on the names also.  Were there two

11　　Muhameds there?

12　　　　INMATE NGO:  Yes.

13　　　　PRESIDING COMMISSIONER ANGELE:  Okay,

14　　because I had two spellings of each name.  It

15　　would probably be pretty reasonable to assume that

16　　Cham, Mr. Cham ---

17　　　　INMATE NGO:  Yes.

18　　　　PRESIDING COMMISSIONER ANGELE:  Probably

19　　brought the gun from Washington when he came down

20　　here.  Just assuming since it was taken from

21　　Washington State.

22　　　　INMATE NGO:  Yes, Sir.

23　　　　PRESIDING COMMISSIONER ANGELE:  And that's

24　　where you wound up going back.  You were born in

25　　Vietnam on May the 18th, 1973.  You (inaudible)

26　　the United States since 1979, graduated Fullerton

27　　High School.  And it says here you attended

92

20

1    Fullerton Community College and Pasadena City

2    College.  You completed 10 units and your major

3    was Business.  You worked as a telemarketer.

4    Who'd you work for as a telemarketer?

5         INMATE NGO:  It's for like a real estate

6    place, (inaudible) insurance, telemarketing.  Try

7    to get them to go to seminar.

8         PRESIDING COMMISSIONER ANGELE:  You worked

9    at your family liquor store and was living with

10   your parents when this occurred?

11        INMATE NGO:  Yes, Sir.

12        PRESIDING COMMISSIONER ANGELE:  I want to

13   make sure I get honest answers from you because

14   I've seen two places now that indicates that you

15   were a member of the Tiger Mafia.

16        INMATE NGO:  Tiger Mafia is who I associated

17   with.  That's when they asked me (inaudible) my

18   tattoo was on there, TM.  I was on bulletin

19   boards.

20        PRESIDING COMMISSIONER ANGELE:  I

21   understand.

22        INMATE NGO:  They ask me TM, that's why I

23   say Tiger Mafia, because you know, I was

24   associated with them.

25        PRESIDING COMMISSIONER ANGELE:  But you left

26   Fullerton.

27        INMATE NGO:  Yes.

93

21

1          PRESIDING COMMISSIONER ANGELE:  And you

2     moved to Los Angeles area.

3          INMATE NGO:  Yes.

4          PRESIDING COMMISSIONER ANGELE:  And became

5     affiliated one way or the other with the Tiger

6     Mafia.

7          INMATE NGO:  When I moved to Orange County,

8     that's when ---

9          PRESIDING COMMISSIONER ANGELE:  Orange

10    County, I'm sorry.

11         INMATE NGO:  Associated with Fullerton Boyz.

12    In LA I was with the Tiger Mafia.

13         PRESIDING COMMISSIONER ANGELE:  Were you in

14    LA before you went to Orange County?

15         INMATE NGO:  Yes, Sir.

16         PRESIDING COMMISSIONER ANGELE:  Okay.  Now

17    you said you were associated with them.  You were

18    associated with them enough to have a tattoo on

19    your arm.

20         INMATE NGO:  It's not --- I can have ---

21    it's taken off already.

22         PRESIDING COMMISSIONER ANGELE:  Well, it was

23    taken off, it was on at the time.  It still said

24    TM.

25         INMATE NGO:  Yes.

26         PRESIDING COMMISSIONER ANGELE:  Which would

27    indicate to me that you were a member.  I mean,

22

1  let's be honest, were you or weren't you?

2       INMATE NGO:  To tell you the truth, Sir ---

3       PRESIDING COMMISSIONER ANGELE:  Yeah, that's

4  what I want to hear, the truth.

5       INMATE NGO:  It's just a made up name,

6  bottom line.  I was Fullerton Boyz, I didn't want

7  to admit that I was in a gang when I was arrested

8  and they just saw the TM, it's my ex-girlfriend's

9  name, Teresa May, so --- it was just a made up

10 name so, I just tried to throw them off.

11      PRESIDING COMMISSIONER ANGELE:  Well, we're

12 looking for honesty and the reason I kept on

13 pushing you is I never heard of Tiger Mafia.

14 Truthfulness is important to us, understand that.

15      INMATE NGO:  Yes, Sir.

16      PRESIDING COMMISSIONER ANGELE:  But you took

17 her initials off your arm?

