# EXHIBIT 1
# PART 2 OF 2

32

1    **DEPUTY COMMISSIONER RODRIGUEZ:** I believe

2    that's in the probation officer's report. Did you

3    quote that, Commissioner Angele?

4    **PRESIDING COMMISSIONER ANGELE:** No.

5    **ATTORNEY FOX:** I don't believe it's stated

6    there.

7    **DEPUTY COMMISSIONER RODRIGUEZ:** Okay, I was

8    looking at the prisoner's version. And what I'm

9    looking at is the current Board report, April

10   2002, and that's on the first page, (inaudible)

11   addressing that --- You explained that they had

12   the gun for protection in case someone else had to

13   have a weapon, correct?

14   **ATTORNEY FOX:** Once again ---

15   **DEPUTY COMMISSIONER RODRIGUEZ:** Excuse me,

16   counsel, I'll let you address that. Ngo stated

17   that he did not see the gun until he was in the

18   vehicle, it was located under the passenger seat,

19   correct?

20   **INMATE NGO:** (Inaudible.)

21   **DEPUTY COMMISSIONER RODRIGUEZ:** And that's

22   the story you're staying ---

23   **INMATE NGO:** It's a true story.

24   **DEPUTY COMMISSIONER RODRIGUEZ:** And he's

25   corrected and we're satisfied ---

26   **ATTORNEY FOX:** And I believe it's

27   consistently stated that way throughout the

W5

33

1    probation report as well, and the defendant's

2    statement and also a statement that was given by

3    one of the detectives involved in the

4    investigation.

5         DEPUTY COMMISSIONER RODRIGUEZ:  All right.

6    Do you agree with everything I've read up to this

7    point, as far as your program?

8         INMATE NGO:  I still have a, I have a

9    certificate in STD and AIDS too.

10        DEPUTY COMMISSIONER RODRIGUEZ:  Okay, I

11   don't think I have copies of those.  Do you have

12   copies of them?

13        INMATE NGO:  Yes, Sir.

14        DEPUTY COMMISSIONER RODRIGUEZ:  I went

15   through all the certificates you have here that

16   they provided us, which I confirmed, which are in

17   the ---

18        INMATE NGO:  Hepatitis and tuberculosis.

19        DEPUTY COMMISSIONER RODRIGUEZ:  Well I

20   addressed those already.

21        INMATE NGO:  Sexually transmitted disease---

22        DEPUTY COMMISSIONER RODRIGUEZ:  I addressed

23   that too.  That was in 1999, correct, right there

24   at the bottom?

25        ATTORNEY FOX:  Well, one is in 2000, the

26   STD's.

27        DEPUTY COMMISSIONER RODRIGUEZ:  Okay.  That

34

1    was the sexually transmitted disease, right.

2          ATTORNEY FOX:  And on the back there's

3    another one in 2000.

4          DEPUTY COMMISSIONER RODRIGUEZ:  Right, and

5    then HIV.  I may have said the wrong date, but I

6    did address both these certificates.

7          ATTORNEY FOX:  The other two, tuberculosis

8    and hepatitis were (inaudible).

9          DEPUTY COMMISSIONER RODRIGUEZ:  Correct,

10   okay.  So do you agree with everything else?

11         INMATE NGO:  Yes, Sir.

12         DEPUTY COMMISSIONER RODRIGUEZ:  Okay.  As

13   far as disciplinary history, you have received no

14   CDC 115's, either administrative or serious since

15   reception.  And you've only received a total of

16   two 128(a) counseling chronos.  The first one was

17   April 1st, 1997, for failure to respond to medical

18   ducat.  And then the last one was on February

19   11th, 2000, for covering your windows with a

20   towel.  Trying to keep the light out, huh?

21         INMATE NGO:  Actually, cold Sir.

22         DEPUTY COMMISSIONER RODRIGUEZ:  Cold.  In

23   going through your counselor's recommendation,

24   that's from the current Board report dated April

25   2002.  The author of this report is the initial M.

26   Rubio, R-U-B-I-O, Correctional Counselor I here at

27   Soledad state prison.  Going to page three under

107

35

1    the heading of Summary, it says considering the

2    commitment offense, minimal prior arrest record

3    and prison adjustment, the writer believes Ngo

4    would probably pose a moderate to low degree of

5    threat to the public at this time if released from

6    prison.  Going to the psych report, there's two

7    reports I'll be addressing.  The first one is

8    dated December 27th, 1996.  It's a three page,

9    three.  It's completed at California State Prison,

10   Lancaster.  The author of that report is the

11   initial C. Schroeder, S-C-H-R-O-E-D-E-R, Staff

12   Psychologist.  I'm not going to read that report

13   in it's entirety, but I will address areas of that

14   report.  Going to page two, under Present

15   Condition, it says the remorse he expresses is

16   sincere.  He is synonymous with inmate Ngo.  He

17   shows much (inaudible) and self-incrimination for

18   the crime.  In hindsight he sees that he perhaps

19   could have stopped the incident and now has great

20   empathy and remorse for the family of the victim.

21   Under Mental Status and Diagnosis, Axis I:  no

22   diagnosis or condition.  Axis II:  no diagnosis.

23   Axis III:  none.  Going to page three, Axis IV:

24   psychosocial stressors, incarceration.  Axis V:

25   Global Assessment of Functioning score, that's

26   your GAF score is 75.  Under Conclusions and

27   Recommendations, Mr. Ngo's history of depression

106

36

1   and suicide attempts may have contributed to his

2   state of mind and poor judgment during the time of

3   the crime.  There are no records of any mental

4   health treatment during incarceration and Mr. Ngo

5   is no longer depressed.  Going to the last psych

6   report, and that is a seven-page report completed

7   here at Soledad state prison.  The date of that

8   report is April, excuse me, January 23rd, 2002.

9   The author of that report is the initial C.

10  Saindon, capital-S-A-I-N-D-O-N, Staff

11  Psychologist.  Under, let's see, going to page

12  four, under heading Current Diagnostic

13  Impressions, Axis I:  no contributory clinical

14  disorder.  Axis II: deferred.  Axis III:  no

15  contributory physical disorder.  Axis IV:

16  long-term incarceration.  Axis V:  Global

17  Assessment of Functioning score, your GAF score is

18  90, noting that it had gone up considerably from

19  75 from the first report that I addressed in 1996.

20  Ninety is a very good score.  Going to page five

21  under Assessment of Dangerousness, based upon his

22  complete lack of disciplinary actions while

23  incarcerated, his insight into the negative

24  aspects of gang involvement and his remorse for

25  his actions, his violence potential within a

26  controlled setting is estimated to be below

27  average relative to this Level II inmate

109

37

1    population.  If released to the community, his

2    violence potential is estimated to be less than

3    the average citizen in the community given his

4    insight, his demonstrated ability to stay out of

5    trouble, his successful development of plans upon

6    release, and the support of his family.  At this

7    time, I'll return to the Chair.

8         **PRESIDING COMMISSIONER ANGELE:**  Thank you.

9    Do you know what the term mad dogging means?

10        **INMATE NGO:**  Yes, Sir.

11        **PRESIDING COMMISSIONER ANGELE:**  What does

12   that mean to you?

13        **INMATE NGO:**  Back then it was dirty looks.

14        **PRESIDING COMMISSIONER ANGELE:**  You

15   indicated that you first saw the gun in the car.

16        **INMATE NGO:**  Yes, Sir.

17        **PRESIDING COMMISSIONER ANGELE:**  And then you

18   were driving around and just happeneded come upon

19   Mr. Gonzales.

20        **INMATE NGO:**  No, Sir.  We met Mr. Gonzales

21   at McDonald's first.

22        **PRESIDING COMMISSIONER ANGELE:**  I understand

23   that.  I'm talking about the second time.

24        **INMATE NGO:**  The second time, what happened

25   was, when we came back me and (inaudible) went to

26   confront Mr. Gonzales and his friend.  We were

27   going to get into a fistfight.  When the fistfight

110

38

1    started, we were fighting one another, we knocked

2    Mr. Gonzales down.  And after that, my crime

3    partner came and while we was beating him up

4    (inaudible) Muhamed was hitting him with a gun.

5    Somehow it shot, it went off, the gun went off and

6    shot him.  The first round probably missed him,

7    but the second round hit him.

8           **PRESIDING COMMISSIONER ANGELE:**  So you were

9    actually looking for him?

10          **INMATE NGO:**  Looking for ---

11          **PRESIDING COMMISSIONER ANGELE:**

12   Mr. Gonzales.

13          **INMATE NGO:**  Yes, we were looking for him to

14   fight.

15          **PRESIDING COMMISSIONER ANGELE:**  Weren't you

16   waiting there for him to get out of school?

17          **INMATE NGO:**  We were waiting for him after

18   school.

19          **PRESIDING COMMISSIONER ANGELE:**  Okay.  Also,

20   you know, a little trouble by some (inaudible)

21   problems.  Back in December '90, you had a problem

22   in school where you jumped somebody else.  Do you

23   recall that?

24          **INMATE NGO:**  It was not a jump.  I got in a

25   fight with another individual.

26          **PRESIDING COMMISSIONER ANGELE:**  Yeah, but

27   you had three guys with you and they all jumped in

\|\|\|

39

1    on it.

2         INMATE NGO:  Yes, Sir, they were my friends,

3    they back me up.

4         PRESIDING COMMISSIONER ANGELE:  They backed

5    you up.  You against one guy.  You knocked him

6    down.

7         INMATE NGO:  I beat him up, yes, Sir.

8         PRESIDING COMMISSIONER ANGELE:  And then

9    three guys backed you up and you all jumped him.

10   How do you figure that backing you up, you didn't

11   sound like you needed a back up at all?

12        INMATE NGO:  I have no control over their

13   actions, Sir.

14        PRESIDING COMMISSIONER ANGELE:  How about

15   the time you were in a vehicle and found three

16   purses, do you remember that?

17        INMATE NGO:  No, Sir.

18        PRESIDING COMMISSIONER ANGELE:  You don't

19   remember that?  This is in the POR, page 11, line

20   seven, (inaudible) automobile during a traffic

21   stop three women's purses were found in the

22   vehicle in which (inaudible) Ngo was the sole

23   occupant.  Indicated you did not know who they

24   belonged to, that's when they found the rock

25   cocaine.

26        INMATE NGO:  Oh, that's my mom's car ---

27        DEPUTY COMMISSIONER RODRIGUEZ:  I'd like to

112

40

1    turn the tape over, one moment.

2            [Thereupon, the tape was turned over.]

3        **DEPUTY COMMISSIONER RODRIGUEZ:**  Side two,

4    back on record.

5        **PRESIDING COMMISSIONER ANGELE:**  So that was

6    your mother's car?

7        **INMATE NGO:**  Uh-hmm.  It was my mother's car

8    when I was arrested, Sir.  If there was a purse,

9    it must belong to my mom.

10       **PRESIDING COMMISSIONER ANGELE:**  Okay.  Then

11   you indicated the car was searched for no reason.

12       **INMATE NGO:**  At first, yes.  But when they

13   asked me for consent, I gave it to them.

14       **PRESIDING COMMISSIONER ANGELE:**  All right.

15   But you do understand a male driving in a vehicle

16   with three purses in the car would be pretty

17   suspicious to me.  I'd think maybe it was a purse-

18   snatcher.  (Inaudible) plenty of probable cause.

19   But they asked you ---

20       **INMATE NGO:**  Yeah.

21       **PRESIDING COMMISSIONER ANGELE:**  And you gave

22   consent and inside one of the purses they found

23   the rock cocaine.  I found in a couple of spots

24   the gun was given to one of your crime partners by

25   somebody at an arcade.  Do you recall that

26   statement at all?

27       **INMATE NGO:**  It was brought up in trial,

113

41

1    Sir, but like I said before, the first time I ever

2    seen the gun was when I got back into the car.

3         PRESIDING COMMISSIONER ANGELE:  Okay, let me

4    ask you this, did you happen to go to the arcade

5    prior to you first seeing the gun?

6         INMATE NGO:  Yeah, I was playing arcade, but

7    I went to the restaurant.  I told them in court

8    that I was at a restaurant, a Hispanic restaurant

9    eating when this ---

10        PRESIDING COMMISSIONER ANGELE:  Okay.  So

11   can we assume without taking anything out of it

12   that isn't, it's a possibility that somebody did

13   get the gun at the arcade and put it in the car

14   and you just didn't see it.

15        INMATE NGO:  Very.

16        PRESIDING COMMISSIONER ANGELE:  What I'm

17   trying to establish is that you were at the arcade

18   before you got in the car and saw the gun?

19        INMATE NGO:  Yes.

20        PRESIDING COMMISSIONER ANGELE:  And the

21   first place you saw it was in the car.

22        INMATE NGO:  Exactly.

23        PRESIDING COMMISSIONER ANGELE:  All right,

24   any questions, Commissioner Rodriguez?

25        DEPUTY COMMISSIONER RODRIGUEZ:  None at this

26   time.

27        PRESIDING COMMISSIONER ANGELE:  Any

114

42

1    questions from the District Attorney?

2        DEPUTY DISTRICT ATTORNEY LAIRD:  Yes, just a

3    few.  And I'm referring to the P and S, the

4    Probation and Sentencing report.

5        PRESIDING COMMISSIONER ANGELE:  One second,

6    (inaudible) you answer the questions.  The

7    questions will be asked by the District Attorney

8    through the Panel and your statements are to be

9    directed to this side of the table.

10        INMATE NGO:  Yes.

11        DEPUTY DISTRICT ATTORNEY LAIRD:  Would you

12    like me to read what's in the probation report?

13    It's just, it's regarding the trial deputy's

14    statement in the report.

15        PRESIDING COMMISSIONER ANGELE:  Is it a

16    question or what do you intend to do with it?

17        DEPUTY DISTRICT ATTORNEY LAIRD:  The

18    question is I want to know if the inmate believes

19    that is an accurate statement, sentence by

20    sentence.  And I'm talking about page nine of the

21    Probation and Sentencing report, starting with

22    line 14, that entire paragraph, 14 to 21, which

23    begins with in a telephone conversation with the

24    prosecuting attorney Robin Park.  She's the Deputy

25    District Attorney that took the case to trial and

26    tried (inaudible) case.  And those are her

27    comments.  And I was wondering if they, Mr. Ngo,

115

43

1    felt that those were accurate comments, and if

2    they are not accurate, how so.

3        **ATTORNEY FOX:**  I think we need to go through

4    each one point by point, otherwise it's ---

5        **DEPUTY DISTRICT ATTORNEY LAIRD:**  Right.

6        **PRESIDING COMMISSIONER ANGELE:**  Well, let me

7    go through it.  There's a statement that the

8    prosecuting attorney made regarding the offenses

9    being a very vicious attack.  After the

10   confrontation at the fast food restaurant, the

11   inmate, along with No Muhamed, drove by the school

12   and planned the revenge.  They subsequently

13   obtained the weapon, loaded it, and drove back to

14   the area of Fullerton High School.  They were

15   lying in wait for the victim to get out of school.

16   This occurred at 3:02 p.m., the victim was killed

17   at 3:07 p.m.  Is that what happened?

18       **INMATE NGO:**  Yes, Sir.

19       **PRESIDING COMMISSIONER ANGELE:**  Now did you

20   understand everything I just said?

21       **INMATE NGO:**  When you say lying in wait, do

22   you mean I was waiting for him (inaudible).

23       **PRESIDING COMMISSIONER ANGELE:**  Uh-hmm.

24   Well no there's a portion that I think is

25   extremely important in today's hearing.  It says

26   after the confrontation at the fast food

27   restaurant, the defendant, which is you, and No

116

44

1   Muhamed, drove by the school and planned the

2   revenge.  They, which would be you and Muhamed,

3   subsequently obtained a weapon, loaded it, and

4   then drove back to the area of Fullerton High

5   School.

6        INMATE NGO:  That's wrong.  It wasn't just

7   me and No Muhamed.  There was five of us.

8        PRESIDING COMMISSIONER ANGELE:  Okay.

9        INMATE NGO:  So, and we didn't load the

10  weapon.  I know I didn't (inaudible).  I didn't

11  see the weapon until I was in the car.  So that

12  statement has to be wrong.

13       PRESIDING COMMISSIONER ANGELE:  All right.

14  But you are aware of the term lying in wait.  Do

15  you know what that means?

16       INMATE NGO:  That we were waiting.

17       PRESIDING COMMISSIONER ANGELE:  Yeah, you

18  were parked by the school waiting for him to get

19  out of school.

20       INMATE NGO:  Yeah.

21       PRESIDING COMMISSIONER ANGELE:  Is that

22  basically what happened?

23       INMATE NGO:  That's true.

24       PRESIDING COMMISSIONER ANGELE:  Did that

25  answer your question?

26       DEPUTY DISTRICT ATTORNEY LAIRD:  Yes.  Just

27  a follow up question.  Did Mr. Ngo realize that

117

45

1    the gun in the car was loaded when they were going

2    back to the school to find victim Gonzales?

3          PRESIDING COMMISSIONER ANGELE:  When you saw

4    the gun or was there any conversation to lead you

5    to believe the gun was loaded?

6          INMATE NGO:  They led me to believe, I think

7    it was loaded because, they say that I told the

8    police that they say, you know, use it for

9    protection.  So I figured it probably is loaded.

10   But my lack of judgment that day ---

11         DEPUTY DISTRICT ATTORNEY LAIRD:  And then

12   was, at the time that they were waiting for the

13   victim, this is addressed to the parole board, at

14   the time the suspects were waiting for the victim,

15   was victim Alex Gonzales by himself?

16         INMATE NGO:  No, he wasn't.  There was two

17   of them, Angel Gonzales and his friend.  That's

18   when No Muhamed confronted Mr. Gonzales and I

19   confronted his other friend.  I followed the other

20   guy, I don't know his name, and No Muhamed was

21   fighting with Mr. Gonzales.  And after that, his

22   friend ran away and I helped No out.

23         PRESIDING COMMISSIONER ANGELE:  And how

24   about the rest of your crime partners?

25         INMATE NGO:  They didn't come until later,

26   until --- it happened so fast.  Me and No was

27   fighting we didn't know until the first time the

110

46

1    gun went off and that's when everybody just

2    stopped and we started running away.  After that,

3    you know, when I heard the first shot, I ran.

4         PRESIDING COMMISSIONER ANGELE:  Okay.

5         DEPUTY DISTRICT ATTORNEY LAIRD:  And, again,

6    this is directed to the parole board.  Did Mr. Ngo

7    realize that one of his group would get out of the

8    car to confront Alex Gonzales, the victim who

9    died, with that firearm that was in the car?

10        PRESIDING COMMISSIONER ANGELE:  Let's see if

11   I understand that clearly.  Did you have knowledge

12   that somebody in the car was going to confront

13   Mr. Gonzales with that firearm?

14        INMATE NGO:  No, Sir.  Not at all.

15        DEPUTY DISTRICT ATTORNEY LAIRD:  Did Mr. Ngo

16   nevertheless realize that somebody was going to be

17   taking that gun out of the car into the

18   confrontation?

19        PRESIDING COMMISSIONER ANGELE:  Do you

20   understand that question?

