# EXHIBIT 3
# PART 2 OF 3

40

1  same tiger but all different, all five of us.

2  It's not for Tiger Mafia or nothing.

3       DEPUTY DISTRICT ATTORNEY CROFOOT:  Okay

4  and the Fullerton Boyz is a gang as well is that

5  correct?

6       INMATE NGO:  It's more like a want to be,

7  there are only five of us, we just friends.

8  Nothing more can say to change it.

9       DEPUTY DISTRICT ATTORNEY CROFOOT:  The

10  probation report indicates a tattoo Wong Lee

11  under the left arm, what is the significance of

12  that tattoo?

13       INMATE NGO:  That is my ex-girlfriend's

14  name that's all.

15       DEPUTY DISTRICT ATTORNEY CROFOOT:  And

16  does the inmate have any other tattoos other

17  than those two?

18       INMATE NGO:  That one no.

19       DEPUTY DISTRICT ATTORNEY CROFOOT:  No.

20       INMATE NGO:  That's all I have.

21       PRESIDING COMMISSIONER BRYSON:  You don't

22  have any other tattoos is that correct?

23       INMATE NGO:  Correct.

24       PRESIDING COMMISSIONER BRYSON:  All

25  right.

26       DEPUTY DISTRICT ATTORNEY CROFOOT:  Was

27  the inmate attending college at the time of this

43

41

1   crime?

2       INMATE NGO:  Yes I was, I was attending

3   at Pasadena City College.

4       DEPUTY DISTRICT ATTORNEY CROFOOT:  And

5   was this --

6       DEPUTY COMMISSIONER FILANGERI:  This is

7   side two of the tape recording of the hearing

8   transcript for Mr. Sieu Ngo, last name spelled

9   N-G-O J-07024.  Sorry for the interruption.

10      DEPUTY DISTRICT ATTORNEY CROFOOT:  Thank

11  you.  The car that was used on the day of the

12  crime, was that the inmate's car?

13      INMATE NGO:  No it wasn't.

14      DEPUTY DISTRICT ATTORNEY CROFOOT:  Whose

15  car was that?

16      INMATE NGO:  I think it belonged to Jimmy

17  Dao.

18      DEPUTY DISTRICT ATTORNEY CROFOOT:  And

19  that car was later burned is that correct?

20      INMATE NGO:  Correct Sir.

21      DEPUTY DISTRICT ATTORNEY CROFOOT:  All

22  right and what were the circumstances of burning

23  that car?

24      INMATE NGO:  My friend wanted to get rid

25  of it so when we were leaving the state of

26  California we didn't want to be followed so they

27  decided to burn it.

44

42

1          PRESIDING COMMISSIONER BRYSON:  Where did

2    you do that?

3          INMATE NGO:  At that point I wasn't even

4    there but I knew what they did when they told me

5    but it was in somewhere, I think it was, I'm not

6    sure but I think it was near some beach or

7    something.  I don't know exactly where though

8    because I wasn't there.

9          DEPUTY DISTRICT ATTORNEY CROFOOT:  Where

10   did the murder weapon come from?

11         INMATE NGO:  Now I know that Asat Chan

12   who live in Washington I think he stole a gun

13   and brought it to California.  That's the only

14   thing I know.

15         DEPUTY DISTRICT ATTORNEY CROFOOT:  Was

16   that person involved in this crime?

17         INMATE NGO:  Yes he was.

18         DEPUTY DISTRICT ATTORNEY CROFOOT:  And

19   did he return to Washington with you?

20         INMATE NGO:  Yes he was -- when we were

21   arrested he was arrested with me and Jimmy Dao

22   at that time.

23         DEPUTY DISTRICT ATTORNEY CROFOOT:  And

24   when you were arrested you still had the murder

25   weapon is that correct?

26         INMATE NGO:  Correct.

27         DEPUTY DISTRICT ATTORNEY CROFOOT:  Thank

*45*

43

1   you I have no further questions.

2           PRESIDING COMMISSIONER BRYSON:  All

3   right, Counselor do you have questions for the

4   inmate?

5           ATTORNEY RUTLEDGE:  Yeah I do.  Clearly

6   you've been busy since you've been here.

7           INMATE NGO:  Yes I have.

8           ATTORNEY RUTLEDGE:  And when you were

9   going to college, you were going to college when

10  this happened and you were?

11          INMATE NGO:  Just visiting them.

12          ATTORNEY RUTLEDGE:  Okay that's what I

13  was getting at.  So what was your social life

14  after -- did you move to Pasadena at that time

15  or were you just going to college there?

16          INMATE NGO:  I moved down there you know

17  back to LA because I want to straighten out my

18  life you know, get away from so called gang but

19  I was trying to straighten out, I had a steady

20  girlfriend, I was going back to college trying

21  to straighten out my life.  I hadn't seen my co-

22  defendant in a little over a year when, before

23  this happened you know so that -- they called me

24  up one day you know to come visit them and one

25  thing led to another, this is what happened.

26          ATTORNEY RUTLEDGE:  And what do you think

27  -- were you able to ever apologize to the

46

44

1    victim's mother or family?

2         **INMATE NGO:**  At the time I tried to

3    during court but I guess she didn't want to hear

4    it so she walked out on me.  I made an attempt

5    but I wasn't successful at that though because

6    she left the court.

7         **ATTORNEY RUTLEDGE:**  All right, and how do

8    you think the loss of this young man affected

9    his mother and he had other siblings, how did

10   that affect them?

11        **INMATE NGO:**  There is really no word can

12   express how truly and deeply sorry I am for the

13   victim's family because the pain and suffering a

14   mother goes through is incomprehensible because

15   it just affect the family and it just everyone

16   that's involved in this crime.  I know this

17   because you know I lost loved one myself so I

18   know, I can emphasize what the family is going

19   through, friends, I mean just everyone, the

20   community that knows Angel Gonzales you know but

21   at this time I can't change what happened you

22   know.  I wish I could make the pain go away but

23   I can't, I'm only human.  But I am truly, truly

24   sorry for what happened to Angel.  It was never

25   my intention to take his life.  It thought it

26   was going to be a fist fight and at a young age

27   I never in my wildest dream think something like

47

1   this was going to happen.  So I take full

2   responsibility for my action, there's no doubt.

3   I deserve to be punished you know, I'm willing

4   to do my time for this so all I can say at this

5   time is I am truly, truly sorry for what I have

6   done to the Gonzales family.  I know what each

7   and every day it's like for them without there

8   son so that's all I have to say.

9        ATTORNEY RUTLEDGE:  Have you been in any

10  fights since you've been in the institution?

11       INMATE NGO:  No I haven't.  I been

12  disciplinary free.

13       ATTORNEY RUTLEDGE:  All right, how do you

14  stay -- have you managed to stay away and I

15  wanted to ask you to have you been involved with

16  any gangs in the prison?

17       INMATE NGO:  No I haven't.

18       ATTORNEY RUTLEDGE:  How have you managed

19  to keep yourself from the gangs and not involve

20  yourself in any violence?

21       INMATE NGO:  Knowing what I know today

22  about what impact a gang can have on people.  I

23  have grown so I know to change my behavior for

24  the better.

25       ATTORNEY RUTLEDGE:  You mentioned, did

26  you recently loose a co-worker here at the

27  prison?

*48*

46

1       INMATE NGO:  Yes I have.

2       ATTORNEY RUTLEDGE:  And how did that

3   impact your life?

4       INMATE NGO:  Realize life is short you

5   know and anything can happen.  I mean he was a

6   good man, older individual.  His name was

7   Nicholas you know.  The last thing I said to him

8   when you know I see you out in the yard.  I gave

9   him a hug but when I came back from visit that's

10  the first thing I heard was that he passed away

11  and I just couldn't believe it you know like

12  something like this happens so short you know.

13  Life is so unpredictable.

14      ATTORNEY RUTLEDGE:  No further questions

15  for Mr. Ngo.

16      PRESIDING COMMISSIONER BRYSON:  I have a

17  couple of questions.  We didn't really discuss

18  and I would like to know what your history has

19  been -- have you trafficked drugs?

20      INMATE NGO:  No I haven't Ma'am.

21      PRESIDING COMMISSIONER BRYSON:  And how

22  was it that you were associated with cocaine at

23  one point in your life?

24      INMATE NGO:  Well at that point you know

25  I tried it, a friend introduced me to it so I

26  tried it and I bought three piece of rock

27  cocaine as I was going home I was pulled over by

49

47

1    the police, got arrested.

2            **PRESIDING COMMISSIONER BRYSON:**   And

3    that's your whole history with cocaine?

4            **INMATE NGO:**   Yeah, pretty much.

5            **PRESIDING COMMISSIONER BRYSON:**   Okay, how

6    about alcohol?

7            **INMATE NGO:**   I don't drink alcohol, I'm

8    allergic to alcohol.

9            **PRESIDING COMMISSIONER BRYSON:**   Okay.

10           **INMATE NGO:**   I break out in hives.   Tried

11   it though but that's how I knew I was allergic

12   to it.

13           **PRESIDING COMMISSIONER BRYSON:**   Okay well

14   that answers those questions.   Thank you.   All

15   right, I'd like to invite the District Attorney

16   Mr. Crofoot to make a closing statement at this

17   time.

18           **DEPUTY DISTRICT ATTORNEY CROFOOT:**   Thank

19   you.   At the time of this offense he was on

20   diversion for possession for that rock cocaine.

21   He was a gang member, Don Rubright stated in his

22   letter that this gang had not established a

23   territory.   The fact is Asian gangs generally

24   are not territorial as opposed to Spanish gangs

25   which are.   So that is meaningless, there in a

26   gang he was in the Tiger Mafia previously to

27   Fullerton Boyz.   Apparently in the gang

48

1    significantly in that he chose to have his chest

2    tattooed with a tiger relating to that gang

3    affiliation.  One of the correctional counselors

4    indicated that he was immature at the time of

5    the crime and easily influenced by peers.

6    Actually he was 19 years old at that time, he

7    was out of high school, he was in his first year

8    of college and in his story had moved away from

9    the gang influence.  However at the request of

10   the other gang members he did return to

11   Fullerton, he entered into a, there was an

12   argument at McDonalds between the Asian gang

13   members and the Fullerton Toker's Gang, a

14   Mexican gang.  That was a verbal confrontation.

15   They left, they the defendant, the inmate and

16   his cohorts left and went to another location

17   where they obtained a gun, returned to the

18   location where the 15 year old victim was

19   attending school and there they waited for the

20   victim, lay and wait for him and when the victim

21   came out the three of them attacked that victim

22   and ultimately the victim was shot in the back.

23   They fled to Washington, saw fit to destroy the

24   vehicle, burn the vehicle which might have

25   identified them.  However they also chose to

26   hang onto that 22 handgun which was the murder

27   weapon and they possessed that at the time they

51

49

1  were arrested.  This inmate denied knowledge of

2  the gun until it was in the vehicle, until it

3  was in the vehicle is the key because this is

4  pre-shooting.  He knew of the gun prior to going

5  to lay and wait for the 15 year old victim.  He

6  indicates that they didn't intend to kill the

7  victim, they only intended to beat him up.  So

8  they chose to bring a handgun to a fist fight.

9  The inmate indicates that they had the gun for

10  protection if someone else had a gun.  If

11  someone else chose, if they thought that someone

12  else had a gun and they bring a gun, it's

13  inevitable that there is going to be a shooting.

14  If he wanted to stay out of this he had plenty

15  of opportunity to walk away when all they had

16  previous to that was a verbal altercation.  The

17  reason for the shooting was inexplicable, it was

18  a minor affront during this argument, I'm sorry,

19  the victim said get out of town and that's the

20  basis for this killing.  In 1990, two years

21  prior to this, there was a similar cowardly

22  attack by this inmate and others.  There were --

23        **ATTORNEY RUTLEDGE:**  I would object to

24  that, do we have a police report for that?

25        **DEPUTY DISTRICT ATTORNEY CROFOOT:**  It's

26  in the probation report.

27        **ATTORNEY RUTLEDGE:**  But they couldn't --

52

50

1    my understanding is that they couldn't confirm

2    it, they couldn't reach the victim.

3        **DEPUTY DISTRICT ATTORNEY CROFOOT:**  The

4    police report is right there, it's on page ten

5    of the probation report.

6        **ATTORNEY RUTLEDGE:**  I would object to it

7    unless they can produce, it's like triple hear

8    say of actual police report.

9        **PRESIDING COMMISSIONER BRYSON:**  Okay,

10    that's over ruled, I won't be looking at all

11    that information.

12        **DEPUTY DISTRICT ATTORNEY CROFOOT:**  It was

13    a similar attack, the victim was confronted by

14    three, this inmate and two others.  He was

15    struck and this inmate was the second person to

16    strike that victim when the victim went down he

17    was kicked and punched by the three of them.  So

18    this is not, this one shooting is a culmination

19    of what was going to happen and what was going

20    to happen eventually and it did and it happened

21    in 1992.  The inmate is programming but he was

22    programming at the time that he got involved in

23    this gang activity.  He was attending college at

24    that time, he had moved from the area at that

25    time, it appeared that he was moving ahead as it

26    appears here that he's moving ahead.  But he

27    chose to go back and get involved in this gang

53

51

1   activity again and that's why he's here.   And I
2   think that he has served his MAPD was less than
3   two years ago, one and a half years ago.   I
4   think that he is - I'm sorry two and a half
5   years ago.   And I don't think that he has served
6   enough time and I would ask that the board not
7   grant him a date at this time.   Thank you.
8           **PRESIDING COMMISSIONER BRYSON:**   Thank
9   you.   All right counsel I would like to invite
10  you to make a closing statement.
11          **ATTORNEY RUTLEDGE:**   Thank you.   Well I
12  think that the most important thing that I would
13  comment that the people shared with us was that
14  this happened in 1992.   I wouldn't consider Mr.
15  Ngo programming when he was on, he had a
16  diversion charge at that time.   I think again
17  that he had just been an adult for about one
18  year.   I think he's discussed openly with the
19  panel his -- and if you have any other questions
20  about what his motivation was to be involved
21  with these people or what they were involved in
22  feel free to ask him again but I think he has
23  pretty much answered that.   I commented to him
24  you know, it's a miracle that most teenagers
25  survive the teen years because there is such a
26  high possibility of them to get involved in
27  stupid things like this.   This was a very

54

52

1    unfortunate situation and you know a clear

2    picture of an ignorant teenager thinking let's

3    just go get in a fight not appreciating at the

4    time that any type of violence has a potential

5    for something serious.  I think he clearly sees

6    that now, in fact he noted to the board that he

7    would like to share that with other people at

8    risk and I think that is, we still have young

9    people that are out there at risk for thinking

10   that they are just going to be beating up people

11   and not truly appreciating and I think there's

12   evidence that at that age your -- everything is

13   not together that's why teenagers act like there

14   from another planet.  But I think there is a

15   truly different person here today at 32.  He's

16   been down for this time.  There hasn't been any

17   evidence of any drug use or gang affiliation.  I

18   believe that some of these co-defendants are

19   housed here at CTF.  Is that correct?

20        **INMATE NGO:**  Correct.

21        **ATTORNEY RUTLEDGE:**  And there has been no

22   further action.  I think this did -- which I

23   would say I would speculate that this was an

24   isolated incident for these boys.  I think, I

25   don't think that that behavior marked Mr. Ngo's

26   life long traits as a person.  I think it was

27   sort of an immature wrong.  I mean I am not

*55*

53

1   going to disagree with the people, it was

2   clearly wrong, clearly had the potential for

3   what happened.  And I think we have all been

4   teenagers, we know how these kids don't think

5   these things through and it's very serious and

6   it had a tremendous impact on the community and

7   on this family and I believe that Mr. Ngo also

8   is in touch with that.  That said the amount of

9   time that he's served, he has served 13 years.

10  Is it 13 or 14?

11        INMATE NGO:  About 13, almost 13.

12        ATTORNEY RUTLEDGE:  Almost 13 years and

13  he came into the system when he was quite a

14  young man so in his twenties.  We all can

15  remember the twenties.  That's a significant

16  time of your life.  It's almost like if you

17  loose your twenties you've lost half your

18  thirties and your forties because that is such a

19  prime time.  So I would like the panel to when

20  you think about the amount of time he's served

21  think about the time of his life when everyone's

22  going to college or discovering life.  He lost

23  that whole decade, I mean he gave it up, I

24  shouldn't say it was taken away from him, he

25  made that decision to get involved in that

26  behavior and gave it up but I do believe that's

27  stronger punishment had he been older it would

54

```
 1   have been a little bit different.  He's lost, he
 2   gave up the prime years of his life in exchange
 3   for this act.  He had no juvenile record, his
 4   stable social history is all there.  All the
 5   letters written by his family and also all the
 6   reports in the file indicate that he had good
 7   family ties, his family had there own business,
 8   they were highly productive members of society.
 9   And as far as remorse goes I think his comments
10   speak for themselves and also what he has
11   included in his Memorandum, I would incorporate
12   that into the remorse.  And his psychological
13   reports also underlie his true feelings of
14   remorse for what he's done.  And the motivation
15   for the crime, I mean what can you say about
16   that.  I'm not sure -- there are rare
17   circumstances when there is any way that you can
18   explain away this type of situation.  Other than
19   the fact again that you've got a bunch of
20   immature teenagers and I would note that when we
21   talk about gangs its one thing if one of us says
22   get out of town but when a gang member says
23   that, its almost like a threat you know.  If
24   there affiliated with dangerous people and they
25   tell other people to get out of town that should
26   put them on notice that something could happen
27   if they don't get out of town.  Mr. Ngo had one
```

57

55

1   prior incident with his diversion which he up
2   until the commitment offense he was completing
3   that.  His maturity level I think is quite
4   significant.  I think its obvious he has spent
5   this time in prison because he's a little bit
6   more mature than we would expect at that age but
7   that's probably what prison does to people.  And
8   his understanding and plans for the future, that
9   goes without saying, he's submitted a Memorandum
10  that's covered every applicable suitability
11  factor as far as skills, he's got three vocs,
12  he's got -- he had been in college, he had
13  completed high school so he does have an
14  aptitude for academics.  He's got the highest
15  TAB score and he has jobs lined up, family
16  support and interesting in his file to is he has
17  been giving money to organizations that are
18  feeding children.  I don't know if you noted,
19  there was a letter thanking him for that so he
20  seems to have a community, a sense of community.
21  His institutional behavior is exceptional.
22  Nothing violent, no substance abuse, nothing
23  again to show that he has any motivation to
24  continue that, the path that he was on when he
25  entered the CDC.  There is no documentation that
26  he's ever disrespected inmates or staff, he has
27  marketable skills, he has many years of self

58

56

1    help, he's fully prepared really for life among

2    free society as a productive citizen.  I think

3    he has covered every possible basis that is

4    necessary for his integration and his behavior

5    here indicates an enhanced ability to actually

6    function within the law.  I mean he knows he is

7    the know what can happen when you aren't

8    following the norms of society.  And while he

9    has been here he has lost his father and been

10   able to get more of an idea of the impact that

11   the death of Mr. Gonzales had on his family

12   which he expressed here today.  All those things

13   considered I would ask the board to please give

14   him a parole date today.  Thank you.

15       PRESIDING COMMISSIONER BRYSON:  Thank

16   you.  Sir I would like to give you an

17   opportunity to make a final statement to this

18   panel regarding your suitability for parole.

19       INMATE NGO:  All right.  I would like to

20   read, I wrote this.  First and for most there is

21   no adequate amount of words in the universe

22   which can express the truly deeply sorry I am to

23   Gonzales family for all the pain and suffering I

24   caused them and everyone else who was affected

25   by Angels death.  In hindsight I wish I could

26   have changed what happened on that tragic day

27   but the truth is I really did not know what was

59

57

1  about to happen that very instant that took

2  Angel's life.  At the time I honestly believe I

3  was getting into a fist fight and nothing more.

