# EXHIBIT 3
# PART 3 OF 3

40

1        mother, brother, or sisters.  Tom has
2        a large extended family.  This is his
3        base of support.  Lastly, I beg the
4        Board to look at the facts
5        surrounding his conviction.  He was a
6        young -- He was young and naïve."
7   So you have lots of family support and you have
8   lots of job offers and you have people offering
9   you a place to live.  And most importantly you
10  have a letter from the Public Defender's Office
11  outlining the case and there's no reason to
12  dispute what he's saying is true and he wrote you
13  a very supportive letter.  And I have to say I
14  haven't seen too many letters from the Public
15  Defender's Office in support of parole.  And with
16  that we'll go to 3042 Notices.  We sent out
17  notices pursuant to Penal Code 3042.  We sent
18  those out to different agencies that would have an
19  interest in your case.  I do see a letter here
20  from the Orange County Deputy District Attorney's
21  Office and basically what it's saying is that the
22  District Attorney's Office will be attending the
23  life parole consideration hearing, and they have
24  their representative here and at the appropriate
25  time she'll have something to say about your
26  parole suitability.  Okay, with that we'll go to
27  questions.  Commissioner, do you have any

181

1   questions?

2       **DEPUTY COMMISSIONER MEJIA:**  Yes.  It looks

3   like you've been attending NA, AA, or self-help

4   since '97?

5       **INMATE NGO:**  I was attending mostly -- I was

6   attending both at the time but I dropped out of AA

7   because I feel that I don't need it because I

8   don't drink, I'm allergic to alcohol.  I never

9   drank.  And I think that I might -- you know,

10   because of my drug offense, I decided to go to NA

11   to better myself, to learn, so that's why I've

12   been attending NA.

13       **DEPUTY COMMISSIONER MEJIA:**  What have you

14   learned so far?

15       **INMATE NGO:**  To stay sober, to be a better

16   person.  Drugs can really harm a person, I mean,

17   change a person, even though you are guilty or

18   not, drugs can just alter your state of mind, you

19   can't function properly using drugs.

20       **DEPUTY COMMISSIONER MEJIA:**  Did they teach

21   the 12-Steps as well?

22       **INMATE NGO:**  Yes.

23       **DEPUTY COMMISSIONER MEJIA:**  Do you remember

24   what -- any of the 12-Steps?

25       **INMATE NGO:**  Yes, I remember all those.

26       **DEPUTY COMMISSIONER MEJIA:**  You remember all

27   of them.  Can you give me one?

182

42

1        INMATE NGO:   Which one?

2        DEPUTY COMMISSIONER MEJIA:   Whichever you

3   recall.

4        INMATE NGO:   Number one that I admitted to

5   God, to myself that (inaudible) drugs or alcohol,

6   that our lives will become unmanageable.   Two,

7   make a decision to turn our will and our lives

8   over to the care of God (inaudible) carry that

9   out.   Three, make decisions, turn our will and our

10  lives over to the care of God and (inaudible).

11  Four, made a searching fearless moral inventory

12  about ourselves.

13       DEPUTY COMMISSIONER MEJIA:   How old were you

14  when you were involved in this crime?

15       INMATE NGO:   I was 19.

16       DEPUTY COMMISSIONER MEJIA:   You were 19.

17  You are how old now?

18       INMATE NGO:   I'm 31.

19       DEPUTY COMMISSIONER MEJIA:   Let me just --

20       [Thereupon, the tape was turned over.]

21       DEPUTY COMMISSIONER MEJIA:   When did you get

22  involved with the gangs, you were 18 then, how old

23  were you when you started with the gang?

24       INMATE NGO:   Believe it or not -- gang is a

25  harsh word because like there was only like five

26  or six of us, you know, during that time.   We were

27  more friends because I (inaudible) know these

183

43

1    guys, I've been moved there for about a year, and

2    I hang around with them, you know.  So to me it's

3    more like a friend more than a gang but because we

4    live at Fullerton they call themselves Fullerton

5    Boys.

6         DEPUTY COMMISSIONER MEJIA:  How old were you

7    when you started hanging out with them?

8         INMATE NGO:  I think I was 16 or 17, Sir.

9         DEPUTY COMMISSIONER MEJIA:  So about two

10   years.

11        INMATE NGO:  Yeah, about two years.

12        DEPUTY COMMISSIONER MEJIA:  If you get

13   released to the streets, how are you going to get

14   away from the elements of the gang lifestyle?

15        INMATE NGO:  Knowing what a gang can do to a

16   person, I have confidence that I can stay away

17   from them, you know, because I learned from my

18   mistakes, that's how I've grown.  I know I can

19   deal with problems differently, you know, just

20   staying away, choose better friends, think before

21   I act, everything, what I've learned in here to be

22   a better person.

23        DEPUTY COMMISSIONER MEJIA:  No other

24   questions.

25        PRESIDING COMMISSIONER WELCH:  Okay, there's

26   one thing in your brief that a lot of it's clothed

27   in legal terminology, but there is one thing that

184

44

1   I think I will put on the record in your defense,

2   it's, "Considering the facts of my personal

3   culpability as established, it is clear that the

4   category --" well, that's not what I'm trying to

5   read.  Here it is, the next paragraph says,

6        "Since there are no words adequate

7        enough to express the sincerity of my

8        remorse of the acceptance of

9        responsibility for my past conduct

10       and behavior, I offer the following

11       actions, that I stipulate to the

12       aggravated term of 19 years in

13       accordance with 15CCR243 that I

14       stipulate to whatever other parole

15       conditions that the Board deems

16       necessary upon me."

17  Okay.  I was looking for something for your

18  remorse and I guess that's the closest thing I've

19  found there.  And under the facts of the crime,

20  starting off where you said, "The facts of the

21  crime shall be discussed with the prisoner to

22  assess determination, the extent of culpability,

23  the Board shall not require the admission --" we

24  already know that.  "Furthermore, I fully and

25  truly confess and accept the facts of my personal

26  culpability and responsibility for the life

27  crime."  Okay, anyway.  Commissioner, District

185

45

1  Attorney, do you have any questions?

2      DEPUTY DISTRICT ATTORNEY CONTINI:   Just very

3  briefly.   Could the Board ask the inmate, he

4  testified or stated that he made up the name Tiger

5  Mafia because he had TM tattooed on his shoulder.

6  What does TM stand for then?

7      INMATE NGO:  My ex-girlfriend's name,

8  Theresa May.

9      DEPUTY DISTRICT ATTORNEY CONTINI:   Could the

10  Board inquire of the inmate why he would make up

11  another gang affiliation and tell a police officer

12  that?

13      INMATE NGO:   Because at the time I just

14  wanted to throw off the investigator because when

15  I was arrested they knew I was from Fullerton so

16  just (inaudible) I didn't want to be associated

17  with them so I threw them off by making up a name.

18      DEPUTY DISTRICT ATTORNEY CONTINI:   Could the

19  Board inquire of the inmate when he and his crime

20  partners were arrested in the State of Washington,

21  he was arrested for possession of stolen property,

22  could the Board inquire of him whether or not he

23  was aware that was not only the murder weapon in

24  his life case but also a nine-millimeter

25  (inaudible) assault pistol that was in the car?

26      INMATE NGO:   Both of the weapons don't

27  belong to me, they belonged to my crime partner.

186

46

```
 1    I'd never been to the State of Washington until I

 2    drove there myself.  I'd never been out of the

 3    State of California, period, so --

 4         PRESIDING COMMISSIONER WELCH:  Did you

 5    understand the question?

 6         INMATE NGO:  She had stated why the weapon

 7    was in the car.

 8         PRESIDING COMMISSIONER WELCH:  She said were

 9    you aware.

10         INMATE NGO:  Of the gun, yes, I was, Sir.

11         PRESIDING COMMISSIONER WELCH:  The other

12    weapon?

13         INMATE NGO:  Yes.

14         PRESIDING COMMISSIONER WELCH:  Okay.

15    District Attorney.

16         DEPUTY DISTRICT ATTORNEY CONTINI:  Could the

17    Board inquire of the inmate, he drove his crime

18    partner and fellow gang members to the State of

19    Washington, correct?

20         INMATE NGO:  Yes, that's correct.

21         DEPUTY DISTRICT ATTORNEY CONTINI:  And could

22    the Board just finally inquire of the inmate, he

23    indicated he had the 11350 arrest for the drug, in

24    the probation report for this case, indicated that

25    he and some other individual had previously beaten

26    up Hispanic men at a school, is he familiar with

27    that case?
```

187

47

1    INMATE NGO:  I'm wondering (inaudible) that

2    was never brought up, I don't see what it has to

3    do with my case right now.  (Inaudible) a fight,

4    everybody was getting in a fight.  We were young

5    then.

