# EXHIBIT 5
# PART 1 OF 3

S148684                          ORIGINAL

# IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

In re

SIEU NGO

On Habeas Corpus

Case No. _____

SUPREME COURT
FILED

DEC - 7 2006

Frederick K. Ohlrich Clerk

DEPUTY

FROM THE JUDGMENT OF THE SUPERIOR COURT OF ORANGE COUNTY, THE
HONORABLE KAZUHARU MAKINO, JUDGE PRESIDING

## PETITION FOR WRIT OF HABEAS CORPUS

**MARILEE MARSHALL**
State Bar No. 101046
**JENNIFER PEABODY**
State Bar No. 198746
**MARILEE MARSHALL & ASSOCIATES, INC**
Attorneys at Law
523 W. Sixth Street
Suite 1109
Los Angeles, CA 90014
(213) 489-7715 Phone
(213) 489-3754 Fax

Attorneys for Petitioner

RECEIVED

DEC - 7 2006

CLERK SUPREME COURT
LOS ANGELES

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PETITION FOR WRIT OF HABEAS CORPUS . . . . . . . . . . . . . . . . . . . . . . . . 1

VERIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

MEMORANDUM OF POINTS & AUTHORITIES . . . . . . . . . . . . . . . . . . . . . 16

I      STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II      THE PAROLE BOARD'S DECISION WAS NOT SUPPORTED BY
ANY EVIDENCE AND RESULTED IN A DEPRIVATION OF
PETITIONER'S FIFTH, SIXTH, EIGHTH AND FOURTEENTH
AMENDMENT RIGHTS
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

         A.     The Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

         B.     There is No Evidence to Support the Board's Decision that Petitioner
Posed an Unreasonable Risk of Danger to Society if Released From
Prison
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

         C.     Reliance Solely on the Facts and Characterization of Petitioner's
Commitment Offense to Deny Parole Resulted in a Violation of the
Eighth and Fourteenth Amendment Prohibition Against Cruel and
Unusual Punishment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

III     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910 ............................................ 20, 21

*Board of Pardons v. Allen* (1987) 482 U.S. 369
[107 S.Ct. 2415, 96 L.Ed.2d 303] ................................................. 20

*Board of Regents of State Colleges v. Roth* (1972) 408 U.S. 56
[92 S.Ct. 2701, 33 L.Ed.2d 548] ..................................................... 20

*Greenholtz v. Inmates of Nebraska Penal* (1979) 442 U.S. 1
[99 S.Ct. 2100, 60 L.Ed.2d 668] ..................................................... 20, 21

*Jancsek v. Oregon Board of Parole* (9th Cir. 1987) 833 F.2d 1389 ................. 21

*McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895 ................................... 20, 21

## STATE CASES

*In re Capistran* (2003) 107 Cal.App.4th 1299 .................................... 19

*In re Dannenberg* (2005) 34 Cal.4th 1061 ................................................ *passim*

*In re DeLuna* (2005) 126 Cal.App.4th 585 ........................................ 16

*In re Elkins* (2006) 144 Cal.App.4th 475 ........................................ *28*

*People v. Croy* (1985) 41 Cal.3d 1 ................................................ 27

*People v. Durham* (1969) 70 Cal.2d 171 ........................................... 27

*People v. Kaufman* (1907) 152 Cal. 331 ........................................... 27

*People v Mendoza* (1998) 18 Cal.4th 1114 ....................................... 27

*People v. Nguyen* (1993) 21 Cal.App.4th 518 ................................... 27

*People v. Prettyman* (1996) 14 Cal.4th 248 ...................................... 27

*People v. Price* (1991) 1 Cal.4th 324 .............................................. 27

*People v. Woods* (1992) 8 Cal.App.4th 1570 ................................... 27

*In re Rosenkrantz* (2002) 29 Cal.4th 616 ................................................... *passim*

*In re Scott* (2004) 119 Cal.App.4th 871 ................................................. 17, 18

## UNITED STATES CONSTITUTION

Fifth Amendment ............................................................................. *passim*

Eighth Amendment .......................................................................... *passim*

Fourteenth Amendment ..................................................................... *passim*

## STATE STATUTES

Cal. Const., Art. V, § 8, subd. ............................................................. 19

Penal Code section 187 ...................................................................... 2

Penal Code section 1000 ................................................................. 8, 30

Penal Code section 3041 ............................................................... *passim*

Penal Code section 12022 ................................................................ 2, 3

# IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

In re

SIEU NGO

On Habeas Corpus

Case No. _____

## PETITION FOR WRIT OF HABEAS CORPUS

TO THE HONORABLE RONALD GEORGE, CHIEF JUSTICE, AND TO

THE HONORABLE ASSOCIATE JUSTICES OF THE SUPREME

COURT OF THE STATE OF CALIFORNIA:

Petitioner, SIEU NGO, by and through his attorneys, JENNIFER

PEABODY and MARILEE MARSHALL, petitions for writ of habeas corpus and

by this verified petition alleges:

I

Petitioner is in the custody of the California Department of Corrections at

the Correctional Training Facility in Soledad, California serving a term of 16 years

to life following his conviction in 1994 in Orange County Superior Court Case No.

C199109, wherein petitioner was convicted of second degree murder in violation

of Penal Code section 187 and it was found that petitioner was vicariously armed

with a firearm within the meaning of Penal Code section 12022. Petitioner was

1

received by the Department of Corrections on February 1, 1994, when his life term commenced. Petitioner's minimum parole eligibility date was May 24, 2003. On February 3, 2006, petitioner appeared before the Board for his second subsequent parole consideration hearing (third actual hearing). Petitioner was denied parole for a period of two years. (Exhibit A: Parole Consideration Hearing.) At this point, petitioner has served a total of twelve actual years in state prison. If given post conviction credit as afforded in Title 15, section 2410, subdivision (b) of the California Code of Regulations, petitioner's term to date is more than 16 years. (CCR, Tit. 15, § 2403, subd. (c).) Petitioner alleges that the continued denial of parole violates his Fifth and Fourteenth Amendment right to due process of law. There is no evidence to support a finding that petitioner currently poses an unreasonable risk to society if released from prison. Accordingly, his continued confinement violates the due process clauses of the Fifth and Fourteenth Amendments and constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

## II

Anthony Kane is the acting warden of the Correctional Training Facility in Soledad, California and thus, is the legal custodian of petitioner.

## III

Dennis Kenneally is the Executive Director of the Board of Parole Hearings (formerly the Board of Prison Terms), the agency which determines whether

prisoners serving life sentences are suitable for release on parole.

## IV

Petitioner was charged with the murder of Angel Gonzales. It was further alleged that petitioner was vicariously armed with a firearm within the meaning of Penal Code section 12022. On October 21, 1993, petitioner was convicted of second degree murder and it was found that petitioner was vicariously armed with a firearm. Petitioner was sentenced to 15 years to life plus one year for the armed allegation. Petitioner's life term commenced on February 1, 1994. Petitioner's minimum parole eligibility date was May 24, 2003.

## V

The facts of the underlying offense are set forth in the trial court file (Case No. C199109) and were summarized by the Parole Board as follows:

> On September 18, 1992, Angel Gonzales was beaten and shot to death near Fullerton High School as he was walking home after school. An investigation revealed that earlier in the day, the victim, a member of the "Fullerton's Toker's Town," a Latin gang and member of "Fullerton's Boyz" B-O-Y-Z, an Asian gang were at McDonald's restaurant near the high school. The victim and No, that's N-O Muhamed M-U-H-A-M-E-D, had a confrontation with each claiming their respective gang affiliations. After this non physical altercation, the group of Asians which at the time included Sieu Phong Ngo obtained a firearm. Ngo, N-G-O, and the Asian gang members returned to the school where they waited for Gonzales. As he walked home, he was attacked and beaten. During the physical altercation the victim was shot one time in the back by Usumang U-S-U-M-A-N-G last M-U-H-A-M-E-D, the group of five Asian gang members including Ngo left the area after the shooting. Angel Gonzales died at the scene as a result of the gun shot wound. Ngo, Jimmy Dao, D-A-O and Asat Cham, A-S-A-T-C-H-A-M fled

3

to the state of Washington. They were subsequently apprehended there and the murder weapon, a stolen 22 caliber handgun was recovered in the vehicle. (Exhibit A, pgs. 5-6 of the Hearing.)

VI

On May 13, 2002, the Board of Prison Terms (which is now referred to as the Board of Parole Hearings) conducted petitioner's Initial Parole Consideration Hearing. The Board found petitioner unsuitable and denied parole for a period of two years. (Exhibit B: Initial Parole Consideration Hearing 5/13/2002.) In support of its finding that petitioner currently posed an unreasonable risk to society, the Board found that the "offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering and life" and the "motive for the crime was inexplicable or very trivial in relation to the offense." (Exhibit B, p. 57.) The Board further found that petitioner had an escalating pattern of criminal conduct. (Exhibit B, p. 58.) Petitioner was, however, commended for remaining disciplinary free, obtaining a positive psychological evaluation, participating in NA, completing two vocations and securing positive parole plans. (Exhibit B, pgs. 58-59.) The Board recommended that petitioner remain disciplinary free, upgrade educationally and vocationally, and participate in self-help and therapy. (Exhibit B, p. 61.)

On August 3, 2004, the Board conducted petitioner's initial subsequent parole consideration hearing (second actual hearing). The Board found petitioner unsuitable for parole and denied parole for a period of one year. In finding

4

petitioner unsuitable for parole, the Board found that the offense was "carried out in an especially cruel and callous manner." (Exhibit C: Parole Consideration Hearing 8/3/04, p. 58.) Specifically, the Board concluded that the "offense was carried out in a dispassionate" and "calculated manner." (Exhibit C.) The Board further found that the offense was "carried out in a manner that demonstrates an exceptionally callous disregard for another human being," and the motive for the crime was "trivial." (Exhibit C, p. 58.) The Board commended petitioner for his parole plans, lack of disciplinary problems, participation in self-help and educational activities and noted that petitioner was making progress from a "psychological perspective." (Exhibit C, p. 60-61.) The Board recommended that petitioner continue self-help and therapy "to continue to make progress" "to the extent that he will be able to face, understand, and cope with stressful situations in a nondestructive manner." (Exhibit C, p. 61.) The Board further recommended that petitioner: (1) remain disciplinary free, (2) continue to explore his culpability in the crime, (3) participate in self-help and therapy, and (4) participate in other positive types of programs. (Exhibit C, p. 62.)

VII

On February 8, 2006, petitioner, after successfully completing the recommendations of the prior Boards, appeared for his second subsequent parole consideration hearing (third actual hearing). (Exhibit A.) Despite petitioner's complete compliance with the requests and suggestions of the Board, the Board

5

again found petitioner unsuitable for parole. The Board also found that it would

not be "reasonable to expect that parole would be granted at a hearing during the

following two years." (Exhibit A, p. 63.) The Board found that petitioner would

pose an unreasonable risk of danger to society or a threat to public safety if

released from prison. (Exhibit A.) In support of its finding, the Board concluded

that "the offense was carried out in a dispassionate and calculated manner in that it

was a confrontation between gang members preplanned by lying in wait for the

victim as he walked home." The Board continued, "The offense was carried out in

a manner demonstrating exceptionally callous disregard for human suffering,

disregard for public safety in that it occurred near a school and there was a clear

opportunity for you to cease but you continued." (Exhibit A, p. 61.) The Board

commended petitioner for having "a relatively criminal free background" and "a

history of stable relationships, including your family support." The Board added:

> As to your institutional behavior you have programmed
> commendably, your education includes 41 units towards you [sic]
> AA Degree and continuing involvement with college enrollment
> including your current independent study through Coast Line
> Community College. We also have read into the record a very
> reputable list of vocational achievements including automotive
> refinishing and upholstery, forklift operator, salesmanship and other
> vocational work. You have participated in self-help and therapy,
> well self-help consistently ranging from Anger Management, the
> Teddy Bear Drive, Feed the Children, Buddhist ordination into
> Buddhist studies, the Impact Program, Key to Fatherhood, The
> Muslim Chapel, and you have assisted in inmate education. As to
> misconduct, you have zero 115's, you have two minor 128A's, the
> last in 2000 for window covering. As to your psychological report,
> the report that is dated January 23, 2002, the last we have by Doctor

Saindon does in general support release. And I quote, this man has
spent ten years in prison and that is at the time of this psychological
report, I would recommend should he be paroled abstinence from all
alcohol or use of any controlled substance, he should be relocated so
that he is near his family, she should make frequent reports to his
parole officer concerning his vocational progress and goals. And
due to his family's commitment to supporting him upon his release,
his projected level of success in the community if granted a date for
parole is seen at this time to be better than average. You also have
made outstanding parole plans. You have viable residential plans in
the last county of legal residence and I refer to the record for the
documentation we have received. You also have acceptable
employment plans with established businesses owned by your
relatives who are assuring you of jobs. (Exhibit A, pgs. 62-63.)

