# EXHIBIT 5
# PART 2 OF 3

42

1        PRESIDING COMMISSIONER BRYSON:  Where did

2  you do that?

3        INMATE NGO:  At that point I wasn't even

4  there but I knew what they did when they told me

5  but it was in somewhere, I think it was, I'm not

6  sure but I think it was near some beach or

7  something.  I don't know exactly where though

8  because I wasn't there.

9        DEPUTY DISTRICT ATTORNEY CROFOOT:  Where

10 did the murder weapon come from?

11       INMATE NGO:  Now I know that Asat Chan

12 who live in Washington I think he stole a gun

13 and brought it to California.  That's the only

14 thing I know.

15       DEPUTY DISTRICT ATTORNEY CROFOOT:  Was

16 that person involved in this crime?

17       INMATE NGO:  Yes he was.

18       DEPUTY DISTRICT ATTORNEY CROFOOT:  And

19 did he return to Washington with you?

20       INMATE NGO:  Yes he was -- when we were

21 arrested he was arrested with me and Jimmy Dao

22 at that time.

23       DEPUTY DISTRICT ATTORNEY CROFOOT:  And

24 when you were arrested you still had the murder

25 weapon is that correct?

26       INMATE NGO:  Correct.

27       DEPUTY DISTRICT ATTORNEY CROFOOT:  Thank

45

43

1   you I have no further questions.

2        PRESIDING COMMISSIONER BRYSON:   All

3   right, Counselor do you have questions for the

4   inmate?

5        ATTORNEY RUTLEDGE:  Yeah I do.   Clearly

6   you've been busy since you've been here.

7        INMATE NGO:  Yes I have.

8        ATTORNEY RUTLEDGE:  And when you were

9   going to college, you were going to college when

10  this happened and you were?

11       INMATE NGO:  Just visiting them.

12       ATTORNEY RUTLEDGE:  Okay that's what I

13  was getting at.  So what was your social life

14  after -- did you move to Pasadena at that time

15  or were you just going to college there?

16       INMATE NGO:  I moved down there you know

17  back to LA because I want to straighten out my

18  life you know, get away from so called gang but

19  I was trying to straighten out, I had a steady

20  girlfriend, I was going back to college trying

21  to straighten out my life.  I hadn't seen my co-

22  defendant in a little over a year when, before

23  this happened you know so that -- they called me

24  up one day you know to come visit them and one

25  thing led to another, this is what happened.

26       ATTORNEY RUTLEDGE:  And what do you think

27  -- were you able to ever apologize to the

44

1    victim's mother or family?

2         **INMATE NGO:** At the time I tried to

3    during court but I guess she didn't want to hear

4    it so she walked out on me. I made an attempt

5    but I wasn't successful at that though because

6    she left the court.

7         **ATTORNEY RUTLEDGE:** All right, and how do

8    you think the loss of this young man affected

9    his mother and he had other siblings, how did

10   that affect them?

11        **INMATE NGO:** There is really no word can

12   express how truly and deeply sorry I am for the

13   victim's family because the pain and suffering a

14   mother goes through is incomprehensible because

15   it just affect the family and it just everyone

16   that's involved in this crime. I know this

17   because you know I lost loved one myself so I

18   know, I can emphasize what the family is going

19   through, friends, I mean just everyone, the

20   community that knows Angel Gonzales you know but

21   at this time I can't change what happened you

22   know. I wish I could make the pain go away but

23   I can't, I'm only human. But I am truly, truly

24   sorry for what happened to Angel. It was never

25   my intention to take his life. It thought it

26   was going to be a fist fight and at a young age

45

1   this was going to happen.  So I take full

2   responsibility for my action, there's no doubt.

3   I deserve to be punished you know, I'm willing

4   to do my time for this so all I can say at this

5   time is I am truly, truly sorry for what I have

6   done to the Gonzales family.  I know what each

7   and every day it's like for them without there

8   son so that's all I have to say.

9       ATTORNEY RUTLEDGE:  Have you been in any

10  fights since you've been in the institution?

11      INMATE NGO:  No I haven't.  I been

12  disciplinary free.

13      ATTORNEY RUTLEDGE:  All right, how do you

14  stay -- have you managed to stay away and I

15  wanted to ask you to have you been involved with

16  any gangs in the prison?

17      INMATE NGO:  No I haven't.

18      ATTORNEY RUTLEDGE:  How have you managed

19  to keep yourself from the gangs and not involve

20  yourself in any violence?

21      INMATE NGO:  Knowing what I know today

22  about what impact a gang can have on people.  I

23  have grown so I know to change my behavior for

24  the better.

25      ATTORNEY RUTLEDGE:  You mentioned, did

26  you recently loose a co-worker here at the

27  prison?

48

46

1        INMATE NGO:  Yes I have.

2        ATTORNEY RUTLEDGE:  And how did that

3   impact your life?

4        INMATE NGO:  Realize life is short you

5   know and anything can happen.  I mean he was a

6   good man, older individual.  His name was

7   Nicholas you know.  The last thing I said to him

8   when you know I see you out in the yard.  I gave

9   him a hug but when I came back from visit that's

10  the first thing I heard was that he passed away

11  and I just couldn't believe it you know like

12  something like this happens so short you know.

13  Life is so unpredictable.

14       ATTORNEY RUTLEDGE:  No further questions

15  for Mr. Ngo.

16       PRESIDING COMMISSIONER BRYSON:  I have a

17  couple of questions.  We didn't really discuss

18  and I would like to know what your history has

19  been -- have you trafficked drugs?

20       INMATE NGO:  No I haven't Ma'am.

21       PRESIDING COMMISSIONER BRYSON:  And how

22  was it that you were associated with cocaine at

23  one point in your life?

24       INMATE NGO:  Well at that point you know

25  I tried it, a friend introduced me to it so I

26  tried it and I bought three piece of rock

27  cocaine as I was going home I was pulled over by

49

47

1    the police, got arrested.

2        PRESIDING COMMISSIONER BRYSON:   And

3    that's your whole history with cocaine?

4        INMATE NGO:   Yeah, pretty much.

5        PRESIDING COMMISSIONER BRYSON:   Okay, how

6    about alcohol?

7        INMATE NGO:   I don't drink alcohol, I'm

8    allergic to alcohol.

9        PRESIDING COMMISSIONER BRYSON:   Okay.

10        INMATE NGO:   I break out in hives.   Tried

11    it though but that's how I knew I was allergic

12    to it.

13        PRESIDING COMMISSIONER BRYSON:   Okay well

14    that answers those questions.   Thank you.   All

15    right, I'd like to invite the District Attorney

16    Mr. Crofoot to make a closing statement at this

17    time.

18        DEPUTY DISTRICT ATTORNEY CROFOOT:   Thank

19    you.   At the time of this offense he was on

20    diversion for possession for that rock cocaine.

21    He was a gang member, Don Rubright stated in his

22    letter that this gang had not established a

23    territory.   The fact is Asian gangs generally

24    are not territorial as opposed to Spanish gangs

25    which are.   So that is meaningless, there in a

26    gang he was in the Tiger Mafia previously to

48

1    significantly in that he chose to have his chest
2    tattooed with a tiger relating to that gang
3    affiliation.  One of the correctional counselors
4    indicated that he was immature at the time of
5    the crime and easily influenced by peers.
6    Actually he was 19 years old at that time, he
7    was out of high school, he was in his first year
8    of college and in his story had moved away from
9    the gang influence.  However at the request of
10   the other gang members he did return to
11   Fullerton, he entered into a, there was an
12   argument at McDonalds between the Asian gang
13   members and the Fullerton Toker's Gang, a
14   Mexican gang.  That was a verbal confrontation.
15   They left, they the defendant, the inmate and
16   his cohorts left and went to another location
17   where they obtained a gun, returned to the
18   location where the 15 year old victim was
19   attending school and there they waited for the
20   victim, lay and wait for him and when the victim
21   came out the three of them attacked that victim
22   and ultimately the victim was shot in the back.
23   They fled to Washington, saw fit to destroy the
24   vehicle, burn the vehicle which might have
25   identified them.  However they also chose to
26   hang onto that 22 handgun which was the murder
27   weapon and they possessed that at the time they

49

1    were arrested.  This inmate denied knowledge of

2    the gun until it was in the vehicle, until it

3    was in the vehicle is the key because this is

4    pre-shooting.  He knew of the gun prior to going

5    to lay and wait for the 15 year old victim.  He

6    indicates that they didn't intend to kill the

7    victim, they only intended to beat him up.  So

8    they chose to bring a handgun to a fist fight.

9    The inmate indicates that they had the gun for

10   protection if someone else had a gun.  If

11   someone else chose, if they thought that someone

12   else had a gun and they bring a gun, it's

13   inevitable that there is going to be a shooting.

14   If he wanted to stay out of this he had plenty

15   of opportunity to walk away when all they had

16   previous to that was a verbal altercation.  The

17   reason for the shooting was inexplicable, it was

18   a minor affront during this argument, I'm sorry,

19   the victim said get out of town and that's the

20   basis for this killing.  In 1990, two years

21   prior to this, there was a similar cowardly

22   attack by this inmate and others.  There were --

23        **ATTORNEY RUTLEDGE:**  I would object to

24   that, do we have a police report for that?

25        **DEPUTY DISTRICT ATTORNEY CROFOOT:**  It's

26   in the probation report.

52

50

1   my understanding is that they couldn't confirm

2   it, they couldn't reach the victim.

3          **DEPUTY DISTRICT ATTORNEY CROFOOT:**  The

4   police report is right there, it's on page ten

5   of the probation report.

6          **ATTORNEY RUTLEDGE:**  I would object to it

7   unless they can produce, it's like triple hear

8   say of actual police report.

9          **PRESIDING COMMISSIONER BRYSON:**  Okay,

10  that's over ruled, I won't be looking at all

11  that information.

12         **DEPUTY DISTRICT ATTORNEY CROFOOT:**  It was

13  a similar attack, the victim was confronted by

14  three, this inmate and two others.  He was

15  struck and this inmate was the second person to

16  strike that victim when the victim went down he

17  was kicked and punched by the three of them.  So

18  this is not, this one shooting is a culmination

19  of what was going to happen and what was going

20  to happen eventually and it did and it happened

21  in 1992.  The inmate is programming but he was

22  programming at the time that he got involved in

23  this gang activity.  He was attending college at

24  that time, he had moved from the area at that

25  time, it appeared that he was moving ahead as it

26  appears here that he's moving ahead.  But he

53

51

1  activity again and that's why he's here.  And I

2  think that he has served his MAPD was less than

3  two years ago, one and a half years ago.  I

4  think that he is - I'm sorry two and a half

5  years ago.  And I don't think that he has served

6  enough time and I would ask that the board not

7  grant him a date at this time.  Thank you.

8      PRESIDING COMMISSIONER BRYSON:  Thank

9  you.  All right counsel I would like to invite

10  you to make a closing statement.

11      ATTORNEY RUTLEDGE:  Thank you.  Well I

12  think that the most important thing that I would

13  comment that the people shared with us was that

14  this happened in 1992.  I wouldn't consider Mr.

15  Ngo programming when he was on, he had a

16  diversion charge at that time.  I think again

17  that he had just been an adult for about one

18  year.  I think he's discussed openly with the

19  panel his -- and if you have any other questions

20  about what his motivation was to be involved

21  with these people or what they were involved in

22  feel free to ask him again but I think he has

23  pretty much answered that.  I commented to him

24  you know, it's a miracle that most teenagers

25  survive the teen years because there is such a

26  high possibility of them to get involved in

27  stupid things like this.  Th...

54

52

1    unfortunate situation and you know a clear

2    picture of an ignorant teenager thinking let's

3    just go get in a fight not appreciating at the

4    time that any type of violence has a potential

5    for something serious.  I think he clearly sees

6    that now, in fact he noted to the board that he

7    would like to share that with other people at

8    risk and I think that is, we still have young

9    people that are out there at risk for thinking

10   that they are just going to be beating up people

11   and not truly appreciating and I think there's

12   evidence that at that age your -- everything is

13   not together that's why teenagers act like there

14   from another planet.  But I think there is a

15   truly different person here today at 32.  He's

16   been down for this time.  There hasn't been any

17   evidence of any drug use or gang affiliation.  I

18   believe that some of these co-defendants are

19   housed here at CTF.  Is that correct?

20          INMATE NGO:  Correct.

21          ATTORNEY RUTLEDGE:  And there has been no

22   further action.  I think this did -- which I

23   would say I would speculate that this was an

24   isolated incident for these boys.  I think, I

25   don't think that that behavior marked Mr. Ngo's

26   life long traits as a person.  I think it was

27   sort of an immature wrong.  I mean I am not

55

53

1   going to disagree with the people, it was

2   clearly wrong, clearly had the potential for

3   what happened.  And I think we have all been

4   teenagers, we know how these kids don't think

5   these things through and it's very serious and

6   it had a tremendous impact on the community and

7   on this family and I believe that Mr. Ngo also

8   is in touch with that.  That said the amount of

9   time that he's served, he has served 13 years.

10  Is it 13 or 14?

11         **INMATE NGO:**  About 13, almost 13.

12         **ATTORNEY RUTLEDGE:**  Almost 13 years and

13  he came into the system when he was quite a

14  young man so in his twenties.  We all can

15  remember the twenties.  That's a significant

16  time of your life.  It's almost like if you

17  loose your twenties you've lost half your

18  thirties and your forties because that is such a

19  prime time.  So I would like the panel to when

20  you think about the amount of time he's served

21  think about the time of his life when everyone's

22  going to college or discovering life.  He lost

23  that whole decade, I mean he gave it up, I

24  shouldn't say it was taken away from him, he

25  made that decision to get involved in that

26  behavior and gave it up but I do believe that's

54

1    have been a little bit different.  He's lost, he
2    gave up the prime years of his life in exchange
3    for this act.  He had no juvenile record, his
4    stable social history is all there.  All the
5    letters written by his family and also all the
6    reports in the file indicate that he had good
7    family ties, his family had there own business,
8    they were highly productive members of society.
9    And as far as remorse goes I think his comments
10   speak for themselves and also what he has
11   included in his Memorandum, I would incorporate
12   that into the remorse.  And his psychological
13   reports also underlie his true feelings of
14   remorse for what he's done.  And the motivation
15   for the crime, I mean what can you say about
16   that.  I'm not sure -- there are rare
17   circumstances when there is any way that you can
18   explain away this type of situation.  Other than
19   the fact again that you've got a bunch of
20   immature teenagers and I would note that when we
21   talk about gangs its one thing if one of us says
22   get out of town but when a gang member says
23   that, its almost like a threat you know.  If
24   there affiliated with dangerous people and they
25   tell other people to get out of town that should
26   put them on notice that something could happen
27   if they don't get out of town.  Mr. Ngo had one

57

55

1    prior incident with his diversion which he up

2    until the commitment offense he was completing

3    that.  His maturity level I think is quite

4    significant.  I think its obvious he has spent

5    this time in prison because he's a little bit

6    more mature than we would expect at that age but

7    that's probably what prison does to people.  And

8    his understanding and plans for the future, that

9    goes without saying, he's submitted a Memorandum

10   that's covered every applicable suitability

11   factor as far as skills, he's got three vocs,

12   he's got -- he had been in college, he had

13   completed high school so he does have an

14   aptitude for academics.  He's got the highest

15   TAB score and he has jobs lined up, family

16   support and interesting in his file to is he has

17   been giving money to organizations that are

18   feeding children.  I don't know if you noted,

19   there was a letter thanking him for that so he

20   seems to have a community, a sense of community.

21   His institutional behavior is exceptional.

22   Nothing violent, no substance abuse, nothing

23   again to show that he has any motivation to

24   continue that, the path that he was on when he

25   entered the CDC.  There is no documentation that

26   he's ever disrespected inmates or staff, he has

27   marketable skills, he has many years of self

56

1  help, he's fully prepared really for life among

2  free society as a productive citizen.  I think

3  he has covered every possible basis that is

4  necessary for his integration and his behavior

5  here indicates an enhanced ability to actually

6  function within the law.  I mean he knows he is

7  the know what can happen when you aren't

8  following the norms of society.  And while he

9  has been here he has lost his father and been

10  able to get more of an idea of the impact that

11  the death of Mr. Gonzales had on his family

12  which he expressed here today.  All those things

13  considered I would ask the board to please give

14  him a parole date today.  Thank you.

15       **PRESIDING COMMISSIONER BRYSON:**  Thank

16  you.  Sir I would like to give you an

17  opportunity to make a final statement to this

18  panel regarding your suitability for parole.

19       **INMATE NGO:**  All right.  I would like to

20  read, I wrote this.  First and for most there is

21  no adequate amount of words in the universe

22  which can express the truly deeply sorry I am to

23  Gonzales family for all the pain and suffering I

24  caused them and everyone else who was affected

25  by Angels death.  In hindsight I wish I could

26  have changed what happened on that tragic day

27  but the truth is I really did not know what was

*59*

57

1  about to happen that very instant that took

2  Angel's life.  At the time I honestly believe I

3  was getting into a fist fight and nothing more.

4  I did not take Angel's life, it was never my

5  intention that is such a tragic incident would

6  occur.  Again I was there for a fist fight,

7  nothing I say or do at this point will ever

8  change what happened on that tragic day.  All I

9  can do on my part is to accept full

10  responsibility for my action alone.  I hope and

11  pray that someday the Gonzales family will find

12  it in there hearts to forgive me for my actions.

