# EXHIBIT 5
# PART 3 OF 3

29

1    take a recess for a minute.

2                          [Off the record.]

3            PRESIDING COMMISSIONER WELCH:  Mr. Ngo, in

4    case --

5            DEPUTY COMMISSIONER MEJIA:  We're back on

6    record.

7            PRESIDING COMMISSIONER WELCH:  Mr. Ngo, in

8    case you receive a parole date, tell the Panel

9    where you plan to live.

10           INMATE NGO:  I'll be living with my mom to

11   start off.

12           PRESIDING COMMISSIONER WELCH:  Where does

13   your mom live?

14           INMATE NGO:  In Monterey Park.

15           PRESIDING COMMISSIONER WELCH:  Do you have

16   an INS hold?

17           INMATE NGO:  No, Sir.

18           PRESIDING COMMISSIONER WELCH:  Are you a US

19   citizen?

20           INMATE NGO:  Yes, Sir.

21           PRESIDING COMMISSIONER WELCH:  Okay, and how

22   do you plan to support yourself?

23           INMATE NGO:  I'll be working at my uncle's

24   restaurant for now, (inaudible) chef.

25           PRESIDING COMMISSIONER WELCH:  Okay, and you

26   have lots of support letters in the file and your

27   affidavit that you submitted.  And it appears that

170

30

1    you do have employment and you have a place to

2    live.  I'll start off by going over some of your

3    letters.  Your mom wrote you a letter, her name is

4    Ngo Phuong?  Phuong Huynh?

5           **INMATE NGO:**  Phuong Huynh.

6           **PRESIDING COMMISSIONER WELCH:**  Phuong Huynh,

7    okay, let me just spell the first name, the first

8    name is spelled P-H-U-O-N-G, and the middle name

9    is H-Y -- H-U-Y-N-H, and the last name is the same

10   as the prisoner's, N-G-O.  Anyway, she writes you

11   a very supportive letter.  She says,

12              "As the birth mother of Sieu Ngo, I

13              am writing to request for your

14              leniency and kind review of the

15              parole of Sieu Ngo.  Years ago our

16              family immigrated into the United

17              States from Vietnam.  With the kind

18              support from the US Government and

19              local communities, we settled down in

20              California and became US citizens in

21              1979.  All of our family members are

22              deeply indebted to our government and

23              community and we are determined to

24              serve our country when called for.

25              In fact, my children volunteer at

26              school and communities and help out

27              kids.  I have six children, some are

171

31

1    college graduates and are doing very

2    well in their careers, such as Chi

3    Phong Ngo, middle name is -- I mean,

4    first name is C-H-I, middle name is

5    P-H-O-N-G.  My son is a quality

6    assurance software engineer.  Judy

7    Seeto --" Seeto?

8    **INMATE NGO:**  Correct.

9    **PRESIDING COMMISSIONER WELCH:**

10    "--S-E-E-T-O, my daughter, is

11    pursuing a college degree while

12    working full-time at Pacific Care.

13    And Lan Lau, L-A-N, last name is

14    L-A-U, another daughter, is an

15    assistant technician working at DG --

16    DCG Group Pacific Bell, SPG

17    (inaudible) Solutions Incorporated.

18    My husband was running a paint

19    business.  Unfortunately he passed

20    away in 1995 at the age of 47.  Some

21    of my uncles and aunts are business

22    owners of restaurants and stores.  I

23    used to run a family business too, a

24    convenience store."

25  And she says,

26    "Sieu Ngo have been working and

27    studying hard in prison and doing

172

32

1        well in his college studies.  Please

2        be assured that Sieu Ngo, if paroled,

3        will be well taken care of and

4        supervised by his family, relatives,

5        and friends.  We, his immediate

6        family members, will support him in

7        every aspect of life.  We plan to let

8        him complete his college studies

9        before entering the workforce.  We

10       are financially capable and

11       emotionally prepared and spiritually

12       determined to help Sieu Ngo and his

13       endeavors to create his reborn life

14       and become a contributing member to

15       our society.  Thank you in

16       anticipation of your kind review in

17       granting Sieu Ngo parole."

18  And your mother signed that.  Very supportive.

19  And another one from Gavin Ung.  Is that U-N-G?

20       **INMATE NGO:**  Yes, my uncle.

21       **PRESIDING COMMISSIONER WELCH:**  He says,

22       "I am in the Chinese restaurant

23       business and currently employ about

24       20 workers.  Sieu, if released from

25       prison, he will also be welcomed to

26       work for me if he so chooses.

27       Besides me willing to provide him

173

1          with accommodation, transportation,

2          and job, I believe there are a lot of

3          other relatives such as his mom,

4          siblings, uncles, and aunts who are

5          willing -- who will always be more

6          than willing to help with all his

7          essential daily needs."

8    Okay, and I have another one from Chi Ngo/Judy Ngo

9    -- slash Judy Ngo, and she writes -- she's writing

10   on behalf of her brother. She feels that you're a

11   good man and, "Tom is a good man and will remain

12   so.  He's a caring person who wants to take care

13   of his mother if he gets a second chance.  My wife

14   and I can fully support him financially and care

15   for all his personal needs including housing. I

16   believe Tom --" Do you also go by the name of Tom?

17        INMATE NGO:  Yes, that's my middle name.

18        PRESIDING COMMISSIONER WELCH:  Okay.  "I

19   believe Tom -- I believe in Tom and only good will

20   shine from him as each day passes."  Another

21   letter here from --

22        INMATE NGO:  Thanah.

23        PRESIDING COMMISSIONER WELCH:  T-H-A-N-A-H,

24   he writes you a very supportive letter.

25        INMATE NGO:  She.

26        PRESIDING COMMISSIONER WELCH:  She, okay,

27   your older sister I'm trying to say.

174

34

1        INMATE NGO:  Second oldest.

2        PRESIDING COMMISSIONER WELCH:  Second oldest

3  sister.  And she says,

4        "As you can see he's just the kind of

5        person and always there for anyone

6        who needs help.  Because of his

7        caring and kind personality, he has

8        done some harm to himself, this is

9        how he got himself into this mess.

10       I'm sure that the whole mess has

11       taught my brother to beware of his

12       friends.  Sieu's decision to hang out

13       with his friends was a costly one.

14       My brother was a young naïve.  Now

15       he's a grownup person and realizes

16       his actions and takes responsibility

17       to make changes to become a better

18       person."

19  And she goes on to say, "Our family have already

20  arranged for his support once he's released, my

21  husband's store," and she writes the telephone

22  number, "and is located on (indiscernible) Avenue

23  and Alhambra.  And a matter of fact his uncle --

24  his aunts and uncle also offered him work in their

25  restaurant.  The store name is Hot Wok --".

26       INMATE NGO:  Hot Wok.

27       PRESIDING COMMISSIONER WELCH:  That's H-O-T

175

35

1    W-O-K, "-- and that's in Fullerton.  And there's a

2    First (inaudible) Kitchen that's in Anaheim.

3    Housing would not be a problem.  And we all make

4    arrangements for him."  So Duc Ngo?

5         **INMATE NGO:**  Duc Ngo.

6         **PRESIDING COMMISSIONER WELCH:**  D-U-C Ngo.

7    Anyway, that's your brother, says, "I'm writing a

8    letter in support of my brother."  He writes you a

9    very supportive letter and he pretty much voices

10   the same thing that the other ones wrote.  I have

11   another letter here from your defense attorney at

12   the time and I'll read his letter.  He says, "I

13   represented --" her letter I should say,

14        "I represented Mr. Ngo in the case

15        which sent him to prison.  I have

16        been a criminal defense attorney for

17        over 26 years and have represented

18        over 40 persons accused of homicides.

19        I do not see my clients through rose

20        colored glasses and have never

21        written a letter like this on behalf

22        of an inmate for a parole hearing.

23        The circumstances of Mr. Sieu's case

24        compel me to make a statement in this

25        instant.  At the time of the incident

26        he was a very likable young man and

27        with no significant criminal history.

176

36

1   My recollection, he had no conviction

2   of any crime or violence.  The

3   incident in question was very

4   different from the typical gang case

5   and in fact a work sketching for your

6   review, Sieu and his friends was a

7   wannabe type group who did not really

8   have a significant history of tough

9   turf in Orange County as a gang.  On

10  the day of the incident, some of

11  Sieu's friends by chance went to

12  McDonald's which was near Fullerton

13  High School in North Orange County.

14  Sieu was not present at the time.

15  One of Sieu's ultimate codefendants

16  got in a staring match with the

17  decedent and some of his friends who

18  were members of the Toker Gang --

19  Toker Town, a long established

20  Hispanic group in Fullerton.

21  Essentially the Toker, that's spelled

22  T-O-K-E-R T-O-W-N -- Essentially the

23  Toker Town Group told Sieu's friends

24  that they, Cooks, that's C-O-O-K-S,

25  were not welcome in Fullerton where

26  some of them already live and they

27  should get out of town.  (Inaudible)

177

37

1    Sieu's friends decided to confront

2    the decedent's group after school got

3    out that day. Sieu was called to

4    help out in case they were

5    outnumbered. Their group waited at

6    the school and confronted the

7    decedent and one of his friends about

8    two blocks out of Fullerton High

9    School, not on school grounds. From

10   all appearances, this was intended to

11   be a fistfight. Sieu and his friends

12   who had been in the stare-down

13   approached the decedent and a friend

14   who was walking on the sidewalk and a

15   fistfight is how it started.

16   However, the decedent's friend fled

17   just after the punching began and

18   left Sieu and his friend fighting the

19   decedent who was much larger than

20   either of them. Of course this was

21   unfair but nothing at this point

22   suggested that this was intended to

23   be a homicide. A third member of

24   Sieu's -- A third member of the group

25   who was part of -- A third member of

26   the group who was part of (inaudible)

27   from where their car was parked to

178.

38

1   the scene of the site, he reached up

2   while the fight was in progress, shot

3   the decedent, killed him, and

4   narrowly missed Sieu. Sieu and all

5   of his friends then fled, ultimately

6   being arrested out of state.