18      INMATE NGO:  No, I mean --- I tried to put

19 it on myself as (inaudible), it never came out

20 anyway, it faded.

21      PRESIDING COMMISSIONER ANGELE:  You've never

22 been married.

23      INMATE NGO:  No.

24      PRESIDING COMMISSIONER ANGELE:  And you've

25 got no children, correct?  Never been in the

26 military.  You indicate you only tried cocaine

27 once.

95

23

1          INMATE NGO:  Yes.

2          PRESIDING COMMISSIONER ANGELE:  Okay.  Have

3    you experimented with any other drugs?

4          INMATE NGO:  No.

5          PRESIDING COMMISSIONER ANGELE:  Alcohol?

6          INMATE NGO:  I'm allergic to alcohol.

7          PRESIDING COMMISSIONER ANGELE:  That's

8    probably good.  Tried nothing else, marijuana,

9    nothing?

10         INMATE NGO:  I don't like drugs, not no

11   more.  (Inaudible) --- never mind.

12         PRESIDING COMMISSIONER ANGELE:  No, tell me.

13         INMATE NGO:  I mean you can test me everyday

14   and I'll be clean.

15         PRESIDING COMMISSIONER ANGELE:  I believe

16   you.  You haven't given me a reason not to.  Okay,

17   we do have some letters that we received on your

18   behalf.  I'd like to try to go over some of these.

19   We received these at a late hour, but I think

20   (inaudible) because I think it's very important.

21   One letter is from, you've got to help me with the

22   names again, okay.

23         INMATE NGO:  Yes, Sir.

24         PRESIDING COMMISSIONER ANGELE:  This is from

25   your sister, Tran?

26         INMATE NGO:  Which one?

27         PRESIDING COMMISSIONER ANGELE:  Tran Ngo.

90

24

1          INMATE NGO:  Tan.

2          PRESIDING COMMISSIONER ANGELE:  Tan Ngo.

3      She indicated that the family will support you any

4      way they can, that her husband has a job for you

5      in his store.

6          INMATE NGO:  Yeah.

7          PRESIDING COMMISSIONER ANGELE:  And that

8      your mother has a job for you in her store.  Then

9      we have one from a Donald Rubridc, R-U-B-R-I-D-C,

10     Orange County Public Defender, explains the case

11     where you were tried and is in support of your

12     release also.  Fong Ngo is your mother?

13         INMATE NGO:  Fong (inaudible).

14         PRESIDING COMMISSIONER ANGELE:  Okay.  She

15     offers support in any way possible.  And then we

16     have Calvin Ung, U-N-G, your uncle.

17         INMATE NGO:  Yes.

18         PRESIDING COMMISSIONER ANGELE:  Who has a

19     job for you in his restaurant.

20         INMATE NGO:  Yes.

21         ATTORNEY FOX:  Have you gone over the letter

22     from his mother, I'm sorry.

23         PRESIDING COMMISSIONER ANGELE:  Uh-hmm,

24     yeah.

25         ATTORNEY FOX:  Okay.

26         PRESIDING COMMISSIONER ANGELE:  Yeah.

27         INMATE NGO:  I have one from my brother,

91

25

1   too.

2          PRESIDING COMMISSIONER ANGELE:   That's

3   Calvin?

4          INMATE NGO:   That's my uncle.

5          PRESIDING COMMISSIONER ANGELE:   Your uncle,

6   okay.  I'm sorry Calvin is the one who has a

7   restaurant job for you.

8          INMATE NGO:   Yes, Sir.

9          PRESIDING COMMISSIONER ANGELE:   I don't have

10  --- I've got your mother.

11         ATTORNEY FOX:   We may have a copy.

12         PRESIDING COMMISSIONER ANGELE:   Your sister.

13  I'm sorry, is it Raymond?  Raymond?

14         INMATE NGO:   Raymond Seto's my new

15  brother-in-law.

16         PRESIDING COMMISSIONER ANGELE:   Is that the

17  one you're talking about?

18         INMATE NGO:   No, my older brother.

19         PRESIDING COMMISSIONER ANGELE:   Okay, I do

20  have one here from Raymond Seto, S-E-T-O, he's

21  your brother-in-law.  He's known you since 1992.