21        INMATE NGO:  Yes.  My understanding is,

22   that's the argument between No, Mr. Muhamed, I

23   asked why did you guys bring a gun, you know,

24   without telling me, you know, when I first saw it

25   under the seat.  That's when they tell me it's

26   only for protection.  My understanding was it was

27   only going to be used if the other group have

119

4 /

1   weapon on them; otherwise, it was supposed to be

2   in the car.  Because when I agreed to go into

3   fistfight, that's all I agreed upon, was to have a

4   fistfight.  I never knew that someone was going to

5   take it out and shoot him; otherwise, I probably

6   wouldn't be there.  But back then I was trying to

7   get my life back straight, you know.  I'm sorry,

8   but ---

9       **PRESIDING COMMISSIONER ANGELE:**  Take your

10  time.

11      **INMATE NGO:**  I'm sorry that Mr. Gonzales,

12  you know, died, but I never wanted that to happen.

13  It was not my intention.  I thought it was just

14  for fight.  (Inaudible.)

15      **PRESIDING COMMISSIONER ANGELE:**  Let's take a

16  break (inaudible).

17                  [Off the record.]

18      **INMATE NGO:**  Thank you.  I know there's

19  nothing I can say or do at this point to bring

20  back Mr. Gonzales.  I know his family is probably

21  going through a lot of pain, but I was young and I

22  was ignorant, naïve.  I made bad judgment.

23  There's nothing I can say to bring him back, Sir.

24  If sorry would help, but hopefully one day they'll

25  find it in their heart to forgive me.

26      **PRESIDING COMMISSIONER ANGELE:**  Any

27  questions?

120

48

1    **DEPUTY DISTRICT ATTORNEY LAIRD:**    Yes.    I

2    appreciate that answer from Mr. Ngo.    I have just

3    a couple of follow up questions to the Board

4    regarding the Tiger Mafia.    Because it is printed

5    in several pieces of documentation including the

6    probation report as well as elsewhere that at

7    about the time of the murder he was affiliated

8    with a group called the Tiger Mafia.    And I'm

9    aware and I can point to a picture here on the

10    table that dealt with search warrants and items

11    that were obtained and seized during the time of

12    this crime.    And I've seen and become aware of

13    several drawings, that are drawings, handwritten

14    drawings of a tiger, which I'm making the

15    assumption refers to the Tiger Mafia.    And I'm

16    just trying to get a clarification of what that

17    group was and why the inmate put the tattoo on his

18    arm for TM or Tiger Mafia.

19    **ATTORNEY FOX:**    I'd like to pose an

20    objection to the extent that the District

21    Attorney was testifying.    If there is a

22    question regarding the Tiger Mafia, I think it

23    might be asked as a direct question rather

24    than a litany of what the District Attorney

25    has seen.

26    **PRESIDING COMMISSIONER ANGELE:**    I'll

27    overrule your objection.    I don't believe he was

121

49

1  testifying.  I believe the question has already

2  been asked and answered.  The Tiger Mafia,

3  according to the inmate, was made up and the

4  initials on his arm stood for the initials of an

5  ex-girlfriend.  Do you still state that?

6         **INMATE NGO:**  Yes, Sir.

7         **PRESIDING COMMISSIONER ANGELE:**  So there

8  never was a group called the Tiger Mafia?

9         **INMATE NGO:**  No.  It's just a made-up name.

10        **DEPUTY COMMISSIONER RODRIGUEZ:**  Are those

11  drawings from ---

12        **DEPUTY DISTRICT ATTORNEY LAIRD:**  I do not

13  know.  I do not know.  I just used it as a purpose

14  of illustration just because I've, in reviewing

15  the file I've seen some pictures of tigers.  I see

16  a tattoo.  So I'm just asking by illustrating what

17  I've seen if there was any connection to the Tiger

18  Mafia.

19         **INMATE NGO:**  If you want clarification what

20  the tattoo of the tiger is, all the Fullerton Boyz

21  has a tiger on his chest.  It's not because of the

22  Tiger Mafia.  It's Fullerton Boyz has a tiger on

23  his chest, all of us.

24        **DEPUTY DISTRICT ATTORNEY LAIRD:**  Thank you.

25        **PRESIDING COMMISSIONER ANGELE:**  Anything

26  further?

27        **DEPUTY DISTRICT ATTORNEY LAIRD:**  Nothing

122

50

1   further.

2       PRESIDING COMMISSIONER ANGELE:  Ms. Fox,

3   questions of your client.

4       ATTORNEY FOX:  Just briefly.  When you were

5   found in possession of cocaine, when the police

6   officer stopped you.

7       INMATE NGO:  Yes.

8       ATTORNEY FOX:  They found the cocaine in a

9   purse, right?

10      INMATE NGO:  I'm not sure where they found

11  it.  I think it was underneath the seat,

12  underneath the seat when they found it.  It wasn't

13  in no purse at all.

14      ATTORNEY FOX:  Okay, that was my question.

15  If it was in the purse how did it get there.  But

16  it's your testimony you didn't put it there?

17      INMATE NGO:  No, if anything, if I remember

18  correctly I put it under the seat.  If it also

19  found it'd be under the seat.

20      ATTORNEY FOX:  So it wasn't your mother's

21  cocaine?

22      INMATE NGO:  No.  It was mine.  I bought it.

23      ATTORNEY FOX:  Okay, I have no further

24  questions.

25      PRESIDING COMMISSIONER ANGELE:  Okay, can we

26  go into closing please, from the District

27  Attorney, Mr. Laird?

123

51

1    **DEPUTY DISTRICT ATTORNEY LAIRD:**   Yes, I

2    have, I've been prosecuting gang cases in my

3    office for approximately five years.  I know Robin

4    Parks, she's a colleague of mine.  I have tried a

5    case just like a case like this in terms that the

6    type of theory that is presented in terms of a

7    gang, group attack that results in a death.  I

8    would indicate that Mr. (inaudible) who I also

9    know is, or who was the Public Defender at the

10   time, and is still a public defender representing

11   his client, basically is not talking about any

12   sort of novel or unique theory that is applied in

13   Orange County in terms of finding the defendant

14   guilty of murder by virtue of being involved in

15   gang related activity and aiding and abetting in a

16   fight on a victim that results in a murder.  I

17   would note that the seriousness of the crime,

18   basically is well spoken for in the probation

19   report by Robin Park.  It's also well spoken for

20   by the fact that a jury did return a first degree

21   murder verdict on this case and that there was a

22   subsequent plea apparently between the District

23   Attorney in exchange for not raising any appellate

24   rights on the case.  It is my opinion that based

25   on, well I'll just withdraw, I won't make any

26   comments regarding the nature of why that plea

27   took place because I personally have not been able

124

52

1   to find the precise material that refers to that.

2   However, I would just point to the gravity of the

3   offense in urging what we have urged in our

4   May 3rd, 2002, letter in that we believe that at

5   this point Mr. Ngo is not suitable for parole.

6   And it's largely based on the heinousness of the

7   crime in that it involved an extremely vulnerable

8   victim at the time of the group attack.   It

9   involved a picture, an accurate picture of gang

10  subculture with respect to the roles of guns and

11  how guns are brought to a conflict for backup.

12  And that in the gang subculture any type of

13  escalation by rival gangs is basically a form of

14  disrespect which must be answered to.   And that by

15  virtue of the victim answering with blows to

16  Mr. Ngo at the time, back in 1990, literally

17  1990's, it was just a right condition for an

18  escalation of a conflict wherein the gun would be

19  used.   The People have a concern also regarding

20  the modus operandi of Asian gangs in this state in

21  that their activity is not as overt in the

22  community.   They appear to be less overt regarding

23  their gang affiliation and it's hard to look at

24  the inmate essentially with a crystal ball at this

25  time.   We're forced to look back at past conduct

26  that has happened which I've described above.

27  It's my belief that the inmate's account about the

126

53

1   gun and the use of the gun at the crime is

2   somewhat unreasonable in that he indicates that

3   the reason they had a gun was for protection and

4   they were laying in wait or lying in wait for the

5   victim to come out of school.  At that time, they

6   knew they had had a conflict earlier at the

7   McDonald's.  They didn't know whether the victim

8   was armed or not or whether the victim's cohort

9   was armed or not.  And it seems unreasonable that

10  this defendant would not know that the gun was

11  taken out of the car in concert with the rest of

12  the suspects who ended up attacking victim

13  Gonzales.  And we just believe based on all the

14  psychiatric reports and based on the limited

15  contact that the experts have had with the inmate

16  that there needs to be a longer test of time

17  before this inmate is found suitable for a parole

18  date and I thank you very much for your time.

19          **PRESIDING COMMISSIONER ANGELE:**  Thank you.

20  Ms. Fox.

21          **ATTORNEY FOX:**  Thank you.  I respectfully

22  disagree with my colleague from Orange County.  I

23  think it would be appropriate to set a date for

24  Mr. Ngo today.  Before the Panel is a man who has

25  matured in the prison system.  Today he displayed

26  genuine remorse, which has been a hallmark of his

27  existence in the Department of Corrections.  Going

126

54

1    back to the probation report, which was used for

2    the Statement of Facts over my objection.

3    Consistently throughout there, that report Mr. Ngo

4    is cited for having stated that he did not know

5    that the weapon is in the car for any long period

6    of time before it was used and today he spoke what

7    he thought the use to which that weapon would be

8    put.  It would be used in self-defense.  Hindsight

9    is 20/20.  He can't go back and change what

10    happened.  Facts is facts.  And I think the fact

11    that he stands convicted of a murder two, not

12    murder one, is a significant finding.  Turning to

13    his institutional adjustment, he has minimal

14    disciplinary history, and that's consistent with

15    his personality prior to the time he came into the

16    Department of Corrections with this one very

17    tragic situation.  He has improved himself to the

18    extent that he's able to within the Department of

19    Corrections having achieved two completed

20    vocations, sustained attendance at AA, good work

21    reports, and he continues to enjoy a sustained

22    excellent family support system out there.  In the

23    psych report it's important to note that he does

24    have a Global Assessment score of 90, which would

25    let us know that he is able to cope with life on

26    the streets in a non-destructive manner.  And he's

27    done that and it's demonstrable or has been

127

55

1  demonstrable since he's been incarcerated. I
2  believe both psych reports accurately describe
3  Mr. Ngo, and he is ready for parole. The plans
4  are excellent. And if the Board is disinclined to
5  find him suitable for parole today, I'd suggest a
6  one or two year denial to allow him time to get
7  into the Impact program and pursue any other
8  self-help and anger management programs that the
9  Board would find useful. So we'll submit based on
10  that unless Mr. Ngo has something he'd like to
11  say.

12      **PRESIDING COMMISSIONER ANGELE:** Thank you.
13  Mr. Ngo, now it's your turn to make a statement to
14  the Panel regarding your parole suitability.
15  Before we do that, I just want to add one thing.
16  When I read the Statement of Facts from the
17  probationary report when we first started the
18  hearing, you indicated to me that that was the way
19  it happened?

20      **INMATE NGO:** Yes.

21      **PRESIDING COMMISSIONER ANGELE:** Thank you.
22  All right, do you need to make a statement or we
23  can end this hearing on what your attorney has
24  said on your behalf.

25      **INMATE NGO:** I just say, honestly I'm sorry
26  for what I've done. I accept the fact that, you
27  know, because of my ignorance that a human life

128

56

1    was lost.  And, you know, I made a mistake.

2    There's nothing I want more than to change what

3    happened.  I'm sorry, but I just don't know what I

4    can say anymore.  That's all I guess.

5         PRESIDING COMMISSIONER ANGELE:  Okay.  Thank

6    you for your comments.  We'll recess for

7    deliberations.

8                    R E C E S S

9                    --o0o—

10
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

129

57

1    CALIFORNIA BOARD OF PRISON TERMS

2         D E C I S I O N

3         DEPUTY COMMISSIONER RODRIGUEZ:  We're back

4    on record, all parties are present.

5         PRESIDING COMMISSIONER ANGELE:  In the

6    matter of Sieu Ngo, that's N-G-O.  Mr. Ngo, the

7    Panel has reviewed all information received from

8    the public and relied on the following

9    circumstances in concluding that you are not

10   suitable for parole and would pose an unreasonable

11   risk of danger to society or a threat to public

12   safety if released from prison.  The offense was

13   carried out in an exceptionally cruel, callous,

14   violent and brutal manner.  The offense was

15   carried out in a manner which demonstrates an

16   exceptionally callous disregard for human

17   suffering and life.  And the motive for the crime

18   was inexplicable or very trivial in relation to

19   the offense.  These conclusions were drawn from

20   the Statement of Facts wherein the inmate and his

21   crime partners, after altercation with the victim,

22   armed themselves with a weapon, went to the high

23   school where the victim, one 15 year old Angel

24   Gonzales went to school, and waited for him to get

25   out of school.  The inmate and one of his crime

26   partners then approached Mr. Gonzales and a friend

27   **SIEU PHONG NGO   J-07024   DECISION PAGE 1   05/13/02**

130

58

1    of his, each getting in a fight with one of them.

2    At which time both the inmate and his other crime

3    partner, both got into a fight with Mr. Gonzales.

4    At the same time three other crime partners

5    jumping in and attacking Mr. Gonzales who was shot

6    and killed after he was on the ground, by one of

7    the other crime partners.  The prisoner has on a

8    previous occasion has attempted to inflict injury

9    upon a victim.  This has to do with another fight

10   in which he was involved in a one-on-one, which he

11   got the better of the fight and knocked the victim

12   down and then his crime partners jumped in and all

13   started beating the victim.  The inmate does have

14   an escalating pattern of criminal conduct, albeit

15   minor.  However, it does include the possession of

16   rock cocaine.  The inmate has received during his

17   incarceration no 115 disciplinary reports, which

18   is a very positive step.  He's received two 128(a)

19   counseling chronos.  4/1/97, failure to respond to

20   a medical ducat and 2/11/00, for window coverings.

21   Psychological evaluation dated 1/23/02, by initial

22   C. Saindon, S-A-I-N-D-O-N, would indicate that the

23   inmate, or would be favorable to the inmate.  The

24   inmate does have parole plans.  He does have

25   residential plans in the last county of legal

26   residence, also in Los Angeles County.  And does

27   **SIEU PHONG NGO   J-07024   DECISION PAGE 2   05/13/02**

121

59

1    have acceptable job offers.  The hearing Panel

2    notes that responses to 3042 notices indicate

3    opposition to a finding of parole suitability,

4    specifically the District Attorney of Orange

5    County.  The Panel makes the following findings:

6    that the inmate needs additional time in order to

7    fully understand and deal with the causation

8    factors that led to the commitment of the life

9    crime.  Until progress is made, the prisoner

10   continues to be unpredictable and a threat to

11   others.  Nevertheless, he should be commended for

12   his participation in NA, for his participation in

13   the 12-steps, for his completing vocational auto

14   upholstery and auto refinishing.  In addition, to

15   his being 115-free during his incarceration and

16   for completing the Keys to Fatherhood a

17   salesmanship course, and the tuberculosis and

18   hepatitis courses.  However, these positive

19   aspects of his behavior do not outweigh the

20   factors of unsuitability.  In a separate decision,

21   the hearing Panel finds that it is not reasonable

22   to expect that parole would be granted at a

23   hearing during the following two years.  The

24   specific reasons for the findings are as follows:

25   the prisoner committed the offense in an

26   exceptionally cruel, callous, violent, brutal

27   **SIEU PHONG NGO   J-07024   DECISION PAGE 3   05/13/02**

132

60

1    manner.  Specifically, he and his crime partners,

2    after one of his crime partners was involved in a

3    fight with the victim, left, armed themselves with

4    a weapon, and then went back to the school area

5    where the victim had gone to school, waited for

6    the victim to get out of school.  The inmate and

7    one of his crime partners then got involved in a

8    one-on-one fight with the victim and one of his

9    friends.  After which, the inmate and his crime

10   partner both began fighting with the victim.  They

11   were then joined in by two other individuals who

12   were beating the victim, knocked to the ground.

13   One of the crime partners shot and killed the

14   victim, one Angel Gonzales, age 15.  The offense

15   was carried out in an exceptionally cruel and

16   callous manner.  The motive for the crime was

17   inexplicable or very trivial in relation to the

18   offense.  The prisoner had been involved in

19   previous violent behaviors, which included once

20   again, a fistfight with an individual who he got

21   the better of and knocked down and after which

22   time three of his crime partners and him all began

23   continuing to strike the victim.  The correctional

24   counselor's report dated (inaudible) 2002, by

25   initial M. Rubio, R-U-B-I-O, indicates a degree of

26   threat as moderate if released to the public.

27   **SIEU PHONG NGO  J-07024  DECISION PAGE 4  05/13/02**

133

61

1    Therefore, a longer period of observation and

2    evaluation of the prisoner is required before the

3    Board should find the prisoner is suitable for

4    parole.  The Panel recommends that inmate remain

5    disciplinary-free.  If available, upgrade any way

6    you can, vocation, education.  If available,

7    participate in self-help and therapy programming.

8    That does conclude the reading of the decision.

9    Any comments, Commissioner Rodriguez?

10        **DEPUTY COMMISSIONER RODRIGUEZ:**  Yeah,

11    Mr. Ngo, one thing I think you took more of a

12    leadership role in this incident and I think

13    you've been a little bit less than truthful today.

14    If I'm wrong and what you stated today is the

15    truth, I don't expect you to change your story

16    just for the Board's panel.  But I truly would

17    like you to take this next two years, as far as

18    I'm certain you're programming well, don't

19    misunderstand me.  But I think there's more to the

20    incident than you're actually telling us today.

21    Whether you just don't want to say it or you

22    choose not to say it or throughout the years

23    you've made yourself believe what you've said in

24    the past is correct.  But I think if you look deep

25    down, I truly believe that you took more of a

26    leadership role and that possibly you did have,

27    **SIEU PHONG NGO   J-07024   DECISION PAGE 5   05/13/02**

12A

62

1    know more about that weapon.  So I want you to

2    think about that.  But, again, like I said, if I

3    am incorrect, I don't expect you to come to the

4    Board next time and say you did do it if you

5    didn't.  But I will ask you one more time, did you

6    know more about that gun?

7         INMATE NGO:  (Inaudible) not until I looked

8    under the car.  When I got into the car, that's

9    the first time I seen the gun, Sir.

10        DEPUTY COMMISSIONER RODRIGUEZ:  Did you plan

11   the assault or the incident?

12        INMATE NGO:  No, Sir.

13        DEPUTY COMMISSIONER RODRIGUEZ:  Okay.  Thank

14   you.

15        ATTORNEY FOX:  I'm sorry.  That's vague,

16   because he did earlier say he planned to fight

17   him, but not shoot him.

18        INMATE NGO:  Thank you.

19        DEPUTY COMMISSIONER RODRIGUEZ:  Okay, no, no

20   that's all right counselor.  Thank you.  And I

21   just want to wish you the best of luck.

22        PRESIDING COMMISSIONER ANGELE:  Mr. Ngo, let

23   me tell you, you know, what disturbs me is the

24   other fight you had and we're very familiar with

25   the gang mentality.  Regardless of whether or not

26   you beat somebody, going to beat somebody, the end

27   SIEU PHONG NGO  J-07024  DECISION PAGE 6  05/13/02

135

63

1    result is everybody jumps on a guy when he's down.