4  I did not take Angel's life, it was never my

5  intention that is such a tragic incident would

6  occur.  Again I was there for a fist fight,

7  nothing I say or do at this point will ever

8  change what happened on that tragic day.  All I

9  can do on my part is to accept full

10  responsibility for my action alone.  I hope and

11  pray that someday the Gonzales family will find

12  it in there hearts to forgive me for my actions.

13  We all have made mistakes at some point in our

14  lives, some more than others but as individual

15  how we choose to learn, grow and change our

16  behavior does set us apart from the one who

17  don't.  Today as I sit in front of you I am no

18  longer the young stupid naive 19 year old back

19  then but as a good decent 32 year old mature

20  adult who is intelligent enough to know the

21  difference between right and wrong.  Who is able

22  to think things through before reacting to any

23  situation and responsible for any actions that I

24  may take here on out.  I know in my heart and

25  soul that I am a good decent person who as a

26  young man made some very poor choices which I

27  am truly sorry for.  There is not a single day

60

58

1   that goes by that I don't think about what

2   happened to Angel and what his family is going

3   through.  Everyday I wake up in here, it's a

4   constant reminder of that tragic day.  I deserve

5   to be punished for my actions but I believe I

6   have served more than enough time for my

7   actions.  In closing I understand the difficulty

8   of you task as Commissioner in determining ones

9   suitability with regard to public safety.  All

10  that I ask of you is please don't judge me for

11  one of my unchanging aspect of my past conduct

12  to find who I am today.  But look at all that I

13  have accomplished during my incarceration.  With

14  absolute certainty I know I am a better person

15  today than I was when I committed this

16  unfortunate offense.  I know I will never come

17  back in prison and I know I can be a law,

18  productive law bidding citizen if you would only

19  give me a second chance.  Should you find me

20  suitable here today the rules that govern this

21  panel in setting my term of confinement are set

22  forth in California Code of Regulation title 15

23  division two section 2403, the conduct most

24  closely related to the crime I've committed is

25  category A section three.  Which has a minimum

26  term of 17 years medium term of 18 years and a

27  maximum term of 19 years.  I respectfully

61

59

1    request that this panel set my appropriate term

2    of 17, 18 or 19 years.  And please, please give

3    me a second chance.  I know I will be a law

4    bidding citizen.  I know I can make it out

5    there.  I won't be a statistic that comes back

6    in here.  I will never, never come back in to

7    prison.  I have a family that's waiting for me

8    out there.  So please grant me a date today.

9    Thank you for your time today.

10        **PRESIDING COMMISSIONER BRYSON:**  Thank you

11   for your remarks.  We will now recess for

12   deliberations the time is 11:11 A.M.

13                    **R E C E S S**

14                    --oOo--

15

16

17

18

19

20

21

22

23

24

25

26

27

62

60

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                  D E C I S I O N

3          DEPUTY COMMISSIONER FILANGERI:   Okay

4    we're back on record.

5          PRESIDING COMMISSIONER BRYSON:   All

6    right, the time is 11:58 A.M. in the matter of

7    Sieu Phong Ngo.

8          DEPUTY COMMISSIONER FILANGERI:   Did

9    somebody tell the DA?

10          PRESIDING COMMISSIONER BRYSON:   Oh my

11    apologies.  We'll start is all again.  Why don't

12    you please find the DA.

13          ATTORNEY RUTLEDGE:   He went home.

14          DEPUTY COMMISSIONER FILANGERI:   We're on

15    record.

16          PRESIDING COMMISSIONER BRYSON:   The time

17    is 11:59 in the matter of Sieu Phong Ngo.  Sir

18    the panel reviewed all information received from

19    the public and you and relied on the following

20    circumstances in concluding that you are not

21    suitable for and would pose an unreasonable risk

22    of danger to society or a threat to public

23    safety if released from prison.  The offense was

24    carried out in an especially cruel and callous

25    manner in that you attacked and beat a 15 year

26    old male, Angel Gonzales who was ultimately shot

27    **SIEU NGO  J-07024  DECISION PAGE 1  2/8/06**

61

1   in the back and died at the scene.  The offense

2   was carried out in a dispassionate and

3   calculated manner in that it was a confrontation

4   between gang members preplanned by lying in wait

5   for the victim as he walked home.  The offense

6   was carried out in a manner demonstrating

7   exceptionally callous disregard for human

8   suffering, disregard for public safety in that

9   it occurred near a school and there was a clear

10  opportunity for you to cease but you continued.

11  Despite some prior record of involvement with

12  cocaine this panel recognizes and submits that

13  you have a relatively criminal free background

14  and you are to be commended for that.  And you

15  have a history of stable relationships including

16  your family support.  We do not have evidence

17  that you have a long history with established

18  gangs and so we do not point to that in terms or

19  your history of relationships.  And it will be

20  further discussed you have presented to us a

21  history of strong stable social support.  As to

22  your institutional behavior you have programmed

23  commendably, your education includes 41 units

24  towards you AA Degree and continuing involvement

25  with college enrollment including your current

26  independent study through Coast Line Community

27  **SIEU NGO   J-07024   DECISION PAGE 2   2/8/06**

62

1    College.  We also have read into the record a

2    very reputable list of vocational achievements

3    including automotive refinishing and upholstery,

4    forklift operator, salesmanship and other

5    vocational work.  You have participated in self

6    help and therapy, well self help consistently

7    ranging from Anger Management, the Teddy Bear

8    Drive, Feed the Children, Buddhist ordination

9    into Buddhist Studies, the Impact Program, Key

10   to Fatherhood, The Muslim Chapel, and you have

11   assisted in inmate education.  As to misconduct

12   you have zero 115's, you have two minor 128A's,

13   the last in 2000 for window covering.  As to

14   your psychological report, the report that is

15   dated January 23rd, 2002, the last we have by

16   Doctor Saindon S-A-I-N-D-O-N does in general

17   support release.  And I quote, this man has

18   spent ten years in prison and that is at the

19   time of this psychological report, I would

20   recommend should he be paroled abstinence from

21   all alcohol or use of any controlled substance,

22   frequent monitoring for substance abuse, he

23   should be relocated so that he is near his

24   family, he should make frequent reports to his

25   parole officer concerning his vocational

26   progress and goals.  And due to his families

27   **SIEU NGO   J-07024   DECISION PAGE 3   2/8/06**

65

63

1  commitment to supporting him upon his release,

2  his projected level of success in the community

3  if granted a date for parole is seen at this

4  time to be better than average.  You also have

5  made outstanding parole plans.  You have viable

6  residential plans in the last county of legal

7  residence and I refer to the record for the

8  documentation that we have received.  You also

9  have acceptable employment plans with

10  established businesses owned by your relatives

11  who are assuring you of jobs.  As to Penal Code

12  3042 responses, the responses indicate

13  opposition to a finding of parole suitability,

14  specifically by the District Attorney of Orange

15  County.  In a separate decision the hearing

16  panel finds it's not reasonable to expect that

17  parole would be granted at a hearing during the

18  following two years.  Specific reasons for this

19  finding are as follows.  The panel reviewed all

20  information received from the public and relied

21  on the following circumstances.  The offense was

22  carried out in a specially cruel and callous

23  manner in that you attacked and beat a 15 year

24  old Angel Gonzales who was ultimately shot in

25  the back and died at the scene.  The offense was

26  carried out in a dispassionate and calculated

27  **SIEU NGO   J-07024   DECISION PAGE 4   2/8/06**

66

64

1   manner, it was a confrontation between gang

2   members preplanned by lying in wait for the

3   victim as he walked home.  The offense was

4   carried out in a manner demonstrating

5   exceptionally callous disregard for human

6   suffering.  The offense risked public safety in

7   that it was conducted near a school and you had

8   a clear opportunity to cease but continued.

9   Moreover, the motive for this crime was very

10  trivial in relation to the offense.  It was gang

11  activity and you told this panel "I thought I

12  was going to a fist fight", that minimizes the

13  gravity of the crime, your involvement in it and

14  there fore your insight into the gravity of this

15  crime.  In denying you parole for two years this

16  panel will place the prisoner on the 2008

17  calendar for the next Subsequent Hearing.  If

18  this decision is final you will not get parole,

19  the board will send you a copy of the decision.

20  It will indicate the reasons you did not get

21  paroled.  If this decision is not final the

22  board will set up another hearing.  You can find

23  the laws of California Code of Regulations title

24  15 section 2041.  The board recommends get self

25  help, stay discipline free, get therapy, and

26  continue your educational and vocational

27  **SIEU NGO   J-07024   DECISION PAGE 5   2/8/06**

67

65

1    development plus your outreach to help others.

2    Commissioner do you have anything further?

3        **DEPUTY COMMISSIONER FILANGERI:**  Yeah, the

4    thing that bother's me the most is you know our

5    job is to determine whether your  release would

6    pose an unreasonable risk to public safety and

7    one of the tools that we look at, one of the

8    tools that I like to try to use in that is your

9    insight into the crime.  I think your contention

10   that you were going to a fist fight when you

11   somebody else was armed is hard to believe and

12   as Commissioner said it tends to minimize your

13   role.  I can see where you might be motivated to

14   minimize your role.  What it means to me is that

15   you haven't come to grips, you haven't developed

16   the insight that you need into the causative

17   factors of this crime and I think you should

18   look at that.  Moreover you told the

19   psychiatrist that no one intended to kill the

20   victim, well even if you weren't holding the gun

21   somebody came to a fist fight with a gun and

22   what was that person's intentions.  So it's hard

23   for me to get a gauge on what risk you would

24   pose to public safety when I can't feel

25   comfortable about the level of insight that

26   you've displayed.  And that's what prevents me

27   **SIEU NGO   J-07024   DECISION PAGE 6   2/8/06**

66

1    from granting you a date.  I wish you the best

2    of luck, you've been doing good work in the

3    institution, I hope you keep it up.  Thank you.

4         **PRESIDING COMMISSIONER BRYSON:**  Please

5    don't get discouraged, I hope you will take this

6    as a challenge and an opportunity.  And that

7    concludes this hearing and the time is 12:08

8    P.M.

9                   --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED TWO YEARS**

24   **THIS DECISION WILL BE FINAL ON:**_____JUN  8 2006_____

25   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **SIEU NGO   J-07024   DECISION PAGE 7   2/8/06**

67

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, SUE GERDES, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 66, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF SIEU NGO

CDC NO. J-07024, ON FEBRUARY 8, 2006, and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated February 27, 2006 at Sacramento,

California.


SUE GERDES
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

70

# EXHIBIT B

71

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
)
SIEU PHONG NGO )
_____ )

CDC Number J-07024

COPY

INMATE

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 13, 2002

2:20 P.M.

PANEL PRESENT:

AL ANGELE, Presiding Commissioner
ROBERT RODRIGUEZ, Deputy Commissioner

OTHERS PRESENT:

SIEU PHONG NGO, Inmate
PAT FOX, Attorney for Inmate
JAMES LAIRD, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

✓  No
___  Yes          See Errata Sheet

**Valerie Lord, Transcriber    Capitol Electronic Reporting**

72

ii

# INDEX

|  | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 9 |
| Pre-Commitment Factors | 15 |
| Parole Plans | 23 |
| Post-Commitment Factors | 29 |
| Closing Statements | 50 |
| Recess | 56 |
| Decision | 57 |
| Adjournment | 64 |
| Transcriber Certification | 65 |

--oOo--

73

1

# P R O C E E D I N G S

1   **PRESIDING COMMISSIONER ANGELE:** --- hearing,

2

3   pronounce your last name.

4       **INMATE NGO:** Ngo.

5       **PRESIDING COMMISSIONER ANGELE:** Ngo?

6       **INMATE NGO:** Yes.

7       **PRESIDING COMMISSIONER ANGELE:** First name?

8       **INMATE NGO:** Sieu.

9       **PRESIDING COMMISSIONER ANGELE:** Sieu, okay.

10  Initial parole consideration hearing for Sieu Ngo,

11  that's N-G-O, CDC number J-John-07024.  Today's

12  date Monday, May 13, 2002.  The time approximately

13  2:20 p.m.  We're located at CTF Soledad.  Inmate

14  received February the 1st, 1994, Orange County,

15  murder second degree.  Case number C-Charles

16  99109, count number one, 187 of the Penal Code.

17  Received a term of 16 years to life, with a

18  minimum eligible parole date of May the 24th,

19  2003.  Mr. Ngo, this hearing's going to be

20  tape-recorded.  For the purpose of voice

21  identification, each of us will state our first

22  name, last name, spelling our last name.  When it

23  comes to your turn, after you spell your last

24  name, give us your CDC number.  I'm going to go to

25  my left.  My name is Al Angele, A-N-G-E-L-E,

26  Commissioner, Board of Prison Terms.

27      **DEPUTY COMMISSIONER RODRIGUEZ:** Deputy

74

2

1    Commissioner Rodriguez, R-O-D-R-I-G-U-E-Z, Board

2    of Prison Terms.

3        **DEPUTY DISTRICT ATTORNEY LAIRD:**  James

4    Laird, Orange County District Attorney's office,

5    L-A-I-R-D.

6        **ATTORNEY FOX:**  Pat Fox, F-O-X, attorney for

7    Mr. Ngo.

8        **INMATE NGO:**  Ngo, N-G-O.  First name,

9    S-I-E-U.  Middle name Phong, P-H-O-N-G.

10       **DEPUTY COMMISSIONER RODRIGUEZ:**  Prison

11   number?

12       **INMATE NGO:**  J-07024.

13       **DEPUTY COMMISSIONER RODRIGUEZ:**  You can

14   bring that closer to you.

15       **PRESIDING COMMISSIONER ANGELE:**  Let the

16   record reflect that there are also two

17   correctional officers in the room for security

18   purposes and will not be participating in today's

19   hearing.  The hearing is being conducted pursuant

20   to Penal Code Sections 3041 and 3042 and the rules

21   and regulations of the Board of Prison Terms

22   governing parole consideration hearings for life

23   prisoners.  The purpose of today's hearing is to

24   consider your suitability for parole.  We'll

25   consider the crimes you were committed for, your

26   prior criminal and social history and your

27   behavior and programming since your commitment.

75

3

1    We'll reach a decision today and inform you
2    whether or not we find you suitable for parole and
3    the reasons for our decision.  If we find you
4    suitable for parole, the length of your
5    confinement will be explained to you.  Before we
6    go any further, I want to instruct you, Mr. Ngo,
7    that if you do not get a date today, this is your
8    initial hearing and this will form the foundation
9    of all future hearings, okay.  In saying that, we
10   ask that you be totally truthful with us.  Nothing
11   you say today is going to change the outcome of
12   your court case, okay.  If you tell us things
13   today that are not true, I'm sure somewhere down
14   the line it's going to catch up to you and you're
15   going to wind up finding yourself with a situation
16   where nobody knows what the story is, the right
17   story.  So, we need to have the total truth today,
18   okay.  I'm going to explain to you the way the
19   system is going to work.  We're going to have two
20   different segments.  I'm going to discuss with you
21   the crime, your prior criminal and social history.
22   I'm going to discuss with you your parole plans,
23   any letters of support or opposition that are in
24   the record.  And Commissioner Rodriguez will then
25   discuss with you your programming since your
26   commitment, your psychological evaluation, your
27   counselor's report and he'll also discuss with you

76

4

1   any sort of discipline that you may have had.

2   Once that is conducted, we will then have the

3   ability to ask you questions, as will the District

4   Attorney and your attorney.  After that, the

5   District Attorney, your attorney and yourself,

6   will have the opportunity to make a closing

7   statement.  Once the closing statements are done,

8   we'll recess, clear the room and deliberate.  When

9   we have completed our deliberations, we'll resume

10  the hearing and announce our decision.  The Board

11  of Prison Terms' rules and the law state a parole

12  date shall be denied if your release would pose an

13  unreasonable risk of danger to others.  Do you

14  understand that?

15          INMATE NGO:  The last part, I ---

16          PRESIDING COMMISSIONER ANGELE:  The law

17  requires that parole would be denied if your

18  release would pose an unreasonable risk of danger

19  to others.  Now you have certain rights.  Those

20  rights include a timely notice of this hearing, a

21  right to review your Central file, have an Olson

22  Review, and a right to present relevant documents.

23  Have those rights been so far, Ms. Fox?

24          ATTORNEY FOX:  Yes, they have.

25          PRESIDING COMMISSIONER ANGELE:  You have an

26  additional right and that's to be heard by an

27  impartial Panel.  Any objections to either member

77

5

1   of this Panel?

2       **ATTORNEY FOX:**  At this time on behalf of

3   Mr. Ngo, I'd pose an objection.  It's not possible

4   for Mr. Ngo to receive a fair hearing before any

5   Panel comprised of members of the Board of Prison

6   Terms as it's currently constituted.  That's based

7   on their policies, practices, and procedures, as

8   well as on the practices, policies, and public

9   statements of the governor.

10      **PRESIDING COMMISSIONER ANGELE:**  Can you

11  enumerate the policies and practices of this

12  particular Panel?

13      **ATTORNEY FOX:**  My understanding is that when

14  a date, for instance, when a date is granted the

15  Board of Prison Terms submits to the governor a

16  list of reasons why the date should not be granted

17  after the Panel has already found the person

18  suitable.  So I think there's a conflict there.

19  And just the inherent conflict of interest having

20  been appointed by the governor and answering back

21  to the governor.

22      **PRESIDING COMMISSIONER ANGELE:**  First of all

23  the statement with regards to the Board of Prison

24  Terms providing the governor with a list of

25  reasons not to find the inmate suitable for parole

26  is not true.  The governor has staff that reviews

27  these cases that have nothing to do with Board of

78

6

1   Prison Terms and it is they who present the

2   governor with reasons (inaudible) to.  As far as

3   this particular Panel goes, I am an appointee of

4   the governor.  I've never discussed with him my

5   appointment, nor have I discussed with him his

6   philosophy on parole dates.  I have given a number

7   of parole dates in the past and will continue

8   doing that as long as I'm on this Board.  And

9   there's no reason at all that I feel that I am not

10  able to give or to be fair and impartial.

11  Commissioner Rodriguez.

12          **DEPUTY COMMISSIONER RODRIGUEZ:**  I'm a civil

13  servant and I've always been known to be fair and

14  impartial as well as I've been on panels with

15  Commissioner Angele where we have given a number

16  of dates at various prisons throughout California.

17          **PRESIDING COMMISSIONER ANGELE:**  I'll

18  overrule your objection, anything else?

19          **ATTORNEY FOX:**  No, that's all.  Thank you.

20          **PRESIDING COMMISSIONER ANGELE:**  Okay,

21  Mr. Ngo, do you have any problems at all

22  understanding or speaking the English language?

23          **INMATE NGO:**  No, I don't, Sir.

24          **PRESIDING COMMISSIONER ANGELE:**  Not even

25  technical words?

26          **INMATE NGO:**  Maybe if you use court lingo,

27  you know, then I might have a problem.

79

1    **PRESIDING COMMISSIONER ANGELE:**  Your

2    attorney can probably help you with that.  So you

3    have no problem at all ---

4    **INMATE NGO:**  No problem.

5    **PRESIDING COMMISSIONER ANGELE:**  All right.

6    I noticed that you signed BPT form 1073 on January

7    the 18th, of this year indicating that you do not

8    have a disability as defined under the Americans

9    with Disabilities Act, is that true?

10    **INMATE NGO:**  Yes, it is.

11    **PRESIDING COMMISSIONER ANGELE:**  And you need

12    no accommodation, correct?