6        PRESIDING COMMISSIONER WELCH:  Okay.

7        INMATE NGO:  That was, you know --

8        PRESIDING COMMISSIONER WELCH:  Let's backup.

9    District Attorney, would you re-ask the question.

10        DEPUTY DISTRICT ATTORNEY CONTINI:  Sure.

11    Would the Board inquire of the inmate, in his

12    probation report for this case, the victim by the

13    last name of Perez was interviewed regarding a

14    physical altercation at a school in which the

15    inmate began the physical altercation and then

16    three of the inmate's companions joined in kicking

17    and punching the victim Perez, alleged to have

18    happened December 14th, 1990.  Is he familiar with

19    that assault?

20        INMATE NGO:  Yes, I am familiar with it.  I

21    was never convicted on anything.  I was released.

22    What can I say?

23        PRESIDING COMMISSIONER WELCH:  Well, you can

24    tell her the circumstances.  I don't think any --

25        INMATE NGO:  Well,

26        PRESIDING COMMISSIONER WELCH:  --

27    (inaudible) what happened.

188

1      INMATE NGO:  For that fight I was going to

2    pick up my girlfriend at the school at that time.

3    She was in the agricultural or floral rearranging

4    class.  I went over there to pick her up and Mr.

5    Perez, I guess, at that -- you know, tell me, who

6    the hell are you, and then he started cussing me.

7    He don't even know who I am.  (Inaudible) what is

8    he doing, you know, what is his business.  So I

9    just left it at that and I left, and I was waiting

10    for my girlfriend at the parking lot and he came

11    out and started mad-dogging me.

12      PRESIDING COMMISSIONER WELCH:  What does

13    mad-dogging mean?

14      INMATE NGO:  It means staring me down and

15    then he asked me who the hell -- you know, F, what

16    are you looking at.  I said, what's your problem?

17    So he came over (inaudible) confronted so I just

18    socked him, you know.

19      PRESIDING COMMISSIONER WELCH:  You socked

20    him?

21      INMATE NGO:  Yes, because he wanted to fight

22    me for some reason so I just was trying to defend

23    myself so I socked him first and that's it.

24      PRESIDING COMMISSIONER WELCH:  Okay, all

25    right.  District Attorney.

26      DEPUTY DISTRICT ATTORNEY CONTINI:  Could the

27    Board just inquire of the inmate whether or not

189

49

1    his three companions that assaulted Mr. Perez on

2    that day were also Fullerton Boys gang members?

3            INMATE NGO:  No.

4            PRESIDING COMMISSIONER WELCH:  No?

5            INMATE NGO:  No, they weren't.

6            DEPUTY DISTRICT ATTORNEY CONTINI:  I don't

7    have anything further.

8            PRESIDING COMMISSIONER WELCH:  Okay.

9    Counselor, do you have any questions for your

10   client?

11           ATTORNEY SPOWART:  I have nothing.

12           PRESIDING COMMISSIONER WELCH:  Okay, Mr.

13   Ngo, at this time we go -- at this portion of the

14   hearing we go to closing.  We start off with the

15   District Attorney.  District Attorney, closing.

16           DEPUTY DISTRICT ATTORNEY CONTINI:  The

17   People of the State of California strongly oppose

18   any parole of Mr. Ngo at this time.  This case was

19   a cold-blooded murderer of a 15-year-old.  Yes,

20   rival gang member, but a 15-year-old when this

21   inmate was 19 years, two years out of high school.

22   He and his friends, after a mad-dogging incident,

23   lie in wait essentially waiting for this young man

24   to walk home from school.  In the inmate's version

25   of events to the Board previously, he indicated

26   that he didn't know that a gun was in the car and

27   that at the same breath he indicates that they had

190

50

1    the gun for protection.  Neither of those things

2    make any sense in the gang world, and when you are

3    waiting for an individual to assault them, it

4    seems ridiculous to say that you have the gun for

5    protection.  Moreover, Mr. -- the victim, the 15-

6    year-old, in the case was walking with another

7    friend when he was first engaged by this inmate

8    and one other person which shows that this inmate

9    was a leader in this attack.  There's five

10   individuals involved, he's one of the first ones

11   to go up and start beating the 15-year-old.  I

12   just want to touch briefly on Mr. Rubright's

13   letter, the public defender, because he indicates

14   in that letter that -- just give me one moment, he

15   indicates in that letter that this was a wannabe

16   gang and I just have a strong -- strongly disagree

17   with that.  This is a gang that had a loaded gun

18   that they used on this 15-year-old.  It's also a

19   gang that when they're arrested after fleeing to

20   the State of Washington, has the nine-millimeter

21   stolen gun, both of the guns stolen, both the .22

22   and the nine-millimeter.  In addition to that,

23   there's a level of sophistication involved in this

24   crime in that the suspects fled and they burn the

25   car that they were driving, and that's contained

26   in the record.  They burn the car that they were

27   driving before taking off to Washington and this

191

51

1    inmate is the one who drove them to Washington.

2    Finally, I would note that although this inmate's

3    criminal history, it was not extensive, he does

4    have the drug offense, and then two years before

5    the killing he has this incident where he and some

6    other fellows are beating up an individual, so

7    there is an escalation of violence in his

8    background there.  When he first was housed at the

9    Orange County Jail, he had three incidents in the

10   Orange County Jail which were noted in his

11   probation report, the last was the mutual combat.

12   He's obviously done well in the last few years

13   here, but he does have a couple of -- I believe I

14   saw a couple of 128s in his record, so we're

15   talking 12 years since this incident occurred.

16   Based on the gang nature of it, basically a cold-

17   blooded execution of a 15-year-old boy, we would

18   strongly oppose a parole at this point.

19        **PRESIDING COMMISSIONER WELCH:**  Counselor,

20   closing.

21        **ATTORNEY SPOWART:**  If we look at Mr. Ngo's

22   entire history, he had no juvenile record.  He

23   came from a very good family, an excellent letter

24   from his mother, talking about her other children,

25   their accomplishments.  My client graduated from

26   high school.  He was attending Fullerton Community

27   College and then Pasadena City College.  He

52

1    completed 10 units.  In other words, he had a
2    stable social history.  He was in high school at
3    that time, various ethnic groups, Latinos, Asians,
4    and they would fight, and this happens.  He did
5    get in a fight once when he tried to pick up his
6    girl.  Now the DA says this shows an escalating
7    pattern.  Motivation for the crime was basically a
8    gang fight.  He was 19 then and he's 31 now.
9    Excellent parole plans which we've gone over, a
10   place to live, a place to work, good letters of
11   support.  Now, this is exactly what I was talking
12   about when I objected.  This is a murder second-
13   degree plea.  The DA comes up here today says
14   cold-blooded lying in wait.  If that was true then
15   the District Attorney's Office was grossly
16   inadequate in the prosecution of my client.  Why
17   wasn't he up for life without parole or the death
18   penalty?  Come on, give me a break, that is not
19   what happened.  He went with his friends, this big
20   gang, five guys, that he went over with and they
21   went over because one of them had gotten in
22   (inaudible) and they went over to have a fight, it
23   was clear.  As his trial attorney says, the fight
24   started and later on a guy comes up with a gun and
25   shoots the victim.  It wasn't my client.  He did
26   not have a gun.  He's never been violent.  If you
27   look at the Board report and he gives -- he says

193.

1    he would pose a low degree of threat to the public

2    at this time.  This opinion is based on Ngo being

3    immature at the time of the crime and easily

4    influenced by his peers.  The crime was episodic

5    in nature.  It wasn't planned, it wasn't cold-

6    blooded, it wasn't lying in wait, it was none of

7    those.  It was a pure simple these five guys got

8    in a fight.  My client was there, he didn't even

9    know they had the gun.  He wasn't living in

10   Fullerton at the time, he was living in Pasadena,

11   going to college.  His institutional adjustment

12   has been outstanding, two 128(a)'s in the entire

13   time he's been down.  No 115s.  Where is the

14   violence?  Where's the violence?  Where's the

15   escalating pattern?  There isn't any.  He

16   completed IMPACT Workshop program, and if you

17   notice they talk about the IMPACT program it

18   includes anger management, domestic violence, gang

19   violence, murder and sexual assault, it includes

20   all these things.  So he's had good therapy there.