Despite all of the evidence supporting a granting of parole, the Board found

petitioner unsuitable for a grant of parole based solely on the commitment offense,

including the nature of the offense and the trivial motive for the offense. (Exhibit

A, pgs. 60-65.) The Board expressed some concern about petitioner's rendition of

the claim and his denial that he knew anyone was armed with a firearm and found

that petitioner's version "minimized" his role and showed "lack of insight" into the

"causative factors" of the crime. (Exhibit A, p. 65.) The Board again

recommended that petitioner: (1) "get self-help," (2) stay disciplinary free, (3) get

therapy and (4) continue his educational and vocational development. (Exhibit A,

pgs. 64-65.)

VIII

Petitioner alleges that there was no evidence to support the Board's finding

that he poses a *current unreasonable* risk if released. In fact, all current, reliable

7

evidence presented to the Board shows that petitioner poses no risk if released. Petitioner further alleges that the Parole Board violated petitioner's statutory rights and his Fifth and Fourteenth Amendment due process rights when it refused to grant petitioner a parole date despite any evidence supporting a finding that petitioner posed an unreasonable risk of harm. Furthermore, his continued confinement constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution. Petitioner was only 19 years old at the time of the commitment offense and had only one prior contact with law enforcement wherein he was found in possession of rock cocaine and was diverted pursuant to Penal Code section 1000. Petitioner has spent more than twelve years in state prison and is currently 33 years old. While incarcerated, he has suffered no 115's, has engaged in no acts of violence and has shown no propensity toward future criminality. Petitioner's offense was the direct result of immaturity and his involvement with a group of wanna-be gangsters. As the psychologist who evaluated petitioner noted, petitioner has gained insight into "the negative aspects of gang involvement" and has remorse for this actions. Petitioner's role in the offense was minimal and he was not the direct perpetrator of the murder, although culpable as an aider and abettor under the natural and probable consequences theory. Petitioner had no prior history of violence. Contrary to the Board's finding, nothing about petitioner or his offense supports a finding that he poses *a current unreasonable risk* to society if released from

prison.

IX

Petitioner further alleges that the Board's finding that the offense was cruel, callous and carried out in a dispassionate manner, ignores the fact that all second degree murders are, by definition, cruel, callous and dispassionate. Since a second degree murder conviction by definition is the unlawful killing of a human being with malice aforethought, it is necessarily cruel and dispassionate. Taking the life of another for an insignificant reason is by definition cruel, callous and dispassionate. Because every second degree murder is cruel, callous and dispassionate, such a finding by the Board is insufficient to overcome the statutory command that parole must normally be given.

Petitioner submits that, contrary to the Board's finding, nothing about his commitment offense is more than minimally necessary to convict him of the life offense for which he is confined, namely, second degree murder. Petitioner was tried and convicted as an aider and abettor. (Exhibit D: Letter from Counsel Donald C. Rubright.) Although there was evidence that petitioner knew one of his friends had a gun in the vehicle, there was no evidence that there was a plan for the accomplice to use the gun. In fact, there was no evidence that petitioner aided and abetted the shooter in any manner. (Exhibit D.) Rather, the record demonstrates that petitioner was convicted under the natural and probable consequences doctrine in that he aided and abetted the fight which led to one

9

member of his group impulsively deciding to retrieve the gun and shoot the victim.
(Exhibit D.)  There was nothing about petitioner's offense to indicate that it was
particularly cruel or egregious.  Rather, it was a typical second degree murder.
Furthermore, petitioner's involvement was minimal in nature.  Although still liable
for the murder under an aiding and abetting and derivative liability theory,
petitioner was not the direct perpetrator of the shooting.  Even if petitioner's
conduct is greater than that minimally required for a second degree murder, it is
insufficient to support a finding that petitioner *currently poses* an unreasonable
risk to society if released from prison.  The Board erred in finding that the
circumstances of the offense were sufficient to support a finding that petitioner
poses an "unreasonable risk to society" if released from prison.  There is nothing
about petitioner's commitment offense which supports an inference that as a result
of his offense, he *currently poses* an *unreasonable risk to society* if released.

                                    X

        Petitioner further alleges that the Board's finding that petitioner "hasn't
developed the insight that he needs into the causative factors of this crime," is
without support.  All of the current evidence before the Board affirmatively
demonstrates that petitioner accepts full responsibility for his actions and
understands the causative factors which led to his participation in the life offense.
Petitioner understands how his participation in the underlying felony facilitated his
co-defendant's commission of the murder and how his life choices led to his

                                    10

involvement in the offense. The Board's decision to the contrary is without merit.

None of the psychological staff indicated or recommended that petitioner needed or required additional self-help or therapy *prior* to being released from prison in order to gain insight into the causative factors which led to his involvement in the life offense. Rather, the available evidence shows that petitioner has "insight into the negative aspects of gang involvement" and has "remorse for his actions." (Exhibit E: BPT Mental Health Evaluation, p. 5.) Dr. C. Saindon, Ph.D., who drafted the mental health evaluation opined that petitioner "is competent and responsible for his behavior" and "does not have a mental health disorder which would necessitate treatment either during his incarceration period or following parole." (Exhibit E.) Saindon found that petitioner "was open in his conversation and emphasized throughout the interview his recognition that gang affiliation had only resulted in injury to himself and to those around him." (Exhibit E, p. 4.) Saindon further found that petitioner "showed significant insight into his commitment offense . . ." (Exhibit E, p. 4.) There was no evidence to support the Board's finding that petitioner lacks insight into the commitment offense or requires additional self-help or therapy to understand the causative factors which led to the commitment offense. Petitioner's version of the offense is consistent with the evidence before the Board. Petitioner was convicted of second degree murder under an aider and abettor theory and the natural and probable consequences doctrine. Petitioner has always accepted responsibility for his role

11

in the offense and appreciates how his involvement in the underlying offense facilitated his co-defendant's actions wherein he retrieved a gun and shot the victim who was engaged in a fight with petitioner and others. The Board's conclusion that petitioner requires additional therapy to understand the causative factors of his life offense is with wholly without support.

## XI

Petitioner did not file an administrative appeal because on April 15, 2004, Title 15 of the California Code of Regulations sections 2050 and 2051 were repealed and the administrative appeals process was abolished.

## XII

On August 18, 2006, petitioner filed a Petition for Writ of Habeas Corpus in the Superior Court of California for the County of Orange. On August 31, 2006, the Superior Court denied the writ finding that the BPH 's denial was authorized bt Penal Code section 3041, subdivision (b). (Exhibit J: Denial of the Superior Court.) Citing In re *Dannenberg, supra,* at 1071, the court concluded that the BPH was not required to consider the factors set forth in California Code regulations, title 15, section 2402. (Exhibit J.) The court reasoned that in petitioner's case the BPH pointed to the gang-related nature of the offense, a factor beyond the minimum elements of second degree murder. The Superior Court's decision, ignored the claims made in petitioner's writ. The court failed to address petitioner's claim that denial of parole based solely on the unchanging factor of the

12

commitment offense violated the constitutional prohibition against cruel and unusual punishment and instead simply recites the analysis contained in *Dannenberg* without an examination of the constitutionality of the far reaching effects of this case and its application to cases such as petitioner's. The court failed to explain the reasoning behind the considerations of elements unrelated to the offense for which petitioner has been committed and instead blindly followed the reasoning of the BPH.

Petitioner filed a new writ in the Court of Appeal, Fourth Appellate District, Division Three (Case No. G037732). On November 9, 2006, the Court denied the petition without comment. (Exhibit K: Denial by the Court of Appeal.)

### XIII

Petitioner has no other plain or speedy remedy to address the issues set forth in the instant petition.

### XIV

No other applications or motions have been filed in regard to the matters complained of herein. This petition is addressed to this Court's original habeas corpus jurisdiction.

### XV

WHEREFORE, petitioner prays that this Court:

A.    Issue its writ of habeas corpus or Order To Show Cause;

B.    Conduct an evidentiary hearing wherein petitioner can obtain

13

additional evidence in support of his petition for writ of habeas;

C.    After a full hearing on the matter, grant petitioner's petition for writ

of habeas corpus and issue an order directing the Board of Prison

Terms to hold a new parole suitability hearing consistent with the

standards set forth in *In re Rosenkrantz* (2002) 29 Cal.4th 616, 625-

626, 656-657 and *In re Dannenberg* (2005) 34 Cal.4th 1061;

D.    Grant such other relief as this Court deems necessary and proper; or

Dated: December 6, 2006      Respectfully submitted,

MARILEE MARSHALL & ASSOCIATES, INC.

JENNIFER PEABODY

Attorneys for Petitioner

14

## VERIFICATION

I the undersigned say:

I am the attorney for petitioner in this action; petitioner is in custody and restrained of his liberty at this time in a county other than that in which I maintain my office.  For these reasons, I am making this verification on petitioner's behalf. I have read the foregoing petition and know the contents thereof, which are based upon the records of the Superior Court of Alameda County, the records of the Department of Corrections, and the exhibits attached hereto.

The above document is true of my own knowledge, except as to matters that are stated on my information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing facts and allegations in the petition are true and correct.

Executed at Los Angeles, California, this 6th day of December, 2006.

JENNIFER PEABODY

15

record and thus is devoid of a factual basis, the court should grant the prisoner's

petition for writ of habeas corpus and should order the Board to vacate its decision

denying parole and thereafter to proceed in accordance with due process of law."

(*In re Scott* (2004) 119 Cal.App.4th 871.) "When the supported factors could

justify denying parole, but it is not clear that the Board would have reached this

conclusion," "the appropriate remedy is to direct the Board to reconsider the

prisoner's parole suitability in accordance with the discretion allowed by law."

(*Id.*)

## II

### THE PAROLE BOARD'S DECISION WAS NOT SUPPORTED BY ANY EVIDENCE AND RESULTED IN A DEPRIVATION OF PETITIONER'S FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

A.    The Applicable Law

Under California law, a life prisoner *must be* paroled when his or her

release would not pose a danger to the public.  (Pen. Code § 3041, subd. (b).)