13  We all have made mistakes at some point in our

14  lives, some more than others but as individual

15  how we choose to learn, grow and change our

16  behavior does set us apart from the one who

17  don't.  Today as I sit in front of you I am no

18  longer the young stupid naive 19 year old back

19  then but as a good decent 32 year old mature

20  adult who is intelligent enough to know the

21  difference between right and wrong.  Who is able

22  to think things through before reacting to any

23  situation and responsible for any actions that I

24  may take here on out.  I know in my heart and

25  soul that I am a good decent person who as a

26  young man made some very poor choices which  I

60

58

1  that goes by that I don't think about what

2  happened to Angel and what his family is going

3  through.  Everyday I wake up in here, it's a

4  constant reminder of that tragic day.  I deserve

5  to be punished for my actions but I believe I

6  have served more than enough time for my

7  actions.  In closing I understand the difficulty

8  of you task as Commissioner in determining ones

9  suitability with regard to public safety.  All

10  that I ask of you is please don't judge me for

11  one of my unchanging aspect of my past conduct

12  to find who I am today.  But look at all that I

13  have accomplished during my incarceration.  With

14  absolute certainty I know I am a better person

15  today than I was when I committed this

16  unfortunate offense.  I know I will never come

17  back in prison and I know I can be a law,

18  productive law bidding citizen if you would only

19  give me a second chance.  Should you find me

20  suitable here today the rules that govern this

21  panel in setting my term of confinement are set

22  forth in California Code of Regulation title 15

23  division two section 2403, the conduct most

24  closely related to the crime I've committed is

25  category A section three.  Which has a minimum

26  term of 17 years medium term of 18 years and a

59

1   request that this panel set my appropriate term

2   of 17, 18 or 19 years.  And please, please give

3   me a second chance.  I know I will be a law

4   bidding citizen.  I know I can make it out

5   there.  I won't be a statistic that comes back

6   in here.  I will never, never come back in to

7   prison.  I have a family that's waiting for me

8   out there.  So please grant me a date today.

9   Thank you for your time today.

10          PRESIDING COMMISSIONER BRYSON:  Thank you

11  for your remarks.  We will now recess for

12  deliberations the time is 11:11 A.M.

13                    R E C E S S

14                    --oOo--

15

16

17

18

19

20

21

22

23

24

25

26

60

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3          DEPUTY COMMISSIONER FILANGERI:  Okay

4    we're back on record.

5          PRESIDING COMMISSIONER BRYSON:  All

6    right, the time is 11:58 A.M. in the matter of

7    Sieu Phong Ngo.

8          DEPUTY COMMISSIONER FILANGERI:  Did

9    somebody tell the DA?

10         PRESIDING COMMISSIONER BRYSON:  Oh my

11   apologies.  We'll start is all again.  Why don't

12   you please find the DA.

13         ATTORNEY RUTLEDGE:  He went home.

14         DEPUTY COMMISSIONER FILANGERI:  We're on

15   record.

16         PRESIDING COMMISSIONER BRYSON:  The time

17   is 11:59 in the matter of Sieu Phong Ngo.  Sir

18   the panel reviewed all information received from

19   the public and you and relied on the following

20   circumstances in concluding that you are not

21   suitable for and would pose an unreasonable risk

22   of danger to society or a threat to public

23   safety if released from prison.  The offense was

24   carried out in an especially cruel and callous

25   manner in that you attacked and beat a 15 year

26   old male, Angel Gonzales who was ultimately shot

61

1   in the back and died at the scene.  The offense

2   was carried out in a dispassionate and

3   calculated manner in that it was a confrontation

4   between gang members preplanned by lying in wait

5   for the victim as he walked home.  The offense

6   was carried out in a manner demonstrating

7   exceptionally callous disregard for human

8   suffering, disregard for public safety in that

9   it occurred near a school and there was a clear

10  opportunity for you to cease but you continued.

11  Despite some prior record of involvement with

12  cocaine this panel recognizes and submits that

13  you have a relatively criminal free background

14  and you are to be commended for that.  And you

15  have a history of stable relationships including

16  your family support.  We do not have evidence

17  that you have a long history with established

18  gangs and so we do not point to that in terms or

19  your history of relationships.  And it will be

20  further discussed you have presented to us a

21  history of strong stable social support.  As to

22  your institutional behavior you have programmed

23  commendably, your education includes 41 units

24  towards you AA Degree and continuing involvement

25  with college enrollment including your current

26  independent study through Coast Line Community

64

62

1   College.  We also have read into the record a

2   very reputable list of vocational achievements

3   including automotive refinishing and upholstery,

4   forklift operator, salesmanship and other

5   vocational work.  You have participated in self

6   help and therapy, well self help consistently

7   ranging from Anger Management, the Teddy Bear

8   Drive, Feed the Children, Buddhist ordination

9   into Buddhist Studies, the Impact Program, Key

10  to Fatherhood, The Muslim Chapel, and you have

11  assisted in inmate education.  As to misconduct

12  you have zero 115's, you have two minor 128A's,

13  the last in 2000 for window covering.  As to

14  your psychological report, the report that is

15  dated January 23rd, 2002, the last we have by

16  Doctor Saindon S-A-I-N-D-O-N does in general

17  support release.  And I quote, this man has

18  spent ten years in prison and that is at the

19  time of this psychological report, I would

20  recommend should he be paroled abstinence from

21  all alcohol or use of any controlled substance,

22  frequent monitoring for substance abuse, he

23  should be relocated so that he is near his

24  family, he should make frequent reports to his

25  parole officer concerning his vocational

26  progress and goals.  And due to his families

65

63

1   commitment to supporting him upon his release,

2   his projected level of success in the community

3   if granted a date for parole is seen at this

4   time to be better than average.  You also have

5   made outstanding parole plans.  You have viable

6   residential plans in the last county of legal

7   residence and I refer to the record for the

8   documentation that we have received.  You also

9   have acceptable employment plans with

10  established businesses owned by your relatives

11  who are assuring you of jobs.  As to Penal Code

12  3042 responses, the responses indicate

13  opposition to a finding of parole suitability,

14  specifically by the District Attorney of Orange

15  County.  In a separate decision the hearing

16  panel finds it's not reasonable to expect that

17  parole would be granted at a hearing during the

18  following two years.  Specific reasons for this

19  finding are as follows.  The panel reviewed all

20  information received from the public and relied

21  on the following circumstances.  The offense was

22  carried out in a specially cruel and callous

23  manner in that you attacked and beat a 15 year

24  old Angel Gonzales who was ultimately shot in

25  the back and died at the scene.  The offense was

26  carried out in a dispassionate and calculated

64

1   manner, it was a confrontation between gang

2   members preplanned by lying in wait for the

3   victim as he walked home.  The offense was

4   carried out in a manner demonstrating

5   exceptionally callous disregard for human

6   suffering.  The offense risked public safety in

7   that it was conducted near a school and you had

8   a clear opportunity to cease but continued.

9   Moreover, the motive for this crime was very

10  trivial in relation to the offense.  It was gang

11  activity and you told this panel "I thought I

12  was going to a fist fight", that minimizes the

13  gravity of the crime, your involvement in it and

14  there fore your insight into the gravity of this

15  crime.  In denying you parole for two years this

16  panel will place the prisoner on the 2008

17  calendar for the next Subsequent Hearing.  If

18  this decision is final you will not get parole,

19  the board will send you a copy of the decision.

20  It will indicate the reasons you did not get

21  paroled.  If this decision is not final the

22  board will set up another hearing.  You can find

23  the laws of California Code of Regulations title

24  15 section 2041.  The board recommends get self

25  help, stay discipline free, get therapy, and

26  continue your educational and vocational

65

1   development plus your outreach to help others.

2   Commissioner do you have anything further?

3        **DEPUTY COMMISSIONER FILANGERI:**  Yeah, the

4   thing that bother's me the most is you know our

5   job is to determine whether your  release would

6   pose an unreasonable risk to public safety and

7   one of the tools that we look at, one of the

8   tools that I like to try to use in that is your

9   insight into the crime.  I think your contention

10  that you were going to a fist fight when you

11  somebody else was armed is hard to believe and

12  as Commissioner said it tends to minimize your

13  role.  I can see where you might be motivated to

14  minimize your role.  What it means to me is that

15  you haven't come to grips, you haven't developed

16  the insight that you need into the causative

17  factors of this crime and I think you should

18  look at that.  Moreover you told the

19  psychiatrist that no one intended to kill the

20  victim, well even if you weren't holding the gun

21  somebody came to a fist fight with a gun and

22  what was that person's intentions.  So it's hard

23  for me to get a gauge on what risk you would

24  pose to public safety when I can't feel

25  comfortable about the level of insight that

26  you've displayed.  And that's what prevents me

27  SIEU NGO  J-07024  DECISION PAGE 6  2/8/06

68

66

1    from granting you a date.  I wish you the best

2    of luck, you've been doing good work in the

3    institution, I hope you keep it up.  Thank you.

4         **PRESIDING COMMISSIONER BRYSON:**  Please

5    don't get discouraged, I hope you will take this

6    as a challenge and an opportunity.  And that

7    concludes this hearing and the time is 12:08

8    P.M.

9                   --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED TWO YEARS**

24   **THIS DECISION WILL BE FINAL ON:**___JUN  8 2006___

25   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27    **SIEU NGO   J-07024   DECISION PAGE 7  2/8/06**

67

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, SUE GERDES, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 66, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF SIEU NGO

CDC NO. J-07024, ON FEBRUARY 8, 2006, and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated February 27, 2006 at Sacramento,

California.


SUE GERDES
TRANSCRIBER
PETERS SHORTHAND REPORTING

# EXHIBIT B



INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )         CDC Number J-07024
Hearing of:               )
                          )
SIEU PHONG NGO    .        )
                          )

# COPY
# INMATE

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 13, 2002

2:20 P.M.

PANEL PRESENT:

AL ANGELE, Presiding Commissioner
ROBERT RODRIGUEZ, Deputy Commissioner

OTHERS PRESENT:

SIEU PHONG NGO, Inmate
PAT FOX, Attorney for Inmate
JAMES LAIRD, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____√_____ No
_____ Yes          See Errata Sheet

Valerie Lord, Transcriber    Capitol Electronic Reporting

72

ii

## INDEX

|  | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 9 |
| Pre-Commitment Factors | 15 |
| Parole Plans | 23 |
| Post-Commitment Factors | 29 |
| Closing Statements | 50 |
| Recess | 56 |
| Decision | 57 |
| Adjournment | 64 |
| Transcriber Certification | 65 |

--oOo--

73

1

# P R O C E E D I N G S

1         **PRESIDING COMMISSIONER ANGELE:**  --- hearing,

2  pronounce your last name.

3         **INMATE NGO:**  Ngo.

4         **PRESIDING COMMISSIONER ANGELE:**  Ngo?

5         **INMATE NGO:**  Yes.

6         **PRESIDING COMMISSIONER ANGELE:**  First name?

7         **INMATE NGO:**  Sieu.

8         **PRESIDING COMMISSIONER ANGELE:**  Sieu, okay.

9  Initial parole consideration hearing for Sieu Ngo,

10  that's N-G-O, CDC number J-John-07024.  Today's

11  date Monday, May 13, 2002.  The time approximately

12  2:20 p.m.  We're located at CTF Soledad.  Inmate

13  received February the 1st, 1994, Orange County,

14  murder second degree.  Case number C-Charles

15  99109, count number one, 187 of the Penal Code.

16  Received a term of 16 years to life, with a

17  minimum eligible parole date of May the 24th,

18  2003.  Mr. Ngo, this hearing's going to be

19  tape-recorded.  For the purpose of voice

20  identification, each of us will state our first

21  name, last name, spelling our last name.  When it

22  comes to your turn, after you spell your last

23  name, give us your CDC number.  I'm going to go to

24  my left.  My name is Al Angele, A-N-G-E-L-E,

25  Commissioner, Board of Prison Terms.

26         **DEPUTY COMMISSIONER RODRIGUEZ:**  Deputy

74

2

1   Commissioner Rodriguez, R-O-D-R-I-G-U-E-Z, Board

2   of Prison Terms.

3       **DEPUTY DISTRICT ATTORNEY LAIRD:**  James

4   Laird, Orange County District Attorney's office,

5   L-A-I-R-D.

6       **ATTORNEY FOX:**  Pat Fox, F-O-X, attorney for

7   Mr. Ngo.

8       **INMATE NGO:**  Ngo, N-G-O.  First name,

9   S-I-E-U.  Middle name Phong, P-H-O-N-G.

10      **DEPUTY COMMISSIONER RODRIGUEZ:**  Prison

11  number?

12      **INMATE NGO:**  J-07024.

13      **DEPUTY COMMISSIONER RODRIGUEZ:**  You can

14  bring that closer to you.

15      **PRESIDING COMMISSIONER ANGELE:**  Let the

16  record reflect that there are also two

17  correctional officers in the room for security

18  purposes and will not be participating in today's

19  hearing.  The hearing is being conducted pursuant

20  to Penal Code Sections 3041 and 3042 and the rules

21  and regulations of the Board of Prison Terms

22  governing parole consideration hearings for life

23  prisoners.  The purpose of today's hearing is to

24  consider your suitability for parole.  We'll

25  consider the crimes you were committed for, your

26  prior criminal and social history and your

27  behavior and programming since your commitment.

75

3

1    We'll reach a decision today and inform you

2    whether or not we find you suitable for parole and

3    the reasons for our decision.  If we find you

4    suitable for parole, the length of your

5    confinement will be explained to you.  Before we

6    go any further, I want to instruct you, Mr. Ngo,

7    that if you do not get a date today, this is your

8    initial hearing and this will form the foundation

9    of all future hearings, okay.  In saying that, we

10   ask that you be totally truthful with us.  Nothing

11   you say today is going to change the outcome of

12   your court case, okay.  If you tell us things

13   today that are not true, I'm sure somewhere down

14   the line it's going to catch up to you and you're

15   going to wind up finding yourself with a situation

16   where nobody knows what the story is, the right

17   story.  So, we need to have the total truth today,

18   okay.  I'm going to explain to you the way the

19   system is going to work.  We're going to have two

20   different segments.  I'm going to discuss with you

21   the crime, your prior criminal and social history.

22   I'm going to discuss with you your parole plans,

23   any letters of support or opposition that are in

24   the record.  And Commissioner Rodriguez will then

25   discuss with you your programming since your

26   commitment, your psychological evaluation, your

27   counselor's report and he'll also discuss with you

4

1    any sort of discipline that you may have had.

2    Once that is conducted, we will then have the

3    ability to ask you questions, as will the District

4    Attorney and your attorney.  After that, the

5    District Attorney, your attorney and yourself,

6    will have the opportunity to make a closing

7    statement.  Once the closing statements are done,

8    we'll recess, clear the room and deliberate.  When

9    we have completed our deliberations, we'll resume

10   the hearing and announce our decision.  The Board

11   of Prison Terms' rules and the law state a parole

12   date shall be denied if your release would pose an

13   unreasonable risk of danger to others.  Do you

14   understand that?

15        **INMATE NGO:**  The last part, I ---

16        **PRESIDING COMMISSIONER ANGELE:**  The law

17   requires that parole would be denied if your

18   release would pose an unreasonable risk of danger

19   to others.  Now you have certain rights.  Those

20   rights include a timely notice of this hearing, a

21   right to review your Central file, have an Olson

22   Review, and a right to present relevant documents.

23   Have those rights been so far, Ms. Fox?

24        **ATTORNEY FOX:**  Yes, they have.

25        **PRESIDING COMMISSIONER ANGELE:**  You have an

26   additional right and that's to be heard by an

27   impartial Panel.  Any objections to either member

77

5

1   of this Panel?

2       **ATTORNEY FOX:**  At this time on behalf of

3   Mr. Ngo, I'd pose an objection.  It's not possible

4   for Mr. Ngo to receive a fair hearing before any

5   Panel comprised of members of the Board of Prison

6   Terms as it's currently constituted.  That's based

7   on their policies, practices, and procedures, as

8   well as on the practices, policies, and public

9   statements of the governor.

10      **PRESIDING COMMISSIONER ANGELE:**  Can you

11  enumerate the policies and practices of this

12  particular Panel?

13      **ATTORNEY FOX:**  My understanding is that when

14  a date, for instance, when a date is granted the

15  Board of Prison Terms submits to the governor a

16  list of reasons why the date should not be granted

17  after the Panel has already found the person

18  suitable.  So I think there's a conflict there.

19  And just the inherent conflict of interest having

20  been appointed by the governor and answering back

21  to the governor.

22      **PRESIDING COMMISSIONER ANGELE:**  First of all

23  the statement with regards to the Board of Prison

24  Terms providing the governor with a list of

25  reasons not to find the inmate suitable for parole

26  is not true.  The governor has staff that reviews

27  these cases that have nothing to do with Board of

78

6

1   Prison Terms and it is they who present the

2   governor with reasons (inaudible) to.  As far as

3   this particular Panel goes, I am an appointee of

4   the governor.  I've never discussed with him my

5   appointment, nor have I discussed with him his

6   philosophy on parole dates.  I have given a number

7   of parole dates in the past and will continue

8   doing that as long as I'm on this Board.  And

9   there's no reason at all that I feel that I am not

10  able to give or to be fair and impartial.

11  Commissioner Rodriguez.

12      DEPUTY COMMISSIONER RODRIGUEZ:  I'm a civil

13  servant and I've always been known to be fair and

14  impartial as well as I've been on panels with

15  Commissioner Angele where we have given a number

16  of dates at various prisons throughout California.

17      PRESIDING COMMISSIONER ANGELE:  I'll

18  overrule your objection, anything else?

19      ATTORNEY FOX:  No, that's all.  Thank you.

20      PRESIDING COMMISSIONER ANGELE:  Okay,

21  Mr. Ngo, do you have any problems at all

22  understanding or speaking the English language?

23      INMATE NGO:  No, I don't, Sir.

24      PRESIDING COMMISSIONER ANGELE:  Not even

25  technical words?

26      INMATE NGO:  Maybe if you use court lingo,

27  you know, then I might have a problem.