7   Evidence was received to show that

8   Sieu and his friends knew that a gun

9   was in a car. Based largely upon

10  that and the theory of foreseeable

11  consequences, he and all of his

12  codefendants were convicted. Sieu

13  was not the shooter and no evidence

14  to show that he suggested,

15  encouraged, abated -- or abetted the

16  shooting in any way. After the

17  shooting, Sieu angrily confronted the

18  shooter, demanded to know why he

19  brought out the gun and asserted that

20  he, Sieu, didn't know the gun was

21  going to be used. In summary, this

22  was not a drive-by or a similar gang

23  crime where everyone knew (inaudible)

24  should have known that death or

25  serious injury was intended. On the

26  contrary, this appears to be an

27  impulsive act by one member of the

179

39

1        group which due to the rest of the

2        circumstances swept them all up by

3        way of the derivative liability --

4        derivative liability,

5        D-E-R-I-V-A-T-I-V-E.  I am not

6        suggesting that Sieu and the other

7        non-shooters bear no responsibility

8        for the tragic outcome, but for the

9        fight of course, no shooting would

10       have taken place.  However, I would

11       submit that the circumstances here

12       are significantly mitigated where --

13       when considered against other

14       convictions of this type.  Assuming

15       that Sieu's performance within the

16       Department of Corrections has been

17       positive, I would urge you to parole

18       at the earliest possible time."

19 Donald J. Rubright -- Donald G. Rubright, that's

20 R-U-B-R-I-G-H-T, Senior Deputy Public Defender,

21 Orange County.  Okay, and you have other letters

22 and some are duplicates and you have other family

23 members providing support.  And Raymond Seeto, the

24 brother-in-law, also writes you a supportive

25 letter and he notes that,

26        "Putting a roof over his head won't

27       be a problem.  He can stay with his

40

1        mother, brother, or sisters.  Tom has

2        a large extended family.  This is his

3        base of support.  Lastly, I beg the

4        Board to look at the facts

5        surrounding his conviction.  He was a

6        young -- He was young and naïve."

7  So you have lots of family support and you have

8  lots of job offers and you have people offering

9  you a place to live.  And most importantly you

10  have a letter from the Public Defender's Office

11  outlining the case and there's no reason to

12  dispute what he's saying is true and he wrote you

13  a very supportive letter.  And I have to say I

14  haven't seen too many letters from the Public

15  Defender's Office in support of parole.  And with

16  that we'll go to 3042 Notices.  We sent out

17  notices pursuant to Penal Code 3042.  We sent

18  those out to different agencies that would have an

19  interest in your case.  I do see a letter here

20  from the Orange County Deputy District Attorney's

21  Office and basically what it's saying is that the

22  District Attorney's Office will be attending the

23  life parole consideration hearing, and they have

24  their representative here and at the appropriate

25  time she'll have something to say about your

26  parole suitability.  Okay, with that we'll go to

27  questions.  Commissioner, do you have any

181

41

1    questions?

2       **DEPUTY COMMISSIONER MEJIA:** Yes. It looks

3   like you've been attending NA, AA, or self-help

4   since '97?

5       **INMATE NGO:** I was attending mostly -- I was

6   attending both at the time but I dropped out of AA

7   because I feel that I don't need it because I

8   don't drink, I'm allergic to alcohol. I never

9   drank. And I think that I might -- you know,

10   because of my drug offense, I decided to go to NA

11   to better myself, to learn, so that's why I've

12   been attending NA.

13       **DEPUTY COMMISSIONER MEJIA:** What have you

14   learned so far?

15       **INMATE NGO:** To stay sober, to be a better

16   person. Drugs can really harm a person, I mean,

17   change a person, even though you are guilty or

18   not, drugs can just alter your state of mind, you

19   can't function properly using drugs.

20       **DEPUTY COMMISSIONER MEJIA:** Did they teach

21   the 12-Steps as well?

22       **INMATE NGO:** Yes.

23       **DEPUTY COMMISSIONER MEJIA:** Do you remember

24   what -- any of the 12-Steps?

25       **INMATE NGO:** Yes, I remember all those.

26       **DEPUTY COMMISSIONER MEJIA:** You remember all

27   of them. Can you give me one?

182

42

1      INMATE NGO:  Which one?

2      DEPUTY COMMISSIONER MEJIA:  Whichever you

3  recall.

4      INMATE NGO:  Number one that I admitted to

5  God, to myself that (inaudible) drugs or alcohol,

6  that our lives will become unmanageable.  Two,

7  make a decision to turn our will and our lives

8  over to the care of God (inaudible) carry that

9  out.  Three, make decisions, turn our will and our

10  lives over to the care of God and (inaudible).

11  Four, made a searching fearless moral inventory

12  about ourselves.

13     DEPUTY COMMISSIONER MEJIA:  How old were you

14  when you were involved in this crime?

15     INMATE NGO:  I was 19.

16     DEPUTY COMMISSIONER MEJIA:  You were 19.

17  You are how old now?

18     INMATE NGO:  I'm 31.

19     DEPUTY COMMISSIONER MEJIA:  Let me just --

20     [Thereupon, the tape was turned over.]

21     DEPUTY COMMISSIONER MEJIA:  When did you get

22  involved with the gangs, you were 18 then, how old

23  were you when you started with the gang?

24     INMATE NGO:  Believe it or not -- gang is a

25  harsh word because like there was only like five

26  or six of us, you know, during that time.  We were

27  more friends because I (inaudible) know these

183

43

1    guys, I've been moved there for about a year, and

2    I hang around with them, you know.  So to me it's

3    more like a friend more than a gang but because we

4    live at Fullerton they call themselves Fullerton

5    Boys.

6            **DEPUTY COMMISSIONER MEJIA:**  How old were you

7    when you started hanging out with them?

8            **INMATE NGO:**  I think I was 16 or 17, Sir.

9            **DEPUTY COMMISSIONER MEJIA:**  So about two

10   years.

11           **INMATE NGO:**  Yeah, about two years.

12           **DEPUTY COMMISSIONER MEJIA:**  If you get

13   released to the streets, how are you going to get

14   away from the elements of the gang lifestyle?

15           **INMATE NGO:**  Knowing what a gang can do to a

16   person, I have confidence that I can stay away

17   from them, you know, because I learned from my

18   mistakes, that's how I've grown.  I know I can

19   deal with problems differently, you know, just

20   staying away, choose better friends, think before

21   I act, everything, what I've learned in here to be

22   a better person.

23           **DEPUTY COMMISSIONER MEJIA:**  No other

24   questions.

25           **PRESIDING COMMISSIONER WELCH:**  Okay, there's

26   one thing in your brief that a lot of it's clothed

27   in legal terminology, but there is one thing that

184

44

1    I think I will put on the record in your defense,

2    it's, "Considering the facts of my personal

3    culpability as established, it is clear that the

4    category --" well, that's not what I'm trying to

5    read.   Here it is, the next paragraph says,

6              "Since there are no words adequate

7              enough to express the sincerity of my

8              remorse of the acceptance of

9              responsibility for my past conduct

10             and behavior, I offer the following

11             actions, that I stipulate to the

12             aggravated term of 19 years in

13             accordance with 15CCR243 that I

14             stipulate to whatever other parole

15             conditions that the Board deems

16             necessary upon me."

17   Okay.   I was looking for something for your

18   remorse and I guess that's the closest thing I've

19   found there.   And under the facts of the crime,

20   starting off where you said, "The facts of the

21   crime shall be discussed with the prisoner to

22   assess determination, the extent of culpability,

23   the Board shall not require the admission --" we

24   already know that.   "Furthermore, I fully and

25   truly confess and accept the facts of my personal

26   culpability and responsibility for the life

27   crime."   Okay, anyway.   Commissioner, District

185

45

1    Attorney, do you have any questions?

2        DEPUTY DISTRICT ATTORNEY CONTINI:  Just very

3    briefly.  Could the Board ask the inmate, he

4    testified or stated that he made up the name Tiger

5    Mafia because he had TM tattooed on his shoulder.

6    What does TM stand for then?

7        INMATE NGO:  My ex-girlfriend's name,

8    Theresa May.

9        DEPUTY DISTRICT ATTORNEY CONTINI:  Could the

10   Board inquire of the inmate why he would make up

11   another gang affiliation and tell a police officer

12   that?

13       INMATE NGO:  Because at the time I just

14   wanted to throw off the investigator because when

15   I was arrested they knew I was from Fullerton so

16   just (inaudible) I didn't want to be associated

17   with them so I threw them off by making up a name.

18       DEPUTY DISTRICT ATTORNEY CONTINI:  Could the

19   Board inquire of the inmate when he and his crime

20   partners were arrested in the State of Washington,

21   he was arrested for possession of stolen property,

22   could the Board inquire of him whether or not he

23   was aware that was not only the murder weapon in

24   his life case but also a nine-millimeter

25   (inaudible) assault pistol that was in the car?

26       INMATE NGO:  Both of the weapons don't

27   belong to me, they belonged to my crime partner.

186

46

1    I'd never been to the State of Washington until I

2    drove there myself.  I'd never been out of the

3    State of California, period, so --

4        **PRESIDING COMMISSIONER WELCH:**  Did you

5    understand the question?

6        **INMATE NGO:**  She had stated why the weapon

7    was in the car.

8        **PRESIDING COMMISSIONER WELCH:**  She said were

9    you aware.

10       **INMATE NGO:**  Of the gun, yes, I was, Sir.

11       **PRESIDING COMMISSIONER WELCH:**  The other

12   weapon?

13       **INMATE NGO:**  Yes.

14       **PRESIDING COMMISSIONER WELCH:**  Okay.

15   District Attorney.

16       **DEPUTY DISTRICT ATTORNEY CONTINI:**  Could the

17   Board inquire of the inmate, he drove his crime

18   partner and fellow gang members to the State of

19   Washington, correct?

20       **INMATE NGO:**  Yes, that's correct.

21       **DEPUTY DISTRICT ATTORNEY CONTINI:**  And could

22   the Board just finally inquire of the inmate, he

23   indicated he had the 11350 arrest for the drug, in

24   the probation report for this case, indicated that

25   he and some other individual had previously beaten

26   up Hispanic men at a school, is he familiar with

27   that case?

187

47

1          INMATE NGO:  I'm wondering (inaudible) that

2     was never brought up, I don't see what it has to

3     do with my case right now.  (Inaudible) a fight,

4     everybody was getting in a fight.  We were young

5     then.

6          PRESIDING COMMISSIONER WELCH:  Okay.

7          INMATE NGO:  That was, you know --

8          PRESIDING COMMISSIONER WELCH:  Let's backup.

9     District Attorney, would you re-ask the question.

10         DEPUTY DISTRICT ATTORNEY CONTINI:  Sure.

11    Would the Board inquire of the inmate, in his

12    probation report for this case, the victim by the

13    last name of Perez was interviewed regarding a

14    physical altercation at a school in which the

15    inmate began the physical altercation and then

16    three of the inmate's companions joined in kicking

17    and punching the victim Perez, alleged to have

18    happened December 14th, 1990.  Is he familiar with

19    that assault?