22         ATTORNEY FOX:   There are two separate

23  letters from Calvin Ung.  One bears the date of

24  January 30th, 2001.  A more recent one is dated

25  April 6th of 2002.  I believe that's the one that

26  was referred to, the later of the two.

27         PRESIDING COMMISSIONER ANGELE:   I have the

98

26

1    2002 letter here.  I don't have it here.  Who is

2    Chi Phong Ngo, your older brother?

3         **INMATE NGO:**  Chi Phong Ngo.

4         **PRESIDING COMMISSIONER ANGELE:**  Chi?

5         **INMATE NGO:**  C-H-I, Phong Ngo.

6         **PRESIDING COMMISSIONER ANGELE:**  This says

7    Sieu.

8         **INMATE NGO:**  That's me.

9         **PRESIDING COMMISSIONER ANGELE:**  Okay, I'm

10   sorry.  He's your older brother.  I've got it.

11   Okay.  First name is Chi, C-H-I.  Middle name

12   Phong, P-H-O-N-G.  Last name, N-G-O.  Writing in

13   support of my brother.  He's offering a job at a

14   convenience store which is in Anaheim.

15        **INMATE NGO:**  Yes, Sir.

16        **PRESIDING COMMISSIONER ANGELE:**  They all

17   believe in you and are willing to support you.

18   There's another letter from Duc Phong Ngo.  D-U-C

19   is the first name.  Middle, P-H-O-N-G.  Last name

20   N-G-O.  Younger brother, writing a letter of

21   support.  I'll help my brother financially and in

22   any way that he needs.  Like to see you get a

23   second chance, make a difference in society with

24   all the training you've had while in prison.  I'll

25   go back to the letter from Raymond Seto.  It's a

26   letter of support asking that you be given a

27   second chance.  Talks about your mother and her

99

27

1   work at the liquor store.  How he believes you

2   have the ability to become a law-abiding citizen.

3   And this is a letter in support of release.  Have

4   we covered them all now?  There's another one?

5        INMATE NGO:  No, just one from my older

6   sister?

7        ATTORNEY FOX:  Which I'm passing over.

8        PRESIDING COMMISSIONER ANGELE:  This is from

9   Lan Lau.

10        INMATE NGO:  Lan.

11        PRESIDING COMMISSIONER ANGELE:  First name

12   is Lan, L-A-N.  Last name is Lau, L-A-U, who is

13   inmate's sister.  She believes that the inmate

14   deserves a second chance to prove himself in the

15   community.  They offer you housing, financial

16   support.  These include a place to stay, food,

17   clothing, and education.  They reside in Alhambra

18   in Los Angeles County, okay.  Anything else?

19        INMATE NGO:  That should be it.

20        ATTORNEY FOX:  Thank you.

21        PRESIDING COMMISSIONER ANGELE:  All right,

22   we sent out what we call 3042 notices.  Those are

23   notices that go to agencies that have a direct

24   interest in your case.  I have received a reply

25   from the District Attorney's office, from the

26   County of Orange.  However, there's a

27   representative here today from that office so

100

28

1  we'll have him make a statement when that time

2  comes.  And we'll go to post-conviction factors

3  please, Commissioner Rodriguez.

4         **DEPUTY COMMISSIONER RODRIGUEZ:**  How do you

5  pronounce your name again?

6         **INMATE NGO:**  Just say "no."

7         **DEPUTY COMMISSIONER RODRIGUEZ:**  No?

8         **INMATE NGO:**  Yeah, it's easiest.

9         **DEPUTY COMMISSIONER RODRIGUEZ:**  All right,

10  inmate Ngo, the purpose of, during the first

11  portion of this reading I'll be addressing what

12  you've done since you've been received in the

13  Department of Corrections, which will then bring

14  us to the present.  This will establish a base for

15  future Board appearances should you not receive a

16  date today.  If there's anything that I leave out

17  during the portion of this reading, either you or

18  your attorney can address it when I'm done, all

19  right?

20         **INMATE NGO:**  Yes, Sir.

21         **DEPUTY COMMISSIONER RODRIGUEZ:**  All right.