2    It happened in another fight you had.  I think

3    your statement was, you couldn't be responsible

4    for what they do, but I'll tell you very frankly

5    if it was one of your crime partners involved in

6    that, you'd of jumped in just like everybody else

7    did.  That's the way things are.  We both know

8    that.

9         **INMATE NGO:**  Yes, it is.

10        **PRESIDING COMMISSIONER ANGELE:**  It disturbs

11   me that the killing of Mr. Gonzales was the same

12   type of situation.  The only difference is

13   somebody had a gun there.  So the history that you

14   started to accumulate would indicate to me that

15   the gang mentality that has no respect at all for

16   humanity, you know what happens next?

17        **INMATE NGO:**  That's when I was young, Sir.

18        **PRESIDING COMMISSIONER ANGELE:**  I realize

19   that.  I realize that.  And the reason why I

20   brought that up is I'd really like to see you get

21   into that anger management program here.

22   Hopefully, they'll get it out for you or you'll

23   get into it soon and maybe the next time you'll

24   have it under your belt.  I figure it will help.

25   And I don't want this to discourage you.  You're

26   doing a good job.  And for an initial hearing,

27   **SIEU PHONG NGO   J-07024   DECISION PAGE 7   05/13/02**

136

64

1    your counsel knows, that two years is not a bad

2    thing.   So I do wish you good luck.

3         INMATE NGO:   Thank you, Sir.

4         PRESIDING COMMISSIONER ANGELE:   That does

5    conclude the hearing.   Time is approximately 3:52

6    p.m.

7                      --o0o--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   **PAROLE DENIED TWO YEARS**

26   **EFFECTIVE DATE OF THIS DECISION**_____   JUN 1 0 2002

27   **SIEU PHONG NGO   J-07024   DECISION PAGE 8   05/13/02**

137

65

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, VALERIE C. LORD, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 64, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, AT SOLEDAD, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING of SIEU PHONG NGO, CDC No. J-07024, on MAY 13, 2002, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 23, 2002, at Auburn, California.

_____
Valerie C. Lord
Transcriber
**CAPITOL ELECTRONIC REPORTING**

128

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT C

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )    CDC Number J-07024
Hearing of: )
)
SIEU NGO )
_____)



CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 3, 2004

1:15 P.M.

PANEL PRESENT:

BOOKER WELCH, Presiding Commissioner
ROLANDO MEJIA, Deputy Commissioner

OTHERS PRESENT:

SIEU NGO, Inmate
DAVID SPOWART, Attorney for Inmate
JENNIFER CONTINI, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No     See Review of Hearing
_____  Yes    Transcript Memorandum

**Wendy Thomas, Capitol Electronic Reporting**

140

ii

# INDEX

|                             | Page |
|-----------------------------|------|
| Proceedings                 | 1    |
| Case Factors                | 12   |
| Pre-Commitment Factors      | 15   |
| Post-Commitment Factors     | 20   |
| Parole Plans                | 29   |
| Closing Statements          | 49   |
| Recess                      | 57   |
| Decision                    | 58   |
| Adjournment                 | 63   |
| Transcriber Certification   | 64   |

--oOo--

141

1

1      P R O C E E D I N G S

2          DEPUTY COMMISSIONER MEJIA:  We are now on

3      the record.

4          PRESIDING COMMISSIONER WELCH:  Okay, good

5.     afternoon, Mr. Ngo.

6          INMATE NGO:  Good afternoon.

7          PRESIDING COMMISSIONER WELCH:  Sir, this is

8      a Subsequent Parole Consideration Hearing.  I'll

9      read your case factors into the record.  The

10     prisoner's name is Ngo, N-G-O.  How do you

11     pronounce your first name?

12         INMATE NGO:  Sieu.

13         PRESIDING COMMISSIONER WELCH:  Sieu,

14     S-I-E-U, CDC number J-07024.  The date of the

15     hearing is Tuesday, August 3rd, 2004, the time is

16     approximately 1:15.  The location is Correctional

17     Training Facility, Soledad.  The prisoner was

18     received CDC on 2-1, 1994 from Orange County for

19     the offense of murder second, case number C99109,

20     count one, Penal Code violated 187, total term 16

21     years to life, minimum eligible parole date was

22     5-24-03.  Sir, this hearing will be tape-recorded

23     so for the purpose of voice identification, we'll

24     need to go around the room and identify ourselves

25     stating our full name, spelling our last name.  In

26     your case, you need to add your CDC number.  I'll

27     start with myself, go to my left.  My name is

142

2

1 Booker Welch, W-E-L-C-H.  Mr. Mejia.

2 **DEPUTY COMMISSIONER MEJIA:**  Rolando Mejia,

3 M-E-J-I-A, Deputy Commissioner.

4 **DEPUTY DISTRICT ATTORNEY CONTINI:**  Jennifer

5 Contini, C-O-N-T-I-N-I, Deputy District Attorney,

6 Orange County.

7 **ATTORNEY SPOWART:**  David Spowart,

8 S-P-O-W-A-R-T, attorney for Mr. Ngo.

9 **INMATE NGO:**  Sieu Ngo, S-I-E-U N-G-O, CDC

10 number J-07024.

11 **PRESIDING COMMISSIONER WELCH:**  Okay, sir,

12 that identifies everyone in the room with the

13 exception of the correctional peace officer who is

14 seated directly behind you, two of them, and

15 they're here for security purposes only and will

16 not be taking part in today's proceedings.  Mr.

17 Ngo, are you familiar with the American with

18 Disabilities law?

19 **INMATE NGO:**  No, I'm not, Sir.

20 **PRESIDING COMMISSIONER WELCH:**  Well, that

21 form in front of you, it will give you a good

22 overview.  Do you mind reading that into the

23 record.

24 **INMATE NGO:**  "ADA American with

25 Disability Act.  Americans with

26 Disability Act (ADA) is a law to help

27 people with disabilities.

143

3

1          Disabilities are problems that make

2          it harder for some people to see,

3          hear, breathe, talk, walk, learn,

4          think, work, or take care of

5          themselves than it is for others.

6          Nobody can be kept of public places

7          or activities because of a

8          disability.  If you have a

9          disability, you have the right to ask

10         for help to get ready for your BPT

11         hearing to get to the hearing, talk,

12         read forms and papers, and understand

13         the hearing process.  BPT will look

14         at what you ask for to make sure that

15         you have a disability that is covered

16         by the ADA and that you have asked

17         for the right kind of help.  If you

18         do not get help or if you don't think

19         you've got the kind of help you need,

20         ask for a BPT 1074 Grievance Form.

21         You can also get help to fill it

22         out."

23         **PRESIDING COMMISSIONER WELCH:**  Very good.

24  Mr. Ngo, does that give you a little bit better

25  overview of what the American with Disabilities

26  law is all about?

27         **INMATE NGO:**  Yes.  Yes, Sir.

144

4

1    PRESIDING COMMISSIONER WELCH:  Now after

2    being armed with that knowledge, let me ask you,

3    do you have a disability as defined under the

4    American Disabilities Act?

5    INMATE NGO:  No, Sir.

6    PRESIDING COMMISSIONER WELCH:  I see you

7    have glasses, do you need those to read?

8    INMATE NGO:  I'm nearsighted.

9    PRESIDING COMMISSIONER WELCH:  Nearsighted,

10   okay.  You have no problems talking, reading here,

11   or walking, is that correct?  You were able to

12   walk over under your own power today?

13   INMATE NGO:  Yes, Sir.

14   PRESIDING COMMISSIONER WELCH:  You have a

15   12.3 overall TABE grade point level which would

16   indicate to the Board that you're totally capable

17   of reading and understanding the documents

18   necessary to prepare for this hearing, is that

19   correct?

20   INMATE NGO:  Correct, Sir.

21   PRESIDING COMMISSIONER WELCH:  Have you

22   received any mental health treatment within the

23   last 12 months?

24   INMATE NGO:  No, Sir.

25   PRESIDING COMMISSIONER WELCH:  Counselor, do

26   you have any concerns about your client's rights

27   as it relates to the American with Disabilities

145

5

1   law?

2           ATTORNEY SPOWART:  I have none.

3           PRESIDING COMMISSIONER WELCH:  Okay, then

4   we'll proceed with this hearing.  The purpose of

5   today's hearing is to once again to consider your

6   suitability for parole.  We will consider the

7   nature and the number of the crimes you were

8   committed for, your prior criminality, your social

9   history, and your behavior and programming since

10  your commitment.  We've had an opportunity to

11  review your C-File and your prior transcripts and

12  you'll have an opportunity to make corrections or

13  clarifications to the record.  We will consider

14  your progress since your last hearing, any new

15  psychiatric reports, and any other information

16  that may have a bearing on your suitability for

17  parole.  Any change in parole plans should be

18  brought to our attention.  Before we recess for

19  deliberations, the District Attorney, your

20  attorney, and yourself will be given the

21  opportunity to make a final statement regarding

22  your suitability for parole and the length of

23  confinement.  After that's done, we will recess,

24  clear the room, and deliberate.  Once we reached a

25  decision, we will reconvene and at that time we'll

26  let you know what our decision is.  Do you

27  understand all that so far?

146

6

1          INMATE NGO:  Yes, Sir.

2          PRESIDING COMMISSIONER WELCH:  Now the Board

3   of Prison Terms rules and the law basically state

4   that a parole date shall be denied you if in the

5   opinion of the Commissioners your parole would

6   pose an unreasonable risk of danger to others.

7   However, prisoners do have certain rights.

8   Counsel, have your client's rights been met?

9          ATTORNEY SPOWART:  Yes, they have.

10          PRESIDING COMMISSIONER WELCH:  Mr. Ngo, you

11   have an additional right, you have the right to a

12   fair and impartial panel.  Do you have any reason

13   to believe the Panel Members will not be fair and

14   impartial to you?

15          INMATE NGO:  I would like to reserve that

16   right towards the end of this hearing.

17          PRESIDING COMMISSIONER WELCH:  Okay.  Mr.

18   Ngo, that's fine, I don't have a problem with

19   that, but I do need to tell you that I have no

20   reason not to give you a fair hearing.  I have

21   every intention to make sure that your due process

22   rights are adhered to.  I've already covered your

23   ADA issues and made sure you didn't have any

24   issues with that.  I'll be going over your due

25   process right issues to insure that you don't have

26   a problem with your rights.  And during the

27   hearing, it is -- I have every intention to insure

147

1   that you receive a fair and impartial hearing.

2   Commissioner, do you have any reasons why you

3   can't give the prisoner a fair hearing?

4        DEPUTY COMMISSIONER MEJIA:  No, I'm

5   objective and I take the case on a case by case

6   basis, no predetermined opinion or belief for

7   suitability or unsuitability.  I'll base all my

8   decision based on what I hear here and also what's

9   reflected in his file.

10       PRESIDING COMMISSIONER WELCH:  Okay, very

11  good.  Sir, you will receive a copy of our written

12  tentative decision today.  The decision becomes

13  effective in 120 days.  Mr. Ngo, you no longer

14  have a right to administrative appeals process, do

15  you understand that?

16       INMATE NGO:  Yes, I do.

17       PRESIDING COMMISSIONER WELCH:  Okay.

18       INMATE NGO:  The 1040 you mean?

19       PRESIDING COMMISSIONER WELCH:  Yes.  You're

20  not required to discuss the offense today, you're

21  not required to admit to guilt.  However, the

22  Panel Members accept as true the findings of the

23  court.  Do you understand that concept?

24       INMATE NGO:  Yes, I do.

25       PRESIDING COMMISSIONER WELCH:  Counselor,

26  pardon me?

27       INMATE NGO:  I would like to say that I will

148

8

1    not be talking about -- discussing my case, my

2    case today under Penal Code section 5011.  And

3    before we go any further, I would like to submit

4    this memorandum as evidence in support of my

5    parole suitability to you.

6         PRESIDING COMMISSIONER WELCH:  Okay, I'll

7    take it at this time, but you're getting a little

8    ahead of the game, we were going to give you an

9    opportunity.  That's fine we'll accept it now,

10   how's that?

11        INMATE NGO:  Thank you.

12        PRESIDING COMMISSIONER WELCH:  Okay, very

13   good.  And certainly you do not have to talk or

14   admit to the crime.  Very good.  Commissioner, is

15   there any confidential information to be used

16   today?

17        DEPUTY COMMISSIONER MEJIA:  None.

18        PRESIDING COMMISSIONER WELCH:  Good.

19   Counselor, I passed you a list of the documents we

20   will be working from.  Do you have those

21   documents?

22        ATTORNEY SPOWART:  Yes, I have these.

23        PRESIDING COMMISSIONER WELCH:  District

24   Attorney, do you have those documents?

25        DEPUTY DISTRICT ATTORNEY CONTINI:  Yes, I

26   do.

27        PRESIDING COMMISSIONER WELCH:  Counselor, do

149

9

1    you have any additional documents to submit?  Your

2    counsel have already -- I mean, your client have

3    already submitted a brief.

4        **ATTORNEY SPOWART:**  He's already given me

5    that brief, he says the first 10 pages are an

6    overview of why he should be considered.

7        **PRESIDING COMMISSIONER WELCH:**  Why he should

8    be considered for parole.

9        **INMATE NGO:**  Because it would clarify my

10   position at this hearing today, Sir.

11       **PRESIDING COMMISSIONER WELCH:**  Okay, then we

12   will review that during deliberations, we'll go

13   through and review that.

14       **INMATE NGO:**  All right, Sir.

15       **PRESIDING COMMISSIONER WELCH:**  Very good,

16   very good.  Any other documents to submit?

17       **ATTORNEY SPOWART:**  No, I haven't.

18       **PRESIDING COMMISSIONER WELCH:**  Any

19   preliminary objections?

20       **ATTORNEY SPOWART:**  Yeah, I have an

21   objection.  This was a plea agreement and I have

22   an objection to the District Attorney being here

23   today on a recent Supreme Court ruling that

24   classifies a plea agreement as a contract.  I know

25   that my client was not the shooter, he had no

26   criminal prior record, and has had an excellent

27   performance since he's been in here, so.

150

10

1    **PRESIDING COMMISSIONER WELCH:**  What does

2    that have to do with the District Attorney being

3    here?

4    **ATTORNEY SPOWART:**  That the District

5    Attorney is breaking the contract (inaudible).

6    When he pled, he gave up certain rights.  The

7    People got certain benefits from that.

8    **PRESIDING COMMISSIONER WELCH:**  Okay.

9    **ATTORNEY SPOWART:**  They got their benefits.

10   Now they're just trying to deny him of his

11   benefits.

12   **PRESIDING COMMISSIONER WELCH:**  Okay, all

13   right, I think I understand.

14   **ATTORNEY SPOWART:**  (Inaudible).

15   **PRESIDING COMMISSIONER WELCH:**  Okay.

16   **ATTORNEY SPOWART:**  I just want it on the

17   record, Commissioner.

18   **PRESIDING COMMISSIONER WELCH:**  Okay,

19   absolutely, absolutely.  I'm going to overrule

20   that objection because according to Penal Code

21   3042, section 3042 that is, the District Attorney

22   or his representative have a right to appear and

23   represent The People's interest at these hearings.

24   If not the District Attorney, certainly the

25   Attorney General, he can appear depending on who

26   prosecuted the case or has a major interest in the

27   case, not one or both, but only one can appear.

11

1    In this case, The People -- the District Attorney

2    of Orange County have opted to send his

3    representative, i.e., the Deputy District Attorney

4    from Orange County here to represent the District

5    Attorney.  Therefore, per statute, per Penal Code,

6    I'll have to overrule that objection, okay.  All

7    righty, thank you very much.  Any other

8    objections?

9         **ATTORNEY SPOWART:**  I have none.

10        **PRESIDING COMMISSIONER WELCH:**  All right,

11   thank you, Mr. Spowart.  Okay, and your client

12   will not be speaking to us today?

13        **ATTORNEY SPOWART:**  Not on the life crime, he

14   pled on the crime.

15        **PRESIDING COMMISSIONER WELCH:**  Will he be

16   speaking -- will he be giving any testimony today?

17        **ATTORNEY SPOWART:**  Yes, he'll talk about

18   everything else.

19        **PRESIDING COMMISSIONER WELCH:**  Okay, Mr.

20   Ngo, would you raise your right hand.

21        **INMATE NGO:**  Yes, Sir.

22        **PRESIDING COMMISSIONER WELCH:**  Do you

23   solemnly swear or affirm that the testimony you

24   give today will be the whole truth and nothing but

25   the truth?

26        **INMATE NGO:**  Yes, I do, Sir.

27        **PRESIDING COMMISSIONER WELCH:**  Okay.  In

152

12

1    that case what I'm going to do, Mr. Ngo, is just

2    go to -- let me give this to my colleague, he can

3    take a look at it and then I'll take a look at it

4    later.  Are your parole plans in that brief you

5    submitted?

6          INMATE NGO:  Yes, Sir.

7          PRESIDING COMMISSIONER WELCH:  You've got

8    everything in it, okay.

9          INMATE NGO:  Parole plan, place for

10   residence, employment, support letters.

11         PRESIDING COMMISSIONER WELCH:  Okay, very

12   good.  Let's go to the summary of the crime, it

13   say,

14              "On 9-18, 1992 Angel Gonzalez,

15              G-O-N-Z-A-L-E-Z, was beaten and shot

16              to death near Fullerton,

17              F-U-L-L-E-R-T-O-N, High School as he

18              walked home after school.  An

19              investigation revealed that earlier

20              in the day the victim, a member of

21              the Fullerton Tokers, T-O-K-E-R-S,

22              Town, a Latin gang, and  members of

23              the Fullerton Boys, an Asian gang,

24              were at a McDonald's Restaurant near

25              the high school.  The victim and

26              Usumang Muhamed had a confrontation

27              with each claiming their respective

153

13

1        gang affiliations.  After a

2        nonphysical altercation, a group of

3        Asians, which at the time included

4        Sieu Phong Ngo obtained -- and middle

5        name is spelled P-H-O-N-G, referring

6        to the prisoner, obtained a firearm.

7        Ngo and the Asian gang members

8        returned to the school where they

9        waited for Gonzalez.  As he walked

10        home, he was attacked and beaten.

11        During the physical altercation, the

12        victim was shot one time in the back

13        by Usumang, that's U-S-U-M-A-N-G,

14        Muhamed, M-U-H-A-M-E-D.  The group of

15        five Asian gang members including Ngo

16        fled the area after shooting Angel

17        Gonzalez who died at the scene as a

18        result of the gunshot wound.  Ngo,

19        Jimmy Bao, B-A-O, and Asat, A-S-A-T,

20        Cham, C-H-A-M, --"

21   or is that Ham?  C-H-A?

22        **INMATE NGO:**  Cham.