13    **INMATE NGO:**  Pardon?

14    **PRESIDING COMMISSIONER ANGELE:**  You need no

15    accommodation?

16    **INMATE NGO:**  No.

17    **PRESIDING COMMISSIONER ANGELE:**  You will

18    receive a copy of our written tentative decision

19    today.  That decision becomes final within 120

20    days.  You'll then receive a copy of the decision

21    and a copy of the transcript and you'll have 90

22    days from the effective date to appeal if you so

23    desire.  You are not required to discuss your

24    offense with us.  You are not required to admit

25    your offense.  However, this Panel does accept as

26    true the findings of the court.  Do you understand

27    what that means?

80

8

1        INMATE NGO:  The findings of the court?

2        PRESIDING COMMISSIONER ANGELE:  We accept as

3    true the findings of the court.  Do you understand

4    what that means?

5        INMATE NGO:  What the court found?

6        PRESIDING COMMISSIONER ANGELE:  Yes.

7        INMATE NGO:  Yes.

8        PRESIDING COMMISSIONER ANGELE:  In other

9    words, we accept that as being true.

10        INMATE NGO:  Yes, it is.

11        PRESIDING COMMISSIONER ANGELE:  Okay.  Any

12    confidential material to be used today,

13    Commissioner Rodriguez?

14        DEPUTY COMMISSIONER RODRIGUEZ:  There will

15    be none used today, Sir.

16        PRESIDING COMMISSIONER ANGELE:  I have

17    passed the hearing checklist marked exhibit one

18    both to your attorney and the District Attorney to

19    ensure that we're all operating off the same set

20    of documents.  Mr. Laird, do you have those

21    documents?

22        DEPUTY DISTRICT ATTORNEY LAIRD:  Yes, Sir.

23        PRESIDING COMMISSIONER ANGELE:  Okay, do you

24    have those documents, Ms. Fox?

25        ATTORNEY FOX:  Yes, I do.

26        PRESIDING COMMISSIONER ANGELE:  Thank you.

27        ATTORNEY FOX:  You're welcome.

*B1*

9

1    **PRESIDING COMMISSIONER ANGELE:**  Any

2    additional documents to submit?

3    **ATTORNEY FOX:**  I don't believe so.  However,

4    if we can't find certain things in the Central

5    file then I would like to present what we do have.

6    But I'm assuming that we're going to find them

7    all.  I do have two photographs, however, of

8    Mr. Ngo's family.

9    **PRESIDING COMMISSIONER ANGELE:**  Will the

10   inmate be speaking with us today?

11   **ATTORNEY FOX:**  Yes, he will.

12   **PRESIDING COMMISSIONER ANGELE:**  Mr. Ngo, if

13   you'd please raise your right hand to be sworn.

14   Do you solemnly swear or affirm that the testimony

15   you give at today's hearing will be the truth, the

16   whole truth, and nothing but the truth?

17   **INMATE NGO:**  Yes, I do.

18   **PRESIDING COMMISSIONER ANGELE:**  If there is

19   no objection, Ms. Fox, I'm going to read into the

20   record the Statement of Facts taking it from the

21   probation officer's report, page three, line 15 to

22   page four, line six.

23   **ATTORNEY FOX:**  I usually object to the use

24   of the probation officer's report because it is

25   based on hearsay to the extent that there are

26   statements attributed to my client in that, I

27   think they could be admitted for prior

82

10

1    inconsistent or consistent statements.

2        PRESIDING COMMISSIONER ANGELE:   You said you

3    usually do or you are?

4        ATTORNEY FOX:   No, I will.

5        PRESIDING COMMISSIONER ANGELE:   And what

6    would you like us to use?

7        ATTORNEY FOX:   Either the trial transcript

8    or the findings of any court of appeals that would

9    be based on the sworn testimony presented in

10   trial.

11       PRESIDING COMMISSIONER ANGELE:   Okay, well I

12   have neither.

13       ATTORNEY FOX:   Well, that's not our fault.

14       PRESIDING COMMISSIONER ANGELE:   Not our

15   fault neither, so I'll overrule that objection

16   also.

17       ATTORNEY FOX:   Then the risk we run is that

18   we're going to have a Statement of Facts that's

19   based on uncorroborated hearsay, which in many

20   cases is just based on the police report, which is

21   not from testimony of percipient witnesses.   And

22   also from the District Attorney's office many

23   times the probation office uses their file to come

24   to their statements.   Perhaps you can read the

25   Statement of Facts and then ask Mr. Ngo if he has

26   any comments, but I do have a standing hearsay

27   objection for non-corroborated statements.

83

11

1        **DEPUTY DISTRICT ATTORNEY LAIRD:**  Mr. Angele,

2    if I may ---

3        **PRESIDING COMMISSIONER ANGELE:**  Yes.

4        **DEPUTY DISTRICT ATTORNEY LAIRD:**  Is it

5    possible, I do note that this went to trial, the

6    jury had found the defendant guilty of murder in

7    the first degree.  However, in exchange for a plea

8    agreement whereby the defendant would admit second

9    degree murder, he got that deal in exchange for

10   getting a 15 to life sentence with a one-year

11   vicarious arm enhancement for a total of 16 years

12   to life.  And he agreed to suspend any, or not to

13   seek any appeal of the matter and that's why there

14   would be no court of appeal record on this case in

15   that he agreed to extinguish all appellate rights

16   (inaudible).

17        **PRESIDING COMMISSIONER ANGELE:**  Well, once

18   again, I'm going to overrule your objection and

19   we'll go ahead and incorporate by reference, or

20   excuse me incorporate by reading into the record

21   the probation officer's report, page three, line

22   15, page four, line six.  September 18th, 1992, 15

23   year old Angel Gonzales was beaten and stabbed to

24   death at a Fullerton High School as she was

25   walking home after school.  As a result of a

26   police investigation, it was learned that earlier

27   in the day the victim, a member of the Fullerton

*84*

12

1    Tokerstown, that's T-O-K-E-R-S-town, a Latin gang,

2    and members of the Asian gang, Fullerton Boyz,

3    B-O-Y-Z, were at a McDonald's restaurant near the

4    high school.  The victim and the name of No

5    Muhamed, that's N-O, first name, Muhamed,

6    M-U-H-A-M-E-D, had a confrontation with each

7    claiming their respective gang affiliations.

8    After this non-physical altercation, the group of

9    Asians, which at the time included the defendant,

10   and for the sake of the interpreter, defendant is

11   synonymous with Mr. Ngo, obtained a firearm.  And

12   defendant and his co-defendants then returned to

13   the school where they waited for Angel Gonzales.

14   As he was walking home he was attacked and beaten.

15   During the physical altercation, the victim was

16   shot one time in the middle of the back by one of

17   the defendants who was later identified as Usumang

18   Muhamed, first name U-S-U-M-A-N-G, last name,

19   M-U-H-A-M-E-D.  The group of five defendants fled

20   the area after the shooting.  Angel Gonzales died

21   at the scene as a result of a gunshot wound.  The

22   defendant, along with Jimmy Dao, D-A-O, and Asat

23   Cham, first name A-S-A-T, last name C-H-A-M, fled

24   to the state of Washington.  They were

25   subsequently arrested there and the murder weapon,

26   a stolen 22-caliber handgun was recovered in the

27   vehicle.  Another statement that I want to add to

85

13

1   this was that the vehicle used the day of the

2   shooting apparently was burned prior to them

3   leaving the state.  Is that what happened,

4   Mr. Ngo?

5          INMATE NGO:  Yes, it was.

6          PRESIDING COMMISSIONER ANGELE:  Are there

7   any changes in this story that I just read that

8   you want to bring up?

9          INMATE NGO:  No, Sir.

10         PRESIDING COMMISSIONER ANGELE:  So this is

11  exactly what happened?

12         INMATE NGO:  Basically, yes.

13         PRESIDING COMMISSIONER ANGELE:  Basically.

14         INMATE NGO:  Yes.

15         PRESIDING COMMISSIONER ANGELE:  Okay.  You

16  were involved in beating this individual, correct?

17         INMATE NGO:  Yes, we got in a fight,

18  fistfight.

19         PRESIDING COMMISSIONER ANGELE:  Well, it was

20  more than a fistfight, he was jumped by a gang of

21  people, right?

22         INMATE NGO:  Yes, he was.

23         PRESIDING COMMISSIONER ANGELE:  Okay.  Now

24  if I'm not mistaken you were the one that handed

25  this gentleman the gun?

26         INMATE NGO:  No, that's ---

27         PRESIDING COMMISSIONER ANGELE:  Is that

86

14

1   true?

2        INMATE NGO:  No, that's not true.

3        PRESIDING COMMISSIONER ANGELE:  You didn't

4   find it on the floor under the seat of the

5   vehicle?

6        INMATE NGO:  In my statement in court was I

7   saw under the car seat.

8        PRESIDING COMMISSIONER ANGELE:  Okay.

9        INMATE NGO:  And after that it was, my crime

10  partner had it on him without my knowledge.

11       PRESIDING COMMISSIONER ANGELE:  So you

12  didn't touch the gun at all?

13       INMATE NGO:  No, I didn't, Sir.

14       PRESIDING COMMISSIONER ANGELE:  Okay.  How

15  many of them, were there four of you or five?

16       INMATE NGO:  Five.

17       PRESIDING COMMISSIONER ANGELE:  And did you

18  know Mr. Gonzales at all?

19       INMATE NGO:  No, Sir.

20       PRESIDING COMMISSIONER ANGELE:  But you had

21  left and were living in Los Angeles County at the

22  time?

23       INMATE NGO:  Yes, I was, Sir.

24       PRESIDING COMMISSIONER ANGELE:  And had

25  become a part of a different gang.

26       INMATE NGO:  It wasn't --- I just known

27  them, associated with them.

87

15

1       **PRESIDING COMMISSIONER ANGELE:**  The Tiger

2  Mafia?

3       **INMATE NGO:**  Yes.

4       **PRESIDING COMMISSIONER ANGELE:**  Did you

5  belong to them or did you just associate?

6       **INMATE NGO:**  Associate.

7       **PRESIDING COMMISSIONER ANGELE:**  Okay, but

8  you were a member of the Fullerton Boyz, right?

9       **INMATE NGO:**  Yes, I was.

10       **PRESIDING COMMISSIONER ANGELE:**  Did these

11  gangs know each other?

12       **INMATE NGO:**  No.

13       **PRESIDING COMMISSIONER ANGELE:**  You were 19

14  years old at the time?

15       **INMATE NGO:**  Yes, Sir.

16       **PRESIDING COMMISSIONER ANGELE:**  How do you

17  feel about what happened?

18       **INMATE NGO:**  I'm sorry.

19       **PRESIDING COMMISSIONER ANGELE:**  All right,

20  as far as I can see you had no criminal record

21  prior to this.  You had some arrests as an adult,

22  but nothing as a juvenile.  You had an intact

23  family?

24       **INMATE NGO:**  Pardon me?

25       **PRESIDING COMMISSIONER ANGELE:**  You had an

26  intact family.

27       **INMATE NGO:**  Yes, I did, Sir.

88

16

1    PRESIDING COMMISSIONER ANGELE:  You just got

2    --- I mean after you had left there, I guess they

3    called you up and said we got something we got to

4    take care of.

5    INMATE NGO:  No.  Actually what happened

6    that day was, you know, we came there, they called

7    me up, you know, I came down to visit them.  I

8    said I'm just glad that you called me, you know,

9    it wasn't nothing planned or nothing.  It just

10   happened.

11   PRESIDING COMMISSIONER ANGELE:  Any reason

12   why you guys kept the gun?

13   INMATE NGO:  The gun wasn't even in the car

14   when I first was there when they picked me up; it

15   was never there.  The first time I saw it was

16   after I got back into the car.

17   PRESIDING COMMISSIONER ANGELE:  I

18   understand.  I'm talking about in Washington.  The

19   murder gun was found in the car?

20   INMATE NGO:  Yes, we kept it.  We never

21   disposed of it.

22   PRESIDING COMMISSIONER ANGELE:  I'll go over

23   your criminal activity.  You had nothing as a

24   juvenile.  As an adult you were arrested in 1992,

25   March, San Gabriel Police Department, possession

26   of rock cocaine.  What was that about?

27   INMATE NGO:  I experimented with cocaine,

89

17

1  rock cocaine.

2      PRESIDING COMMISSIONER ANGELE:  You were

3  experimenting with it?

4      INMATE NGO:  Yes.

5      PRESIDING COMMISSIONER ANGELE:  Were you

6  dealing it at all?

7      INMATE NGO:  No.

8      PRESIDING COMMISSIONER ANGELE:  Did you

9  experiment with it?

10     INMATE NGO:  Yes.

11     PRESIDING COMMISSIONER ANGELE:  And?

12     INMATE NGO:  I got busted the first time I

13  bought it.  I was just driving home at that point

14  and police pulled me over and he searched the

15  vehicle and found --- I gave him permission to

16  search the vehicle, he found the rock cocaine.

17  They gave me diversion for it.

18     PRESIDING COMMISSIONER ANGELE:  How long

19  after you bought it did they stop you?

20     INMATE NGO:  About what, 15 minutes.  I was

21  just going home by then.

22     PRESIDING COMMISSIONER ANGELE:  Was it a

23  sting do you know?

24     INMATE NGO:  I don't know.

25     PRESIDING COMMISSIONER ANGELE:  Do you know

26  what that means?

27     INMATE NGO:  Yeah, yes I do.  It was not a

90

18

1   sting.  The cop just saw me and he pulled me over.

2        **PRESIDING COMMISSIONER ANGELE:**  Pulled you

3   over for what?

4        **INMATE NGO:**  I don't know.

5        **PRESIDING COMMISSIONER ANGELE:**  Okay, he

6   never indicated to you that he saw you make the

7   purchase?

8        **INMATE NGO:**  No.

9        **PRESIDING COMMISSIONER ANGELE:**  Had you

10  tried it before?

11       **INMATE NGO:**  Yes.

12       **PRESIDING COMMISSIONER ANGELE:**  It does

13  indicate that you were diverted, but you were also

14  arrested apparently in Olympia, Washington,

15  possession of stolen property.  But apparently

16  they dismissed it and I think they probably

17  dismissed it because of the arrest and the murder,

18  correct?

19       **INMATE NGO:**  I think so.

20       **PRESIDING COMMISSIONER ANGELE:**  Okay.  What

21  was the stolen property?

22       **INMATE NGO:**  From what my understanding is

23  the gun that the murder weapon came from was

24  (inaudible) Washington.

25       **PRESIDING COMMISSIONER ANGELE:**  Okay.

26       **INMATE NGO:**  So I was never even in

27  Washington until after the fact.

*91*

19

1      **PRESIDING COMMISSIONER ANGELE:** Which one of

2 your crime partners was from Washington?

3      **INMATE NGO:** Asat Cham.

4      **ATTORNEY FOX:** Do you want to spell that? I

5 think for the ---

6      **INMATE NGO:** A-S-A-T, C-H-A-M.

7      **PRESIDING COMMISSIONER ANGELE:** I think we

8 already went through that one time. Now, okay, it

9 would indicate --- I want to make sure I have the

10 record straight on the names also. Were there two

11 Muhameds there?

12      **INMATE NGO:** Yes.

13      **PRESIDING COMMISSIONER ANGELE:** Okay,

14 because I had two spellings of each name. It

15 would probably be pretty reasonable to assume that

16 Cham, Mr. Cham ---

17      **INMATE NGO:** Yes.

18      **PRESIDING COMMISSIONER ANGELE:** Probably

19 brought the gun from Washington when he came down

20 here. Just assuming since it was taken from

21 Washington State.

22      **INMATE NGO:** Yes, Sir.

23      **PRESIDING COMMISSIONER ANGELE:** And that's

24 where you wound up going back. You were born in

25 Vietnam on May the 18th, 1973. You (inaudible)

26 the United States since 1979, graduated Fullerton

27 High School. And it says here you attended

92

20

1    Fullerton Community College and Pasadena City

2    College.  You completed 10 units and your major

3    was Business.  You worked as a telemarketer.

4    Who'd you work for as a telemarketer?

5          INMATE NGO:  It's for like a real estate

6    place, (inaudible) insurance, telemarketing.  Try

7    to get them to go to seminar.

8          PRESIDING COMMISSIONER ANGELE:  You worked

9    at your family liquor store and was living with

10   your parents when this occurred?

11         INMATE NGO:  Yes, Sir.

12         PRESIDING COMMISSIONER ANGELE:  I want to

13   make sure I get honest answers from you because

14   I've seen two places now that indicates that you

15   were a member of the Tiger Mafia.

16         INMATE NGO:  Tiger Mafia is who I associated

17   with.  That's when they asked me (inaudible) my

18   tattoo was on there, TM.  I was on bulletin

19   boards.

20         PRESIDING COMMISSIONER ANGELE:  I

21   understand.

22         INMATE NGO:  They ask me TM, that's why I

23   say Tiger Mafia, because you know, I was

24   associated with them.

25         PRESIDING COMMISSIONER ANGELE:  But you left

26   Fullerton.

27         INMATE NGO:  Yes.

93

21

1          **PRESIDING COMMISSIONER ANGELE:**  And you

2    moved to Los Angeles area.

3          **INMATE NGO:**  Yes.

4          **PRESIDING COMMISSIONER ANGELE:**  And became

5    affiliated one way or the other with the Tiger

6    Mafia.

7          **INMATE NGO:**  When I moved to Orange County,

8    that's when ---

9          **PRESIDING COMMISSIONER ANGELE:**  Orange

10   County, I'm sorry.

11         **INMATE NGO:**  Associated with Fullerton Boyz.

12   In LA I was with the Tiger Mafia.

13         **PRESIDING COMMISSIONER ANGELE:**  Were you in

14   LA before you went to Orange County?

15         **INMATE NGO:**  Yes, Sir.

16         **PRESIDING COMMISSIONER ANGELE:**  Okay.  Now

17   you said you were associated with them.  You were

18   associated with them enough to have a tattoo on

19   your arm.

20         **INMATE NGO:**  It's not --- I can have ---

21   it's taken off already.

22         **PRESIDING COMMISSIONER ANGELE:**  Well, it was

23   taken off, it was on at the time.  It still said

24   TM.

25         **INMATE NGO:**  Yes.

26         **PRESIDING COMMISSIONER ANGELE:**  Which would

27   indicate to me that you were a member.  I mean,

94

22

1    let's be honest, were you or weren't you?

2            INMATE NGO:  To tell you the truth, Sir ---

3            PRESIDING COMMISSIONER ANGELE:  Yeah, that's

4    what I want to hear, the truth.

5            INMATE NGO:  It's just a made up name,

6    bottom line.  I was Fullerton Boyz, I didn't want

7    to admit that I was in a gang when I was arrested

8    and they just saw the TM, it's my ex-girlfriend's

9    name, Teresa May, so --- it was just a made up

10    name so, I just tried to throw them off.

11            PRESIDING COMMISSIONER ANGELE:  Well, we're

12    looking for honesty and the reason I kept on

13    pushing you is I never heard of Tiger Mafia.

14    Truthfulness is important to us, understand that.

15            INMATE NGO:  Yes, Sir.

16            PRESIDING COMMISSIONER ANGELE:  But you took

17    her initials off your arm?

18            INMATE NGO:  No, I mean --- I tried to put

19    it on myself as (inaudible), it never came out

20    anyway, it faded.

21            PRESIDING COMMISSIONER ANGELE:  You've never

22    been married.

23            INMATE NGO:  No.

24            PRESIDING COMMISSIONER ANGELE:  And you've

25    got no children, correct?  Never been in the

26    military.  You indicate you only tried cocaine

27    once.