21   He's been AA or NA the entire time he's been down.

22   He completed the course of Sexual Transmitted

23   Disease, has excellent work reports, completed the

24   Salesmanship and the Key to Fatherhood, completed

25   the forklift certification.  The Board report is

26   low.  Now let's look at the psych report, and

27   let's remember, the psych report is the expert

194

54

1  here, and this is low too.  The Commissioner read
2  it, based on his complete lack of disciplinary
3  actions while incarcerated, his insight into the
4  negative aspects of gang involvement, and his
5  remorse for his actions, he has expressed remorse,
6  and the psych takes that into consideration, his
7  violence potential within a controlled setting is
8  estimated to be below average relative to this
9  level inmate II population, which is low.  If
10  released to the community, his violence potential
11  is estimated to be less than, not average, but
12  less than the average citizen in the community.
13  And he talks about, given his insight, his
14  demonstrated ability to stay out of trouble, his
15  successful development of plans upon release and
16  the support of his family -- and I know -- look
17  again at his plans, he's very detailed.  This is a
18  serious young man.  He's very serious about
19  wanting to get out.  He has clearly worked to get
20  out.  He admits what he did.  You can't get away
21  from it, he was there, he participated.  It was a
22  fight and then there was a gun there.  He did not
23  do the shooting.  He had no reason to believe that
24  this other guy would shoot anybody, it happened.
25  The point is, we're here now when he's 31 years
26  old not 19.  He's been in Coastline Community
27  College, he's preparing himself to get out.  He's

195

55

1    paid for his crime.  For his part in that crime,

2    he has paid for it.  And he's stated, if you find

3    me suitable, give me the highest because I know I

4    shouldn't have been there and I shouldn't have

5    participated in this.  Board report low, psych

6    report below average here, less than average.  Do

7    you know what that means?  Look at anybody walking

8    downtown Fullerton or Pasadena, they're the

9    average Joes.  And he, the psych, the

10   professional, is saying my client is no more -- is

11   less dangerous than they are, less dangerous.  So

12   how now does he become an unreasonable risk of

13   danger to society.  I think not.  You know, I'm

14   surprised really, I know it's difficult to get a

15   date on your first initial hearing, but I'm

16   surprised that this man didn't get a date on his

17   initial hearing.  I think he should be found

18   suitable today and I'll submit it.

19        PRESIDING COMMISSIONER WELCH:  Okay, Mr.

20   Ngo, you can make a closing statement or you can

21   let your attorney's statement be  your closing

22   statement.

23        INMATE NGO:  I'd like to make a statement.

24   During my last initial hearing, previous hearing,

25   one of the Commissioners told me that I needed

26   time to understand the nature and circumstances of

27   my crime and my disregard for human life.  In my

196.

56

1   defense, I would say that it's part of telling the

2   truth because for the last 12 years I've had

3   nothing but time to think about my crime. It's

4   with me every day, it's a reminder every day.   I

5   know nothing I can say or do can bring back Mr.

6   Angel Gonzalez. I know I caused a lot of harm to

7   his family, anyone involved, but there's nothing I

8   can say or do at this point to ever change the

9   fact. You know, I know what I did, or lack of on

10  my part is, I could have maybe have stopped this

11  from happening if I was smart enough to act upon

12  it because I was young and naïve. I know that's

13  not an excuse, but looking back now I see what I

14  could have done if I'd have known better. I took

15  full complete responsibility for my action. I

16  can't take responsibility for others, only for

17  myself. I know I'm partly responsible that's why

18  I know I deserve to do some time, but I have done

19  my time. I have done everything you have asked me

20  to do, I've gone beyond my scope of

21  (indiscernible) to better myself. All I ask is

22  that you give me a fair chance, a second chance.

23  I know I have to prove to you that I can be a law-

24  abiding citizen, but if you should not find me

25  suitable at this time, I'd ask you, urge you, to

26  please specify what exactly I need to do in order

27  to be found suitable at my future hearings.

197

57.

1   That's all I ask of you.  Thank you.

2         **PRESIDING COMMISSIONER WELCH:**  Okay, thank

3   you very much for our comments.  We'll take a

4   recess.

5                       **R E C E S S**

6                       --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

58.

1      CALIFORNIA BOARD OF PRISON TERMS

2                D E C I S I O N

3          **DEPUTY COMMISSIONER MEJIA:**  Okay, we're back

4      on record for our decision.

5          **PRESIDING COMMISSIONER WELCH:**  Okay, Mr.

6      Ngo, we have a decision.  The Panel reviewed all

7      the information received from the public and

8      relied on the following circumstances in

9      concluding -- could you close the door, please, --

10     in concluding that the prisoner is not suitable

11     for parole and would pose an unreasonable risk of

12     danger to society or a threat to public safety.

13     One, this crime was carried out in an especially

14     cruel and callous manner.  Gang related violence

15     in a community is always cruel and callous

16     violence.  Actually there was multiple victims

17     attacked, one was killed, one ran away and was

18     able to escape.  The offense was carried out in a

19     dispassionate, it was a calculated manner.  The

20     victim was abused, he was beaten and then he was

21     shot.  The offense was carried out in a manner

22     that demonstrates an exceptionally callous

23     disregard for another human being.  The motive for

24     the crime was inexplicable or very trivial in

25     relationship to the offense.  Any gang-related

26     activity in our community is (inaudible) and

27     **SIEU NGO   J-07024   DECISION PAGE 1   8/3/04**

*199*

59

1    inexplicable type of behavior, it's the type of

2    behavior that certainly cannot be condoned in any

3    well-ordered society.  The conclusion was drawn

4    from the Statement of Facts wherein on 9-18-92

5    Angel Gonzalez who was beaten and shot to death

6    near Fullerton High School as he was walking away

7    -- as he was walking home.  The circumstances

8    surround this crime, apparently the prisoner and

9    some of his gang members had been at a McDonald's.

10   There was a stare down contest and apparently some

11   words was exchanged.  The prisoner and his crime

12   partners waited for the victim as he was walking

13   home and a fight ensued and he was shot and killed

14   with a .22 caliber handgun.  Mr. Angel Gonzalez,

15   aged 15, lost his life over a very, very trivial

16   matter, over a matter that really cheapens human

17   life, the gang related -- the gang mentality that

18   occurs in our cities.  The prisoner really did not

19   have an escalating pattern of criminal conduct.

20   He did have one contact with law enforcement

21   agency.  He has -- well, two contacts with law

22   enforcement agencies, one was for a controlled

23   substance and one was for stolen property

24   including the instant offense, so he did not have

25   a major record of criminal history or an

26   escalating pattern of violent type of behavior.

27   **SIEU NGO   J-07024   DECISION PAGE 2   8/3/04**

*200*

60

```
 1    Under unstable social history, other than the
 2    prisoner's gang activity or involvement in gang
 3    activity to whatever extent it was.  The Board
 4    have no reason to disbelieve the public defender
 5    who detailed from his perspective what had
 6    occurred, so it does not appear that the prisoner
 7    was heavily into gang activity, criminal type of
 8    behavior.  Also under unstable -- it appears that
 9    the prisoner did have a stable home environment,
10    the letters from the family are very impressive in
11    terms of the type of support he have in the
12    community.  The prisoner has programmed in an
13    acceptable manner.  Recent psychological report
14    shows that the prisoner is making progress, shows
15    that his level of dangerousness both in a
16    structured environment and non-structured
17    environment is reduced.  He's on the right track
18    and he is making progress.  Certainly from a
19    psychological perspective we feel that the
20    prisoner is making progress.  Dr. Zika is the one
21    that prepared this report.  However, we are going
22    to request a new psychological evaluation for the
23    prisoner's next hearing.  Under parole plans,
24    certainly the prisoner have parole plans, lots of
25    support in the community, job offers, residential
26    plan.  The Hearing Panel notes that in response to
27    SIEU NGO  J-07024  DECISION PAGE 3  8/3/04
```

201

1    Penal Code 3042 Notices, the Deputy District

2    Attorney from Orange County spoke in opposition.

3    The Panel makes the following findings:   The Panel

4    finds that the prisoner needs to continue to

5    participate in the kinds of programs that he's

6    participating in, to continue to make progress,

7    continue to participate to the extent that he will

8    be able to face, understand, and cope with

9    stressful situations in a nondestructive manner.

10   Until the Board feels that enough progress is

11   made, the prisoner continues to be unpredictable

12   thereby presents some amount of threat.   However,

13   there are some things that we certainly want to

14   commend him for.   The prisoner's disciplinary

15   behavior certainly is not -- is something that we

16   certainly want to give him some accolades for and

17   encourage him to continue in his self-help

18   programs that he's involved in, his educational

19   programs that he's involved in, all of those kinds

20   of things we think is very significant and we want

21   to continue to -- him to continue in that way.

22   However, those positive aspects at this time does

23   not outweigh the factors of unsuitability.   Now

24   your parole is going to be denied for one-year

25   this time and we encourage you to continue to

26   remain disciplinary free, continue to explore your

27   **SIEU NGO   J-07024   DECISION PAGE 4   8/3/04**

202

62

1    culpability in the crime, continue to participate

2    in self-help programs and other type of positive

3    kinds of programs, educational programs, as they

4    maybe available to you.  There again we want the

5    clinicians to look at your violence potential in

6    the free community when they complete the

7    psychological evaluation, whether there's a

8    significant problem with alcohol and drugs as it

9    relates to the commitment offense into which you

10   have -- and I think this is one area that we

11   certainly want them to take a look at, the extent

12   to which you have explored your commitment offense

13   and come to terms with the underlying causative

14   factors.  That concludes the reading of the

15   decision.  And personally I think you're making

16   progress, and you asked specifically what it is

17   that you need to do.  You need to continue to do

18   the things that you're doing, you need to continue

19   to participate in self-help programs, continue to

20   participate in educational programs, continue to

21   explore the crime that you were committed for and

22   develop greater insight into it.  And I think

23   you're on the right track.  I think you'll get a

24   parole date in the not too distant future.