Penal Code section 3041 confers upon the Board of Prison Terms its authority and

its duty to determine eligibility for parole.  That section provides that "[o]ne year

prior to the inmates minimum eligible parole release date a panel consisting of at

least two commissioners of the Board of Prison Terms . . . shall normally set a

parole release date. . ."  (Pen. Code § 3041, subd. (a).)  This requirement that

normally a parole release date shall be set is made subject to explicit statutory

17

criteria in subdivision (b) of section 3041. Subdivision (b) provides,

> The panel or board *shall* set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Matters to be considered by the Board of Prison Terms in making a parole suitability include: The circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special circumstances under which the prisoner may safely be released to the community, and any other information which bears on the prisoner's suitability for release. (Cal. Code Regs., tit. 15, §2402, subd. (b).) Subdivision (c) of Title 15 section 2402 sets forth six nonexclusive circumstances tending to show unsuitability, "the relevant importance of which is left to the judgment of the Board." (*In re Scott, supra,* 119 Cal.App.4th 871.) The factors showing unsuitability include (1) the commitment offense, (2) a previous record of violence, (3) unstable social history, (4) sadistic sexual offenses, (5) psychological factors, and (6) institutional behavior. (Cal. Code Regs. tit. 15 § 2402, subd. (c).) Subdivision (d), on the other hand, identifies nine circumstances tending to show

suitability for release. The circumstances showing suitability include: (1) no

juvenile record, (2) stable social history, (3) signs of remorse, (4) motivation for

the crime, (5) battered woman's syndrome, (6) lack of criminal history, (7) age, (8)

understanding and plans for the future, and (9) institutional behavior. (Cal. Code

Regs. tit. 15 § 2402, subd. (d).) Neither the Board nor the Governor may deny

parole to petitioner unless he currently poses "an unreasonable risk of danger to

society if released from prison." (Cal. Code Regs. (hereinafter "CCR"), tit. 15, §

2402, subd. (a); See also, Cal. Const., Art. V, § 8, subd. (b).) Due process

requires the Board's decision "reflect an individualized consideration of the

specialized criteria." (*In re Rosenkrantz, supra,* 29 Cal.4th at 677.) The Parole

Board's decision to deny parole will not be disturbed if supported by "some

evidence" and based upon the factors set forth in Penal Code section 3041,

subdivision (b). (*In re Rosenkrantz, supra,* 29 Cal.4th at 676-677; *In re Capistran*

(2003) 107 Cal.App.4th 1299.) In the instant case, there was no evidence to

support the Board's decision.

     The Fourteenth Amendment provides that no state shall deprive any person

of life, liberty or property without due process of law. (U.S. Const., Amend. XIV,

§ 1.) Federal courts examine questions of procedural due process in two steps.

First, the court ascertains whether there is a liberty or property interest that was

interfered with by the state. Second, if there is such an interest, the courts must

determine if the procedures attendant upon a depravation of that interest were

constitutionally sufficient. (*Board of Regents of State Colleges v. Roth* (1972) 408

U.S. 564, 571 [92 S.Ct. 2701, 33 L.Ed.2d 548].)

The Supreme Court in *Greenholtz v. Inmates of Nebraska Penal* (1979) 442

U.S. 1, 7, 11-12 [99 S.Ct. 2100, 60 L.Ed.2d 668] and *Board of Pardons v. Allen*

(1987) 482 U.S. 369, 373 [107 S.Ct. 2415, 96 L.Ed.2d 303] established that:

> while there is no constitutional or inherent right of a convicted
> person to be conditionally released before the expiration of a valid
> sentence, a state's statutory scheme, if it uses mandatory language,
> creates a presumption that parole release will be granted when or
> unless certain designated findings are made, and thereby give rise to
> a constitutional liberty interest.

The Ninth Circuit Court of Appeals in *McQuillion v. Duncan* (9th Cir. 2002) 306

F.3d 895 and *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910 examined the parole

scheme in California, namely, Penal Code section 3041, and concluded that

language is mandatory and thus, "creates a presumption that parole release will be

granted" unless the statutorially defined determinations are made. These courts

found that the California parole scheme uses mandatory language and is largely

parallel to the schemes found in *Greenholtz* and *Allen*. (*McQuillion v. Duncan*,

*supra*, 306 F.3d at 901, *Biggs v. Terhune, supra*, 334 F.3d at 914.)  Accordingly,

the Courts found that "it is clear that 'California's parole scheme gives rise to a

cognizable liberty interest in release on parole.'" (*McQuillion v. Duncan, supra*,

306 F.3d at 902, *Biggs v. Terhune, supra*, 334 F.3d at 914.)  "The liberty interest

is created, not upon the grant of a parole date, but upon the incarceration of the

inmate." (*Id.* at 915.)

Because the California parole scheme vests in every inmate, a constitutionally protected liberty interest, the court must look to the second step in the procedural due process analysis to see of adequate procedural protections were afforded. (See, *Biggs v. Terhune, supra*, 334 F.3d at 915.) "In the parole context, the requirements of due process are satisfied if "some evidence" supports the decision." (*McQuillion v. Duncan, supra*, 306 F.3d at 304.) "Additionally, the evidence underlying the board's decision must have some *indicia of reliability*." (*Biggs v. Terhune, supra*, 334 F.3d at 915 [emphasis added].) "To ensure that a state-created parole scheme serves the public interest purposes of rehabilitation and deterrence, the Parole Board must be cognizant not only of the factors required by state statute to be considered, but also the concepts embodied in the Constitution requiring due process of law." (*Id.* citing *Greenholtz v. Inmates, supra*, 442 U.S. at 7-8.) In California, in order to comply with the due process requirements of the state and federal constitution, the decision to deny parole must be based on (1) some evidence; (2) of the existence of the factors specified by the statutory framework; (3) that is relevant and reliable and (4) that suggests an inmate poses a *current unreasonable* threat to public safety. (Title 15 CCR § 2402, subds. (a)(b); See, *Jancsek v. Oregon Bd. of Parole* (9th Cir. 1987) 833 F.2d 1389, 1390.) In the instant case, there was no reliable evidence before the Parole Board indicating that petitioner poses a *current unreasonable risk* to society if

21

released from custody. Accordingly, the Board's failure to grant petitioner a parole release date violated petitioner's Fifth and Fourteenth Amendment due process rights.

B.    There is No Evidence to Support the Board's Decision that Petitioner Posed an Unreasonable Risk of Danger to Society if Released From Prison

At petitioner's second subsequent hearing, the Board again determined that petitioner would pose a current unreasonable risk to society if released from prison. (Exhibit A.) In making this determination, the Board found that (1) the offense was carried out in a manner demonstrating a callous disregard for human suffering and a disregard for public safety, (2) the motive for the offense was "very trivial" and (3) petitioner's statement, "I thought I was going to a fist fight," "minimizes the gravity of the crime" and minimizes petitioner's involvement in the offense. (Exhibit A, pgs. 61-64.) The Board however, commended petitioner for having "a relatively criminal free background," "a history of stable relationships, including your family support," programming "commendably," upgrading educationally, "a very reputable list of vocational achievements," consistent "participation in self-help," total lack of disciplinary violations and "outstanding parole plans." (Exhibit A, pgs. 62-63.) Despite all of petitioner's accomplishments and achievements, the Board inexplicably found that the positive factors showing suitability do not outweigh the factors showing unsuitability. The

22

Board then recommended that petitioner: (1) "get self-help," (2) "stay disciplinary free," (3) "get therapy," and (4) continue his educational and vocational development." (Exhibit A, pgs. 64-65.) The Board's decision was unsupported by any evidence in the record. Rather, all competent evidence, including petitioner's Board Reports and Psychological Reports, overwhelmingly established that petitioner does not pose an unreasonable risk to society if released from prison. According, habeas relief is warranted.

The current evidence presented to the Board shows that petitioner does not pose an unreasonable risk of danger to the public or a threat to the public safety. Petitioner's Mental Health Evaluation report authored by C. Saindon, Ph.D. on January 23, 2002, was supportive of release. Dr. Saindon concluded, "if released to the community, [petitioner's] violence potential is estimated to be less than the average citizen in the community, given his insight, his demonstrated ability to stay out of trouble, his successful development of plans upon release, and the support of his family." (Exhibit E, p. 5.)

Saindon's opinion is consistent with the findings of petitioner's correctional counselors. All of petitioner's correctional counselors have been supportive of release on parole. While his current Life Prisoner Evaluation Report does not contain a risk assessment due to new rules by the Board, the report is nonetheless supportive of release. In the section titled "Assessment," petitioner's counselor opined,

23

Inmate Ngo does not have any prior record of criminal conduct
(considering the recency and frequency of prior crimes) and the
circumstances of the instant offense, he does not appear to be
criminally minded and has a good insight into himself. He has been
able to maintain himself relatively disciplinary free (of serious rules
violations) since 2/12/00 [sic]. In 9/12/97 and 2/27/97, he acquired
two (2) Certificates of Completion, Vocational Automotive
Refinishing and Upholstery, respectively. In addition, he is in the
process of acquiring college credits via correspondence from
Coastline Community College with the hope that said credits will be
transferable to a university and eventually obtain a degree in
Biology. Finally, he has achieved realistic parole plans. (Exhibit F:
Life Prisoner Evaluation August 2005, pgs. 2-3.)

In the Life Prisoner Evaluation Report prepared for the May 2004

hearing, petitioner's correctional counselor concluded, "Considering the

commitment offense, minimal prior arrest record and good prison adjustment, the

writer believes that Ngo would probably pose a low degree of threat to the public

at this time, if release[d] from prison." (Exhibit G: Life Prisoner Evaluation May,

2004.) In reaching this decision, CCI Rubio relied on petitioner's immaturity at

the time of the offense, being easily influenced by his peers and his limited

criminal history and lack of violence in custody. (Exhibit G, p. 3.) Rubio further

found the crime to be "episodic in nature." (Exhibit G, p. 3.) In April 2002,

petitioner's counselor was also supportive of parole. CCI Rubio found that

petitioner would probably pose a "moderate to low degree of threat to the public at

this time, if released from prison." (Exhibit H: Life Prisoner Evaluation April,

2002.)

The information before the Board overwhelmingly established that

24

petitioner does not pose an unreasonable risk to society if released from prison. The mental health professional who has evaluated petitioner and make a risk assessment has concluded that petitioner posed a low risk to society if released from prison. Furthermore, the correctional counselors have determined that petitioner poses a low risk if released. These experienced individuals have unanimously concluded that petitioner does not pose an "unreasonable risk" to society if released from prison. These conclusions are supported by petitioner's age, his new-found maturity, the "episodic" nature of his offense, his institutional adjustment and his involvement in NA and other self-help and therapy programs. Petitioner is currently 33 years old and has gained the maturity he was lacking at the time of his commitment offense when he was only 19 years old. He has gained insight into the negative impact his involvement with wanna-be gangsters had on his life, the victim's life and society in general. He has been incarcerated since 1993. While incarcerated, he has suffered no 115's, has engaged in no acts of violence and has shown no propensity toward future criminality. Petitioner's offense, as recognized by the experts evaluating petitioner, was episodic in nature, and the result of immaturity and negative peer influences. (Exhibits E, F, G, H.) Nothing about petitioner or his offense supports a finding that he poses *a current unreasonable risk* to society if released from prison.

Furthermore, there is no current evidence to support a finding that petitioner requires additional self-help or therapy to gain further insight into his offense in

order to be able to ensure that he no longer poses a danger to society. Rather, all
the evidence before the Board shows that petitioner has participated in all of the
available self-help programs and no longer requires self-help or therapy in order to
ensure that he does not pose an unreasonable risk to society if released. As Dr.
Saindon found, petitioner has "insight into the negative aspects of gang
involvement." (Exhibit E, p. 5.) In concluding that petitioner poses less potential
for violence than the average citizen, Saindon relied, in part, on petitioner's
"insight." (Exhibit E, p. 5.) Similarly, when petitioner was evaluated by Dr. C.
Schroeder, Ph.D. in December, 1996, Dr. Schroeder noted that at the time of the
offense, petitioner had very limited insight into the causative factors which led to
the offense. However, Schroeder noted that now, "In hindsight, he sees that he
perhaps could have stopped the incident and now has great empathy and remorse
for the family of the victim." (Exhibit I, p. 2.) Schroeder further noted that
petitioner is now "able to think before acting." (Exhibit I, p. 2.) Petitioner has
always accepted responsibility for his role in the commitment offense and his
version of the offense is consistent with the prosecution's theory and the evidence
presented against petitioner. Petitioner has always stated that he did not intend to
kill the victim. This lack of intent is consistent with the prosecution's theory of
the case. Petitioner was tried as an aider and abettor. The jury was instructed with
the natural and probable consequences doctrine which permitted the jury to find
that petitioner was guilty of second degree murder if he aided and abetted the fist

26

fight and that the shooting was a natural and probable consequence of aiding and

abetting the fight.  (Exhibit D.)  Thus, there was no requirement that petitioner

form the specific intent to kill or be aware that anyone else formed the specific

intent to kill. [1] (Exhibit D.)  The Board's finding that petitioner lacks insight into

the commission of his life offense is without any support and is based solely on

ignorance of applicable California law governing aiding and abetting and the

natural and probable consequences theory of second degree murder.  There is no

evidence to support a finding that petitioner lacks insight into the life offense and

requires additional self-help to gain such insight.