79

1    PRESIDING COMMISSIONER ANGELE:  Your

2  attorney can probably help you with that.  So you

3  have no problem at all ---

4    INMATE NGO:  No problem.

5    PRESIDING COMMISSIONER ANGELE:  All right.

6  I noticed that you signed BPT form 1073 on January

7  the 18th, of this year indicating that you do not

8  have a disability as defined under the Americans

9  with Disabilities Act, is that true?

10    INMATE NGO:  Yes, it is.

11    PRESIDING COMMISSIONER ANGELE:  And you need

12  no accommodation, correct?

13    INMATE NGO:  Pardon?

14    PRESIDING COMMISSIONER ANGELE:  You need no

15  accommodation?

16    INMATE NGO:  No.

17    PRESIDING COMMISSIONER ANGELE:  You will

18  receive a copy of our written tentative decision

19  today.  That decision becomes final within 120

20  days.  You'll then receive a copy of the decision

21  and a copy of the transcript and you'll have 90

22  days from the effective date to appeal if you so

23  desire.  You are not required to discuss your

24  offense with us.  You are not required to admit

25  your offense.  However, this Panel does accept as

26  true the findings of the court.  Do you understand

27  what that means?

80

8

1      INMATE NGO:  The findings of the court?

2      PRESIDING COMMISSIONER ANGELE:  We accept as

3  true the findings of the court.  Do you understand

4  what that means?

5      INMATE NGO:  What the court found?

6      PRESIDING COMMISSIONER ANGELE:  Yes.

7      INMATE NGO:  Yes.

8      PRESIDING COMMISSIONER ANGELE:  In other

9  words, we accept that as being true.

10     INMATE NGO:  Yes, it is.

11     PRESIDING COMMISSIONER ANGELE:  Okay.  Any

12  confidential material to be used today,

13  Commissioner Rodriguez?

14     DEPUTY COMMISSIONER RODRIGUEZ:  There will

15  be none used today, Sir.

16     PRESIDING COMMISSIONER ANGELE:  I have

17  passed the hearing checklist marked exhibit one

18  both to your attorney and the District Attorney to

19  ensure that we're all operating off the same set

20  of documents.  Mr. Laird, do you have those

21  documents?

22     DEPUTY DISTRICT ATTORNEY LAIRD:  Yes, Sir.

23     PRESIDING COMMISSIONER ANGELE:  Okay, do you

24  have those documents, Ms. Fox?

25     ATTORNEY FOX:  Yes, I do.

26     PRESIDING COMMISSIONER ANGELE:  Thank you.

27     ATTORNEY FOX:  You're welcome.

81

9

1   PRESIDING COMMISSIONER ANGELE:  Any

2   additional documents to submit?

3   ATTORNEY FOX:  I don't believe so.  However,

4   if we can't find certain things in the Central

5   file then I would like to present what we do have.

6   But I'm assuming that we're going to find them

7   all.  I do have two photographs, however, of

8   Mr. Ngo's family.

9   PRESIDING COMMISSIONER ANGELE:  Will the

10  inmate be speaking with us today?

11  ATTORNEY FOX:  Yes, he will.

12  PRESIDING COMMISSIONER ANGELE:  Mr. Ngo, if

13  you'd please raise your right hand to be sworn.

14  Do you solemnly swear or affirm that the testimony

15  you give at today's hearing will be the truth, the

16  whole truth, and nothing but the truth?

17  INMATE NGO:  Yes, I do.

18  PRESIDING COMMISSIONER ANGELE:  If there is

19  no objection, Ms. Fox, I'm going to read into the

20  record the Statement of Facts taking it from the

21  probation officer's report, page three, line 15 to

22  page four, line six.

23  ATTORNEY FOX:  I usually object to the use

24  of the probation officer's report because it is

25  based on hearsay to the extent that there are

26  statements attributed to my client in that, I

27  think they could be admitted for prior

82

10

1    inconsistent or consistent statements.

2    PRESIDING COMMISSIONER ANGELE:  You said you

3    usually do or you are?

4    ATTORNEY FOX:  No, I will.

5    PRESIDING COMMISSIONER ANGELE:  And what

6    would you like us to use?

7    ATTORNEY FOX:  Either the trial transcript

8    or the findings of any court of appeals that would

9    be based on the sworn testimony presented in

10   trial.

11   PRESIDING COMMISSIONER ANGELE:  Okay, well I

12   have neither.

13   ATTORNEY FOX:  Well, that's not our fault.

14   PRESIDING COMMISSIONER ANGELE:  Not our

15   fault neither, so I'll overrule that objection

16   also.

17   ATTORNEY FOX:  Then the risk we run is that

18   we're going to have a Statement of Facts that's

19   based on uncorroborated hearsay, which in many

20   cases is just based on the police report, which is

21   not from testimony of percipient witnesses.  And

22   also from the District Attorney's office many

23   times the probation office uses their file to come

24   to their statements.  Perhaps you can read the

25   Statement of Facts and then ask Mr. Ngo if he has

26   any comments, but I do have a standing hearsay

27   objection for non-corroborated statements.

83

11

1    DEPUTY DISTRICT ATTORNEY LAIRD:  Mr. Angele,

2    if I may ---

3    PRESIDING COMMISSIONER ANGELE:  Yes.

4    DEPUTY DISTRICT ATTORNEY LAIRD:  Is it

5    possible, I do note that this went to trial, the

6    jury had found the defendant guilty of murder in

7    the first degree.  However, in exchange for a plea

8    agreement whereby the defendant would admit second

9    degree murder, he got that deal in exchange for

10    getting a 15 to life sentence with a one-year

11    vicarious arm enhancement for a total of 16 years

12    to life.  And he agreed to suspend any, or not to

13    seek any appeal of the matter and that's why there

14    would be no court of appeal record on this case in

15    that he agreed to extinguish all appellate rights

16    (inaudible).

17    PRESIDING COMMISSIONER ANGELE:  Well, once

18    again, I'm going to overrule your objection and

19    we'll go ahead and incorporate by reference, or

20    excuse me incorporate by reading into the record

21    the probation officer's report, page three, line

22    15, page four, line six.  September 18th, 1992, 15

23    year old Angel Gonzales was beaten and stabbed to

24    death at a Fullerton High School as she was

25    walking home after school.  As a result of a

26    police investigation, it was learned that earlier

27    in the day the victim, a member of the Fullerton

*84*

12

1   Tokerstown, that's T-O-K-E-R-S-town, a Latin gang,

2   and members of the Asian gang, Fullerton Boyz,

3   B-O-Y-Z, were at a McDonald's restaurant near the

4   high school.  The victim and the name of No

5   Muhamed, that's N-O, first name, Muhamed,

6   M-U-H-A-M-E-D, had a confrontation with each

7   claiming their respective gang affiliations.

8   After this non-physical altercation, the group of

9   Asians, which at the time included the defendant,

10  and for the sake of the interpreter, defendant is

11  synonymous with Mr. Ngo, obtained a firearm.  And

12  defendant and his co-defendants then returned to

13  the school where they waited for Angel Gonzales.

14  As he was walking home he was attacked and beaten.

15  During the physical altercation, the victim was

16  shot one time in the middle of the back by one of

17  the defendants who was later identified as Usumang

18  Muhamed, first name U-S-U-M-A-N-G, last name,

19  M-U-H-A-M-E-D.  The group of five defendants fled

20  the area after the shooting.  Angel Gonzales died

21  at the scene as a result of a gunshot wound.  The

22  defendant, along with Jimmy Dao, D-A-O, and Asat

23  Cham, first name A-S-A-T, last name C-H-A-M, fled

24  to the state of Washington.  They were

25  subsequently arrested there and the murder weapon,

26  a stolen 22-caliber handgun was recovered in the

27  vehicle.  Another statement that I want to add to

85

13

1    this was that the vehicle used the day of the

2    shooting apparently was burned prior to them

3    leaving the state.  Is that what happened,

4    Mr. Ngo?

5         INMATE NGO:  Yes, it was.

6         PRESIDING COMMISSIONER ANGELE:  Are there

7    any changes in this story that I just read that

8    you want to bring up?

9         INMATE NGO:  No, Sir.

10        PRESIDING COMMISSIONER ANGELE:  So this is

11   exactly what happened?

12        INMATE NGO:  Basically, yes.

13        PRESIDING COMMISSIONER ANGELE:  Basically.

14        INMATE NGO:  Yes.

15        PRESIDING COMMISSIONER ANGELE:  Okay.  You

16   were involved in beating this individual, correct?

17        INMATE NGO:  Yes, we got in a fight,

18   fistfight.

19        PRESIDING COMMISSIONER ANGELE:  Well, it was

20   more than a fistfight, he was jumped by a gang of

21   people, right?

22        INMATE NGO:  Yes, he was.

23        PRESIDING COMMISSIONER ANGELE:  Okay.  Now

24   if I'm not mistaken you were the one that handed

25   this gentleman the gun?

26        INMATE NGO:  No, that's ---

27        PRESIDING COMMISSIONER ANGELE:  Is that

86

14

1    true?

2        INMATE NGO:  No, that's not true.

3        PRESIDING COMMISSIONER ANGELE:  You didn't

4    find it on the floor under the seat of the

5    vehicle?

6        INMATE NGO:  In my statement in court was I

7    saw under the car seat.

8        PRESIDING COMMISSIONER ANGELE:  Okay.

9        INMATE NGO:  And after that it was, my crime

10   partner had it on him without my knowledge.

11       PRESIDING COMMISSIONER ANGELE:  So you

12   didn't touch the gun at all?

13       INMATE NGO:  No, I didn't, Sir.

14       PRESIDING COMMISSIONER ANGELE:  Okay.  How

15   many of them, were there four of you or five?

16       INMATE NGO:  Five.

17       PRESIDING COMMISSIONER ANGELE:  And did you

18   know Mr. Gonzales at all?

19       INMATE NGO:  No, Sir.

20       PRESIDING COMMISSIONER ANGELE:  But you had

21   left and were living in Los Angeles County at the

22   time?

23       INMATE NGO:  Yes, I was, Sir.

24       PRESIDING COMMISSIONER ANGELE:  And had

25   become a part of a different gang.

26       INMATE NGO:  It wasn't --- I just known

27   them, associated with them.

87

15

1       PRESIDING COMMISSIONER ANGELE:  The Tiger

2  Mafia?

3       INMATE NGO:  Yes.

4       PRESIDING COMMISSIONER ANGELE:  Did you

5  belong to them or did you just associate?

6       INMATE NGO:  Associate.

7       PRESIDING COMMISSIONER ANGELE:  Okay, but

8  you were a member of the Fullerton Boyz, right?

9       INMATE NGO:  Yes, I was.

10       PRESIDING COMMISSIONER ANGELE:  Did these

11  gangs know each other?

12       INMATE NGO:  No.

13       PRESIDING COMMISSIONER ANGELE:  You were 19

14  years old at the time?

15       INMATE NGO:  Yes, Sir.

16       PRESIDING COMMISSIONER ANGELE:  How do you

17  feel about what happened?

18       INMATE NGO:  I'm sorry.

19       PRESIDING COMMISSIONER ANGELE:  All right,

20  as far as I can see you had no criminal record

21  prior to this.  You had some arrests as an adult,

22  but nothing as a juvenile.  You had an intact

23  family?

24       INMATE NGO:  Pardon me?

25       PRESIDING COMMISSIONER ANGELE:  You had an

26  intact family.

27       INMATE NGO:  Yes, I did, Sir.

88

16

1    PRESIDING COMMISSIONER ANGELE:  You just got

2    --- I mean after you had left there, I guess they

3    called you up and said we got something we got to

4    take care of.

5       INMATE NGO:  No.  Actually what happened

6    that day was, you know, we came there, they called

7    me up, you know, I came down to visit them.  I

8    said I'm just glad that you called me, you know,

9    it wasn't nothing planned or nothing.  It just

10   happened.

11      PRESIDING COMMISSIONER ANGELE:  Any reason

12   why you guys kept the gun?

13      INMATE NGO:  The gun wasn't even in the car

14   when I first was there when they picked me up; it

15   was never there.  The first time I saw it was

16   after I got back into the car.

17      PRESIDING COMMISSIONER ANGELE:  I

18   understand.  I'm talking about in Washington.  The

19   murder gun was found in the car?

20      INMATE NGO:  Yes, we kept it.  We never

21   disposed of it.

22      PRESIDING COMMISSIONER ANGELE:  I'll go over

23   your criminal activity.  You had nothing as a

24   juvenile.  As an adult you were arrested in 1992,

25   March, San Gabriel Police Department, possession

26   of rock cocaine.  What was that about?

27      INMATE NGO:  I experimented with cocaine,

89

17

1  rock cocaine.

2       PRESIDING COMMISSIONER ANGELE:  You were

3  experimenting with it?

4       INMATE NGO:  Yes.

5       PRESIDING COMMISSIONER ANGELE:  Were you

6  dealing it at all?

7       INMATE NGO:  No.

8       PRESIDING COMMISSIONER ANGELE:  Did you

9  experiment with it?

10       INMATE NGO:  Yes.

11       PRESIDING COMMISSIONER ANGELE:  And?

12       INMATE NGO:  I got busted the first time I

13  bought it.  I was just driving home at that point

14  and police pulled me over and he searched the

15  vehicle and found --- I gave him permission to

16  search the vehicle, he found the rock cocaine.

17  They gave me diversion for it.

18       PRESIDING COMMISSIONER ANGELE:  How long

19  after you bought it did they stop you?

20       INMATE NGO:  About what, 15 minutes.  I was

21  just going home by then.

22       PRESIDING COMMISSIONER ANGELE:  Was it a

23  sting do you know?

24       INMATE NGO:  I don't know.

25       PRESIDING COMMISSIONER ANGELE:  Do you know

26  what that means?

27       INMATE NGO:  Yeah, yes I do.  It was not a

90

18

1    sting.  The cop just saw me and he pulled me over.

2         PRESIDING COMMISSIONER ANGELE:  Pulled you

3    over for what?

4         INMATE NGO:  I don't know.

5         PRESIDING COMMISSIONER ANGELE:  Okay, he

6    never indicated to you that he saw you make the

7    purchase?

8         INMATE NGO:  No.

9         PRESIDING COMMISSIONER ANGELE:  Had you

10   tried it before?

11        INMATE NGO:  Yes.

12        PRESIDING COMMISSIONER ANGELE:  It does

13   indicate that you were diverted, but you were also

14   arrested apparently in Olympia, Washington,

15   possession of stolen property.  But apparently

16   they dismissed it and I think they probably

17   dismissed it because of the arrest and the murder,

18   correct?

19        INMATE NGO:  I think so.

20        PRESIDING COMMISSIONER ANGELE:  Okay.  What

21   was the stolen property?

22        INMATE NGO:  From what my understanding is

23   the gun that the murder weapon came from was

24   (inaudible) Washington.

25        PRESIDING COMMISSIONER ANGELE:  Okay.

26        INMATE NGO:  So I was never even in

27   Washington until after the fact.

19

1      **PRESIDING COMMISSIONER ANGELE:**  Which one of

2  your crime partners was from Washington?

3      **INMATE NGO:**  Asat Cham.

4      **ATTORNEY FOX:**  Do you want to spell that?  I

5  think for the ---

6      **INMATE NGO:**  A-S-A-T, C-H-A-M.

7      **PRESIDING COMMISSIONER ANGELE:**  I think we

8  already went through that one time.  Now, okay, it

9  would indicate --- I want to make sure I have the

10  record straight on the names also.  Were there two

11  Muhameds there?

12      **INMATE NGO:**  Yes.

13      **PRESIDING COMMISSIONER ANGELE:**  Okay,

14  because I had two spellings of each name.  It

15  would probably be pretty reasonable to assume that

16  Cham, Mr. Cham ---

17      **INMATE NGO:**  Yes.

18      **PRESIDING COMMISSIONER ANGELE:**  Probably

19  brought the gun from Washington when he came down

20  here.  Just assuming since it was taken from

21  Washington State.

22      **INMATE NGO:**  Yes, Sir.

23      **PRESIDING COMMISSIONER ANGELE:**  And that's

24  where you wound up going back.  You were born in

25  Vietnam on May the 18th, 1973.  You (inaudible)

26  the United States since 1979, graduated Fullerton

27  High School.  And it says here you attended

92

20

1    Fullerton Community College and Pasadena City

2    College.  You completed 10 units and your major

3    was Business.  You worked as a telemarketer.

4    Who'd you work for as a telemarketer?

5        INMATE NGO:  It's for like a real estate

6    place, (inaudible) insurance, telemarketing.  Try

7    to get them to go to seminar.

8        PRESIDING COMMISSIONER ANGELE:  You worked

9    at your family liquor store and was living with

10   your parents when this occurred?

11       INMATE NGO:  Yes, Sir.

12       PRESIDING COMMISSIONER ANGELE:  I want to

13   make sure I get honest answers from you because

14   I've seen two places now that indicates that you

15   were a member of the Tiger Mafia.

16       INMATE NGO:  Tiger Mafia is who I associated

17   with.  That's when they asked me (inaudible) my

18   tattoo was on there, TM.  I was on bulletin

19   boards.

20       PRESIDING COMMISSIONER ANGELE:  I

21   understand.

22       INMATE NGO:  They ask me TM, that's why I

23   say Tiger Mafia, because you know, I was

24   associated with them.

25       PRESIDING COMMISSIONER ANGELE:  But you left

26   Fullerton.

27       INMATE NGO:  Yes.

93

21

1      PRESIDING COMMISSIONER ANGELE:   And you

2   moved to Los Angeles area.