20         INMATE NGO:  Yes, I am familiar with it.  I

21    was never convicted on anything.  I was released.

22    What can I say?

23         PRESIDING COMMISSIONER WELCH:  Well, you can

24    tell her the circumstances.  I don't think any --

25         INMATE NGO:  Well,

26         PRESIDING COMMISSIONER WELCH:  --

27    (inaudible) what happened.

*188*

1        INMATE NGO:  For that fight I was going to

2    pick up my girlfriend at the school at that time.

3    She was in the agricultural or floral rearranging

4    class.  I went over there to pick her up and Mr.

5    Perez, I guess, at that -- you know, tell me, who

6    the hell are you, and then he started cussing me.

7    He don't even know who I am.  (Inaudible) what is

8    he doing, you know, what is his business.  So I

9    just left it at that and I left, and I was waiting

10   for my girlfriend at the parking lot and he came

11   out and started mad-dogging me.

12        PRESIDING COMMISSIONER WELCH:  What does

13   mad-dogging mean?

14        INMATE NGO:  It means staring me down and

15   then he asked me who the hell -- you know, F, what

16   are you looking at.  I said, what's your problem?

17   So he came over (inaudible) confronted so I just

18   socked him, you know.

19        PRESIDING COMMISSIONER WELCH:  You socked

20   him?

21        INMATE NGO:  Yes, because he wanted to fight

22   me for some reason so I just was trying to defend

23   myself so I socked him first and that's it.

24        PRESIDING COMMISSIONER WELCH:  Okay, all

25   right.  District Attorney.

26        DEPUTY DISTRICT ATTORNEY CONTINI:  Could the

27   Board just inquire of the inmate whether or not

*189*

49

1    his three companions that assaulted Mr. Perez on

2    that day were also Fullerton Boys gang members?

3              INMATE NGO:  No.

4              PRESIDING COMMISSIONER WELCH:  No?

5              INMATE NGO:  No, they weren't.

6              DEPUTY DISTRICT ATTORNEY CONTINI:  I don't

7    have anything further.

8              PRESIDING COMMISSIONER WELCH:  Okay.

9    Counselor, do you have any questions for your

10   client?

11             ATTORNEY SPOWART:  I have nothing.

12             PRESIDING COMMISSIONER WELCH:  Okay, Mr.

13   Ngo, at this time we go -- at this portion of the

14   hearing we go to closing.  We start off with the

15   District Attorney.  District Attorney, closing.

16             DEPUTY DISTRICT ATTORNEY CONTINI:  The

17   People of the State of California strongly oppose

18   any parole of Mr. Ngo at this time.  This case was

19   a cold-blooded murderer of a 15-year-old.  Yes,

20   rival gang member, but a 15-year-old when this

21   inmate was 19 years, two years out of high school.

22   He and his friends, after a mad-dogging incident,

23   lie in wait essentially waiting for this young man

24   to walk home from school.  In the inmate's version

25   of events to the Board previously, he indicated

26   that he didn't know that a gun was in the car and

27   that at the same breath he indicates that they had

190

50

1    the gun for protection.  Neither of those things

2    make any sense in the gang world, and when you are

3    waiting for an individual to assault them, it

4    seems ridiculous to say that you have the gun for

5    protection.  Moreover, Mr. -- the victim, the 15-

6    year-old, in the case was walking with another

7    friend when he was first engaged by this inmate

8    and one other person which shows that this inmate

9    was a leader in this attack.  There's five

10   individuals involved, he's one of the first ones

11   to go up and start beating the 15-year-old.  I

12   just want to touch briefly on Mr. Rubright's

13   letter, the public defender, because he indicates

14   in that letter that -- just give me one moment, he

15   indicates in that letter that this was a wannabe

16   gang and I just have a strong -- strongly disagree

17   with that.  This is a gang that had a loaded gun

18   that they used on this 15-year-old.  It's also a

19   gang that when they're arrested after fleeing to

20   the State of Washington, has the nine-millimeter

21   stolen gun, both of the guns stolen, both the .22

22   and the nine-millimeter.  In addition to that,

23   there's a level of sophistication involved in this

24   crime in that the suspects fled and they burn the

25   car that they were driving, and that's contained

26   in the record.  They burn the car that they were

27   driving before taking off to Washington and this

*191*

51

1   inmate is the one who drove them to Washington.

2   Finally, I would note that although this inmate's

3   criminal history, it was not extensive, he does

4   have the drug offense, and then two years before

5   the killing he has this incident where he and some

6   other fellows are beating up an individual, so

7   there is an escalation of violence in his

8   background there.  When he first was housed at the

9   Orange County Jail, he had three incidents in the

10  Orange County Jail which were noted in his

11  probation report, the last was the mutual combat.

12  He's obviously done well in the last few years

13  here, but he does have a couple of -- I believe I

14  saw a couple of 128s in his record, so we're

15  talking 12 years since this incident occurred.

16  Based on the gang nature of it, basically a cold-

17  blooded execution of a 15-year-old boy, we would

18  strongly oppose a parole at this point.

19          **PRESIDING COMMISSIONER WELCH:**  Counselor,

20  closing.

21          **ATTORNEY SPOWART:**  If we look at Mr. Ngo's

22  entire history, he had no juvenile record.  He

23  came from a very good family, an excellent letter

24  from his mother, talking about her other children,

25  their accomplishments.  My client graduated from

26  high school.  He was attending Fullerton Community

27  College and then Pasadena City College.  He

*192*

52

1    completed 10 units.  In other words, he had a

2    stable social history.  He was in high school at

3    that time, various ethnic groups, Latinos, Asians,

4    and they would fight, and this happens.  He did

5    get in a fight once when he tried to pick up his

6    girl.  Now the DA says this shows an escalating

7    pattern.  Motivation for the crime was basically a

8    gang fight.  He was 19 then and he's 31 now.

9    Excellent parole plans which we've gone over, a

10   place to live, a place to work, good letters of

11   support.  Now, this is exactly what I was talking

12   about when I objected.  This is a murder second-

13   degree plea.  The DA comes up here today says

14   cold-blooded lying in wait.  If that was true then

15   the District Attorney's Office was grossly

16   inadequate in the prosecution of my client.  Why

17   wasn't he up for life without parole or the death

18   penalty?  Come on, give me a break, that is not

19   what happened.  He went with his friends, this big

20   gang, five guys, that he went over with and they

21   went over because one of them had gotten in

22   (inaudible) and they went over to have a fight, it

23   was clear.  As his trial attorney says, the fight

24   started and later on a guy comes up with a gun and

25   shoots the victim.  It wasn't my client.  He did

26   not have a gun.  He's never been violent.  If you

27   look at the Board report and he gives -- he says

193

53

1  he would pose a low degree of threat to the public

2  at this time.  This opinion is based on Ngo being

3  immature at the time of the crime and easily

4  influenced by his peers.  The crime was episodic

5  in nature.  It wasn't planned, it wasn't cold-

6  blooded, it wasn't lying in wait, it was none of

7  those.  It was a pure simple these five guys got

8  in a fight.  My client was there, he didn't even

9  know they had the gun.  He wasn't living in

10  Fullerton at the time, he was living in Pasadena,

11  going to college.  His institutional adjustment

12  has been outstanding, two 128(a)'s in the entire

13  time he's been down.  No 115s.  Where is the

14  violence?  Where's the violence?  Where's the

15  escalating pattern?  There isn't any.  He

16  completed IMPACT Workshop program, and if you

17  notice they talk about the IMPACT program it

18  includes anger management, domestic violence, gang

19  violence, murder and sexual assault, it includes

20  all these things.  So he's had good therapy there.

21  He's been AA or NA the entire time he's been down.

22  He completed the course of Sexual Transmitted

23  Disease, has excellent work reports, completed the

24  Salesmanship and the Key to Fatherhood, completed

25  the forklift certification.  The Board report is

26  low.  Now let's look at the psych report, and

27  let's remember, the psych report is the expert

*194*

54

1    here, and this is low too.  The Commissioner read

2    it, based on his complete lack of disciplinary

3    actions while incarcerated, his insight into the

4    negative aspects of gang involvement, and his

5    remorse for his actions, he has expressed remorse,

6    and the psych takes that into consideration, his

7    violence potential within a controlled setting is

8    estimated to be below average relative to this

9    level inmate II population, which is low.  If

10   released to the community, his violence potential

11   is estimated to be less than, not average, but

12   less than the average citizen in the community.

13   And he talks about, given his insight, his

14   demonstrated ability to stay out of trouble, his

15   successful development of plans upon release and

16   the support of his family -- and I know -- look

17   again at his plans, he's very detailed.  This is a

18   serious young man.  He's very serious about

19   wanting to get out.  He has clearly worked to get

20   out.  He admits what he did.  You can't get away

21   from it, he was there, he participated.  It was a

22   fight and then there was a gun there.  He did not

23   do the shooting.  He had no reason to believe that

24   this other guy would shoot anybody, it happened.

25   The point is, we're here now when he's 31 years

26   old not 19.  He's been in Coastline Community

27   College, he's preparing himself to get out.  He's

195

55

1   paid for his crime.  For his part in that crime,

2   he has paid for it.  And he's stated, if you find

3   me suitable, give me the highest because I know I

4   shouldn't have been there and I shouldn't have

5   participated in this.  Board report low, psych

6   report below average here, less than average.  Do

7   you know what that means?  Look at anybody walking

8   downtown Fullerton or Pasadena, they're the

9   average Joes.  And he, the psych, the

10  professional, is saying my client is no more -- is

11  less dangerous than they are, less dangerous.  So

12  how now does he become an unreasonable risk of

13  danger to society.  I think not.  You know, I'm

14  surprised really, I know it's difficult to get a

15  date on your first initial hearing, but I'm

16  surprised that this man didn't get a date on his

17  initial hearing.  I think he should be found

18  suitable today and I'll submit it.

19       **PRESIDING COMMISSIONER WELCH:**  Okay, Mr.

20  Ngo, you can make a closing statement or you can

21  let your attorney's statement be  your closing

22  statement.

23       **INMATE NGO:**  I'd like to make a statement.

24  During my last initial hearing, previous hearing,

25  one of the Commissioners told me that I needed

26  time to understand the nature and circumstances of

27  my crime and my disregard for human life.  In my

196.