22  You were received in the Department of Corrections

23  on February 1st, 1994, at RJ Donovan Reception

24  Center.  From there you transferred on March 17th,

25  1994, to Centinella State Prison.  From there you

26  transferred on May 16th, 1995, to Calipatria State

27  Prison, excuse me, California State Prison,

101

29

1    Lancaster, and that was a non-adverse transfer.

2    And then you subsequently transferred here to

3    California (sic) Training Facility in Soledad,

4    also a non-adverse transfer on December 16th,

5    1998.  Your current classification score is zero.

6    You're currently housed as a Level II inmate on a

7    life override.  Your custody is Medium A.  You're

8    still in culinary warehouse?

9         INMATE NGO:  Yes, Sir.

10        DEPUTY COMMISSIONER RODRIGUEZ:  And I note

11   that you have exceptional to excellent work

12   reports.  You did complete your high school.  You

13   have completed vocation auto upholstery and that

14   was on April 3rd, 1997.  What is, is vocation

15   automotive refinishing a separate course?

16        INMATE NGO:  Yes, that's a separate course.

17   That's auto paint.

18        DEPUTY COMMISSIONER RODRIGUEZ:  Okay, and

19   you did complete that one and that was in

20   September 1997.  So you've completed two

21   vocations.

22        INMATE NGO:  Yes, Sir.

23        DEPUTY COMMISSIONER RODRIGUEZ:  You've been

24   an active participant in the NA program as

25   evidenced by your most recent chronos.  You've

26   also completed the Key to Fatherhood, December of

27   2000.  You completed a course in the Cause,

102

30

1    Prevention, and Treatment of both Tuberculosis and

2    Hepatitis and that was December 1999.  And also

3    you've participated in a Muslim group course,

4    Salesmanship II.  And what do you do in that?

5        INMATE NGO:  On the Muslim fatherhood and

6    salesmanship, you learn how to be a parent if

7    someday by circumstance to have my kids and stuff.

8    You learn to take care of your own kids and I'll

9    be a good, how a father should be.

10       DEPUTY COMMISSIONER RODRIGUEZ:  Have you

11   gone to any anger management courses?

12       INMATE NGO:  I try.  The only one try to

13   enroll right now, try to get into is Impact.

14       DEPUTY COMMISSIONER RODRIGUEZ:  Yeah, the

15   impact program, which is an excellent program

16   here.  Captain Gara runs that program.

17       INMATE NGO:  Captain Gara's running it.

18       DEPUTY COMMISSIONER RODRIGUEZ:  Exactly.

19       INMATE NGO:  And it's been very difficult to

20   get in.

21       DEPUTY COMMISSIONER RODRIGUEZ:  But you've

22   been here for a long, going on ---

23       INMATE NGO:  I have tried since last year,

24   sir.

25       DEPUTY COMMISSIONER RODRIGUEZ:  Almost five

26   years, four years actually.

27       INMATE NGO:  Yeah.

103

31

1      **DEPUTY COMMISSIONER RODRIGUEZ:**  Yeah.

2      **INMATE NGO:**  They just start this program

3  recently.

4      **DEPUTY COMMISSIONER RODRIGUEZ:**  It's a very

5  good program.  I strongly urge you to try to get

6  in and at least keep your name active on that.

7      **INMATE NGO:**  I will.

8      **DEPUTY COMMISSIONER RODRIGUEZ:**  Do you study

9  your 12-steps?

10     **INMATE NGO:**  Not all of them because I have

11 to say I'm a Buddhist and some steps I can't

12 really apply to it.  There's only four step, maybe

13 step four, step eight.

14     **DEPUTY COMMISSIONER RODRIGUEZ:**  What is step

15 number eight to you?

16     **INMATE NGO:**  Making a list of all persons

17 harmed.

18     **DEPUTY COMMISSIONER RODRIGUEZ:**  Who would be

19 at the top of that list?

20     **INMATE NGO:**  All of the families, victim

21 family and my family.

22     **DEPUTY COMMISSIONER RODRIGUEZ:**  Now you

23 stated, I believe somewhere we read in the reports

24 that you furnished the gun.  You say you didn't?

25     **INMATE NGO:**  No (inaudible).

26     **ATTORNEY FOX:**  Could you tell us where you

27 saw that because I'd like to correct it as well.

104