23        **PRESIDING COMMISSIONER WELCH:**  "-- Cham,

24   C-H-A-M, fled to the State of Washington.  They

25   were subsequently apprehended there and the murder

26   weapon, a stolen .22 caliber handgun, was

27   recovered in the vehicle."  Now we'll go to the

154

14

1    prisoner's version,

2            "Ngo explained that earlier in the

3            day his group had a confrontation

4            with the victim.  Subsequently he and

5            his group went to an arcade to play

6            games.  At that time his companion

7            took possession of a weapon.  Ngo

8            stated that he did not see the gun

9            until he was in the vehicle.  It was

10           located under the passenger's seat

11           and he and his companion returned to

12           Fullerton High School where they

13           parked and went to look for Gonzalez,

14           the victim.  Ngo explained that they

15           had a gun for protection in case

16           someone else happened to have a

17           weapon.  They found Gonzalez and his

18           group and started fighting with the

19           victim.  During the fighting Ngo

20           heard two shots.  Ngo explained that

21           no one intended to kill the victim,

22           they just planned to beat him up

23           because the victim had told them to

24           get out of town and that made Muhamed

25           angry.  Ngo realized that his

26           behavior was a mistake.  Ngo drove

27           his two companions to Washington

155

15

```
 1              because Muhamed told him that he knew
 2              someone who would give them shelter.
 3              Ngo feels sorry for the victim's
 4              family."
 5      Juvenile record, there's no juvenile arrest.  Will
 6      you be talking about your juvenile record, I mean,
 7      your criminal history?
 8              INMATE NGO:  I have no juvenile record.  I
 9      have one drug diversion with a controlled
10      substance.  I was given a diversion but I was
11      never able to complete it --
12              PRESIDING COMMISSIONER WELCH:  Okay.
13              INMATE NGO:  -- because I got this case,
14      that's about it.
15              PRESIDING COMMISSIONER WELCH:  It says, no
16      juvenile record as previously noted.  On 3-30,
17      1992 Ngo was arrested by the San Gabriel Police
18      Department for possession of controlled substance,
19      three pieces of rock cocaine.  On 5-7-92 he was
20      diverted pursuant to Penal Code section --
21      pursuant to section 1000 of the Penal Code.  On
22      9-22, 1992, Ngo was arrested by the Olympic
23      Sheriff for possession of stolen property.  This
24      case was subsequently dismissed.  So you had two
25      arrests?
26              INMATE NGO:  Yes, because we were arrested
27      in Washington.
```

154

16

1      **PRESIDING COMMISSIONER WELCH:**  Okay.

2          **INMATE NGO:**  I guess you can consider it as

3      two, for the same crime.

4          **PRESIDING COMMISSIONER WELCH:**  Well, it says

5      you was arrested for stolen property and that was

6      dismissed.

7          **INMATE NGO:**  They say the gun -- I sold the

8      gun but I never lived in Washington so they note

9      there was a (indiscernible) chance I stole the gun

10     when he brought it to California, so.  I didn't

11     know nothing about the gun.  I just drove there

12     for shelter like I said.  I didn't know nothing

13     about the stolen property.

14         **PRESIDING COMMISSIONER WELCH:**  All right,

15     now we have the explanation on the record.

16     Personal factors, Ngo was born in Vietnam on 5-18,

17     1973.  He resided in the United States until 1979.

18     In 19 -- He resided in the United States since

19     1979.  In 1991 he graduated from Fullerton High

20     School and subsequently attended Fullerton

21     Community College and Pasadena City College.  He

22     completed 10 units and his major was business.

23     Ngo was employed as a telemarketing and worked odd

24     jobs.  He was employed at his family's liquor

25     store and resided with his parents.  Ngo had

26     problems with -- Ngo had problems with controlled

27     substance or alcohol.  Is that true?

157

17

1        INMATE NGO:  I don't have no problem with

2    drugs at this point.  I never drank alcohol

3    because I'm allergic to alcohol.  I tried cocaine

4    and I got busted.

5        PRESIDING COMMISSIONER WELCH:  Okay.

6        INMATE NGO:  I have never used since, since

7    that day.

8        PRESIDING COMMISSIONER WELCH:  Have you used

9    any -- used any other illegal substances?

10       INMATE NGO:  No, I don't, Sir.

11       PRESIDING COMMISSIONER WELCH:  Okay.  It

12   says you were a member of the Fullerton Boys, is

13   that correct, gang?

14       INMATE NGO:  Used to be.

15       PRESIDING COMMISSIONER WELCH:  Okay.  And

16   after you moved to Los Angeles you became

17   affiliated with the Tiger Mafia.

18       INMATE NGO:  Yeah, that was just a made up

19   name (inaudible) at that point.

20       PRESIDING COMMISSIONER WELCH:  What?

21       INMATE NGO:  It was a made up name, like I

22   told my last hearing that it was just to throw the

23   detective off my trail.

24       PRESIDING COMMISSIONER WELCH:  To throw the

25   detective off your trail, okay, all right.  Your

26   family, do you have any brothers and sisters?

27       INMATE NGO:  Yes, I do, Sir.

158

18

1        **PRESIDING COMMISSIONER WELCH:** How many?

2        **INMATE NGO:** I've got one older brother, two

3    older sisters, one younger brother, and one

4    younger sister.

5        **PRESIDING COMMISSIONER WELCH:** Okay, any of

6    your brothers have problems with law enforcement

7    agents?

8        **INMATE NGO:** No.

9        **PRESIDING COMMISSIONER WELCH:** Any of your

10    brothers been members of gangs?

11        **INMATE NGO:** No.

12        **PRESIDING COMMISSIONER WELCH:** Did you grow

13    up in an intact home with both parents?

14        **INMATE NGO:** Yes, I did, Sir.

15        **PRESIDING COMMISSIONER WELCH:** Would you say

16    you had a stable home environment?

17        **INMATE NGO:** Yes, I have.

18        **PRESIDING COMMISSIONER WELCH:** Were you

19    married before you came to prison?

20        **INMATE NGO:** No, Sir.

21        **PRESIDING COMMISSIONER WELCH:** Any childrens

22    before you came to prison?

23        **INMATE NGO:** No, Sir.

24        **PRESIDING COMMISSIONER WELCH:** Did you ever

25    serve in any branch of the military?

26        **INMATE NGO:** No. I tried it but they didn't

27    want me because I was a smoker back then.

159

19

1        **PRESIDING COMMISSIONER WELCH:**  Because you

2  were smoker of what?

3        **INMATE NGO:**  Cigarettes, tobacco.

4        **PRESIDING COMMISSIONER WELCH:**  And the

5  military turned you down because you smoked

6  tobacco?

7        **INMATE NGO:**  Yes.

8        **PRESIDING COMMISSIONER WELCH:**  What year was

9  that?

10       **INMATE NGO:**  I think I tried it during --

11  after my graduation in South Pasadena and before

12  my graduation it was '89 or '90 I tried, I wanted

13  to go to the Marines because I heard they can

14  travel around the world.

15       **PRESIDING COMMISSIONER WELCH:**  And they

16  turned you down because you smoke?

17       **INMATE NGO:**  Yes.

18       **PRESIDING COMMISSIONER WELCH:**  That's a new

19  one on me.

20       **INMATE NGO:**  That's what they said.

21       **PRESIDING COMMISSIONER WELCH:**  Okay, depends

22  on what you smoke.  What did you smoke?  What did

23  you tell them you smoked?

24       **INMATE NGO:**  Tobacco.

25       **PRESIDING COMMISSIONER WELCH:**  Okay, just

26  tobacco, huh?

27       **INMATE NGO:**  Just tobacco.

160

20

1    **PRESIDING COMMISSIONER WELCH:**  All right.

2    It says you had -- and we already talked about you

3    said you had odd jobs, fast-food and you worked in

4    your family's liquor store, is that correct?

5    **INMATE NGO:**  Yes, Sir.

6    **PRESIDING COMMISSIONER WELCH:**  Is that

7    pretty much your employment history?

8    **INMATE NGO:**  Yes.

9    **PRESIDING COMMISSIONER WELCH:**  Okay, what

10   I'd like for you to do now is give your attention

11   to my colleague, he's going to talk to you about

12   post-conviction.  I'll come back and talk to you

13   about your parole plans.

14   **INMATE NGO:**  All right, Sir.

15   **DEPUTY COMMISSIONER MEJIA:**  All right, Mr.

16   Ngo, I'll be covering your institutional

17   adjustment in this portion of this hearing since

18   your last Board appearance.  I have reviewed your

19   Central File, Board reports and psychiatric

20   reports.  If I miss anything, I'll be giving you

21   and your attorney an opportunity to make comments

22   at the end of my presentation.  Your last Board

23   appearance was on May 13th, 2002 where you received

24   a two-year denial.  Your recommendation was for

25   you to remain disciplinary free, upgrade

26   educationally, participate in self-help and

27   therapy.  Classification score is 19, custody

161

21

1  level is medium A, you're assigned to the culinary

2  warehouse, correct?

3          INMATE NGO:  Correct, Sir.

4          DEPUTY COMMISSIONER MEJIA:  And I see some

5  laudatory chronos here about your performance.

6  Vocational history, you have an auto upholstery

7  completion, an auto finishing completion.  You

8  also have a forklift certification.

9          INMATE NGO:  Correct, Sir.

10         DEPUTY COMMISSIONER MEJIA:  And I see that

11  you're taking classes (inaudible) with the

12  Coastline Community College.

13         INMATE NGO:  Correct, Sir.

14         DEPUTY COMMISSIONER MEJIA:  When did you

15  start this?

16         INMATE NGO:  A little over -- about two

17  years now.

18         DEPUTY COMMISSIONER MEJIA:  Two years.  How

19  many years have you completed so far?

20         INMATE NGO:  So far completed -- at this --

21  this class I'm taking health right now.  Currently

22  I have 23.

23         DEPUTY COMMISSIONER MEJIA:  Twenty-three

24  units.

25         INMATE NGO:  I will have 23 units.

26         DEPUTY COMMISSIONER MEJIA:  Forklift.  Do

27  you have a high school?

162

22

1          INMATE NGO:  Yes, I do.

2          DEPUTY COMMISSIONER MEJIA:  Where did you

3    complete your high school at?

4          INMATE NGO:  Fullerton Union High.

5          DEPUTY COMMISSIONER MEJIA:  Fullerton Union

6    High.  Do you have a copy of the diploma?

7          INMATE NGO:  I should, yes.

8          DEPUTY COMMISSIONER MEJIA:  Can I see it,

9    please?  I couldn't find it in here.

10          INMATE NGO:  It should be in my file.

11          DEPUTY COMMISSIONER MEJIA:  If I thought --

12    If it was here I wouldn't ask for it.  Maybe I'm

13    just missing it but I don't want to spend time

14    looking for it.

15          INMATE NGO:  Unless I didn't put it in

16    there.

17          DEPUTY COMMISSIONER MEJIA:  It's not in your

18    --

19          INMATE NGO:  It's not in my C-File either?

20          DEPUTY COMMISSIONER MEJIA:  It's not in your

21    --

22          INMATE NGO:  I guess I didn't put it in

23    there.  I figured the C-File had it, but I can

24    always get you a copy if you need one.

25          DEPUTY COMMISSIONER MEJIA:  Okay.  What year

26    did you graduate there?

27          INMATE NGO:  '91.

163

23

1          DEPUTY COMMISSIONER MEJIA:  1991?

2          INMATE NGO:  It was '91, yes.

3          DEPUTY COMMISSIONER MEJIA:  Okay, and since

4     your last Board appearance in 2002 you were -- I

5     see that you have started in AA since 1997 and

6     then you switched to NA 2001 (inaudible)?

7          INMATE NGO:  I've been going, yes.

8          DEPUTY COMMISSIONER MEJIA:  The last chrono

9     was on --

10         INMATE NGO:  It should be -- my last chrono

11    was 7-8-04 date of it.

12         DEPUTY COMMISSIONER MEJIA:  Okay, 7-8-04 is

13    your NA participation.

14         INMATE NGO:  My most recent one.

15         DEPUTY COMMISSIONER MEJIA:  Yes, and the one

16    I have here on file is 2003 of March.  Okay, you

17    also completed the IMPACT program in 2002

18    workshop?

19         INMATE NGO:  Right.

20         DEPUTY COMMISSIONER MEJIA:  3-16, 2002.

21    There's a chrono from Mr. Vazquez, warehouse

22    supervisor, as a culinary storekeeper.  You have

23    performed your assignment with excellence.  You

24    have a good, helpful, mature attitude and has

25    worked even on holidays.  On disciplinaries, you

26    have zero 115s and two 128(a)'s from -- one on

27    April '97 and one on 2000 -- in 2000.  (Inaudible)

104

24

1   gang affiliation noted (inaudible) Tiger Mafia

2   member.  And when was the last time you were

3   hanging out with the Tiger Mafia as a member?

4        INMATE NGO:  Well, there is no Tiger Mafia,

5   as I was saying earlier, it's just a made up name,

6   so I don't have -- you know, there's no more gang

7   for me.  I've grown out of it.  Back then it was

8   just a --

9        DEPUTY COMMISSIONER MEJIA:  So was that the

10  Fullerton?

11       INMATE NGO:  Fullerton, yes.

12       DEPUTY COMMISSIONER MEJIA:  What was that,

13  Fullerton --

14       INMATE NGO:  Fullerton Boys, they call it

15  Fullerton Boys.

16       DEPUTY COMMISSIONER MEJIA:  Fullerton Boys

17  named as the Tiger Mafia?  Are you talking about

18  the same place?

19       INMATE NGO:  No, it's two different places,

20  LA right, I was living at LA at that time so, you

21  know, when they asked me where I was from, I told

22  them Tiger Mafia because they saw two initials on

23  my arm with TM so I just told them Tiger Mafia

24  just to make it up.

25       DEPUTY COMMISSIONER MEJIA:  So was there

26  really a Tiger Mafia gang?

27       INMATE NGO:  No, there's not.  You can check

165

25

1    into LA Police Department, you will not find no

2    Tiger Mafia at all.

3         **DEPUTY COMMISSIONER MEJIA:**  Well, I'm going

4    to your psych report.  Your psych report is dated

5    January 21, 2002 by Dr. Saindon, spelling

6    S-A-I-N-D-O-N.  We're going to look at your

7    substance abuse history, we have heard that you

8    said that you tried cocaine.  "Previous mental

9    health evaluation for the Board of Prison Terms

10   has recommended that he be involved in AA and NA.

11   However, inmate feels that he never really had a

12   drug or alcohol problem although he does currently

13   attend AA."  And you are attending NA right now,

14   right?

15        **INMATE NGO:**  Right.

16        **DEPUTY COMMISSIONER MEJIA:**  Okay.  And his

17   mental health status at this time of the

18   evaluation 2002 indicates that,

19             "There's no evidence of mood or

20             thought disorder, his judgment

21             appeared to be sound, showed

22             significant insight into his

23             commitment offense as far as some

24             recognition.  There's no guarantee

25             that he will be paroled at this time

26             by the Board of Prison Terms."

27   Diagnostic impressions, No Contributory Clinical

26

1    Disorder, Axis I.  Axis II Deferred, Axis III No

2    Contributory Physical Disorder, Axis IV Long-Term

3    Incarceration, Axis V Global Assessment of

4    Functioning of 90.  There's no evidence that he

5    suffers from any psychiatric illness.  Assessment

6    of dangerousness, "Although --" he says,

7            "There's no evidence the inmate

8            currently suffers from any

9            psychiatric illness although he does

10           recognize that (inaudible) he was

11           vulnerable to depression and was

12           tempted by conscious altering

13           substances.  In consideration of the

14           fact that he has received no 115s

15           through his entire incarceration, it

16           would appear that he has at least in

17           this controlled setting been able to

18           manage his behavior and remain

19           incident free."

20   Assessment of dangerousness,

21           "Mr. Ngo (inaudible) with the

22           information given in the Central File

23           and medical record with respect to

24           his prior history of (inaudible) or

25           attempt to use cocaine and was

26           affiliated with gangs, this resulted

27           in his current offense.  Based upon

1107

21

1      his complete lack of disciplinary

2      action while incarcerated, his

3      insight into negative aspects of gang

4      involvement, his remorse for his

5      actions, his violence potential

6      within a controlled is to be below

7      average relative to the level II

8      inmate population.  If released to

9      the community, his violence potential

10     is estimated to be less than the

11     average citizen in the community

12     given his insight, his demonstrated

13     ability to stay out of trouble, his

14     successful development of plans upon

15     release, and the support of his

16     family.  (Inaudible) the most

17     significant risk factor for this

18     inmate as a precursor to violence or

19     a return to criminal behavior would

20     be his being involved with others

21     having a criminal history and/or gang

22     members, the use of alcohol and

23     drugs, and isolation from his family

24     members.  As this man has spent 10

25     years in prison, I would recommend,

26     should he be paroled, abstinence from

27     all alcohol and use of uncontrolled

168

28

1           substance, frequent monitoring of

2           substance abuse, if at all possible

3           should be a relative so he's near to

4           his family, and should make frequent

5           reports to his parole officer.  Given

6           his family's commitment in supporting

7           him upon his release, his projected

8           level of success in the community if

9           granted a date for parole is seen at

10          this time to be better than average."

11  His counselor based him as posing a low degree of

12  threat to the community if released.  Have you got

13  any comments or any additions to my presentation,

14  Counsel?

15          INMATE NGO:  Do you have any of my support

16  letters from my family because --

17          DEPUTY COMMISSIONER MEJIA:  That will be

18  done by --

19          INMATE NGO:  Okay.

20          DEPUTY COMMISSIONER MEJIA:  Any additional

21  comments?

22          PRESIDING COMMISSIONER WELCH:  Are you done?

23          DEPUTY COMMISSIONER MEJIA:  Yeah.

24          PRESIDING COMMISSIONER WELCH:  Okay.

25          DEPUTY COMMISSIONER MEJIA:  I'll go back to

26  the Chair and we'll take a recess.

27          PRESIDING COMMISSIONER WELCH:  Okay, we'll

109

29

1    take a recess for a minute.

2                         [Off the record.]

3          **PRESIDING COMMISSIONER WELCH:**  Mr. Ngo, in

4    case --

5          **DEPUTY COMMISSIONER MEJIA:**  We're back on

6    record.

7          **PRESIDING COMMISSIONER WELCH:**  Mr. Ngo, in

8    case you receive a parole date, tell the Panel

9    where you plan to live.

10         **INMATE NGO:**  I'll be living with my mom to

11   start off.

12         **PRESIDING COMMISSIONER WELCH:**  Where does

13   your mom live?

14         **INMATE NGO:**  In Monterey Park.

15         **PRESIDING COMMISSIONER WELCH:**  Do you have

16   an INS hold?

17         **INMATE NGO:**  No, Sir.

18         **PRESIDING COMMISSIONER WELCH:**  Are you a US

19   citizen?

20         **INMATE NGO:**  Yes, Sir.

21         **PRESIDING COMMISSIONER WELCH:**  Okay, and how

22   do you plan to support yourself?

23         **INMATE NGO:**  I'll be working at my uncle's

24   restaurant for now, (inaudible) chef.

25         **PRESIDING COMMISSIONER WELCH:**  Okay, and you

26   have lots of support letters in the file and your

27   affidavit that you submitted.  And it appears that

170

30

1    you do have employment and you have a place to

2    live.  I'll start off by going over some of your

3    letters.  Your mom wrote you a letter, her name is

4    Ngo Phuong?  Phuong Huynh?

5          **INMATE NGO:**  Phuong Huynh.