96

23

1        INMATE NGO:  Yes.

2        PRESIDING COMMISSIONER ANGELE:  Okay.  Have

3   you experimented with any other drugs?

4        INMATE NGO:  No.

5        PRESIDING COMMISSIONER ANGELE:  Alcohol?

6        INMATE NGO:  I'm allergic to alcohol.

7        PRESIDING COMMISSIONER ANGELE:  That's

8   probably good.  Tried nothing else, marijuana,

9   nothing?

10        INMATE NGO:  I don't like drugs, not no

11   more.  (Inaudible) --- never mind.

12        PRESIDING COMMISSIONER ANGELE:  No, tell me.

13        INMATE NGO:  I mean you can test me everyday

14   and I'll be clean.

15        PRESIDING COMMISSIONER ANGELE:  I believe

16   you.  You haven't given me a reason not to.  Okay,

17   we do have some letters that we received on your

18   behalf.  I'd like to try to go over some of these.

19   We received these at a late hour, but I think

20   (inaudible) because I think it's very important.

21   One letter is from, you've got to help me with the

22   names again, okay.

23        INMATE NGO:  Yes, Sir.

24        PRESIDING COMMISSIONER ANGELE:  This is from

25   your sister, Tran?

26        INMATE NGO:  Which one?

27        PRESIDING COMMISSIONER ANGELE:  Tran Ngo.

*96*

24

1          INMATE NGO:  Tan.

2          PRESIDING COMMISSIONER ANGELE:  Tan Ngo.

3    She indicated that the family will support you any

4    way they can, that her husband has a job for you

5    in his store.

6          INMATE NGO:  Yeah.

7          PRESIDING COMMISSIONER ANGELE:  And that

8    your mother has a job for you in her store.  Then

9    we have one from a Donald Rubridc, R-U-B-R-I-D-C,

10   Orange County Public Defender, explains the case

11   where you were tried and is in support of your

12   release also.  Fong Ngo is your mother?

13         INMATE NGO:  Fong (inaudible).

14         PRESIDING COMMISSIONER ANGELE:  Okay.  She

15   offers support in any way possible.  And then we

16   have Calvin Ung, U-N-G, your uncle.

17         INMATE NGO:  Yes.

18         PRESIDING COMMISSIONER ANGELE:  Who has a

19   job for you in his restaurant.

20         INMATE NGO:  Yes.

21         ATTORNEY FOX:  Have you gone over the letter

22   from his mother, I'm sorry.

23         PRESIDING COMMISSIONER ANGELE:  Uh-hmm,

24   yeah.

25         ATTORNEY FOX:  Okay.

26         PRESIDING COMMISSIONER ANGELE:  Yeah.

27         INMATE NGO:  I have one from my brother,

97

25

1   too.

2        PRESIDING COMMISSIONER ANGELE:   That's

3   Calvin?

4        INMATE NGO:   That's my uncle.

5        PRESIDING COMMISSIONER ANGELE:   Your uncle,

6   okay.   I'm sorry Calvin is the one who has a

7   restaurant job for you.

8        INMATE NGO:   Yes, Sir.

9        PRESIDING COMMISSIONER ANGELE:   I don't have

10   --- I've got your mother.

11        ATTORNEY FOX:   We may have a copy.

12        PRESIDING COMMISSIONER ANGELE:   Your sister.

13   I'm sorry, is it Raymond?   Raymond?

14        INMATE NGO:   Raymond Seto's my new

15   brother-in-law.

16        PRESIDING COMMISSIONER ANGELE:   Is that the

17   one you're talking about?

18        INMATE NGO:   No, my older brother.

19        PRESIDING COMMISSIONER ANGELE:   Okay, I do

20   have one here from Raymond Seto, S-E-T-O, he's

21   your brother-in-law.   He's known you since 1992.

22        ATTORNEY FOX:   There are two separate

23   letters from Calvin Ung.   One bears the date of

24   January 30th, 2001.   A more recent one is dated

25   April 6th of 2002.   I believe that's the one that

26   was referred to, the later of the two.

27        PRESIDING COMMISSIONER ANGELE:   I have the

98

26

1    2002 letter here.  I don't have it here.  Who is

2    Chi Phong Ngo, your older brother?

3             INMATE NGO:  Chi Phong Ngo.

4             PRESIDING COMMISSIONER ANGELE:  Chi?

5             INMATE NGO:  C-H-I, Phong Ngo.

6             PRESIDING COMMISSIONER ANGELE:  This says

7    Sieu.

8             INMATE NGO:  That's me.

9             PRESIDING COMMISSIONER ANGELE:  Okay, I'm

10   sorry.  He's your older brother.  I've got it.

11   Okay.  First name is Chi, C-H-I.  Middle name

12   Phong, P-H-O-N-G.  Last name, N-G-O.  Writing in

13   support of my brother.  He's offering a job at a

14   convenience store which is in Anaheim.

15            INMATE NGO:  Yes, Sir.

16            PRESIDING COMMISSIONER ANGELE:  They all

17   believe in you and are willing to support you.

18   There's another letter from Duc Phong Ngo.  D-U-C

19   is the first name.  Middle, P-H-O-N-G.  Last name

20   N-G-O.  Younger brother, writing a letter of

21   support.  I'll help my brother financially and in

22   any way that he needs.  Like to see you get a

23   second chance, make a difference in society with

24   all the training you've had while in prison.  I'll

25   go back to the letter from Raymond Seto.  It's a

26   letter of support asking that you be given a

27   second chance.  Talks about your mother and her

99

27

1    work at the liquor store.  How he believes you

2    have the ability to become a law-abiding citizen.

3    And this is a letter in support of release.  Have

4    we covered them all now?  There's another one?

5         INMATE NGO:  No, just one from my older

6    sister?

7         ATTORNEY FOX:  Which I'm passing over.

8         PRESIDING COMMISSIONER ANGELE:  This is from

9    Lan Lau.

10        INMATE NGO:  Lan.

11        PRESIDING COMMISSIONER ANGELE:  First name

12   is Lan, L-A-N.  Last name is Lau, L-A-U, who is

13   inmate's sister.  She believes that the inmate

14   deserves a second chance to prove himself in the

15   community.  They offer you housing, financial

16   support.  These include a place to stay, food,

17   clothing, and education.  They reside in Alhambra

18   in Los Angeles County, okay.  Anything else?

19        INMATE NGO:  That should be it.

20        ATTORNEY FOX:  Thank you.

21        PRESIDING COMMISSIONER ANGELE:  All right,

22   we sent out what we call 3042 notices.  Those are

23   notices that go to agencies that have a direct

24   interest in your case.  I have received a reply

25   from the District Attorney's office, from the

26   County of Orange.  However, there's a

27   representative here today from that office so

100

28

1   we'll have him make a statement when that time

2   comes.  And we'll go to post-conviction factors

3   please, Commissioner Rodriguez.

4        DEPUTY COMMISSIONER RODRIGUEZ:  How do you

5   pronounce your name again?

6        INMATE NGO:  Just say "no."

7        DEPUTY COMMISSIONER RODRIGUEZ:  No?

8        INMATE NGO:  Yeah, it's easiest.

9        DEPUTY COMMISSIONER RODRIGUEZ:  All right,

10  inmate Ngo, the purpose of, during the first

11  portion of this reading I'll be addressing what

12  you've done since you've been received in the

13  Department of Corrections, which will then bring

14  us to the present.  This will establish a base for

15  future Board appearances should you not receive a

16  date today.  If there's anything that I leave out

17  during the portion of this reading, either you or

18  your attorney can address it when I'm done, all

19  right?

20       INMATE NGO:  Yes, Sir.

21       DEPUTY COMMISSIONER RODRIGUEZ:  All right.

22  You were received in the Department of Corrections

23  on February 1st, 1994, at RJ Donovan Reception

24  Center.  From there you transferred on March 17th,

25  1994, to Centinella State Prison.  From there you

26  transferred on May 16th, 1995, to Calipatria State

27  Prison, excuse me, California State Prison,

*101*

29

1    Lancaster, and that was a non-adverse transfer.

2    And then you subsequently transferred here to

3    California (sic) Training Facility in Soledad,

4    also a non-adverse transfer on December 16th,

5    1998.  Your current classification score is zero.

6    You're currently housed as a Level II inmate on a

7    life override.  Your custody is Medium A.  You're

8    still in culinary warehouse?

9            INMATE NGO:  Yes, Sir.

10           DEPUTY COMMISSIONER RODRIGUEZ:  And I note

11   that you have exceptional to excellent work

12   reports.  You did complete your high school.  You

13   have completed vocation auto upholstery and that

14   was on April 3rd, 1997.  What is, is vocation

15   automotive refinishing a separate course?

16           INMATE NGO:  Yes, that's a separate course.

17   That's auto paint.

18           DEPUTY COMMISSIONER RODRIGUEZ:  Okay, and

19   you did complete that one and that was in

20   September 1997.  So you've completed two

21   vocations.

22           INMATE NGO:  Yes, Sir.

23           DEPUTY COMMISSIONER RODRIGUEZ:  You've been

24   an active participant in the NA program as

25   evidenced by your most recent chronos.  You've

26   also completed the Key to Fatherhood, December of

27   2000.  You completed a course in the Cause,

102

30

1    Prevention, and Treatment of both Tuberculosis and

2    Hepatitis and that was December 1999.  And also

3    you've participated in a Muslim group course,

4    Salesmanship II.  And what do you do in that?

5        INMATE NGO:  On the Muslim fatherhood and

6    salesmanship, you learn how to be a parent if

7    someday by circumstance to have my kids and stuff.

8    You learn to take care of your own kids and I'll

9    be a good, how a father should be.

10        DEPUTY COMMISSIONER RODRIGUEZ:  Have you

11    gone to any anger management courses?

12        INMATE NGO:  I try.  The only one try to

13    enroll right now, try to get into is Impact.

14        DEPUTY COMMISSIONER RODRIGUEZ:  Yeah, the

15    impact program, which is an excellent program

16    here.  Captain Gara runs that program.

17        INMATE NGO:  Captain Gara's running it.

18        DEPUTY COMMISSIONER RODRIGUEZ:  Exactly.

19        INMATE NGO:  And it's been very difficult to

20    get in.

21        DEPUTY COMMISSIONER RODRIGUEZ:  But you've

22    been here for a long, going on ---

23        INMATE NGO:  I have tried since last year,

24    sir.

25        DEPUTY COMMISSIONER RODRIGUEZ:  Almost five

26    years, four years actually.

27        INMATE NGO:  Yeah.

103

31

1        DEPUTY COMMISSIONER RODRIGUEZ:    Yeah.

2        INMATE NGO:    They just start this program

3    recently.

4        DEPUTY COMMISSIONER RODRIGUEZ:    It's a very

5    good program.    I strongly urge you to try to get

6    in and at least keep your name active on that.

7        INMATE NGO:    I will.

8        DEPUTY COMMISSIONER RODRIGUEZ:    Do you study

9    your 12-steps?

10        INMATE NGO:    Not all of them because I have

11    to say I'm a Buddhist and some steps I can't

12    really apply to it.    There's only four step, maybe

13    step four, step eight.

14        DEPUTY COMMISSIONER RODRIGUEZ:    What is step

15    number eight to you?

16        INMATE NGO:    Making a list of all persons

17    harmed.

18        DEPUTY COMMISSIONER RODRIGUEZ:    Who would be

19    at the top of that list?

20        INMATE NGO:    All of the families, victim

21    family and my family.

22        DEPUTY COMMISSIONER RODRIGUEZ:    Now you

23    stated, I believe somewhere we read in the reports

24    that you furnished the gun.    You say you didn't?

25        INMATE NGO:    No (inaudible).

26        ATTORNEY FOX:    Could you tell us where you

27    saw that because I'd like to correct it as well.

104

32

1        **DEPUTY COMMISSIONER RODRIGUEZ:**  I believe

2    that's in the probation officer's report.  Did you

3    quote that, Commissioner Angele?

4        **PRESIDING COMMISSIONER ANGELE:**  No.

5        **ATTORNEY FOX:**  I don't believe it's stated

6    there.

7        **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay, I was

8    looking at the prisoner's version.  And what I'm

9    looking at is the current Board report, April

10    2002, and that's on the first page, (inaudible)

11    addressing that --- You explained that they had

12    the gun for protection in case someone else had to

13    have a weapon, correct?

14        **ATTORNEY FOX:**  Once again ---

15        **DEPUTY COMMISSIONER RODRIGUEZ:**  Excuse me,

16    counsel, I'll let you address that.  Ngo stated

17    that he did not see the gun until he was in the

18    vehicle, it was located under the passenger seat,

19    correct?

20        **INMATE NGO:**  (Inaudible.)

21        **DEPUTY COMMISSIONER RODRIGUEZ:**  And that's

22    the story you're staying ---

23        **INMATE NGO:**  It's a true story.

24        **DEPUTY COMMISSIONER RODRIGUEZ:**  And he's

25    corrected and we're satisfied ---

26        **ATTORNEY FOX:**  And I believe it's

27    consistently stated that way throughout the

105

33

1    probation report as well, and the defendant's

2    statement and also a statement that was given by

3    one of the detectives involved in the

4    investigation.

5        DEPUTY COMMISSIONER RODRIGUEZ:  All right.

6    Do you agree with everything I've read up to this

7    point, as far as your program?

8        INMATE NGO:  I still have a, I have a

9    certificate in STD and AIDS too.

10        DEPUTY COMMISSIONER RODRIGUEZ:  Okay, I

11    don't think I have copies of those.  Do you have

12    copies of them?

13        INMATE NGO:  Yes, Sir.

14        DEPUTY COMMISSIONER RODRIGUEZ:  I went

15    through all the certificates you have here that

16    they provided us, which I confirmed, which are in

17    the ---

18        INMATE NGO:  Hepatitis and tuberculosis.

19        DEPUTY COMMISSIONER RODRIGUEZ:  Well I

20    addressed those already.

21        INMATE NGO:  Sexually transmitted disease---

22        DEPUTY COMMISSIONER RODRIGUEZ:  I addressed

23    that too.  That was in 1999, correct, right there

24    at the bottom?

25        ATTORNEY FOX:  Well, one is in 2000, the

26    STD's.

27        DEPUTY COMMISSIONER RODRIGUEZ:  Okay.  That

106

34

1    was the sexually transmitted disease, right.

2         ATTORNEY FOX:  And on the back there's

3    another one in 2000.

4         DEPUTY COMMISSIONER RODRIGUEZ:  Right, and

5    then HIV.  I may have said the wrong date, but I

6    did address both these certificates.

7         ATTORNEY FOX:  The other two, tuberculosis

8    and hepatitis were (inaudible).

9         DEPUTY COMMISSIONER RODRIGUEZ:  Correct,

10   okay.  So do you agree with everything else?

11        INMATE NGO:  Yes, Sir.

12        DEPUTY COMMISSIONER RODRIGUEZ:  Okay.  As

13   far as disciplinary history, you have received no

14   CDC 115's, either administrative or serious since

15   reception.  And you've only received a total of

16   two 128(a) counseling chronos.  The first one was

17   April 1st, 1997, for failure to respond to medical

18   ducat.  And then the last one was on February

19   11th, 2000, for covering your windows with a

20   towel.  Trying to keep the light out, huh?

21        INMATE NGO:  Actually, cold Sir.

22        DEPUTY COMMISSIONER RODRIGUEZ:  Cold.  In

23   going through your counselor's recommendation,

24   that's from the current Board report dated April

25   2002.  The author of this report is the initial M.

26   Rubio, R-U-B-I-O, Correctional Counselor I here at

27   Soledad state prison.  Going to page three under

107

35

```
 1    the heading of Summary, it says considering the
 2    commitment offense, minimal prior arrest record
 3    and prison adjustment, the writer believes Ngo
 4    would probably pose a moderate to low degree of
 5    threat to the public at this time if released from
 6    prison.  Going to the psych report, there's two
 7    reports I'll be addressing.  The first one is
 8    dated December 27th, 1996.  It's a three page,
 9    three.  It's completed at California State Prison,
10    Lancaster.  The author of that report is the
11    initial C. Schroeder, S-C-H-R-O-E-D-E-R, Staff
12    Psychologist.  I'm not going to read that report
13    in it's entirety, but I will address areas of that
14    report.  Going to page two, under Present
15    Condition, it says the remorse he expresses is
16    sincere.  He is synonymous with inmate Ngo.  He
17    shows much (inaudible) and self-incrimination for
18    the crime.  In hindsight he sees that he perhaps
19    could have stopped the incident and now has great
20    empathy and remorse for the family of the victim.
21    Under Mental Status and Diagnosis, Axis I:  no
22    diagnosis or condition.  Axis II:  no diagnosis.
23    Axis III:  none.  Going to page three, Axis IV:
24    psychosocial stressors, incarceration.  Axis V:
25    Global Assessment of Functioning score, that's
26    your GAF score is 75.  Under Conclusions and
27    Recommendations, Mr. Ngo's history of depression
```

*108*

36

1    and suicide attempts may have contributed to his

2    state of mind and poor judgment during the time of

3    the crime.  There are no records of any mental

4    health treatment during incarceration and Mr. Ngo

5    is no longer depressed.  Going to the last psych

6    report, and that is a seven-page report completed

7    here at Soledad state prison.  The date of that

8    report is April, excuse me, January 23rd, 2002.

9    The author of that report is the initial C.

10   Saindon, capital-S-A-I-N-D-O-N, Staff

11   Psychologist.  Under, let's see, going to page

12   four, under heading Current Diagnostic

13   Impressions, Axis I:  no contributory clinical

14   disorder.  Axis II:  deferred.  Axis III:  no

15   contributory physical disorder.  Axis IV:

16   long-term incarceration.  Axis V:  Global

17   Assessment of Functioning score, your GAF score is

18   90, noting that it had gone up considerably from

19   75 from the first report that I addressed in 1996.

20   Ninety is a very good score.  Going to page five

21   under Assessment of Dangerousness, based upon his

22   complete lack of disciplinary actions while

23   incarcerated, his insight into the negative

24   aspects of gang involvement and his remorse for

25   his actions, his violence potential within a

26   controlled setting is estimated to be below

27   average relative to this Level II inmate

109

37

1   population.  If released to the community, his

2   violence potential is estimated to be less than

3   the average citizen in the community given his

4   insight, his demonstrated ability to stay out of

5   trouble, his successful development of plans upon

6   release, and the support of his family.  At this

7   time, I'll return to the Chair.

8        PRESIDING COMMISSIONER ANGELE:  Thank you.

9   Do you know what the term mad dogging means?

10       INMATE NGO:  Yes, Sir.

11       PRESIDING COMMISSIONER ANGELE:  What does

12  that mean to you?

13       INMATE NGO:  Back then it was dirty looks.

14       PRESIDING COMMISSIONER ANGELE:  You

15  indicated that you first saw the gun in the car.

16       INMATE NGO:  Yes, Sir.

17       PRESIDING COMMISSIONER ANGELE:  And then you

18  were driving around and just happeneded come upon

19  Mr. Gonzales.

20       INMATE NGO:  No, Sir.  We met Mr. Gonzales

21  at McDonald's first.

22       PRESIDING COMMISSIONER ANGELE:  I understand

23  that.  I'm talking about the second time.

24       INMATE NGO:  The second time, what happened

25  was, when we came back me and (inaudible) went to

26  confront Mr. Gonzales and his friend.  We were

27  going to get into a fistfight.  When the fistfight

110

38

1   started, we were fighting one another, we knocked

2   Mr. Gonzales down.  And after that, my crime

3   partner came and while we was beating him up

4   (inaudible) Muhamed was hitting him with a gun.