25   Commissioner, comments?

26          **DEPUTY COMMISSIONER MEJIA:**  Good luck to

27   **SIEU NGO   J-07024   DECISION PAGE 5   8/3/04**

203

63

1    you.

2         INMATE NGO:  Thank you.

3         DEPUTY COMMISSIONER MEJIA:  Keep up the good

4    work.

5         PRESIDING COMMISSIONER WELCH:  Good luck to

6    you, Mr. Ngo.  That concludes the hearing at

7    approximately 1500 hours.

8                    --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED ONE YEAR

24    THIS DECISION WILL BE FINAL ON:_____DEC -1 2004_____.

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    SIEU NGO  J-07024  DECISION PAGE 6  8/3/04

*204*

64

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, WENDY THOMAS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 63, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY at SOLEDAD, CALIFORNIA in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of SIEU NGO, CDC No. J-07024, on AUGUST 3, 2004 and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated August 19, 2004 at Sacramento County, California.


_Wendy Thomas_____
Wendy Thomas
Transcriber
**CAPITOL ELECTRONIC REPORTING**

205

# EXHIBIT D

June 23, 2005

Board of Prison Terms
CTF Soledad
P.O. Box 686
Soledad, CA 93960

Re: Sieu Phong Ngo, CDC # J07024
    Parole Hearing

Dear Sirs:

I represented Mr. Ngo in the case which sent him to prison. I have been a criminal defense attorney for almost thirty years and have represented over 40 persons accused of homicide. I do not see my clients through rose colored glasses. However, the circumstances of Sieu's case are unusual enough that I feel compelled to make a statement on his behalf.

At the time I represented him, Sieu was a very likeable young man with a minor criminal record. To my recollection he had no convictions for any crimes of violence. The incident in question was very different from the typical "gang case" and the facts are worth sketching for your review.

Sieu and his friends were a "wanna be" type gang who did not really have a significant history or established turf in Orange County. On the day of the incident some of Sieu's friends, by chance, went to the McDonald's which was near Fullerton High School in northern Orange County. Sieu was not present at the time.
One of Sieu's friends got in a staring match with the decedent and some of his friends, who were members of "Tokertown," a long established Hispanic gang in Fullerton.

207

Essentially, the "Tokertown" group told Sieu's friends that they were not welcome in Fullerton (where some of them already lived) and they should get out of town.

Angered by this, Sieu's friends decided to confront the decedent's group after school got out that day. Sieu was called to help out in case they should be outnumbered. Their group waited after school and confronted the decedent and one of his friends about two blocks south of Fullerton High School (**not on school grounds**).

From all appearances this was intended to be a fist fight. Sieu, and the friend who'd been in the stare-down, approached the decedent and another young man who were walking on a sidewalk. A fist fight is how it started. However, the decedent's friend fled just after the punching began and that left Sieu and his friend fighting the decedent who was significantly larger than either of them. Of course, this was unfair, but nothing at this point suggested that this was intended to be a homicide.

While the fist fight was ongoing a third member of the group Sieu was part of ran forward to the scene While the fight was in still in progress he reached around Sieu and shot the decedent, killing him and narrowly missing Sieu. Sieu and his group then fled, ultimately being arrested out of state.

Evidence was received to show that Sieu and his friends knew that a gun was in the car. However there was no evidence to show that there was a plan to use it. Based upon the theory of foreseeable consequences, Sieu and several co-defendant's were convicted or pled guilty to murder. **Sieu was not the shooter and no evidence existed to show that he suggested, encouraged or aided or abetted the shooting in any way.**

After the shooting Sieu angrily confronted the shooter, demanding to know "why" he brought out the gun and asserting that he (Sieu) didn't know the gun was going to be used.

208

In summary, this was not a "drive by" or similar gang crime where everyone knew or legitimately should have known that death or serious bodily injury was intended.

On the contrary, this appeared to be an impulsive act by one member of the group which, due to the rest of the circumstances, swept them all up by way of derivative liability.

I am not suggesting that Sieu and the other non-shooters bear no responsibility for the tragic outcome. But for the fight, of course, no shooting would have taken place. However, I would submit that the circumstances here are significantly mitigated when considered against other convictions of this type.

Assuming that Sieu's performance within the department of corrections has been positive, I would urge his parole at the earliest possible time.

Sincerely,

Donald G. Rubright
Senior Deputy Public Defender
Orange County, Ca
(949) 249-5060

209

# EXHIBIT E

210

MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
APRIL 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JANUARY 23, 2002

This is the second mental health evaluation for the Board of
Prison Terms on inmate Sieu Phong Ngo, CDC# J-07024.  This
report is the product of a personal clinical interview of
the inmate, conducted on 01/23/02, as well as a review of
his Central file and medical record.  This clinical
interview and a review of all pertinent documents were for
the express purpose of preparing this report.  Prior to
today's interview, I had no previous contact with this
inmate.

## PSYCHOSOCIAL ASSESSMENT

I.   **IDENTIFYING INFORMATION:**

Inmate Ngo is a 28-year-old, single, Vietnamese male
who was born on 05/18/73.  He was born in Vietnam and
moved to the United States in 1979 with his family,
where they settled in Los Angeles.  He has multiple
tattoos on his arms, as well as scars from a suicide
attempt when he was 16.  He denies the use of any
nicknames or aliases.

II.  **DEVELOPMENTAL HISTORY:**

Inmate Ngo was born in Vietnam.  His family moved to
the United States in 1979.  They settled in Los
Angeles, where they remain to this day.  The inmate has
one older brother, two older sisters, one younger
brother, and one younger sister.  They were raised by
both parents.

His father died in 1996 while the inmate was
incarcerated, but the inmate reports that he is still
in contact with his siblings and his mother.

He denies any history of birth defects or abnormalities
of developmental milestones, a history of cruelty to

211

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE TWO

animals, a history of arson, any significant childhood
medical history, or a childhood history of physical or
sexual abuse as either a perpetrator or a victim.

III. <u>EDUCATIONAL HISTORY</u>:

Inmate Ngo graduated from high school and attended one
year of college, studying general education, prior to
his incarceration.  In high school, he relates that he
was in English as a Second Language classes for some
time.  Chinese is his primary language, although he
speaks very fluent English at this time.  He reported
that he had some reading problems, probably related to
English being his second language at the time.

Since his incarceration, he has been studying
vocational, self-paced, business courses.  He intends
to finish college.

IV. <u>FAMILY HISTORY</u>:

Inmate Ngo speaks of his family in largely positive
terms.  He states that he is the only one in his family
who has a criminal record.  There is no family history
of mental illness or criminality, other than his.  He
also denies a family history of alcohol or drug abuse.

V. <u>PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION</u>:

Inmate Ngo states that he is a heterosexual male.  He
denies any history of high-risk sexual behavior or
sexual aggression.

VI. <u>MARITAL HISTORY</u>:

Inmate Ngo has never been married and has no children.
He does have a female friend whom he corresponds with,
but who does not visit.  He did have a girlfriend prior
to his incarceration.  He reports normal sexual
relations.

VII. <u>MILITARY HISTORY</u>:

The inmate denies any history of military service.

212

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE THREE


VIII. EMPLOYMENT/INCOME HISTORY:

Inmate Ngo was quite young at the time of his commitment offense.  However, he had worked at odd jobs in the fast food industry.

Since his incarceration, he has been a clerk.  The works chronos in his Central file show that he has been a satisfactory worker in job attendance, quality and quantity.  He has learned a couple of job skills, both in cooking and in upholstery, which he intends to continue if granted parole.

IX.  SUBSTANCE ABUSE HISTORY:

Inmate Ngo readily acknowledges having tried cocaine once.  He reports that the first time he tried it, he was caught and ordered to attend a diversion class for drug addiction.  Previous mental health evaluations for the Board of Prison Terms have recommended that he be involved in Alcoholics Anonymous and Narcotics Anonymous.  However, the inmate feels that he never really had a drug or alcohol problem, although he does currently attend Alcoholics Anonymous.

X.  PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Ngo reports one incident of psychiatric illness, in which he states that when he was 16 years old, he tried to kill himself by cutting his arms.  He reports that his family life and personal problems felt overwhelming at the time.  He states that he has not suffered from depression or had any suicidal thoughts since that time.  He has had no contact with the mental health system since that time, either outside or inside of prison.

He denies any significant medical history, other than mentioned above.  He denies a history of serious accidents or head injuries, a history of suicidal behavior, or a history of seizures or other neurological conditions.  He is taking no medications.

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE FOUR


XI.  **PLANS IF GRANTED RELEASE:**

Inmate Ngo states that if he is paroled, he would be fully supported by his family, and would use the money he has earned as a clerk to start his own business, either in the upholstery or restaurant business.  He does acknowledge that he is determined not to have any gang affiliation.  He shows a good deal of insight into the negative aspects of gang involvement, which he regrets to this day.