    In the instant case, the record is devoid of any evidence that of aggravated

---

[1]

Under the natural and probable consequences doctrine, " ... the aider and abettor in a proper case is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable consequences of any act that he knowingly aided or encouraged." (*People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5; *People v. Prettyman* (1996) 14 Cal.4th 248.)  Thus, the pivotal question is, "whether the collateral criminal act was the ordinary and probable effect of the common design or was a fresh and independent product of the mind of one of the participants, outside of, or foreign to, the common design." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 531 citing *People v. Kaufman* (1907) 152 Cal. 331, 337; See also, *People v. Durham* (1969) 70 Cal.2d 171, 182-183.)  Each juror must be convinced, beyond a reasonable doubt, that the defendant aided and abetted the commission of a criminal act, and that the offense actually committed was a natural and probable consequence of that act.  (*People v. Prettyman, supra,* 14 Cal.4th at 268.)  In order to determine whether a particular criminal act was a natural and probable consequence of another criminal act aided and abetted, a jury must determine whether, "under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant." (*People v. Nguyen, supra,* 21 Cal.App.4th at 531 citing, *People v. Woods* (1992) 8 Cal.App.4th 1570, 1587; See, *People v Mendoza* (1998) 18 Cal.4th 1114, 1133; *People v. Price* (1991) 1 Cal.4th 324, 443.)

conduct reflecting an exceptionally callous disregard for human suffering.  Rather,

the offense was a routine second degree gang murder premised on an aiding and

abetting theory and the natural and probable consequences doctrine.  Petitioner

was not the shooter and there was no evidence that he intended for the victim to be

shot or had knowledge that the shooter had armed himself with a firearm during

the fight.  Rather, the testimony was that petitioner aided and abetted a fight which

led to the commission of murder.  As petitioner's counselor noted, the crime was

"episodic" in nature and was not indicative of petitioner's character.  (Exhibits G

and H.)  Furthermore, whether a particular second degree murder is exceptionally

callous or especially heinous, atrocious or cruel is relevant only to inform a

judgment that the inmate poses a current unreasonable threat to public safety.  The

"commitment offense" subfactors set forth in section 2402, subdivision (c),

subsection (1) speak to this question- they focus on past acts as predictors of an

inmate's future dangerousness, and are not meant to simply prolong punishment.

Nothing about petitioner's commitment offense supports an inference that

petitioner *currently* poses an unreasonable risk to society if released.  Following

*Dannenberg*, the First Appellate District, Division Two in *In re Elkins* (2006) 144

Cal.App.4th 475, stated, "The commitment offense can negate suitability only if

circumstances of the crime reliably established by evidence in the record rationally

indicate that the offender will present an unreasonable risk to public safety if

released from prison.  Yet, the predictive value of the commitment offense may be

28

very questionable after a long period of time." Here, there is nothing about petitioner's commitment offense which supports an inference that he currently poses an unreasonable risk to society.

Contrary to the finding of the Board, there is no evidence to support a finding that petitioner's commitment offense supports an inference that he currently poses an unreasonable risk to society if released.  The Board's conclusion that petitioner remains a danger to society, is so lacking in any medical, psychological or behavioral evidentiary support that it is arbitrary and capricious. Petitioner's continued confinement absent some evidence showing that he currently poses an unreasonable risk to society violates the Fifth and Fourteenth Amendments of the United State Constitution.  Petitioner should be given a parole release date.

C.  Reliance Solely on the Facts and Characterization of Petitioner's Commitment Offense and Petitioner's Prior Record to Deny Parole Resulted in a Violation of the Eighth and Fourteenth Amendment Prohibition Against Cruel and Unusual Punishment.

Even assuming that petitioner's offense is "cruel, callous or dispassionate," over and above that necessarily implied in second degree murder, the crime fails to support a finding that petitioner currently poses an unreasonable risk to society if released.  Petitioner was only 19 years old at the time he committed the life offense and, as discussed thoroughly above, petitioner was convicted as an aider

29

and abettor. He has been in state prison for 13 years. While in custody, he has stayed away from trouble and/or violence and has been without any 115's during his entire term. The crime, as discussed above, was episodic in nature and was not indicative of his character. Petitioner was young and susceptible to negative peer influences. Other than the life offense, petitioner had no prior violent criminal history. His only other contact with law enforcement was when he was arrested for possessing cocaine. As a result of his arrest, petitioner was diverted pursuant to Penal Code section 1000. Petitioner has obtained treatment in prison for his drug use and has remained clean throughout his incarceration. Nothing about petitioner's commitment offense supports an inference that he currently poses an unreasonable risk to society. As discussed above, all of the available evidence, including the professional opinions of the mental health professionals who evaluated petitioner and petitioner's correctional counselors, indicates that despite the facts of petitioner's commitment offense, petitioner does not pose an unreasonable risk to society if released from custody.

Petitioner recognizes that in *In re Danneberg, supra*, 34 Cal.4th at 1071, the California Supreme Court concluded that "the Board in exercising its traditional broad discretion, may protect public safety *in each discrete case* by considering the dangerous implications of a life-maximum prisoner's crime individually." [emphasis in original.] The court, however, added, "Of course, no inmate may be imprisoned beyond a period that is constitutionally proportionate to

30

the commitment offense or offenses." (*Id.*) In the instant case, continual reliance by the Board on the facts and characterization of petitioner's commitment offense to support a current finding of dangerousness violates the state and federal prohibition against sentences which are cruel and unusual. When the facts of petitioner's offense are considered in relation to the time served and performance in prison, continual confinement based solely on the nature of petitioner's offense and prior criminal history is constitutionally excessive.

The facts of petitioner's commitment offense will never change. However, it does not necessarily follow that petitioner will always remain a danger to society, especially in light of the overwhelming evidence that petitioner no longer poses a danger to society. In the instant case, there is no evidence to support the Board's finding that the facts of petitioner's commitment offense render him a danger to society if released from custody. Petitioner has served more than 13 years in custody. Petitioner's rehabilitation, as documented in the psychological evaluations and counselor's report, clearly establishes that petitioner poses no danger to society if released. In the instant case, reliance on the facts of petitioner's commitment offense and his prior record are insufficient to justify the denial of parole. Petitioner's continued confinement based solely such immutable factors violates the state and federal prohibition against sentences which are cruel and unusual.

31

III

## CONCLUSION

For all of the foregoing reasons, this Court should grant writ relief and direct the Board of Prison Terms to conduct a parole eligibility hearing that complies with the requirements in *In re Rosenkrantz, supra,* 29 Cal.4th at 625-626, 656-657 and *In re Dannenberg, supra,* 34 Cal.4th 1061.

Dated: December 6, 2006                 Respectfully submitted,

MARILEE MARSHALL & ASSOCIATES, INC.

JENNIFER PEABODY

Attorneys for Petitioner

## **CERTIFICATE OF COMPLIANCE**

The text of this brief consists of 7756 words as counted by the WordPerfect version 8 word processing program used to generate this brief.

Dated: December 6, 2006                Respectfully submitted,

JENNIFER PEABODY

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

I am over eighteen (18) years of age, and not a party to the within cause; my business address is 523 West Sixth Street, Suite 1109, Los Angeles, CA. 90014. That on December 6, 2006, I served a copy of the within:

### PETITION FOR WRIT OF HABEAS CORPUS

On the interested parties by placing them in an envelope (or envelopes) addressed respectively as follows:

Office of the Attorney General
P.O. Box 85266
San Diego, CA 92186-5266

Court of Appeal
Fourth Appellate District / Division 3
925 N. Spurgeon Street
Santa Ana, CA 92701-3700

Mr. Sieu Phong Ngo
J-07024/ B-wing 319-up
CTF- Soledad
P.O. Box 689
Soledad, CA 93960-0689

Each said envelope was then, on December 6, 2006, sealed and deposited in the United States mail at Los Angeles, California, the county in which I maintain my office, with postage fully prepaid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 6, 2006, at Los Angeles, California.

SHANNON CALLAHAN

ORIGINAL

# S148684

# IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

In re

SIEU NGO

On Habeas Corpus

Case No. _____

SUPREME COURT
FILED

DEC - 7 2006

Frederick K. Ohlrich Clerk

DEPUTY

FROM THE JUDGMENT OF THE SUPERIOR COURT OF ORANGE COUNTY, THE
HONORABLE KAZUHARU MAKINO, JUDGE PRESIDING

## EXHIBITS IN SUPPORT OF
## PETITION FOR WRIT OF HABEAS CORPUS

**MARILEE MARSHALL**
State Bar No. 101046
**JENNIFER PEABODY**
State Bar No. 198746
**MARILEE MARSHALL & ASSOCIATES, INC**
Attorneys at Law
523 W. Sixth Street
Suite 1109
Los Angeles, CA 90014
(213) 489-7715 Phone
(213) 489-3754 Fax

Attorneys for Petitioner

RECEIVED

DEC - 7 2006

CLERK SUPREME COURT
LOS ANGELES

# <u>TABLE OF EXHIBITS</u>

Exhibit A    Transcript of Parole Hearing 2/8/2006 . . . . . . . . . . . . . . . . . . . . . . . . . .    1

Exhibit B    Transcript of Parole Hearing 5/13/2002 . . . . . . . . . . . . . . . . . . . . . . .    71

Exhibit C    Transcript of Parole Hearing 8/3/2004 . . . . . . . . . . . . . . . . . . . . . . .    139

Exhibit D    Support letter from Donald G. Rubright . . . . . . . . . . . . . . . . . . . . . . .    206

Exhibit E    Psychological Evaluation 1/23/2002 . . . . . . . . . . . . . . . . . . . . . . . . .    210

Exhibit F    Life prisoner Evaluation 8/2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . .    218

Exhibit G    Life Prisoner Evaluation 5/2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . .    224

Exhibit H    Life Prisoner Evaluation 5/2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . .    232

Exhibit I    Psychological Evaluation 12/27/1996 . . . . . . . . . . . . . . . . . . . . . . . .    238

Exhibit J    Superior Court Minute Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    242

Exhibit K    Court of Appeal Order Denying Petition . . . . . . . . . . . . . . . . . . . . . . .    247

# EXHIBIT A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:                )        CDC Number J-07024
                           )
SIEU NGO                   )
                           )        **INMATE**
_____)
                                    **COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

FEBRUARY 8, 2006

9:58 A.M.

PANEL PRESENT:

Ms. Sandra Bryson, Presiding Commissioner
Mr. Doug Filangeri, Deputy Commissioner

OTHERS PRESENT:

Mr. Sieu Ngo, Inmate
Ms. Tara Rutledge, Attorney for Inmate
Mr. Tom Crofoot, Deputy District Attorney
Correctional Officers Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No      See Review of Hearing
_____  Yes     Transcript Memorandum

Sue Gerdes, Peters Shorthand Reporting

ii

## INDEX

|                                   | PAGE |
|-----------------------------------|------|
| Proceedings                       | 1    |
| Case Factors                      | 5    |
| Pre-Commitment Factors            | 6    |
| Post-Commitment Factors           | 12   |
| Parole Plans                      | 24   |
| Closing Statements                | 47   |
| Recess                            | 59   |
| Decision                          | 60   |
| Adjournment                       | 66   |
| Transcriber Certification         | 67   |

--oOo--

1

1           P R O C E E D I N G S

2           DEPUTY COMMISSIONER FILANGERI:  We're on

3    record.