3      INMATE NGO:   Yes.

4      PRESIDING COMMISSIONER ANGELE:   And became

5   affiliated one way or the other with the Tiger

6   Mafia.

7      INMATE NGO:   When I moved to Orange County,

8   that's when ---

9      PRESIDING COMMISSIONER ANGELE:   Orange

10  County, I'm sorry.

11     INMATE NGO:   Associated with Fullerton Boyz.

12  In LA I was with the Tiger Mafia.

13     PRESIDING COMMISSIONER ANGELE:   Were you in

14  LA before you went to Orange County?

15     INMATE NGO:   Yes, Sir.

16     PRESIDING COMMISSIONER ANGELE:   Okay.  Now

17  you said you were associated with them.  You were

18  associated with them enough to have a tattoo on

19  your arm.

20     INMATE NGO:   It's not --- I can have ---

21  it's taken off already.

22     PRESIDING COMMISSIONER ANGELE:   Well, it was

23  taken off, it was on at the time.  It still said

24  TM.

25     INMATE NGO:   Yes.

26     PRESIDING COMMISSIONER ANGELE:   Which would

27  indicate to me that you were a member.  I mean,

94

22

1  let's be honest, were you or weren't you?

2      INMATE NGO:  To tell you the truth, Sir ---

3      PRESIDING COMMISSIONER ANGELE:  Yeah, that's

4  what I want to hear, the truth.

5      INMATE NGO:  It's just a made up name,

6  bottom line.  I was Fullerton Boyz, I didn't want

7  to admit that I was in a gang when I was arrested

8  and they just saw the TM, it's my ex-girlfriend's

9  name, Teresa May, so --- it was just a made up

10  name so, I just tried to throw them off.

11      PRESIDING COMMISSIONER ANGELE:  Well, we're

12  looking for honesty and the reason I kept on

13  pushing you is I never heard of Tiger Mafia.

14  Truthfulness is important to us, understand that.

15      INMATE NGO:  Yes, Sir.

16      PRESIDING COMMISSIONER ANGELE:  But you took

17  her initials off your arm?

18      INMATE NGO:  No, I mean --- I tried to put

19  it on myself as (inaudible), it never came out

20  anyway, it faded.

21      PRESIDING COMMISSIONER ANGELE:  You've never

22  been married.

23      INMATE NGO:  No.

24      PRESIDING COMMISSIONER ANGELE:  And you've

25  got no children, correct?  Never been in the

26  military.  You indicate you only tried cocaine

27  once.

96

23

1        INMATE NGO:  Yes.

2        PRESIDING COMMISSIONER ANGELE:  Okay.  Have

3   you experimented with any other drugs?

4        INMATE NGO:  No.

5        PRESIDING COMMISSIONER ANGELE:  Alcohol?

6        INMATE NGO:  I'm allergic to alcohol.

7        PRESIDING COMMISSIONER ANGELE:  That's

8   probably good.  Tried nothing else, marijuana,

9   nothing?

10       INMATE NGO:  I don't like drugs, not no

11  more.  (Inaudible) --- never mind.

12       PRESIDING COMMISSIONER ANGELE:  No, tell me.

13       INMATE NGO:  I mean you can test me everyday

14  and I'll be clean.

15       PRESIDING COMMISSIONER ANGELE:  I believe

16  you.  You haven't given me a reason not to.  Okay,

17  we do have some letters that we received on your

18  behalf.  I'd like to try to go over some of these.

19  We received these at a late hour, but I think

20  (inaudible) because I think it's very important.

21  One letter is from, you've got to help me with the

22  names again, okay.

23       INMATE NGO:  Yes, Sir.

24       PRESIDING COMMISSIONER ANGELE:  This is from

25  your sister, Tran?

26       INMATE NGO:  Which one?

27       PRESIDING COMMISSIONER ANGELE:  Tran Ngo.

96

24

1          INMATE NGO:  Tan.

2          PRESIDING COMMISSIONER ANGELE:  Tan Ngo.

3    She indicated that the family will support you any

4    way they can, that her husband has a job for you

5    in his store.

6          INMATE NGO:  Yeah.

7          PRESIDING COMMISSIONER ANGELE:  And that

8    your mother has a job for you in her store.  Then

9    we have one from a Donald Rubridc, R-U-B-R-I-D-C,

10   Orange County Public Defender, explains the case

11   where you were tried and is in support of your

12   release also.  Fong Ngo is your mother?

13         INMATE NGO:  Fong (inaudible).

14         PRESIDING COMMISSIONER ANGELE:  Okay.  She

15   offers support in any way possible.  And then we

16   have Calvin Ung, U-N-G, your uncle.

17         INMATE NGO:  Yes.

18         PRESIDING COMMISSIONER ANGELE:  Who has a

19   job for you in his restaurant.

20         INMATE NGO:  Yes.

21         ATTORNEY FOX:  Have you gone over the letter

22   from his mother, I'm sorry.

23         PRESIDING COMMISSIONER ANGELE:  Uh-hmm,

24   yeah.

25         ATTORNEY FOX:  Okay.

26         PRESIDING COMMISSIONER ANGELE:  Yeah.

27         INMATE NGO:  I have one from my brother,

*97*

25

1   too.

2           PRESIDING COMMISSIONER ANGELE:   That's

3   Calvin?

4           INMATE NGO:   That's my uncle.

5           PRESIDING COMMISSIONER ANGELE:   Your uncle,

6   okay.  I'm sorry Calvin is the one who has a

7   restaurant job for you.

8           INMATE NGO:   Yes, Sir.

9           PRESIDING COMMISSIONER ANGELE:   I don't have

10  --- I've got your mother.

11          ATTORNEY FOX:   We may have a copy.

12          PRESIDING COMMISSIONER ANGELE:   Your sister.

13  I'm sorry, is it Raymond?  Raymond?

14          INMATE NGO:   Raymond Seto's my new

15  brother-in-law.

16          PRESIDING COMMISSIONER ANGELE:   Is that the

17  one you're talking about?

18          INMATE NGO:   No, my older brother.

19          PRESIDING COMMISSIONER ANGELE:   Okay, I do

20  have one here from Raymond Seto, S-E-T-O, he's

21  your brother-in-law.  He's known you since 1992.

22          ATTORNEY FOX:   There are two separate

23  letters from Calvin Ung.  One bears the date of

24  January 30th, 2001.  A more recent one is dated

25  April 6th of 2002.  I believe that's the one that

26  was referred to, the later of the two.

27          PRESIDING COMMISSIONER ANGELE:   I have the

26

1    2002 letter here.  I don't have it here.   Who is

2    Chi Phong Ngo, your older brother?

3            INMATE NGO:  Chi Phong Ngo.

4            PRESIDING COMMISSIONER ANGELE:   Chi?

5            INMATE NGO:  C-H-I, Phong Ngo.

6            PRESIDING COMMISSIONER ANGELE:   This says

7    Sieu.

8            INMATE NGO:  That's me.

9            PRESIDING COMMISSIONER ANGELE:  Okay, I'm

10   sorry.  He's your older brother.  I've got it.

11   Okay.  First name is Chi, C-H-I.  Middle name

12   Phong, P-H-O-N-G.  Last name, N-G-O.  Writing in

13   support of my brother.  He's offering a job at a

14   convenience store which is in Anaheim.

15           INMATE NGO:  Yes, Sir.

16           PRESIDING COMMISSIONER ANGELE:  They all

17   believe in you and are willing to support you.

18   There's another letter from Duc Phong Ngo.  D-U-C

19   is the first name.  Middle, P-H-O-N-G.  Last name

20   N-G-O.  Younger brother, writing a letter of

21   support.  I'll help my brother financially and in

22   any way that he needs.  Like to see you get a

23   second chance, make a difference in society with

24   all the training you've had while in prison.  I'll

25   go back to the letter from Raymond Seto.  It's a

26   letter of support asking that you be given a

27   second chance.  Talks about your mother and her

*99*

27

1  work at the liquor store. How he believes you

2  have the ability to become a law-abiding citizen.

3  And this is a letter in support of release. Have

4  we covered them all now? There's another one?

5      INMATE NGO: No, just one from my older

6  sister?

7      ATTORNEY FOX: Which I'm passing over.

8      PRESIDING COMMISSIONER ANGELE: This is from

9  Lan Lau.

10      INMATE NGO: Lan.

11      PRESIDING COMMISSIONER ANGELE: First name

12  is Lan, L-A-N. Last name is Lau, L-A-U, who is

13  inmate's sister. She believes that the inmate

14  deserves a second chance to prove himself in the

15  community. They offer you housing, financial

16  support. These include a place to stay, food,

17  clothing, and education. They reside in Alhambra

18  in Los Angeles County, okay. Anything else?

19      INMATE NGO: That should be it.

20      ATTORNEY FOX: Thank you.

21      PRESIDING COMMISSIONER ANGELE: All right,

22  we sent out what we call 3042 notices. Those are

23  notices that go to agencies that have a direct

24  interest in your case. I have received a reply

25  from the District Attorney's office, from the

26  County of Orange. However, there's a

27  representative here today from that office so

100

28

1   we'll have him make a statement when that time

2   comes.  And we'll go to post-conviction factors

3   please, Commissioner Rodriguez.

4        DEPUTY COMMISSIONER RODRIGUEZ:  How do you

5   pronounce your name again?

6        INMATE NGO:  Just say "no."

7        DEPUTY COMMISSIONER RODRIGUEZ:  No?

8        INMATE NGO:  Yeah, it's easiest.

9        DEPUTY COMMISSIONER RODRIGUEZ:  All right,

10  inmate Ngo, the purpose of, during the first

11  portion of this reading I'll be addressing what

12  you've done since you've been received in the

13  Department of Corrections, which will then bring

14  us to the present.  This will establish a base for

15  future Board appearances should you not receive a

16  date today.  If there's anything that I leave out

17  during the portion of this reading, either you or

18  your attorney can address it when I'm done, all

19  right?

20        INMATE NGO:  Yes, Sir.

21        DEPUTY COMMISSIONER RODRIGUEZ:  All right.

22  You were received in the Department of Corrections

23  on February 1st, 1994, at RJ Donovan Reception

24  Center.  From there you transferred on March 17th,

25  1994, to Centinella State Prison.  From there you

26  transferred on May 16th, 1995, to Calipatria State

27  Prison, excuse me, California State Prison,

*101*

29

1   Lancaster, and that was a non-adverse transfer.

2   And then you subsequently transferred here to

3   California (sic) Training Facility in Soledad,

4   also a non-adverse transfer on December 16th,

5   1998.  Your current classification score is zero.

6   You're currently housed as a Level II inmate on a

7   life override.  Your custody is Medium A.  You're

8   still in culinary warehouse?

9        INMATE NGO:  Yes, Sir.

10       DEPUTY COMMISSIONER RODRIGUEZ:  And I note

11  that you have exceptional to excellent work

12  reports.  You did complete your high school.  You

13  have completed vocation auto upholstery and that

14  was on April 3rd, 1997.  What is, is vocation

15  automotive refinishing a separate course?

16       INMATE NGO:  Yes, that's a separate course.

17  That's auto paint.

18       DEPUTY COMMISSIONER RODRIGUEZ:  Okay, and

19  you did complete that one and that was in

20  September 1997.  So you've completed two

21  vocations.

22       INMATE NGO:  Yes, Sir.

23       DEPUTY COMMISSIONER RODRIGUEZ:  You've been

24  an active participant in the NA program as

25  evidenced by your most recent chronos.  You've

26  also completed the Key to Fatherhood, December of

27  2000.  You completed a course in the Cause,

102

30

1    Prevention, and Treatment of both Tuberculosis and

2    Hepatitis and that was December 1999.  And also

3    you've participated in a Muslim group course,

4    Salesmanship II.  And what do you do in that?

5        INMATE NGO:  On the Muslim fatherhood and

6    salesmanship, you learn how to be a parent if

7    someday by circumstance to have my kids and stuff.

8    You learn to take care of your own kids and I'll

9    be a good, how a father should be.

10       DEPUTY COMMISSIONER RODRIGUEZ:  Have you

11   gone to any anger management courses?

12       INMATE NGO:  I try.  The only one try to

13   enroll right now, try to get into is Impact.

14       DEPUTY COMMISSIONER RODRIGUEZ:  Yeah, the

15   impact program, which is an excellent program

16   here.  Captain Gara runs that program.

17       INMATE NGO:  Captain Gara's running it.

18       DEPUTY COMMISSIONER RODRIGUEZ:  Exactly.

19       INMATE NGO:  And it's been very difficult to

20   get in.

21       DEPUTY COMMISSIONER RODRIGUEZ:  But you've

22   been here for a long, going on ---

23       INMATE NGO:  I have tried since last year,

24   sir.

25       DEPUTY COMMISSIONER RODRIGUEZ:  Almost five

26   years, four years actually.

27       INMATE NGO:  Yeah.

103

31

1       DEPUTY COMMISSIONER RODRIGUEZ:  Yeah.

2       INMATE NGO:  They just start this program

3    recently.

4       DEPUTY COMMISSIONER RODRIGUEZ:  It's a very

5    good program.  I strongly urge you to try to get

6    in and at least keep your name active on that.

7       INMATE NGO:  I will.

8       DEPUTY COMMISSIONER RODRIGUEZ:  Do you study

9    your 12-steps?

10      INMATE NGO:  Not all of them because I have

11   to say I'm a Buddhist and some steps I can't

12   really apply to it.  There's only four step, maybe

13   step four, step eight.

14      DEPUTY COMMISSIONER RODRIGUEZ:  What is step

15   number eight to you?

16      INMATE NGO:  Making a list of all persons

17   harmed.

18      DEPUTY COMMISSIONER RODRIGUEZ:  Who would be

19   at the top of that list?

20      INMATE NGO:  All of the families, victim

21   family and my family.

22      DEPUTY COMMISSIONER RODRIGUEZ:  Now you

23   stated, I believe somewhere we read in the reports

24   that you furnished the gun.  You say you didn't?

25      INMATE NGO:  No (inaudible).

26      ATTORNEY FOX:  Could you tell us where you

27   saw that because I'd like to correct it as well.

104

32

1    DEPUTY COMMISSIONER RODRIGUEZ:  I believe

2  that's in the probation officer's report.  Did you

3  quote that, Commissioner Angele?

4    PRESIDING COMMISSIONER ANGELE:  No.

5    ATTORNEY FOX:  I don't believe it's stated

6  there.

7    DEPUTY COMMISSIONER RODRIGUEZ:  Okay, I was

8  looking at the prisoner's version.  And what I'm

9  looking at is the current Board report, April

10  2002, and that's on the first page, (inaudible)

11  addressing that --- You explained that they had

12  the gun for protection in case someone else had to

13  have a weapon, correct?

14    ATTORNEY FOX:  Once again ---

15    DEPUTY COMMISSIONER RODRIGUEZ:  Excuse me,

16  counsel, I'll let you address that.  Ngo stated

17  that he did not see the gun until he was in the

18  vehicle, it was located under the passenger seat,

19  correct?

20    INMATE NGO:  (Inaudible.)

21    DEPUTY COMMISSIONER RODRIGUEZ:  And that's

22  the story you're staying ---

23    INMATE NGO:  It's a true story.

24    DEPUTY COMMISSIONER RODRIGUEZ:  And he's

25  corrected and we're satisfied ---

26    ATTORNEY FOX:  And I believe it's

27  consistently stated that way throughout the

105

33

1    probation report as well, and the defendant's

2    statement and also a statement that was given by

3    one of the detectives involved in the

4    investigation.

5        DEPUTY COMMISSIONER RODRIGUEZ:  All right.

6    Do you agree with everything I've read up to this

7    point, as far as your program?

8        INMATE NGO:  I still have a, I have a

9    certificate in STD and AIDS too.

10        DEPUTY COMMISSIONER RODRIGUEZ:  Okay, I

11    don't think I have copies of those.  Do you have

12    copies of them?

13        INMATE NGO:  Yes, Sir.

14        DEPUTY COMMISSIONER RODRIGUEZ:  I went

15    through all the certificates you have here that

16    they provided us, which I confirmed, which are in

17    the ---

18        INMATE NGO:  Hepatitis and tuberculosis.

19        DEPUTY COMMISSIONER RODRIGUEZ:  Well I

20    addressed those already.

21        INMATE NGO:  Sexually transmitted disease---

22        DEPUTY COMMISSIONER RODRIGUEZ:  I addressed

23    that too.  That was in 1999, correct, right there

24    at the bottom?

25        ATTORNEY FOX:  Well, one is in 2000, the

26    STD's.

27        DEPUTY COMMISSIONER RODRIGUEZ:  Okay.  That

106

34

1    was the sexually transmitted disease, right.

2          ATTORNEY FOX:  And on the back there's

3    another one in 2000.

4          DEPUTY COMMISSIONER RODRIGUEZ:  Right, and

5    then HIV.  I may have said the wrong date, but I

6    did address both these certificates.

7          ATTORNEY FOX:  The other two, tuberculosis

8    and hepatitis were (inaudible).

9          DEPUTY COMMISSIONER RODRIGUEZ:  Correct,

10   okay.  So do you agree with everything else?

11         INMATE NGO:  Yes, Sir.

12         DEPUTY COMMISSIONER RODRIGUEZ:  Okay.  As

13   far as disciplinary history, you have received no

14   CDC 115's, either administrative or serious since

15   reception.  And you've only received a total of

16   two 128(a) counseling chronos.  The first one was

17   April 1st, 1997, for failure to respond to medical

18   ducat.  And then the last one was on February

19   11th, 2000, for covering your windows with a

20   towel.  Trying to keep the light out, huh?

21         INMATE NGO:  Actually, cold Sir.

22         DEPUTY COMMISSIONER RODRIGUEZ:  Cold.  In

23   going through your counselor's recommendation,

24   that's from the current Board report dated April

25   2002.  The author of this report is the initial M.