56

1  defense, I would say that it's part of telling the
2  truth because for the last 12 years I've had
3  nothing but time to think about my crime.  It's
4  with me every day, it's a reminder every day.    I
5  know nothing I can say or do can bring back Mr.
6  Angel Gonzalez.  I know I caused a lot of harm to
7  his family, anyone involved, but there's nothing I
8  can say or do at this point to ever change the
9  fact.  You know, I know what I did, or lack of on
10  my part is, I could have maybe have stopped this
11  from happening if I was smart enough to act upon
12  it because I was young and naïve.  I know that's
13  not an excuse, but looking back now I see what I
14  could have done if I'd have known better.  I took
15  full complete responsibility for my action. I
16  can't take responsibility for others, only for
17  myself.  I know I'm partly responsible that's why
18  I know I deserve to do some time, but I have done
19  my time. I have done everything you have asked me
20  to do, I've gone beyond my scope of
21  (indiscernible) to better myself.  All I ask is
22  that you give me a fair chance, a second chance.
23  I know I have to prove to you that I can be a law-
24  abiding citizen, but if you should not find me
25  suitable at this time, I'd ask you, urge you, to
26  please specify what exactly I need to do in order
27  to be found suitable at my future hearings.

197

57

1    That's all I ask of you.   Thank you.

2         PRESIDING COMMISSIONER WELCH:   Okay, thank

3    you very much for our comments.   We'll take a

4    recess.

5                    R E C E S S

6                    --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

198

58

1        CALIFORNIA BOARD OF PRISON TERMS

2              D E C I S I O N

3        DEPUTY COMMISSIONER MEJIA:    Okay, we're back

4    on record for our decision.

5        PRESIDING COMMISSIONER WELCH:    Okay, Mr.

6    Ngo, we have a decision.   The Panel reviewed all

7    the information received from the public and

8    relied on the following circumstances in

9    concluding -- could you close the door, please, --

10   in concluding that the prisoner is not suitable

11   for parole and would pose an unreasonable risk of

12   danger to society or a threat to public safety.

13   One, this crime was carried out in an especially

14   cruel and callous manner.   Gang related violence

15   in a community is always cruel and callous

16   violence.   Actually there was multiple victims

17   attacked, one was killed, one ran away and was

18   able to escape.   The offense was carried out in a

19   dispassionate, it was a calculated manner.   The

20   victim was abused, he was beaten and then he was

21   shot.   The offense was carried out in a manner

22   that demonstrates an exceptionally callous

23   disregard for another human being.   The motive for

24   the crime was inexplicable or very trivial in

25   relationship to the offense.   Any gang-related

26   activity in our community is (inaudible) and

27   **SIEU NGO   J-07024   DECISION PAGE 1   8/3/04**

199

59

1    inexplicable type of behavior, it's the type of

2    behavior that certainly cannot be condoned in any

3    well-ordered society.  The conclusion was drawn

4    from the Statement of Facts wherein on 9-18-92

5    Angel Gonzalez who was beaten and shot to death

6    near Fullerton High School as he was walking away

7    -- as he was walking home.  The circumstances

8    surround this crime, apparently the prisoner and

9    some of his gang members had been at a McDonald's.

10    There was a stare down contest and apparently some

11    words was exchanged.  The prisoner and his crime

12    partners waited for the victim as he was walking

13    home and a fight ensued and he was shot and killed

14    with a .22 caliber handgun.  Mr. Angel Gonzalez,

15    aged 15, lost his life over a very, very trivial

16    matter, over a matter that really cheapens human

17    life, the gang related -- the gang mentality that

18    occurs in our cities.  The prisoner really did not

19    have an escalating pattern of criminal conduct.

20    He did have one contact with law enforcement

21    agency.  He has -- well, two contacts with law

22    enforcement agencies, one was for a controlled

23    substance and one was for stolen property

24    including the instant offense, so he did not have

25    a major record of criminal history or an

26    escalating pattern of violent type of behavior.

27    **SIEU NGO   J-07024   DECISION PAGE 2   8/3/04**

200

60

1    Under unstable social history, other than the

2    prisoner's gang activity or involvement in gang

3    activity to whatever extent it was.  The Board

4    have no reason to disbelieve the public defender

5    who detailed from his perspective what had

6    occurred, so it does not appear that the prisoner

7    was heavily into gang activity, criminal type of

8    behavior.  Also under unstable -- it appears that

9    the prisoner did have a stable home environment,

10   the letters from the family are very impressive in

11   terms of the type of support he have in the

12   community.  The prisoner has programmed in an

13   acceptable manner.  Recent psychological report

14   shows that the prisoner is making progress, shows

15   that his level of dangerousness both in a

16   structured environment and non-structured

17   environment is reduced.  He's on the right track

18   and he is making progress.  Certainly from a

19   psychological perspective we feel that the

20   prisoner is making progress.  Dr. Zika is the one

21   that prepared this report.  However, we are going

22   to request a new psychological evaluation for the

23   prisoner's next hearing.  Under parole plans,

24   certainly the prisoner have parole plans, lots of

25   support in the community, job offers, residential

26   plan.  The Hearing Panel notes that in response to

27   **SIEU NGO  J-07024  DECISION PAGE 3  8/3/04**

*201*

61

1    Penal Code 3042 Notices, the Deputy District

2    Attorney from Orange County spoke in opposition.

3    The Panel makes the following findings:  The Panel

4    finds that the prisoner needs to continue to

5    participate in the kinds of programs that he's

6    participating in, to continue to make progress,

7    continue to participate to the extent that he will

8    be able to face, understand, and cope with

9    stressful situations in a nondestructive manner.

10   Until the Board feels that enough progress is

11   made, the prisoner continues to be unpredictable

12   thereby presents some amount of threat.  However,

13   there are some things that we certainly want to

14   commend him for.  The prisoner's disciplinary

15   behavior certainly is not -- is something that we

16   certainly want to give him some accolades for and

17   encourage him to continue in his self-help

18   programs that he's involved in, his educational

19   programs that he's involved in, all of those kinds

20   of things we think is very significant and we want

21   to continue to -- him to continue in that way.

22   However, those positive aspects at this time does

23   not outweigh the factors of unsuitability.  Now

24   your parole is going to be denied for one-year

25   this time and we encourage you to continue to

26   remain disciplinary free, continue to explore your

27   **SIEU NGO   J-07024   DECISION PAGE 4   8/3/04**

202

62

1   culpability in the crime, continue to participate

2   in self-help programs and other type of positive

3   kinds of programs, educational programs, as they

4   maybe available to you.  There again we want the

5   clinicians to look at your violence potential in

6   the free community when they complete the

7   psychological evaluation, whether there's a

8   significant problem with alcohol and drugs as it

9   relates to the commitment offense into which you

10  have -- and I think this is one area that we

11  certainly want them to take a look at, the extent

12  to which you have explored your commitment offense

13  and come to terms with the underlying causative

14  factors.  That concludes the reading of the

15  decision.  And personally I think you're making

16  progress, and you asked specifically what it is

17  that you need to do.  You need to continue to do

18  the things that you're doing, you need to continue

19  to participate in self-help programs, continue to

20  participate in educational programs, continue to

21  explore the crime that you were committed for and

22  develop greater insight into it.  And I think

23  you're on the right track.  I think you'll get a

24  parole date in the not too distant future.

25  Commissioner, comments?

26          DEPUTY COMMISSIONER MEJIA:  Good luck to

27  SIEU NGO  J-07024  DECISION PAGE 5  8/3/04

203

63

1    you.

2            INMATE NGO:   Thank you.

3            DEPUTY COMMISSIONER MEJIA:   Keep up the good

4    work.

5            PRESIDING COMMISSIONER WELCH:   Good luck to

6    you, Mr. Ngo.   That concludes the hearing at

7    approximately 1500 hours.

8                        --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED ONE YEAR

24    THIS DECISION WILL BE FINAL ON:_____DEC - 1 2004_____.

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    SIEU NGO   J-07024   DECISION PAGE 6   8/3/04

204

64

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, WENDY THOMAS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 63, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY at SOLEDAD, CALIFORNIA in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of SIEU NGO, CDC No. J-07024, on AUGUST 3, 2004 and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated August 19, 2004 at Sacramento County, California.

Wendy Thomas
Wendy Thomas
Transcriber
**CAPITOL ELECTRONIC REPORTING**

205

# EXHIBIT D

206

June 23, 2005

Board of Prison Terms
CTF Soledad
P.O. Box 686
Soledad, CA 93960

Re: Sieu Phong Ngo, CDC # J07024
    Parole Hearing

Dear Sirs:

I represented Mr. Ngo in the case which sent him to prison. I have been a criminal defense attorney for almost thirty years and have represented over 40 persons accused of homicide. I do not see my clients through rose colored glasses. However, the circumstances of Sieu's case are unusual enough that I feel compelled to make a statement on his behalf.

At the time I represented him, Sieu was a very likeable young man with a minor criminal record. To my recollection he had no convictions for any crimes of violence. The incident in question was very different from the typical "gang case" and the facts are worth sketching for your review.

Sieu and his friends were a "wanna be" type gang who did not really have a significant history or established turf in Orange County. On the day of the incident some of Sieu's friends, by chance, went to the McDonald's which was near Fullerton High School in northern Orange County. Sieu was not present at the time.
One of Sieu's friends got in a staring match with the decedent and some of his friends, who were members of "Tokertown," a long established Hispanic gang in Fullerton.

207

Essentially, the "Tokertown" group told Sieu's friends that they were not welcome in Fullerton (where some of them already lived) and they should get out of town.

Angered by this, Sieu's friends decided to confront the decedent's group after school got out that day. Sieu was called to help out in case they should be outnumbered. Their group waited after school and confronted the decedent and one of his friends about two blocks south of Fullerton High School (**not on school grounds**).

From all appearances this was intended to be a fist fight. Sieu, and the friend who'd been in the stare-down, approached the decedent and another young man who were walking on a sidewalk. A fist fight is how it started. However, the decedent's friend fled just after the punching began and that left Sieu and his friend fighting the decedent who was significantly larger than either of them. Of course, this was unfair, but nothing at this point suggested that this was intended to be a homicide.

While the fist fight was ongoing a third member of the group Sieu was part of ran forward to the scene. While the fight was in still in progress he reached around Sieu and shot the decedent, killing him and narrowly missing Sieu. Sieu and his group then fled, ultimately being arrested out of state.

Evidence was received to show that Sieu and his friends knew that a gun was in the car. However there was no evidence to show that there was a plan to use it. Based upon the theory of foreseeable consequences, Sieu and several co-defendant's were convicted or pled guilty to murder. **Sieu was not the shooter and no evidence existed to show that he suggested, encouraged or aided or abetted the shooting in any way.**

After the shooting Sieu angrily confronted the shooter, demanding to know "why" he brought out the gun and asserting that he (Sieu) didn't know the gun was going to be used.