6          **PRESIDING COMMISSIONER WELCH:**  Phuong Huynh,

7    okay, let me just spell the first name, the first

8    name is spelled P-H-U-O-N-G, and the middle name

9    is H-Y -- H-U-Y-N-H, and the last name is the same

10   as the prisoner's, N-G-O.  Anyway, she writes you

11   a very supportive letter.  She says,

12              "As the birth mother of Sieu Ngo, I

13              am writing to request for your

14              leniency and kind review of the

15              parole of Sieu Ngo.  Years ago our

16              family immigrated into the United

17              States from Vietnam.  With the kind

18              support from the US Government and

19              local communities, we settled down in

20              California and became US citizens in

21              1979.  All of our family members are

22              deeply indebted to our government and

23              community and we are determined to

24              serve our country when called for.

25              In fact, my children volunteer at

26              school and communities and help out

27              kids.  I have six children, some are

171

31

1         college graduates and are doing very

2         well in their careers, such as Chi

3         Phong Ngo, middle name is -- I mean,

4         first name is C-H-I, middle name is

5         P-H-O-N-G. My son is a quality

6         assurance software engineer.  Judy

7         Seeto --" Seeto?

8    **INMATE NGO:**  Correct.

9    **PRESIDING COMMISSIONER WELCH:**

10        "--S-E-E-T-O, my daughter, is

11        pursuing a college degree while

12        working full-time at Pacific Care.

13        And Lan Lau, L-A-N, last name is

14        L-A-U, another daughter, is an

15        assistant technician working at DG --

16        DCG Group Pacific Bell, SPG

17        (inaudible) Solutions Incorporated.

18        My husband was running a paint

19        business.  Unfortunately he passed

20        away in 1995 at the age of 47.  Some

21        of my uncles and aunts are business

22        owners of restaurants and stores.   I

23        used to run a family business too, a

24        convenience store."

25   And she says,

26        "Sieu Ngo have been working and

27        studying hard in prison and doing

172

32

1         well in his college studies.  Please

2         be assured that Sieu Ngo, if paroled,

3         will be well taken care of and

4         supervised by his family, relatives,

5         and friends.  We, his immediate

6         family members, will support him in

7         every aspect of life.  We plan to let

8         him complete his college studies

9         before entering the workforce.  We

10        are financially capable and

11        emotionally prepared and spiritually

12        determined to help Sieu Ngo and his

13        endeavors to create his reborn life

14        and become a contributing member to

15        our society.  Thank you in

16        anticipation of your kind review in

17        granting Sieu Ngo parole."

18  And your mother signed that.  Very supportive.

19  And another one from Gavin Ung.  Is that U-N-G?

20        **INMATE NGO:**  Yes, my uncle.

21        **PRESIDING COMMISSIONER WELCH:**  He says,

22        "I am in the Chinese restaurant

23        business and currently employ about

24        20 workers.  Sieu, if released from

25        prison, he will also be welcomed to

26        work for me if he so chooses.

27        Besides me willing to provide him

173

33

1        with accommodation, transportation,

2        and job, I believe there are a lot of

3        other relatives such as his mom,

4        siblings, uncles, and aunts who are

5        willing -- who will always be more

6        than willing to help with all his

7        essential daily needs."

8  Okay, and I have another one from Chi Ngo/Judy Ngo

9  -- slash Judy Ngo, and she writes -- she's writing

10  on behalf of her brother. She feels that you're a

11  good man and, "Tom is a good man and will remain

12  so.  He's a caring person who wants to take care

13  of his mother if he gets a second chance.  My wife

14  and I can fully support him financially and care

15  for all his personal needs including housing. I

16  believe Tom --" Do you also go by the name of Tom?

17        **INMATE NGO:**  Yes, that's my middle name.

18        **PRESIDING COMMISSIONER WELCH:**  Okay.  "I

19  believe Tom -- I believe in Tom and only good will

20  shine from him as each day passes."  Another

21  letter here from --

22        **INMATE NGO:**  Thanah.

23        **PRESIDING COMMISSIONER WELCH:**  T-H-A-N-A-H,

24  he writes you a very supportive letter.

25        **INMATE NGO:**  She.

26        **PRESIDING COMMISSIONER WELCH:**  She, okay,

27  your older sister I'm trying to say.

174

34

1          **INMATE NGO:**  Second oldest.

2          **PRESIDING COMMISSIONER WELCH:**  Second oldest

3    sister.  And she says,

4               "As you can see he's just the kind of

5               person and always there for anyone

6               who needs help.  Because of his

7               caring and kind personality, he has

8               done some harm to himself, this is

9               how he got himself into this mess.

10              I'm sure that the whole mess has

11              taught my brother to beware of his

12              friends.  Sieu's decision to hang out

13              with his friends was a costly one.

14              My brother was a young naïve.  Now

15              he's a grownup person and realizes

16              his actions and takes responsibility

17              to make changes to become a better

18              person."

19    And she goes on to say, "Our family have already

20    arranged for his support once he's released, my

21    husband's store," and she writes the telephone

22    number, "and is located on (indiscernible) Avenue

23    and Alhambra.  And a matter of fact his uncle --

24    his aunts and uncle also offered him work in their

25    restaurant.  The store name is Hot Wok --"

26          **INMATE NGO:**  Hot Wok.

27          **PRESIDING COMMISSIONER WELCH:**  That's H-O-T

175

35

1    W-O-K, "-- and that's in Fullerton.  And there's a

2    First (inaudible) Kitchen that's in Anaheim.

3    Housing would not be a problem.  And we all make

4    arrangements for him."  So Duc Ngo?

5         INMATE NGO:  Duc Ngo.

6         PRESIDING COMMISSIONER WELCH:  D-U-C Ngo.

7    Anyway, that's your brother, says, "I'm writing a

8    letter in support of my brother."  He writes you a

9    very supportive letter and he pretty much voices

10   the same thing that the other ones wrote.  I have

11   another letter here from your defense attorney at

12   the time and I'll read his letter.  He says, "I

13   represented --" her letter I should say,

14        "I represented Mr. Ngo in the case

15        which sent him to prison.  I have

16        been a criminal defense attorney for

17        over 26 years and have represented

18        over 40 persons accused of homicides.

19        I do not see my clients through rose

20        colored glasses and have never

21        written a letter like this on behalf

22        of an inmate for a parole hearing.

23        The circumstances of Mr. Sieu's case

24        compel me to make a statement in this

25        instant.  At the time of the incident

26        he was a very likable young man and

27        with no significant criminal history.

170

36

1          My recollection, he had no conviction

2          of any crime or violence.   The

3          incident in question was very

4          different from the typical gang case

5          and in fact a work sketching for your

6          review, Sieu and his friends was a

7          wannabe type group who did not really

8          have a significant history of tough

9          turf in Orange County as a gang.   On

10         the day of the incident, some of

11         Sieu's friends by chance went to

12         McDonald's which was near Fullerton

13         High School in North Orange County.

14         Sieu was not present at the time.

15         One of Sieu's ultimate codefendants

16         got in a staring match with the

17         decedent and some of his friends who

18         were members of the Toker Gang --

19         Toker Town, a long established

20         Hispanic group in Fullerton.

21         Essentially the Toker, that's spelled

22         T-O-K-E-R T-O-W-N -- Essentially the

23         Toker Town Group told Sieu's friends

24         that they, Cooks, that's C-O-O-K-S,

25         were not welcome in Fullerton where

26         some of them already live and they

27         should get out of town.   (Inaudible)

177

37

1      Sieu's friends decided to confront
2      the decedent's group after school got
3      out that day.  Sieu was called to
4      help out in case they were
5      outnumbered.  Their group waited at
6      the school and confronted the
7      decedent and one of his friends about
8      two blocks out of Fullerton High
9      School, not on school grounds.  From
10     all appearances, this was intended to
11     be a fistfight.  Sieu and his friends
12     who had been in the stare-down
13     approached the decedent and a friend
14     who was walking on the sidewalk and a
15     fistfight is how it started.
16     However, the decedent's friend fled
17     just after the punching began and
18     left Sieu and his friend fighting the
19     decedent who was much larger than
20     either of them.  Of course this was
21     unfair but nothing at this point
22     suggested that this was intended to
23     be a homicide.  A third member of
24     Sieu's -- A third member of the group
25     who was part of -- A third member of
26     the group who was part of (inaudible)
27     from where their car was parked to

118

38

1     the scene of the site, he reached up

2     while the fight was in progress, shot

3     the decedent, killed him, and

4     narrowly missed Sieu. Sieu and all

5     of his friends then fled, ultimately

6     being arrested out of state.

7     Evidence was received to show that

8     Sieu and his friends knew that a gun

9     was in a car. Based largely upon

10    that and the theory of foreseeable

11    consequences, he and all of his

12    codefendants were convicted. Sieu

13    was not the shooter and no evidence

14    to show that he suggested,

15    encouraged, abated -- or abetted the

16    shooting in any way. After the

17    shooting, Sieu angrily confronted the

18    shooter, demanded to know why he

19    brought out the gun and asserted that

20    he, Sieu, didn't know the gun was

21    going to be used. In summary, this

22    was not a drive-by or a similar gang

23    crime where everyone knew (inaudible)

24    should have known that death or

25    serious injury was intended. On the

26    contrary, this appears to be an

27    impulsive act by one member of the

179

39

```
 1         group which due to the rest of the
 2         circumstances swept them all up by
 3         way of the derivative liability --
 4         derivative liability,
 5         D-E-R-I-V-A-T-I-V-E.  I am not
 6         suggesting that Sieu and the other
 7         non-shooters bear no responsibility
 8         for the tragic outcome, but for the
 9         fight of course, no shooting would
10         have taken place.  However, I would
11         submit that the circumstances here
12         are significantly mitigated where --
13         when considered against other
14         convictions of this type.  Assuming
15         that Sieu's performance within the
16         Department of Corrections has been
17         positive, I would urge you to parole
18         at the earliest possible time."
19  Donald J. Rubright -- Donald G. Rubright, that's
20  R-U-B-R-I-G-H-T, Senior Deputy Public Defender,
21  Orange County.  Okay, and you have other letters
22  and some are duplicates and you have other family
23  members providing support.  And Raymond Seeto, the
24  brother-in-law, also writes you a supportive
25  letter and he notes that,
26         "Putting a roof over his head won't
27         be a problem.  He can stay with his
```

180

40

1          mother, brother, or sisters.  Tom has

2          a large extended family.  This is his

3          base of support.  Lastly, I beg the

4          Board to look at the facts

5          surrounding his conviction.  He was a

6          young -- He was young and naïve."

7   So you have lots of family support and you have

8   lots of job offers and you have people offering

9   you a place to live.  And most importantly you

10  have a letter from the Public Defender's Office

11  outlining the case and there's no reason to

12  dispute what he's saying is true and he wrote you

13  a very supportive letter.  And I have to say I

14  haven't seen too many letters from the Public

15  Defender's Office in support of parole.  And with

16  that we'll go to 3042 Notices.  We sent out

17  notices pursuant to Penal Code 3042.  We sent

18  those out to different agencies that would have an

19  interest in your case.  I do see a letter here

20  from the Orange County Deputy District Attorney's

21  Office and basically what it's saying is that the

22  District Attorney's Office will be attending the

23  life parole consideration hearing, and they have

24  their representative here and at the appropriate

25  time she'll have something to say about your

26  parole suitability.  Okay, with that we'll go to

27  questions.  Commissioner, do you have any

41

1   questions?

2         DEPUTY COMMISSIONER MEJIA:  Yes.  It looks

3   like you've been attending NA, AA, or self-help

4   since '97?

5         INMATE NGO:  I was attending mostly -- I was

6   attending both at the time but I dropped out of AA

7   because I feel that I don't need it because I

8   don't drink, I'm allergic to alcohol.  I never

9   drank.  And I think that I might -- you know,

10  because of my drug offense, I decided to go to NA

11  to better myself, to learn, so that's why I've

12  been attending NA.

13        DEPUTY COMMISSIONER MEJIA:  What have you

14  learned so far?

15        INMATE NGO:  To stay sober, to be a better

16  person.  Drugs can really harm a person, I mean,

17  change a person, even though you are guilty or

18  not, drugs can just alter your state of mind, you

19  can't function properly using drugs.

20        DEPUTY COMMISSIONER MEJIA:  Did they teach

21  the 12-Steps as well?

22        INMATE NGO:  Yes.

23        DEPUTY COMMISSIONER MEJIA:  Do you remember

24  what -- any of the 12-Steps?

25        INMATE NGO:  Yes, I remember all those.

26        DEPUTY COMMISSIONER MEJIA:  You remember all

27  of them.  Can you give me one?

182

42

1          INMATE NGO:  Which one?

2          DEPUTY COMMISSIONER MEJIA:  Whichever you

3    recall.

4          INMATE NGO:  Number one that I admitted to

5    God, to myself that (inaudible) drugs or alcohol,

6    that our lives will become unmanageable.  Two,

7    make a decision to turn our will and our lives

8    over to the care of God (inaudible) carry that

9    out.  Three, make decisions, turn our will and our

10   lives over to the care of God and (inaudible).

11   Four, made a searching fearless moral inventory

12   about ourselves.

13         DEPUTY COMMISSIONER MEJIA:  How old were you

14   when you were involved in this crime?

15         INMATE NGO:  I was 19.

16         DEPUTY COMMISSIONER MEJIA:  You were 19.

17   You are how old now?

18         INMATE NGO:  I'm 31.

19         DEPUTY COMMISSIONER MEJIA:  Let me just --

20         [Thereupon, the tape was turned over.]

21         DEPUTY COMMISSIONER MEJIA:  When did you get

22   involved with the gangs, you were 18 then, how old

23   were you when you started with the gang?

24         INMATE NGO:  Believe it or not -- gang is a

25   harsh word because like there was only like five

26   or six of us, you know, during that time.  We were

27   more friends because I (inaudible) know these

B3

43

1    guys, I've been moved there for about a year, and

2    I hang around with them, you know.  So to me it's

3    more like a friend more than a gang but because we

4    live at Fullerton they call themselves Fullerton

5    Boys.

6         DEPUTY COMMISSIONER MEJIA:  How old were you

7    when you started hanging out with them?

8         INMATE NGO:  I think I was 16 or 17, Sir.

9         DEPUTY COMMISSIONER MEJIA:  So about two

10   years.

11        INMATE NGO:  Yeah, about two years.

12        DEPUTY COMMISSIONER MEJIA:  If you get

13   released to the streets, how are you going to get

14   away from the elements of the gang lifestyle?

15        INMATE NGO:  Knowing what a gang can do to a

16   person, I have confidence that I can stay away

17   from them, you know, because I learned from my

18   mistakes, that's how I've grown.  I know I can

19   deal with problems differently, you know, just

20   staying away, choose better friends, think before

21   I act, everything, what I've learned in here to be

22   a better person.

23        DEPUTY COMMISSIONER MEJIA:  No other

24   questions.

25        PRESIDING COMMISSIONER WELCH:  Okay, there's

26   one thing in your brief that a lot of it's clothed

27   in legal terminology, but there is one thing that

184

44

1   I think I will put on the record in your defense,

2   it's, "Considering the facts of my personal

3   culpability as established, it is clear that the

4   category --" well, that's not what I'm trying to

5   read.  Here it is, the next paragraph says,

6           "Since there are no words adequate

7           enough to express the sincerity of my

8           remorse of the acceptance of

9           responsibility for my past conduct

10          and behavior, I offer the following

11          actions, that I stipulate to the

12          aggravated term of 19 years in

13          accordance with 15CCR243 that I

14          stipulate to whatever other parole

15          conditions that the Board deems

16          necessary upon me."

17  Okay.  I was looking for something for your

18  remorse and I guess that's the closest thing I've

19  found there.  And under the facts of the crime,

20  starting off where you said, "The facts of the

21  crime shall be discussed with the prisoner to

22  assess determination, the extent of culpability,

23  the Board shall not require the admission --" we

24  already know that.  "Furthermore, I fully and

25  truly confess and accept the facts of my personal

26  culpability and responsibility for the life

27  crime."  Okay, anyway.  Commissioner, District

186

45

1    Attorney, do you have any questions?

2         **DEPUTY DISTRICT ATTORNEY CONTINI:**  Just very

3    briefly.  Could the Board ask the inmate, he

4    testified or stated that he made up the name Tiger

5    Mafia because he had TM tattooed on his shoulder.

6    What does TM stand for then?

7         **INMATE NGO:**  My ex-girlfriend's name,

8    Theresa May.

9         **DEPUTY DISTRICT ATTORNEY CONTINI:**  Could the

10   Board inquire of the inmate why he would make up

11   another gang affiliation and tell a police officer

12   that?

13        **INMATE NGO:**  Because at the time I just

14   wanted to throw off the investigator because when

15   I was arrested they knew I was from Fullerton so

16   just (inaudible) I didn't want to be associated

17   with them so I threw them off by making up a name.

18        **DEPUTY DISTRICT ATTORNEY CONTINI:**  Could the

19   Board inquire of the inmate when he and his crime

20   partners were arrested in the State of Washington,

21   he was arrested for possession of stolen property,

22   could the Board inquire of him whether or not he

23   was aware that was not only the murder weapon in

24   his life case but also a nine-millimeter

25   (inaudible) assault pistol that was in the car?

26        **INMATE NGO:**  Both of the weapons don't

27   belong to me, they belonged to my crime partner.

186

46

1    I'd never been to the State of Washington until I

2    drove there myself.  I'd never been out of the

3    State of California, period, so --

4        **PRESIDING COMMISSIONER WELCH:**  Did you

5    understand the question?

6        **INMATE NGO:**  She had stated why the weapon

7    was in the car.

8        **PRESIDING COMMISSIONER WELCH:**  She said were

9    you aware.

10       **INMATE NGO:**  Of the gun, yes, I was, Sir.

11       **PRESIDING COMMISSIONER WELCH:**  The other

12   weapon?

13       **INMATE NGO:**  Yes.

14       **PRESIDING COMMISSIONER WELCH:**  Okay.

15   District Attorney.

16       **DEPUTY DISTRICT ATTORNEY CONTINI:**  Could the

17   Board inquire of the inmate, he drove his crime

18   partner and fellow gang members to the State of

19   Washington, correct?

20       **INMATE NGO:**  Yes, that's correct.

21       **DEPUTY DISTRICT ATTORNEY CONTINI:**  And could

22   the Board just finally inquire of the inmate, he

23   indicated he had the 11350 arrest for the drug, in

24   the probation report for this case, indicated that

25   he and some other individual had previously beaten

26   up Hispanic men at a school, is he familiar with

27   that case?

187

47

1          INMATE NGO:  I'm wondering (inaudible) that

2    was never brought up, I don't see what it has to

3    do with my case right now.  (Inaudible) a fight,

4    everybody was getting in a fight.  We were young

5    then.

6          PRESIDING COMMISSIONER WELCH:  Okay.

7          INMATE NGO:  That was, you know --

8          PRESIDING COMMISSIONER WELCH:  Let's backup.

9    District Attorney, would you re-ask the question.

10         DEPUTY DISTRICT ATTORNEY CONTINI:  Sure.

11   Would the Board inquire of the inmate, in his

12   probation report for this case, the victim by the

13   last name of Perez was interviewed regarding a

14   physical altercation at a school in which the

15   inmate began the physical altercation and then

16   three of the inmate's companions joined in kicking

17   and punching the victim Perez, alleged to have

18   happened December 14th, 1990.  Is he familiar with

19   that assault?