5   Somehow it shot, it went off, the gun went off and

6   shot him.  The first round probably missed him,

7   but the second round hit him.

8        PRESIDING COMMISSIONER ANGELE:  So you were

9   actually looking for him?

10       INMATE NGO:  Looking for ---

11       PRESIDING COMMISSIONER ANGELE:

12   Mr. Gonzales.

13       INMATE NGO:  Yes, we were looking for him to

14   fight.

15       PRESIDING COMMISSIONER ANGELE:  Weren't you

16   waiting there for him to get out of school?

17       INMATE NGO:  We were waiting for him after

18   school.

19       PRESIDING COMMISSIONER ANGELE:  Okay.  Also,

20   you know, a little trouble by some (inaudible)

21   problems.  Back in December '90, you had a problem

22   in school where you jumped somebody else.  Do you

23   recall that?

24       INMATE NGO:  It was not a jump.  I got in a

25   fight with another individual.

26       PRESIDING COMMISSIONER ANGELE:  Yeah, but

27   you had three guys with you and they all jumped in

///

39

1    on it.

2        INMATE NGO:  Yes, Sir, they were my friends,

3    they back me up.

4        PRESIDING COMMISSIONER ANGELE:  They backed

5    you up.  You against one guy.  You knocked him

6    down.

7        INMATE NGO:  I beat him up, yes, Sir.

8        PRESIDING COMMISSIONER ANGELE:  And then

9    three guys backed you up and you all jumped him.

10   How do you figure that backing you up, you didn't

11   sound like you needed a back up at all?

12       INMATE NGO:  I have no control over their

13   actions, Sir.

14       PRESIDING COMMISSIONER ANGELE:  How about

15   the time you were in a vehicle and found three

16   purses, do you remember that?

17       INMATE NGO:  No, Sir.

18       PRESIDING COMMISSIONER ANGELE:  You don't

19   remember that?  This is in the POR, page 11, line

20   seven, (inaudible) automobile during a traffic

21   stop three women's purses were found in the

22   vehicle in which (inaudible) Ngo was the sole

23   occupant.  Indicated you did not know who they

24   belonged to, that's when they found the rock

25   cocaine.

26       INMATE NGO:  Oh, that's my mom's car ---

27       DEPUTY COMMISSIONER RODRIGUEZ:  I'd like to

112

40

1    turn the tape over, one moment.

2         [Thereupon, the tape was turned over.]

3         DEPUTY COMMISSIONER RODRIGUEZ:  Side two,

4    back on record.

5         PRESIDING COMMISSIONER ANGELE:  So that was

6    your mother's car?

7         INMATE NGO:  Uh-hmm.  It was my mother's car

8    when I was arrested, Sir.  If there was a purse,

9    it must belong to my mom.

10        PRESIDING COMMISSIONER ANGELE:  Okay.  Then

11   you indicated the car was searched for no reason.

12        INMATE NGO:  At first, yes.  But when they

13   asked me for consent, I gave it to them.

14        PRESIDING COMMISSIONER ANGELE:  All right.

15   But you do understand a male driving in a vehicle

16   with three purses in the car would be pretty

17   suspicious to me.  I'd think maybe it was a purse-

18   snatcher.  (Inaudible) plenty of probable cause.

19   But they asked you ---

20        INMATE NGO:  Yeah.

21        PRESIDING COMMISSIONER ANGELE:  And you gave

22   consent and inside one of the purses they found

23   the rock cocaine.  I found in a couple of spots

24   the gun was given to one of your crime partners by

25   somebody at an arcade.  Do you recall that

26   statement at all?

27        INMATE NGO:  It was brought up in trial,

113

41

1    Sir, but like I said before, the first time I ever

2    seen the gun was when I got back into the car.

3         PRESIDING COMMISSIONER ANGELE:  Okay, let me

4    ask you this, did you happen to go to the arcade

5    prior to you first seeing the gun?

6         INMATE NGO:  Yeah, I was playing arcade, but

7    I went to the restaurant.  I told them in court

8    that I was at a restaurant, a Hispanic restaurant

9    eating when this ---

10        PRESIDING COMMISSIONER ANGELE:  Okay.  So

11   can we assume without taking anything out of it

12   that isn't, it's a possibility that somebody did

13   get the gun at the arcade and put it in the car

14   and you just didn't see it.

15        INMATE NGO:  Very.

16        PRESIDING COMMISSIONER ANGELE:  What I'm

17   trying to establish is that you were at the arcade

18   before you got in the car and saw the gun?

19        INMATE NGO:  Yes.

20        PRESIDING COMMISSIONER ANGELE:  And the

21   first place you saw it was in the car.

22        INMATE NGO:  Exactly.

23        PRESIDING COMMISSIONER ANGELE:  All right,

24   any questions, Commissioner Rodriguez?

25        DEPUTY COMMISSIONER RODRIGUEZ:  None at this

26   time.

27        PRESIDING COMMISSIONER ANGELE:  Any

114

42

1    questions from the District Attorney?

2         DEPUTY DISTRICT ATTORNEY LAIRD:  Yes, just a

3    few.  And I'm referring to the P and S, the

4    Probation and Sentencing report.

5         PRESIDING COMMISSIONER ANGELE:  One second,

6    (inaudible) you answer the questions.  The

7    questions will be asked by the District Attorney

8    through the Panel and your statements are to be

9    directed to this side of the table.

10        INMATE NGO:  Yes.

11        DEPUTY DISTRICT ATTORNEY LAIRD:  Would you

12   like me to read what's in the probation report?

13   It's just, it's regarding the trial deputy's

14   statement in the report.

15        PRESIDING COMMISSIONER ANGELE:  Is it a

16   question or what do you intend to do with it?

17        DEPUTY DISTRICT ATTORNEY LAIRD:  The

18   question is I want to know if the inmate believes

19   that is an accurate statement, sentence by

20   sentence.  And I'm talking about page nine of the

21   Probation and Sentencing report, starting with

22   line 14, that entire paragraph, 14 to 21, which

23   begins with in a telephone conversation with the

24   prosecuting attorney Robin Park.  She's the Deputy

25   District Attorney that took the case to trial and

26   tried (inaudible) case.  And those are her

27   comments.  And I was wondering if they, Mr. Ngo,

115

43

1  felt that those were accurate comments, and if

2  they are not accurate, how so.

3       **ATTORNEY FOX:**  I think we need to go through

4  each one point by point, otherwise it's ---

5       **DEPUTY DISTRICT ATTORNEY LAIRD:**  Right.

6       **PRESIDING COMMISSIONER ANGELE:**  Well, let me

7  go through it.  There's a statement that the

8  prosecuting attorney made regarding the offenses

9  being a very vicious attack.  After the

10  confrontation at the fast food restaurant, the

11  inmate, along with No Muhamed, drove by the school

12  and planned the revenge.  They subsequently

13  obtained the weapon, loaded it, and drove back to

14  the area of Fullerton High School.  They were

15  lying in wait for the victim to get out of school.

16  This occurred at 3:02 p.m., the victim was killed

17  at 3:07 p.m.  Is that what happened?

18       **INMATE NGO:**  Yes, Sir.

19       **PRESIDING COMMISSIONER ANGELE:**  Now did you

20  understand everything I just said?

21       **INMATE NGO:**  When you say lying in wait, do

22  you mean I was waiting for him (inaudible).

23       **PRESIDING COMMISSIONER ANGELE:**  Uh-hmm.

24  Well no there's a portion that I think is

25  extremely important in today's hearing.  It says

26  after the confrontation at the fast food

27  restaurant, the defendant, which is you, and No

116

44

1    Muhamed, drove by the school and planned the

2    revenge.  They, which would be you and Muhamed,

3    subsequently obtained a weapon, loaded it, and

4    then drove back to the area of Fullerton High

5    School.

6        INMATE NGO:  That's wrong.  It wasn't just

7    me and No Muhamed.  There was five of us.

8        PRESIDING COMMISSIONER ANGELE:  Okay.

9        INMATE NGO:  So, and we didn't load the

10   weapon.  I know I didn't (inaudible).  I didn't

11   see the weapon until I was in the car.  So that

12   statement has to be wrong.

13       PRESIDING COMMISSIONER ANGELE:  All right.

14   But you are aware of the term lying in wait.  Do

15   you know what that means?

16       INMATE NGO:  That we were waiting.

17       PRESIDING COMMISSIONER ANGELE:  Yeah, you

18   were parked by the school waiting for him to get

19   out of school.

20       INMATE NGO:  Yeah.

21       PRESIDING COMMISSIONER ANGELE:  Is that

22   basically what happened?

23       INMATE NGO:  That's true.

24       PRESIDING COMMISSIONER ANGELE:  Did that

25   answer your question?

26       DEPUTY DISTRICT ATTORNEY LAIRD:  Yes.  Just

27   a follow up question.  Did Mr. Ngo realize that

117

45

1    the gun in the car was loaded when they were going

2    back to the school to find victim Gonzales?

3         PRESIDING COMMISSIONER ANGELE:  When you saw

4    the gun or was there any conversation to lead you

5    to believe the gun was loaded?

6         INMATE NGO:  They led me to believe, I think

7    it was loaded because, they say that I told the

8    police that they say, you know, use it for

9    protection.  So I figured it probably is loaded.

10   But my lack of judgment that day ---

11        DEPUTY DISTRICT ATTORNEY LAIRD:  And then

12   was, at the time that they were waiting for the

13   victim, this is addressed to the parole board, at

14   the time the suspects were waiting for the victim,

15   was victim Alex Gonzales by himself?

16        INMATE NGO:  No, he wasn't.  There was two

17   of them, Angel Gonzales and his friend.  That's

18   when No Muhamed confronted Mr. Gonzales and I

19   confronted his other friend.  I followed the other

20   guy, I don't know his name, and No Muhamed was

21   fighting with Mr. Gonzales.  And after that, his

22   friend ran away and I helped No out.

23        PRESIDING COMMISSIONER ANGELE:  And how

24   about the rest of your crime partners?

25        INMATE NGO:  They didn't come until later,

26   until --- it happened so fast.  Me and No was

27   fighting we didn't know until the first time the

118

46

1    gun went off and that's when everybody just
2    stopped and we started running away.  After that,
3    you know, when I heard the first shot, I ran.
4              PRESIDING COMMISSIONER ANGELE:  Okay.
5              DEPUTY DISTRICT ATTORNEY LAIRD:  And, again,
6    this is directed to the parole board.  Did Mr. Ngo
7    realize that one of his group would get out of the
8    car to confront Alex Gonzales, the victim who
9    died, with that firearm that was in the car?
10             PRESIDING COMMISSIONER ANGELE:  Let's see if
11   I understand that clearly.  Did you have knowledge
12   that somebody in the car was going to confront
13   Mr. Gonzales with that firearm?
14             INMATE NGO:  No, Sir.  Not at all.
15             DEPUTY DISTRICT ATTORNEY LAIRD:  Did Mr. Ngo
16   nevertheless realize that somebody was going to be
17   taking that gun out of the car into the
18   confrontation?
19             PRESIDING COMMISSIONER ANGELE:  Do you
20   understand that question?
21             INMATE NGO:  Yes.  My understanding is,
22   that's the argument between No, Mr. Muhamed, I
23   asked why did you guys bring a gun, you know,
24   without telling me, you know, when I first saw it
25   under the seat.  That's when they tell me it's
26   only for protection.  My understanding was it was
27   only going to be used if the other group have

119

47

1    weapon on them; otherwise, it was supposed to be

2    in the car.  Because when I agreed to go into

3    fistfight, that's all I agreed upon, was to have a

4    fistfight.  I never knew that someone was going to

5    take it out and shoot him; otherwise, I probably

6    wouldn't be there.  But back then I was trying to

7    get my life back straight, you know.  I'm sorry,

8    but ---

9           PRESIDING COMMISSIONER ANGELE:  Take your

10   time.

11          INMATE NGO:  I'm sorry that Mr. Gonzales,

12   you know, died, but I never wanted that to happen.

13   It was not my intention.  I thought it was just

14   for fight.  (Inaudible.)

15          PRESIDING COMMISSIONER ANGELE:  Let's take a

16   break (inaudible).

17                      [Off the record.]

18          INMATE NGO:  Thank you.  I know there's

19   nothing I can say or do at this point to bring

20   back Mr. Gonzales.  I know his family is probably

21   going through a lot of pain, but I was young and I

22   was ignorant, naïve.  I made bad judgment.

23   There's nothing I can say to bring him back, Sir.

24   If sorry would help, but hopefully one day they'll

25   find it in their heart to forgive me.

26          PRESIDING COMMISSIONER ANGELE:  Any

27   questions?

120

48

1    **DEPUTY DISTRICT ATTORNEY LAIRD:**  Yes.  I

2    appreciate that answer from Mr. Ngo.  I have just

3    a couple of follow up questions to the Board

4    regarding the Tiger Mafia.  Because it is printed

5    in several pieces of documentation including the

6    probation report as well as elsewhere that at

7    about the time of the murder he was affiliated

8    with a group called the Tiger Mafia.  And I'm

9    aware and I can point to a picture here on the

10   table that dealt with search warrants and items

11   that were obtained and seized during the time of

12   this crime.  And I've seen and become aware of

13   several drawings, that are drawings, handwritten

14   drawings of a tiger, which I'm making the

15   assumption refers to the Tiger Mafia.  And I'm

16   just trying to get a clarification of what that

17   group was and why the inmate put the tattoo on his

18   arm for TM or Tiger Mafia.

19   **ATTORNEY FOX:**  I'd like to pose an

20   objection to the extent that the District

21   Attorney was testifying.  If there is a

22   question regarding the Tiger Mafia, I think it

23   might be asked as a direct question rather

24   than a litany of what the District Attorney

25   has seen.

26   **PRESIDING COMMISSIONER ANGELE:**  I'll

27   overrule your objection.  I don't believe he was

/2/

49

1    testifying.  I believe the question has already

2    been asked and answered.  The Tiger Mafia,

3    according to the inmate, was made up and the

4    initials on his arm stood for the initials of an

5    ex-girlfriend.  Do you still state that?

6              INMATE NGO:  Yes, Sir.

7              PRESIDING COMMISSIONER ANGELE:  So there

8    never was a group called the Tiger Mafia?

9              INMATE NGO:  No.  It's just a made-up name.

10             DEPUTY COMMISSIONER RODRIGUEZ:  Are those

11   drawings from ---

12             DEPUTY DISTRICT ATTORNEY LAIRD:  I do not

13   know.  I do not know.  I just used it as a purpose

14   of illustration just because I've, in reviewing

15   the file I've seen some pictures of tigers.  I see

16   a tattoo.  So I'm just asking by illustrating what

17   I've seen if there was any connection to the Tiger

18   Mafia.

19             INMATE NGO:  If you want clarification what

20   the tattoo of the tiger is, all the Fullerton Boyz

21   has a tiger on his chest.  It's not because of the

22   Tiger Mafia.  It's Fullerton Boyz has a tiger on

23   his chest, all of us.

24             DEPUTY DISTRICT ATTORNEY LAIRD:  Thank you.

25             PRESIDING COMMISSIONER ANGELE:  Anything

26   further?

27             DEPUTY DISTRICT ATTORNEY LAIRD:  Nothing

122

50

1    further.

2        **PRESIDING COMMISSIONER ANGELE:**  Ms. Fox,

3    questions of your client.

4        **ATTORNEY FOX:**  Just briefly.  When you were

5    found in possession of cocaine, when the police

6    officer stopped you.

7        **INMATE NGO:**  Yes.

8        **ATTORNEY FOX:**  They found the cocaine in a

9    purse, right?

10        **INMATE NGO:**  I'm not sure where they found

11    it.  I think it was underneath the seat,

12    underneath the seat when they found it.  It wasn't

13    in no purse at all.

14        **ATTORNEY FOX:**  Okay, that was my question.

15    If it was in the purse how did it get there.  But

16    it's your testimony you didn't put it there?

17        **INMATE NGO:**  No, if anything, if I remember

18    correctly I put it under the seat.  If it also

19    found it'd be under the seat.

20        **ATTORNEY FOX:**  So it wasn't your mother's

21    cocaine?

22        **INMATE NGO:**  No.  It was mine.  I bought it.

23        **ATTORNEY FOX:**  Okay, I have no further

24    questions.

25        **PRESIDING COMMISSIONER ANGELE:**  Okay, can we

26    go into closing please, from the District

27    Attorney, Mr. Laird?

123

51

1       **DEPUTY DISTRICT ATTORNEY LAIRD:**  Yes, I

2    have, I've been prosecuting gang cases in my

3    office for approximately five years.  I know Robin

4    Parks, she's a colleague of mine.  I have tried a

5    case just like a case like this in terms that the

6    type of theory that is presented in terms of a

7    gang, group attack that results in a death.  I

8    would indicate that Mr. (inaudible) who I also

9    know is, or who was the Public Defender at the

10   time, and is still a public defender representing

11   his client, basically is not talking about any

12   sort of novel or unique theory that is applied in

13   Orange County in terms of finding the defendant

14   guilty of murder by virtue of being involved in

15   gang related activity and aiding and abetting in a

16   fight on a victim that results in a murder.  I

17   would note that the seriousness of the crime,

18   basically is well spoken for in the probation

19   report by Robin Park.  It's also well spoken for

20   by the fact that a jury did return a first degree

21   murder verdict on this case and that there was a

22   subsequent plea apparently between the District

23   Attorney in exchange for not raising any appellate

24   rights on the case.  It is my opinion that based

25   on, well I'll just withdraw, I won't make any

26   comments regarding the nature of why that plea

27   took place because I personally have not been able

*124*

52

1   to find the precise material that refers to that.

2   However, I would just point to the gravity of the

3   offense in urging what we have urged in our

4   May 3rd, 2002, letter in that we believe that at

5   this point Mr. Ngo is not suitable for parole.

6   And it's largely based on the heinousness of the

7   crime in that it involved an extremely vulnerable

8   victim at the time of the group attack.   It

9   involved a picture, an accurate picture of gang

10  subculture with respect to the roles of guns and

11  how guns are brought to a conflict for backup.

12  And that in the gang subculture any type of

13  escalation by rival gangs is basically a form of

14  disrespect which must be answered to.   And that by

15  virtue of the victim answering with blows to

16  Mr. Ngo at the time, back in 1990, literally

17  1990's, it was just a right condition for an

18  escalation of a conflict wherein the gun would be

19  used.   The People have a concern also regarding

20  the modus operandi of Asian gangs in this state in

21  that their activity is not as overt in the

22  community.   They appear to be less overt regarding

23  their gang affiliation and it's hard to look at

24  the inmate essentially with a crystal ball at this

25  time.   We're forced to look back at past conduct

26  that has happened which I've described above.

27  It's my belief that the inmate's account about the

125

53

1   gun and the use of the gun at the crime is

2   somewhat unreasonable in that he indicates that

3   the reason they had a gun was for protection and

4   they were laying in wait or lying in wait for the

5   victim to come out of school.  At that time, they

6   knew they had had a conflict earlier at the

7   McDonald's.  They didn't know whether the victim

8   was armed or not or whether the victim's cohort

9   was armed or not.  And it seems unreasonable that

10  this defendant would not know that the gun was

11  taken out of the car in concert with the rest of

12  the suspects who ended up attacking victim

13  Gonzales.  And we just believe based on all the

14  psychiatric reports and based on the limited

15  contact that the experts have had with the inmate

16  that there needs to be a longer test of time

17  before this inmate is found suitable for a parole

18  date and I thank you very much for your time.

19          **PRESIDING COMMISSIONER ANGELE:**  Thank you.