### CLINICAL ASSESSMENT


XII. **CURRENT MENTAL STATUS/TREATMENT NEEDS:**

Inmate Ngo appears to be his stated age of 28.  He was appropriately dressed and groomed.  He was calm, cooperative, coherent and alert during the entire interview.  He was open in his conversation and emphasized throughout the interview his recognition that gang affiliation had only resulted in injury to himself and to those around him.  His mood was sober, but his range of affect was good.  His speech, flow of thought and affect all appeared to be within the normal range.  His intellectual functioning was estimated to be within the average range.  There was no evidence of a mood or thought disorder.  His judgment appeared to be sound.  He showed significant insight into his commitment offense, as well as some recognition that there is no guarantee he will be paroled at this time by the Board of Prison Terms.

**CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):**

AXIS I:     No Contributory Clinical Disorder.
AXIS II:    Deferred.
AXIS III:   No Contributory Physical Disorder.
AXIS IV:    Long-term incarceration.
AXIS V:     Global Assessment of Functioning (GAF) = 90.

There is no evidence that inmate Ngo currently suffers from any psychiatric illness, although he does recognize that in his early youth he was vulnerable to

214

NGO, SIEU PHONG
CDC NUMBER:   J-07024
BPT MENTAL HEALTH EVALUATION
PAGE FIVE

depression and was tempted by consciousness-altering
substances.  In consideration of the fact that he has
received no CDC-115 violations during his entire
incarceration, it would appear that he has, at least in
this controlled setting, been able to manage his
behavior and remain incident-free.

XIII. <u>REVIEW OF LIFE CRIME</u>:

According to inmate Ngo, his offense for which he was
convicted and sentenced to 16 years to life was P.C.
187-A, Second Degree Murder, with enhancement P.C.
12022, vicariously armed with a gun.

The inmate stated that he agreed with the version of
the crime given in his Central file, the verdict and
the sentencing.  However, he did state that no one
intended to kill the victim, and that their intent was
only to beat him up.  He had past prior offenses, which
included a two-year drug diversion, as referred to
earlier in this report.  He has had one previous BPT
evaluation.

XIV. <u>ASSESSMENT OF DANGEROUSNESS</u>:

A.   Inmate Ngo's report agrees in all details with the
     information given in the Central file and medical
     record with respect to his prior history as a
     person who attempted to use cocaine and was
     affiliated with gangs, which resulted in his
     current offense.  Based upon his complete lack of
     disciplinary actions while incarcerated, his
     insight into the negative aspects of gang
     involvement, and his remorse for his actions, his
     violence potential within a controlled setting is
     estimated to be below average relative to this
     Level II inmate population.

B.   If released to the community, his violence
     potential is estimated to be less than the
     average citizen in the community, given his
     insight, his demonstrated ability to stay out of
     trouble, his successful development of plans upon
     release, and the support of his family.

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE SIX


     C.  Clearly, the most significant risk factor for this
         inmate as a precursor to violence or a return to
         criminal behavior would be his reinvolvement with
         others having a criminal history and/or gang
         members, the abuse of alcohol and/or drugs, and
         isolation from his family members.

XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

     A.  This inmate is competent and responsible for his
         behavior.  He has the capacity to abide by
         institutional standards and has done so during his
         entire incarceration period.

     B.  This inmate does not have a mental health disorder
         which would necessitate treatment either during
         his incarceration period or following parole.

     C.  As this man has spent ten years in prison, I would
         recommend, should he be paroled:

        1)  Abstinence from all alcohol and/or use of any
            controlled substance.

        2)  Frequent monitoring for substance abuse.

        3)  If at all possible, he should be relocated so
            he is near his family.

        4)  He should make frequent reports to his parole
            officer concerning his vocational progress and
            goals.  The structure of the institution has,
            inevitably, to some extent, served to diminish
            his own self-reliance, and the process of
            reporting in and setting validating goals might
            be helpful in assisting him in establishing,
            perhaps for the first time in his life, a real
            sense of self-reliance and a positive prosocial
            sentence.

        5)  Due to his family's commitment to supporting
            him upon his release, his projected level of

216

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE SEVEN


success in the community, if granted a date for
parole, is seen at this time to be better than
average.



C. SAINDON, Ph.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD



BILL ZIKA, Ph.D.
Senior Supervising Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

CS/gmj

D:  01/23/02
T:  01/31/02

217

# EXHIBIT F

DeQuznian
CFBW 319u

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
AUGUST 2005 CALENDAR

NGO, SIEU                                                           J-07024

INMATE COPY

I.    **COMMITMENT FACTORS:**

   A.    **Life Crime:** PC 187, Murder 2nd with PC 12022(A)(1), Use of Weapon in commission of a felony. Orange County Superior Court Case #C99109. Term: 15 years to Life plus 1 year enhancement. MEPD: 5/24/03. Victim: Angel Ganzales, 15 years old. Inmate Ngo was received in the California Department of Corrections on 2/1/94.

      1.    **Summary of Crime:** All relevant documents from the previous hearing including the transcripts have been considered and that information appears valid. The writer has no further information to add.

      2.    **Prisoner's Version:** Remains the same as stated in the previous hearing.

      3.    **Aggravating/Mitigating Circumstances:**

         a.    **Aggravating Factors:** Remains the same as stated in the previous hearing.

         b.    **Mitigating Factors:** Remains the same as stated in the previous hearing.

   B.    **Multiple Crime(s):** N/A.

      1.    **Summary of Crime:** N/A.

      2.    **Prisoner's Version:** N/A.

II.    **PRECONVICTION FACTORS:**

   A.    **Juvenile Record:** Documents from the previous hearing have been considered and that information remains valid.

   B.    **Adult Convictions and Arrests:** Documents from the previous hearing have been considered and that information remains valid.

COPY TO INMATE ON:
June 22 2005

219

LIFE PRISONER EVALUAT   I REPORT        (          2
PAROLE CONSIDERATION HEARING
AUGUST 2005 CALENDAR

    C.    **Personal Factors:**  Documents from the previous hearing have been considered and that information remains valid.

## III.  POSTCONVICTION FACTORS:

    A.    **Special Programming/Accommodations:** None.

    B.    **Custody History:** Documents from the previous hearing(s) have been considered and that information remains valid.  Since his last Board of Prison Terms (BPT) hearing on 8/5/04, in which his parole was denied for one (1), inmate Ngo has remained at the Correctional Training Facility (CTF), in the General Population (GP).  He has retained his custody at Medium A with a Preliminary/behavior classification score of 0 and a Mandatory Minimum Placement score of 19 (the change is due to the revised classification scoring system effective 10/15/02).

    C.    **Therapy and Self-Help Activities:**  Refer to the Postconviction Progress Report for details.

    D.    **Disciplinary History:**  Refer to the Disciplinary Sheet for details.

    E.    **Other:**

## IV.  FUTURE PLANS:

    A.    **Residence:** Inmate Ngo plans to live with his mother, Huynh Phong Ngo at 709 Triana Street, Monterey Park, California, 91754 with telephone number 626-282-3156.  In addition, most, if not all of his relatives has offered housing, employment, financial, moral and social assistance to inmate Ngo, if and when he is released to parole.

    B.    **Employment:** Inmate Ngo is in receipt of two (2) Certificates of Completion, Vocational Automotive Refinishing (9/12/97) and Upholstery (2/27/97), both employable trades.  Inmate Ngo has been a Culinary Storekeeper Office Aide over two (2) years, another employable trade.  His relatives are offering immediate employment opportunities in their liquor and restaurant business, if and when he is released to parole.

    C.    **Assessment:** Inmate Ngo does not have any prior record of criminal conduct (considering the recency and frequency of prior crimes) and the circumstances of the instant offense, he does not appear to be criminally minded and has a good insight into himself.  He has been able to maintain himself relatively disciplinary free (of serious rules violation report) since 2/12/00.  In 9/12/97 and 2/27/97, he

acquired two (2) Certificates of Completion, Vocational Automotive Refinishing
and Upholstery, respectively. In addition, he is in the process of acquiring college
credits via correspondence from Coastline Community College with the hope that
said credits will be transferable to a university and eventually obtain a degree in
Biology. Finally, he has achievable and realistic parole plans.

V.    **USINS STATUS:** Inmate Ngo was born on 5/18/73 in Vietnam, immigrated to the
United States of America (USA) and later became a naturalized citizen of the USA.

VI.   **SUMMARY:**

A.    Prior to release the prisoner could benefit from:

(1) Participate in self-help programs;
(2) Remain disciplinary free;
(3) Earn positive chronos;

B.    This report is based upon 3 hours of Central File research, an interview with
inmate Ngo and incidental contact with the prisoner during this period of review.

C.    Inmate Ngo reviewed his Central File pursuant to in re: Olson on 5/31/05.

D.    No accommodation was required per the Armstrong vs. Davis BPT Parole
Proceedings Remedial Plan (ARP) for effective communication.