4           PRESIDING COMMISSIONER BRYSON:  This is a

5    Subsequent Parole Consideration Hearing for Sieu

6    Ngo CDC number J-07024.  Today's date is

7    February 8th, 2006 and the time is 9:58 A.M.  We

8    are located at Correction Training Facility in

9    Soledad.  The inmate was received on February

10   1st, 1994 committed from Orange County.  The

11   life term began February 1st, 1994.  The

12   inmate's minimum eligible parole date is May

13   24th, 2003.  The controlling offense for which

14   the inmate is committed is set forth in case

15   number C199109 charging in count one a violation

16   of Penal Code 187 murder second enhanced with a

17   weapon Penal Code 1222A sub one, armed with a

18   firearm to wit a 22 caliber pistol for which the

19   inmate received a term of 15 years to life plus

20   one year.  This hearing is being recorded.  For

21   the purpose of voice identification each of us

22   will state our first and last name, spelling the

23   last name.  When it is your turn Sir, after you

24   spell your last name please state your CDC

25   number.  I will start and then go to my left,

26   Sandra Bryson B-R-Y-S-O-N Commissioner Board of

27   Parole Hearings.

2

1    DEPUTY COMMISSIONER FILANGERI:  Deputy

2  Commissioner Doug Filangeri F-I-L-A-N-G-E-R-I.

3    DEPUTY DISTRICT ATTORNEY CROFOOT:  Tom

4  Crofoot C-R-O-F-O-O-T Orange County District

5  Attorney's Office.

6    ATTORNEY RUTLEDGE:  Tara E. Rutledge R-U-

7  T-L-E-D-G-E Attorney for Mr. Ngo.

8    INMATE NGO:  Inmate Ngo N-G-O first name

9  Sieu S-I-E-U middle name Phong P-H-O-N-G CDC

10  number J-07024.

11    PRESIDING COMMISSIONER BRYSON:  I note

12  for the record that we have two correctional

13  peace officers in the room who are here for

14  security purposes.  Commissioner Filangeri is

15  there any confidential material in the file and

16  if so will it be used today?

17    DEPUTY COMMISSIONER FILANGERI:  There is

18  none we will be using today.

19    PRESIDING COMMISSIONER BRYSON:  All right

20  I passed the hearing checklist marked exhibit

21  one to your counsel and I believe, do you have

22  that District Attorney?

23    DEPUTY DISTRICT ATTORNEY CROFOOT:  I have

24  it as well.

25    PRESIDING COMMISSIONER BRYSON:  All right

26  and confirming that the District Attorney has

27  the documentation

3

1        DEPUTY DISTRICT ATTORNEY CROFOOT:  I have

2    thank you.

3        PRESIDING COMMISSIONER BRYSON:  And

4    counsel you have the documentation.

5        ATTORNEY RUTLEDGE:  Yes.

6        PRESIDING COMMISSIONER BRYSON:  Thank

7    you.  Are there any additional documents to be

8    submitted counsel?

9        ATTORNEY RUTLEDGE:  No, just that the

10   packet that we provided dated February the 8th I

11   believe --

12       PRESIDING COMMISSIONER BRYSON:  We do

13   have this.

14       ATTORNEY RUTLEDGE:  Okay other than that

15   we have nothing to submit.

16       DEPUTY DISTRICT ATTORNEY CROFOOT:  I have

17   not seen that, can you just describe it for me?

18       ATTORNEY RUTLEDGE:  Sure, it's Mr. Ngo

19   has prepared sort of a, it's entitled Memorandum

20   of Evidence in Law and Support of Parole

21   Suitability where he tells the board, well, it

22   includes parole plans, what his place of

23   residence and employment, psych evaluation

24   reports, life prisoner evaluation reports,

25   includes his chronos and certificates which are

26   all in the C File, and support letters.  Last I

4

1   except the first two sections.  Is that correct

2   or not?

3          INMATE NGO:  I don't know.

4          ATTORNEY RUTLEDGE:  Everything else

5   beginning with the psych eval should –

6          INMATE NGO:  Should be all in there.

7          ATTORNEY RUTLEDGE:  Is all in the C File.

8   So if you want to review this I'll let you.

9          DEPUTY DISTRICT ATTORNEY CROFOOT:  That's

10  fine thank you.

11         PRESIDING COMMISSIONER BRYSON:  And we

12  will be going over those first two sections

13  basically here in the hearing.  All right Sir,

14  today you and your attorney signed a document

15  marked exhibit two regarding ADA Accommodation

16  Hearing Procedures and Inmate's Rights.  Counsel

17  do you have any comments or concerns regarding

18  the ADA Rights or the inmate's ability to

19  participate in the hearing?

20         ATTORNEY RUTLEDGE:  No.

21         PRESIDING COMMISSIONER BRYSON:  Are there

22  any preliminary objections?

23         ATTORNEY RUTLEDGE:  No, not at this time.

24         PRESIDING COMMISSIONER BRYSON:  All

25  right, will the inmate be speaking with the

26  panel?

27         ATTORNEY RUTLEDGE:

7

5

1   wrote there he will be speaking to the panel in

2   all issues other than the commitment offense

3   which he spoke to the board I believe at his

4   first hearing and he notes in his Memorandum,

5   let me just quote from there, "further more I

6   have fully and freely, I confess and accept the

7   facts of my personal culpability and

8   responsibility for the life term offense."  So

9   that would conclude his comments on the offense.

10  Other than that though he will discuss other

11  issues with the board.

12       **PRESIDING COMMISSIONER BRYSON:**  All right

13  then Sir if you are going to address the panel

14  we will swear you in.  So would you raise your

15  right hand please, do you solemnly swear or

16  affirm that the testimony you give at this

17  hearing will be the truth, the whole truth and

18  nothing but the truth?

19       **INMATE NGO:**  Yes I swear.

20       **PRESIDING COMMISSIONER BRYSON:**  All right

21  I will read the facts of the crime into the

22  record, information obtained from the probation

23  officer's report pages three and four.  On

24  September 18th, 1992 Angel Gonzales was beaten

25  and shot to death near Fullerton High School as

26  he was walking home after school.  An

6

1   the victim, a member of the "Fullerton's Toker's
2   Town" a Latin gang and member of "Fullerton's
3   Boyz" B-O-Y-Z an Asian gang were at a McDonald's
4   restaurant near the high school.  The victim and
5   No, that's N-O Muhamed M-U-H-A-M-E-D, had a
6   confrontation with each claiming there each
7   respective gang affiliations.  After this non
8   physical altercation the group of Asians which
9   at the time included Sieu Phong Ngo obtained a
10  firearm.  Ngo, N-G-O, and the Asian gang members
11  returned to the school where they waited for
12  Gonzales.  As he walked home he was attacked and
13  beaten.  During the physical altercation the
14  victim was shot one time in the back by Usumang
15  U-S-U-M-A-N-G last M-U-H-A-M-E-D, the group of
16  five Asian gang members including Ngo N-G-O fled
17  the area after the shooting.  Angel Gonzales
18  died at the scene as a result of the gun shot
19  wound.  Ngo N-G-O, Jimmy Dao D-A-O and Asat Cham
20  A-S-A-T-C-H-A-M fled to the state of Washington.
21  They were subsequently apprehended there and the
22  murder weapon, a stolen 22 caliber hand gun was
23  recovered in the vehicle.  All right Sir, as to
24  your pre-conviction record you have none as a
25  juvenile.  We have as to your adult arrest
26  history and conviction's, we have that on March
27  30th, 1992 you were arrested by the San Gabriel

7

1    Police Department for possession of a controlled

2    substance, three pieces of rock cocaine.  On May

3    7th, 1992 that was diverted pursuant to Section

4    1000 of the Penal Code.  And then on September

5    22nd, 1992 you were arrested by the Olympia

6    Sherriff's Office for possession of stolen

7    property.  This case was subsequently dismissed

8    and that of course ensued with the instant

9    crime.  And that comports with your record here

10   so they are the same.  Okay, all right, as to

11   your personal history, it's cleared also by the

12   way that you do have a strong stable family and

13   good social support.  Just reviewing it and then

14   your welcome to add to it if you would like.

15   You were born in Vietnam on May 18th 1973.

16        INMATE NGO:  Correct.

17        PRESIDING COMMISSIONER BRYSON:  And you

18   resided in the United States since 1979 so that

19   means that you basically came here when you were

20   six years old.  Is that right?

21        INMATE NGO:  Correct.

22        PRESIDING COMMISSIONER BRYSON:  In 1991

23   you graduated from Fullerton High School and

24   subsequently attended Fullerton Community

25   College and Pasadena City College.  As to your

26   high school courses and then your subsequent

10

8

1    professionally in both high school and college

2    as you went through?

3            INMATE NGO:  Well I was trying major in

4    small business and you know hopefully start my

5    own business one day.

6            PRESIDING COMMISSIONER BRYSON:  Okay, we

7    have here that you completed ten units and your

8    major was business.  Were those semester units,

9    is that what that's referencing?

10           INMATE NGO:  Yeah, semester.

11           PRESIDING COMMISSIONER BRYSON:  All

12    right, you were employed as a telemarketer and

13    worked odd jobs.  So you were working while you

14    were in college?

15           INMATE NGO:  Right.

16           PRESIDING COMMISSIONER BRYSON:  You were

17    employed at your family's liquor store and

18    resided with your parents.  We note that you had

19    problems with substance abuse including, it says

20    controlled substances or alcohol.  Would you

21    explain that a little more.  First of all your

22    record is very A characteristic of your getting

23    involved in this in the first place so that's

24    where I'm trying to gain some understanding.

25    You were in a gang, or a want to be gang at the

26    time?

27           INMATE NGO:  Correct.

9

1      PRESIDING COMMISSIONER BRYSON:  And what

2  go you motivated into the gang, I can't imagine

3  actually from your record?

4      INMATE NGO:  Well you know as kids you

5  always you know feel like you want to belong to

6  somebody or be a part of something you know.

7      PRESIDING COMMISSIONER BRYSON:  Right.

8      INMATE NGO:  I mean at that time you

9  know, that's how I felt when I was a kid you

10  know, wanted to belong to something you know.

11  Never thinking something like this leads to you

12  know what happened in this instant case but you

13  know that's my mistake you know choosing the

14  wrong friends you know, not knowing any better

15  but now your know I realize what I did was you

16  know by choosing wrong friends you know can cost

17  you your life you know, ruin your life.

18      PRESIDING COMMISSIONER BRYSON:  Were your

19  parents aware of your involvement with gangs and

20  or drugs?

21      INMATE NGO:  At that time I don't know,

22  no they weren't aware of it you know because you

23  know I guess you know you can say I hide from

24  them or what not because like was said earlier

25  we just more like want to be gang member.  We

26  just like, there was five of us we like friends

27  you know we just hang around you know do what

12

10

1  kids do, you know, play arcade and what not you

2  know, that's about it.

3      PRESIDING COMMISSIONER BRYSON:  Were your

4  parents both employed?

5      INMATE NGO:  Yes they were, we own -- at

6  that time we had a family business, a liquor

7  store.

8      PRESIDING COMMISSIONER BRYSON:  Right.

9      INMATE NGO:  Before that my dad you know

10 he was into making signs and stuff before we

11 purchased a liquor store.  From that point on we

12 just run a liquor store, a family liquor store

13 in Anaheim.

14     PRESIDING COMMISSIONER BRYSON:  You have

15 brothers and sisters?

16     INMATE NGO:  I have one older brother,

17 two older sisters and one younger brother, and

18 one younger sister.  There are all doing well, I

19 mean, my brothers getting married soon and they

20 all graduate, most of them graduated from

21 college and my little sister, I don't know,

22 right now I really don't know where she is

23 because of what happened to me and stuff like

24 that you know, my dad and he was passing away.

25 I don't know what happened, she came visit me

26 one time and she just moved out and I have never

/3

11

1        PRESIDING COMMISSIONER BRYSON:  I see.

2        INMATE NGO:  That's the only person,

3   thing I know about what -- I don't even know

4   where she is right now at this point, my little

5   sister so I would like to look for her when I

6   get out though if I'm given a second chance.

7        PRESIDING COMMISSIONER BRYSON:  Okay, now

8   is your mom still living?

9        INMATE NGO:  Yes my mom is still living.

10       PRESIDING COMMISSIONER BRYSON:  And how

11  is she doing?

12       INMATE NGO:  She's doing well.

13       PRESIDING COMMISSIONER BRYSON:  Is she

14  working or is she retired?