26   Rubio, R-U-B-I-O, Correctional Counselor I here at

27   Soledad state prison.  Going to page three under

107

35

1  the heading of Summary, it says considering the

2  commitment offense, minimal prior arrest record

3  and prison adjustment, the writer believes Ngo

4  would probably pose a moderate to low degree of

5  threat to the public at this time if released from

6  prison.  Going to the psych report, there's two

7  reports I'll be addressing.  The first one is

8  dated December 27th, 1996.  It's a three page,

9  three.  It's completed at California State Prison,

10  Lancaster.  The author of that report is the

11  initial C. Schroeder, S-C-H-R-O-E-D-E-R, Staff

12  Psychologist.  I'm not going to read that report

13  in it's entirety, but I will address areas of that

14  report.  Going to page two, under Present

15  Condition, it says the remorse he expresses is

16  sincere.  He is synonymous with inmate Ngo.  He

17  shows much (inaudible) and self-incrimination for

18  the crime.  In hindsight he sees that he perhaps

19  could have stopped the incident and now has great

20  empathy and remorse for the family of the victim.

21  Under Mental Status and Diagnosis, Axis I:  no

22  diagnosis or condition.  Axis II:  no diagnosis.

23  Axis III:  none.  Going to page three, Axis IV:

24  psychosocial stressors, incarceration.  Axis V:

25  Global Assessment of Functioning score, that's

26  your GAF score is 75.  Under Conclusions and

27  Recommendations, Mr. Ngo's history of depression

108

36

1    and suicide attempts may have contributed to his

2    state of mind and poor judgment during the time of

3    the crime.  There are no records of any mental

4    health treatment during incarceration and Mr. Ngo

5    is no longer depressed.  Going to the last psych

6    report, and that is a seven-page report completed

7    here at Soledad state prison.  The date of that

8    report is April, excuse me, January 23rd, 2002.

9    The author of that report is the initial C.

10   Saindon, capital-S-A-I-N-D-O-N, Staff

11   Psychologist.  Under, let's see, going to page

12   four, under heading Current Diagnostic

13   Impressions, Axis I:  no contributory clinical

14   disorder.  Axis II:  deferred.  Axis III:  no

15   contributory physical disorder.  Axis IV:

16   long-term incarceration.  Axis V:  Global

17   Assessment of Functioning score, your GAF score is

18   90, noting that it had gone up considerably from

19   75 from the first report that I addressed in 1996.

20   Ninety is a very good score.  Going to page five

21   under Assessment of Dangerousness, based upon his

22   complete lack of disciplinary actions while

23   incarcerated, his insight into the negative

24   aspects of gang involvement and his remorse for

25   his actions, his violence potential within a

26   controlled setting is estimated to be below

27   average relative to this Level II inmate

37

1  population.  If released to the community, his

2  violence potential is estimated to be less than

3  the average citizen in the community given his

4  insight, his demonstrated ability to stay out of

5  trouble, his successful development of plans upon

6  release, and the support of his family.  At this

7  time, I'll return to the Chair.

8      PRESIDING COMMISSIONER ANGELE:  Thank you.

9  Do you know what the term mad dogging means?

10     INMATE NGO:  Yes, Sir.

11     PRESIDING COMMISSIONER ANGELE:  What does

12 that mean to you?

13     INMATE NGO:  Back then it was dirty looks.

14     PRESIDING COMMISSIONER ANGELE:  You

15 indicated that you first saw the gun in the car.

16     INMATE NGO:  Yes, Sir.

17     PRESIDING COMMISSIONER ANGELE:  And then you

18 were driving around and just happeneded come upon

19 Mr. Gonzales.

20     INMATE NGO:  No, Sir.  We met Mr. Gonzales

21 at McDonald's first.

22     PRESIDING COMMISSIONER ANGELE:  I understand

23 that.  I'm talking about the second time.

24     INMATE NGO:  The second time, what happened

25 was, when we came back me and (inaudible) went to

26 confront Mr. Gonzales and his friend.  We were

27 going to get into a fistfight.  When the fistfight

110

38

1   started, we were fighting one another, we knocked

2   Mr. Gonzales down.  And after that, my crime

3   partner came and while we was beating him up

4   (inaudible) Muhamed was hitting him with a gun.

5   Somehow it shot, it went off, the gun went off and

6   shot him.  The first round probably missed him,

7   but the second round hit him.

8         PRESIDING COMMISSIONER ANGELE:  So you were

9   actually looking for him?

10        INMATE NGO:  Looking for ---

11        PRESIDING COMMISSIONER ANGELE:

12   Mr. Gonzales.

13        INMATE NGO:  Yes, we were looking for him to

14   fight.

15        PRESIDING COMMISSIONER ANGELE:  Weren't you

16   waiting there for him to get out of school?

17        INMATE NGO:  We were waiting for him after

18   school.

19        PRESIDING COMMISSIONER ANGELE:  Okay.  Also,

20   you know, a little trouble by some (inaudible)

21   problems.  Back in December '90, you had a problem

22   in school where you jumped somebody else.  Do you

23   recall that?

24        INMATE NGO:  It was not a jump.  I got in a

25   fight with another individual.

26        PRESIDING COMMISSIONER ANGELE:  Yeah, but

27   you had three guys with you and they all jumped in

///

39

1    on it.

2         INMATE NGO:  Yes, Sir, they were my friends,

3    they back me up.

4         PRESIDING COMMISSIONER ANGELE:  They backed

5    you up.  You against one guy.  You knocked him

6    down.

7         INMATE NGO:  I beat him up, yes, Sir.

8         PRESIDING COMMISSIONER ANGELE:  And then

9    three guys backed you up and you all jumped him.

10   How do you figure that backing you up, you didn't

11   sound like you needed a back up at all?

12        INMATE NGO:  I have no control over their

13   actions, Sir.

14        PRESIDING COMMISSIONER ANGELE:  How about

15   the time you were in a vehicle and found three

16   purses, do you remember that?

17        INMATE NGO:  No, Sir.

18        PRESIDING COMMISSIONER ANGELE:  You don't

19   remember that?  This is in the POR, page 11, line

20   seven, (inaudible) automobile during a traffic

21   stop three women's purses were found in the

22   vehicle in which (inaudible) Ngo was the sole

23   occupant.  Indicated you did not know who they

24   belonged to, that's when they found the rock

25   cocaine.

26        INMATE NGO:  Oh, that's my mom's car ---

27        DEPUTY COMMISSIONER RODRIGUEZ:  I'd like to

112

40

1    turn the tape over, one moment.

2        [Thereupon, the tape was turned over.]

3        **DEPUTY COMMISSIONER RODRIGUEZ:**  Side two,

4    back on record.

5        **PRESIDING COMMISSIONER ANGELE:**  So that was

6    your mother's car?

7        **INMATE NGO:**  Uh-hmm.  It was my mother's car

8    when I was arrested, Sir.  If there was a purse,

9    it must belong to my mom.

10       **PRESIDING COMMISSIONER ANGELE:**  Okay.  Then

11   you indicated the car was searched for no reason.

12       **INMATE NGO:**  At first, yes.  But when they

13   asked me for consent, I gave it to them.

14       **PRESIDING COMMISSIONER ANGELE:**  All right.

15   But you do understand a male driving in a vehicle

16   with three purses in the car would be pretty

17   suspicious to me.  I'd think maybe it was a purse-

18   snatcher.  (Inaudible) plenty of probable cause.

19   But they asked you ---

20       **INMATE NGO:**  Yeah.

21       **PRESIDING COMMISSIONER ANGELE:**  And you gave

22   consent and inside one of the purses they found

23   the rock cocaine.  I found in a couple of spots

24   the gun was given to one of your crime partners by

25   somebody at an arcade.  Do you recall that

26   statement at all?

27       **INMATE NGO:**  It was brought up in trial,

113

41

1    Sir, but like I said before, the first time I ever

2    seen the gun was when I got back into the car.

3         PRESIDING COMMISSIONER ANGELE:  Okay, let me

4    ask you this, did you happen to go to the arcade

5    prior to you first seeing the gun?

6         INMATE NGO:  Yeah, I was playing arcade, but

7    I went to the restaurant.  I told them in court

8    that I was at a restaurant, a Hispanic restaurant

9    eating when this ---

10        PRESIDING COMMISSIONER ANGELE:  Okay.  So

11   can we assume without taking anything out of it

12   that isn't, it's a possibility that somebody did

13   get the gun at the arcade and put it in the car

14   and you just didn't see it.

15        INMATE NGO:  Very.

16        PRESIDING COMMISSIONER ANGELE:  What I'm

17   trying to establish is that you were at the arcade

18   before you got in the car and saw the gun?

19        INMATE NGO:  Yes.

20        PRESIDING COMMISSIONER ANGELE:  And the

21   first place you saw it was in the car.

22        INMATE NGO:  Exactly.

23        PRESIDING COMMISSIONER ANGELE:  All right,

24   any questions, Commissioner Rodriguez?

25        DEPUTY COMMISSIONER RODRIGUEZ:  None at this

26   time.

27        PRESIDING COMMISSIONER ANGELE:  Any

114

42

1    questions from the District Attorney?

2        DEPUTY DISTRICT ATTORNEY LAIRD:  Yes, just a

3    few.  And I'm referring to the P and S, the

4    Probation and Sentencing report.

5        PRESIDING COMMISSIONER ANGELE:  One second,

6    (inaudible) you answer the questions.  The

7    questions will be asked by the District Attorney

8    through the Panel and your statements are to be

9    directed to this side of the table.

10        INMATE NGO:  Yes.

11        DEPUTY DISTRICT ATTORNEY LAIRD:  Would you

12   like me to read what's in the probation report?

13   It's just, it's regarding the trial deputy's

14   statement in the report.

15        PRESIDING COMMISSIONER ANGELE:  Is it a

16   question or what do you intend to do with it?

17        DEPUTY DISTRICT ATTORNEY LAIRD:  The

18   question is I want to know if the inmate believes

19   that is an accurate statement, sentence by

20   sentence.  And I'm talking about page nine of the

21   Probation and Sentencing report, starting with

22   line 14, that entire paragraph, 14 to 21, which

23   begins with in a telephone conversation with the

24   prosecuting attorney Robin Park.  She's the Deputy

25   District Attorney that took the case to trial and

26   tried (inaudible) case.  And those are her

27   comments.  And I was wondering if they, Mr. Ngo,

/15

43

1    felt that those were accurate comments, and if

2    they are not accurate, how so.

3         **ATTORNEY FOX:**  I think we need to go through

4    each one point by point, otherwise it's ---

5         **DEPUTY DISTRICT ATTORNEY LAIRD:**  Right.

6         **PRESIDING COMMISSIONER ANGELE:**  Well, let me

7    go through it.  There's a statement that the

8    prosecuting attorney made regarding the offenses

9    being a very vicious attack.  After the

10   confrontation at the fast food restaurant, the

11   inmate, along with No Muhamed, drove by the school

12   and planned the revenge.  They subsequently

13   obtained the weapon, loaded it, and drove back to

14   the area of Fullerton High School.  They were

15   lying in wait for the victim to get out of school.

16   This occurred at 3:02 p.m., the victim was killed

17   at 3:07 p.m.  Is that what happened?

18        **INMATE NGO:**  Yes, Sir.

19        **PRESIDING COMMISSIONER ANGELE:**  Now did you

20   understand everything I just said?

21        **INMATE NGO:**  When you say lying in wait, do

22   you mean I was waiting for him (inaudible).

23        **PRESIDING COMMISSIONER ANGELE:**  Uh-hmm.

24   Well no there's a portion that I think is

25   extremely important in today's hearing.  It says

26   after the confrontation at the fast food

27   restaurant, the defendant, which is you, and No

116

44

1    Muhamed, drove by the school and planned the

2    revenge.  They, which would be you and Muhamed,

3    subsequently obtained a weapon, loaded it, and

4    then drove back to the area of Fullerton High

5    School.

6         INMATE NGO:  That's wrong.  It wasn't just

7    me and No Muhamed.  There was five of us.

8         PRESIDING COMMISSIONER ANGELE:  Okay.

9         INMATE NGO:  So, and we didn't load the

10   weapon.  I know I didn't (inaudible).  I didn't

11   see the weapon until I was in the car.  So that

12   statement has to be wrong.

13        PRESIDING COMMISSIONER ANGELE:  All right.

14   But you are aware of the term lying in wait.  Do

15   you know what that means?

16        INMATE NGO:  That we were waiting.

17        PRESIDING COMMISSIONER ANGELE:  Yeah, you

18   were parked by the school waiting for him to get

19   out of school.

20        INMATE NGO:  Yeah.

21        PRESIDING COMMISSIONER ANGELE:  Is that

22   basically what happened?

23        INMATE NGO:  That's true.

24        PRESIDING COMMISSIONER ANGELE:  Did that

25   answer your question?

26        DEPUTY DISTRICT ATTORNEY LAIRD:  Yes.  Just

27   a follow up question.  Did Mr. Ngo realize that

117

45

1   the gun in the car was loaded when they were going

2   back to the school to find victim Gonzales?

3           PRESIDING COMMISSIONER ANGELE:  When you saw

4   the gun or was there any conversation to lead you

5   to believe the gun was loaded?

6           INMATE NGO:  They led me to believe, I think

7   it was loaded because, they say that I told the

8   police that they say, you know, use it for

9   protection.  So I figured it probably is loaded.

10  But my lack of judgment that day ---

11          DEPUTY DISTRICT ATTORNEY LAIRD:  And then

12  was, at the time that they were waiting for the

13  victim, this is addressed to the parole board, at

14  the time the suspects were waiting for the victim,

15  was victim Alex Gonzales by himself?

16          INMATE NGO:  No, he wasn't.  There was two

17  of them, Angel Gonzales and his friend.  That's

18  when No Muhamed confronted Mr. Gonzales and I

19  confronted his other friend.  I followed the other

20  guy, I don't know his name, and No Muhamed was

21  fighting with Mr. Gonzales.  And after that, his

22  friend ran away and I helped No out.

23          PRESIDING COMMISSIONER ANGELE:  And how

24  about the rest of your crime partners?

25          INMATE NGO:  They didn't come until later,

26  until --- it happened so fast.  Me and No was

27  fighting we didn't know until the first time the

118

46

1  gun went off and that's when everybody just

2  stopped and we started running away.  After that,

3  you know, when I heard the first shot, I ran.

4       PRESIDING COMMISSIONER ANGELE:  Okay.

5       DEPUTY DISTRICT ATTORNEY LAIRD:  And, again,

6  this is directed to the parole board.  Did Mr. Ngo

7  realize that one of his group would get out of the

8  car to confront Alex Gonzales, the victim who

9  died, with that firearm that was in the car?

10      PRESIDING COMMISSIONER ANGELE:  Let's see if

11 I understand that clearly.  Did you have knowledge

12 that somebody in the car was going to confront

13 Mr. Gonzales with that firearm?

14      INMATE NGO:  No, Sir.  Not at all.

15      DEPUTY DISTRICT ATTORNEY LAIRD:  Did Mr. Ngo

16 nevertheless realize that somebody was going to be

17 taking that gun out of the car into the

18 confrontation?

19      PRESIDING COMMISSIONER ANGELE:  Do you

20 understand that question?

21      INMATE NGO:  Yes.  My understanding is,

22 that's the argument between No, Mr. Muhamed, I

23 asked why did you guys bring a gun, you know,

24 without telling me, you know, when I first saw it

25 under the seat.  That's when they tell me it's

26 only for protection.  My understanding was it was

27 only going to be used if the other group have

*119*

4'7

```
 1   weapon on them; otherwise, it was supposed to be
 2   in the car.  Because when I agreed to go into
 3   fistfight, that's all I agreed upon, was to have a
 4   fistfight.  I never knew that someone was going to
 5   take it out and shoot him; otherwise, I probably
 6   wouldn't be there.  But back then I was trying to
 7   get my life back straight, you know.  I'm sorry,
 8   but ---
 9        PRESIDING COMMISSIONER ANGELE:  Take your
10   time.
11        INMATE NGO:  I'm sorry that Mr. Gonzales,
12   you know, died, but I never wanted that to happen.
13   It was not my intention.  I thought it was just
14   for fight.  (Inaudible.)
15        PRESIDING COMMISSIONER ANGELE:  Let's take a
16   break (inaudible).
17                    [Off the record.]
18        INMATE NGO:  Thank you.  I know there's
19   nothing I can say or do at this point to bring
20   back Mr. Gonzales.  I know his family is probably
21   going through a lot of pain, but I was young and I
22   was ignorant, naïve.  I made bad judgment.
23   There's nothing I can say to bring him back, Sir.
24   If sorry would help, but hopefully one day they'll
25   find it in their heart to forgive me.
26        PRESIDING COMMISSIONER ANGELE:  Any
27   questions?
```

120

48

1    **DEPUTY DISTRICT ATTORNEY LAIRD:**  Yes.  I
2    appreciate that answer from Mr. Ngo.  I have just
3    a couple of follow up questions to the Board
4    regarding the Tiger Mafia.  Because it is printed
5    in several pieces of documentation including the
6    probation report as well as elsewhere that at
7    about the time of the murder he was affiliated
8    with a group called the Tiger Mafia.  And I'm
9    aware and I can point to a picture here on the
10   table that dealt with search warrants and items
11   that were obtained and seized during the time of
12   this crime.  And I've seen and become aware of
13   several drawings, that are drawings, handwritten
14   drawings of a tiger, which I'm making the
15   assumption refers to the Tiger Mafia.  And I'm
16   just trying to get a clarification of what that
17   group was and why the inmate put the tattoo on his
18   arm for TM or Tiger Mafia.
19        **ATTORNEY FOX:**  I'd like to pose an
20   objection to the extent that the District
21   Attorney was testifying.  If there is a
22   question regarding the Tiger Mafia, I think it
23   might be asked as a direct question rather
24   than a litany of what the District Attorney
25   has seen.
26        **PRESIDING COMMISSIONER ANGELE:**  I'll
27   overrule your objection.  I don't believe he was

/21/

49

1  testifying.  I believe the question has already

2  been asked and answered.  The Tiger Mafia,

3  according to the inmate, was made up and the

4  initials on his arm stood for the initials of an

5  ex-girlfriend.  Do you still state that?