208

In summary, this was not a "drive by" or similar gang crime where everyone knew or legitimately should have known that death or serious bodily injury was intended.

On the contrary, this appeared to be an impulsive act by one member of the group which, due to the rest of the circumstances, swept them all up by way of derivative liability.

I am not suggesting that Sieu and the other non-shooters bear no responsibility for the tragic outcome. But for the fight, of course, no shooting would have taken place. However, I would submit that the circumstances here are significantly mitigated when considered against other convictions of this type.

Assuming that Sieu's performance within the department of corrections has been positive, I would urge his parole at the earliest possible time.

Sincerely,

Donald G. Rubright
Senior Deputy Public Defender
Orange County, Ca
(949) 249-5060

209

# EXHIBIT E

MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
APRIL 2002 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JANUARY 23, 2002

This is the second mental health evaluation for the Board of
Prison Terms on inmate Sieu Phong Ngo, CDC# J-07024. This
report is the product of a personal clinical interview of
the inmate, conducted on 01/23/02, as well as a review of
his Central file and medical record. This clinical
interview and a review of all pertinent documents were for
the express purpose of preparing this report. Prior to
today's interview, I had no previous contact with this
inmate.

## PSYCHOSOCIAL ASSESSMENT

I.    IDENTIFYING INFORMATION:

Inmate Ngo is a 28-year-old, single, Vietnamese male
who was born on 05/18/73. He was born in Vietnam and
moved to the United States in 1979 with his family,
where they settled in Los Angeles. He has multiple
tattoos on his arms, as well as scars from a suicide
attempt when he was 16. He denies the use of any
nicknames or aliases.

II.   DEVELOPMENTAL HISTORY:

Inmate Ngo was born in Vietnam. His family moved to
the United States in 1979. They settled in Los
Angeles, where they remain to this day. The inmate has
one older brother, two older sisters, one younger
brother, and one younger sister. They were raised by
both parents.

His father died in 1996 while the inmate was
incarcerated, but the inmate reports that he is still
in contact with his siblings and his mother.

He denies any history of birth defects or abnormalities
of developmental milestones, a history of cruelty to

211

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE TWO

animals, a history of arson, any significant childhood medical history, or a childhood history of physical or sexual abuse as either a perpetrator or a victim.

## III.  EDUCATIONAL HISTORY:

Inmate Ngo graduated from high school and attended one year of college, studying general education, prior to his incarceration.  In high school, he relates that he was in English as a Second Language classes for some time.  Chinese is his primary language, although he speaks very fluent English at this time.  He reported that he had some reading problems, probably related to English being his second language at the time.

Since his incarceration, he has been studying vocational, self-paced, business courses.  He intends to finish college.

## IV.  FAMILY HISTORY:

Inmate Ngo speaks of his family in largely positive terms.  He states that he is the only one in his family who has a criminal record.  There is no family history of mental illness or criminality, other than his.  He also denies a family history of alcohol or drug abuse.

## V.  PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Ngo states that he is a heterosexual male.  He denies any history of high-risk sexual behavior or sexual aggression.

## VI.  MARITAL HISTORY:

Inmate Ngo has never been married and has no children. He does have a female friend whom he corresponds with, but who does not visit.  He did have a girlfriend prior to his incarceration.  He reports normal sexual relations.

## VII.  MILITARY HISTORY:

The inmate denies any history of military service.

212

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE THREE


VIII. EMPLOYMENT/INCOME HISTORY:

Inmate Ngo was quite young at the time of his
commitment offense.  However, he had worked at odd jobs
in the fast food industry.

Since his incarceration, he has been a clerk.  The
works chronos in his Central file show that he has been
a satisfactory worker in job attendance, quality and
quantity.  He has learned a couple of job skills, both
in cooking and in upholstery, which he intends to
continue if granted parole.

IX.  SUBSTANCE ABUSE HISTORY:

Inmate Ngo readily acknowledges having tried cocaine
once.  He reports that the first time he tried it, he
was caught and ordered to attend a diversion class for
drug addiction.  Previous mental health evaluations for
the Board of Prison Terms have recommended that he be
involved in Alcoholics Anonymous and Narcotics
Anonymous.  However, the inmate feels that he never
really had a drug or alcohol problem, although he does
currently attend Alcoholics Anonymous.

X.  PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Ngo reports one incident of psychiatric
illness, in which he states that when he was 16 years
old, he tried to kill himself by cutting his arms.  He
reports that his family life and personal problems felt
overwhelming at the time.  He states that he has not
suffered from depression or had any suicidal thoughts
since that time.  He has had no contact with the mental
health system since that time, either outside or inside
of prison.

He denies any significant medical history, other than
mentioned above.  He denies a history of serious
accidents or head injuries, a history of suicidal
behavior, or a history of seizures or other
neurological conditions.  He is taking no medications.

213

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE FOUR


XI.  PLANS IF GRANTED RELEASE:

Inmate Ngo states that if he is paroled, he would be
fully supported by his family, and would use the money
he has earned as a clerk to start his own business,
either in the upholstery or restaurant business.  He
does acknowledge that he is determined not to have any
gang affiliation.  He shows a good deal of insight into
the negative aspects of gang involvement, which he
regrets to this day.

### CLINICAL ASSESSMENT

XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Ngo appears to be his stated age of 28.  He
was appropriately dressed and groomed.  He was calm,
cooperative, coherent and alert during the entire
interview.  He was open in his conversation and
emphasized throughout the interview his recognition
that gang affiliation had only resulted in injury to
himself and to those around him.  His mood was sober,
but his range of affect was good.  His speech, flow of
thought and affect all appeared to be within the normal
range.  His intellectual functioning was estimated to
be within the average range.  There was no evidence of
a mood or thought disorder.  His judgment appeared to
be sound.  He showed significant insight into his
commitment offense, as well as some recognition that
there is no guarantee he will be paroled at this time
by the Board of Prison Terms.

CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):

AXIS I:    No Contributory Clinical Disorder.
AXIS II:   Deferred.
AXIS III:  No Contributory Physical Disorder.
AXIS IV:   Long-term incarceration.
AXIS V:    Global Assessment of Functioning (GAF) = 90.

There is no evidence that inmate Ngo currently suffers
from any psychiatric illness, although he does
recognize that in his early youth he was vulnerable to

214

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE FIVE

depression and was tempted by consciousness-altering
substances.  In consideration of the fact that he has
received no CDC-115 violations during his entire
incarceration, it would appear that he has, at least in
this controlled setting, been able to manage his
behavior and remain incident-free.

## XIII. REVIEW OF LIFE CRIME:

According to inmate Ngo, his offense for which he was
convicted and sentenced to 16 years to life was P.C.
187-A, Second Degree Murder, with enhancement P.C.
12022, vicariously armed with a gun.

The inmate stated that he agreed with the version of
the crime given in his Central file, the verdict and
the sentencing.  However, he did state that no one
intended to kill the victim, and that their intent was
only to beat him up.  He had past prior offenses, which
included a two-year drug diversion, as referred to
earlier in this report.  He has had one previous BPT
evaluation.

## XIV. ASSESSMENT OF DANGEROUSNESS:

A.  Inmate Ngo's report agrees in all details with the
information given in the Central file and medical
record with respect to his prior history as a
person who attempted to use cocaine and was
affiliated with gangs, which resulted in his
current offense.  Based upon his complete lack of
disciplinary actions while incarcerated, his
insight into the negative aspects of gang
involvement, and his remorse for his actions, his
violence potential within a controlled setting is
estimated to be below average relative to this
Level II inmate population.

B.  If released to the community, his violence
potential is estimated to be less than the
average citizen in the community, given his
insight, his demonstrated ability to stay out of
trouble, his successful development of plans upon
release, and the support of his family.

215

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE SIX

C.  Clearly, the most significant risk factor for this
    inmate as a precursor to violence or a return to
    criminal behavior would be his reinvolvement with
    others having a criminal history and/or gang
    members, the abuse of alcohol and/or drugs, and
    isolation from his family members.

XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.  This inmate is competent and responsible for his
    behavior.  He has the capacity to abide by
    institutional standards and has done so during his
    entire incarceration period.

B.  This inmate does not have a mental health disorder
    which would necessitate treatment either during
    his incarceration period or following parole.

C.  As this man has spent ten years in prison, I would
    recommend, should he be paroled:

    1)  Abstinence from all alcohol and/or use of any
        controlled substance.

    2)  Frequent monitoring for substance abuse.

    3)  If at all possible, he should be relocated so
        he is near his family.

    4)  He should make frequent reports to his parole
        officer concerning his vocational progress and
        goals.  The structure of the institution has,
        inevitably, to some extent, served to diminish
        his own self-reliance, and the process of
        reporting in and setting validating goals might
        be helpful in assisting him in establishing,
        perhaps for the first time in his life, a real
        sense of self-reliance and a positive prosocial
        sentence.

    5)  Due to his family's commitment to supporting
        him upon his release, his projected level of

216

NGO, SIEU PHONG
CDC NUMBER:  J-07024
BPT MENTAL HEALTH EVALUATION
PAGE SEVEN


success in the community, if granted a date for
parole, is seen at this time to be better than
average.



C. SAINDON, Ph.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD



BILL ZIKA, Ph.D.
Senior Supervising Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

CS/gmj

D:  01/23/02
T:  01/31/02

217

# EXHIBIT F

218

DeGuzman
CFBW319u

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
AUGUST 2005 CALENDAR

NGO, SIEU                                                          J-07024

INMATE COPY

I.    **COMMITMENT FACTORS:**

    A.    **Life Crime:** PC 187, Murder 2nd with PC 12022(A)(1), Use of Weapon in commission of a felony. Orange County Superior Court Case #C99109. Term: 15 years to Life plus 1 year enhancement. MEPD: 5/24/03. Victim: Angel Ganzales, 15 years old. Inmate Ngo was received in the California Department of Corrections on 2/1/94.

        1.    **Summary of Crime:** All relevant documents from the previous hearing including the transcripts have been considered and that information appears valid. The writer has no further information to add.

        2.    **Prisoner's Version:** Remains the same as stated in the previous hearing.

        3.    **Aggravating/Mitigating Circumstances:**

            a.    **Aggravating Factors:** Remains the same as stated in the previous hearing.

            b.    **Mitigating Factors:** Remains the same as stated in the previous hearing.

    B.    **Multiple Crime(s):** N/A.

        1.    **Summary of Crime:** N/A.

        2.    **Prisoner's Version:** N/A.