20         INMATE NGO:  Yes, I am familiar with it.  I

21   was never convicted on anything.  I was released.

22   What can I say?

23         PRESIDING COMMISSIONER WELCH:  Well, you can

24   tell her the circumstances.  I don't think any --

25         INMATE NGO:  Well,

26         PRESIDING COMMISSIONER WELCH:  --

27   (inaudible) what happened.

188

48

1        INMATE NGO:  For that fight I was going to

2    pick up my girlfriend at the school at that time.

3    She was in the agricultural or floral rearranging

4    class.  I went over there to pick her up and Mr.

5    Perez, I guess, at that -- you know, tell me, who

6    the hell are you, and then he started cussing me.

7    He don't even know who I am.  (Inaudible) what is

8    he doing, you know, what is his business.  So I

9    just left it at that and I left, and I was waiting

10   for my girlfriend at the parking lot and he came

11   out and started mad-dogging me.

12       PRESIDING COMMISSIONER WELCH:  What does

13   mad-dogging mean?

14       INMATE NGO:  It means staring me down and

15   then he asked me who the hell -- you know, F, what

16   are you looking at.  I said, what's your problem?

17   So he came over (inaudible) confronted so I just

18   socked him, you know.

19       PRESIDING COMMISSIONER WELCH:  You socked

20   him?

21       INMATE NGO:  Yes, because he wanted to fight

22   me for some reason so I just was trying to defend

23   myself so I socked him first and that's it.

24       PRESIDING COMMISSIONER WELCH:  Okay, all

25   right.  District Attorney.

26       DEPUTY DISTRICT ATTORNEY CONTINI:  Could the

27   Board just inquire of the inmate whether or not

189

49

```
 1    his three companions that assaulted Mr. Perez on
 2    that day were also Fullerton Boys gang members?
 3          INMATE NGO:  No.
 4          PRESIDING COMMISSIONER WELCH:  No?
 5          INMATE NGO:  No, they weren't.
 6          DEPUTY DISTRICT ATTORNEY CONTINI:  I don't
 7    have anything further.
 8          PRESIDING COMMISSIONER WELCH:  Okay.
 9    Counselor, do you have any questions for your
10    client?
11          ATTORNEY SPOWART:  I have nothing.
12          PRESIDING COMMISSIONER WELCH:  Okay, Mr.
13    Ngo, at this time we go -- at this portion of the
14    hearing we go to closing.  We start off with the
15    District Attorney.  District Attorney, closing.
16          DEPUTY DISTRICT ATTORNEY CONTINI:  The
17    People of the State of California strongly oppose
18    any parole of Mr. Ngo at this time.  This case was
19    a cold-blooded murderer of a 15-year-old.  Yes,
20    rival gang member, but a 15-year-old when this
21    inmate was 19 years, two years out of high school.
22    He and his friends, after a mad-dogging incident,
23    lie in wait essentially waiting for this young man
24    to walk home from school.  In the inmate's version
25    of events to the Board previously, he indicated
26    that he didn't know that a gun was in the car and
27    that at the same breath he indicates that they had
```

50

1    the gun for protection.  Neither of those things
2    make any sense in the gang world, and when you are
3    waiting for an individual to assault them, it
4    seems ridiculous to say that you have the gun for
5    protection.  Moreover, Mr. -- the victim, the 15-
6    year-old, in the case was walking with another
7    friend when he was first engaged by this inmate
8    and one other person which shows that this inmate
9    was a leader in this attack.  There's five
10   individuals involved, he's one of the first ones
11   to go up and start beating the 15-year-old.  I
12   just want to touch briefly on Mr. Rubright's
13   letter, the public defender, because he indicates
14   in that letter that -- just give me one moment, he
15   indicates in that letter that this was a wannabe
16   gang and I just have a strong -- strongly disagree
17   with that.  This is a gang that had a loaded gun
18   that they used on this 15-year-old.  It's also a
19   gang that when they're arrested after fleeing to
20   the State of Washington, has the nine-millimeter
21   stolen gun, both of the guns stolen, both the .22
22   and the nine-millimeter.  In addition to that,
23   there's a level of sophistication involved in this
24   crime in that the suspects fled and they burn the
25   car that they were driving, and that's contained
26   in the record.  They burn the car that they were
27   driving before taking off to Washington and this

191

51

1   inmate is the one who drove them to Washington.

2   Finally, I would note that although this inmate's

3   criminal history, it was not extensive, he does

4   have the drug offense, and then two years before

5   the killing he has this incident where he and some

6   other fellows are beating up an individual, so

7   there is an escalation of violence in his

8   background there.  When he first was housed at the

9   Orange County Jail, he had three incidents in the

10  Orange County Jail which were noted in his

11  probation report, the last was the mutual combat.

12  He's obviously done well in the last few years

13  here, but he does have a couple of -- I believe I

14  saw a couple of 128s in his record, so we're

15  talking 12 years since this incident occurred.

16  Based on the gang nature of it, basically a cold-

17  blooded execution of a 15-year-old boy, we would

18  strongly oppose a parole at this point.

19          **PRESIDING COMMISSIONER WELCH:**  Counselor,

20  closing.

21          **ATTORNEY SPOWART:**  If we look at Mr. Ngo's

22  entire history, he had no juvenile record.  He

23  came from a very good family, an excellent letter

24  from his mother, talking about her other children,

25  their accomplishments.  My client graduated from

26  high school.  He was attending Fullerton Community

27  College and then Pasadena City College.  He

192

52

1    completed 10 units.  In other words, he had a

2    stable social history.  He was in high school at

3    that time, various ethnic groups, Latinos, Asians,

4    and they would fight, and this happens.  He did

5    get in a fight once when he tried to pick up his

6    girl.  Now the DA says this shows an escalating

7    pattern.  Motivation for the crime was basically a

8    gang fight.  He was 19 then and he's 31 now.

9    Excellent parole plans which we've gone over, a

10   place to live, a place to work, good letters of

11   support.  Now, this is exactly what I was talking

12   about when I objected.  This is a murder second-

13   degree plea.  The DA comes up here today says

14   cold-blooded lying in wait.  If that was true then

15   the District Attorney's Office was grossly

16   inadequate in the prosecution of my client.  Why

17   wasn't he up for life without parole or the death

18   penalty?  Come on, give me a break, that is not

19   what happened.  He went with his friends, this big

20   gang, five guys, that he went over with and they

21   went over because one of them had gotten in

22   (inaudible) and they went over to have a fight, it

23   was clear.  As his trial attorney says, the fight

24   started and later on a guy comes up with a gun and

25   shoots the victim.  It wasn't my client.  He did

26   not have a gun.  He's never been violent.  If you

27   look at the Board report and he gives -- he says

193

53

1    he would pose a low degree of threat to the public

2    at this time.  This opinion is based on Ngo being

3    immature at the time of the crime and easily

4    influenced by his peers.  The crime was episodic

5    in nature.  It wasn't planned, it wasn't cold-

6    blooded, it wasn't lying in wait, it was none of

7    those.  It was a pure simple these five guys got

8    in a fight.  My client was there, he didn't even

9    know they had the gun.  He wasn't living in

10   Fullerton at the time, he was living in Pasadena,

11   going to college.  His institutional adjustment

12   has been outstanding, two 128(a)'s in the entire

13   time he's been down.  No 115s.  Where is the

14   violence?  Where's the violence?  Where's the

15   escalating pattern?  There isn't any.  He

16   completed IMPACT Workshop program, and if you

17   notice they talk about the IMPACT program it

18   includes anger management, domestic violence, gang

19   violence, murder and sexual assault, it includes

20   all these things.  So he's had good therapy there.

21   He's been AA or NA the entire time he's been down.

22   He completed the course of Sexual Transmitted

23   Disease, has excellent work reports, completed the

24   Salesmanship and the Key to Fatherhood, completed

25   the forklift certification.  The Board report is

26   low.  Now let's look at the psych report, and

27   let's remember, the psych report is the expert

194

54

1    here, and this is low too.  The Commissioner read

2    it, based on his complete lack of disciplinary

3    actions while incarcerated, his insight into the

4    negative aspects of gang involvement, and his

5    remorse for his actions, he has expressed remorse,

6    and the psych takes that into consideration, his

7    violence potential within a controlled setting is

8    estimated to be below average relative to this

9    level inmate II population, which is low.  If

10   released to the community, his violence potential

11   is estimated to be less than, not average, but

12   less than the average citizen in the community.

13   And he talks about, given his insight, his

14   demonstrated ability to stay out of trouble, his

15   successful development of plans upon release and

16   the support of his family -- and I know -- look

17   again at his plans, he's very detailed.  This is a

18   serious young man.  He's very serious about

19   wanting to get out.  He has clearly worked to get

20   out.  He admits what he did.  You can't get away

21   from it, he was there, he participated.  It was a

22   fight and then there was a gun there.  He did not

23   do the shooting.  He had no reason to believe that

24   this other guy would shoot anybody, it happened.

25   The point is, we're here now when he's 31 years

26   old not 19.  He's been in Coastline Community

27   College, he's preparing himself to get out.  He's

196

55

1   paid for his crime.  For his part in that crime,

2   he has paid for it.  And he's stated, if you find

3   me suitable, give me the highest because I know I

4   shouldn't have been there and I shouldn't have

5   participated in this.  Board report low, psych

6   report below average here, less than average.  Do

7   you know what that means?  Look at anybody walking

8   downtown Fullerton or Pasadena, they're the

9   average Joes.  And he, the psych, the

10  professional, is saying my client is no more -- is

11  less dangerous than they are, less dangerous.  So

12  how now does he become an unreasonable risk of

13  danger to society.  I think not.  You know, I'm

14  surprised really, I know it's difficult to get a

15  date on your first initial hearing, but I'm

16  surprised that this man didn't get a date on his

17  initial hearing.  I think he should be found

18  suitable today and I'll submit it.

19          **PRESIDING COMMISSIONER WELCH:**  Okay, Mr.

20  Ngo, you can make a closing statement or you can

21  let your attorney's statement be  your closing

22  statement.

23          **INMATE NGO:**  I'd like to make a statement.

24  During my last initial hearing, previous hearing,

25  one of the Commissioners told me that I needed

26  time to understand the nature and circumstances of

27  my crime and my disregard for human life.  In my

190

56

1  defense, I would say that it's part of telling the

2  truth because for the last 12 years I've had

3  nothing but time to think about my crime. It's

4  with me every day, it's a reminder every day.    I

5  know nothing I can say or do can bring back Mr.

6  Angel Gonzalez.  I know I caused a lot of harm to

7  his family, anyone involved, but there's nothing I

8  can say or do at this point to ever change the

9  fact.  You know, I know what I did, or lack of on

10  my part is, I could have maybe have stopped this

11  from happening if I was smart enough to act upon

12  it because I was young and naïve.  I know that's

13  not an excuse, but looking back now I see what I

14  could have done if I'd have known better.  I took

15  full complete responsibility for my action. I

16  can't take responsibility for others, only for

17  myself.  I know I'm partly responsible that's why

18  I know I deserve to do some time, but I have done

19  my time.  I have done everything you have asked me

20  to do, I've gone beyond my scope of

21  (indiscernible) to better myself.  All I ask is

22  that you give me a fair chance, a second chance.

23  I know I have to prove to you that I can be a law-

24  abiding citizen, but if you should not find me

25  suitable at this time, I'd ask you, urge you, to

26  please specify what exactly I need to do in order

27  to be found suitable at my future hearings.

197

57

1   That's all I ask of you.  Thank you.

2           PRESIDING COMMISSIONER WELCH:  Okay, thank

3   you very much for our comments.  We'll take a

4   recess.

5                    R E C E S S

6                     --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

198

58

1        CALIFORNIA BOARD OF PRISON TERMS

2                D E C I S I O N

3        **DEPUTY COMMISSIONER MEJIA:**  Okay, we're back

4    on record for our decision.

5        **PRESIDING COMMISSIONER WELCH:**  Okay, Mr.

6    Ngo, we have a decision.  The Panel reviewed all

7    the information received from the public and

8    relied on the following circumstances in

9    concluding -- could you close the door, please, --

10   in concluding that the prisoner is not suitable

11   for parole and would pose an unreasonable risk of

12   danger to society or a threat to public safety.

13   One, this crime was carried out in an especially

14   cruel and callous manner.  Gang related violence

15   in a community is always cruel and callous

16   violence.  Actually there was multiple victims

17   attacked, one was killed, one ran away and was

18   able to escape.  The offense was carried out in a

19   dispassionate, it was a calculated manner.  The

20   victim was abused, he was beaten and then he was

21   shot.  The offense was carried out in a manner

22   that demonstrates an exceptionally callous

23   disregard for another human being.  The motive for

24   the crime was inexplicable or very trivial in

25   relationship to the offense.  Any gang-related

26   activity in our community is (inaudible) and

27   **SIEU NGO   J-07024   DECISION PAGE 1   8/3/04**

P9

59

1  inexplicable type of behavior, it's the type of

2  behavior that certainly cannot be condoned in any

3  well-ordered society.  The conclusion was drawn

4  from the Statement of Facts wherein on 9-18-92

5  Angel Gonzalez who was beaten and shot to death

6  near Fullerton High School as he was walking away

7  -- as he was walking home.  The circumstances

8  surround this crime, apparently the prisoner and

9  some of his gang members had been at a McDonald's.

10  There was a stare down contest and apparently some

11  words was exchanged.  The prisoner and his crime

12  partners waited for the victim as he was walking

13  home and a fight ensued and he was shot and killed

14  with a .22 caliber handgun.  Mr. Angel Gonzalez,

15  aged 15, lost his life over a very, very trivial

16  matter, over a matter that really cheapens human

17  life, the gang related -- the gang mentality that

18  occurs in our cities.  The prisoner really did not

19  have an escalating pattern of criminal conduct.

20  He did have one contact with law enforcement

21  agency.  He has -- well, two contacts with law

22  enforcement agencies, one was for a controlled

23  substance and one was for stolen property

24  including the instant offense, so he did not have

25  a major record of criminal history or an

26  escalating pattern of violent type of behavior.

27  **SIEU NGO   J-07024  DECISION PAGE 2   8/3/04**

200

60

1    Under unstable social history, other than the

2    prisoner's gang activity or involvement in gang

3    activity to whatever extent it was.  The Board

4    have no reason to disbelieve the public defender

5    who detailed from his perspective what had

6    occurred, so it does not appear that the prisoner

7    was heavily into gang activity, criminal type of

8    behavior.  Also under unstable -- it appears that

9    the prisoner did have a stable home environment,

10   the letters from the family are very impressive in

11   terms of the type of support he have in the

12   community.  The prisoner has programmed in an

13   acceptable manner.  Recent psychological report

14   shows that the prisoner is making progress, shows

15   that his level of dangerousness both in a

16   structured environment and non-structured

17   environment is reduced.  He's on the right track

18   and he is making progress.  Certainly from a

19   psychological perspective we feel that the

20   prisoner is making progress.  Dr. Zika is the one

21   that prepared this report.  However, we are going

22   to request a new psychological evaluation for the

23   prisoner's next hearing.  Under parole plans,

24   certainly the prisoner have parole plans, lots of

25   support in the community, job offers, residential

26   plan.  The Hearing Panel notes that in response to

27   **SIEU NGO   J-07024   DECISION PAGE 3   8/3/04**

201

61

1  Penal Code 3042 Notices, the Deputy District

2  Attorney from Orange County spoke in opposition.

3  The Panel makes the following findings:  The Panel

4  finds that the prisoner needs to continue to

5  participate in the kinds of programs that he's

6  participating in, to continue to make progress,

7  continue to participate to the extent that he will

8  be able to face, understand, and cope with

9  stressful situations in a nondestructive manner.

10  Until the Board feels that enough progress is

11  made, the prisoner continues to be unpredictable

12  thereby presents some amount of threat.  However,

13  there are some things that we certainly want to

14  commend him for.  The prisoner's disciplinary

15  behavior certainly is not -- is something that we

16  certainly want to give him some accolades for and

17  encourage him to continue in his self-help

18  programs that he's involved in, his educational

19  programs that he's involved in, all of those kinds

20  of things we think is very significant and we want

21  to continue to -- him to continue in that way.

22  However, those positive aspects at this time does

23  not outweigh the factors of unsuitability.  Now

24  your parole is going to be denied for one-year

25  this time and we encourage you to continue to

26  remain disciplinary free, continue to explore your

27  **SIEU NGO  J-07024  DECISION PAGE 4  8/3/04**

202

62

```
 1   culpability in the crime, continue to participate
 2   in self-help programs and other type of positive
 3   kinds of programs, educational programs, as they
 4   maybe available to you.  There again we want the
 5   clinicians to look at your violence potential in
 6   the free community when they complete the
 7   psychological evaluation, whether there's a
 8   significant problem with alcohol and drugs as it
 9   relates to the commitment offense into which you
10   have -- and I think this is one area that we
11   certainly want them to take a look at, the extent
12   to which you have explored your commitment offense
13   and come to terms with the underlying causative
14   factors.  That concludes the reading of the
15   decision.  And personally I think you're making
16   progress, and you asked specifically what it is
17   that you need to do.  You need to continue to do
18   the things that you're doing, you need to continue
19   to participate in self-help programs, continue to
20   participate in educational programs, continue to
21   explore the crime that you were committed for and
22   develop greater insight into it.  And I think
23   you're on the right track.  I think you'll get a
24   parole date in the not too distant future.
25   Commissioner, comments?
26           DEPUTY COMMISSIONER MEJIA:  Good luck to
27   SIEU NGO  J-07024  DECISION PAGE 5  8/3/04
```

203

63

1    you.

2            **INMATE NGO:**  Thank you.

3            **DEPUTY COMMISSIONER MEJIA:**  Keep up the good

4    work.

5            **PRESIDING COMMISSIONER WELCH:**  Good luck to

6    you, Mr. Ngo.  That concludes the hearing at

7    approximately 1500 hours.

8                            --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED ONE YEAR**

24    **THIS DECISION WILL BE FINAL ON:**_____DEC ⁻1 2003_____.

25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **SIEU NGO   J-07024   DECISION PAGE 6   8/3/04**

204

64

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, WENDY THOMAS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 63, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY at SOLEDAD, CALIFORNIA in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of SIEU NGO, CDC No. J-07024, on AUGUST 3, 2004 and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated August 19, 2004 at Sacramento County, California.


_Wendy Thomas_____
Wendy Thomas
Transcriber
**CAPITOL ELECTRONIC REPORTING**

205

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT D

June 23, 2005

Board of Prison Terms
CTF Soledad
P.O. Box 686
Soledad, CA 93960

Re: Sieu Phong Ngo, CDC # J07024
    Parole Hearing

Dear Sirs:

I represented Mr. Ngo in the case which sent him to prison. I
have been a criminal defense attorney for almost thirty years
and have represented over 40 persons accused of homicide. I
do not see my clients through rose colored glasses.
However, the circumstances of Sieu's case are unusual
enough that I feel compelled to make a statement on his
behalf.