20  Ms. Fox.

21          **ATTORNEY FOX:**  Thank you.  I respectfully

22  disagree with my colleague from Orange County.  I

23  think it would be appropriate to set a date for

24  Mr. Ngo today.  Before the Panel is a man who has

25  matured in the prison system.  Today he displayed

26  genuine remorse, which has been a hallmark of his

27  existence in the Department of Corrections.  Going

126

54

1  back to the probation report, which was used for

2  the Statement of Facts over my objection.

3  Consistently throughout there, that report Mr. Ngo

4  is cited for having stated that he did not know

5  that the weapon is in the car for any long period

6  of time before it was used and today he spoke what

7  he thought the use to which that weapon would be

8  put.  It would be used in self-defense.  Hindsight

9  is 20/20.  He can't go back and change what

10  happened.  Facts is facts.  And I think the fact

11  that he stands convicted of a murder two, not

12  murder one, is a significant finding.  Turning to

13  his institutional adjustment, he has minimal

14  disciplinary history, and that's consistent with

15  his personality prior to the time he came into the

16  Department of Corrections with this one very

17  tragic situation.  He has improved himself to the

18  extent that he's able to within the Department of

19  Corrections having achieved two completed

20  vocations, sustained attendance at AA, good work

21  reports, and he continues to enjoy a sustained

22  excellent family support system out there.  In the

23  psych report it's important to note that he does

24  have a Global Assessment score of 90, which would

25  let us know that he is able to cope with life on

26  the streets in a non-destructive manner.  And he's

27  done that and it's demonstrable or has been

127

55

1    demonstrable since he's been incarcerated.    I

2    believe both psych reports accurately describe

3    Mr. Ngo, and he is ready for parole.    The plans

4    are excellent.    And if the Board is disinclined to

5    find him suitable for parole today, I'd suggest a

6    one or two year denial to allow him time to get

7    into the Impact program and pursue any other

8    self-help and anger management programs that the

9    Board would find useful.    So we'll submit based on

10    that unless Mr. Ngo has something he'd like to

11    say.

12        **PRESIDING COMMISSIONER ANGELE:**    Thank you.

13    Mr. Ngo, now it's your turn to make a statement to

14    the Panel regarding your parole suitability.

15    Before we do that, I just want to add one thing.

16    When I read the Statement of Facts from the

17    probationary report when we first started the

18    hearing, you indicated to me that that was the way

19    it happened?

20        **INMATE NGO:**    Yes.

21        **PRESIDING COMMISSIONER ANGELE:**    Thank you.

22    All right, do you need to make a statement or we

23    can end this hearing on what your attorney has

24    said on your behalf.

25        **INMATE NGO:**    I just say, honestly I'm sorry

26    for what I've done.    I accept the fact that, you

27    know, because of my ignorance that a human life

*128*

56

1    was lost.  And, you know, I made a mistake.

2    There's nothing I want more than to change what

3    happened.  I'm sorry, but I just don't know what I

4    can say anymore.  That's all I guess.

5          PRESIDING COMMISSIONER ANGELE:  Okay.  Thank

6    you for your comments.  We'll recess for

7    deliberations.

8                        R E C E S S

9                         --o0o—

10
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

129

57

1        **CALIFORNIA BOARD OF PRISON TERMS**

2              **D E C I S I O N**

3       **DEPUTY COMMISSIONER RODRIGUEZ:**  We're back

4    on record, all parties are present.

5       **PRESIDING COMMISSIONER ANGELE:**  In the

6    matter of Sieu Ngo, that's N-G-O.  Mr. Ngo, the

7    Panel has reviewed all information received from

8    the public and relied on the following

9    circumstances in concluding that you are not

10    suitable for parole and would pose an unreasonable

11    risk of danger to society or a threat to public

12    safety if released from prison.  The offense was

13    carried out in an exceptionally cruel, callous,

14    violent and brutal manner.  The offense was

15    carried out in a manner which demonstrates an

16    exceptionally callous disregard for human

17    suffering and life.  And the motive for the crime

18    was inexplicable or very trivial in relation to

19    the offense.  These conclusions were drawn from

20    the Statement of Facts wherein the inmate and his

21    crime partners, after altercation with the victim,

22    armed themselves with a weapon, went to the high

23    school where the victim, one 15 year old Angel

24    Gonzales went to school, and waited for him to get

25    out of school.  The inmate and one of his crime

26    partners then approached Mr. Gonzales and a friend

27    **SIEU PHONG NGO   J-07024   DECISION PAGE 1   05/13/02**

130

58

1    of his, each getting in a fight with one of them.

2    At which time both the inmate and his other crime

3    partner, both got into a fight with Mr. Gonzales.

4    At the same time three other crime partners

5    jumping in and attacking Mr. Gonzales who was shot

6    and killed after he was on the ground, by one of

7    the other crime partners.   The prisoner has on a

8    previous occasion has attempted to inflict injury

9    upon a victim.   This has to do with another fight

10   in which he was involved in a one-on-one, which he

11   got the better of the fight and knocked the victim

12   down and then his crime partners jumped in and all

13   started beating the victim.   The inmate does have

14   an escalating pattern of criminal conduct, albeit

15   minor.   However, it does include the possession of

16   rock cocaine.   The inmate has received during his

17   incarceration no 115 disciplinary reports, which

18   is a very positive step.   He's received two 128(a)

19   counseling chronos.   4/1/97, failure to respond to

20   a medical ducat and 2/11/00, for window coverings.

21   Psychological evaluation dated 1/23/02, by initial

22   C. Saindon, S-A-I-N-D-O-N, would indicate that the

23   inmate, or would be favorable to the inmate.   The

24   inmate does have parole plans.   He does have

25   residential plans in the last county of legal

26   residence, also in Los Angeles County.   And does

27   **SIEU PHONG NGO   J-07024   DECISION PAGE 2   05/13/02**

131

59

1   have acceptable job offers.  The hearing Panel

2   notes that responses to 3042 notices indicate

3   opposition to a finding of parole suitability,

4   specifically the District Attorney of Orange

5   County.  The Panel makes the following findings:

6   that the inmate needs additional time in order to

7   fully understand and deal with the causation

8   factors that led to the commitment of the life

9   crime.  Until progress is made, the prisoner

10  continues to be unpredictable and a threat to

11  others.  Nevertheless, he should be commended for

12  his participation in NA, for his participation in

13  the 12-steps, for his completing vocational auto

14  upholstery and auto refinishing.  In addition, to

15  his being 115-free during his incarceration and

16  for completing the Keys to Fatherhood a

17  salesmanship course, and the tuberculosis and

18  hepatitis courses.  However, these positive

19  aspects of his behavior do not outweigh the

20  factors of unsuitability.  In a separate decision,

21  the hearing Panel finds that it is not reasonable

22  to expect that parole would be granted at a

23  hearing during the following two years.  The

24  specific reasons for the findings are as follows:

25  the prisoner committed the offense in an

26  exceptionally cruel, callous, violent, brutal

27  **SIEU PHONG NGO   J-07024   DECISION PAGE 3   05/13/02**

*132*

60

1    manner.  Specifically, he and his crime partners,

2    after one of his crime partners was involved in a

3    fight with the victim, left, armed themselves with

4    a weapon, and then went back to the school area

5    where the victim had gone to school, waited for

6    the victim to get out of school.  The inmate and

7    one of his crime partners then got involved in a

8    one-on-one fight with the victim and one of his

9    friends.  After which, the inmate and his crime

10   partner both began fighting with the victim.  They

11   were then joined in by two other individuals who

12   were beating the victim, knocked to the ground.

13   One of the crime partners shot and killed the

14   victim, one Angel Gonzales, age 15.  The offense

15   was carried out in an exceptionally cruel and

16   callous manner.  The motive for the crime was

17   inexplicable or very trivial in relation to the

18   offense.  The prisoner had been involved in

19   previous violent behaviors, which included once

20   again, a fistfight with an individual who he got

21   the better of and knocked down and after which

22   time three of his crime partners and him all began

23   continuing to strike the victim.  The correctional

24   counselor's report dated (inaudible) 2002, by

25   initial M. Rubio, R-U-B-I-O, indicates a degree of

26   threat as moderate if released to the public.

27   **SIEU PHONG NGO   J-07024   DECISION PAGE 4   05/13/02**

*133*

61

1    Therefore, a longer period of observation and
2    evaluation of the prisoner is required before the
3    Board should find the prisoner is suitable for
4    parole.  The Panel recommends that inmate remain
5    disciplinary-free.  If available, upgrade any way
6    you can, vocation, education.  If available,
7    participate in self-help and therapy programming.
8    That does conclude the reading of the decision.
9    Any comments, Commissioner Rodriguez?
10         **DEPUTY COMMISSIONER RODRIGUEZ:**  Yeah,
11   Mr. Ngo, one thing I think you took more of a
12   leadership role in this incident and I think
13   you've been a little bit less than truthful today.
14   If I'm wrong and what you stated today is the
15   truth, I don't expect you to change your story
16   just for the Board's panel.  But I truly would
17   like you to take this next two years, as far as
18   I'm certain you're programming well, don't
19   misunderstand me.  But I think there's more to the
20   incident than you're actually telling us today.
21   Whether you just don't want to say it or you
22   choose not to say it or throughout the years
23   you've made yourself believe what you've said in
24   the past is correct.  But I think if you look deep
25   down, I truly believe that you took more of a
26   leadership role and that possibly you did have,
27   **SIEU PHONG NGO   J-07024   DECISION PAGE 5  05/13/02**

*134*

62

1    know more about that weapon.  So I want you to

2    think about that.  But, again, like I said, if I

3    am incorrect, I don't expect you to come to the

4    Board next time and say you did do it if you

5    didn't.  But I will ask you one more time, did you

6    know more about that gun?

7        INMATE NGO:  (Inaudible) not until I looked

8    under the car.  When I got into the car, that's

9    the first time I seen the gun, Sir.

10       DEPUTY COMMISSIONER RODRIGUEZ:  Did you plan

11   the assault or the incident?

12       INMATE NGO:  No, Sir.

13       DEPUTY COMMISSIONER RODRIGUEZ:  Okay.  Thank

14   you.

15       ATTORNEY FOX:  I'm sorry.  That's vague,

16   because he did earlier say he planned to fight

17   him, but not shoot him.

18       INMATE NGO:  Thank you.

19       DEPUTY COMMISSIONER RODRIGUEZ:  Okay, no, no

20   that's all right counselor.  Thank you.  And I

21   just want to wish you the best of luck.

22       PRESIDING COMMISSIONER ANGELE:  Mr. Ngo, let

23   me tell you, you know, what disturbs me is the

24   other fight you had and we're very familiar with

25   the gang mentality.  Regardless of whether or not

26   you beat somebody, going to beat somebody, the end

27   SIEU PHONG NGO  J-07024  DECISION PAGE 6  05/13/02

135

63

1    result is everybody jumps on a guy when he's down.

2    It happened in another fight you had.  I think

3    your statement was, you couldn't be responsible

4    for what they do, but I'll tell you very frankly

5    if it was one of your crime partners involved in

6    that, you'd of jumped in just like everybody else

7    did.  That's the way things are.  We both know

8    that.

9         **INMATE NGO:**  Yes, it is.

10        **PRESIDING COMMISSIONER ANGELE:**  It disturbs

11    me that the killing of Mr. Gonzales was the same

12    type of situation.  The only difference is

13    somebody had a gun there.  So the history that you

14    started to accumulate would indicate to me that

15    the gang mentality that has no respect at all for

16    humanity, you know what happens next?

17        **INMATE NGO:**  That's when I was young, Sir.

18        **PRESIDING COMMISSIONER ANGELE:**  I realize

19    that.  I realize that.  And the reason why I

20    brought that up is I'd really like to see you get

21    into that anger management program here.

22    Hopefully, they'll get it out for you or you'll

23    get into it soon and maybe the next time you'll

24    have it under your belt.  I figure it will help.

25    And I don't want this to discourage you.  You're

26    doing a good job.  And for an initial hearing,

27    **SIEU PHONG NGO   J-07024   DECISION PAGE 7   05/13/02**

*136.*

64

1    your counsel knows, that two years is not a bad

2    thing.  So I do wish you good luck.

3              **INMATE NGO:**  Thank you, Sir.

4              **PRESIDING COMMISSIONER ANGELE:**  That does

5    conclude the hearing.  Time is approximately 3:52

6    p.m.

7                            --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   **PAROLE DENIED TWO YEARS**

26   **EFFECTIVE DATE OF THIS DECISION** JUN 1 0 2002 _____

27   **SIEU PHONG NGO   J-07024   DECISION PAGE 8   05/13/02**

137

65

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, VALERIE C. LORD, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 64, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, AT SOLEDAD, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING of SIEU PHONG NGO, CDC No. J-07024, on MAY 13, 2002, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 23, 2002, at Auburn, California.

Valerie C. Lord
Transcriber
**CAPITOL ELECTRONIC REPORTING**

138

# EXHIBIT C

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life ) 
Term Parole Consideration )     CDC Number J-07024
Hearing of: )
 )
SIEU NGO )
_____ )

COPY

INMATE

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 3, 2004

1:15 P.M.

PANEL PRESENT:

BOOKER WELCH, Presiding Commissioner
ROLANDO MEJIA, Deputy Commissioner

OTHERS PRESENT:

SIEU NGO, Inmate
DAVID SPOWART, Attorney for Inmate
JENNIFER CONTINI, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No     See Review of Hearing
_____ Yes    Transcript Memorandum

**Wendy Thomas, Capitol Electronic Reporting**

*140*

ii

## INDEX

|  | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 12 |
| Pre-Commitment Factors | 15 |
| Post-Commitment Factors | 20 |
| Parole Plans | 29 |
| Closing Statements | 49 |
| Recess | 57 |
| Decision | 58 |
| Adjournment | 63 |
| Transcriber Certification | 64 |

--oOo--

141

1

# P R O C E E D I N G S

1    
2          **DEPUTY COMMISSIONER MEJIA:**  We are now on

3    the record.

4          **PRESIDING COMMISSIONER WELCH:**  Okay, good

5    afternoon, Mr. Ngo.

6          **INMATE NGO:**  Good afternoon.

7          **PRESIDING COMMISSIONER WELCH:**  Sir, this is

8    a Subsequent Parole Consideration Hearing.  I'll

9    read your case factors into the record.  The

10   prisoner's name is Ngo, N-G-O.  How do you

11   pronounce your first name?

12         **INMATE NGO:**  Sieu.

13         **PRESIDING COMMISSIONER WELCH:**  Sieu,

14   S-I-E-U, CDC number J-07024.  The date of the

15   hearing is Tuesday, August 3rd, 2004, the time is

16   approximately 1:15.  The location is Correctional

17   Training Facility, Soledad.  The prisoner was

18   received CDC on 2-1, 1994 from Orange County for

19   the offense of murder second, case number C99109,

20   count one, Penal Code violated 187, total term 16

21   years to life, minimum eligible parole date was

22   5-24-03.  Sir, this hearing will be tape-recorded

23   so for the purpose of voice identification, we'll

24   need to go around the room and identify ourselves

25   stating our full name, spelling our last name.  In

26   your case, you need to add your CDC number.  I'll

27   start with myself, go to my left.  My name is

*142*

2

1    Booker Welch, W-E-L-C-H.  Mr. Mejia.

2         **DEPUTY COMMISSIONER MEJIA:**  Rolando Mejia,

3    M-E-J-I-A, Deputy Commissioner.

4         **DEPUTY DISTRICT ATTORNEY CONTINI:**  Jennifer

5    Contini, C-O-N-T-I-N-I, Deputy District Attorney,

6    Orange County.

7         **ATTORNEY SPOWART:**  David Spowart,

8    S-P-O-W-A-R-T, attorney for Mr. Ngo.

9         **INMATE NGO:**  Sieu Ngo, S-I-E-U N-G-O, CDC

10   number J-07024.

11        **PRESIDING COMMISSIONER WELCH:**  Okay, sir,

12   that identifies everyone in the room with the

13   exception of the correctional peace officer who is

14   seated directly behind you, two of them, and

15   they're here for security purposes only and will

16   not be taking part in today's proceedings.  Mr.

17   Ngo, are you familiar with the American with

18   Disabilities law?

19        **INMATE NGO:**  No, I'm not, Sir.

20        **PRESIDING COMMISSIONER WELCH:**  Well, that

21   form in front of you, it will give you a good

22   overview.  Do you mind reading that into the

23   record.

24        **INMATE NGO:**  "ADA American with

25             Disability Act.  Americans with

26             Disability Act (ADA) is a law to help

27             people with disabilities.

/43

Disabilities are problems that make it harder for some people to see, hear, breathe, talk, walk, learn, think, work, or take care of themselves than it is for others. Nobody can be kept of public places or activities because of a disability. If you have a disability, you have the right to ask for help to get ready for your BPT hearing to get to the hearing, talk, read forms and papers, and understand the hearing process. BPT will look at what you ask for to make sure that you have a disability that is covered by the ADA and that you have asked for the right kind of help. If you do not get help or if you don't think you've got the kind of help you need, ask for a BPT 1074 Grievance Form. You can also get help to fill it out."

**PRESIDING COMMISSIONER WELCH:** Very good. Mr. Ngo, does that give you a little bit better overview of what the American with Disabilities law is all about?

**INMATE NGO:** Yes. Yes, Sir.

4

1          **PRESIDING COMMISSIONER WELCH:**  Now after

2    being armed with that knowledge, let me ask you,

3    do you have a disability as defined under the

4    American Disabilities Act?

5          **INMATE NGO:**  No, Sir.

6          **PRESIDING COMMISSIONER WELCH:**  I see you

7    have glasses, do you need those to read?

8          **INMATE NGO:**  I'm nearsighted.

9          **PRESIDING COMMISSIONER WELCH:**  Nearsighted,

10   okay.  You have no problems talking, reading here,

11   or walking, is that correct?  You were able to

12   walk over under your own power today?

13         **INMATE NGO:**  Yes, Sir.

14         **PRESIDING COMMISSIONER WELCH:**  You have a

15   12.3 overall TABE grade point level which would

16   indicate to the Board that you're totally capable

17   of reading and understanding the documents

18   necessary to prepare for this hearing, is that

19   correct?

20         **INMATE NGO:**  Correct, Sir.

21         **PRESIDING COMMISSIONER WELCH:**  Have you

22   received any mental health treatment within the

23   last 12 months?

24         **INMATE NGO:**  No, Sir.

25         **PRESIDING COMMISSIONER WELCH:**  Counselor, do

26   you have any concerns about your client's rights

27   as it relates to the American with Disabilities

145

5

1   law?

2           **ATTORNEY SPOWART:**  I have none.

3           **PRESIDING COMMISSIONER WELCH:**  Okay, then

4   we'll proceed with this hearing.  The purpose of

5   today's hearing is to once again to consider your

6   suitability for parole.  We will consider the

7   nature and the number of the crimes you were

8   committed for, your prior criminality, your social

9   history, and your behavior and programming since

10  your commitment.  We've had an opportunity to

11  review your C-File and your prior transcripts and

12  you'll have an opportunity to make corrections or

13  clarifications to the record.  We will consider

14  your progress since your last hearing, any new

15  psychiatric reports, and any other information

16  that may have a bearing on your suitability for

17  parole.  Any change in parole plans should be

18  brought to our attention.  Before we recess for

19  deliberations, the District Attorney, your

20  attorney, and yourself will be given the

21  opportunity to make a final statement regarding

22  your suitability for parole and the length of

23  confinement.  After that's done, we will recess,

24  clear the room, and deliberate.  Once we reached a

25  decision, we will reconvene and at that time we'll

26  let you know what our decision is.  Do you

27  understand all that so far?