221

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

INSTRUCTIONS
   TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
   TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
       ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
| YEAR | BPT | PBR | |
|---|---|---|---|
| 4/24/04 to 6/8/05 (Present) | | | **PLACEMENT:** Remains housed at CTF, in the GP. **CUSTODY:** Remains at Medium A. **ACADEMIC:** Graduated from Fullerton High School, Orange County in 1992. Additionally, inmate Ngo has been and is currently enrolled in an Independent Study Program through Coastline Community College (semester ending May, 2005). **WORK:** Remains assigned as a Culinary Storekeeper Office Aide receiving satisfactory grades per the Work Supervisor's Report (CDC101). **VOCATION:** Inmate Ngo is in receipt of two (2) Certificates of Completion, Vocational Automotive Refinishing (9/12/97) and Upholstery (2/27/97). Additionally, he is in the Vocational Data Processing waiting list. **GROUP ACTIVITIES:** None noted this period. **PSYCH TREATMENT:** None noted this period. **PRISON BEHAVIOR:** Disciplinary free of serious rules violation reports since 2/12/00. **OTHER:** Inmate Ngo continues to better himself year after year. |

CORRECTIONAL COUNSELOR'S SIGNATURE

I. DeGUZMAN                                                           DATE
                                                                     6/8/05
NGO, SIEU PHONG        J07024              CTF              AUG/2005

222

BPT 1004 (REV 7/86)                    Page  1

# DISCIPLINARY SHEET

### CDC 128A'S:

| | | |
|---|---|---|
| 02/11/00 | CTF | Window covering |
| 04/01/97 | LAC | Failed to respond to ducat |

### CDC 115's:

None

NGO, SIEU        J07024        CTF        AUG/2005

223

# EXHIBIT G

224

# LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
### MAY 2004 CALENDAR

NGO, SIEU PHONG

J-07024

I.  **COMMITMENT FACTORS:**

    A.  **Life Crime:** Murder second, PC 187, with use of a firearm PC 12022(A) (1). San Francisco County case #c99109, sentence: 15 years to life plus one year enhancement. MEPD: 5-24-03. Victim: Angel Gonzalez, age 15 years old. Received by CDC on 2-1-94.

        1.  **Summary of Crime:** All relevant documents from the previous hearings including the transcripts have been considered and that information appears valid and the writer has no further information to add.

        2.  **Prisoner's Version:** Remains the same as stated in the previous hearing.

        3.  **Aggravating/Mitigating Circumstances:**

            a.  **Aggravating Factors:** Remains the same as stated in the previous hearing.

            b.  **Mitigating Factors:** Remains the same as stated in the previous hearing.

    B.  **Multiple Crime(s):** None.

        1.  **Summary of Crime:** None.

        2.  **Prisoner's Version:** None.

II.  **PRECONVICTION FACTORS:**

    A.  **Juvenile Record:** Remains the same.

    B.  **Adult Convictions and Arrests:** Remains the same.

    C.  **Personal Factors:** Remains the same.

LIFE PRISONER EVALUATI    REPORT                                    2
SUBSEQUENT PAROLE CO..SIDERATION HEARING
MAY 2004 CALENDAR

III.    POSTCONVICTION FACTORS:

    A.    Special Programming /Accommodations:  None.

    B.    Custody History: Documents from the previous hearing have been considered and that information remains valid. During the period of time since the last hearing (5-13-02), Ngo's behavior has been positive, in that he has remained disciplinary free and maintained a stable work program in his assignment as a culinary warehouse worker.

    C.    Therapy and Self-Help Activities:  Ngo is involved in an Independent Study Program through Coastline Community College. He participates in the Narcotics Anonymous Program. He completed the 13 week IMPACT workshop.

    D.    Disciplinary History: Ngo received only two CDC 128A's. See Disciplinary Sheet for details.

    E.    Other:  An Initial Parole Consideration Hearing was held on 5-13-02. The BPT recommended:
        1. Remain disciplinary free.
        2. Upgrade education.
        3. Continue to participate in self-help and therapy.
        The BPT denied parole for an additional two years.

IV.    FUTURE PLANS:

    A.    Residence:  Ngo plans to reside with his mother, Phuong Hungk Ngo, at 709 Triana Street, Monterey Park, California, (714)827-7832.

    B.    Employment: Ngo plans to work at the family liquor store which is owned by his sister, Julie Seeto, in Anaheim. His uncle, Calvin Ung owns a restaurant in Anaheim and has offered Ngo a job as a cook.

    C.    Assessment:  Ngo's chances of a successful parole are very good. He has concrete parole plans and letters of support from his family.

V.    USINS STATUS:  No holds.

VI.    SUMMARY:

LIFE PRISONER EVALUATION REPORT                                    3
SUBSEQUENT PAROLE CONSIDERATION HEARING
MAY 2004 CALENDAR

A.    Considering the commitment offense, minimal prior arrest record and good prison adjustment, the writer believes Ngo would probably pose a low degree of threat to the public at this time, if release from prison. This opinion is based on Ngo being immature at the time of the crime and easily influenced by his peers. The crime was episodic in nature. Ngo has a limited criminal history and has not shown a pattern of violence in custody.

B.    Prior to release, Ngo could benefit from remaining disciplinary free and upgrading his education.

C.    This board report is based upon a one hour interview, incidental contact in the housing unit and a through review of the Central File lasting on hour.

D.    Ngo declined the opportunity to review the Central File on 1-20-04 (see CDC 128B Chrono).

E.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceeding Remedial Plan for effective communication.

# DISCIPLINARY SHEET

## CDC 128A's:

2-11-00     CTF       Window covering.
4-1-97      LAC       Failed to respond to medical ducat.

## CDC 115's:

None.

LIFE PRISONER EVALUAT   | REPORT                          4
SUBSEQUENT PAROLE CC..SIDERATION HEARING
MAY 2004 CALENDAR


_M. Rubio_     4-23-04
M. Rubio                    Date
Correctional Counselor I


_L.R Baker, CCII (A)_   4-23-04
L.R Baker                   Date
Correctional Counselor II


_J.L Clancy_        4-27-04
J.L Clancy                  Date
Facility Captain


_D.S. Levorse_      4-28-04
D. S. Levorse               Date
Classification and Parole Representative

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 5/02 TO 4/2003 | | | **PLACEMENT:** CTF. |
| | | | **CUSTODY:** MED A. |
| | | | **VOC. TRAINING:** None. |
| | | | **ACADEMICS:** Enrolled in an Independent Study Program. |
| | | | **WORK RECORD:** Assigned to the culinary warehouse. |
| | | | **GROUP ACTIVITIES:** Completed the IMPACT workshop attended Narcotics Anonymous meetings. |
| | | | **PSYCH. TREATMENT:** None. |
| | | | **PRISON BEHAVIOR:** No disciplinaries. |
| | | | **OTHER:** None. |

CORRECTIONAL COUNSELOR'S SIGNATURE

*M. Rubio* CCI

DATE 4-23-04

May/2004

Ngo, Sieu                    J-07024                    CTF-SOLEDAD

*230*

BPT 1004 (REV 7/86)

RD OF PRISON TERMS                                                                STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 5/2003 To Present | | | **PLACEMENT:** CTF. <br> **CUSTODY:** MED A. <br> **VOC. TRAINING:** None. <br> **ACADEMICS:** Enrolled in an Independent Study Program. <br> **WORK RECORD:** Assigned to the culinary warehouse. <br> **GROUP ACTIVITIES:** Participated in Narcotics Anonymous meetings. <br> **PSYCH. TREATMENT:** None. <br> **PRISON BEHAVIOR:** No disciplinaries. <br> **OTHER:** None. |

ORDER:
- [ ] BPT date advanced by _____ months.
- [ ] PBR date advanced by _____ months.
- [ ] BPT date affirmed without change.
- [ ] PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- [ ] Previously imposed conditions affirmed.
- [ ] Add or modify

- [ ] Schedule for Progress Hearing on appropriate institutional calendar

| | | | |
|---|---|---|---|
| Ngo, Sieu | J-07024 | CTF-SOLEDAD | May/2004 |

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

231

# EXHIBIT H

THE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2002 CALENDAR

NGO, SIEU PHONG                                     J07024

## I.    COMMITMENT FACTORS:

**A.**    **Life Crime:** Murder Second, PC 187, with Use of a Firearm, PC 12022(A)(1). San Francisco County Case #C99109. Sentence: 15 years to Life plus one year enhancement. MEPD: 5/24/03. Victim: Angel Gonzalez, age 15 years old. Received by CDC on 2/1/94.

     **1.**    **Summary of Crime:** On 9/18/92, Angel Gonzalez was beaten and shot to death near Fullerton High School as he was walking home after school. An investigation revealed that earlier in the day the victim, a member of the "Fullerton Tokers Town" a Latin gang and member of "Fullerton Boyz" an Asian gang, were at a McDonald's restaurant, near the high school. The victim and No Muhamed had a confrontation with each claiming their respective gang affiliations. After this non-physical altercation, the group of Asians which at the time included Sieu Phong Ngo, obtained a firearm. Ngo and the Asian gang members returned to the school where they waited for Gonzalez. As he walked home he was attacked and beaten. During the physical altercation the victim was shot one time in the back by Usumang Muhamed. The group of five Asian gang members including Ngo fled the area after the shooting. Angel Gonzalez died at the scene as a result of the gunshot wound. Ngo, Jimmy Dao and Asat Cham fled to the state of Washington. They were subsequently apprehended there, and the murder weapon, a stolen .22 caliber handgun was recovered in the vehicle. Information obtained from POR pages 3 & 4.