15       INMATE NGO:  Right now she's going to

16  school right now.  She's trying to learn English

17  she said you know so it's a good thing to keep

18  her occupied you know because since my dad

19  passed away and she really you know had no one

20  to you know talk to so you know friends wise and

21  what not so beside family members so she's going

22  to school from what I understand.

23       PRESIDING COMMISSIONER BRYSON:  All

24  right, let's go to post-conviction factors and

25  Commissioner -- do you have any questions first

26  of all relevant to the personal history?

14

12

1 thanks I do.  Are you suggesting that your

2 sister's disappearance has something to do with

3 your imprisonment?

4      INMATE NGO:  I think she was maybe

5 traumatized and I know she feel you know she's,

6 I don't know I can't personally say how she

7 feels but I think it might have a little affect

8 on her because you know she just moved away you

9 know so.  My family is still looking for her so.

10      PRESIDING COMMISSIONER BRYSON:  How old

11 is she now?

12      INMATE NGO:  She should be about 28 right

13 now, 28, 29.

14      DEPUTY COMMISSIONER FILANGERI:  So what

15 makes you think she might become traumatized?

16      INMATE NGO:  At the time my dad was sick

17 and he was dying of cancer and me being in

18 prison I guess it just, she didn't want to be

19 around at that time I guess.  I don't know what

20 the reason, I would like to know but I can't

21 answer that at this point right now.

22      DEPUTY COMMISSIONER FILANGERI:  Well what

23 would stop me from thinking that you're just

24 trying to exploit the situation to garner some

25 sympathy from the panel members?

26      INMATE NGO:  I'm not, not at all.

27      DEPUTY COMMISSIONER FILANGERI:  That's

15

13

1    all the questions I have.

2         **PRESIDING COMMISSIONER BRYSON:**   All

3    right, we'll go to post conviction factors with

4    Commissioner Filangeri.

5         **DEPUTY COMMISSIONER FILANGERI:**   Okay

6    thanks.  The purpose of this part of the hearing

7    is to detail your prison behavior since you last

8    appeared before the board.  I think that was

9    August 5th, 2004 where you were denied for one.

10   That was your first Subsequent Parole

11   Consideration Hearing.

12        **INMATE NGO:**   I was denied two years for

13   my first one and my Subsequent was one year.

14        **DEPUTY COMMISSIONER FILANGERI:**   Right,

15   that was 2004 your first Subsequent Parole

16   Consideration Hearing resulted in a one year

17   denial.

18        **INMATE NGO:**   Right, correct Sir.

19        **DEPUTY COMMISSIONER FILANGERI:**   The first

20   document that I want to refer to is the

21   Correctional Counselor's Report provided by F.I.

22   DeGuzman D-E-G-U-Z-M-A-N its dated 6/16/05.

23   Under post-conviction factors the counselor

24   writes that you've remained at CTF in the

25   general population, medium A with a mandatory

26   minimum placement score of 19 although your

*16*

14

1    a lifer without a date would have been zero.

2    The writer refers us to the post conviction

3    progress report which says that you're doing

4    independent studies through Coast Line Community

5    College.  I saw six items in the C File from

6    Coast Line College about training material,

7    tests, CDs and stuff like that.  Each one of

8    those items correspond to a particular course?

9          INMATE NGO:  Yes, like some course

10   require you know, it's enclosed with the books

11   along which explained the program itself but

12   since we can't, we don't allow the use of

13   computers so it's pretty much pointless so I had

14   to return it you know.

15         DEPUTY COMMISSIONER FILANGERI:  So if

16   they come on CD's you can't do the class?

17         INMATE NGO:  No, the CD just part of the

18   curriculum but it's just basically what there

19   teachers like explaining what's in the class

20   itself.

21         DEPUTY COMMISSIONER FILANGERI:  So you

22   can still do the class with the books and still

23   pass the tests?

24         INMATE NGO:  Yes.

25         DEPUTY COMMISSIONER FILANGERI:  You have

26   enough to do to pass the tests?

27         INMATE NGO:  Yes, you have a syllabus it

17

15

1  has all the curriculum in there.

2      DEPUTY COMMISSIONER FILANGERI:  Okay, I

3  saw that first item was I think dated around

4  2005, have you actually completed any of the

5  course work yet?

6      INMATE NGO:  For the Coast Line, yes.

7      DEPUTY COMMISSIONER FILANGERI:  Do you

8  have certificates?

9      INMATE NGO:  There's no certificate but I

10 have grades which unfortunately I don't have it

11 hear but I have listed all the courses I've

12 completed.  If you look -

13     DEPUTY COMMISSIONER FILANGERI:  What

14 section of that is that in the packet?

15     INMATE NGO:  Page seven of my Memorandum.

16     DEPUTY COMMISSIONER FILANGERI:  Okay

17 current academic and self help programs and down

18 here, here it is Coast Line College.

19     INMATE NGO:  Right.

20     DEPUTY COMMISSIONER FILANGERI:  So you

21 have completed biology 100.

22     INMATE NGO:  Correct.

23     DEPUTY COMMISSIONER FILANGERI:  Business

24 110.

25     INMATE NGO:  120.

26     DEPUTY COMMISSIONER FILANGERI:  I see,

27 this one says 110.

18

16

1          INMATE NGO:  Oh typo.

2          DEPUTY COMMISSIONER FILANGERI:  Okay,

3   counseling 105.

4          INMATE NGO:  Correct.

5          DEPUTY COMMISSIONER FILANGERI:

6   Psychology 100.

7          INMATE NGO:  Correct.

8          DEPUTY COMMISSIONER FILANGERI:  Sociology

9   100.

10         INMATE NGO:  Correct.

11         DEPUTY COMMISSIONER FILANGERI:  Spanish

12  180.

13         INMATE NGO:  Correct.

14         DEPUTY COMMISSIONER FILANGERI:  And your

15  currently enrolled in Health 100?

16         INMATE NGO:  No that's the old from a

17  previous board.

18         ATTORNEY RUTLEDGE:  Here maybe this one

19  will I think, in fact this does not have the

20  typo.  I didn't realize they weren't the same so

21  go right ahead.

22         DEPUTY COMMISSIONER FILANGERI:  I see

23  okay.  Okay this one says Business 120.  Spanish

24  180, Health 100 you've completed that?

25         INMATE NGO:  Yes.

26         DEPUTY COMMISSIONER FILANGERI:

27  Philosophy.

*19*

17

1          INMATE NGO:  Yes.

2          DEPUTY COMMISSIONER FILANGERI:

3   Communications 100.

4          INMATE NGO:  Yes.

5          DEPUTY COMMISSIONER FILANGERI:  Geology

6   100.

7          INMATE NGO:  Yes.

8          DEPUTY COMMISSIONER FILANGERI:  History

9   175.

10          INMATE NGO:  Yes.

11          DEPUTY COMMISSIONER FILANGERI:  Astronomy

12   100.

13          INMATE NGO:  Yes.

14          DEPUTY COMMISSIONER FILANGERI:  Marine

15   Science 100.

16          INMATE NGO:  Correct.

17          DEPUTY COMMISSIONER FILANGERI:  And your

18   currently enrolled in Humanities and Political

19   Science.

20          INMATE NGO:  Correct.

21          DEPUTY COMMISSIONER FILANGERI:  Okay,

22   let's see, 13 classes figuring there what, about

23   worth three units a piece?

24          INMATE NGO:  Three units except for

25   Spanish its five units.

26          DEPUTY COMMISSIONER FILANGERI:  So you

27   are more than halfway towards your AA degree?

20

18

1          INMATE NGO:   I have 41 unit.

2          DEPUTY COMMISSIONER FILANGERI:   How many?

3          INMATE NGO:   41 units currently.

4          DEPUTY COMMISSIONER FILANGERI:   And you

5    need 60?

6          INMATE NGO:   Sixty.

7          DEPUTY COMMISSIONER FILANGERI:   Great,

8    are you taking all the necessary core classes

9    that I'm assuming there are some classes that

10   have to be taken?

11         INMATE NGO:   Yes, I still have to take

12   English which is required and math so Political

13   Science is required so I'm taking it right now.

14   After I take those two classes I will be taking

15   Small Business and Business Management.

16         DEPUTY COMMISSIONER FILANGERI:   Great.

17         INMATE NGO:   To upgrade.

18         DEPUTY COMMISSIONER FILANGERI:   Great, it

19   seems to me I noticed that a test of Adult Basic

20   Education, it was 12.9.

21         INMATE NGO:   Correct.

22         DEPUTY COMMISSIONER FILANGERI:   All right

23   and I also saw a certificate of High School

24   Graduation from Fullerton in 1992.

25         INMATE NGO:   Correct.

26         DEPUTY COMMISSIONER FILANGERI:   Okay, all

27   right.   Let's go back to the Counselor's post-

21

19

1  conviction progress report.  It says that you

2  are assigned as the culinary store keeper office

3  aid with satisfactory grades.  You've got

4  certificates of completion in automotive

5  refinishing in 1997 and upholstery in 1997.  Now

6  that was when you were at LA County.

7        INMATE NGO:  Lancaster.

8        DEPUTY COMMISSIONER FILANGERI:  Lancaster

9  that's it, Lancaster.  You haven't had any

10 vocational upgrading since you've been at CTF?

11        INMATE NGO:  Well the only one that they

12 have right now it was drafting and at that time

13 was computer data.

14        DEPUTY COMMISSIONER FILANGERI:  It says

15 that your on the computer processing or the data

16 processing waiting list but I heard that people

17 been on that list forever.

18        INMATE NGO:  Forever, it's so I have a

19 upgrade on forklift things which is trade in

20 itself, a forklift operator.

21        DEPUTY COMMISSIONER FILANGERI:  That's

22 right, you didn't mention it.  I did see that.

23        PRESIDING COMMISSIONER BRYSON:  It's in

24 here.

25        DEPUTY COMMISSIONER FILANGERI:  2002, I

26 saw that.

27        INMATE NGO:  I am certified and I have a

20

1  new updated license I just been renewed.

2       DEPUTY COMMISSIONER FILANGERI:  Do you

3  use that forklift operator's license in this --

4       INMATE NGO:  Facility yes to move.

5       DEPUTY COMMISSIONER FILANGERI:  Culinary

6  store keeper office aid?

7       INMATE NGO:  Right.

8       DEPUTY COMMISSIONER FILANGERI:  Good.

9  Are there any more upgrades you can do on that?

10      INMATE NGO:  Besides fork lifting?

11      DEPUTY COMMISSIONER FILANGERI:  Something

12 about jacks you had some sort of certification.

13      INMATE NGO:  Those are hand jacks, it's

14 just like manual by my self.  It's pretty easy

15 to operate, they electric ones to though.

16      DEPUTY COMMISSIONER FILANGERI:  Okay in

17 terms of your education I also saw some peer

18 education back in 1999 for sexual transmitted

19 disease, HIV, AIDS, TB and hepatitis.

20      INMATE NGO:  Correct.

21      DEPUTY COMMISSIONER FILANGERI:  I saw a

22 document for anger management in 2005 and some

23 2000 documents for Salesmanship and Key to

24 Fatherhood, something through the Muslim Chapel

25 was it?

26      INMATE NGO:  Correct.

27      DEPUTY COMMISSIONER FILANGERI:  Okay

21

1    let's go to the psychological evaluation.  My

2    file indicates that there was a new

3    psychological evaluation ordered 1/20/06 which I

4    would guess is the reason why I'm having to use

5    the last one from 2002.  I realize it's old but

6    it's not particularly negative so I wouldn't be

7    surprised if we did have a new one it wouldn't

8    be similar.  And you should also know that the

9    board has a new directive that if your not

10   involved in the -- if your not Triple CMS or EOP

11   then we are not going to be asking for updated

12   psych reports.

13            **INMATE NGO:**  No I'm not.