6       INMATE NGO:  Yes, Sir.

7       PRESIDING COMMISSIONER ANGELE:  So there

8  never was a group called the Tiger Mafia?

9       INMATE NGO:  No.  It's just a made-up name.

10      DEPUTY COMMISSIONER RODRIGUEZ:  Are those

11  drawings from ---

12      DEPUTY DISTRICT ATTORNEY LAIRD:  I do not

13  know.  I do not know.  I just used it as a purpose

14  of illustration just because I've, in reviewing

15  the file I've seen some pictures of tigers.  I see

16  a tattoo.  So I'm just asking by illustrating what

17  I've seen if there was any connection to the Tiger

18  Mafia.

19      INMATE NGO:  If you want clarification what

20  the tattoo of the tiger is, all the Fullerton Boyz

21  has a tiger on his chest.  It's not because of the

22  Tiger Mafia.  It's Fullerton Boyz has a tiger on

23  his chest, all of us.

24      DEPUTY DISTRICT ATTORNEY LAIRD:  Thank you.

25      PRESIDING COMMISSIONER ANGELE:  Anything

26  further?

27      DEPUTY DISTRICT ATTORNEY LAIRD:  Nothing

122

50

1    further.

2         PRESIDING COMMISSIONER ANGELE:  Ms. Fox,

3    questions of your client.

4         ATTORNEY FOX:  Just briefly.  When you were

5    found in possession of cocaine, when the police

6    officer stopped you.

7         INMATE NGO:  Yes.

8         ATTORNEY FOX:  They found the cocaine in a

9    purse, right?

10        INMATE NGO:  I'm not sure where they found

11   it.  I think it was underneath the seat,

12   underneath the seat when they found it.  It wasn't

13   in no purse at all.

14        ATTORNEY FOX:  Okay, that was my question.

15   If it was in the purse how did it get there.  But

16   it's your testimony you didn't put it there?

17        INMATE NGO:  No, if anything, if I remember

18   correctly I put it under the seat.  If it also

19   found it'd be under the seat.

20        ATTORNEY FOX:  So it wasn't your mother's

21   cocaine?

22        INMATE NGO:  No.  It was mine.  I bought it.

23        ATTORNEY FOX:  Okay, I have no further

24   questions.

25        PRESIDING COMMISSIONER ANGELE:  Okay, can we

26   go into closing please, from the District

27   Attorney, Mr. Laird?

123

51

1    DEPUTY DISTRICT ATTORNEY LAIRD:    Yes, I

2    have, I've been prosecuting gang cases in my

3    office for approximately five years.    I know Robin

4    Parks, she's a colleague of mine.    I have tried a

5    case just like a case like this in terms that the

6    type of theory that is presented in terms of a

7    gang, group attack that results in a death.    I

8    would indicate that Mr. (inaudible) who I also

9    know is, or who was the Public Defender at the

10   time, and is still a public defender representing

11   his client, basically is not talking about any

12   sort of novel or unique theory that is applied in

13   Orange County in terms of finding the defendant

14   guilty of murder by virtue of being involved in

15   gang related activity and aiding and abetting in a

16   fight on a victim that results in a murder.    I

17   would note that the seriousness of the crime,

18   basically is well spoken for in the probation

19   report by Robin Park.    It's also well spoken for

20   by the fact that a jury did return a first degree

21   murder verdict on this case and that there was a

22   subsequent plea apparently between the District

23   Attorney in exchange for not raising any appellate

24   rights on the case.    It is my opinion that based

25   on, well I'll just withdraw, I won't make any

26   comments regarding the nature of why that plea

27   took place because I personally have not been able

124

52

1    to find the precise material that refers to that.

2    However, I would just point to the gravity of the

3    offense in urging what we have urged in our

4    May 3rd, 2002, letter in that we believe that at

5    this point Mr. Ngo is not suitable for parole.

6    And it's largely based on the heinousness of the

7    crime in that it involved an extremely vulnerable

8    victim at the time of the group attack.  It

9    involved a picture, an accurate picture of gang

10    subculture with respect to the roles of guns and

11    how guns are brought to a conflict for backup.

12    And that in the gang subculture any type of

13    escalation by rival gangs is basically a form of

14    disrespect which must be answered to.  And that by

15    virtue of the victim answering with blows to

16    Mr. Ngo at the time, back in 1990, literally

17    1990's, it was just a right condition for an

18    escalation of a conflict wherein the gun would be

19    used.  The People have a concern also regarding

20    the modus operandi of Asian gangs in this state in

21    that their activity is not as overt in the

22    community.  They appear to be less overt regarding

23    their gang affiliation and it's hard to look at

24    the inmate essentially with a crystal ball at this

25    time.  We're forced to look back at past conduct

26    that has happened which I've described above.

27    It's my belief that the inmate's account about the

125

53

1   gun and the use of the gun at the crime is

2   somewhat unreasonable in that he indicates that

3   the reason they had a gun was for protection and

4   they were laying in wait or lying in wait for the

5   victim to come out of school.  At that time, they

6   knew they had had a conflict earlier at the

7   McDonald's.  They didn't know whether the victim

8   was armed or not or whether the victim's cohort

9   was armed or not.  And it seems unreasonable that

10  this defendant would not know that the gun was

11  taken out of the car in concert with the rest of

12  the suspects who ended up attacking victim

13  Gonzales.  And we just believe based on all the

14  psychiatric reports and based on the limited

15  contact that the experts have had with the inmate

16  that there needs to be a longer test of time

17  before this inmate is found suitable for a parole

18  date and I thank you very much for your time.

19          **PRESIDING COMMISSIONER ANGELE:**  Thank you.

20  Ms. Fox.

21          **ATTORNEY FOX:**  Thank you.  I respectfully

22  disagree with my colleague from Orange County.  I

23  think it would be appropriate to set a date for

24  Mr. Ngo today.  Before the Panel is a man who has

25  matured in the prison system.  Today he displayed

26  genuine remorse, which has been a hallmark of his

27  existence in the Department of Corrections.  Going

126

54

1    back to the probation report, which was used for

2    the Statement of Facts over my objection.

3    Consistently throughout there, that report Mr. Ngo

4    is cited for having stated that he did not know

5    that the weapon is in the car for any long period

6    of time before it was used and today he spoke what

7    he thought the use to which that weapon would be

8    put.  It would be used in self-defense.  Hindsight

9    is 20/20.  He can't go back and change what

10   happened.  Facts is facts.  And I think the fact

11   that he stands convicted of a murder two, not

12   murder one, is a significant finding.  Turning to

13   his institutional adjustment, he has minimal

14   disciplinary history, and that's consistent with

15   his personality prior to the time he came into the

16   Department of Corrections with this one very

17   tragic situation.  He has improved himself to the

18   extent that he's able to within the Department of

19   Corrections having achieved two completed

20   vocations, sustained attendance at AA, good work

21   reports, and he continues to enjoy a sustained

22   excellent family support system out there.  In the

23   psych report it's important to note that he does

24   have a Global Assessment score of 90, which would

25   let us know that he is able to cope with life on

26   the streets in a non-destructive manner.  And he's

27   done that and it's demonstrable or has been

127

55

1  demonstrable since he's been incarcerated.  I

2  believe both psych reports accurately describe

3  Mr. Ngo, and he is ready for parole.  The plans

4  are excellent.  And if the Board is disinclined to

5  find him suitable for parole today, I'd suggest a

6  one or two year denial to allow him time to get

7  into the Impact program and pursue any other

8  self-help and anger management programs that the

9  Board would find useful.  So we'll submit based on

10  that unless Mr. Ngo has something he'd like to

11  say.

12      PRESIDING COMMISSIONER ANGELE:  Thank you.

13  Mr. Ngo, now it's your turn to make a statement to

14  the Panel regarding your parole suitability.

15  Before we do that, I just want to add one thing.

16  When I read the Statement of Facts from the

17  probationary report when we first started the

18  hearing, you indicated to me that that was the way

19  it happened?

20      INMATE NGO:  Yes.

21      PRESIDING COMMISSIONER ANGELE:  Thank you.

22  All right, do you need to make a statement or we

23  can end this hearing on what your attorney has

24  said on your behalf.

25      INMATE NGO:  I just say, honestly I'm sorry

26  for what I've done.  I accept the fact that, you

27  know, because of my ignorance that a human life

128

56

1    was lost.  And, you know, I made a mistake.

2    There's nothing I want more than to change what

3    happened.  I'm sorry, but I just don't know what I

4    can say anymore.  That's all I guess.

5         PRESIDING COMMISSIONER ANGELE:  Okay.  Thank

6    you for your comments.  We'll recess for

7    deliberations.

8                        R E C E S S

9                         --o0o--

10
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

129

57

```
1        CALIFORNIA BOARD OF PRISON TERMS

2                  D E C I S I O N

3        DEPUTY COMMISSIONER RODRIGUEZ:  We're back

4   on record, all parties are present.

5        PRESIDING COMMISSIONER ANGELE:  In the

6   matter of Sieu Ngo, that's N-G-O.  Mr. Ngo, the

7   Panel has reviewed all information received from

8   the public and relied on the following

9   circumstances in concluding that you are not

10  suitable for parole and would pose an unreasonable

11  risk of danger to society or a threat to public

12  safety if released from prison.  The offense was

13  carried out in an exceptionally cruel, callous,

14  violent and brutal manner.  The offense was

15  carried out in a manner which demonstrates an

16  exceptionally callous disregard for human

17  suffering and life.  And the motive for the crime

18  was inexplicable or very trivial in relation to

19  the offense.  These conclusions were drawn from

20  the Statement of Facts wherein the inmate and his

21  crime partners, after altercation with the victim,

22  armed themselves with a weapon, went to the high

23  school where the victim, one 15 year old Angel

24  Gonzales went to school, and waited for him to get

25  out of school.  The inmate and one of his crime

26  partners then approached Mr. Gonzales and a friend

27  SIEU PHONG NGO  J-07024  DECISION PAGE 1  05/13/02
```

*130*

58

1    of his, each getting in a fight with one of them.

2    At which time both the inmate and his other crime

3    partner, both got into a fight with Mr. Gonzales.

4    At the same time three other crime partners

5    jumping in and attacking Mr. Gonzales who was shot

6    and killed after he was on the ground, by one of

7    the other crime partners.  The prisoner has on a

8    previous occasion has attempted to inflict injury

9    upon a victim.  This has to do with another fight

10   in which he was involved in a one-on-one, which he

11   got the better of the fight and knocked the victim

12   down and then his crime partners jumped in and all

13   started beating the victim.  The inmate does have

14   an escalating pattern of criminal conduct, albeit

15   minor.  However, it does include the possession of

16   rock cocaine.  The inmate has received during his

17   incarceration no 115 disciplinary reports, which

18   is a very positive step.  He's received two 128(a)

19   counseling chronos.  4/1/97, failure to respond to

20   a medical ducat and 2/11/00, for window coverings.

21   Psychological evaluation dated 1/23/02, by initial

22   C. Saindon, S-A-I-N-D-O-N, would indicate that the

23   inmate, or would be favorable to the inmate.  The

24   inmate does have parole plans.  He does have

25   residential plans in the last county of legal

26   residence, also in Los Angeles County.  And does

27   **SIEU PHONG NGO   J-07024   DECISION PAGE 2   05/13/02**

*131*

59

1   have acceptable job offers.  The hearing Panel

2   notes that responses to 3042 notices indicate

3   opposition to a finding of parole suitability,

4   specifically the District Attorney of Orange

5   County.  The Panel makes the following findings:

6   that the inmate needs additional time in order to

7   fully understand and deal with the causation

8   factors that led to the commitment of the life

9   crime.  Until progress is made, the prisoner

10  continues to be unpredictable and a threat to

11  others.  Nevertheless, he should be commended for

12  his participation in NA, for his participation in

13  the 12-steps, for his completing vocational auto

14  upholstery and auto refinishing.  In addition, to

15  his being 115-free during his incarceration and

16  for completing the Keys to Fatherhood a

17  salesmanship course, and the tuberculosis and

18  hepatitis courses.  However, these positive

19  aspects of his behavior do not outweigh the

20  factors of unsuitability.  In a separate decision,

21  the hearing Panel finds that it is not reasonable

22  to expect that parole would be granted at a

23  hearing during the following two years.  The

24  specific reasons for the findings are as follows:

25  the prisoner committed the offense in an

26  exceptionally cruel, callous, violent, brutal

27  SIEU PHONG NGO   J-07024   DECISION PAGE 3  05/13/02

*132*

60

1   manner.  Specifically, he and his crime partners,

2   after one of his crime partners was involved in a

3   fight with the victim, left, armed themselves with

4   a weapon, and then went back to the school area

5   where the victim had gone to school, waited for

6   the victim to get out of school.  The inmate and

7   one of his crime partners then got involved in a

8   one-on-one fight with the victim and one of his

9   friends.  After which, the inmate and his crime

10  partner both began fighting with the victim.  They

11  were then joined in by two other individuals who

12  were beating the victim, knocked to the ground.

13  One of the crime partners shot and killed the

14  victim, one Angel Gonzales, age 15.  The offense

15  was carried out in an exceptionally cruel and

16  callous manner.  The motive for the crime was

17  inexplicable or very trivial in relation to the

18  offense.  The prisoner had been involved in

19  previous violent behaviors, which included once

20  again, a fistfight with an individual who he got

21  the better of and knocked down and after which

22  time three of his crime partners and him all began

23  continuing to strike the victim.  The correctional

24  counselor's report dated (inaudible) 2002, by

25  initial M. Rubio, R-U-B-I-O, indicates a degree of

26  threat as moderate if released to the public.

27  **SIEU PHONG NGO   J-07024   DECISION PAGE 4   05/13/02**

*133*

61

1    Therefore, a longer period of observation and

2    evaluation of the prisoner is required before the

3    Board should find the prisoner is suitable for

4    parole.  The Panel recommends that inmate remain

5    disciplinary-free.  If available, upgrade any way

6    you can, vocation, education.  If available,

7    participate in self-help and therapy programming.

8    That does conclude the reading of the decision.

9    Any comments, Commissioner Rodriguez?

10           **DEPUTY COMMISSIONER RODRIGUEZ:**  Yeah,

11   Mr. Ngo, one thing I think you took more of a

12   leadership role in this incident and I think

13   you've been a little bit less than truthful today.

14   If I'm wrong and what you stated today is the

15   truth, I don't expect you to change your story

16   just for the Board's panel.  But I truly would

17   like you to take this next two years, as far as

18   I'm certain you're programming well, don't

19   misunderstand me.  But I think there's more to the

20   incident than you're actually telling us today.

21   Whether you just don't want to say it or you

22   choose not to say it or throughout the years

23   you've made yourself believe what you've said in

24   the past is correct.  But I think if you look deep

25   down, I truly believe that you took more of a

26   leadership role and that possibly you did have,

27   **SIEU PHONG NGO   J-07024   DECISION PAGE 5   05/13/02**

*134*

62

1    know more about that weapon.  So I want you to

2    think about that.  But, again, like I said, if I

3    am incorrect, I don't expect you to come to the

4    Board next time and say you did do it if you

5    didn't.  But I will ask you one more time, did you

6    know more about that gun?

7         **INMATE NGO:**  (Inaudible) not until I looked

8    under the car.  When I got into the car, that's

9    the first time I seen the gun, Sir.

10         **DEPUTY COMMISSIONER RODRIGUEZ:**  Did you plan

11   the assault or the incident?

12         **INMATE NGO:**  No, Sir.

13         **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay.  Thank

14   you.

15         **ATTORNEY FOX:**  I'm sorry.  That's vague,

16   because he did earlier say he planned to fight

17   him, but not shoot him.

18         **INMATE NGO:**  Thank you.

19         **DEPUTY COMMISSIONER RODRIGUEZ:**  Okay, no, no

20   that's all right counselor.  Thank you.  And I

21   just want to wish you the best of luck.

22         **PRESIDING COMMISSIONER ANGELE:**  Mr. Ngo, let

23   me tell you, you know, what disturbs me is the

24   other fight you had and we're very familiar with

25   the gang mentality.  Regardless of whether or not

26   you beat somebody, going to beat somebody, the end

27   **SIEU PHONG NGO   J-07024   DECISION PAGE 6  05/13/02**

*135*

63

1   result is everybody jumps on a guy when he's down.

2   It happened in another fight you had.  I think

3   your statement was, you couldn't be responsible

4   for what they do, but I'll tell you very frankly

5   if it was one of your crime partners involved in

6   that, you'd of jumped in just like everybody else

7   did.  That's the way things are.  We both know

8   that.

9       **INMATE NGO:**  Yes, it is.

10       **PRESIDING COMMISSIONER ANGELE:**  It disturbs

11   me that the killing of Mr. Gonzales was the same

12   type of situation.  The only difference is

13   somebody had a gun there.  So the history that you

14   started to accumulate would indicate to me that

15   the gang mentality that has no respect at all for

16   humanity, you know what happens next?

17       **INMATE NGO:**  That's when I was young, Sir.

18       **PRESIDING COMMISSIONER ANGELE:**  I realize

19   that.  I realize that.  And the reason why I

20   brought that up is I'd really like to see you get

21   into that anger management program here.

22   Hopefully, they'll get it out for you or you'll

23   get into it soon and maybe the next time you'll

24   have it under your belt.  I figure it will help.