II.   **PRECONVICTION FACTORS:**

    A.    **Juvenile Record:** Documents from the previous hearing have been considered and that information remains valid.

    B.    **Adult Convictions and Arrests:** Documents from the previous hearing have been considered and that information remains valid.

COPY TO INMATE ON: Jun 22 2005

219

LIFE PRISONER EVALUAT   I REPORT                    (                    2
PAROLE CONSIDERATION  ,EARING
AUGUST 2005 CALENDAR

C.    **Personal Factors:**  Documents from the previous hearing have been considered
and that information remains valid.

III.    **POSTCONVICTION FACTORS:**

A.    **Special Programming/Accommodations:** None.

B.    **Custody History:** Documents from the previous hearing(s) have been considered
and that information remains valid.  Since his last Board of Prison Terms (BPT)
hearing on 8/5/04, in which his parole was denied for one (1), inmate Ngo has
remained at the Correctional Training Facility (CTF), in the General Population
(GP).  He has retained his custody at Medium A with a Preliminary/behavior
classification score of 0 and a Mandatory Minimum Placement score of 19 (the
change is due to the revised classification scoring system effective 10/15/02).

C.    **Therapy and Self-Help Activities:**  Refer to the Postconviction Progress Report
for details.

D.    **Disciplinary History:**  Refer to the Disciplinary Sheet for details.

E.    **Other:**

IV.    **FUTURE PLANS:**

A.    **Residence:** Inmate Ngo plans to live with his mother, Huynh Phong Ngo at 709
Triana Street, Monterey Park, California, 91754 with telephone number 626-282-
3156.  In addition, most, if not all of his relatives has offered housing,
employment, financial, moral and social assistance to inmate Ngo, if and when he
is released to parole.

B.    **Employment:** Inmate Ngo is in receipt of two (2) Certificates of Completion,
Vocational Automotive Refinishing (9/12/97) and Upholstery (2/27/97), both
employable trades.  Inmate Ngo has been a Culinary Storekeeper Office Aide over
two (2) years, another employable trade.  His relatives are offering immediate
employment opportunities in their liquor and restaurant business, if and when he
is released to parole.

C.    **Assessment:** Inmate Ngo does not have any prior record of criminal conduct
(considering the recency and frequency of prior crimes) and the circumstances of
the instant offense,  he does not appear to be criminally minded and has a good
insight into himself.  He has been able to maintain himself relatively disciplinary
free (of serious rules violation report) since 2/12/00.  In 9/12/97 and 2/27/97, he

2 20

LIFE PRISONER EVALUAT   I REPORT                                    3
PAROLE CONSIDERATION   EARING
AUGUST 2005 CALENDAR

        acquired two (2) Certificates of Completion, Vocational Automotive Refinishing
and Upholstery, respectively.  In addition, he is in the process of acquiring college
credits via correspondence from Coastline Community College with the hope that
said credits will be transferable to a university and eventually obtain a degree in
Biology.  Finally, he has achievable and realistic parole plans.

V.     **USINS STATUS:**  Inmate Ngo was born on 5/18/73 in Vietnam, immigrated to the
United States of America (USA) and later became a naturalized citizen of the USA.

VI.    **SUMMARY:**

    A.    Prior to release the prisoner could benefit from:

        (1)  Participate in self-help programs;
        (2)  Remain disciplinary free;
        (3)  Earn positive chronos;

    B.    This report is based upon 3 hours of Central File research, an interview with
        inmate Ngo and incidental contact with the prisoner during this period of review.

    C.    Inmate Ngo reviewed his Central File pursuant to in re: Olson on 5/31/05.

    D.    No accommodation was required per the Armstrong vs. Davis BPT Parole
        Proceedings Remedial Plan (ARP) for effective communication.

221

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

**E PRISONER: POSTCONVICTION PROGRESS REPORT**

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 4/24/04 to 6/8/05 (Present) | | | **PLACEMENT:** Remains housed at CTF, in the GP. **CUSTODY:** Remains at Medium A. **ACADEMIC:** Graduated from Fullerton High School, Orange County in 1992. Additionally, inmate Ngo has been and is currently enrolled in an Independent Study Program through Coastline Community College (semester ending May, 2005). **WORK:** Remains assigned as a Culinary Storekeeper Office Aide receiving satisfactory grades per the Work Supervisor's Report (CDC101). **VOCATION:** Inmate Ngo is in receipt of two (2) Certificates of Completion, Vocational Automotive Refinishing (9/12/97) and Upholstery (2/27/97). Additionally, he is in the Vocational Data Processing waiting list. **GROUP ACTIVITIES:** None noted this period. **PSYCH TREATMENT:** None noted this period. **PRISON BEHAVIOR:** Disciplinary free of serious rules violation reports since 2/12/00. **OTHER:** Inmate Ngo continues to better himself year after year. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | DATE |
|---|---|
| F. I. DeGUZMAN | 6/8/05 |

NGO, SIEU PHONG    J07024        CTF        AUG/2005

BPT 1004 (REV 2/86)

222

# DISCIPLINARY SHEET

### CDC 128A'S:

| | | |
|---|---|---|
| 02/11/00 | CTF | Window covering |
| 04/01/97 | LAC | Failed to respond to ducat |

### CDC 115's:

None

# EXHIBIT G

224

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
MAY 2004 CALENDAR

NGO, SIEU PHONG                                                    J-07024

I.    **COMMITMENT FACTORS:**

    A.    **Life Crime:** Murder second, PC 187, with use of a firearm PC 12022(A) (1). San Francisco County case #c99109, sentence: 15 years to life plus one year enhancement.MEPD: 5-24-03. Victim: Angel Gonzalez, age 15 years old. Received by CDC on 2-1-94.

        1.    **Summary of Crime:** All relevant documents from the previous hearings including the transcripts have been considered and that information appears valid and the writer has no further information to add.

        2.    **Prisoner's Version:** Remains the same as stated in the previous hearing.

        3.    **Aggravating/Mitigating Circumstances:**

            a.    **Aggravating Factors:** Remains as stated in the previous hearing.

            b.    **Mitigating Factors:** Remains the same as stated in the previous hearing.

    B.    **Multiple Crime(s):** None.

        1.    **Summary of Crime:** None.

        2.    **Prisoner's Version:** None.

II.    **PRECONVICTION FACTORS:**

    A.    **Juvenile Record:** Remains the same.

    B.    **Adult Convictions and Arrests:** Remains the same.

    C.    **Personal Factors:** Remains the same.

INMATE COPY

LIFE PRISONER EVALUATI REPORT
SUBSEQUENT PAROLE CO.SIDERATION HEARING
MAY 2004 CALENDAR

2

III. **POSTCONVICTION FACTORS:**

A. **Special Programming /Accommodations:** None.

B. **Custody History:** Documents from the previous hearing have been considered and that information remains valid. During the period of time since the last hearing (5-13-02), Ngo's behavior has been positive, in that he has remained disciplinary free and maintained a stable work program in his assignment as a culinary warehouse worker.

C. **Therapy and Self-Help Activities:** Ngo is involved in an Independent Study Program through Coastline Community College. He participates in the Narcotics Anonymous Program. He completed the 13 week IMPACT workshop.

D. **Disciplinary History:** Ngo received only two CDC 128A's. See Disciplinary Sheet for details.

E. **Other:** An Initial Parole Consideration Hearing was held on 5-13-02. The BPT recommended:
1. Remain disciplinary free.
2. Upgrade education.
3. Continue to participate in self-help and therapy.
The BPT denied parole for an additional two years.

IV. **FUTURE PLANS:**

A. **Residence:** Ngo plans to reside with his mother, Phuong Hungk Ngo, at 709 Triana Street, Monterey Park, California, (714)827-7832.

B. **Employment:** Ngo plans to work at the family liquor store which is owned by his sister, Julie Seeto, in Anaheim. His uncle, Calvin Ung owns a restaurant in Anaheim and has offered Ngo a job as a cook.

C. **Assessment:** Ngo's chances of a successful parole are very good. He has concrete parole plans and letters of support from his family.

V. **USINS STATUS:** No holds.

VI. **SUMMARY:**

NGO, SIEU, PHONG          J-07024     CTF-SOLEDAD          MAY/2004

226

LIFE PRISONER EVALUAT(    ` REPORT                                    (                    3
SUBSEQUENT PAROLE CONSIDERATION HEARING
MAY 2004 CALENDAR

A.    Considering the commitment offense, minimal prior arrest record and good prison
      adjustment, the writer believes Ngo would probably pose a low degree of threat to
      the public at this time, if release from prison. This opinion is based on Ngo being
      immature at the time of the crime and easily influenced by his peers. The crime
      was episodic in nature. Ngo has a limited criminal history and has not shown a
      pattern of violence in custody.

B.    Prior to release, Ngo could benefit from remaining disciplinary free and upgrading
      his education.

C.    This board report is based upon a one hour interview, incidental contact in the
      housing unit and a through review of the Central File lasting on hour.

D.    Ngo declined the opportunity to review the Central File on 1-20-04 (see CDC
      128B Chrono).

E.    No accommodation was required per the Armstrong vs. Davis BPT Parole
      Proceeding Remedial Plan for effective communication.

227

NGO, SIEU PHONG        J-07024        CTF-SOLEDAD        MAY/2004

# DISCIPLINARY SHEET

### CDC 128A's:

| | | |
|---|---|---|
| 2-11-00 | CTF | Window covering. |
| 4-1-97 | LAC | Failed to respond to medical ducat. |

### CDC 115's:

None.