At the time I represented him, Sieu was a very likeable young
man with a minor criminal record. To my recollection he had
no convictions for any crimes of violence. The incident in
question was very different from the typical "gang case" and
the facts are worth sketching for your review.

Sieu and his friends were a "wanna be" type gang who did not
really have a significant history or established turf in Orange
County. On the day of the incident some of Sieu's friends, by
chance, went to the McDonald's which was near Fullerton
High School in northern Orange County. Sieu was not present
at the time.
One of Sieu's friends got in a staring match with the decedent
and some of his friends, who were members of "Tokertown," a
long established Hispanic gang in Fullerton.

207

Essentially, the "Tokertown" group told Sieu's friends that they were not welcome in Fullerton (where some of them already lived) and they should get out of town.

Angered by this, Sieu's friends decided to confront the decedent's group after school got out that day. Sieu was called to help out in case they should be outnumbered. Their group waited after school and confronted the decedent and one of his friends about two blocks south of Fullerton High School (**not on school grounds**).

From all appearances this was intended to be a fist fight. Sieu, and the friend who'd been in the stare-down, approached the decedent and another young man who were walking on a sidewalk. A fist fight is how it started. However, the decedent's friend fled just after the punching began and that left Sieu and his friend fighting the decedent who was significantly larger than either of them. Of course, this was unfair, but nothing at this point suggested that this was intended to be a homicide.

While the fist fight was ongoing a third member of the group Sieu was part of ran forward to the scene While the fight was in still in progress he reached around Sieu and shot the decedent, killing him and narrowly missing Sieu. Sieu and his group then fled, ultimately being arrested out of state.

Evidence was received to show that Sieu and his friends knew that a gun was in the car. However there was no evidence to show that there was a plan to use it. Based upon the theory of foreseeable consequences, Sieu and several co-defendant's were convicted or pled guilty to murder. **Sieu was not the shooter and no evidence existed to show that he suggested, encouraged or aided or abetted the shooting in any way.**

After the shooting Sieu angrily confronted the shooter, demanding to know "why" he brought out the gun and asserting that he (Sieu) didn't know the gun was going to be used.

In summary, this was not a "drive by" or similar gang crime where everyone knew or legitimately should have known that death or serious bodily injury was intended.

On the contrary, this appeared to be an impulsive act by one member of the group which, due to the rest of the circumstances, swept them all up by way of derivative liability.

I am not suggesting that Sieu and the other non-shooters bear no responsibility for the tragic outcome. But for the fight, of course, no shooting would have taken place. However, I would submit that the circumstances here are significantly mitigated when considered against other convictions of this type.

Assuming that Sieu's performance within the department of corrections has been positive, I would urge his parole at the earliest possible time.

Sincerely,

Donald G. Rubright
Senior Deputy Public Defender
Orange County, Ca
(949) 249-5060

209

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT E

(                (

MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
APRIL 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JANUARY 23, 2002

This is the second mental health evaluation for the Board of
Prison Terms on inmate Sieu Phong Ngo, CDC# J-07024.  This
report is the product of a personal clinical interview of
the inmate, conducted on 01/23/02, as well as a review of
his Central file and medical record.  This clinical
interview and a review of all pertinent documents were for
the express purpose of preparing this report.  Prior to
today's interview, I had no previous contact with this
inmate.

### PSYCHOSOCIAL ASSESSMENT

I.   **IDENTIFYING INFORMATION:**

Inmate Ngo is a 28-year-old, single, Vietnamese male
who was born on 05/18/73.  He was born in Vietnam and
moved to the United States in 1979 with his family,
where they settled in Los Angeles.  He has multiple
tattoos on his arms, as well as scars from a suicide
attempt when he was 16.  He denies the use of any
nicknames or aliases.

II.  **DEVELOPMENTAL HISTORY:**

Inmate Ngo was born in Vietnam.  His family moved to
the United States in 1979.  They settled in Los
Angeles, where they remain to this day.  The inmate has
one older brother, two older sisters, one younger
brother, and one younger sister.  They were raised by
both parents.

His father died in 1996 while the inmate was
incarcerated, but the inmate reports that he is still
in contact with his siblings and his mother.

He denies any history of birth defects or abnormalities
of developmental milestones, a history of cruelty to

711

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE TWO

animals, a history of arson, any significant childhood
medical history, or a childhood history of physical or
sexual abuse as either a perpetrator or a victim.

III. <u>EDUCATIONAL HISTORY</u>:

Inmate Ngo graduated from high school and attended one
year of college, studying general education, prior to
his incarceration.  In high school, he relates that he
was in English as a Second Language classes for some
time.  Chinese is his primary language, although he
speaks very fluent English at this time.  He reported
that he had some reading problems, probably related to
English being his second language at the time.

Since his incarceration, he has been studying
vocational, self-paced, business courses.  He intends
to finish college.

IV.  <u>FAMILY HISTORY</u>:

Inmate Ngo speaks of his family in largely positive
terms.  He states that he is the only one in his family
who has a criminal record.  There is no family history
of mental illness or criminality, other than his.  He
also denies a family history of alcohol or drug abuse.

V.   <u>PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION</u>:

Inmate Ngo states that he is a heterosexual male.  He
denies any history of high-risk sexual behavior or
sexual aggression.

VI.  <u>MARITAL HISTORY</u>:

Inmate Ngo has never been married and has no children.
He does have a female friend whom he corresponds with,
but who does not visit.  He did have a girlfriend prior
to his incarceration.  He reports normal sexual
relations.

VII. <u>MILITARY HISTORY</u>:

The inmate denies any history of military service.

212

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE THREE

VIII. EMPLOYMENT/INCOME HISTORY:

Inmate Ngo was quite young at the time of his
commitment offense.  However, he had worked at odd jobs
in the fast food industry.

Since his incarceration, he has been a clerk.  The
works chronos in his Central file show that he has been
a satisfactory worker in job attendance, quality and
quantity.  He has learned a couple of job skills, both
in cooking and in upholstery, which he intends to
continue if granted parole.

IX.  SUBSTANCE ABUSE HISTORY:

Inmate Ngo readily acknowledges having tried cocaine
once.  He reports that the first time he tried it, he
was caught and ordered to attend a diversion class for
drug addiction.  Previous mental health evaluations for
the Board of Prison Terms have recommended that he be
involved in Alcoholics Anonymous and Narcotics
Anonymous.  However, the inmate feels that he never
really had a drug or alcohol problem, although he does
currently attend Alcoholics Anonymous.

X.  PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Ngo reports one incident of psychiatric
illness, in which he states that when he was 16 years
old, he tried to kill himself by cutting his arms.  He
reports that his family life and personal problems felt
overwhelming at the time.  He states that he has not
suffered from depression or had any suicidal thoughts
since that time.  He has had no contact with the mental
health system since that time, either outside or inside
of prison.

He denies any significant medical history, other than
mentioned above.  He denies a history of serious
accidents or head injuries, a history of suicidal
behavior, or a history of seizures or other
neurological conditions.  He is taking no medications.

213

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE FOUR


XI.  **PLANS IF GRANTED RELEASE:**

Inmate Ngo states that if he is paroled, he would be
fully supported by his family, and would use the money
he has earned as a clerk to start his own business,
either in the upholstery or restaurant business.  He
does acknowledge that he is determined not to have any
gang affiliation.  He shows a good deal of insight into
the negative aspects of gang involvement, which he
regrets to this day.


## CLINICAL ASSESSMENT


XII.  **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

Inmate Ngo appears to be his stated age of 28.  He
was appropriately dressed and groomed.  He was calm,
cooperative, coherent and alert during the entire
interview.  He was open in his conversation and
emphasized throughout the interview his recognition
that gang affiliation had only resulted in injury to
himself and to those around him.  His mood was sober,
but his range of affect was good.  His speech, flow of
thought and affect all appeared to be within the normal
range.  His intellectual functioning was estimated to
be within the average range.  There was no evidence of
a mood or thought disorder.  His judgment appeared to
be sound.  He showed significant insight into his
commitment offense, as well as some recognition that
there is no guarantee he will be paroled at this time
by the Board of Prison Terms.

**CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):**

**AXIS I:**    No Contributory Clinical Disorder.
**AXIS II:**   Deferred.
**AXIS III:**  No Contributory Physical Disorder.
**AXIS IV:**   Long-term incarceration.
**AXIS V:**    Global Assessment of Functioning (GAF) = 90.

There is no evidence that inmate Ngo currently suffers
from any psychiatric illness, although he does
recognize that in his early youth he was vulnerable to

214

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE FIVE

depression and was tempted by consciousness-altering
substances.  In consideration of the fact that he has
received no CDC-115 violations during his entire
incarceration, it would appear that he has, at least in
this controlled setting, been able to manage his
behavior and remain incident-free.

## XIII. REVIEW OF LIFE CRIME:

According to inmate Ngo, his offense for which he was
convicted and sentenced to 16 years to life was P.C.
187-A, Second Degree Murder, with enhancement P.C.
12022, vicariously armed with a gun.

The inmate stated that he agreed with the version of
the crime given in his Central file, the verdict and
the sentencing.  However, he did state that no one
intended to kill the victim, and that their intent was
only to beat him up.  He had past prior offenses, which
included a two-year drug diversion, as referred to
earlier in this report.  He has had one previous BPT
evaluation.

## XIV. ASSESSMENT OF DANGEROUSNESS:

A.  Inmate Ngo's report agrees in all details with the
    information given in the Central file and medical
    record with respect to his prior history as a
    person who attempted to use cocaine and was
    affiliated with gangs, which resulted in his
    current offense.  Based upon his complete lack of
    disciplinary actions while incarcerated, his
    insight into the negative aspects of gang
    involvement, and his remorse for his actions, his
    violence potential within a controlled setting is
    estimated to be below average relative to this
    Level II inmate population.

B.  If released to the community, his violence
    potential is estimated to be less than the
    average citizen in the community, given his
    insight, his demonstrated ability to stay out of
    trouble, his successful development of plans upon
    release, and the support of his family.

215

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE SIX


C.   Clearly, the most significant risk factor for this
     inmate as a precursor to violence or a return to
     criminal behavior would be his reinvolvement with
     others having a criminal history and/or gang
     members, the abuse of alcohol and/or drugs, and
     isolation from his family members.

XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.   This inmate is competent and responsible for his
     behavior.  He has the capacity to abide by
     institutional standards and has done so during his
     entire incarceration period.

B.   This inmate does not have a mental health disorder
     which would necessitate treatment either during
     his incarceration period or following parole.

C.   As this man has spent ten years in prison, I would
     recommend, should he be paroled:

     1)  Abstinence from all alcohol and/or use of any
         controlled substance.

     2)  Frequent monitoring for substance abuse.

     3)  If at all possible, he should be relocated so
         he is near his family.

     4)  He should make frequent reports to his parole
         officer concerning his vocational progress and
         goals.  The structure of the institution has,
         inevitably, to some extent, served to diminish
         his own self-reliance, and the process of
         reporting in and setting validating goals might
         be helpful in assisting him in establishing,
         perhaps for the first time in his life, a real
         sense of self-reliance and a positive prosocial
         sentence.

     5)  Due to his family's commitment to supporting
         him upon his release, his projected level of

214

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE SEVEN


success in the community, if granted a date for
parole, is seen at this time to be better than
average.



C. SAINDON, Ph.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD



BILL ZIKA, Ph.D.
Senior Supervising Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

CS/gmj

D:   01/23/02
T:   01/31/02

217

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT F



COPY TO INMATE ON:
June 22, 2005

# LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
### AUGUST 2005 CALENDAR

NGO, SIEU                                                         J-07024

INMATE COPY

**I.    COMMITMENT FACTORS:**

A.    **Life Crime:** PC 187, Murder 2nd with PC 12022(A)(1), Use of Weapon in commission of a felony. Orange County Superior Court Case #C99109. Term: 15 years to Life plus 1 year enhancement. MEPD: 5/24/03. Victim: Angel Ganzales, 15 years old. Inmate Ngo was received in the California Department of Corrections on 2/1/94.

   1.    **Summary of Crime:** All relevant documents from the previous hearing including the transcripts have been considered and that information appears valid. The writer has no further information to add.

   2.    **Prisoner's Version:** Remains the same as stated in the previous hearing.

   3.    **Aggravating/Mitigating Circumstances:**

      a.    **Aggravating Factors:** Remains the same as stated in the previous hearing.

      b.    **Mitigating Factors:** Remains the same as stated in the previous hearing.

B.    **Multiple Crime(s):** N/A.

   1.    **Summary of Crime:** N/A.

   2.    **Prisoner's Version:** N/A.

**II.    PRECONVICTION FACTORS:**

A.    **Juvenile Record:** Documents from the previous hearing have been considered and that information remains valid.

B.    **Adult Convictions and Arrests:** Documents from the previous hearing have been considered and that information remains valid.

2/9

LIFE PRISONER EVALUAT   I REPORT                                            2
PAROLE CONSIDERATION  IEARING
AUGUST 2005 CALENDAR

C.    **Personal Factors:** Documents from the previous hearing have been considered
and that information remains valid.

## III.  POSTCONVICTION FACTORS:

A.    **Special Programming/Accommodations:** None.

B.    **Custody History:** Documents from the previous hearing(s) have been considered
and that information remains valid. Since his last Board of Prison Terms (BPT)
hearing on 8/5/04, in which his parole was denied for one (1), inmate Ngo has
remained at the Correctional Training Facility (CTF), in the General Population
(GP). He has retained his custody at Medium A with a Preliminary/behavior
classification score of 0 and a Mandatory Minimum Placement score of 19 (the
change is due to the revised classification scoring system effective 10/15/02).

C.    **Therapy and Self-Help Activities:** Refer to the Postconviction Progress Report
for details.

D.    **Disciplinary History:** Refer to the Disciplinary Sheet for details.

E.    **Other:**

## IV.  FUTURE PLANS:

A.    **Residence:** Inmate Ngo plans to live with his mother, Huynh Phong Ngo at 709
Triana Street, Monterey Park, California, 91754 with telephone number 626-282-
3156. In addition, most, if not all of his relatives has offered housing,
employment, financial, moral and social assistance to inmate Ngo, if and when he
is released to parole.

B.    **Employment:** Inmate Ngo is in receipt of two (2) Certificates of Completion,
Vocational Automotive Refinishing (9/12/97) and Upholstery (2/27/97), both
employable trades. Inmate Ngo has been a Culinary Storekeeper Office Aide over
two (2) years, another employable trade. His relatives are offering immediate
employment opportunities in their liquor and restaurant business, if and when he
is released to parole.

C.    **Assessment:** Inmate Ngo does not have any prior record of criminal conduct
(considering the recency and frequency of prior crimes) and the circumstances of
the instant offense, He does not appear to be criminally minded and has a good
insight into himself. He has been able to maintain himself relatively disciplinary
free (of serious rules violation report) since 2/12/00. In 9/12/97 and 2/27/97, he

220

NGO, SIEU              J07024                    CTF-SOLEDAD              AUG/2005

LIFE PRISONER EVALUAT    I REPORT
PAROLE CONSIDERATION . .EARING                              (                    3
AUGUST 2005 CALENDAR

acquired two (2) Certificates of Completion, Vocational Automotive Refinishing and Upholstery, respectively. In addition, he is in the process of acquiring college credits via correspondence from Coastline Community College with the hope that said credits will be transferable to a university and eventually obtain a degree in Biology. Finally, he has achievable and realistic parole plans.

V.    <u>USINS STATUS:</u>  Inmate Ngo was born on 5/18/73 in Vietnam, immigrated to the United States of America (USA) and later became a naturalized citizen of the USA.

VI.   <u>SUMMARY:</u>

A.    Prior to release the prisoner could benefit from:

(1) Participate in self-help programs;
(2) Remain disciplinary free;
(3) Earn positive chronos;

B.    This report is based upon 3 hours of Central File research, an interview with inmate Ngo and incidental contact with the prisoner during this period of review.

C.    Inmate Ngo reviewed his Central File pursuant to in re: Olson on 5/31/05.

D.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

221

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF.  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 4/24/04 to 6/8/05 (Present) | | | **PLACEMENT:**  Remains housed at CTF, in the GP. **CUSTODY:**  Remains at Medium A. **ACADEMIC:**  Graduated from Fullerton High School, Orange County in 1992. Additionally, inmate Ngo has been and is currently enrolled in an Independent Study Program through Coastline Community College (semester ending May, 2005). **WORK:**  Remains assigned as a Culinary Storekeeper Office Aide receiving satisfactory grades per the Work Supervisor's Report (CDC101).· **VOCATION:**  Inmate Ngo is in receipt of two (2) Certificates of Completion, Vocational Automotive Refinishing (9/12/97) and Upholstery (2/27/97). Additionally, he is in the Vocational Data Processing waiting list. **GROUP ACTIVITIES:**  None noted this period. **PSYCH TREATMENT:**  None noted this period. **PRISON BEHAVIOR:**  Disciplinary free of serious rules violation reports since 2/12/00. **OTHER:**  Inmate Ngo continues to better himself year after year. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | DATE |
|---|---|---|
| F. I. DeGUZMAN | | 6/8/05 |

| NGO, SIEU PHONG | J07024 | CTF | AUG/2005 |
|---|---|---|---|

222

# DISCIPLINARY SHEET

## CDC 128A'S:

| | | |
|---|---|---|
| 02/11/00 | CTF | Window covering |
| 04/01/97 | LAC | Failed to respond to ducat |

## CDC 115's:

None

| | | | |
|---|---|---|---|
| NGO, SIEU | J07024 | CTF | AUG/2005 |

223

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT G

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
MAY 2004 CALENDAR

NGO, SIEU PHONG                                                    J-07024

I.   **COMMITMENT FACTORS:**

   A.   **Life Crime:** Murder second, PC 187, with use of a firearm PC 12022(A) (1). San Francisco County case #c99109, sentence: 15 years to life plus one year enhancement. MEPD: 5-24-03. Victim: Angel Gonzalez, age 15 years old. Received by CDC on 2-1-94.

       1.   **Summary of Crime:** All relevant documents from the previous hearings including the transcripts have been considered and that information appears valid and the writer has no further information to add.

       2.   **Prisoner's Version:** Remains the same as stated in the previous hearing.

       3.   **Aggravating/Mitigating Circumstances:**

          a.   **Aggravating Factors:** Remains the same as stated in the previous hearing.

          b.   **Mitigating Factors:** Remains the same as stated in the previous hearing.

   B.   **Multiple Crime(s):** None.

       1.   **Summary of Crime:** None.

       2.   **Prisoner's Version:** None.

II.  **PRECONVICTION FACTORS:**

   A.   **Juvenile Record:** Remains the same.

   B.   **Adult Convictions and Arrests:** Remains the same.

   C.   **Personal Factors:** Remains the same.

225

LIFE PRISONER EVALUATI   REPORT                                         2
SUBSEQUENT PAROLE CC..SIDERATION HEARING
MAY 2004 CALENDAR

### III.   POSTCONVICTION FACTORS:

A.   **Special Programming /Accommodations:**  None.

B.   **Custody History:** Documents from the previous hearing have been considered and that information remains valid. During the period of time since the last hearing (5-13-02), Ngo's behavior has been positive, in that he has remained disciplinary free and maintained a stable work program in his assignment as a culinary warehouse worker.