146

6

1      INMATE NGO:  Yes, Sir.

2      PRESIDING COMMISSIONER WELCH:  Now the Board

3   of Prison Terms rules and the law basically state

4   that a parole date shall be denied you if in the

5   opinion of the Commissioners your parole would

6   pose an unreasonable risk of danger to others.

7   However, prisoners do have certain rights.

8   Counsel, have your client's rights been met?

9      ATTORNEY SPOWART:  Yes, they have.

10      PRESIDING COMMISSIONER WELCH:  Mr. Ngo, you

11   have an additional right, you have the right to a

12   fair and impartial panel.  Do you have any reason

13   to believe the Panel Members will not be fair and

14   impartial to you?

15      INMATE NGO:  I would like to reserve that

16   right towards the end of this hearing.

17      PRESIDING COMMISSIONER WELCH:  Okay.  Mr.

18   Ngo, that's fine, I don't have a problem with

19   that, but I do need to tell you that I have no

20   reason not to give you a fair hearing.  I have

21   every intention to make sure that your due process

22   rights are adhered to.  I've already covered your

23   ADA issues and made sure you didn't have any

24   issues with that.  I'll be going over your due

25   process right issues to insure that you don't have

26   a problem with your rights.  And during the

27   hearing, it is -- I have every intention to insure

*147*

1   that you receive a fair and impartial hearing.

2   Commissioner, do you have any reasons why you

3   can't give the prisoner a fair hearing?

4       DEPUTY COMMISSIONER MEJIA:  No, I'm

5   objective and I take the case on a case by case

6   basis, no predetermined opinion or belief for

7   suitability or unsuitability.  I'll base all my

8   decision based on what I hear here and also what's

9   reflected in his file.

10      PRESIDING COMMISSIONER WELCH:  Okay, very

11  good.  Sir, you will receive a copy of our written

12  tentative decision today.  The decision becomes

13  effective in 120 days.  Mr. Ngo, you no longer

14  have a right to administrative appeals process, do

15  you understand that?

16      INMATE NGO:  Yes, I do.

17      PRESIDING COMMISSIONER WELCH:  Okay.

18      INMATE NGO:  The 1040 you mean?

19      PRESIDING COMMISSIONER WELCH:  Yes.  You're

20  not required to discuss the offense today, you're

21  not required to admit to guilt.  However, the

22  Panel Members accept as true the findings of the

23  court.  Do you understand that concept?

24      INMATE NGO:  Yes, I do.

25      PRESIDING COMMISSIONER WELCH:  Counselor,

26  pardon me?

27      INMATE NGO:  I would like to say that I will

148

8

1    not be talking about -- discussing my case, my

2    case today under Penal Code section 5011.  And

3    before we go any further, I would like to submit

4    this memorandum as evidence in support of my

5    parole suitability to you.

6          PRESIDING COMMISSIONER WELCH:  Okay, I'll

7    take it at this time, but you're getting a little

8    ahead of the game, we were going to give you an

9    opportunity.  That's fine we'll accept it now,

10   how's that?

11         INMATE NGO:  Thank you.

12         PRESIDING COMMISSIONER WELCH:  Okay, very

13   good.  And certainly you do not have to talk or

14   admit to the crime.  Very good.  Commissioner, is

15   there any confidential information to be used

16   today?

17         DEPUTY COMMISSIONER MEJIA:  None.

18         PRESIDING COMMISSIONER WELCH:  Good.

19   Counselor, I passed you a list of the documents we

20   will be working from.  Do you have those

21   documents?

22         ATTORNEY SPOWART:  Yes, I have these.

23         PRESIDING COMMISSIONER WELCH:  District

24   Attorney, do you have those documents?

25         DEPUTY DISTRICT ATTORNEY CONTINI:  Yes, I

26   do.

27         PRESIDING COMMISSIONER WELCH:  Counselor, do

149

9

1    you have any additional documents to submit?  Your

2    counsel have already -- I mean, your client have

3    already submitted a brief.

4        **ATTORNEY SPOWART:**  He's already given me

5    that brief, he says the first 10 pages are an

6    overview of why he should be considered.

7        **PRESIDING COMMISSIONER WELCH:**  Why he should

8    be considered for parole.

9        **INMATE NGO:**  Because it would clarify my

10   position at this hearing today, Sir.

11       **PRESIDING COMMISSIONER WELCH:**  Okay, then we

12   will review that during deliberations, we'll go

13   through and review that.

14       **INMATE NGO:**  All right, Sir.

15       **PRESIDING COMMISSIONER WELCH:**  Very good,

16   very good.  Any other documents to submit?

17       **ATTORNEY SPOWART:**  No, I haven't.

18       **PRESIDING COMMISSIONER WELCH:**  Any

19   preliminary objections?

20       **ATTORNEY SPOWART:**  Yeah, I have an

21   objection.  This was a plea agreement and I have

22   an objection to the District Attorney being here

23   today on a recent Supreme Court ruling that

24   classifies a plea agreement as a contract.  I know

25   that my client was not the shooter, he had no

26   criminal prior record, and has had an excellent

27   performance since he's been in here, so.

150

10

1     **PRESIDING COMMISSIONER WELCH:**  What does

2     that have to do with the District Attorney being

3     here?

4     **ATTORNEY SPOWART:**  That the District

5     Attorney is breaking the contract (inaudible).

6     When he pled, he gave up certain rights.  The

7     People got certain benefits from that.

8     **PRESIDING COMMISSIONER WELCH:**  Okay.

9     **ATTORNEY SPOWART:**  They got their benefits.

10    Now they're just trying to deny him of his

11    benefits.

12    **PRESIDING COMMISSIONER WELCH:**  Okay, all

13    right, I think I understand.

14    **ATTORNEY SPOWART:**  (Inaudible).

15    **PRESIDING COMMISSIONER WELCH:**  Okay.

16    **ATTORNEY SPOWART:**  I just want it on the

17    record, Commissioner.

18    **PRESIDING COMMISSIONER WELCH:**  Okay,

19    absolutely, absolutely.  I'm going to overrule

20    that objection because according to Penal Code

21    3042, section 3042 that is, the District Attorney

22    or his representative have a right to appear and

23    represent The People's interest at these hearings.

24    If not the District Attorney, certainly the

25    Attorney General, he can appear depending on who

26    prosecuted the case or has a major interest in the

27    case, not one or both, but only one can appear.

151

11

1   In this case, The People -- the District Attorney

2   of Orange County have opted to send his

3   representative, i.e., the Deputy District Attorney

4   from Orange County here to represent the District

5   Attorney.  Therefore, per statute, per Penal Code,

6   I'll have to overrule that objection, okay.  All

7   righty, thank you very much.  Any other

8   objections?

9        ATTORNEY SPOWART:  I have none.

10       PRESIDING COMMISSIONER WELCH:  All right,

11  thank you, Mr. Spowart.  Okay, and your client

12  will not be speaking to us today?

13       ATTORNEY SPOWART:  Not on the life crime, he

14  pled on the crime.

15       PRESIDING COMMISSIONER WELCH:  Will he be

16  speaking -- will he be giving any testimony today?

17       ATTORNEY SPOWART:  Yes, he'll talk about

18  everything else.

19       PRESIDING COMMISSIONER WELCH:  Okay, Mr.

20  Ngo, would you raise your right hand.

21       INMATE NGO:  Yes, Sir.

22       PRESIDING COMMISSIONER WELCH:  Do you

23  solemnly swear or affirm that the testimony you

24  give today will be the whole truth and nothing but

25  the truth?

26       INMATE NGO:  Yes, I do, Sir.

27       PRESIDING COMMISSIONER WELCH:  Okay.  In

152

12

```
 1    that case what I'm going to do, Mr. Ngo, is just
 2    go to -- let me give this to my colleague, he can
 3    take a look at it and then I'll take a look at it
 4    later.  Are your parole plans in that brief you
 5    submitted?
 6            INMATE NGO:  Yes, Sir.
 7            PRESIDING COMMISSIONER WELCH:  You've got
 8    everything in it, okay.
 9            INMATE NGO:  Parole plan, place for
10    residence, employment, support letters.
11            PRESIDING COMMISSIONER WELCH:  Okay, very
12    good.  Let's go to the summary of the crime, it
13    say,
14            "On 9-18, 1992 Angel Gonzalez,
15            G-O-N-Z-A-L-E-Z, was beaten and shot
16            to death near Fullerton,
17            F-U-L-L-E-R-T-O-N, High School as he
18            walked home after school.  An
19            investigation revealed that earlier
20            in the day the victim, a member of
21            the Fullerton Tokers, T-O-K-E-R-S,
22            Town, a Latin gang, and  members of
23            the Fullerton Boys, an Asian gang,
24            were at a McDonald's Restaurant near
25            the high school.  The victim and
26            Usumang Muhamed had a confrontation
27            with each claiming their respective
```

153

13

1        gang affiliations.  After a

2        nonphysical altercation, a group of

3        Asians, which at the time included

4        Sieu Phong Ngo obtained -- and middle

5        name is spelled P-H-O-N-G, referring

6        to the prisoner, obtained a firearm.

7        Ngo and the Asian gang members

8        returned to the school where they

9        waited for Gonzalez.  As he walked

10       home, he was attacked and beaten.

11       During the physical altercation, the

12       victim was shot one time in the back

13       by Usumang, that's U-S-U-M-A-N-G,

14       Muhamed, M-U-H-A-M-E-D.  The group of

15       five Asian gang members including Ngo

16       fled the area after shooting Angel

17       Gonzalez who died at the scene as a

18       result of the gunshot wound.  Ngo,

19       Jimmy Bao, B-A-O, and Asat, A-S-A-T,

20       Cham, C-H-A-M, --"

21  or is that Ham?  C-H-A?

22       **INMATE NGO:**  Cham.

23       **PRESIDING COMMISSIONER WELCH:**  "-- Cham,

24  C-H-A-M, fled to the State of Washington.  They

25  were subsequently apprehended there and the murder

26  weapon, a stolen .22 caliber handgun, was

27  recovered in the vehicle."  Now we'll go to the

154

14

1    prisoner's version,

2            "Ngo explained that earlier in the

3            day his group had a confrontation

4            with the victim.  Subsequently he and

5            his group went to an arcade to play

6            games.  At that time his companion

7            took possession of a weapon.  Ngo

8            stated that he did not see the gun

9            until he was in the vehicle.  It was

10           located under the passenger's seat

11           and he and his companion returned to

12           Fullerton High School where they

13           parked and went to look for Gonzalez,

14           the victim.  Ngo explained that they

15           had a gun for protection in case

16           someone else happened to have a

17           weapon.  They found Gonzalez and his

18           group and started fighting with the

19           victim.  During the fighting Ngo

20           heard two shots.  Ngo explained that

21           no one intended to kill the victim,

22           they just planned to beat him up

23           because the victim had told them to

24           get out of town and that made Muhamed

25           angry.  Ngo realized that his

26           behavior was a mistake.  Ngo drove

27           his two companions to Washington

155

15

```
 1              because Muhamed told him that he knew
 2              someone who would give them shelter.
 3              Ngo feels sorry for the victim's
 4              family."
 5   Juvenile record, there's no juvenile arrest.  Will
 6   you be talking about your juvenile record, I mean,
 7   your criminal history?
 8              INMATE NGO:  I have no juvenile record.  I
 9   have one drug diversion with a controlled
10   substance.  I was given a diversion but I was
11   never able to complete it --
12              PRESIDING COMMISSIONER WELCH:  Okay.
13              INMATE NGO:  -- because I got this case,
14   that's about it.
15              PRESIDING COMMISSIONER WELCH:  It says, no
16   juvenile record as previously noted.  On 3-30,
17   1992 Ngo was arrested by the San Gabriel Police
18   Department for possession of controlled substance,
19   three pieces of rock cocaine.  On 5-7-92 he was
20   diverted pursuant to Penal Code section --
21   pursuant to section 1000 of the Penal Code.  On
22   9-22, 1992, Ngo was arrested by the Olympic
23   Sheriff for possession of stolen property.  This
24   case was subsequently dismissed.  So you had two
25   arrests?
26              INMATE NGO:  Yes, because we were arrested
27   in Washington.
```

156

16

1       PRESIDING COMMISSIONER WELCH:  Okay.

2       INMATE NGO:  I guess you can consider it as

3   two, for the same crime.

4       PRESIDING COMMISSIONER WELCH:  Well, it says

5   you was arrested for stolen property and that was

6   dismissed.

7       INMATE NGO:  They say the gun -- I sold the

8   gun but I never lived in Washington so they note

9   there was a (indiscernible) chance I stole the gun

10  when he brought it to California, so.  I didn't

11  know nothing about the gun.  I just drove there

12  for shelter like I said.  I didn't know nothing

13  about the stolen property.

14      PRESIDING COMMISSIONER WELCH:  All right,

15  now we have the explanation on the record.

16  Personal factors, Ngo was born in Vietnam on 5-18,

17  1973.  He resided in the United States until 1979.

18  In 19 -- He resided in the United States since

19  1979.  In 1991 he graduated from Fullerton High

20  School and subsequently attended Fullerton

21  Community College and Pasadena City College.  He

22  completed 10 units and his major was business.

23  Ngo was employed as a telemarketing and worked odd

24  jobs.  He was employed at his family's liquor

25  store and resided with his parents.  Ngo had

26  problems with -- Ngo had problems with controlled

27  substance or alcohol.  Is that true?

157

17

1    INMATE NGO:  I don't have no problem with

2    drugs at this point.  I never drank alcohol

3    because I'm allergic to alcohol.  I tried cocaine

4    and I got busted.

5        PRESIDING COMMISSIONER WELCH:  Okay.

6        INMATE NGO:  I have never used since, since

7    that day.

8        PRESIDING COMMISSIONER WELCH:  Have you used

9    any -- used any other illegal substances?

10        INMATE NGO:  No, I don't, Sir.

11        PRESIDING COMMISSIONER WELCH:  Okay.  It

12    says you were a member of the Fullerton Boys, is

13    that correct, gang?

14        INMATE NGO:  Used to be.

15        PRESIDING COMMISSIONER WELCH:  Okay.  And

16    after you moved to Los Angeles you became

17    affiliated with the Tiger Mafia.

18        INMATE NGO:  Yeah, that was just a made up

19    name (inaudible) at that point.

20        PRESIDING COMMISSIONER WELCH:  What?

21        INMATE NGO:  It was a made up name, like I

22    told my last hearing that it was just to throw the

23    detective off my trail.

24        PRESIDING COMMISSIONER WELCH:  To throw the

25    detective off your trail, okay, all right.  Your

26    family, do you have any brothers and sisters?

27        INMATE NGO:  Yes, I do, Sir.

158

18

1      PRESIDING COMMISSIONER WELCH:  How many?

2      INMATE NGO:  I've got one older brother, two

3  older sisters, one younger brother, and one

4  younger sister.

5      PRESIDING COMMISSIONER WELCH:  Okay, any of

6  your brothers have problems with law enforcement

7  agents?

8      INMATE NGO:  No.

9      PRESIDING COMMISSIONER WELCH:  Any of your

10 brothers been members of gangs?

11     INMATE NGO:  No.

12     PRESIDING COMMISSIONER WELCH:  Did you grow

13 up in an intact home with both parents?

14     INMATE NGO:  Yes, I did, Sir.

15     PRESIDING COMMISSIONER WELCH:  Would you say

16 you had a stable home environment?

17     INMATE NGO:  Yes, I have.

18     PRESIDING COMMISSIONER WELCH:  Were you

19 married before you came to prison?

20     INMATE NGO:  No, Sir.

21     PRESIDING COMMISSIONER WELCH:  Any childrens

22 before you came to prison?

23     INMATE NGO:  No, Sir.

24     PRESIDING COMMISSIONER WELCH:  Did you ever

25 serve in any branch of the military?

26     INMATE NGO:  No.  I tried it but they didn't

27 want me because I was a smoker back then.

159

19

1        PRESIDING COMMISSIONER WELCH:  Because you

2   were smoker of what?

3        INMATE NGO:  Cigarettes, tobacco.

4        PRESIDING COMMISSIONER WELCH:  And the

5   military turned you down because you smoked

6   tobacco?

7        INMATE NGO:  Yes.

8        PRESIDING COMMISSIONER WELCH:  What year was

9   that?

10        INMATE NGO:  I think I tried it during --

11   after my graduation in South Pasadena and before

12   my graduation it was '89 or '90 I tried, I wanted

13   to go to the Marines because I heard they can

14   travel around the world.

15        PRESIDING COMMISSIONER WELCH:  And they

16   turned you down because you smoke?

17        INMATE NGO:  Yes.

18        PRESIDING COMMISSIONER WELCH:  That's a new

19   one on me.

20        INMATE NGO:  That's what they said.

21        PRESIDING COMMISSIONER WELCH:  Okay, depends

22   on what you smoke.  What did you smoke?  What did

23   you tell them you smoked?

24        INMATE NGO:  Tobacco.

25        PRESIDING COMMISSIONER WELCH:  Okay, just

26   tobacco, huh?

27        INMATE NGO:  Just tobacco.

160

20

1          PRESIDING COMMISSIONER WELCH:  All right.

2     It says you had -- and we already talked about you

3     said you had odd jobs, fast-food and you worked in

4     your family's liquor store, is that correct?

5          INMATE NGO:  Yes, Sir.

6          PRESIDING COMMISSIONER WELCH:  Is that

7     pretty much your employment history?

8          INMATE NGO:  Yes.

9          PRESIDING COMMISSIONER WELCH:  Okay, what

10    I'd like for you to do now is give your attention

11    to my colleague, he's going to talk to you about

12    post-conviction.  I'll come back and talk to you

13    about your parole plans.

14         INMATE NGO:  All right, Sir.

15         DEPUTY COMMISSIONER MEJIA:  All right, Mr.

16    Ngo, I'll be covering your institutional

17    adjustment in this portion of this hearing since

18    your last Board appearance.  I have reviewed your

19    Central File, Board reports and psychiatric

20    reports.  If I miss anything, I'll be giving you

21    and your attorney an opportunity to make comments

22    at the end of my presentation.  Your last Board

23    appearance was on May 13th, 2002 where you received

24    a two-year denial.  Your recommendation was for

25    you to remain disciplinary free, upgrade

26    educationally, participate in self-help and

27    therapy.  Classification score is 19, custody

161

21

```
 1   level is medium A, you're assigned to the culinary
 2   warehouse, correct?
 3         INMATE NGO:  Correct, Sir.
 4         DEPUTY COMMISSIONER MEJIA:  And I see some
 5   laudatory chronos here about your performance.
 6   Vocational history, you have an auto upholstery
 7   completion, an auto finishing completion.  You
 8   also have a forklift certification.
 9         INMATE NGO:  Correct, Sir.
10         DEPUTY COMMISSIONER MEJIA:  And I see that
11   you're taking classes (inaudible) with the
12   Coastline Community College.
13         INMATE NGO:  Correct, Sir.
14         DEPUTY COMMISSIONER MEJIA:  When did you
15   start this?
16         INMATE NGO:  A little over -- about two
17   years now.
18         DEPUTY COMMISSIONER MEJIA:  Two years.  How
19   many years have you completed so far?
20         INMATE NGO:  So far completed -- at this --
21   this class I'm taking health right now.  Currently
22   I have 23.
23         DEPUTY COMMISSIONER MEJIA:  Twenty-three
24   units.
25         INMATE NGO:  I will have 23 units.
26         DEPUTY COMMISSIONER MEJIA:  Forklift.  Do
27   you have a high school?
```

102

22

1          INMATE NGO:  Yes, I do.

2          DEPUTY COMMISSIONER MEJIA:  Where did you

3    complete your high school at?