     **2.**    **Prisoner's Version:** Ngo explained that earlier in the day his group had a confrontation with the victim. Subsequently, he and his group went to an arcade to play games. At that time his companions took possession of a weapon. Ngo stated that he did not see the gun until he was in the vehicle, it was located under the passenger's seat. He and his companions returned to Fullerton High School where they parked and went to look for Gonzalez. Ngo explained that they had gun for protection in case someone else happened to have a weapon. They found Gonzalez, and he and his group started fighting with the victim. During the fight Ngo heard two shots. Ngo explained that no one intended to kill the victim. They just planned to beat him up because Gonzalez had told them to "get out of town," and this made Muhamed angry. Ngo realizes that his behavior was a mistake. Ngo drove his two companions to Washington because

*233*

Muhamed told him that he knew someone who would give them shelter. Ngo feels sorry for the victim's family.

**B.**   **Aggravating/Mitigating Circumstances:**

    1.   **Aggravating Factors:**

        a.   The victim was particularly vulnerable in that he was outnumbered.

        b.   The crime was racially motivated.

        c.   The inmate had an opportunity to cease but continued with the crime.

        d.   The crime involved use of a firearm.

    2.   **Mitigating Factors:**  The inmate has a minimal history of criminal behavior.

**II.**   **PRECONVICTION FACTORS:**

**A.**   **Juvenile Record:**  None.

**B.**   **Adult Convictions:**  On 3/30/92, Ngo arrested by the San Gabriel Police Department for Possession of a Controlled Substance (three pieces of rock cocaine). On 5/7/92 he was diverted pursuant to Section 1000 of the Penal Code. On 9/22/92, Ngo was arrested by the Olympia Sheriff's Office for Possession of Stolen Property. This case was Subsequently dismissed. Information obtained from CI&I.

**C.**   **Personal Factors:**  Ngo was born in Vietnam on 5/18/73. He has resided in the United States since 1979. In 1991 he graduated from Fullerton High School and subsequently attended Fullerton Community College and Pasadena City College. He completed ten units and his major was business. Ngo was employed as a telemarketer and worked odd jobs. He was employed at his family's liquor store and resided with his parents. Ngo had problems with controlled substances or alcohol. He was a member of the "Fullerton Boyz," and after his move to Los Angeles he became affiliated with the "Tiger Mafia."

**III.**   **POSTCONVICTION FACTORS:**

234

LIFE PRISONER EVALUATION REPORT                                    3
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2002 CALENDAR

    **A.**    <u>Special Accommodations/Disability:</u>  None.

    **B.**    <u>Custody History:</u>  Ngo was received by R.J. Donovan Correctional Facility for Initial Processing on 2/1/84. He was transferred to Centinela State Prison on 3/17/94 and placed on Close A Custody. On 5/16/95 he was transferred to California State Prison at Lancaster and placed on Medium A Custody. On 12/16/98 he was transferred to the Correctional Training Facility and continued Medium A Custody. Ngo has been assigned to the Yard Crew and various positions as a clerk. He has completed courses in Tuberculosis, AIDS and Hepatitis. Ngo successfully completed Vocational Auto Upholstery, Automotive Refinishing and Vocational Auto Paint.

    **C.**    <u>Work, Education, Vocation, Therapy & Self-Help Activities:</u>  Ngo has completed self-help courses in Salesmanship and Parenting and has been a participating member of Alcoholics Anonymous and Narcotics Anonymous.

    **D.**    <u>Disciplinary History:</u>  Ngo has received only two CDC 128A's during his incarceration. See Disciplinary Sheet for details.

## IV.  <u>FUTURE PLANS:</u>

    **A.**    <u>Residence:</u>  Ngo plans to reside with his mother, Phuong Hungk Ngo, at 709 Triana Street, Monterey Park, California, (714) 827-7832.

    **B.**    <u>Employment:</u>  Ngo plans to work at the family liquor store which is owned by his sister, Julie Seeto, in Anaheim. His uncle, Calvin Ung, owns a restaurant in Anaheim and has offered Ngo a job as a cook.

## V.  <u>USINS STATUS:</u>  Ngo is a United States Citizen.

## VI.  <u>SUMMARY:</u>

    **A.**    Considering the commitment offense, minimal prior arrest record and prison adjustment, the writer believes Ngo would probably pose a moderate to low degree of threat to the public at this time, if released from prison. This opinion is based on Ngo being immature at the time of the crime and easily influenced by his peers. The crime was episodic in nature. Ngo has a limited criminal history and has not shown a pattern of violence in custody.

    **B.**    Prior to release Ngo could benefit from remaining disciplinary free and completing an additional vocational program.

*225*

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2002 CALENDAR

4

C.  This report is based upon a one hour interview, incidental contact in the housing unit and a thorough review of the Central File.

D.  Ngo reviewed his Central File on 1/18/02.

236

NGO, SIEU PHONG          J07024                    CTF-Soledad              APR/2002

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2002 CALENDAR

5

_____

M. Rubio
Correctional Counselor I


_____

C. Plymesser
Correctional Counselor II


_____

J.L. Clancy
Facility Captain


_____

D.S. Levorse
Classification and Parole Representative


237

NGO, SIEU PHONG          J07024          CTF-Soledad          APR/2002

# EXHIBIT I

COPY TO I/M
VIA
CC-1 ON  1-8-97
(date)

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS
MARCH 1997 CALENDAR
CALIFORNIA STATE PRISON-LOS ANGELES COUNTY

NAME:           NGO, SIEU
CDC#:           J-07024
DATE OF EVALUATION:       December 27, 1996

## IDENTIFICATION/FORENSIC DATA:

This is the psychological report for the "Documentation #1
Hearing" scheduled for March of 1997 for Sieu Ngo; CDC#
J-07024.  On October 21, 1993; Mr. Ngo was convicted by jury
trial of P.C. 187A murder in the second degree, reduced from
first degree in exchange for agreeing to a 15-to-life
sentence and no appeal, with enhancement P.C. 12022
vicariously armed with a gun.  He was sentenced to 16-years-
to-life.  The crime occurred September 18, 1992.  Mr. Ngo
and four co-defendants beat and shot in the back a fifteen
year old member of an enemy gang.  Mr. Ngo stated that he
agreed with the records of the crime, the verdict, and the
sentencing.  However, he did state at the time of the trial
that no one intended to kill the victim only to beat him up.

Past prior offenses include a two year drug diversion, for
possession of Cocaine and several other arrests which did
not result in convictions.  There have been no prior
psychological Board of Prison Terms reports.

## BACKGROUND INFORMATION:

The evaluation consisted of a single 45-minute interview,
for the purposes of this report.  This was after review of
the Central File and medical records on 12/27/96.  There are
no records of past psychological/psychiatric treatment.

Mr. Ngo has received no disciplinary actions.  Not a single
115 or 128A.  Mr. Ngo completed two years of college prior
to coming to prison.  During incarceration, his vocational
training in auto upholstery earned him good comments from
his instructors such as, "doing well - shows enthusiasm".
He received several certificates of completion.  The last
one in October of 1996.  Mr. Ngo has attended Narcotic's

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS
MARCH 1997 CALENDAR
DATE OF EVALUATION: December 27, 1996
PAGE 2

Anonymous and received a one year perfect attendance
certificate in November of 1996. He has not been employed
in prison. Prior to incarceration, he was employed in sells,
telemarketing, and as a cook while a student in junior
college.

The historical information supplied by the inmate agreed
with the records and there were no distortions.

PRESENT CONDITION:

His Central File contains no records of past mental illness;
however, the inmate reported a history of depression, with
three suicide attempts during his adolescence. He has
records of hospitalization for the suicide attempts and his
family will be obtaining these records for entry in his
Central File. He has numerous cuts and slices on his arm
from suicide attempts. Mr. Ngo describes his level of
insight at the time of the crime as very limited, naive,
showing poor judgment in his friends and activities. He had
decided to disengage from these friends and moved away one
year prior to the crime, which occurred while he was
visiting. Now, he reports he is able to think before
acting; he has changed his attitude to one of valuing
service to his fellow man such as mentoring and tutoring.
The remorse he expresses is sincere. He shows much shame
and self-incrimination for the crime. In hindsight, he sees
that he perhaps could have stopped the incident and now has
great empathy and remorse for the family of the victim.

MENTAL STATUS AND DIAGNOSIS:

Mental status indicators are clear in all areas: mood and
affect, behavior, speech, thought content and processes, and
cognition.

AXIS I:   V71.09   NO DIAGNOSIS OR CONDITION.

AXIS II:  V71.09   NO DIAGNOSIS.

AXIS III:          NONE.

240

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS
MARCH 1997 CALENDAR
DATE OF EVALUATION:  December 27, 1996
PAGE 3


AXIS IV:  PSYCHOSOCIAL STRESSORS:  INCARCERATION.