14            **DEPUTY COMMISSIONER FILANGERI:**  So this

15   one is dated 1/31/02 and it's signed by, no it's

16   not signed by C. Saindon S-A-I-N-D-O-N PHD,

17   staff psychologist although he appears to be the

18   writer.  It is signed by Bill Zika Z-I-K-A PHD

19   Senior Supervising Staff Psychologist.  Under

20   clinical assessment on page four, current

21   diagnostic impressions on axis I no contributory

22   clinical disorder, axis II deferred, global

23   assessment of functioning score is 90.  The

24   examiner writes that there's no evidence that

25   inmate Ngo currently suffers from any

26   psychiatric illness.  Under review of the life

27   crime the inmate stated that he agreed with the

22

1    version of the crime given in the Central File

2    and the verdict from sentencing, however he

3    stated that no one intended to kill the victim.

4    Under assessment of dangerousness item 14 the

5    examiner writes that cocaine use and gang

6    affiliation resulted in the current offense.

7    Under item C, the most significant risk factors

8    of this inmate as a precursor to violence or

9    return to criminal behavior would be his re-

10   involvement with others having a criminal

11   history and or gang members.  If use of alcohol

12   and or drugs in isolation from his family

13   members.  Clinical observations, the inmate is

14   competent and responsible for his behavior.

15   Inmate does not have a mental disorder which

16   would resuscitate treatment either during his

17   incarceration period or following parole.  In

18   back of the short file there is several items

19   I'd like to make note of.  Oh yeah, here's the

20   tape test score, that was back in 1997 for 12.9

21   and there's a list of disciplinaries, there are

22   no 115's, two 128's minor in 1997 and 2000 for

23   failure to respond to a medical duckett, and a

24   covered window respectively.  Here is the

25   certificate to anger management that I already

26   said, talked about.  And there's a series of

27   chronos, one 11/06 for NA attendance, 12/8/05

23

1   completion of the Phobic Anger Management Class,

2   10/28/05 a laudatory chrono signed by

3   Correctional Supervising Cook W. Rogers R-O-G-E-

4   R-S, says he finds you to be a reliable worker

5   who needs little or no supervision working in

6   the culinary warehouse store keeper.  Says that

7   you are responsible for many tasks that require

8   attention to detail and accuracy and the writer

9   believes you would be an asset to any employer

10  upon release given your range of skills

11  including certification for the operation of

12  forklifts and power jacks.  6/13/05 is a chrono

13  for NA, 3/12/05 Narcotics Anonymous, 1/5/05

14  Correctional Supervising Cook W. Rogers writes

15  again that your , commending your outstanding

16  performance of your assignment, your still in

17  the culinary warehouse store keeper and Rogers

18  believes you can be relied upon to take the

19  initiative to ensure the varies duties your

20  responsible for are completed and you would be

21  an asset to any employer upon release given your

22  range of skills.  10/22/04 Narcotics Anonymous,

23  9/27/04 NA.  Is there anything else that you

24  want to call the panel's attention to regarding

25  behavior during the last, since August of 2004?

26          INMATE NGO:  That should be it for my

27  incarceration for what I been doing but as you

24

1  can I see I have a lot of support letter's here.

2      DEPUTY COMMISSIONER FILANGERI:  That's in

3  another segment of the hearing.

4      INMATE NGO:  All right.

5      DEPUTY COMMISSIONER FILANGERI:  Right now

6  I am just focusing on your behavior in the

7  institution and I don't mean to cut you off.

8      INMATE NGO:  Oh no problem.

9      DEPUTY COMMISSIONER FILANGERI:  If there

10  is something else that you have done that you

11  want to call our attention to now would be the

12  time.

13      INMATE NGO:  No that would be all.

14      DEPUTY COMMISSIONER FILANGERI:  Okay.

15      INMATE NGO:  Thank you.

16      DEPUTY COMMISSIONER FILANGERI:  Thank

17  you.

18      PRESIDING COMMISSIONER BRYSON:  All

19  right, we'll talk about your parole plans and

20  support which I have to say is extensive and  --

21      DEPUTY COMMISSIONER FILANGERI:  I'm

22  sorry, I forgot to mention the certificate that

23  Mr. Ngo handed us that 2005 certificate of

24  appreciation for your generous donation to the

25  5th Annual Correctional Training Facilities

26  Teddy Bear Drive.  I'm sorry.

27      PRESIDING COMMISSIONER BRYSON:  Thank

27

25

1  you.  It's very well thought out and well

2  organized, that's very helpful to the board.

3       INMATE NGO:  Thank you.

4       PRESIDING COMMISSIONER BRYSON:  Let's go

5  to your parole plans and I'd like to read these,

6  these seem very current, I assume they are.

7       INMATE NGO:  Yes they are.

8       PRESIDING COMMISSIONER BRYSON:  We will

9  go with this first.  You've organized it in a

10  liable way.  First you have articulated what you

11  plan to do in the first year of adjustment and

12  then for the next two to five years.  So for the

13  first one to twelve months you have written that

14  you will first report to work at "First China

15  Kitchen" or "Hot Wok" which will meet your

16  immediate needs.  So you would be working as a

17  cook there?

18       INMATE NGO:  Waiter, cashier, it don't

19  matter.

20       PRESIDING COMMISSIONER BRYSON:  Okay

21  second you would continue working toward

22  completing your Associates Arts Degree in

23  Liberal Arts at Coast Line Community College.

24       INMATE NGO:  Correct.

25       PRESIDING COMMISSIONER BRYSON:  Third you

26  would reinforce your relationship with your

27  family members, academically and technically

26

1    Fifth or fourth you would continue to attend and

2    participate in the local Narcotics Anonymous

3    Meetings and then you would also purchase an

4    automobile for transportation.  All right now,

5    this stuff tails into where you would plan to

6    reside during this time which would be with your

7    mother, Phuong Hung Ngo at Monterey Park.  Is

8    there anyone else living at home right now with

9    her?

10          INMATE NGO:  My little brother, he's

11   taking care of her.

12          PRESIDING COMMISSIONER BRYSON:  And how

13   is he doing, what's he do?

14          INMATE NGO:  He works at Kaiser

15   Permanente.

16          PRESIDING COMMISSIONER BRYSON:  Oh he

17   does.

18          INMATE NGO:  So, he's taking care of her.

19          PRESIDING COMMISSIONER BRYSON:  And does

20   he have a record of any sort?

21          INMATE NGO:  No, I am the only one.

22          PRESIDING COMMISSIONER BRYSON:  Okay well

23   that's good actually.  All right and then -- let

24   me go ahead now at this point and divert again

25   to this place of residence, places of residence

26   that you allude to.  You have an alternative

27   residency that you've planned in the event

29

27

1   something unforeseen occurs.  I've made

2   arrangements to obtain housing, transportation,

3   food, clothing at the following addresses.  Now

4   are these all relatives?

5           INMATE NGO:  Yes.

6           PRESIDING COMMISSIONER BRYSON:  All

7   right, and he lists Lisa and Raymond Lau L-A-U

8   in Alhambra, is that Chi Fong Ngo?

9           INMATE NGO:  Chi Fong Ngo.

10          PRESIDING COMMISSIONER BRYSON:  Chi Fong

11  Ngo thank you, that's in Monterey.  And Julie

12  and Raymond Seeto S-E-E-T-O in Placentia

13  California.

14          INMATE NGO:  Right.

15          PRESIDING COMMISSIONER BRYSON:  That's

16  good so you'll have alternatives and I believe

17  I've seen support letters in here that we will

18  be going over from these people.  Okay, so that

19  would be -- upon my release I will be working at

20  the following places of business, so here you

21  are giving options?

22          INMATE NGO:  Correct.

23          PRESIDING COMMISSIONER BRYSON:  All

24  right, now you're listing these, you realize

25  does not constitute verification in our minds

26  because this is your out reach.  Have you, how

27  have you contacted these establishments, have

30

28

1   you had personal contact with them or --

2          INMATE NGO:  Yes I have personal contact

3   with them because my uncle owns these, the First

4   China Kitchen and Hot Wok.

5          PRESIDING COMMISSIONER BRYSON:  I see.

6          INMATE NGO:  And he just started a new

7   business called Empire Lighting, one in New

8   Orleans Heights and one in Riverside.

9          PRESIDING COMMISSIONER BRYSON:  And what

10  is Empire Lighting, what is it like?

11         INMATE NGO:  From my understanding it's

12  just selling lamps and stuff.

13         PRESIDING COMMISSIONER BRYSON:  Lamps and

14  things?

15         INMATE NGO:  Kitchen furniture and what

16  not, accessories.

17         ATTORNEY RUTLEDGE:  He has a letter in

18  there to.

19         INMATE NGO:  Yeah.

20         PRESIDING COMMISSIONER BRYSON:  All

21  right, okay good.

22         INMATE NGO:  Updated business card along

23  with it.

24         PRESIDING COMMISSIONER BRYSON:  Okay.

25         INMATE NGO:  So and AC Financial which is

26  my brother in law where my sister Julie, Raymond

27  Seeto they own that company.

21

29

1      PRESIDING COMMISSIONER BRYSON:  I see,
2  and what would you do for them do you think?
3      INMATE NGO:  Well probably clerical
4  duties to begin.
5      PRESIDING COMMISSIONER BRYSON:
6  Initially.
7      INMATE NGO:  To start out.
8      PRESIDING COMMISSIONER BRYSON:  Okay, all
9  right.  Then you have a projected plan for the
10  next two to five years.  First you would
11  continue to establish yourself as a law bidding
12  citizen with respect and integrity.  Two become
13  a concerned community member about negative
14  influences that our youth face today.  Three
15  help to change my community into a safe and
16  wholesome environment.  How would you do that?
17      INMATE NGO:  Well just by teaching kids
18  just you know, talking to kids and cause I'm
19  trying to organize, not try but like organize
20  station called I-Inga right which is based on
21  community for the kids.  It's supported by NFL,
22  stores like that and it's well known so I would
23  like to keep in contact with them out there so
24  you know I can educate the kids about what
25  violence gang can impact on family and anyone in
26  the community that sorts.
27      PRESIDING COMMISSIONER BRYSON:

32

30

.1  Outstanding, okay.  Continue working and open a

2  savings account and finally use money saved to

3  start my own business.  You also have made,

4  presented a statement here as to your overall

5  plan.  Either I can read that now or you're

6  welcome to read this as part of your closing

7  statement.  Would you like to read it then?

8       INMATE NGO:  Oh no, I have a closing

9  statement.

10      PRESIDING COMMISSIONER BRYSON:  All

11 right, would you like to read this here?

12      INMATE NGO:  What?

13      PRESIDING COMMISSIONER BRYSON:  This is

14 your overall plan, this is immediately following

15 the place of residences.

16      INMATE NGO:  My overall plan is to spend

17 my time working to earn a living wage, assist my

18 mom with maintaining the household in a loving

19 good atmosphere and to work closely with my

20 assigned parole officer to ensure that my

21 understanding of all conditions of parole is

22 complete and in compliance.  The evidence that I

23 asked to present above strongly show great

24 institutional program efforts.  More over I have

25 made every attempt to comply with BPT to demand

26 more therapy as shown in psychological

27 consideration portion of this Memorandum.  The

33

31

1  California Department of Corrections have made

2  final determination that I do not qualify for

3  nor do I require continued therapy where public

4  safety issue are concerned.  I've made every

5  effort to change from the immature 19 year old I

6  was at the time of the commitment offense into

7  the mature, responsible and well reasoned 32

8  year old adult I am today.  I submit to this

9  panel that my institutional programming is

10  sufficient to warrant a finding of suitability

11  at this time.  In addition, I am willing to

12  volunteer submit to a continuous electronic

13  monitoring in accordance with Penal Code 9000

14  and I am willing to have my wages garnished for

15  the purpose of paying for the cost of my parole

16  during the parole period.  For the all the

17  reasons stated above I urge this panel of the

18  Board of Prison Terms to make a unanimous

19  finding that I am no longer would pose an

20  unreasonable risk of danger to the public if

21  paroled at this time.  Find me suitable for

22  parole and set a release date in accordance with

23  applicable regulation regarding the length of

24  time I may have yet to serve.

25          PRESIDING COMMISSIONER BRYSON:  Thank

26  you.