25   And I don't want this to discourage you.  You're

26   doing a good job.  And for an initial hearing,

27   **SIEU PHONG NGO   J-07024   DECISION PAGE 7   05/13/02**

*136.*

64

1   your counsel knows, that two years is not a bad

2   thing.  So I do wish you good luck.

3        INMATE NGO:  Thank you, Sir.

4        PRESIDING COMMISSIONER ANGELE:   That does

5   conclude the hearing.  Time is approximately 3:52

6   p.m.

7                        --o0o--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  PAROLE DENIED TWO YEARS

26  EFFECTIVE DATE OF THIS DECISION_____
    JUN 1 0 2002

27  SIEU PHONG NGO  J-07024  DECISION PAGE 8  05/13/02

137

65

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, VALERIE C. LORD, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 64, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, AT SOLEDAD, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING of SIEU PHONG NGO, CDC No. J-07024, on MAY 13, 2002, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 23, 2002, at Auburn, California.

Valerie C. Lord
Transcriber
**CAPITOL ELECTRONIC REPORTING**

138

# EXHIBIT C

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )          CDC Number J-07024
Hearing of:               )
                          )          COPY
SIEU NGO                  )
                          )          INMATE
_____ )

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 3, 2004

1:15 P.M.

PANEL PRESENT:

BOOKER WELCH, Presiding Commissioner
ROLANDO MEJIA, Deputy Commissioner

OTHERS PRESENT:

SIEU NGO, Inmate
DAVID SPOWART, Attorney for Inmate
JENNIFER CONTINI, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No    See Review of Hearing
_____  Yes   Transcript Memorandum

**Wendy Thomas, Capitol Electronic Reporting**

140

ii

## INDEX

| | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 12 |
| Pre-Commitment Factors | 15 |
| Post-Commitment Factors | 20 |
| Parole Plans | 29 |
| Closing Statements | 49 |
| Recess | 57 |
| Decision | 58 |
| Adjournment | 63 |
| Transcriber Certification | 64 |

--oOo--

141

1

# P R O C E E D I N G S

1       **DEPUTY COMMISSIONER MEJIA:** We are now on

2      the record.

3       **PRESIDING COMMISSIONER WELCH:** Okay, good

4      afternoon, Mr. Ngo.

5       **INMATE NGO:** Good afternoon.

6       **PRESIDING COMMISSIONER WELCH:** Sir, this is

7      a Subsequent Parole Consideration Hearing. I'll

8      read your case factors into the record. The

9      prisoner's name is Ngo, N-G-O. How do you

10     pronounce your first name?

11       **INMATE NGO:** Sieu.

12       **PRESIDING COMMISSIONER WELCH:** Sieu,

13     S-I-E-U, CDC number J-07024. The date of the

14     hearing is Tuesday, August 3rd, 2004, the time is

15     approximately 1:15. The location is Correctional

16     Training Facility, Soledad. The prisoner was

17     received CDC on 2-1, 1994 from Orange County for

18     the offense of murder second, case number C99109,

19     count one, Penal Code violated 187, total term 16

20     years to life, minimum eligible parole date was

21     5-24-03. Sir, this hearing will be tape-recorded

22     so for the purpose of voice identification, we'll

23     need to go around the room and identify ourselves

24     stating our full name, spelling our last name. In

25     your case, you need to add your CDC number. I'll

26     start with myself, go to my left. My name is

142

2

1    Booker Welch, W-E-L-C-H.  Mr. Mejia.

2         **DEPUTY COMMISSIONER MEJIA:**  Rolando Mejia,

3    M-E-J-I-A, Deputy Commissioner.

4         **DEPUTY DISTRICT ATTORNEY CONTINI:**  Jennifer

5    Contini, C-O-N-T-I-N-I, Deputy District Attorney,

6    Orange County.

7         **ATTORNEY SPOWART:**  David Spowart,

8    S-P-O-W-A-R-T, attorney for Mr. Ngo.

9         **INMATE NGO:**  Sieu Ngo, S-I-E-U N-G-O, CDC

10   number J-07024.

11        **PRESIDING COMMISSIONER WELCH:**  Okay, sir,

12   that identifies everyone in the room with the

13   exception of the correctional peace officer who is

14   seated directly behind you, two of them, and

15   they're here for security purposes only and will

16   not be taking part in today's proceedings.  Mr.

17   Ngo, are you familiar with the American with

18   Disabilities law?

19        **INMATE NGO:**  No, I'm not, Sir.

20        **PRESIDING COMMISSIONER WELCH:**  Well, that

21   form in front of you, it will give you a good

22   overview.  Do you mind reading that into the

23   record.

24        **INMATE NGO:**  "ADA American with

25        Disability Act.  Americans with

26        Disability Act (ADA) is a law to help

27        people with disabilities.

143

3

1      Disabilities are problems that make

2      it harder for some people to see,

3      hear, breathe, talk, walk, learn,

4      think, work, or take care of

5      themselves than it is for others.

6      Nobody can be kept of public places

7      or activities because of a

8      disability.  If you have a

9      disability, you have the right to ask

10     for help to get ready for your BPT

11     hearing to get to the hearing, talk,

12     read forms and papers, and understand

13     the hearing process.  BPT will look

14     at what you ask for to make sure that

15     you have a disability that is covered

16     by the ADA and that you have asked

17     for the right kind of help.  If you

18     do not get help or if you don't think

19     you've got the kind of help you need,

20     ask for a BPT 1074 Grievance Form.

21     You can also get help to fill it

22     out."

23            **PRESIDING COMMISSIONER WELCH:**  Very good.

24  Mr. Ngo, does that give you a little bit better

25  overview of what the American with Disabilities

26  law is all about?

27            **INMATE NGO:**  Yes.  Yes, Sir.

*144*

4

1        PRESIDING COMMISSIONER WELCH:  Now after

2   being armed with that knowledge, let me ask you,

3   do you have a disability as defined under the

4   American Disabilities Act?

5        INMATE NGO:  No, Sir.

6        PRESIDING COMMISSIONER WELCH:  I see you

7   have glasses, do you need those to read?

8        INMATE NGO:  I'm nearsighted.

9        PRESIDING COMMISSIONER WELCH:  Nearsighted,

10  okay.  You have no problems talking, reading here,

11  or walking, is that correct?  You were able to

12  walk over under your own power today?

13       INMATE NGO:  Yes, Sir.

14       PRESIDING COMMISSIONER WELCH:  You have a

15  12.3 overall TABE grade point level which would

16  indicate to the Board that you're totally capable

17  of reading and understanding the documents

18  necessary to prepare for this hearing, is that

19  correct?

20       INMATE NGO:  Correct, Sir.

21       PRESIDING COMMISSIONER WELCH:  Have you

22  received any mental health treatment within the

23  last 12 months?

24       INMATE NGO:  No, Sir.

25       PRESIDING COMMISSIONER WELCH:  Counselor, do

26  you have any concerns about your client's rights

27  as it relates to the American with Disabilities

145

5

1    law?

2           ATTORNEY SPOWART:   I have none.

3           PRESIDING COMMISSIONER WELCH:   Okay, then

4    we'll proceed with this hearing.   The purpose of

5    today's hearing is to once again to consider your

6    suitability for parole.   We will consider the

7    nature and the number of the crimes you were

8    committed for, your prior criminality, your social

9    history, and your behavior and programming since

10   your commitment.   We've had an opportunity to

11   review your C-File and your prior transcripts and

12   you'll have an opportunity to make corrections or

13   clarifications to the record.   We will consider

14   your progress since your last hearing, any new

15   psychiatric reports, and any other information

16   that may have a bearing on your suitability for

17   parole.   Any change in parole plans should be

18   brought to our attention.   Before we recess for

19   deliberations, the District Attorney, your

20   attorney, and yourself will be given the

21   opportunity to make a final statement regarding

22   your suitability for parole and the length of

23   confinement.   After that's done, we will recess,

24   clear the room, and deliberate.   Once we reached a

25   decision, we will reconvene and at that time we'll

26   let you know what our decision is.   Do you

27   understand all that so far?

146

6

1    INMATE NGO:  Yes, Sir.

2    PRESIDING COMMISSIONER WELCH:  Now the Board

3    of Prison Terms rules and the law basically state

4    that a parole date shall be denied you if in the

5    opinion of the Commissioners your parole would

6    pose an unreasonable risk of danger to others.

7    However, prisoners do have certain rights.

8    Counsel, have your client's rights been met?

9    ATTORNEY SPOWART:  Yes, they have.

10   PRESIDING COMMISSIONER WELCH:  Mr. Ngo, you

11   have an additional right, you have the right to a

12   fair and impartial panel.  Do you have any reason

13   to believe the Panel Members will not be fair and

14   impartial to you?

15   INMATE NGO:  I would like to reserve that

16   right towards the end of this hearing.

17   PRESIDING COMMISSIONER WELCH:  Okay.  Mr.

18   Ngo, that's fine, I don't have a problem with

19   that, but I do need to tell you that I have no

20   reason not to give you a fair hearing.  I have

21   every intention to make sure that your due process

22   rights are adhered to.  I've already covered your

23   ADA issues and made sure you didn't have any

24   issues with that.  I'll be going over your due

25   process right issues to insure that you don't have

26   a problem with your rights.  And during the

27   hearing, it is -- I have every intention to insure

147

1    that you receive a fair and impartial hearing.

2    Commissioner, do you have any reasons why you

3    can't give the prisoner a fair hearing?

4         DEPUTY COMMISSIONER MEJIA:  No, I'm

5    objective and I take the case on a case by case

6    basis, no predetermined opinion or belief for

7    suitability or unsuitability.  I'll base all my

8    decision based on what I hear here and also what's

9    reflected in his file.

10        PRESIDING COMMISSIONER WELCH:  Okay, very

11   good.  Sir, you will receive a copy of our written

12   tentative decision today.  The decision becomes

13   effective in 120 days.  Mr. Ngo, you no longer

14   have a right to administrative appeals process, do

15   you understand that?

16        INMATE NGO:  Yes, I do.

17        PRESIDING COMMISSIONER WELCH:  Okay.

18        INMATE NGO:  The 1040 you mean?

19        PRESIDING COMMISSIONER WELCH:  Yes.  You're

20   not required to discuss the offense today, you're

21   not required to admit to guilt.  However, the

22   Panel Members accept as true the findings of the

23   court.  Do you understand that concept?

24        INMATE NGO:  Yes, I do.

25        PRESIDING COMMISSIONER WELCH:  Counselor,

26   pardon me?

27        INMATE NGO:  I would like to say that I will

148

8

1    not be talking about -- discussing my case, my

2    case today under Penal Code section 5011.  And

3    before we go any further, I would like to submit

4    this memorandum as evidence in support of my

5    parole suitability to you.

6         PRESIDING COMMISSIONER WELCH:  Okay, I'll

7    take it at this time, but you're getting a little

8    ahead of the game, we were going to give you an

9    opportunity.  That's fine we'll accept it now,

10   how's that?

11        INMATE NGO:  Thank you.

12        PRESIDING COMMISSIONER WELCH:  Okay, very

13   good.  And certainly you do not have to talk or

14   admit to the crime.  Very good.  Commissioner, is

15   there any confidential information to be used

16   today?

17        DEPUTY COMMISSIONER MEJIA:  None.

18        PRESIDING COMMISSIONER WELCH:  Good.

19   Counselor, I passed you a list of the documents we

20   will be working from.  Do you have those

21   documents?

22        ATTORNEY SPOWART:  Yes, I have these.

23        PRESIDING COMMISSIONER WELCH:  District

24   Attorney, do you have those documents?

25        DEPUTY DISTRICT ATTORNEY CONTINI:  Yes, I

26   do.

27        PRESIDING COMMISSIONER WELCH:  Counselor, do

149

9

1   you have any additional documents to submit?  Your

2   counsel have already -- I mean, your client have

3   already submitted a brief.

4       ATTORNEY SPOWART:  He's already given me

5   that brief, he says the first 10 pages are an

6   overview of why he should be considered.

7       PRESIDING COMMISSIONER WELCH:  Why he should

8   be considered for parole.

9       INMATE NGO:  Because it would clarify my

10  position at this hearing today, Sir.

11      PRESIDING COMMISSIONER WELCH:  Okay, then we

12  will review that during deliberations, we'll go

13  through and review that.

14      INMATE NGO:  All right, Sir.

15      PRESIDING COMMISSIONER WELCH:  Very good,

16  very good.  Any other documents to submit?

17      ATTORNEY SPOWART:  No, I haven't.

18      PRESIDING COMMISSIONER WELCH:  Any

19  preliminary objections?

20      ATTORNEY SPOWART:  Yeah, I have an

21  objection.  This was a plea agreement and I have

22  an objection to the District Attorney being here

23  today on a recent Supreme Court ruling that

24  classifies a plea agreement as a contract.  I know

25  that my client was not the shooter, he had no

26  criminal prior record, and has had an excellent

27  performance since he's been in here, so.

150

10

1     PRESIDING COMMISSIONER WELCH:  What does

2   that have to do with the District Attorney being

3   here?

4     ATTORNEY SPOWART:  That the District

5   Attorney is breaking the contract (inaudible).

6   When he pled, he gave up certain rights.  The

7   People got certain benefits from that.

8     PRESIDING COMMISSIONER WELCH:  Okay.

9     ATTORNEY SPOWART:  They got their benefits.

10   Now they're just trying to deny him of his

11   benefits.

12     PRESIDING COMMISSIONER WELCH:  Okay, all

13   right, I think I understand.

14     ATTORNEY SPOWART:  (Inaudible).

15     PRESIDING COMMISSIONER WELCH:  Okay.

16     ATTORNEY SPOWART:  I just want it on the

17   record, Commissioner.

18     PRESIDING COMMISSIONER WELCH:  Okay,

19   absolutely, absolutely.  I'm going to overrule

20   that objection because according to Penal Code

21   3042, section 3042 that is, the District Attorney

22   or his representative have a right to appear and

23   represent The People's interest at these hearings.

24   If not the District Attorney, certainly the

25   Attorney General, he can appear depending on who

26   prosecuted the case or has a major interest in the

27   case, not one or both, but only one can appear.

151

11

1    In this case, The People -- the District Attorney

2    of Orange County have opted to send his

3    representative, i.e., the Deputy District Attorney

4    from Orange County here to represent the District

5    Attorney.  Therefore, per statute, per Penal Code,

6    I'll have to overrule that objection, okay.  All

7    righty, thank you very much.  Any other

8    objections?

9          **ATTORNEY SPOWART:**  I have none.

10         **PRESIDING COMMISSIONER WELCH:**  All right,

11   thank you, Mr. Spowart.  Okay, and your client

12   will not be speaking to us today?

13         **ATTORNEY SPOWART:**  Not on the life crime, he

14   pled on the crime.

15         **PRESIDING COMMISSIONER WELCH:**  Will he be

16   speaking -- will he be giving any testimony today?

17         **ATTORNEY SPOWART:**  Yes, he'll talk about

18   everything else.

19         **PRESIDING COMMISSIONER WELCH:**  Okay, Mr.

20   Ngo, would you raise your right hand.

21         **INMATE NGO:**  Yes, Sir.

22         **PRESIDING COMMISSIONER WELCH:**  Do you

23   solemnly swear or affirm that the testimony you

24   give today will be the whole truth and nothing but

25   the truth?

26         **INMATE NGO:**  Yes, I do, Sir.

27         **PRESIDING COMMISSIONER WELCH:**  Okay.  In

152

12

1    that case what I'm going to do, Mr. Ngo, is just

2    go to -- let me give this to my colleague, he can

3    take a look at it and then I'll take a look at it

4    later.  Are your parole plans in that brief you

5    submitted?

6              **INMATE NGO:** Yes, Sir.

7              **PRESIDING COMMISSIONER WELCH:** You've got

8    everything in it, okay.

9              **INMATE NGO:** Parole plan, place for

10    residence, employment, support letters.

11              **PRESIDING COMMISSIONER WELCH:** Okay, very

12    good.  Let's go to the summary of the crime, it

13    say,

14              "On 9-18, 1992 Angel Gonzalez,

15              G-O-N-Z-A-L-E-Z, was beaten and shot

16              to death near Fullerton,

17              F-U-L-L-E-R-T-O-N, High School as he

18              walked home after school.  An

19              investigation revealed that earlier

20              in the day the victim, a member of

21              the Fullerton Tokers, T-O-K-E-R-S,

22              Town, a Latin gang, and  members of

23              the Fullerton Boys, an Asian gang,

24              were at a McDonald's Restaurant near

25              the high school.  The victim and

26              Usumang Muhamed had a confrontation

27              with each claiming their respective

153

13

1     gang affiliations.  After a

2     nonphysical altercation, a group of

3     Asians, which at the time included

4     Sieu Phong Ngo obtained -- and middle

5     name is spelled P-H-O-N-G, referring

6     to the prisoner, obtained a firearm.

7     Ngo and the Asian gang members

8     returned to the school where they

9     waited for Gonzalez.  As he walked

10    home, he was attacked and beaten.

11    During the physical altercation, the

12    victim was shot one time in the back

13    by Usumang, that's U-S-U-M-A-N-G,

14    Muhamed, M-U-H-A-M-E-D.  The group of

15    five Asian gang members including Ngo

16    fled the area after shooting Angel

17    Gonzalez who died at the scene as a

18    result of the gunshot wound.  Ngo,

19    Jimmy Bao, B-A-O, and Asat, A-S-A-T,

20    Cham, C-H-A-M, --"

21 or is that Ham?  C-H-A?

22         **INMATE NGO:**  Cham.