LIFE PRISONER EVALUAT~~I~~ REPORT                                    4
SUBSEQUENT PAROLE C~~ONSIDERATION~~ HEARING
MAY 2004 CALENDAR


_M. Rubio_    4-23-04
M. Rubio                     Date
Correctional Counselor I


_L.R. Baker, CCII (A)_    4-23-04
L.R Baker                    Date
Correctional Counselor II


_J.L Clancy_    4-27-04
J.L Clancy                   Date
Facility Captain


4) _D.S. Levorse_    4-28-04
   D.S. Levorse              Date
   Classification and Parole Representative

STATE OF CALIFORNIA

ARD OF PRISON TERMS

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

- [ ] DOCUMENTATION HEARING
- [X] PAROLE CONSIDERATION HEARING
- [ ] PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
    ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 5/02 TO 4/2003 | | | **PLACEMENT:** CTF. <br> **CUSTODY:** MED A. <br> **VOC. TRAINING:** None. <br> **ACADEMICS:** Enrolled in an Independent Study Program. <br> **WORK RECORD:** Assigned to the culinary warehouse. <br> **GROUP ACTIVITIES:** Completed the IMPACT workshop attended Narcotics Anonymous meetings. <br> **PSYCH. TREATMENT:** None. <br> **PRISON BEHAVIOR:** No disciplinaries. <br> **OTHER:** None. |

CORRECTIONAL COUNSELOR'S SIGNATURE

_M. Rubio_ CCI

Ngo, Sieu    J-07024    CTF-SOLEDAD

DATE 4-23-04

May/2004

230

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 5/2003 To Present | | | **PLACEMENT:** CTF.<br>**CUSTODY:** MED A.<br>**VOC. TRAINING:** None.<br>**ACADEMICS:** Enrolled in an Independent Study Program.<br>**WORK RECORD:** Assigned to the culinary warehouse.<br>**GROUP ACTIVITIES:** Participated in Narcotics Anonymous meetings.<br>**PSYCH. TREATMENT:** None.<br>**PRISON BEHAVIOR:** No disciplinaries.<br>**OTHER:** None. |

ORDER:
- ☐ BPT date advanced by _____ months.
- ☐ PBR date advanced by _____ months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- ☐ Previously imposed conditions affirmed.
- ☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

Ngo, Sieu                  J-07024                  CTF-SOLEDAD                  May/2004

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

231

# EXHIBIT H

( JE PRISONER EVALUATION RE  JRT
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2002 CALENDAR

NGO, SIEU PHONG                                                    J07024

## I.  COMMITMENT FACTORS:

A.  **Life Crime**: Murder Second, PC 187, with Use of a Firearm, PC 12022(A)(1). San Francisco County Case #C99109. Sentence: 15 years to Life plus one year enhancement. MEPD: 5/24/03. Victim: Angel Gonzalez, age 15 years old. Received by CDC on 2/1/94.

1.  **Summary of Crime**: On 9/18/92, Angel Gonzalez was beaten and shot to death near Fullerton High School as he was walking home after school. An investigation revealed that earlier in the day the victim, a member of the "Fullerton Tokers Town" a Latin gang and member of "Fullerton Boyz" an Asian gang, were at a McDonald's restaurant, near the high school. The victim and No Muhamed had a confrontation with each claiming their respective gang affiliations. After this non-physical altercation, the group of Asians which at the time included Sieu Phong Ngo, obtained a firearm. Ngo and the Asian gang members returned to the school where they waited for Gonzalez. As he walked home he was attacked and beaten. During the physical altercation the victim was shot one time in the back by Usumang Muhamed. The group of five Asian gang members including Ngo fled the area after the shooting. Angel Gonzalez died at the scene as a result of the gunshot wound. Ngo, Jimmy Dao and Asat Cham fled to the state of Washington. They were subsequently apprehended there, and the murder weapon, a stolen .22 caliber handgun was recovered in the vehicle. Information obtained from POR pages 3 & 4.

2.  **Prisoner's Version**: Ngo explained that earlier in the day his group had a confrontation with the victim. Subsequently, he and his group went to an arcade to play games. At that time his companions took possession of a weapon. Ngo stated that he did not see the gun until he was in the vehicle, it was located under the passenger's seat. He and his companions returned to Fullerton High School where they parked and went to look for Gonzalez. Ngo explained that they had gun for protection in case someone else happened to have a weapon. They found Gonzalez, and he and his group started fighting with the victim. During the fight Ngo heard two shots. Ngo explained that no one intended to kill the victim. They just planned to beat him up because Gonzalez had told them to "get out of town," and this made Muhamed angry. Ngo realizes that his behavior was a mistake. Ngo drove his two companions to Washington because

233

LIFE PRISONER EVALUAT   N REPORT                                    (                    2
INITIAL PAROLE CONSIDE...ATION HEARING
APRIL 2002 CALENDAR

Muhamed told him that he knew someone who would give them shelter.
Ngo feels sorry for the victim's family.

B.    **Aggravating/Mitigating Circumstances:**

1.    **Aggravating Factors:**

a.    The victim was particularly vulnerable in that he was
outnumbered.

b.    The crime was racially motivated.

c.    The inmate had an opportunity to cease but continued with the
crime.

d.    The crime involved use of a firearm.

2.    **Mitigating Factors:**  The inmate has a minimal history of criminal
behavior.

## II.    PRECONVICTION FACTORS:

A.    **Juvenile Record:**  None.

B.    **Adult Convictions:**  On 3/30/92, Ngo was arrested by the San Gabriel Police
Department for Possession of a Controlled Substance (three pieces of rock
cocaine). On 5/7/92 he was diverted pursuant to Section 1000 of the Penal Code.
On 9/22/92, Ngo was arrested by the Olympia Sheriff's Office for Possession of
Stolen Property. This case was Subsequently dismissed. Information obtained
from CI&I.

C.    **Personal Factors:**  Ngo was born in Vietnam on 5/18/73. He has resided in the
United States since 1979. In 1991 he graduated from Fullerton High School and
subsequently attended Fullerton Community College and Pasadena City College.
He completed ten units and his major was business. Ngo was employed as a
telemarketer and worked odd jobs. He was employed at his family's liquor store
and resided with his parents. Ngo had problems with controlled substances or
alcohol. He was a member of the "Fullerton Boyz," and after his move to Los
Angels he became affiliated with the "Tiger Mafia."

## III.    POSTCONVICTION FACTORS:

234

LIFE PRISONER EVALUATION REPORT                                    3
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2002 CALENDAR

    **A.**   **Special Accommodations/Disability:** None.

    **B.**   **Custody History:** Ngo was received by R.J. Donovan Correctional Facility for Initial Processing on 2/1/84. He was transferred to Centinela State Prison on 3/17/94 and placed on Close A Custody. On 5/16/95 he was transferred to California State Prison at Lancaster and placed on Medium A Custody. On 12/16/98 he was transferred to the Correctional Training Facility and continued Medium A Custody. Ngo has been assigned to the Yard Crew and various positions as a clerk. He has completed courses in Tuberculosis, AIDS and Hepatitis. Ngo successfully completed Vocational Auto Upholstery, Automotive Refinishing and Vocational Auto Paint.

    **C.**   **Work, Education, Vocation, Therapy & Self-Help Activities:** Ngo has completed self-help courses in Salesmanship and Parenting and has been a participating member of Alcoholics Anonymous and Narcotics Anonymous.

    **D.**   **Disciplinary History:** Ngo has received only two CDC 128A's during his incarceration. See Disciplinary Sheet for details.

**IV.**  **FUTURE PLANS:**

    **A.**   **Residence:** Ngo plans to reside with his mother, Phuong Hungk Ngo, at 709 Triana Street, Monterey Park, California, (714) 827-7832.

    **B.**   **Employment:** Ngo plans to work at the family liquor store which is owned by his sister, Julie Seeto, in Anaheim. His uncle, Calvin Ung, owns a restaurant in Anaheim and has offered Ngo a job as a cook.

**V.**  **USINS STATUS:** Ngo is a United States Citizen.

**VI.**  **SUMMARY:**

    **A.**   Considering the commitment offense, minimal prior arrest record and prison adjustment, the writer believes Ngo would probably pose a moderate to low degree of threat to the public at this time, if released from prison. This opinion is based on Ngo being immature at the time of the crime and easily influenced by his peers. The crime was episodic in nature. Ngo has a limited criminal history and has not shown a pattern of violence in custody.

    **B.**   Prior to release Ngo could benefit from remaining disciplinary free and completing an additional vocational program.

225

LIFE PRISONER EVALUA~ ~N REPORT                                    (                    4
INITIAL PAROLE CONSIDL. ATION HEARING
APRIL 2002 CALENDAR

      C.     This report is based upon a one hour interview, incidental contact in the housing
                unit and a thorough review of the Central File.

      D.     Ngo reviewed his Central File on 1/18/02.

LIFE PRISONER EVALUA⌐ ̄ ̄ N REPORT
INITIAL PAROLE CONSIDL. ATION HEARING
APRIL 2002 CALENDAR

5

M. Rubio
Correctional Counselor I

C. Plymesser
Correctional Counselor II

J.L. Clancy
Facility Captain

D.S. Levorse
Classification and Parole Representative

237

# EXHIBIT I

238

COPY TO I/M
VIA
CC-1 ON   1-8-97
(date)

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS
MARCH 1997 CALENDAR
CALIFORNIA STATE PRISON-LOS ANGELES COUNTY

NAME:      NGO, SIEU
CDC#:      J-07024
DATE OF EVALUATION:      December 27, 1996


## IDENTIFICATION/FORENSIC DATA:

This is the psychological report for the "Documentation #1 Hearing" scheduled for March of 1997 for Sieu Ngo; CDC# J-07024. On October 21, 1993, Mr. Ngo was convicted by jury trial of P.C. 187A murder in the second degree, reduced from first degree in exchange for agreeing to a 15-to-life sentence and no appeal, with enhancement P.C. 12022 vicariously armed with a gun. He was sentenced to 16-years-to-life. The crime occurred September 18, 1992. Mr. Ngo and four co-defendants beat and shot in the back a fifteen year old member of an enemy gang. Mr. Ngo stated that he agreed with the records of the crime, the verdict, and the sentencing. However, he did state at the time of the trial that no one intended to kill the victim only to beat him up.

Past prior offenses include a two year drug diversion, for possession of Cocaine and several other arrests which did not result in convictions. There have been no prior psychological Board of Prison Terms reports.

## BACKGROUND INFORMATION:

The evaluation consisted of a single 45-minute interview, for the purposes of this report. This was after review of the Central File and medical records on 12/27/96. There are no records of past psychological/psychiatric treatment.

Mr. Ngo has received no disciplinary actions. Not a single 115 or 128A. Mr. Ngo completed two years of college prior to coming to prison. During incarceration, his vocational training in auto upholstery earned him good comments from his instructors such as, "doing well - shows enthusiasm". He received several certificates of completion. The last one in October of 1996. Mr. Ngo has attended Narcotic's

239

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS
MARCH 1997 CALENDAR
DATE OF EVALUATION:  December 27, 1996
PAGE 2

Anonymous and received a one year perfect attendance
certificate in November of 1996. He has not been employed
in prison. Prior to incarceration, he was employed in sells,
telemarketing, and as a cook while a student in junior
college.

The historical information supplied by the inmate agreed
with the records and there were no distortions.