C.   **Therapy and Self-Help Activities:** Ngo is involved in an Independent Study Program through Coastline Community College. He participates in the Narcotics Anonymous Program. He completed the 13 week IMPACT workshop.

D.   **Disciplinary History:** Ngo received only two CDC 128A's. See Disciplinary Sheet for details.

E.   **Other:** An Initial Parole Consideration Hearing was held on 5-13-02. The BPT recommended:
1. Remain disciplinary free.
2. Upgrade education.
3. Continue to participate in self-help and therapy.
The BPT denied parole for an additional two years.

### IV.   FUTURE PLANS:

A.   **Residence:** Ngo plans to reside with his mother, Phuong Hungk Ngo, at 709 Triana Street, Monterey Park, California, (714)827-7832.

B.   **Employment:** Ngo plans to work at the family liquor store which is owned by his sister, Julie Seeto, in Anaheim. His uncle, Calvin Ung owns a restaurant in Anaheim and has offered Ngo a job as a cook.

C.   **Assessment:** Ngo's chances of a successful parole are very good. He has concrete parole plans and letters of support from his family.

### V.   USINS STATUS: No holds.

### VI.   SUMMARY:

NGO, SIEU, PHONG        J-07024    CTF-SOLEDAD        MAY/2004

226

LIFE PRISONER EVALUAT[ ] REPORT                                              3
SUBSEQUENT PAROLE CONSIDERATION HEARING
MAY 2004 CALENDAR

A.    Considering the commitment offense, minimal prior arrest record and good prison
      adjustment, the writer believes Ngo would probably pose a low degree of threat to
      the public at this time, if release from prison. This opinion is based on Ngo being
      immature at the time of the crime and easily influenced by his peers. The crime
      was episodic in nature. Ngo has a limited criminal history and has not shown a
      pattern of violence in custody.

B.    Prior to release, Ngo could benefit from remaining disciplinary free and upgrading
      his education.

C.    This board report is based upon a one hour interview, incidental contact in the
      housing unit and a through review of the Central File lasting on hour.

D.    Ngo declined the opportunity to review the Central File on 1-20-04 (see CDC
      128B Chrono).

E.    No accommodation was required per the Armstrong vs. Davis BPT Parole
      Proceeding Remedial Plan for effective communication.

227

# DISCIPLINARY SHEET

### CDC 128A's:

| | | |
|---|---|---|
| 2-11-00 | CTF | Window covering. |
| 4-1-97 | LAC | Failed to respond to medical ducat. |

### CDC 115's:

None.

228

NGO, SIEU                J-07024          CTF-SOLEDAD          MAY 2004

LIFE PRISONER EVALUAT⎯⎯ ⎯ REPORT                                        4
SUBSEQUENT PAROLE CC..SIDERATION HEARING
MAY 2004 CALENDAR


_M. Rubio_     _4-23-04_
M. Rubio            Date
Correctional Counselor I


_L.R. Baker, CCII (A)_    _4-23-04_
L.R Baker            Date
Correctional Counselor II


_J.L. Clancy_     _4-27-04_
J.L Clancy          Date
Facility Captain


_D.S. Levorse_     _4-28-04_
D.S. Levorse        Date
Classification and Parole Representative


229

NGO, SIEU, PHONG      J-07024     CTF-SOLEDAD      MAY/2004

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 5/02 TO 4/2003 | | | **PLACEMENT:** CTF. <br> **CUSTODY:** MED A. <br> **VOC. TRAINING:** None. <br> **ACADEMICS:** Enrolled in an Independent Study Program. <br> **WORK RECORD:** Assigned to the culinary warehouse. <br> **GROUP ACTIVITIES:** Completed the IMPACT workshop attended Narcotics Anonymous meetings. <br> **PSYCH. TREATMENT:** None. <br> **PRISON BEHAVIOR:** No disciplinaries. <br> **OTHER:** None. |

CORRECTIONAL COUNSELOR'S SIGNATURE

*M. Rubio* CCI

DATE

4-23-04

Ngo, Sieu                J-07024                CTF-SOLEDAD                May/2004

230

BOARD OF PRISON TERMS                                                                          STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
| YEAR | BPT | PBR | REASONS |
|---|---|---|---|
| 5/2003 To Present | | | **PLACEMENT:** CTF.<br>**CUSTODY:** MED A.<br>**VOC. TRAINING:** None.<br>**ACADEMICS:** Enrolled in an Independent Study Program.<br>**WORK RECORD:** Assigned to the culinary warehouse.<br>**GROUP ACTIVITIES:** Participated in Narcotics Anonymous meetings.<br>**PSYCH. TREATMENT:** None.<br>**PRISON BEHAVIOR:** No disciplinaries.<br>**OTHER:** None. |

ORDER:
- ☐ BPT date advanced by _____ months.
- ☐ PBR date advanced by _____ months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- ☐ Previously imposed conditions affirmed.
- ☐ Add or modify

- ☐ Schedule for Progress Hearing on appropriate institutional calendar

Ngo, Sieu                    J-07024                    CTF-SOLEDAD                    May/2004

BOARD OF PRISON TERMS                                                            STATE OF CALIFORNIA

231

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT H

232

( *E PRISONER EVALUATION RE . *RT
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2002 CALENDAR

NGO, SIEU PHONG                                                                J07024

I.    **COMMITMENT FACTORS:**

A.    **Life Crime:** Murder Second, PC 187, with Use of a Firearm, PC 12022(A)(1).
San Francisco County Case #C99109. Sentence: 15 years to Life plus one year
enhancement. MEPD: 5/24/03. Victim: Angel Gonzalez, age 15 years old.
Received by CDC on 2/1/94.

1.    **Summary of Crime:** On 9/18/92, Angel Gonzalez was beaten and shot to
death near Fullerton High School as he was walking home after school. An
investigation revealed that earlier in the day the victim, a member of the
"Fullerton Tokers Town" a Latin gang and member of "Fullerton Boyz"
an Asian gang, were at a McDonald's restaurant, near the high school. The
victim and No Muhamed had a confrontation with each claiming their
respective gang affiliations. After this non-physical altercation, the group
of Asians which at the time included Sieu Phong Ngo, obtained a firearm.
Ngo and the Asian gang members returned to the school where they
waited for Gonzalez. As he walked home he was attacked and beaten.
During the physical altercation the victim was shot one time in the back by
Usumang Muhamed. The group of five Asian gang members including
Ngo fled the area after the shooting. Angel Gonzalez died at the scene as a
result of the gunshot wound. Ngo, Jimmy Dao and Asat Cham fled to the
state of Washington. They were subsequently apprehended there, and the
murder weapon, a stolen .22 caliber handgun was recovered in the vehicle.
Information obtained from POR pages 3 & 4.

2.    **Prisoner's Version:** Ngo explained that earlier in the day his group had a
confrontation with the victim. Subsequently, he and his group went to an
arcade to play games. At that time his companions took possession of a
weapon. Ngo stated that he did not see the gun until he was in the vehicle,
it was located under the passenger's seat. He and his companions returned
to Fullerton High School where they parked and went to look for
Gonzalez. Ngo explained that they had gun for protection in case someone
else happened to have a weapon. They found Gonzalez, and he and his
group started fighting with the victim. During the fight Ngo heard two
shots. Ngo explained that no one intended to kill the victim. They just
planned to beat him up because Gonzalez had told them to "get out of
town," and this made Muhamed angry. Ngo realizes that his behavior was
a mistake. Ngo drove his two companions to Washington because

LIFE PRISONER EVALUAT N REPORT                                    2
INITIAL PAROLE CONSIDE ATION HEARING
APRIL 2002 CALENDAR

Muhamed told him that he knew someone who would give them shelter.
Ngo feels sorry for the victim's family.

**B.**   **Aggravating/Mitigating Circumstances:**

    **1.**   **Aggravating Factors:**

        **a.**   The victim was particularly vulnerable in that he was outnumbered.

        **b.**   The crime was racially motivated.

        **c.**   The inmate had an opportunity to cease but continued with the crime.

        **d.**   The crime involved use of a firearm.

    **2.**   **Mitigating Factors:**   The inmate has a minimal history of criminal behavior.

**II.**   **PRECONVICTION FACTORS:**

  **A.**   **Juvenile Record:**   None.

  **B.**   **Adult Convictions:**   On 3/30/92, Ngo was arrested by the San Gabriel Police Department for Possession of a Controlled Substance (three pieces of rock cocaine). On 5/7/92 he was diverted pursuant to Section 1000 of the Penal Code. On 9/22/92, Ngo was arrested by the Olympia Sheriff's Office for Possession of Stolen Property. This case was Subsequently dismissed. Information obtained from CI&I.

  **C.**   **Personal Factors:**   Ngo was born in Vietnam on 5/18/73. He has resided in the United States since 1979. In 1991 he graduated from Fullerton High School and subsequently attended Fullerton Community College and Pasadena City College. He completed ten units and his major was business. Ngo was employed as a telemarketer and worked odd jobs. He was employed at his family's liquor store and resided with his parents. Ngo had problems with controlled substances or alcohol. He was a member of the "Fullerton Boyz," and after his move to Los Angels he became affiliated with the "Tiger Mafia."

**III.**   **POSTCONVICTION FACTORS:**

*22A*

LIFE PRISONER EVALUAT^ ^N REPORT                                    3
INITIAL PAROLE CONSID^ .^TION HEARING
APRIL 2002 CALENDAR

A.    Special Accommodations/Disability:  None.

B.    Custody History:  Ngo was received by R.J. Donovan Correctional Facility for
      Initial Processing on 2/1/84. He was transferred to Centinela State Prison on
      3/17/94 and placed on Close A Custody. On 5/16/95 he was transferred to
      California State Prison at Lancaster and placed on Medium A Custody. On
      12/16/98 he was transferred to the Correctional Training Facility and continued
      Medium A Custody. Ngo has been assigned to the Yard Crew and various
      positions as a clerk. He has completed courses in Tuberculosis, AIDS and
      Hepatitis. Ngo successfully completed Vocational Auto Upholstery, Automotive
      Refinishing and Vocational Auto Paint.

C.    Work, Education, Vocation, Therapy & Self-Help Activities:  Ngo has
      completed self-help courses in Salesmanship and Parenting and has been a
      participating member of Alcoholics Anonymous and Narcotics Anonymous.

D.    Disciplinary History:  Ngo has received only two CDC 128A's during his
      incarceration. See Disciplinary Sheet for details.


IV.   FUTURE PLANS:

A.    Residence:  Ngo plans to reside with his mother, Phuong Hungk Ngo, at 709
      Triana Street, Monterey Park, California, (714) 827-7832.

B.    Employment:  Ngo plans to work at the family liquor store which is owned by
      his sister, Julie Seeto, in Anaheim. His uncle, Calvin Ung, owns a restaurant in
      Anaheim and has offered Ngo a job as a cook.


V.    USINS STATUS:  Ngo is a United States Citizen.


VI.   SUMMARY:

A.    Considering the commitment offense, minimal prior arrest record and prison
      adjustment, the writer believes Ngo would probably pose a moderate to low
      degree of threat to the public at this time, if released from prison. This opinion is
      based on Ngo being immature at the time of the crime and easily influenced by his
      peers. The crime was episodic in nature. Ngo has a limited criminal history and
      has not shown a pattern of violence in custody.

B.    Prior to release Ngo could benefit from remaining disciplinary free and
      completing an additional vocational program.

225

NGO  SIEU PHONG            J07024                    CTF-Soledad         APR/2002

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2002 CALENDAR

4

C.     This report is based upon a one hour interview, incidental contact in the housing unit and a thorough review of the Central File.

D.     Ngo reviewed his Central File on 1/18/02.

236

NGO. SIFU PHONG          J07024          CTF-Soledad          APR/2002

LIFE PRISONER EVALUA~ ⌐N REPORT
INITIAL PAROLE CONSIDE.ATION HEARING
APRIL 2002 CALENDAR

5

_____
M. Rubio
Correctional Counselor I


_____
C. Plymesser
Correctional Counselor II


_____
J.L. Clancy
Facility Captain


_____
D.S. Levorse
Classification and Parole Representative


237

# EXHIBIT I

228

COPY TO I/M
VIA
CC-1 ON ___1-8-97___
(date)

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS
MARCH 1997 CALENDAR
CALIFORNIA STATE PRISON-LOS ANGELES COUNTY


NAME:      NGO, SIEU
CDC#:      J-07024
DATE OF EVALUATION:      December 27, 1996


IDENTIFICATION/FORENSIC DATA:

This is the psychological report for the "Documentation #1
Hearing" scheduled for March of 1997 for Sieu Ngo; CDC#
J-07024.  On October 21, 1993; Mr. Ngo was convicted by jury
trial of P.C. 187A murder in the second degree, reduced from
first degree in exchange for agreeing to a 15-to-life
sentence and no appeal, with enhancement P.C. 12022
vicariously armed with a gun.  He was sentenced to 16-years-
to-life.   The crime occurred September 18, 1992.  Mr. Ngo
and four co-defendants beat and shot in the back a fifteen
year old member of an enemy gang.  Mr. Ngo stated that he
agreed with the records of the crime, the verdict, and the
sentencing.   However, he did state at the time of the trial
that no one intended to kill the victim only to beat him up.

Past prior offenses include a two year drug diversion, for
possession of Cocaine and several other arrests which did
not result in convictions..  There have been no prior
psychological Board of Prison Terms reports.

BACKGROUND INFORMATION:

The evaluation consisted of a single 45-minute interview,
for the purposes of this report.  This was after review of
the Central File and medical records on 12/27/96.  There are
no records of past psychological/psychiatric treatment.

Mr. Ngo has received no disciplinary actions.  Not a single
115 or 128A.  Mr. Ngo completed two years of college prior
to coming to prison.  During incarceration, his vocational
training in auto upholstery earned him good comments from
his instructors such as, "doing well - shows enthusiasm".
He received several certificates of completion.  The last
one in October of 1996.  Mr. Ngo has attended Narcotic's

239

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS
MARCH 1997 CALENDAR
DATE OF EVALUATION:  December 27, 1996
PAGE 2

Anonymous and received a one year perfect attendance
certificate in November of 1996.  He has not been employed
in prison. Prior to incarceration, he was employed in sells,
telemarketing, and as a cook while a student in junior
college.

The historical information supplied by the inmate agreed
with the records and there were no distortions.

PRESENT CONDITION:

His Central File contains no records of past mental illness;
however, the inmate reported a history of depression, with
three suicide attempts during his adolescence.  He has
records of hospitalization for the suicide attempts and his
family will be obtaining these records for entry in his
Central File.  He has numerous cuts and slices on his arm
from suicide attempts.  Mr. Ngo describes his level of
insight at the time of the crime as very limited, naive,
showing poor judgment in his friends and activities.  He had
decided to disengage from these friends and moved away one
year prior to the crime, which occurred while he was
visiting.  Now, he reports he is able to think before
acting; he has changed his attitude to one of valuing
service to his fellow man such as mentoring and tutoring.
The remorse he expresses is sincere.  He shows much shame
and self-incrimination for the crime.  In hindsight, he sees
that he perhaps could have stopped the incident and now has
great empathy and remorse for the family of the victim.

MENTAL STATUS AND DIAGNOSIS:

Mental status indicators are clear in all areas: mood and
affect, behavior, speech, thought content and processes, and
cognition.

AXIS I:    V71.09    NO DIAGNOSIS OR CONDITION.

AXIS II:   V71.09    NO DIAGNOSIS.

AXIS III:            NONE.

240

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS
MARCH 1997 CALENDAR
DATE OF EVALUATION:  December 27, 1996
PAGE 3


AXIS IV:  PSYCHOSOCIAL STRESSORS:  INCARCERATION.

AXIS V:   GLOBAL ASSESSMENT OF FUNCTIONING = 75.

CONCLUSIONS AND RECOMMENDATIONS:

Mr. Ngo's history of depression and suicide attempts may
have contributed to his state of mind and poor judgment
during the time of the crime.  There are no records of any
mental health treatment during incarceration and Mr. Ngo is
no longer depressed.  He has increased his chances for
successful re-entry into society by setting educational
goals in academic subjects and a good start in attendance in
Narcotic's Anonymous.  He plans to start Alcoholic's
Anonymous in 1997.  He also has excellent family support who
can provide him a place to live, employment, and are willing
to pay for correspondence courses for him during
incarceration.  This inmate is of above average intelligence
and has excellent potential in intellectual endeavors.  He
is no longer depressed and is now able to recognize the
symptoms of depression and would seek help as needed.  Also
in his favor is the absence of any indications of violence
other than the crime.

To continue positive programming, Mr. Ngo needs to regularly
attend Narcotic's Anonymous and Alcoholic's Anonymous,
remain disciplinary-free, and pursue higher education
through correspondence courses.  By reducing his points, he
can possibly transfer to other institutions that facilitate
correspondence studies and provide other self-help group
opportunities.  Psychotherapy is not part of his program
unless he has a recurrence of his depression.


C. SCHROEDER, Ph.D.                       Date  1/6/97
Staff Psychologist

Orig:    C-File
  cc:    Medical Records    Psych.    Inmate

241

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

I am over eighteen (18) years of age, and not a party to the within cause; my business address is 523 West Sixth Street, Suite 1109, Los Angeles, CA. 90014. That on August 15, 2006, I served a copy of the within:

### EXHIBITS IN SUPPORT OF
### PETITION FOR WRIT OF HABEAS CORPUS

On the interested parties by placing them in an envelope (or envelopes) addressed respectively as follows:

Office of the Attorney General          Mr. Sieu Phong Ngo
P.O. Box 85266                          J-07024/ B-wing 319-up
San Diego, CA 92186-5266                CTF- Soledad
                                        P.O. Box 689
Office of the District Attorney         Soledad, CA 93960-0689
700 Civic Center Drive West
Santa Ana, CA 92701


Each said envelope was then, on August 15, 2006, sealed and deposited in the United States mail at Los Angeles, California, the county in which I maintain my office, with postage fully prepaid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2006, at Los Angeles, California.


SHANNON CALLAHAN

2:12

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

I am over eighteen (18) years of age, and not a party to the within cause; my

business address is 523 West Sixth Street, Suite 1109, Los Angeles, CA. 90014. That on

October 17, 2006, I served a copy of the within:

### EXHIBITS IN SUPPORT OF
### PETITION FOR WRIT OF HABEAS CORPUS

On the interested parties by placing them in an envelope (or envelopes) addressed
respectively as follows:

Office of the Attorney General
P.O. Box 85266
San Diego, CA 92186-5266

Office of the District Attorney
700 Civic Center Drive West
Santa Ana, CA 92701

Clerk of the Superior Court
700 Civic Center Drive West
Santa Ana, CA 92702-1944
For delivery to the Honorbable Kazuharu
Makino

Mr. Sieu Phong Ngo
J-07024/ B-wing 319-up
CTF- Soledad
P.O. Box 689
Soledad, CA 93960-0689

Each said envelope was then, on October 17, 2006, sealed and deposited in the
United States mail at Los Angeles, California, the county in which I maintain my office,
with postage fully prepaid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 17, 2006, at Los Angeles, California.

SHANNON CALLAHAN