4          INMATE NGO:  Fullerton Union High.

5          DEPUTY COMMISSIONER MEJIA:  Fullerton Union

6    High.  Do you have a copy of the diploma?

7          INMATE NGO:  I should, yes.

8          DEPUTY COMMISSIONER MEJIA:  Can I see it,

9    please?  I couldn't find it in here.

10          INMATE NGO:  It should be in my file.

11          DEPUTY COMMISSIONER MEJIA:  If I thought --

12    If it was here I wouldn't ask for it.  Maybe I'm

13    just missing it but I don't want to spend time

14    looking for it.

15          INMATE NGO:  Unless I didn't put it in

16    there.

17          DEPUTY COMMISSIONER MEJIA:  It's not in your

18    --

19          INMATE NGO:  It's not in my C-File either?

20          DEPUTY COMMISSIONER MEJIA:  It's not in your

21    --

22          INMATE NGO:  I guess I didn't put it in

23    there.  I figured the C-File had it, but I can

24    always get you a copy if you need one.

25          DEPUTY COMMISSIONER MEJIA:  Okay.  What year

26    did you graduate there?

27          INMATE NGO:  '91.

163

23

1          **DEPUTY COMMISSIONER MEJIA:**  1991?

2          **INMATE NGO:**  It was '91, yes.

3          **DEPUTY COMMISSIONER MEJIA:**  Okay, and since

4    your last Board appearance in 2002 you were -- I

5    see that you have started in AA since 1997 and

6    then you switched to NA 2001 (inaudible)?

7          **INMATE NGO:**  I've been going, yes.

8          **DEPUTY COMMISSIONER MEJIA:**  The last chrono

9    was on --

10          **INMATE NGO:**  It should be -- my last chrono

11   was 7-8-04 date of it.

12          **DEPUTY COMMISSIONER MEJIA:**  Okay, 7-8-04 is

13   your NA participation.

14          **INMATE NGO:**  My most recent one.

15          **DEPUTY COMMISSIONER MEJIA:**  Yes, and the one

16   I have here on file is 2003 of March.  Okay, you

17   also completed the IMPACT program in 2002

18   workshop?

19          **INMATE NGO:**  Right.

20          **DEPUTY COMMISSIONER MEJIA:**  3-16, 2002.

21   There's a chrono from Mr. Vazquez, warehouse

22   supervisor, as a culinary storekeeper.  You have

23   performed your assignment with excellence.  You

24   have a good, helpful, mature attitude and has

25   worked even on holidays.  On disciplinaries, you

26   have zero 115s and two 128(a)'s from -- one on

27   April '97 and one on 2000 -- in 2000.  (Inaudible)

164

24

1    gang affiliation noted (inaudible) Tiger Mafia

2    member.  And when was the last time you were

3    hanging out with the Tiger Mafia as a member?

4        INMATE NGO:  Well, there is no Tiger Mafia,

5    as I was saying earlier, it's just a made up name,

6    so I don't have -- you know, there's no more gang

7    for me.  I've grown out of it.  Back then it was

8    just a --

9        DEPUTY COMMISSIONER MEJIA:  So was that the

10   Fullerton?

11       INMATE NGO:  Fullerton, yes.

12       DEPUTY COMMISSIONER MEJIA:  What was that,

13   Fullerton --

14       INMATE NGO:  Fullerton Boys, they call it

15   Fullerton Boys.

16       DEPUTY COMMISSIONER MEJIA:  Fullerton Boys

17   named as the Tiger Mafia?  Are you talking about

18   the same place?

19       INMATE NGO:  No, it's two different places,

20   LA right, I was living at LA at that time so, you

21   know, when they asked me where I was from, I told

22   them Tiger Mafia because they saw two initials on

23   my arm with TM so I just told them Tiger Mafia

24   just to make it up.

25       DEPUTY COMMISSIONER MEJIA:  So was there

26   really a Tiger Mafia gang?

27       INMATE NGO:  No, there's not.  You can check

105

25

```
 1    into LA Police Department, you will not find no
 2    Tiger Mafia at all.
 3         DEPUTY COMMISSIONER MEJIA:  Well, I'm going
 4    to your psych report.  Your psych report is dated
 5    January 21, 2002 by Dr. Saindon, spelling
 6    S-A-I-N-D-O-N.  We're going to look at your
 7    substance abuse history, we have heard that you
 8    said that you tried cocaine.  "Previous mental
 9    health evaluation for the Board of Prison Terms
10    has recommended that he be involved in AA and NA.
11    However, inmate feels that he never really had a
12    drug or alcohol problem although he does currently
13    attend AA."  And you are attending NA right now,
14    right?
15         INMATE NGO:  Right.
16         DEPUTY COMMISSIONER MEJIA:  Okay.  And his
17    mental health status at this time of the
18    evaluation 2002 indicates that,
19              "There's no evidence of mood or
20              thought disorder, his judgment
21              appeared to be sound, showed
22              significant insight into his
23              commitment offense as far as some
24              recognition.  There's no guarantee
25              that he will be paroled at this time
26              by the Board of Prison Terms."
27    Diagnostic impressions, No Contributory Clinical
```

166.

26

1    Disorder, Axis I.  Axis II Deferred, Axis III No

2    Contributory Physical Disorder, Axis IV Long-Term

3    Incarceration, Axis V Global Assessment of

4    Functioning of 90.  There's no evidence that he

5    suffers from any psychiatric illness.  Assessment

6    of dangerousness, "Although --" he says,

7           "There's no evidence the inmate

8           currently suffers from any

9           psychiatric illness although he does

10          recognize that (inaudible) he was

11          vulnerable to depression and was

12          tempted by conscious altering

13          substances.  In consideration of the

14          fact that he has received no 115s

15          through his entire incarceration, it

16          would appear that he has at least in

17          this controlled setting been able to

18          manage his behavior and remain

19          incident free."

20   Assessment of dangerousness,

21          "Mr. Ngo (inaudible) with the

22          information given in the Central File

23          and medical record with respect to

24          his prior history of (inaudible) or

25          attempt to use cocaine and was

26          affiliated with gangs, this resulted

27          in his current offense.  Based upon

107

27

1     his complete lack of disciplinary

2     action while incarcerated, his

3     insight into negative aspects of gang

4     involvement, his remorse for his

5     actions, his violence potential

6     within a controlled is to be below

7     average relative to the level II

8     inmate population.  If released to

9     the community, his violence potential

10    is estimated to be less than the

11    average citizen in the community

12    given his insight, his demonstrated

13    ability to stay out of trouble, his

14    successful development of plans upon

15    release, and the support of his

16    family.  (Inaudible) the most

17    significant risk factor for this

18    inmate as a precursor to violence or

19    a return to criminal behavior would

20    be his being involved with others

21    having a criminal history and/or gang

22    members, the use of alcohol and

23    drugs, and isolation from his family

24    members.  As this man has spent 10

25    years in prison, I would recommend,

26    should he be paroled, abstinence from

27    all alcohol and use of uncontrolled

108

28

```
1              substance, frequent monitoring of
2              substance abuse, if at all possible
3              should be a relative so he's near to
4              his family, and should make frequent
5              reports to his parole officer.  Given
6              his family's commitment in supporting
7              him upon his release, his projected
8              level of success in the community if
9              granted a date for parole is seen at
10             this time to be better than average."
11   His counselor based him as posing a low degree of
12   threat to the community if released.  Have you got
13   any comments or any additions to my presentation,
14   Counsel?
15             INMATE NGO:  Do you have any of my support
16   letters from my family because --
17             DEPUTY COMMISSIONER MEJIA:  That will be
18   done by --
19             INMATE NGO:  Okay.
20             DEPUTY COMMISSIONER MEJIA:  Any additional
21   comments?
22             PRESIDING COMMISSIONER WELCH:  Are you done?
23             DEPUTY COMMISSIONER MEJIA:  Yeah.
24             PRESIDING COMMISSIONER WELCH:  Okay.
25             DEPUTY COMMISSIONER MEJIA:  I'll go back to
26   the Chair and we'll take a recess.
27             PRESIDING COMMISSIONER WELCH:  Okay, we'll
```

169

29

1    take a recess for a minute.

2                    [Off the record.]

3        PRESIDING COMMISSIONER WELCH:  Mr. Ngo, in

4    case --

5        DEPUTY COMMISSIONER MEJIA:  We're back on

6    record.

7        PRESIDING COMMISSIONER WELCH:  Mr. Ngo, in

8    case you receive a parole date, tell the Panel

9    where you plan to live.

10       INMATE NGO:  I'll be living with my mom to

11   start off.

12       PRESIDING COMMISSIONER WELCH:  Where does

13   your mom live?

14       INMATE NGO:  In Monterey Park.

15       PRESIDING COMMISSIONER WELCH:  Do you have

16   an INS hold?

17       INMATE NGO:  No, Sir.

18       PRESIDING COMMISSIONER WELCH:  Are you a US

19   citizen?

20       INMATE NGO:  Yes, Sir.

21       PRESIDING COMMISSIONER WELCH:  Okay, and how

22   do you plan to support yourself?

23       INMATE NGO:  I'll be working at my uncle's

24   restaurant for now, (inaudible) chef.

25       PRESIDING COMMISSIONER WELCH:  Okay, and you

26   have lots of support letters in the file and your

27   affidavit that you submitted.  And it appears that

170

30

1  you do have employment and you have a place to

2  live.  I'll start off by going over some of your

3  letters.  Your mom wrote you a letter, her name is

4  Ngo Phuong?  Phuong Huynh?

5          **INMATE NGO:**  Phuong Huynh.

6          **PRESIDING COMMISSIONER WELCH:**  Phuong Huynh,

7  okay, let me just spell the first name, the first

8  name is spelled P-H-U-O-N-G, and the middle name

9  is H-Y -- H-U-Y-N-H, and the last name is the same

10  as the prisoner's, N-G-O.  Anyway, she writes you

11  a very supportive letter.  She says,

12          "As the birth mother of Sieu Ngo, I

13          am writing to request for your

14          leniency and kind review of the

15          parole of Sieu Ngo.  Years ago our

16          family immigrated into the United

17          States from Vietnam.  With the kind

18          support from the US Government and

19          local communities, we settled down in

20          California and became US citizens in

21          1979.  All of our family members are

22          deeply indebted to our government and

23          community and we are determined to

24          serve our country when called for.

25          In fact, my children volunteer at

26          school and communities and help out

27          kids.  I have six children, some are

171

31

```
1              college graduates and are doing very
2              well in their careers, such as Chi
3              Phong Ngo, middle name is -- I mean,
4              first name is C-H-I, middle name is
5              P-H-O-N-G.  My son is a quality
6              assurance software engineer.  Judy
7              Seeto --" Seeto?
8         INMATE NGO:  Correct.
9         PRESIDING COMMISSIONER WELCH:
10             "--S-E-E-T-O, my daughter, is
11             pursuing a college degree while
12             working full-time at Pacific Care.
13             And Lan Lau, L-A-N, last name is
14             L-A-U, another daughter, is an
15             assistant technician working at DG --
16             DCG Group Pacific Bell, SPG
17             (inaudible) Solutions Incorporated.
18             My husband was running a paint
19             business.  Unfortunately he passed
20             away in 1995 at the age of 47.  Some
21             of my uncles and aunts are business
22             owners of restaurants and stores.   I
23             used to run a family business too, a
24             convenience store."
25    And she says,
26             "Sieu Ngo have been working and
27             studying hard in prison and doing
```

172

32

1         well in his college studies.  Please

2         be assured that Sieu Ngo, if paroled,

3         will be well taken care of and

4         supervised by his family, relatives,

5         and friends.  We, his immediate

6         family members, will support him in

7         every aspect of life.  We plan to let

8         him complete his college studies

9         before entering the workforce.  We

10        are financially capable and

11        emotionally prepared and spiritually

12        determined to help Sieu Ngo and his

13        endeavors to create his reborn life

14        and become a contributing member to

15        our society.  Thank you in

16        anticipation of your kind review in

17        granting Sieu Ngo parole."

18   And your mother signed that.  Very supportive.

19   And another one from Gavin Ung.  Is that U-N-G?

20        **INMATE NGO:**  Yes, my uncle.

21        **PRESIDING COMMISSIONER WELCH:**  He says,

22        "I am in the Chinese restaurant

23        business and currently employ about

24        20 workers.  Sieu, if released from

25        prison, he will also be welcomed to

26        work for me if he so chooses.

27        Besides me willing to provide him

173

1         with accommodation, transportation,

2         and job, I believe there are a lot of

3         other relatives such as his mom,

4         siblings, uncles, and aunts who are

5         willing -- who will always be more

6         than willing to help with all his

7         essential daily needs."

8  Okay, and I have another one from Chi Ngo/Judy Ngo

9  -- slash Judy Ngo, and she writes -- she's writing

10  on behalf of her brother. She feels that you're a

11  good man and, "Tom is a good man and will remain

12  so.  He's a caring person who wants to take care

13  of his mother if he gets a second chance.  My wife

14  and I can fully support him financially and care

15  for all his personal needs including housing. I

16  believe Tom --" Do you also go by the name of Tom?

17      **INMATE NGO:**  Yes, that's my middle name.

18      **PRESIDING COMMISSIONER WELCH:**  Okay.  "I

19  believe Tom -- I believe in Tom and only good will

20  shine from him as each day passes."  Another

21  letter here from --

22      **INMATE NGO:**  Thanah.

23      **PRESIDING COMMISSIONER WELCH:**  T-H-A-N-A-H,

24  he writes you a very supportive letter.

25      **INMATE NGO:**  She.

26      **PRESIDING COMMISSIONER WELCH:**  She, okay,

27  your older sister I'm trying to say.

174

34

1          INMATE NGO:  Second oldest.

2          PRESIDING COMMISSIONER WELCH:  Second oldest

3    sister.  And she says,

4               "As you can see he's just the kind of

5               person and always there for anyone

6               who needs help.  Because of his

7               caring and kind personality, he has

8               done some harm to himself, this is

9               how he got himself into this mess.

10              I'm sure that the whole mess has

11              taught my brother to beware of his

12              friends.  Sieu's decision to hang out

13              with his friends was a costly one.

14              My brother was a young naïve.  Now

15              he's a grownup person and realizes

16              his actions and takes responsibility

17              to make changes to become a better

18              person."

19   And she goes on to say, "Our family have already

20   arranged for his support once he's released, my

21   husband's store," and she writes the telephone

22   number, "and is located on (indiscernible) Avenue

23   and Alhambra.  And a matter of fact his uncle --

24   his aunts and uncle also offered him work in their

25   restaurant.  The store name is Hot Wok --"

26          INMATE NGO:  Hot Wok.

27          PRESIDING COMMISSIONER WELCH:  That's H-O-T

175

35

1   W-O-K, "-- and that's in Fullerton.  And there's a

2   First (inaudible) Kitchen that's in Anaheim.

3   Housing would not be a problem.  And we all make

4   arrangements for him."  So Duc Ngo?

5          **INMATE NGO:**  Duc Ngo.

6          **PRESIDING COMMISSIONER WELCH:**  D-U-C Ngo.

7   Anyway, that's your brother, says, "I'm writing a

8   letter in support of my brother."  He writes you a

9   very supportive letter and he pretty much voices

10  the same thing that the other ones wrote.  I have

11  another letter here from your defense attorney at

12  the time and I'll read his letter.  He says, "I

13  represented --" her letter I should say,

14          "I represented Mr. Ngo in the case

15          which sent him to prison.  I have

16          been a criminal defense attorney for

17          over 26 years and have represented

18          over 40 persons accused of homicides.

19          I do not see my clients through rose

20          colored glasses and have never

21          written a letter like this on behalf

22          of an inmate for a parole hearing.

23          The circumstances of Mr. Sieu's case

24          compel me to make a statement in this

25          instant.  At the time of the incident

26          he was a very likable young man and

27          with no significant criminal history.

176

36

```
 1        My recollection, he had no conviction
 2        of any crime or violence.  The
 3        incident in question was very
 4        different from the typical gang case
 5        and in fact a work sketching for your
 6        review, Sieu and his friends was a
 7        wannabe type group who did not really
 8        have a significant history of tough
 9        turf in Orange County as a gang.  On
10        the day of the incident, some of
11        Sieu's friends by chance went to
12        McDonald's which was near Fullerton
13        High School in North Orange County.
14        Sieu was not present at the time.
15        One of Sieu's ultimate codefendants
16        got in a staring match with the
17        decedent and some of his friends who
18        were members of the Toker Gang --
19        Toker Town, a long established
20        Hispanic group in Fullerton.
21        Essentially the Toker, that's spelled
22        T-O-K-E-R T-O-W-N -- Essentially the
23        Toker Town Group told Sieu's friends
24        that they, Cooks, that's C-O-O-K-S,
25        were not welcome in Fullerton where
26        some of them already live and they
27        should get out of town.  (Inaudible)
```

177

37

```
 1        Sieu's friends decided to confront
 2        the decedent's group after school got
 3        out that day.  Sieu was called to
 4        help out in case they were
 5        outnumbered.  Their group waited at
 6        the school and confronted the
 7        decedent and one of his friends about
 8        two blocks out of Fullerton High
 9        School, not on school grounds.  From
10        all appearances, this was intended to
11        be a fistfight.  Sieu and his friends
12        who had been in the stare-down
13        approached the decedent and a friend
14        who was walking on the sidewalk and a
15        fistfight is how it started.
16        However, the decedent's friend fled
17        just after the punching began and
18        left Sieu and his friend fighting the
19        decedent who was much larger than
20        either of them.  Of course this was
21        unfair but nothing at this point
22        suggested that this was intended to
23        be a homicide.  A third member of
24        Sieu's -- A third member of the group
25        who was part of -- A third member of
26        the group who was part of (inaudible)
27        from where their car was parked to
```

178.

38

1    the scene of the site, he reached up

2    while the fight was in progress, shot

3    the decedent, killed him, and

4    narrowly missed Sieu. Sieu and all

5    of his friends then fled, ultimately

6    being arrested out of state.

7    Evidence was received to show that

8    Sieu and his friends knew that a gun

9    was in a car. Based largely upon

10    that and the theory of foreseeable

11    consequences, he and all of his

12    codefendants were convicted. Sieu

13    was not the shooter and no evidence

14    to show that he suggested,

15    encouraged, abated -- or abetted the

16    shooting in any way. After the

17    shooting, Sieu angrily confronted the

18    shooter, demanded to know why he

19    brought out the gun and asserted that

20    he, Sieu, didn't know the gun was

21    going to be used. In summary, this

22    was not a drive-by or a similar gang

23    crime where everyone knew (inaudible)

24    should have known that death or

25    serious injury was intended. On the

26    contrary, this appears to be an

27    impulsive act by one member of the

179

39

```
 1              group which due to the rest of the
 2              circumstances swept them all up by
 3              way of the derivative liability --
 4              derivative liability,
 5              D-E-R-I-V-A-T-I-V-E.  I am not
 6              suggesting that Sieu and the other
 7              non-shooters bear no responsibility
 8              for the tragic outcome, but for the
 9              fight of course, no shooting would
10              have taken place.  However, I would
11              submit that the circumstances here
12              are significantly mitigated where --
13              when considered against other
14              convictions of this type.  Assuming
15              that Sieu's performance within the
16              Department of Corrections has been
17              positive, I would urge you to parole
18              at the earliest possible time."
19    Donald J. Rubright -- Donald G. Rubright, that's
20    R-U-B-R-I-G-H-T, Senior Deputy Public Defender,
21    Orange County.  Okay, and you have other letters
22    and some are duplicates and you have other family
23    members providing support.  And Raymond Seeto, the
24    brother-in-law, also writes you a supportive
25    letter and he notes that,
26              "Putting a roof over his head won't
27              be a problem.  He can stay with his
```

180