AXIS V:  GLOBAL ASSESSMENT OF FUNCTIONING = 75.

CONCLUSIONS AND RECOMMENDATIONS:

Mr. Ngo's history of depression and suicide attempts may
have contributed to his state of mind and poor judgment
during the time of the crime.  There are no records of any
mental health treatment during incarceration and Mr. Ngo is
no longer depressed.  He has increased his chances for
successful re-entry into society by setting educational
goals in academic subjects and a good start in attendance in
Narcotic's Anonymous.  He plans to start Alcoholic's
Anonymous in 1997.  He also has excellent family support who
can provide him a place to live, employment, and are willing
to pay for correspondence courses for him during
incarceration.  This inmate is of above average intelligence
and has excellent potential in intellectual endeavors.  He
is no longer depressed and is now able to recognize the
symptoms of depression and would seek help as needed.  Also
in his favor is the absence of any indications of violence
other than the crime.

To continue positive programming, Mr. Ngo needs to regularly
attend Narcotic's Anonymous and Alcoholic's Anonymous,
remain disciplinary-free, and pursue higher education
through correspondence courses.  By reducing his points, he
can possibly transfer to other institutions that facilitate
correspondence studies and provide other self-help group
opportunities.  Psychotherapy is not part of his program
unless he has a recurrence of his depression.


C Schroeder PhD                                    1/6/97
C. SCHROEDER, Ph.D.                                Date
Staff Psychologist

Orig:    C-File
  cc:    Medical Records    Psych.    Inmate

241

# EXHIBIT J

242

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE

# MINUTE ORDER

**Case Number   M-10984 X A**

**People Vs Ngo, Sieu**

| Docket Dt | Seq | Text |
|---|---|---|
| 8/31/2006 | 1 | **Hearing held on 08/31/2006 at 09:00 AM in Department C5 for Chambers Work.** |
| | 2 | Officiating Judge: Kazuharu Makino, Judge |
| | 3 | Clerk: L. Torres |
| | 4 | No Court Reporter present at proceedings. |
| | 5 | No appearances. |
| | 6 | Order denying Writ of Habeas Corpus filed. |
| | 7 | Petition for Writ of Habeas Corpus is denied for the reasons stated in the order denying writ filed 08/18/2006. |
| | 8 | As ordered, the clerk this date has mailed a copy of this minute order to the Petitioner at MARILEE MARSHALL & ASSOCIATES 523 WEST SIXTH STREET SUITE 1109 LOS ANGELES, CA. 90014 |
| | 9 | The clerk this date has forwarded a copy of this minute order to Orange County District Attorney's Office. |

243

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

AUG 3 1 2006

ALAN SLATER, Clerk of the Court

BY _____, DEPUTY

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF ORANGE

In re

**SIEU NGO,**

    Petitioner,

ON HABEAS CORPUS.

CASE NO. **M-10984**

**ORDER**

TO THE PETITIONER AND THE OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, HAVING RECEIVED THE PETITION FOR WRIT OF HABEAS CORPUS, THE COURT FINDS AND ORDERS AS FOLLOWS:

I

In 1993, Petitioner was a gang member who, along with four other members of his gang, attacked a 15-year-old rival gang member. The victim was beaten, kicked and finally shot and killed. Petitioner was not the shooter. In 1994, Petitioner entered a plea to second degree murder and was sentenced to 16 years to life. He became eligible for parole in 2003. He had a subsequent parole hearing in February 2006.

At the February 2006 hearing, the Board of Parole Hearings (hereafter individually and collectively referred to as "the BPH") found Petitioner would pose an unreasonable risk of danger to society or a threat to public safety at this time if he were released. In announcing its decision, the BPH stated the crime was carried out in an especially cruel and callous manner in that the 15-year-old victim was attacked and beaten and ultimately shot in the back and died at the scene. The offense displayed a disregard for public safety in that it occurred near a school. During the hearing, Petitioner stated that he thought he was going to a fist fight; he saw the gun under a car seat, but he did not intend that the victim would be killed and did not realize anyone else had that intent. The BPH concluded that Petitioner's statement minimized the gravity of the

1

*244*

crime as well as his involvement, and demonstrated a lack of insight based on that, the BPH stated it was "hard . . . to get a gauge on what risk [Petitioner] would pose to public safety when [it cannot] feel comfortable about the level of insight [Petitioner] displayed."

The BPH acknowledged that Petitioner was a model prisoner. He had no record of misconduct in prison and only two minor rule violations, one being for window coverings. Petitioner had participated in multiple self-help programs, had made substantial progress toward a college degree, had outstanding parole plans, and a psychological report supported his release. The psychologist had concluded Petitioner's violence potential was less than the average citizen in the community. Nevertheless, the BPH determined it would not grant parole. Based on Petitioner's statement that he thought he was going to a fist fight, the BPH believed Petitioner was minimizing the gravity of the crime as well as his involvement, and demonstrating a lack of insight. Based on Petitioner's lack of insight, the BPH concluded it was "hard . . . to get a gauge on what risk" Petitioner would pose to public safety. Parole was denied for two years.

II

Petitioner argues there was no evidence to support the BPH decision that he posed an unreasonable risk of danger to society if released from prison. Petitioner acknowledges that the requirements of due process are satisfied if "some evidence" supports the decision. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 626.) He contends, however, that the factors set forth in California Code of Regulations, title 15, section 2402 all indicate his suitability for parole. He points out that the psychological evaluation was extremely supportive of release and the evaluator concluded Petitioner's violence potential was less than the average citizen in the community. Further, the crime occurred when he was 19. He is now 33. He has a flawless prison record, has participated in numerous self-help programs and has upgraded educationally. He also argues, citing Penal Code section 3041, subdivision (b), that a life prisoner must be paroled when his release would not pose a danger to the public.

Petitioner further contends that denial of parole based solely on the unchanging facts of his commitment offense violated the constitutional prohibition against cruel and unusual punishment. Even assuming the BPH characterization of the offense was accurate, he argues, the crime alone cannot support a finding he currently poses a risk to society.

III

The petition is denied on the following grounds:

2

245

The California Supreme Court in *In re Dannenberg* (2005) 34 Cal.4th 1061 held that the BPH "may protect public safety" by "considering the dangerous implications" of the commitment offense. (*Id.* at p. 1071.) This applies to crimes such as Petitioner's. (Pen. Code, § 3041; *In re Dannenberg, supra*, at pp. 1082-1084.) Thus, while the BPH must point to factors "beyond the minimum elements of the crime . . . it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." (*In re Dannenberg, supra*, at p. 1071.) Here, the BPH pointed over and over to the gang-related nature of the offense. Petitioner was not the shooter; nevertheless the death of the young victim resulted from gang rivalry, a factor beyond the minimum elements of second degree murder. (Compare *In re Shaputis* (2005) 135 Cal.App.4th 217 [no evidence of conduct beyond the minimum required for conviction of second degree murder where wife-victim died from a single gunshot wound fired at close range after marital argument and the petitioner immediately called police and turned himself in].) The BPH was therefore not required to consider the factors set forth in California Code of Regulations, title 15, section 2402. (*In re Dannenberg, supra*, at p. 1071.)

Moreover, the BPH "shall set a release date *unless* it determines that the gravity of the current convicted offense . . . is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen. Code, § 3041, subd. (b), emphasis added.) The BPH focused on Petitioner's statement he thought he was going to a fist fight and concluded he was minimizing the gravity of the crime and his involvement and demonstrating a lack of insight. It determined public safety considerations required more incarceration and denied parole on that basis. The denial was therefore authorized by Penal Code section 3041, subdivision (b).) (*In re Dannenberg, supra*, at p. 1071.) The petition is denied on that basis. (*Ibid.*)

IV

The petition for a writ of habeas corpus is DENIED.

DATED: ___8-31-06___                              ___K Malino___

                                                    JUDGE OF THE SUPERIOR COURT

246

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

I am over eighteen (18) years of age, and not a party to the within cause; my

business address is 523 West Sixth Street, Suite 1109, Los Angeles, CA. 90014. That on

October 17, 2006, I served a copy of the within:

### EXHIBITS IN SUPPORT OF
### PETITION FOR WRIT OF HABEAS CORPUS

On the interested parties by placing them in an envelope (or envelopes) addressed
respectively as follows:

Office of the Attorney General
P.O. Box 85266
San Diego, CA 92186-5266

Office of the District Attorney
700 Civic Center Drive West
Santa Ana, CA 92701

Clerk of the Superior Court
700 Civic Center Drive West
Santa Ana, CA 92702-1944
For delivery to the Honorbable Kazuharu
Makino

Mr. Sieu Phong Ngo
J-07024/ B-wing 319-up
CTF- Soledad
P.O. Box 689
Soledad, CA 93960-0689

Each said envelope was then, on October 17, 2006, sealed and deposited in the
United States mail at Los Angeles, California, the county in which I maintain my office,
with postage fully prepaid.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on October 17, 2006, at Los Angeles, California.

SHANNON CALLAHAN