27          INMATE NGO:  Thank you for your time and

24

32

1    consideration.

2          PRESIDING COMMISSIONER BRYSON:   All

3    right, let's go to your support letters.

4          INMATE NGO:   Okay.

5          PRESIDING COMMISSIONER BRYSON:   And I

6    believe this even more updated than our board

7    packet so I'll just operate off of this

8    document.   Counsel do you concur?

9          ATTORNEY RUTLEDGE:   Yes.

10          PRESIDING COMMISSIONER BRYSON:   All right

11    and I'm just going to elude to them, frankly

12    there's quite a few as you know and so we

13    actually, I have read most all of them.   I

14    believe the other Commissioner has also and we

15    will be going through them in our deliberations

16    extensively but you have a letter of support

17    from Empire Lighting from Calvin Ung U-N-G Ung

18    and is this your uncle?

19          INMATE NGO:   My uncle.

20          PRESIDING COMMISSIONER BRYSON:   Okay, and

21    this is dated June 21st, 2005.

22          INMATE NGO:   Correct.

23          PRESIDING COMMISSIONER BRYSON:   And he is

24    totally supportive of your release.   He says

25    that I am the Chinese Restaurant and lighting

26    retail business, he mentions both of those.

27    Between these two businesses I have about 25

*35*

33

1   employees.  At any time I am always will to

2   offer a job position that is suitable for Sieu.

3   All right, he also references other, your

4   siblings, you mom, your other uncles, aunts and

5   cousins who in aggregate provide support and

6   care for you.  Then we have a letter, one

7   moment, from Donald G. Rubright R-U-B-R-I-G-H-T

8   the Senior Deputy Public Defender of Orange

9   County, this letter is dated June 23rd, 2005.  I

10  represented Mr. Ngo in the case that sent him to

11  prison.  I've been a criminal defense lawyer for

12  almost 30 years and I represented over 40

13  persons accused of homicide.  I do not see my

14  clients through rose colored glasses however the

15  circumstances of Sieu's case are unusual enough

16  that I feel compelled to make a statement on his

17  behalf.  I am going to read this in it's

18  entirety because I think it's worth reading.  At

19  the time I represented him, Sieu was a very

20  likeable young man with a minor criminal record.

21  To my recollection he had no convictions for any

22  crimes of violence.  The incident in question

23  was very different from the typical "gangs case"

24  and the facts are worth sketching for your

25  review.  Sieu and his friends were a want to be

26  type gang who really did not have a significant

27  history or established turf in Orange County

3b

34

1  On the day of the incident, some of Sieu's
2  friends by chance went to the McDonalds which
3  was near Fullerton High School in Northern
4  Orange County. Sieu was not present at the
5  time. One of Sieu's friends got in a staring
6  match with the decedent and some of his friends
7  who were members of "Toker Town" T-O-K-E-R a
8  long established Hispanic gang in Fullerton.
9  Essentially the Toker Town group told Sieu's
10  friends that they were not welcome in Fullerton
11  where some of them already lived and they should
12  get out of town. Angered by this Sieu's friends
13  decided to confront the decedents group after
14  school got out that day. Sieu was called to
15  help out in case they should be out numbered.
16  There group waited after school and confronted
17  the decedent and one of his friends about two
18  blocks south of Fullerton High School, not on
19  school grounds. From all appearances this was
20  intended to be a fist fight. Sieu and the
21  friends that had been in the stare down
22  approached the decedent and another young who
23  were walking on the sidewalk. A fist fight is
24  how it started, however the decedent's friend
25  fled just after the punching began and that left
26  Sieu and his friend fighting the decedent who
27  was significantly larger than both

27

35

1  Of course this wasn't fair but nothing at this

2  point suggested that this was intended to be a

3  homicide.  While the fist fight was ongoing a

4  third member of the group Sieu was part of ran

5  forward to the scene.  While the fight was still

6  in progress he reached around Sieu and shot the

7  decedent killing him and narrowly missing Sieu.

8  Sieu and his group then fled ultimately being

9  arrested out of state.  Evidence was received to

10 show that Sieu and his friends knew that a gun

11 was in the car.  However there was no evidence

12 to show that there was a plan to use it.  Based

13 upon the theory of foreseeable consequences,

14 Sieu and several co-defendants were convicted or

15 plead guilty to the murder.  The following is

16 underlined, Sieu was not the shooter and no

17 evidence suggested to show that he suggested,

18 encouraged or aided or abetted the shooting in

19 any way.  After the shooting Sieu angrily

20 confronted the shooter demanding to know why he

21 brought out the gun and asserting that he, Sieu,

22 didn't know the gun was going to be used.  In

23 summary this was not a drive by or similar gang

24 crime where everyone knew that legitimately

25 should have know that death or serious bodily

26 injury was intended.  On the contrary this

38

36

1    the group which due to the rest of the

2    circumstances swept all of them away by

3    derivative liability.  I'm not suggesting that

4    Sieu and the other non shooters bear no

5    responsibility for the tragic outcome but for

6    the fight of course no shooting would have taken

7    place.  However I would submit that the

8    circumstances here are significantly mitigated

9    when considered against other convictions of

10   this type.  Assuming that Sieu's performance

11   within the Department of Corrections has been

12   positive I would urge his parole at the earliest

13   possible time.  Then we have a letter from Chi

14   Phong Ngo of June 30th, 2005, that's C-H-I P-H-

15   O-N-G N-G-O and from your brother.  According to

16   the productive things you've done in prison and

17   there willing to help by providing housing,

18   financial aid, job hunt and any other assistance

19   he may need to promote a better life.  Now we

20   have next a letter of July 14th, 2005 from okay,

21   Thanh?

22        **INMATE NGO:**  Thanh.

23        **PRESIDING COMMISSIONER BRYSON:**  Thanh.

24        **INMATE NGO:**  My sister.

25        **PRESIDING COMMISSIONER BRYSON:**  That's T-

26   H-A-N-H T N-G-O yes she's your older sister,

39

37

1   person.  And then she also is offering support,

2   our families have arranged for his support once

3   released.  My husband's store number, she gives

4   that number, in Anaheim, her husband is Raymond.

5         **INMATE NGO:**  Right.

6         **PRESIDING COMMISSIONER BRYSON:**  Raymond's

7   mom and dad have offered him work if he wishes

8   to work there.  Housing would not be a problem.

9   The housing indicated would be located in

10  Placentia and you also had indicated that.  Then

11  we have a letter dated June 30th, 2005 from is

12  that Duck Phan Ngo?

13        **INMATE NGO:**  Duck Phan Ngo.

14        **PRESIDING COMMISSIONER BRYSON:**  Duck Phan

15  Ngo, a brother who gives you general support.

16  Says I work for Kaiser Permanente as a help desk

17  technician.  I am willing to provide Sieu with

18  any support, financial or emotional in his

19  transition into society as an obedient citizen.

20  Then July 19th, 2005 from Connie Hua.

21        **INMATE NGO:**  Hua.

22        **PRESIDING COMMISSIONER BRYSON:**  All

23  right, H-U-A and she's your cousin and has known

24  you since childhood.  She reviews your

25  accomplishments, doing all that he can to

26  improve his life, full support, I can offer

27  financial help, advice and encouragement, ...

40

38

1  offers her family as well.  My father can offer

2  him a job at his restaurant.  Is that one of the

3  restaurants that you referenced?

4       INMATE NGO:  Yes, a few of my uncles own

5  restaurants so I can work at any one of them.

6       PRESIDING COMMISSIONER BRYSON:  I see,

7  all right.  Then we have a letter of March 22nd,

8  2004 from Calvin Ung?

9       INMATE NGO:  Correct, my uncle again.

10      PRESIDING COMMISSIONER BRYSON:  Okay and

11 then we have a letter of May 22nd, 2004 from

12 Phang Hung Ngo?

13      INMATE NGO:  My mom.

14      PRESIDING COMMISSIONER BRYSON:  Okay.

15      ATTORNEY RUTLEDGE:  These are the letters

16 you brought for your last hearing?

17      PRESIDING COMMISSIONER BRYSON:  These go

18 back to the last letters.

19      INMATE NGO:  These were my last letters.

20      PRESIDING COMMISSIONER BRYSON:  We will

21 take note of that, there are quite a few of

22 them, probably a dozen of them I would say

23 attached.  Okay and then earlier letters beyond

24 that.  All right this is a very extensive

25 comprehensive support file.  All right do you

26 have anything further then because I think this

27 is quite comprehensive at this point.

41

39

1          INMATE NGO:  No, that should cover it.

2          PRESIDING COMMISSIONER BRYSON:  We will

3     be reviewing this even further.  We have sent

4     out 3042 notices, those notices go to agencies

5     having a direct interest in your case.  We have

6     a representative from the Orange County District

7     Attorney's Office present who will have the

8     opportunity to make a statement regarding parole

9     suitability prior to the conclusion of this

10    hearing.  First Commissioner do you have any

11    questions for the inmate at this time?

12         DEPUTY COMMISSIONER FILANGERI:  No thank

13    you.

14         PRESIDING COMMISSIONER BRYSON:  All

15    right, Mr. Crofoot do you have any questions of

16    the inmate?

17         DEPUTY DISTRICT ATTORNEY CROFOOT:  Thank

18    you, I have -- the reports indicate that the

19    inmate has multiple tattoos, I see specifically

20    referenced a tiger on the chest.  Is that tiger,

21    does that have significance with the membership

22    into the Tiger Mafia?

23         INMATE NGO:  No Sir.

24         DEPUTY DISTRICT ATTORNEY CROFOOT:  What

25    is the significance of the tiger.

26         INMATE NGO:  The tiger was just for, it

40

1  same tiger but all different, all five of us.

2  It's not for Tiger Mafia or nothing.

3      DEPUTY DISTRICT ATTORNEY CROFOOT:  Okay

4  and the Fullerton Boyz is a gang as well is that

5  correct?

6      INMATE NGO:  It's more like a want to be,

7  there are only five of us, we just friends.

8  Nothing more can say to change it.

9      DEPUTY DISTRICT ATTORNEY CROFOOT:  The

10 probation report indicates a tattoo Wong Lee

11 under the left arm, what is the significance of

12 that tattoo?

13     INMATE NGO:  That is my ex-girlfriend's

14 name that's all.

15     DEPUTY DISTRICT ATTORNEY CROFOOT:  And

16 does the inmate have any other tattoos other

17 than those two?

18     INMATE NGO:  That one no.

19     DEPUTY DISTRICT ATTORNEY CROFOOT:  No.

20     INMATE NGO:  That's all I have.

21     PRESIDING COMMISSIONER BRYSON:  You don't

22 have any other tattoos is that correct?

23     INMATE NGO:  Correct.

24     PRESIDING COMMISSIONER BRYSON:  All

25 right.

26     DEPUTY DISTRICT ATTORNEY CROFOOT:  Was

42

41

1    crime?

2         INMATE NGO:  Yes I was, I was attending

3    at Pasadena City College.

4         DEPUTY DISTRICT ATTORNEY CROFOOT:  And

5    was this --

6         DEPUTY COMMISSIONER FILANGERI:  This is

7    side two of the tape recording of the hearing

8    transcript for Mr. Sieu Ngo, last name spelled

9    N-G-O J-07024.  Sorry for the interruption.

10        DEPUTY DISTRICT ATTORNEY CROFOOT:  Thank

11   you.  The car that was used on the day of the

12   crime, was that the inmate's car?

13        INMATE NGO:  No it wasn't.

14        DEPUTY DISTRICT ATTORNEY CROFOOT:  Whose

15   car was that?

16        INMATE NGO:  I think it belonged to Jimmy

17   Dao.

18        DEPUTY DISTRICT ATTORNEY CROFOOT:  And

19   that car was later burned is that correct?

20        INMATE NGO:  Correct Sir.

21        DEPUTY DISTRICT ATTORNEY CROFOOT:  All

22   right and what were the circumstances of burning

23   that car?

24        INMATE NGO:  My friend wanted to get rid

25   of it so when we were leaving the state of

26   California we didn't want to be followed so they

44