23         **PRESIDING COMMISSIONER WELCH:**  "-- Cham,

24 C-H-A-M, fled to the State of Washington.  They

25 were subsequently apprehended there and the murder

26 weapon, a stolen .22 caliber handgun, was

27 recovered in the vehicle."  Now we'll go to the

154

14

1    prisoner's version,

2         "Ngo explained that earlier in the

3         day his group had a confrontation

4         with the victim.  Subsequently he and

5         his group went to an arcade to play

6         games.  At that time his companion

7         took possession of a weapon.  Ngo

8         stated that he did not see the gun

9         until he was in the vehicle.  It was

10        located under the passenger's seat

11        and he and his companion returned to

12        Fullerton High School where they

13        parked and went to look for Gonzalez,

14        the victim.  Ngo explained that they

15        had a gun for protection in case

16        someone else happened to have a

17        weapon.  They found Gonzalez and his

18        group and started fighting with the

19        victim.  During the fighting Ngo

20        heard two shots.  Ngo explained that

21        no one intended to kill the victim,

22        they just planned to beat him up

23        because the victim had told them to

24        get out of town and that made Muhamed

25        angry.  Ngo realized that his

26        behavior was a mistake.  Ngo drove

27        his two companions to Washington

155

15

1          because Muhamed told him that he knew

2          someone who would give them shelter.

3          Ngo feels sorry for the victim's

4          family."

5     Juvenile record, there's no juvenile arrest.  Will

6     you be talking about your juvenile record, I mean,

7     your criminal history?

8          INMATE NGO:  I have no juvenile record.  I

9     have one drug diversion with a controlled

10    substance.  I was given a diversion but I was

11    never able to complete it --

12         PRESIDING COMMISSIONER WELCH:  Okay.

13         INMATE NGO:  -- because I got this case,

14    that's about it.

15         PRESIDING COMMISSIONER WELCH:  It says, no

16    juvenile record as previously noted.  On 3-30,

17    1992 Ngo was arrested by the San Gabriel Police

18    Department for possession of controlled substance,

19    three pieces of rock cocaine.  On 5-7-92 he was

20    diverted pursuant to Penal Code section --

21    pursuant to section 1000 of the Penal Code.  On

22    9-22, 1992, Ngo was arrested by the Olympic

23    Sheriff for possession of stolen property.  This

24    case was subsequently dismissed.  So you had two

25    arrests?

26         INMATE NGO:  Yes, because we were arrested

27    in Washington.

156

16

1          PRESIDING COMMISSIONER WELCH:   Okay.

2          INMATE NGO:   I guess you can consider it as

3     two, for the same crime.

4          PRESIDING COMMISSIONER WELCH:   Well, it says

5     you was arrested for stolen property and that was

6     dismissed.

7          INMATE NGO:   They say the gun -- I sold the

8     gun but I never lived in Washington so they note

9     there was a (indiscernible) chance I stole the gun

10    when he brought it to California, so.  I didn't

11    know nothing about the gun.  I just drove there

12    for shelter like I said.  I didn't know nothing

13    about the stolen property.

14         PRESIDING COMMISSIONER WELCH:   All right,

15    now we have the explanation on the record.

16    Personal factors, Ngo was born in Vietnam on 5-18,

17    1973.  He resided in the United States until 1979.

18    In 19 -- He resided in the United States since

19    1979.  In 1991 he graduated from Fullerton High

20    School and subsequently attended Fullerton

21    Community College and Pasadena City College.  He

22    completed 10 units and his major was business.

23    Ngo was employed as a telemarketing and worked odd

24    jobs.  He was employed at his family's liquor

25    store and resided with his parents.  Ngo had

26    problems with -- Ngo had problems with controlled

27    substance or alcohol.  Is that true?

157

17

1        INMATE NGO:  I don't have no problem with

2    drugs at this point.  I never drank alcohol

3    because I'm allergic to alcohol.  I tried cocaine

4    and I got busted.

5        PRESIDING COMMISSIONER WELCH:  Okay.

6        INMATE NGO:  I have never used since, since

7    that day.

8        PRESIDING COMMISSIONER WELCH:  Have you used

9    any -- used any other illegal substances?

10        INMATE NGO:  No, I don't, Sir.

11        PRESIDING COMMISSIONER WELCH:  Okay.  It

12   says you were a member of the Fullerton Boys, is

13   that correct, gang?

14        INMATE NGO:  Used to be.

15        PRESIDING COMMISSIONER WELCH:  Okay.  And

16   after you moved to Los Angeles you became

17   affiliated with the Tiger Mafia.

18        INMATE NGO:  Yeah, that was just a made up

19   name (inaudible) at that point.

20        PRESIDING COMMISSIONER WELCH:  What?

21        INMATE NGO:  It was a made up name, like I

22   told my last hearing that it was just to throw the

23   detective off my trail.

24        PRESIDING COMMISSIONER WELCH:  To throw the

25   detective off your trail, okay, all right.  Your

26   family, do you have any brothers and sisters?

27        INMATE NGO:  Yes, I do, Sir.

158

18

1        PRESIDING COMMISSIONER WELCH:  How many?

2        INMATE NGO:  I've got one older brother, two

3    older sisters, one younger brother, and one

4    younger sister.

5        PRESIDING COMMISSIONER WELCH:  Okay, any of

6    your brothers have problems with law enforcement

7    agents?

8        INMATE NGO:  No.

9        PRESIDING COMMISSIONER WELCH:  Any of your

10   brothers been members of gangs?

11       INMATE NGO:  No.

12       PRESIDING COMMISSIONER WELCH:  Did you grow

13   up in an intact home with both parents?

14       INMATE NGO:  Yes, I did, Sir.

15       PRESIDING COMMISSIONER WELCH:  Would you say

16   you had a stable home environment?

17       INMATE NGO:  Yes, I have.

18       PRESIDING COMMISSIONER WELCH:  Were you

19   married before you came to prison?

20       INMATE NGO:  No, Sir.

21       PRESIDING COMMISSIONER WELCH:  Any childrens

22   before you came to prison?

23       INMATE NGO:  No, Sir.

24       PRESIDING COMMISSIONER WELCH:  Did you ever

25   serve in any branch of the military?

26       INMATE NGO:  No.  I tried it but they didn't

27   want me because I was a smoker back then.

159

19

1          PRESIDING COMMISSIONER WELCH:  Because you

2  were smoker of what?

3          INMATE NGO:  Cigarettes, tobacco.

4          PRESIDING COMMISSIONER WELCH:  And the

5  military turned you down because you smoked

6  tobacco?

7          INMATE NGO:  Yes.

8          PRESIDING COMMISSIONER WELCH:  What year was

9  that?

10          INMATE NGO:  I think I tried it during --

11  after my graduation in South Pasadena and before

12  my graduation it was '89 or '90 I tried, I wanted

13  to go to the Marines because I heard they can

14  travel around the world.

15          PRESIDING COMMISSIONER WELCH:  And they

16  turned you down because you smoke?

17          INMATE NGO:  Yes.

18          PRESIDING COMMISSIONER WELCH:  That's a new

19  one on me.

20          INMATE NGO:  That's what they said.

21          PRESIDING COMMISSIONER WELCH:  Okay, depends

22  on what you smoke.  What did you smoke?  What did

23  you tell them you smoked?

24          INMATE NGO:  Tobacco.

25          PRESIDING COMMISSIONER WELCH:  Okay, just

26  tobacco, huh?

27          INMATE NGO:  Just tobacco.

160

20

1       PRESIDING COMMISSIONER WELCH: All right.

2   It says you had -- and we already talked about you

3   said you had odd jobs, fast-food and you worked in

4   your family's liquor store, is that correct?

5       INMATE NGO: Yes, Sir.

6       PRESIDING COMMISSIONER WELCH: Is that

7   pretty much your employment history?

8       INMATE NGO: Yes.

9       PRESIDING COMMISSIONER WELCH: Okay, what

10  I'd like for you to do now is give your attention

11  to my colleague, he's going to talk to you about

12  post-conviction. I'll come back and talk to you

13  about your parole plans.

14      INMATE NGO: All right, Sir.

15      DEPUTY COMMISSIONER MEJIA: All right, Mr.

16  Ngo, I'll be covering your institutional

17  adjustment in this portion of this hearing since

18  your last Board appearance. I have reviewed your

19  Central File, Board reports and psychiatric

20  reports. If I miss anything, I'll be giving you

21  and your attorney an opportunity to make comments

22  at the end of my presentation. Your last Board

23  appearance was on May 13th, 2002 where you received

24  a two-year denial. Your recommendation was for

25  you to remain disciplinary free, upgrade

26  educationally, participate in self-help and

27  therapy. Classification score is 19, custody

21

1   level is medium A, you're assigned to the culinary

2   warehouse, correct?

3         INMATE NGO:  Correct, Sir.

4         DEPUTY COMMISSIONER MEJIA:  And I see some

5   laudatory chronos here about your performance.

6   Vocational history, you have an auto upholstery

7   completion, an auto finishing completion.  You

8   also have a forklift certification.

9         INMATE NGO:  Correct, Sir.

10        DEPUTY COMMISSIONER MEJIA:  And I see that

11  you're taking classes (inaudible) with the

12  Coastline Community College.

13        INMATE NGO:  Correct, Sir.

14        DEPUTY COMMISSIONER MEJIA:  When did you

15  start this?

16        INMATE NGO:  A little over -- about two

17  years now.

18        DEPUTY COMMISSIONER MEJIA:  Two years.  How

19  many years have you completed so far?

20        INMATE NGO:  So far completed -- at this --

21  this class I'm taking health right now.  Currently

22  I have 23.

23        DEPUTY COMMISSIONER MEJIA:  Twenty-three

24  units.

25        INMATE NGO:  I will have 23 units.

26        DEPUTY COMMISSIONER MEJIA:  Forklift.  Do

27  you have a high school?

102

22

1        INMATE NGO:  Yes, I do.

2        DEPUTY COMMISSIONER MEJIA:  Where did you

3    complete your high school at?

4        INMATE NGO:  Fullerton Union High.

5        DEPUTY COMMISSIONER MEJIA:  Fullerton Union

6    High.  Do you have a copy of the diploma?

7        INMATE NGO:  I should, yes.

8        DEPUTY COMMISSIONER MEJIA:  Can I see it,

9    please?  I couldn't find it in here.

10        INMATE NGO:  It should be in my file.

11        DEPUTY COMMISSIONER MEJIA:  If I thought --

12    If it was here I wouldn't ask for it.  Maybe I'm

13    just missing it but I don't want to spend time

14    looking for it.

15        INMATE NGO:  Unless I didn't put it in

16    there.

17        DEPUTY COMMISSIONER MEJIA:  It's not in your

18    --

19        INMATE NGO:  It's not in my C-File either?

20        DEPUTY COMMISSIONER MEJIA:  It's not in your

21    --

22        INMATE NGO:  I guess I didn't put it in

23    there.  I figured the C-File had it, but I can

24    always get you a copy if you need one.

25        DEPUTY COMMISSIONER MEJIA:  Okay.  What year

26    did you graduate there?

27        INMATE NGO:  '91.

163

23

1        **DEPUTY COMMISSIONER MEJIA:**  1991?

2        **INMATE NGO:**  It was '91, yes.

3        **DEPUTY COMMISSIONER MEJIA:**  Okay, and since

4  your last Board appearance in 2002 you were -- I

5  see that you have started in AA since 1997 and

6  then you switched to NA 2001 (inaudible)?

7        **INMATE NGO:**  I've been going, yes.

8        **DEPUTY COMMISSIONER MEJIA:**  The last chrono

9  was on --

10       **INMATE NGO:**  It should be -- my last chrono

11  was 7-8-04 date of it.

12       **DEPUTY COMMISSIONER MEJIA:**  Okay, 7-8-04 is

13  your NA participation.

14       **INMATE NGO:**  My most recent one.

15       **DEPUTY COMMISSIONER MEJIA:**  Yes, and the one

16  I have here on file is 2003 of March.  Okay, you

17  also completed the IMPACT program in 2002

18  workshop?

19       **INMATE NGO:**  Right.

20       **DEPUTY COMMISSIONER MEJIA:**  3-16, 2002.

21  There's a chrono from Mr. Vazquez, warehouse

22  supervisor, as a culinary storekeeper.  You have

23  performed your assignment with excellence.  You

24  have a good, helpful, mature attitude and has

25  worked even on holidays.  On disciplinaries, you

26  have zero 115s and two 128(a)'s from -- one on

27  April '97 and one on 2000 -- in 2000.  (Inaudible)

164

24

1    gang affiliation noted (inaudible) Tiger Mafia

2    member.  And when was the last time you were

3    hanging out with the Tiger Mafia as a member?

4         INMATE NGO:  Well, there is no Tiger Mafia,

5    as I was saying earlier, it's just a made up name,

6    so I don't have -- you know, there's no more gang

7    for me.  I've grown out of it.  Back then it was

8    just a --

9         DEPUTY COMMISSIONER MEJIA:  So was that the

10   Fullerton?

11        INMATE NGO:  Fullerton, yes.

12        DEPUTY COMMISSIONER MEJIA:  What was that,

13   Fullerton --

14        INMATE NGO:  Fullerton Boys, they call it

15   Fullerton Boys.

16        DEPUTY COMMISSIONER MEJIA:  Fullerton Boys

17   named as the Tiger Mafia?  Are you talking about

18   the same place?

19        INMATE NGO:  No, it's two different places,

20   LA right, I was living at LA at that time so, you

21   know, when they asked me where I was from, I told

22   them Tiger Mafia because they saw two initials on

23   my arm with TM so I just told them Tiger Mafia

24   just to make it up.

25        DEPUTY COMMISSIONER MEJIA:  So was there

26   really a Tiger Mafia gang?

27        INMATE NGO:  No, there's not.  You can check

105

25

1    into LA Police Department, you will not find no

2    Tiger Mafia at all.

3        **DEPUTY COMMISSIONER MEJIA:**  Well, I'm going

4    to your psych report.  Your psych report is dated

5    January 21, 2002 by Dr. Saindon, spelling

6    S-A-I-N-D-O-N.  We're going to look at your

7    substance abuse history, we have heard that you

8    said that you tried cocaine.  "Previous mental

9    health evaluation for the Board of Prison Terms

10   has recommended that he be involved in AA and NA.

11   However, inmate feels that he never really had a

12   drug or alcohol problem although he does currently

13   attend AA."  And you are attending NA right now,

14   right?

15       **INMATE NGO:**  Right.

16       **DEPUTY COMMISSIONER MEJIA:**  Okay.  And his

17   mental health status at this time of the

18   evaluation 2002 indicates that,

19           "There's no evidence of mood or

20           thought disorder, his judgment

21           appeared to be sound, showed

22           significant insight into his

23           commitment offense as far as some

24           recognition.  There's no guarantee

25           that he will be paroled at this time

26           by the Board of Prison Terms."

27   Diagnostic impressions, No Contributory Clinical

166

26

1    Disorder, Axis I.  Axis II Deferred, Axis III No

2    Contributory Physical Disorder, Axis IV Long-Term

3    Incarceration, Axis V Global Assessment of

4    Functioning of 90.  There's no evidence that he

5    suffers from any psychiatric illness.  Assessment

6    of dangerousness, "Although --" he says,

7         "There's no evidence the inmate

8         currently suffers from any

9         psychiatric illness although he does

10        recognize that (inaudible) he was

11        vulnerable to depression and was

12        tempted by conscious altering

13        substances.  In consideration of the

14        fact that he has received no 115s

15        through his entire incarceration, it

16        would appear that he has at least in

17        this controlled setting been able to

18        manage his behavior and remain

19        incident free."

20   Assessment of dangerousness,

21        "Mr. Ngo (inaudible) with the

22        information given in the Central File

23        and medical record with respect to

24        his prior history of (inaudible) or

25        attempt to use cocaine and was

26        affiliated with gangs, this resulted

27        in his current offense.  Based upon

167

27

```
 1        his complete lack of disciplinary
 2        action while incarcerated, his
 3        insight into negative aspects of gang
 4        involvement, his remorse for his
 5        actions, his violence potential
 6        within a controlled is to be below
 7        average relative to the level II
 8        inmate population.  If released to
 9        the community, his violence potential
10        is estimated to be less than the
11        average citizen in the community
12        given his insight, his demonstrated
13        ability to stay out of trouble, his
14        successful development of plans upon
15        release, and the support of his
16        family.  (Inaudible) the most
17        significant risk factor for this
18        inmate as a precursor to violence or
19        a return to criminal behavior would
20        be his being involved with others
21        having a criminal history and/or gang
22        members, the use of alcohol and
23        drugs, and isolation from his family
24        members.  As this man has spent 10
25        years in prison, I would recommend,
26        should he be paroled, abstinence from
27        all alcohol and use of uncontrolled
```

108

28

1        substance, frequent monitoring of

2        substance abuse, if at all possible

3        should be a relative so he's near to

4        his family, and should make frequent

5        reports to his parole officer.  Given

6        his family's commitment in supporting

7        him upon his release, his projected

8        level of success in the community if

9        granted a date for parole is seen at

10       this time to be better than average."

11   His counselor based him as posing a low degree of

12   threat to the community if released.  Have you got

13   any comments or any additions to my presentation,

14   Counsel?

15       **INMATE NGO:**  Do you have any of my support

16   letters from my family because --

17       **DEPUTY COMMISSIONER MEJIA:**  That will be

18   done by --

19       **INMATE NGO:**  Okay.

20       **DEPUTY COMMISSIONER MEJIA:**  Any additional

21   comments?

22       **PRESIDING COMMISSIONER WELCH:**  Are you done?

23       **DEPUTY COMMISSIONER MEJIA:**  Yeah.

24       **PRESIDING COMMISSIONER WELCH:**  Okay.

25       **DEPUTY COMMISSIONER MEJIA:**  I'll go back to

26   the Chair and we'll take a recess.

27       **PRESIDING COMMISSIONER WELCH:**  Okay, we'll

169