## PRESENT CONDITION:

His Central File contains no records of past mental illness;
however, the inmate reported a history of depression, with
three suicide attempts during his adolescence. He has
records of hospitalization for the suicide attempts and his
family will be obtaining these records for entry in his
Central File. He has numerous cuts and slices on his arm
from suicide attempts. Mr. Ngo describes his level of
insight at the time of the crime as very limited, naive,
showing poor judgment in his friends and activities. He had
decided to disengage from these friends and moved away one
year prior to the crime, which occurred while he was
visiting. Now, he reports he is able to think before
acting; he has changed his attitude to one of valuing
service to his fellow man such as mentoring and tutoring.
The remorse he expresses is sincere. He shows much shame
and self-incrimination for the crime. In hindsight, he sees
that he perhaps could have stopped the incident and now has
great empathy and remorse for the family of the victim.

## MENTAL STATUS AND DIAGNOSIS:

Mental status indicators are clear in all areas: mood and
affect, behavior, speech, thought content and processes, and
cognition.

AXIS I:   V71.09     NO DIAGNOSIS OR CONDITION.

AXIS II:  V71.09     NO DIAGNOSIS.

AXIS III:            NONE.

*240*

PSYCHOLOGICAL EVALUATION FOR
THE BOARD OF PRISON TERMS
MARCH 1997 CALENDAR
DATE OF EVALUATION:  December 27, 1996
PAGE 3

AXIS IV:  PSYCHOSOCIAL STRESSORS:  INCARCERATION.

AXIS V:   GLOBAL ASSESSMENT OF FUNCTIONING = 75.

CONCLUSIONS AND RECOMMENDATIONS:

Mr. Ngo's history of depression and suicide attempts may
have contributed to his state of mind and poor judgment
during the time of the crime.  There are no records of any
mental health treatment during incarceration and Mr. Ngo is
no longer depressed.  He has increased his chances for
successful re-entry into society by setting educational
goals in academic subjects and a good start in attendance in
Narcotic's Anonymous.  He plans to start Alcoholic's
Anonymous in 1997.  He also has excellent family support who
can provide him a place to live, employment, and are willing
to pay for correspondence courses for him during
incarceration.  This inmate is of above average intelligence
and has excellent potential in intellectual endeavors.  He
is no longer depressed and is now able to recognize the
symptoms of depression and would seek help as needed.  Also
in his favor is the absence of any indications of violence
other than the crime.

To continue positive programming, Mr. Ngo needs to regularly
attend Narcotic's Anonymous and Alcoholic's Anonymous,
remain disciplinary-free, and pursue higher education
through correspondence courses.  By reducing his points, he
can possibly transfer to other institutions that facilitate
correspondence studies and provide other self-help group
opportunities.  Psychotherapy is not part of his program
unless he has a recurrence of his depression.


C Schroeder PhD                           1/6/97
C. SCHROEDER, Ph.D.                        Date
Staff Psychologist


Orig:    C-File
  cc:    Medical Records      Psych.    Inmate

241

# EXHIBIT J

242

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE

# MINUTE ORDER

**Case Number   M-10984 X A**

**People Vs Ngo, Sieu**

┌─── Report Request Criteria ───
1. Docket Date Range      : Date filter
2. Sequnce Number Range : Sequence filter
3. Docket Category       : Category filter

| Docket Dt | Seq | Text |
|---|---|---|
| 8/31/2006 | 1 | **Hearing held on 08/31/2006 at 09:00 AM in Department C5 for Chambers Work.** |
| | 2 | Officiating Judge: Kazuharu Makino, Judge |
| | 3 | Clerk: L. Torres |
| | 4 | No Court Reporter present at proceedings. |
| | 5 | No appearances. |
| | 6 | Order denying Writ of Habeas Corpus filed. |
| | 7 | Petition for Writ of Habeas Corpus is denied for the reasons stated in the order denying writ filed 08/18/2006. |
| | 8 | As ordered, the clerk this date has mailed a copy of this minute order to the Petitioner at MARILEE MARSHALL & ASSOCIATES 523 WEST SIXTH STREET SUITE 1109 LOS ANGELES, CA. 90014 |
| | 9 | The clerk this date has forwarded a copy of this minute order to Orange County District Attorney's Office. |

*243*

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

AUG 3 1 2006

ALAN SLATER, Clerk of the Court

BY_____DEPUTY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF ORANGE

In re

**SIEU NGO,**

    Petitioner,

    ON HABEAS CORPUS.

CASE NO. **M-10984**

**ORDER**

TO THE PETITIONER AND THE OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, HAVING RECEIVED THE PETITION FOR WRIT OF HABEAS CORPUS, THE COURT FINDS AND ORDERS AS FOLLOWS:

I

In 1993, Petitioner was a gang member who, along with four other members of his gang, attacked a 15-year-old rival gang member. The victim was beaten, kicked and finally shot and killed. Petitioner was not the shooter. In 1994, Petitioner entered a plea to second degree murder and was sentenced to 16 years to life. He became eligible for parole in 2003. He had a subsequent parole hearing in February 2006.

At the February 2006 hearing, the Board of Parole Hearings (hereafter individually and collectively referred to as "the BPH") found Petitioner would pose an unreasonable risk of danger to society or a threat to public safety at this time if he were released. In announcing its decision, the BPH stated the crime was carried out in an especially cruel and callous manner in that the 15-year-old victim was attacked and beaten and ultimately shot in the back and died at the scene. The offense displayed a disregard for public safety in that it occurred near a school. During the hearing, Petitioner stated that he thought he was going to a fist fight; he saw the gun under a car seat, but he did not intend that the victim would be killed and did not realize anyone else had that intent. The BPH concluded that Petitioner's statement minimized the gravity of the

244

crime as well as his invo...ent, and demonstrated a lack of insigh...ased on that, the BPH stated it was "hard . . . to get a gauge on what risk [Petitioner] would pose to public safety when [it cannot] feel comfortable about the level of insight [Petitioner] displayed."

The BPH acknowledged that Petitioner was a model prisoner. He had no record of misconduct in prison and only two minor rule violations, one being for window coverings. Petitioner had participated in multiple self-help programs, had made substantial progress toward a college degree, had outstanding parole plans, and a psychological report supported his release. The psychologist had concluded Petitioner's violence potential was less than the average citizen in the community. Nevertheless, the BPH determined it would not grant parole. Based on Petitioner's statement that he thought he was going to a fist fight, the BPH believed Petitioner was minimizing the gravity of the crime as well as his involvement, and demonstrating a lack of insight. Based on Petitioner's lack of insight, the BPH concluded it was "hard . . . to get a gauge on what risk" Petitioner would pose to public safety. Parole was denied for two years.

II

Petitioner argues there was no evidence to support the BPH decision that he posed an unreasonable risk of danger to society if released from prison. Petitioner acknowledges that the requirements of due process are satisfied if "some evidence" supports the decision. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 626.) He contends, however, that the factors set forth in California Code of Regulations, title 15, section 2402 all indicate his suitability for parole. He points out that the psychological evaluation was extremely supportive of release and the evaluator concluded Petitioner's violence potential was less than the average citizen in the community. Further, the crime occurred when he was 19. He is now 33. He has a flawless prison record, has participated in numerous self-help programs and has upgraded educationally. He also argues, citing Penal Code section 3041, subdivision (b), that a life prisoner must be paroled when his release would not pose a danger to the public.

Petitioner further contends that denial of parole based solely on the unchanging facts of his commitment offense violated the constitutional prohibition against cruel and unusual punishment. Even assuming the BPH characterization of the offense was accurate, he argues, the crime alone cannot support a finding he currently poses a risk to society.

III

The petition is denied on the following grounds:

2

245

The California Supreme Court in *In re Dannenberg* (2005) 34 Cal.4th 1061 held that the BPH "may protect public safety" by "considering the dangerous implications" of the commitment offense. (*Id.* at p. 1071.) This applies to crimes such as Petitioner's. (Pen. Code, § 3041; *In re Dannenberg, supra*, at pp. 1082-1084.) Thus, while the BPH must point to factors "beyond the minimum elements of the crime . . . it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." (*In re Dannenberg, supra*, at p. 1071.) Here, the BPH pointed over and over to the gang-related nature of the offense. Petitioner was not the shooter; nevertheless the death of the young victim resulted from gang rivalry, a factor beyond the minimum elements of second degree murder. (Compare *In re Shaputis* (2005) 135 Cal.App.4th 217 [no evidence of conduct beyond the minimum required for conviction of second degree murder where wife-victim died from a single gunshot wound fired at close range after marital argument and the petitioner immediately called police and turned himself in].) The BPH was therefore not required to consider the factors set forth in California Code of Regulations, title 15, section 2402. (*In re Dannenberg, supra*, at p. 1071.)

Moreover, the BPH "shall set a release date *unless* it determines that the gravity of the current convicted offense . . . is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen. Code, § 3041, subd. (b), emphasis added.) The BPH focused on Petitioner's statement he thought he was going to a fist fight and concluded he was minimizing the gravity of the crime and his involvement and demonstrating a lack of insight. It determined public safety considerations required more incarceration and denied parole on that basis. The denial was therefore authorized by Penal Code section 3041, subdivision (b).) (*In re Dannenberg, supra*, at p. 1071.) The petition is denied on that basis. (*Ibid.*)

IV

The petition for a writ of habeas corpus is DENIED.

DATED: 8-31-06

_____

JUDGE OF THE SUPERIOR COURT

3

246

# EXHIBIT K

247

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

COURT OF APPEAL-4TH DIST DIV 3
FILED

NOV 0 9 2006

Deputy Clerk _____

In re SIEU NGO

on Habeas Corpus.

G037732

(Super. Ct. No. M10984)

O R D E R

THE COURT:*

The petition for a writ of habeas corpus is DENIED.

O'LEARY, J.
_____
O'LEARY, ACTING P. J.

* Before O'Leary, Acting P. J., Aronson, J., and Ikola, J.



## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

I am over eighteen (18) years of age, and not a party to the within cause; my business address is 523 West Sixth Street, Suite 1109, Los Angeles, CA. 90014. That on December 6, 2006, I served a copy of the within:

### EXHIBITS IN SUPPORT OF
### PETITION FOR WRIT OF HABEAS CORPUS

On the interested parties by placing them in an envelope (or envelopes) addressed respectively as follows:

Office of the Attorney General
P.O. Box 85266
San Diego, CA 92186-5266

Court of Appeal
Fourth Appellate District / Division 3
925 N. Spurgeon Street
Santa Ana, CA 92701-3700

Mr. Sieu Phong Ngo
J-07024/ B-wing 319-up
CTF- Soledad
P.O. Box 689
Soledad, CA 93960-0689

Each said envelope was then, on December 6, 2006, sealed and deposited in the United States mail at Los Angeles, California, the county in which I maintain my office, with postage fully prepaid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 6, 2006, at Los Angeles, California.

SHANNON CALLAHAN